No. 23-1537

---

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

---

CSX TRANSPORTATION, INC., individually and on
behalf of Norfolk & Portsmouth Belt Line Railroad Company,

*Plaintiff-Appellant,*

v.

NORFOLK SOUTHERN RAILWAY COMPANY; NORFOLK &
PORTSMOUTH BELT LINE RAILROAD COMPANY,

*Defendants-Appellees.*

---

Appeal from Order of the United States District Court
for the Eastern District of Virginia
No. 2:18-cv-0530 (Davis, J.)

---

**OPENING BRIEF OF PLAINTIFF-APPELLANT
CSX TRANSPORTATION, INC.**

---

Benjamin L. Hatch
Robert W. McFarland
MCGUIRE WOODS, LLP
101 W. Main Street, Ste. 9000
Norfolk, VA 23510
Telephone: (757) 640-3700

Michael A. Scodro
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
Telephone: (312) 701-8886

Charles A. Rothfeld
Evan M. Tager
Carmen N. Longoria-Green
MAYER BROWN LLP
1999 K Street, N.W.
Washington, DC 20006
Telephone: (202) 263-3000
etager@mayerbrown.com

*Attorneys for Plaintiff-Appellant*

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __23-1537__    Caption: __CSX Transportation, Inc. v. Norfolk Southern Railway, et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__CSX Transportation, Inc.__
(name of party/amicus)

_____

who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO

2.  Does party/amicus have any parent corporations?    ☑ YES ☐ NO
    If yes, identify all parent corporations, including all generations of parent corporations:

    CSX Corporation

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☑ YES ☐ NO
    If yes, identify all such owners:

    CSX Corporation

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Charles Rothfeld                          Date:    August 31, 2023

Counsel for: CSX Transportation, Inc.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................... v

INTRODUCTION ..................................................................... 1

JURISDICTIONAL STATEMENT ............................................ 4

STATEMENT OF ISSUES......................................................... 4

STATEMENT OF THE CASE .................................................... 5

    A.   Factual Background ..................................................... 5

    B.   Procedural History ..................................................... 11

SUMMARY OF ARGUMENT .................................................. 18

STANDARD OF REVIEW ........................................................ 21

ARGUMENT ........................................................................... 21

I.    Defendants' Implementation Of The Unlawfully
Exclusionary Switch Rate Was A Continuing Antitrust
Violation That Inflicted Actionable Harm On CSXT
During The Limitations Period............................................ 22

    A.   Antitrust plaintiffs may recover for injuries
caused by a violation that started before but
continued into the limitations period. ........................ 22

    B.   Defendants' application of the exclusionary
switch rate is a continuing antitrust violation........... 28

        1.   Defendants' implementation of the rate
during the limitations period continued the
violation and caused new harm. ........................ 28

        2.   Defendants committed injurious acts in the
limitations period. ............................................ 30

            a.   The "overt act" requirement. .................... 31

            b.   Competitors of monopolists and price-
fixers, like customers, benefit from the
continuing-violation doctrine.................... 37

iii

## TABLE OF CONTENTS
### (continued)

**Page**

    C.    The district court's contrary analysis is mistaken.....48

    D.    Antitrust and statute-of-limitations policies preclude termination of CSXT's right of action..........53

II.    Defendants Committed Overt Acts That Caused A Right Of Action To Accrue When They Took Steps In 2015-2018 To Keep CSXT From Conducting Business At NIT.................................................................58

CONCLUSION ........................................................63

REQUEST FOR ORAL ARGUMENT................................64

iv

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Bell v. Dow Chem. Co.,*
847 F.2d 1179 (5th Cir. 1988) ........................................................... 47

*Berkey Photo, Inc. v. Eastman Kodak Co.,*
603 F.2d 263 (2d Cir. 1979) ................................................. 41, 55, 56

*Charlotte Telecasters, Inc. v. Jefferson-Pilot Corp.,*
546 F.2d 570 (4th Cir. 1976) ...................................................... *passim*

*Columbia Steel Casting Co. v. Portland Gen. Elec. Co.,*
111 F.3d 1427 (9th Cir. 1996) ................................................ 28, 50

*In re Cotton Yarn Antitrust Litig.,*
505 F.3d 274 (4th Cir. 2007) ........................................................ 39

*Delta Theaters, Inc. v. Paramount Pictures, Inc.,*
158 F. Supp. 644 (E.D. La.1958) ........................................ 24, 25, 29

*DXS, Inc. v. Siemens Med. Sys., Inc.,*
100 F.3d 462 (6th Cir. 1996) ........................................................ 53

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.,*
392 U.S. 481 (1968) ................................................................ *passim*

*Hennegan v. Pacifico Creative Serv., Inc.,*
787 F.2d 1299 (9th Cir. 1986) ................................................ 47, 50

*Imperial Point Colonnades Condo., Inc. v. Mangurian,*
549 F.2d 1029 (5th Cir. 1977) ................................................ 26, 56

*Kaw Valley Elec. Co-op. Co. v. Kan. Elec. Power Co-op, Inc.,*
872 F.2d 931 (10th Cir. 1989) ................................................ 52, 53

*Klehr v. A.O. Smith Corp.,*
521 U.S. 179 (1997) ................................................................ *passim*

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Lawlor v. Nat'l Screen Serv. Corp.*,
  349 U.S. 322 (1955).................................................................55

*Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.*,
  43 F.3d 922 (4th Cir. 1995)....................................................21

*In re Lower Lake Erie Iron Ore Antitrust Litig.*,
  998 F.2d 1144 (3d Cir. 1993) .......................................*passim*

*Mayor of Balt. v. Actelion Pharms. Ltd.*,
  995 F.3d 123 (4th Cir. 2021)......................................*passim*

*Minn. Mining & Mfg. Co. v. N.J. Wood Finishing Co.*,
  381 U.S. 311 (1965).................................................................55

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
  473 U.S. 614 (1985).................................................................55

*Morton's Market, Inc. v. Gustafson's Dairy, Inc.*,
  198 F.3d 823 (11th Cir. 1999)...........................................39, 41

*In re Multidistrict Vehicle Air Pollution*,
  591 F.2d 68 (9th Cir.1979)....................................................49

*Nahigian v. Juno-Loudoun, LLC*,
  677 F.3d 579 (4th Cir. 2012)................................................21

*Nat'l Souvenir Ctr., Inc. v. Historic Figures, Inc.*,
  728 F.2d 503 (D.C Cir. 1984).........................................25, 61

*Norfolk S. Ry. v. Surface Transp. Bd.*,
  72 F.4th 297 (D.C. Cir. 2023)...............................................5, 6

*Pennsylvania Dental Ass'n v. Medical Serv. Ass'n*,
  815 F.2d 270 (3d Cir. 1987) .................................................25

*Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*,
  517 F.2d 117 (5th Cir. 1975)......................................*passim*

vi

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*In re Pre-Filled Propane Tank Antitrust Litig.*,
  860 F.3d 1059 (8th Cir. 2017) ........................................ 39, 57

*Samsung Elecs. Co. v. Panasonic Corp.*,
  747 F.3d 1199 (9th Cir. 2014) ................................. 27, 50, 53

*Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*,
  530 F.3d 204 (3d Cir. 2008) .............................................. 37

*W. Penn Allegheny Health Sys., Inc. v. UPMC*,
  627 F.3d 85 (3d Cir. 2010) ........................................ *passim*

*Western Shoe Gallery, Inc. v. Duty Free Shoppers, Ltd.*,
  593 F. Supp. 348 (N.D. Cal. 1984) ...................................... 47

*Xechem, Inc. v. Bristol-Myers Squibb Co.*,
  372 F.3d 899 (7th Cir. 2004) ...................................... 28, 50

*Zenith Radio Corp. v. Hazeltine Res., Inc.*,
  401 U.S. 321 (1971) ................................................ *passim*

## Statutes

15 U.S.C. § 1 ................................................... 4, 12, 39

15 U.S.C. § 2 ................................................... 4, 12, 39

15 U.S.C. § 15b ..................................................... 13

15 U.S.C. § 26 ............................................... 18, 55, 57

28 U.S.C. § 1291 ..................................................... 4

28 U.S.C. § 1331 ..................................................... 4

## INTRODUCTION

In 2018, plaintiff-appellant CSX Transportation, Inc. ("CSXT") brought federal antitrust claims against defendants-appellees Norfolk Southern Railway Company ("NSR") and Norfolk & Portsmouth Belt Line Railroad Company ("NPBL"), alleging that defendants unlawfully excluded CSXT from on-dock rail access at a critical marine terminal. CSXT's evidence demonstrated that defendants accomplished these monopolization and restraint-of-trade violations by (among other things) using illegally anticompetitive methods to set the "switch rate" for accessing the terminal at an excessive level. Defendants first established the exclusionary switch rate in 2009, and they have maintained it at the same excessive level to the present day, harming CSXT by denying it business every day the rate has remained in effect. There is no doubt that these allegations are substantial: The district court pointed to evidence from which a jury could find that defendants violated the law.

But the court nevertheless granted defendants summary judgment, ruling that the four-year federal antitrust statute of limitations began to run in 2009 and therefore precludes a damages action commenced in 2018. The court recognized that the exclusionary switch rate first

implemented in 2009 remained in effect into the limitations period and, indeed, that defendants continue to charge it now. The court also acknowledged that defendants could have changed that rate at any time, thus terminating their anticompetitive conduct. And the court did not question that continuation of the rate into the limitations period costs CSXT business, harming CSXT anew every day. But because the court believed that continued implementation of an unlawful rate was not a "new overt act" that caused "new and accumulating harm beyond the damage flowing from the inertial consequences of time-barred conduct" (Dkt. 559, at 40), the court held that CSXT no longer could seek damages for this anticompetitive practice.

That holding misunderstands the governing statute-of-limitations standard. The controlling rule, as stated by the Supreme Court and applied by courts of appeals in a wide range of circumstances, is that damages claims arising from "conduct which constituted a continuing violation of the Sherman Act and which inflicted continuing and accumulating harm on" the plaintiff are *not* barred by the statute of limitations, even if the conduct began outside (even decades outside) the limitations period. *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 502 n.15

(1968). That is just what this case presents: Defendants' unlawful rate effects a continuing violation of the Sherman Act that inflicts accumulating harm on CSXT by denying it new business *every day*. Certainly, the statute of limitations would start to run afresh if defendants charged a *different* unlawful rate every day. That they instead demand the *same* excessive rate every day should make no difference.

That conclusion not only is compelled by precedent and logic, but is dictated by the goals of the antitrust laws. Under the district court's approach, so long as monopolists and conspirators maintain an anticompetitive practice for four years without challenge, that practice becomes forever immune from damages claims and their ongoing antitrust violations may continue indefinitely. But "[e]mploying the limitations statute … to immunize recent repetition or continuation of [antitrust] violations and damages occasioned thereby not only extends the [limitations] statute beyond its purpose, but also conflicts with the policies of vigorous enforcement of private rights through private actions." *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 107-108 (3d Cir. 2010) (cleaned up). Conversely, allowing suit to proceed in these circumstances offers would-be plaintiffs no incentive to rest on their rights; all agree that

plaintiffs may recover only for harm suffered within the limitations pe-
riod, so those injured always will have every reason to act expeditiously.

Accordingly, this Court should reverse, allowing CSXT to challenge
anticompetitive conduct that remains ongoing.

## JURISDICTIONAL STATEMENT

CSXT brought claims under Sections 1 and 2 of the Sherman Act,
15 U.S.C. §§ 1-2, and Virginia law. The district court had federal-question
jurisdiction under 28 U.S.C. § 1331 for the federal claims and
supplemental jurisdiction over the state-law claims. The district court
entered judgment on April 26, 2023, and CSXT filed a timely notice of
appeal on May 16, 2023. This Court's jurisdiction rests on 28 U.S.C.
§ 1291.

## STATEMENT OF ISSUES

I. Whether the district court erred in holding that CSXT's anti-
   trust damages claims are time-barred even though CSXT suf-
   fered new injury each day during the limitations period as a
   result of defendants' exclusionary switch rate.

II. Whether the district court erred in holding that the statute of
    limitations precluded CSXT from recovering damages

notwithstanding defendants' additional anticompetitive conduct within the limitations period.

## STATEMENT OF THE CASE

### A.   Factual Background

1. CSXT and NSR are the only two class I railroads that operate throughout the eastern United States and Canada. As the district court recognized, the two railroads are intense business rivals, "vigorously compet[ing] for the domestic rail transportation of international 'intermodal' containers delivered to and from various East Coast ports, including the Port of Virginia in Hampton Roads (the 'POV')." Dkt. 559, at 2-3.

NPBL, also known as the Belt Line, is a switching railroad (a "short line") that operates in Hampton Roads. NPBL was founded by eight railroads in 1896 for their "mutual benefit." Compl.¶ 1, Dkt. 1; Dkt. 559, at 2. After industry consolidation, NSR now owns a majority stake in NPBL, while CSXT is NPBL's sole minority owner; NSR names three members to NPBL's five-person board, while CSXT names two. Dkt. 559, at 2; *see* Dkt. 324-2, at 2.[1] NPBL provides switching services for its owners,

---

[1]     The Surface Transportation Board ("STB"), which regulates railroads, has determined that NSR has no lawful authority to control NPBL. *See Norfolk S. Ry. v. Surface Transp. Bd.*, 72 F.4th 297, 303-304 (D.C. Cir.

receiving rail cars from NSR or CSXT and delivering those cars to locations on its or NSR's tracks, or vice versa. Dkt. 1-1. One location where NPBL provides these switching services is Norfolk International Terminals ("NIT") in Hampton Roads, the largest marine terminal in the POV and one of the most important terminals for international intermodal cargo on the East Coast, through which almost all major ocean carriers move international intermodal traffic. Dkt. 308-59 ¶ 53.

Access to NIT is essential to CSXT's business. Dkt. 308-59 ¶ 53. Ocean carriers contract with railroads to transport intermodal freight from marine terminals to inland destinations. Those carriers typically award a large percentage of their business (generally over 80%) in multiyear contracts to a single railroad. Dkt. 308-3 ¶¶ 11-18. CSXT's evidence showed that, to be competitive for such contracts, CSXT must offer service at all major ports in a geographic region, including the POV. *Id.* at ¶ 36. The record also established that, at the POV, there is no adequate substitute for on-dock rail access at NIT—that is, for a railroad's ability to move its trains into the marine terminal so that containers can be

---

2023) (citing STB decisions). The D.C. Circuit rejected NSR's challenge to that administrative determination. *Id.* at 306-308.

loaded onto railcars either on or near the dock. Dkt. 559, at 5-6; Dkt. 324-13, at 79-80.[2]

But NSR and NPBL offer the only access to NIT. NSR has access to on-dock rail at NIT over its own tracks, while NPBL has such access via its trackage rights over NSR-owned tracks. Dkt. 559, at 3. Thus, as the district court recognized, "CSX can only access NIT by rail through NPBL's contractual right to use NSR's tracks to access the terminal. Utilizing NPBL's trackage rights requires CSX to pay the NPBL 'switch rate,' which is the cost per train car 'well' that NPBL charges customers to use its tracks/switching services." Dkt. 559, at 3.[3]

2. In 2009, NSR and NPBL set NIT's switch rate at $210 per "well," making it economically infeasible for CSXT to access NIT once the rate took effect in early 2010. Dkt. 559, at 3; Dkt. 324-3, at NSR_00177917-18; Dkt. 324-19, at NSR_00027070. As the district court recognized:

---

[2]     Although there were two other terminals at the POV when the case was litigated in district court, CSXT's evidence showed that neither could substitute for NIT. In addition, drayage, the trucking of containers through Norfolk neighborhoods between NIT and CSXT's rail yard in Portsmouth, Virginia, is an expensive and inefficient alternative to all-hours on-dock rail access and is strongly disfavored by ocean carriers; it therefore also could not substitute for on-dock rail access at NIT. *See* Dkt. 326-24, at 11-12 of 14; Dkt. 326-25, at NSR_00122610.

[3]     A "well" is a railcar designed to carry vertically stacked containers.

> CSX has presented sufficient evidence on which a factfinder could conclude that the rate was viewed by NSR as a "high" rate that acted as an obstacle to CSX's ability to provide on-dock rail at NIT. CSX has also provided facially damaging evidence indicating that NSR acted to leverage its majority stake in NPBL to prevent CSX from securing a lower rate to access NIT in 2009 and shortly thereafter. CSX therefore has presented evidence supporting its claim that, in or around 2009, NSR and/or NSR in conjunction with NPBL, knowingly acted to preclude CSX from accessing NIT by rail even though NPBL exists for the purpose of providing its owners (including CSX) access to NPBL tracks and trackage rights.

Dkt. 559, at 3 n.2. Evidence thus supports CSXT's contention that the NSR- and NPBL-implemented switch rate has the effect of excluding CSXT from NIT. *Id.*; *see also id.* at 5 ("[v]arious forms of record evidence demonstrate that NSR highly valued its position as the 'sole' provider of on-dock rail access at NIT").

It is undisputed that, once implemented in 2009-2010, the exclusionary NIT switch rate continued in force over the following years and remains in effect today. Dkt. 559, at 3. The continued application of the switch rate has had the practical effect of almost entirely precluding CSXT from offering on-dock rail service at NIT. For example, over this time, NSR has handled between 74% and 80% of the international intermodal business at the POV, and between 84% and 98% at NIT. Dkt. 559, at 93 n.39; Dkt. 324-6, at 11-13 of 16.

As would be expected, this practical exclusion from NIT has placed CSXT at a severe competitive disadvantage to NSR. Ocean carriers have expressed concern that CSXT does not have reliable on-dock access at NIT, negatively affecting CSXT's ability to compete for their contracts. Dkt. 308-3 ¶¶ 78-81. Likewise, "employees [of Virginia International Terminals, the entity that operates the POV terminals] viewed CSX's lack of on-dock rail access at NIT as negatively impacting CSX's ability to compete for international shipping business at NIT." Dkt. 559, at 5. This suppression of competition has allowed NSR to charge supracompetitive prices to ocean carriers that rely on use of NIT, simultaneously injuring rail customers and, record evidence shows, costing CSXT hundreds of millions of dollars in lost profits; CSXT's expert economist calculated the value of lost contracts and resultant business by year for each year within the limitations period. Dkt. 308-3 ¶¶ 85-100; *see also* Dkt. 308-59 ¶¶ 62-67.

3. Beginning in 2015, defendants took additional steps that further effectuated their scheme to exclude CSXT from NIT. "It is undisputed that 2015 was a period of 'extreme port congestion across the East Coast'" (Dkt. 559, at 46); CSXT's evidence showed that, although the switch rate

remained prohibitively high, business imperatives required it "to move a small number of trains [at NIT] out of necessity even though it would lose money doing so." *Id*. CSXT's evidence also showed that, in addition to requiring payment of this prohibitive rate, "NSR, or NSR as assisted by NPBL, took affirmative steps [in 2015] to complicate or delay CSX's operational use of the track to NIT for one or more trains." *Id*. at 45; *see id*. (noting "factual dispute" on this issue). In addition, CSXT's evidence showed that in 2015 and into 2016, NSR sought to curtail, or dramatically increase the fee for, NPBL's trackage rights over NSR's tracks in order to limit CSXT's access to NIT. Dkt. 326-8; Dkt. 326-7; *see* Dkt. 559, at 54-55.

And in 2018, CSXT attempted to persuade NPBL and NSR to modify the exclusionary $210 switch rate. Specifically, CSXT proposed that NPBL establish a new switch rate of $80 per car at NIT in exchange for CSXT's commitment to move a minimum number of train cars annually, thereby generating additional profits for NPBL. *See* Dkt. 559, at 63-65; Dkt. 324-5, at 15-18 of 19; Dkt. 328-13. As that proposal was pending, CSXT also requested that NPBL's board structure be modified to fairly account for CSXT's interests, while making the additional request that

10

the NPBL board appoint an independent rate committee to evaluate CSXT's rate proposal. Dkt. 559, at 63-65.[4]

In the district court's view of the evidence, however, NPBL's board never voted either on whether to approve the proposed new rate or on whether to form a special independent rate committee to consider the rate proposal. Dkt. 559, at 66. With NSR voting its NPBL shares against the governance proposal, that proposal was denied and the NPBL structure remained unchanged. *Id*. at 64-65. The upshot was that the excessive $210 NIT switch rate remained, and still remains, in force.

## B.    Procedural History

CSXT brought suit against NSR and NPBL in October 2018. Focusing in significant part on the preclusive effects of NPBL's exclusionary switch rate, "[t]he crux of the instant lawsuit," as characterized by the district court, is whether

> NSR and NPBL committed monopolistic antitrust violations, or unlawfully colluded with each other in restraint of trade, in a manner that prevented CSX from fairly competing to transport international shipping containers destined for the

---

[4]    At the same time, the Virginia Port Authority asked NPBL to set a competitive switch rate, noting that the "lack of proper access to NIT by CSX" puts the Commonwealth at a "competitive disadvantage" and "may lead to … businesses seeking alternative Ports and states." Dkt. 326-37.

POV, or more specifically for NIT, by preventing CSX from ob-
taining on-dock rail access at NIT.

Dkt. 559, at 4; *see id.* at 5. The complaint presents multiple federal anti-
trust claims under Sections 1 and 2 of the Sherman Act, seeking damages
and injunctive relief. *Id.* at 7. It asserts that defendants first used NPBL
to establish monopolistic control over intermodal transportation at NIT
and then engaged in ongoing activities to maintain that monopoly con-
trol. Compl. ¶ 3, Dkt. 1.

The district court denied defendants' motions to dismiss in substan-
tial part. *See* Dkt. 66; Dkt. 395. But following discovery, the district court
granted defendants summary judgment on CSXT's damages claims (and
later on its claims for injunctive relief).

In its decision regarding damages, the district court held that CSXT
presented triable antitrust claims on the merits. As the court explained,
"the potentially actionable conduct alleged in this case is NSR's manipu-
lation of NPBL or NPBL's legal rights in a manner that restrains trade
and/or creates or preserves an *unlawful* monopoly." Dkt. 559, at 58. As
noted above, the court determined that CSXT offered evidence that would
allow a factfinder to find that NSR and NPBL "knowingly acted to pre-
clude CSX from accessing NIT by rail" in just that way. *Id.* at 3 n.2.

The court also rejected defendants' "additional challenges to CSX's ability to prevail at trial on its federal antitrust claims," including defendants' arguments contesting (a) CSXT's definition of the relevant market, (b) CSXT's allegation that NSR exercised monopoly power, and (c) CSXT's proof of an agreement between NSR and NPBL to restrain trade. Dkt. 559, at 89. The court declared itself "largely in agreement with CSX's summary judgment position on these issues, and [it found] that genuine and material factual disputes preclude summary judgment on most of these arguments and subarguments, and that all such claims fail to demonstrate that summary judgment should be entered in favor of Defendants." *Id*.; *see id*. at 83, 85 (noting "facially strong evidence" that NSR "manipulated its opportunity to dominate the NPBL Board" to harm CSXT, creating "a triable issue as to whether NSR will use its ability to control the NPBL Board to harm CSX in the future"); *see generally id*. at 90-94.

But relying on the federal antitrust four-year statute of limitations, the court granted defendants summary judgment regarding CSXT's Clayton Act damages claims. In opposing application of the statute of limitations, CSXT had acknowledged that, under 15 U.S.C. § 15b, an antitrust

13

damages action is barred "unless commenced within four years after the cause of action accrued." It also acknowledged that defendants' actionably anticompetitive conduct had started at least by 2009, more than four years before CSXT brought suit in 2018. But CSXT maintained that, under the "continuing-violation doctrine" applied by the Supreme Court[5] and courts of appeals,[6] defendants' antitrust violations continued into the limitations period and to the present day, accruing new rights of action every day those actions caused injury—as they do every day that NPBL and NSR demand an excessive switch rate or otherwise exclude CSXT from NIT.

As CSXT argued, having selected and imposed the excessive switch rate, defendants "continue the conduct that precludes [CSXT] from that market year after year. … [T]hat's what you have to do as a monopolist. If you haven't killed your competitor, you have to continue to block them year after year." Dkt. 520, at 40. Thus, addressing the district court's

---

[5]    *Hanover Shoe*, 392 U.S. at 502 n.15; *Zenith Radio Corp. v. Hazeltine Res., Inc.*, 401 U.S. 321 (1971); *Klehr v. A.O. Smith Corp.*, 521 U.S. 179 (1997) (cited in CSXT Summary Judgment Br. 43-44, 49).

[6]    *See, e.g.*, *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144 (3d Cir. 1993) (cited in CSXT Summary Judgment Br. 43-45, 49).

question whether CSXT's injury within the limitations period was attributable to events occurring in 2009, CSXT's counsel responded:

> [N]o, it's not. Because [defendants] could have at any time between then and now decided to lower that rate. And in fact we made in 2018 an effort, again, to get them to do that. They did not. *So by persisting in the rate, they're deciding to maintain and establish and charge that rate each year, causing the market damages.*

*Id.* at 41 (emphasis added); *see also* CSXT Summary Judgment Mot. Br. 42-45, Dkt. 328.

The court, however, rejected application of the continuing-violation doctrine. The court repeatedly noted that "application [of the doctrine] is exceedingly complex." Dkt. 559, at 16; *see id.* at 30 (addressing "the complexities of this area of the law"); *id.* at 37-38 ("[e]ven within one 'type' of case, federal courts often differ as to the correct approach when deciding limitations issues and the applicability of the 'continuing violation' theory"). The court also observed that there is a "circuit split" over certain aspects of the doctrine. *Id.* at 30; *see id.* at 24 n.7. And it acknowledged that, "although CSX's evidence reveals that the exclusion of CSX from on-dock rail access at NIT *became effective* at some point in or around 2009/2010, such exclusion was not 'final' or 'immutable' because … NPBL has procedures in place that allow CSX to seek modification of the switch

15

rate through convening a NPBL rate committee." *Id.* at 34. "Therefore," the court continued, "the continuing violation doctrine is, as a general matter, 'available' to CSX." *Id.* at 35.

Nevertheless, the court declined to apply the doctrine. The court found it "dispositive with respect to the antitrust damages claimed by CSX in this case," "in the continuing violation context[,] that acts committed during the limitations period will constitute 'overt acts' that restart the limitations period only if they are new acts that 'inflict new and accumulating injury on the plaintiff.'" Dkt. 559, at 39 (citation omitted); *see id.* at 26, 35. Such acts, the court reasoned, must "cause[] new and accumulating harm beyond the damages flowing from the inertial consequences of time-barred conduct." *Id.* at 40. And at bottom, the court accepted defendants' argument "that CSX cannot establish either that antitrust 'overt acts' were committed during the limitations period or that it suffered new injuries from Defendants' conduct occurring during the limitations period." *Id.* at 14.

The court recognized that, under its approach, "the limitations period for antitrust damages is generally treated differently when the plaintiff is *a customer* forced to pay a supracompetitive price due to an

antitrust conspiracy or monopoly, than when the plaintiff is *a competitor* suffering harm due to partial or total exclusion from an industry." Dkt. 559, at 36. In the court's view, the customers of antitrust defendants *may* sue when they paid anticompetitive prices that initially had been fixed outside the limitations period. *Id*. The court held, however, that competitors of antitrust defendants may *not* sue for damages caused by business lost as a consequence of monopolistic practices initially implemented outside the limitations period but continuously applied within it. *Id*. at 35-36; *see id*. at 37.

The court also rejected CSXT's argument that the events of 2015-2018 continued the conspiracy and restarted the limitations period. Dkt. 559, at 45-80. Although the court recognized that levying the elevated switch rate and delaying CSXT trains at NIT in 2015 inflicted injury at that time (*id*. at 46-47), it opined that this was not "'new and accumulating injury'" that caused CSXT's inability "to compete for contracts with international intermodal customers." *Id*. at 49-50; *see also id*. at 60 (NSR's conduct during trackage dispute in 2016 also was not "an overt act *that caused new and accumulating harm*"). As for defendants' conduct in 2018—when they failed to adopt CSXT's request to modify the switch

17

rate—the court ruled that defendants' failure to vote on the rate proposal was "'purposeful inaction'" that, as a matter of law, cannot qualify as an overt act. *Id.* at 74-76.

In a subsequent ruling, the court held that CSXT's request for federal injunctive relief is barred by 15 U.S.C. § 26, which denies a court authority to grant such relief if the defendant is "a common carrier subject to the jurisdiction" of the STB. *See* Dkt. 613, at 14. As a consequence, absent an injunctive suit initiated by the United States, defendants' indefinite maintenance of a switch rate that the district court has found may well be monopolistic and exclusionary is not subject to challenge at all.[7]

## SUMMARY OF ARGUMENT

I.    The continuing-violation doctrine governs in this case. Under that doctrine, the statute of limitations restarts when an antitrust

---

[7]    CSXT also brought various state-law claims, including for breach of contract and conspiracy. *See* Dkt. 559, at 7. In relevant part, the court held these damages claims to be time-barred, noting that the parties' arguments on state law "rel[ied] heavily on their respective federal law arguments" and that "the Court's analysis follows suit where appropriate." *Id.* at 94; *see id.* at 95-102. Accordingly, if this Court reverses the district court's federal statute-of-limitations ruling, it also should vacate the district court's state-law ruling and remand for reconsideration in light of the Court's decision.

violation continues into, and causes damage during, the limitations period, allowing recovery for damage inflicted during that period. The doctrine distinguishes cases in which all of the wrongful conduct occurred and all damage was inflicted *outside* the limitations period. This distinction is both logical and essential to effectuation of antitrust policy: It allows for challenge to ongoing anticompetitive conduct that is causing new and accumulating injury during the limitations period. Any other approach would convert the statute of limitations into a rule of perpetual immunity, permitting anticompetitive conduct to continue indefinitely.

This case involves just such a continuing violation: Defendants have continued to demand an anticompetitive switch rate (and thus to exclude CSXT from NIT) during the limitations period, engaging in unlawful conduct and causing new injury every day, up to the present. Allowing a challenge to such continuing misconduct should not be controversial. All agree that customers who pay fixed prices or monopolistic overcharges may seek damages for the overpayments, even if the elevated prices initially were set far outside the limitations period; this case, in which an exclusionary practice first implemented outside the

limitations period caused CSXT to lose business within it, is identical in principle.

In reaching its contrary conclusion, the district court believed that a different rule applies to competitors than to customers of monopolists, but there is no basis for that distinction: There is no reason why an anti-competitive practice put in place outside the limitations period may be challenged when it extracts an excessive price, but not (as here) when it causes loss of business. The point is proved by refusal-to-deal and other market-exclusion cases, in which courts routinely apply the continuing-violation doctrine in suits by competitors.

II.    Even if continuation of the unlawful switch rate into the limitations period is insufficient without more to allow a suit seeking recovery for harm inflicted during that period, there *is* more here. During 2015-2018—well within the limitations period—defendants took further discrete steps to exclude CSXT from NIT. Those injurious acts were committed in furtherance of, and to effectuate, defendant's monopoly and ongoing restraint of trade. Those acts accordingly permit recovery for all harm stemming from the monopoly and conspiracy within the limitations period.

## STANDARD OF REVIEW

This Court reviews a grant of summary judgment *de novo*. *Nahigian v. Juno-Loudoun, LLC*, 677 F.3d 579, 585 (4th Cir. 2012). As the non-moving party, CSXT receives the "benefit of all reasonable inferences that may be drawn from the evidence." *Id*. This Court "will reverse the granting of summary judgment if a genuine issue of material fact exists or if the movant is not entitled to judgment as a matter of law." *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.*, 43 F.3d 922, 928 (4th Cir. 1995).

## ARGUMENT

As the case comes to this Court, the district court's findings on the merits mean it must be assumed that the switch rate first promulgated by defendants in 2009 is a violation of the Sherman Act, implemented for the purpose—and maintained year-in and year-out with the effect—of injuring CSXT. That violation has continued to the present, causing additional harm to CSXT every day by effectively precluding it from doing business at NIT. But the district court's statute-of-limitations holding (combined with its holding that injunctive relief is unavailable) will allow that unlawful conduct to continue—forever.

21

That decision undermines the Sherman Act and distorts the goals of the statute of limitations. All agree that a suit is time-barred when it challenges a discrete act that occurred outside the limitations period and caused harm once, even if the plaintiff continued to feel that harm over time and the injury compounded into the future. But here the injurious *practice* continued into the statute-of-limitations period (and continues still), causing *new* harm every day. This is the very model of a continuing violation that, as to each day's harm, starts the limitations period anew. And even if that were not so, NSR and NPBL restarted the limitations period when their additional conduct during 2015-2018 facilitated continuation of their anticompetitive practices. The district court erred in holding otherwise.

## I.     Defendants' Implementation Of The Unlawfully Exclusionary Switch Rate Was A Continuing Antitrust Violation That Inflicted Actionable Harm On CSXT During The Limitations Period.

### A.     Antitrust plaintiffs may recover for injuries caused by a violation that started before but continued into the limitations period.

The Supreme Court, this Court, and other courts of appeal have agreed that the continuing-violation doctrine applies to antitrust claims

of all sorts. That doctrine governs here and dictates the conclusion that CSXT's claims are timely.

The seminal Supreme Court decision on the continuing-violation doctrine—*Hanover Shoe*—both defined the principle and controls in this case. There, defendant United Shoe Machinery refused to sell manufacturing equipment to plaintiff Hanover, instead adopting a policy of only renting the equipment—a policy that caused Hanover to spend far more for the equipment than it would have through purchases. 392 U.S. at 483-84. Although Hanover first felt the harmful effects of this policy in 1912, it did not bring suit until 1955, after suffering damage for more than forty years. *Id*. at 502 n.15.

But the Supreme Court held that Hanover's claim was not time-barred. "We are not dealing with a violation which, if it occurs at all, must occur within some specific and limited time span," the Court explained. 392 U.S. at 502 n.15. "Rather, we are dealing with conduct" that "inflicted continuing and accumulating harm on Hanover"—the repeated demand that Hanover submit to a lease instead of buying the desired equipment outright. *Id*. As the Court concluded, "[a]lthough Hanover could have

sued in 1912 for the injury then being inflicted, it was equally entitled to sue in 1955." *Id*.

In subsequent years, the Court repeatedly has reaffirmed the continuing-violation doctrine. In *Zenith*, the Court explained that, "[i]n the context of a continuing conspiracy to violate the antitrust laws, … each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and …, as to those damages, the statute of limitations runs from the commission of the act." 401 U.S. at 338.

> Thus, *if a plaintiff feels the adverse impact of an antitrust conspiracy on a particular date, a cause of action immediately accrues to him to recover all damages incurred by that date and all provable damages that will flow in the future from the acts of the conspirators on that date*. To recover those damages, he must sue within the requisite number of years from the accrual of the action.

*Id.* at 339 (emphasis added). The Court left no doubt what it meant by this principle, offering as an illustration Judge J. Skelly Wright's ruling in *Delta Theaters, Inc. v. Paramount Pictures, Inc.*, 158 F. Supp. 644 (E.D. La.1958). That case involved a theater that lost profits when conspirators kept it from exhibiting first-run films. As Judge Wright explained, "[i]n the case of successive damages suffered day by day from a continuing

24

conspiracy, *the statute begins to run on each day's damage as it occurs.*"

*Id.* at 649 (emphasis added); *see Zenith*, 401 U.S. at 338 (citing *Delta Theaters*).[8]

The Court reiterated the principle yet again in *Klehr*. Although that case involved a RICO rather than an antitrust suit, the Court addressed "the ordinary Clayton Act rule," explaining:

> Antitrust law provides that, in the case of a continuing violation, say, a price-fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years, each overt act *that is part of the violation and that injures the plaintiff*, *e.g.,* each sale to the plaintiff, starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times.

521 U.S. at 189 (cleaned up; emphasis added).[9]

---

[8]     The Fifth Circuit subsequently noted "the unqualified embrace in *Zenith* of the recognition that each injurious act of a continuing conspiracy gives rise to an antitrust cause of action, and the *Zenith* opinion's conspicuous selection of authorities eschewing the requirement of acts different in kind to set up a later accruing cause of action." *Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*, 517 F.2d 117, 127 (5th Cir. 1975).

[9]     Again, the Court's citations illustrated what it had in mind as constituting "a separate overt act" for this purpose. *See Klehr*, 521 U.S. at 189-90 (citing cases). These decisions included, among others, *Pennsylvania Dental Ass'n v. Medical Serv. Ass'n*, 815 F.2d 270, 278 (3d Cir. 1987) (plaintiff "continues to encounter resistance to its [business practices] traceable to the [defendants'] earlier actions"); *Nat'l Souvenir Ctr., Inc. v. Historic Figures, Inc.*, 728 F.2d 503, 510 (D.C Cir. 1984) ("the 'overt act' requirement may be satisfied merely by the parties continuing to maintain contractual relationships that directly affect competition in the tied

In reaching this conclusion, the Court distinguished between acts that cause harm once, even when that harm persists or compounds over time, and situations in which a continuing anticompetitive policy is applied and causes *new* harm to the plaintiff every day. In the first situation, "the plaintiff cannot use an independent, new predicate act as a bootstrap *to recover for injuries caused by other earlier predicate acts that took place outside the limitations period.*" 521 U.S. at 190 (emphasis added). In that circumstance (as in *Klehr* itself), the plaintiffs "have not shown how any new act could have caused them harm over and above the harm that the earlier acts caused." *Id.*

The second situation, in contrast, is that of the continuing violation—as the Fifth Circuit described it in one of the leading decisions in this area, when the plaintiff's "complaint is based on continuing antitrust behavior, not merely the continuing damage [that the plaintiff] feels from a single day's monopoly and refusal to deal in [the year of the monopoly's creation]." *Poster Exch.*, 517 F.2d at 125. In such a situation, when (for

---

product market"); and *Imperial Point Colonnades Condo., Inc. v. Mangurian*, 549 F.2d 1029, 1036 (5th Cir. 1977) (cause of action "continues to accrue for as long as the defendant takes advantage of the contract in question").

example) the plaintiff "has been continually injured by … conspiratorial foreclosure … from access to supplies, … [the court is] obliged to recognize [the plaintiff's] continually accruing cause of action during this period." *Id.* at 127. Or, as the Ninth Circuit put it, the continuing-violation "standard is meant to differentiate those cases where a continuing violation is ongoing—and an antitrust suit can therefore be maintained—from those where all of the harm occurred at the time of the initial violation." *Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199, 1202 (9th Cir. 2014).

Courts, including this one, have embraced the continuing-violation principle. *See*, *e.g.*, *Mayor of Balt. v. Actelion Pharms. Ltd.*, 995 F.3d 123, 132-33 (4th Cir. 2021); *Charlotte Telecasters, Inc. v. Jefferson-Pilot Corp.*, 546 F.2d 570, 572 (4th Cir. 1976). The doctrine applies in all antitrust suits, but has come into play most often in monopolization (including refusal-to-deal) and price-fixing cases: Every time the defendant bars the plaintiff from the relevant market or the supracompetitive price is charged, the plaintiff is injured—and the limitations period starts to run again. *See, e.g.*, *Poster Exch.*, 546 F.2d at 125-25 (refusal-to-deal conspiracy); *Actelion*, 995 F.3d at 132-33 (supracompetitive prices charged by

monopolist); *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 902 (7th Cir. 2004) (applying continuing-violation doctrine because "improperly prolonging a monopoly is as much an offense against the Sherman Act as is wrongfully acquiring market power in the first place"); *Columbia Steel Casting Co. v. Portland Gen. Elec. Co.*, 111 F.3d 1427, 1444-45 (9th Cir. 1996) (conspiracy to monopolize provision of utilities).

**B.  Defendants' application of the exclusionary switch rate is a continuing antitrust violation.**

**1.  Defendants' implementation of the rate during the limitations period continued the violation and caused new harm.**

This case calls for a straightforward application of the continuing-violation doctrine.

It is uncontested that the NPBL board raised the switch rate to $210 in 2009, that the rate took effect in early 2010, and that NPBL has continued to demand that rate ever since; the rate currently appears on NPBL's tariff list, which governs access to tracks at NIT. *See* Dkt. 559, at 3; Dkt. 297-2. The district court found that CSXT has "presented sufficient evidence on which a factfinder could conclude" that, "in or around 2009, NSR and/or NSR in conjunction with NPBL, knowingly acted to preclude CSX from accessing" NIT by setting the prohibitively high rate.

28

Dkt. 559, at 3 n.2. This has remained true every day that NPBL maintained that rate for use of its track at NIT—which has been every day since NPBL set the rate. Each day's implementation of that rate unquestionably has harmed CSXT by denying it that day's worth of business at NIT, precluding CSXT from obtaining long-running contracts that require on-dock access to NIT. *See* pages 6-9, *supra*. In such circumstances, when the plaintiff experiences "successive damages suffered day by day from a continuing conspiracy, the statute begins to run on each day's damage as it occurs." *Delta Theaters*, 158 F. Supp. at 649.

Indeed, this case is materially identical in principle to *Hanover Shoe* itself. There, the defendant's monopolistic lease-only policy was set decades outside the limitations period but continued unchanged into it, damaging the plaintiff's business each time that policy was applied to require the plaintiff to lease rather than purchase manufacturing equipment. This practice, the Supreme Court said, "inflicted continuing and accumulating harm on" the plaintiff. 392 U.S. at 502 n.15. "This language [from *Hanover Shoe*] applies equally aptly to the matter at bar." *Poster Exch.*, 517 F.2d at 126 (footnote omitted). In this connection, the damage here is not, as the district court put it, injury that flows in a metaphysical

29

sense "from the mere continuation of a conspiracy" (Dkt. 559, at 42 (cleaned up)); it is the product of an unlawfully anticompetitive practice that is implemented, and causes new injury, every day.

CSXT therefore is entitled to present a jury with its claim that NSR and NPBL engaged in a continuing violation of the Sherman Act from 2009 through the present. Because the limitations period began in October 2014 (CSXT having filed its complaint in October 2018), CSXT should be able to recover for the injuries it incurred every day since then.

### 2. Defendants committed injurious acts in the limitations period.

In nevertheless holding the continuing-violation doctrine inapplicable, the district court concluded that defendants' continued application of an exclusionary policy—and publicly posted anticompetitive rate—was insufficient to cause the continuing accrual of new rights of action. As noted, the court recognized that CSXT's evidence adequately showed the implementation of an exclusionary switch rate beginning in 2009-2010 and continuing to the present day. Dkt. 559, at 2-3. And the court did not suggest that the anticompetitive impact of that rate diminished over time. But the court opined that "a competitor that is excluded from a market and sleeps on its rights" may not recover in these circumstances,

deeming it "dispositive" that defendants' conduct did not "cause[] new and accumulating harm beyond the damages flowing from the inertial consequences of time-barred conduct." *Id*. at 40; *see id.* at 26. This analysis runs counter to *Hanover Shoe* and misunderstands the nature of the continuing-violation doctrine.

### a.    The "overt act" requirement.

All agree that, when a defendant has engaged in a continuing antitrust violation, the statute of limitations "commences to run from the last overt act causing injury to the plaintiff's business." *Charlotte Telecasters*, 546 F.2d at 572; *see*, *e.g.*, *Klehr*, 521 U.S. at 189. Although courts characteristically use the terminology of "overt act" in this context, that term has no specialized or technical meaning here beyond that of conduct that advances the anticompetitive scheme in a manner that causes injury to the plaintiff; as this Court has put it, "the statute of limitations begins to run from '*each time a plaintiff is injured by an act of the defendants*.'" *Actelion*, 995 F.3d at 131 (quoting *Zenith*, 401 U.S. 338) (emphasis added). In this case, that has happened every day since NPBL first set the switch rate in 2009, as the elevated rate prevents

CSXT from entering the market of railroad companies serving NIT via on-dock rail.

The scope of the "overt act" requirement in exactly this setting—defendants' maintenance of a practice that excludes the plaintiffs from a market—is illustrated by the Third Circuit's decision in *Lower Lake Erie*. There, plaintiffs brought suit in 1982, alleging that railroad companies had conspired to stop competitors from entering the market of land transport for iron ore shipped across the Great Lakes. 998 F.2d at 1151. Originally, only docks equipped to service railroads could receive the ore. *Id*. at 1153. But non-railroad docks gained the ability to compete with the railroads by loading the ore directly into trucks. *Id*.

The railroad defendants allegedly responded by "artificially inflat[ing]" the dock-handling rates charged to these new competitors (998 F.2d at 1172), "refusing to lease [their new competitors] dock property suitable for the shipment of iron ore, and … overcharging the companies to use the railroads to ship ore." *W. Penn*, 627 F.3d at 107 (describing *Lower Lake Erie*). These actions effectively foreclosed the competitors' entry into the market. *See Lower Lake Erie*, 998 F.2d at

32

1153-54 ("plaintiffs claimed injury due to the railroads' refusal to permit them entry into the iron ore unloading business").

The defendant railroad companies argued that the plaintiffs' 1982 lawsuit was time-barred because the conspiracy started in the 1950s. Of particular relevance here, the defendants argued that there were no "injury-causing overt acts" during the limitations period—defendants' decision to decline to do business with their competitors and to set artificially high prices having been made before the limitations period started. *Lower Lake Erie*, 998 F.2d at 1172. But the Third Circuit rejected that characterization, explaining: "This argument fails to recognize that certain conspiracies, such as boycotts, operate through inaction." *Id*. at 1172. Thus, "[t]he purposeful nature of the inaction—here an ongoing refusal to sell or lease—obviously constitutes an injurious act, although perhaps not an overt one in the commonly-understood sense." *Id*. That was sufficient to restart the limitations period.

*Lower Lake Erie* is on all fours with this case. In both cases, defendants unlawfully raised the price of a resource that competitors needed to enter the market—there, increasing dock fees and railroad shipping rates; here, imposing an excessive switch rate for access to NIT.

In both cases, the exclusionary prices first were set more than four years before suit was brought but continued into the limitations period. And in both cases, the competitor was priced out of conducting business in the relevant market. The result therefore should be the same—just as the *Lower Lake Erie* conspiracy could "be viewed as a continuing series of acts upon which successive causes of action may accrue" (998 F.2d at 1173 (cleaned up)), so the anticompetitive conduct here caused injury and generated a right of action every day that NSR and NPBL maintained the supracompetitive switch rate.

The district court recognized that *Lower Lake Erie* "offers CSX a favorable interpretation of *Zenith* in support of CSX's limitations and damages theories." Dkt. 559, at 23. But the court declined to follow *Lower Lake Erie*, deeming it inconsistent with *Klehr*, *Zenith*, and more recent decisions of the Third and other circuits. *Id*. The court was incorrect, for at least two reasons.

*First*, the court appears to have misunderstood *Lower Lake Erie*. It seemed to view the Third Circuit's decision as contrary to "the anti-bootstrapping rule in *Klehr*" and to *Zenith*'s instruction that "the limitations period restarts for *new and accumulating damages* caused by

*new actions committed within the limitations period*" (Dkt. 559, at 23), and as rejecting an overt-act requirement altogether. *Id.* at 22.; *see id.* at 25-26. But none of that is so. Although the Third Circuit quibbled with the nomenclature of "overt" acts, it could not have been clearer that the defendants' "ongoing refusal to sell or lease … obviously constitutes an injurious act." 998 F.2d at 1172.[10] And this was, as the court of appeals emphasized, "an 'injurious act' *causing damages within the limitations period*." *Id.* (emphasis added). Lest there be any doubt on this point, the Third Circuit added that the *Lower Lake Erie* jury's findings established that the defendants "*committed Sherman Act violations within the limitations period* which caused injury to most of the plaintiffs" and that the jury instructions "were sufficient to inform the jury that *damages must have been caused within the limitations period.*" *Id.* at 1173 (emphasis added); *see id.* at 1172 ("We have held that an injurious act within the limitations period may serve as a basis for an antitrust suit.").

---

[10]     The Third Circuit's repeated use of the term "injurious act" is identical in substance to the phrase "overt act" as used by the district court here. *See Lower Lake Erie,* 998 F.2d at 1172-73.

This holding is wholly consistent with *Klehr* and *Zenith*, hinging liability on damage-causing anticompetitive conduct occurring "within the limitations period." Because the Third Circuit nowhere used a new act to trigger "recover[y] for the injury caused by old overt acts outside the limitations period" (*Klehr*, 521 U.S. at 189), the decision did not implicate *Klehr*'s "anti-bootstrapping rule" at all. In this context, the Third Circuit's holding that "intentional, concerted inaction" within the limitations period "constitutes an injurious act" (*Lower Lake Erie,* 998 F.2d at 1172) rested on an unexceptional application of Supreme Court doctrine.

*Second*, although the district court suggested that subsequent case law from the Third Circuit backed away from *Lower Lake Erie* (*see* Dkt. 559, at 23, 25), that, too, is incorrect. To the contrary, in *West Penn*, a decision cited by the district court here (Dkt. 559, at 25), the Third Circuit forcefully reaffirmed *Lower Lake Erie*. The court of appeals there described the facts of *Lower Lake Erie* in some detail, recounted *Lower Lake Erie*'s holding that the plaintiffs' "claims were timely because the [defendants'] exclusionary conduct … had continued into the limitations period," and approved that holding even though "the acts that occurred

within the limitations period were reaffirmations of decisions originally made outside the limitations period." 627 F.3d at 107. Nothing in this decision disavowed *Lower Lake Erie* in any respect. *See also Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 218 (3d Cir. 2008) ("'a conspiracy's refusal to deal, which began outside the limitations period, may be viewed as a continuing series of acts upon which successive causes of action may accrue'") (quoting *Lower Lake Erie*, 998 F.2d at 1173).

*Lower Lake Erie* thus applied settled principles to hold—on facts materially identical to those here—that the acts of maintaining supracompetitive prices day after day to keep a competitor out of the market are injurious overt acts that restart the limitations period each day that the high price remains in place—because each day the defendants could have lowered that price and chose not to. This Court should follow that reasoning here.

> **b.  *Competitors of monopolists and price-fixers, like customers, benefit from the continuing-violation doctrine.***

**i.** That conclusion should not be controversial: It is almost uniformly agreed that *customers* who are injured by the effects of an

anticompetitive practice that began outside the limitations period but continued into it may sue for harm inflicted by the defendant's application of that practice within the limitations period. *Hanover Shoe* itself was the model of such a case, as the plaintiff was injured by the defendant's decades-long refusal to sell (and insistence instead only on renting) manufacturing equipment. And there are myriad cases in which courts have permitted plaintiffs to recover damages for the payment of excessive prices within the limitations period, even though the anticompetitive policy was formulated and inflated prices first collected outside that period. In those cases, as in this one, the harm within the limitations period followed simply from continued implementation of that same anticompetitive policy.

This Court, for example, recently held that "the continuing-violation doctrine would … entitle the plaintiffs to recover damages for each supracompetitive sale" made by a monopolist. *Actelion*, 995 F.3d at 131; *see id* at 132 ("each time that [the defendant] sold [its product] to the plaintiffs at monopoly prices …, it engaged in a new injurious overt act that commenced a new limitations period"). As the Court explained, "[v]irtually every court faced with similar allegations has held, citing the

continuing-violation doctrine, 'that a new cause of action accrues to purchasers upon each overpriced sale.'" *Id.* (citation omitted).

The same reasoning has been employed in many Sherman Act Section 1 price-fixing cases. To offer just one characteristic example, in *Morton's Market, Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823 (11th Cir. 1999), the defendant dairies conspired in 1987 to fix the price of milk. *Id.* at 826. The Eleventh Circuit explained that, "when sellers conspire to fix the price of a product, each time a customer purchases that product at the artificially inflated price, an antitrust violation occurs and a cause of action accrues." *Id.* at 828. Because milk "sales at … fixed prices continued at least until 1992," the plaintiffs' cause of action could have accrued as late as that year had they purchased milk during that time— and this was so "even if there were no price-fixing conversations [between the defendant dairies] after 1987." *Id.*; *see also, e.g.*, *In re Cotton Yarn Antitrust Litig.*, 505 F.3d 274, 290-91 (4th Cir. 2007); *In re Pre-Filled Propane Tank Antitrust Litig.*, 860 F.3d 1059, 1065-66 (8th Cir. 2017).

Here again, the reasoning of these decisions applies in this case. The only difference is that, instead of *extracting* an inflated payment (as

in the price-fixing cases), the high price here *denied* CSXT income by keeping it from operating in the affected market.

**ii.** The district court agreed that the continuing-violation doctrine *does* apply and a cause of action *is* available when an anticompetitive price is set outside the limitations period but continued into it, so long as "the plaintiff is *a customer* forced to pay a supracompetitive price due to an antitrust conspiracy or monopoly." Dkt. 559, at 35-36. But the court believed that a different rule applies, and the continuing-violation principle is *un*available, "when the plaintiff is *a competitor* suffering harm due to partial or total exclusion from an industry." *Id.* at 36. In drawing this distinction, the court did not suggest that any antitrust policy supports more expansive recovery rights for customers than for competitors. Instead, the court opined that "[t]he differing treatment between these two types of claims is grounded in the concept that, unlike an excluded rival who is injured *as soon as the exclusion begins*, a customer *is not injured until a sale* occurs." Dkt. 559, at 37.

There is, however, no logical or policy distinction between competitors and customers. For one thing, the dichotomy suggested by the district court often is a false one. Of course, it will sometimes be the

case that customers suffer no harm until long after an anticompetitive practice goes into effect, as when (for example) a monopolist uses predatory prices to entrench its monopoly; in that context, it is only when "the monopolist, having devoured its smaller rivals, enjoys the spoils of its conquest by boosting its price to excessive levels that a purchaser 'feels the adverse impact' of the violation." *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 295 (2d Cir. 1979) (citation omitted). And as the district court suggested, competitors sometimes will suffer immediately from exclusionary conduct, as when (for example) those targeted by the monopolist's predatory prices suffer quick losses once the scheme begins.

But that often will not be the case. In fact, customers of price fixers typically pay elevated prices from the very inception of the conspiracy (after all, price fixers fix prices for the purpose of charging the fixed prices to customers)—but customers still may invoke the continuing-violation doctrine to support a claim for excessive prices paid more than four years after initial implementation of the elevated price (as, for example, happened in *Morton's Market* and in the analogous situation presented by *Hanover Shoe*). Conversely, a competitor may not have an action until long after anticompetitive conduct begins, as when a new entrant to the

market seeks to challenge a monopolist years after the monopoly was created. So customers sometimes will be injured immediately after the initiation of anticompetitive conduct; and competitors, sometimes not until many years afterwards. In either case, what matters is that the anticompetitive conduct continues into, and causes harm during, the limitations period.[11]

The illusory nature of the distinction between customers and competitors is especially apparent in this case, in which CSXT was *both* a competitor *and* a customer of the defendants, which targeted CSXT's ability to compete by demanding an inflated switch rate. Indeed, the district court recognized that, if CSXT had paid the exorbitant rate every day during the limitations period, it would have a timely claim for all

---

[11] The district court construed *Actelion* to draw a distinction between customers and competitors. Dkt. 559, at 36-37. But this Court nowhere suggested that competitors may not invoke the continuing-violation doctrine to challenge competitive injury caused by the continuation of monopolistic and damaging conduct into the limitations period. Instead, in the language invoked by the district court, *Actelion* rejected the defendant's very different argument that the plaintiffs failed to make out a refusal to deal, finding that argument immaterial not because customers and competitors are categorically different for statute-of-limitations purposes, but because the plaintiffs in *Actelion* sued as customers, not competitors. 995 F.3d at 131-32. That holding has no bearing here.

payments made during that period. Dkt. 559, at 46-47.[12] Yet it is perverse to hold that CSXT would be able to sue as a customer for excessive payments made had it paid the inflated rate every day, but may not sue for profits lost because the inflated rate was *so* high that CSXT could not economically afford to pay the rate *at all* on each day that the rate remained in effect and therefore excluded CSXT from the market altogether.

Nothing in the difference between these types of harm supports treating them differently under the statute of limitations. CSXT suffers at least as much from market exclusion as it would have from paying an excessive switch rate to enter the market. And the exclusion of CSXT from NIT injures not just one competitor or customer, but competition itself, inevitably leading to higher prices for rail customers as NSR is freed from competitive constraints at NIT.

In fact, in a recent filing the United States rejected the assertion that antitrust suits involving continuing violations have "'two different

---

[12]     CSXT in fact did pay the supracompetitive switch rate in 2015. *See* Dkt. 559, at 46; pages 9-10, *supra*. The district court acknowledged that if CSXT had sought "to recover for the excessive price it paid during 2015," it would have been entitled to do so. Dkt. 559, at 46.

accrual rules'—one for 'competitors,' one for 'consumers.'" Corrected Brief of the United States as *Amicus Curiae* in Support of Plaintiffs-Appellants at 30, *Giordano v. Saks & Co.*, No. 23-600 (2d Cir. Aug. 7, 2023) ("U.S. *Giordano* Br."). As the United States explained, although factual differences between cases can lead to differing outcomes, "[t]he same accrual rule (*Zenith Radio*'s) applies to both types of claims." *Id.* at 31. Thus, "[i]f plaintiffs suffer antitrust injury during the limitations period due to overt acts committed pursuant to a continuing violation, the plaintiffs may bring suit, whether they are 'consumers,' 'competitors,' or neither." *Id*.

Accordingly, the precise nature of the antitrust violation and of the harm inflicted by that violation is beside the point for statute-of-limitations purposes (although in fact, the relevant anticompetitive *act* is the same whether CSXT sues as a competitor or as a customer: the maintenance every day of a supracompetitive switch rate). What matters is that the defendants engaged in illegal conduct that continued into the limitations period and caused new harm in that period. The ongoing imposition of an elevated switch rate was an "injurious act" (*Lower Lake Erie*, 998 F.2d at 1172-73) that occurred every day during the limitations

period and, by denying CSXT business, "caused [it] harm over and above the harm that the earlier acts caused." *Klehr*, 521 U.S. at 190.

**iii.** If further confirmation were needed, the district court's understanding that the customer cases are inapplicable here because an "excluded rival … is injured as soon as the exclusion begins" (Dkt. 559, at 37)—and thus that the limitations period in competitor suits runs solely from the start of the exclusionary conduct—is also belied by numerous cases addressing refusal-to-deal schemes. Those decisions establish that a refusal to deal is a continuing violation so long as the defendant is indeed continuing not to do business with the plaintiff. That is so because the continued choice *not* to engage with the plaintiff is itself an injurious act that restarts the limitations period.

The leading and oft-cited case on the subject is the Fifth Circuit's *Poster Exchange* decision. There, Poster Exchange brought suit in 1969, complaining that it had been excluded from the market of "motion picture advertising accessories" because defendant National Screen was the "sole distributor" of those products and refused to do business with Poster Exchange. 517 F.2d at 123. The district court held the suit time-barred because National Screen had "cut off" Poster Exchange in 1961. *See id.*

at 119, 123. But the Fifth Circuit disagreed, explaining that Poster Exchange was complaining of "continuing antitrust behavior, not merely the continuing damage it feels from a single day's monopoly and refusal to deal in 1961." *Id*. at 125.

It therefore was sufficient for Poster Exchange to show that the exclusionary policy extended into the limitations period by demonstrating "some specific act or word precluding Poster from obtaining supplies from National Screen." 517 F.2d at 128. That showing of "act or word" was necessary because "a mere absence of dealing" does not establish an antitrust violation at all; "a specific act or word of refusal during the limitations period" would confirm that the defendant was in fact still "denying" Poster Exchange "access [to supplies] during the statutory period" and thus continuing the offense. *Id*. at 128-29.

Relying on *Poster Exchange*, this Court has agreed that "exclusion from participation in an industry constitutes a continuing conspiracy, unless the exclusion is final in its impact." *Charlotte Telecasters*, 546 F.2d at 572. Applying that understanding, the Court held that an allegation of conspiracy to prevent the plaintiff from obtaining a franchise asserted a continuing violation but nevertheless was time-barred—but only

because no act manifesting continued exclusion occurred during the limitations period. *Id*. at 572-73. There are many similar cases in which the defendants' continued refusal to deal during the limitations period *did* cause a right of action to accrue during that period because it was apparent that the defendants' exclusionary policy was indeed a continuing one. *See*, *e.g.*, *Bell v. Dow Chem. Co.*, 847 F.2d 1179, 1186-87 (5th Cir. 1988); *Hennegan v. Pacifico Creative Serv., Inc.*, 787 F.2d 1299, 1300-01 (9th Cir. 1986); *Western Shoe Gallery, Inc. v. Duty Free Shoppers, Ltd.*, 593 F. Supp. 348, 351-53 (N.D. Cal. 1984).

And here, we have the clearest indication that defendants were indeed continuing their damage-causing anticompetitive conduct: It is undisputed that, at all times since 2009, NPBL has continued to demand the exclusionary $210 switch rate that, CSXT's evidence demonstrates, unlawfully keeps it from doing business at NIT. Therefore, by showing that NSR and NPBL maintained their supracompetitive pricing from October 2014 onward, CSXT has established the necessary overt act required to demonstrate that defendants' exclusionary practice continued during the limitations period.

47

### C.    The district court's contrary analysis is mistaken.

None of the additional considerations discussed by the district court supports its contrary holding.

*First*, CSXT does not allege only "damages flowing from the inertial consequences of time-barred conduct." Dkt. 559, at 40. That was the sort of situation presented in *Klehr*, in which the plaintiffs were injured by a single sale occurring before the limitations period that caused harm that compounded over time. 521 U.S. at 190. That likewise may be true when a plaintiff complains of "the continuing damage it feels from a single day's monopoly and refusal to deal [at the time the violation commenced]." *Poster Exch.*, 517 F.2d at 125. In such a case, harm inflicted at one earlier time may "inertially" continue or worsen into the future.

The very point of the continuing-violation doctrine, however, is that it encompasses not a particular day's past harmful conduct, but a practice that (whenever formulated) is implemented day after day, causing *additional damage* (and thus newly accrued legal violations) into the future. Such a claim is not barred simply because—as was true of the practice challenged in *Hanover Shoe*—the policy that causes all of the continually recurring damage was created at a single time outside

48

limitations period. The United States recently made just this point, noting "the distinction between discrete contracts"—which, "for statute-of-limitations purposes, … are 'instantaneous'"—"and ongoing conduct," which is not. U.S. *Giordano* Br. 28.

To be sure, different considerations may come into play when the anticompetitive practice was "final in its impact" prior to the start of the limitations period. *Charlotte Telecasters*, 546 F.2d at 572. Courts have generally recognized  that "[w]here the violation is final at its impact, for example, where the plaintiff's business is immediately and permanently destroyed, or where the actionable wrong is by its nature permanent at initiation without further acts, then the acts causing damage are unrepeated, and suit must be brought within the limitations period and upon the initial act." *Poster Exch.*, 517 F.2d at 126-27; *see, e.g.*, *In re Multidistrict Vehicle Air Pollution,* 591 F.2d 68, 72 (9th Cir.1979) (statute of limitations is not restarted by "unabated inertial consequences of some pre-limitations action" that are "irrevocable, immutable, permanent[,] and final").

But courts likewise generally agree that anticompetitive practices adopted prior to the limitations period that are *not* irrevocable *are*

"sufficient to restart the statute of limitations so long as the defendant had the ability not to [continue to] take the challenged action." *Samsung*, 747 F.3d at 1203. As Judge Easterbrook put it for the Seventh Circuit, there is a difference between "'never' and 'maybe later.'" *Xechem, Inc.*, 372 F.3d at 901; *see*, *e.g.*, *Hennegan*, 787 F.2d at 1301; *Columbia Steel Casting*, 111 F.3d at 1444-45; Dkt. 559, at 33 (citing cases indicating that "a sufficiently 'final' act of exclusion committed prior to the limitations period renders the [continuing-violation] doctrine legally inapplicable").

There is logic to this approach. Once wrongful conduct is final and irrevocable, future harm traceable to that conduct may fairly be characterized as the inertial consequence of that wrongful act, following from it inevitably and not traceable to the defendant's further within-limitations conscious action (or inaction). But it is undisputed that NSR and NPBL's implementation of the switch rate in this case is *not* permanent in that sense. Because defendants certainly could have abandoned that rate at any time, the district court itself found that the "prior rate was … not a final, immutable decision." Dkt. 559, at 34.

*Second*, insofar as the district court believed that maintenance of the switch rate could not qualify as an overt act that restarted the statute

of limitations because (a) continuation of an *existing* rate constitutes "inaction" and (b) inaction cannot be an overt act (*see* Dkt. 559, at 76 ("an overt act … must be based on affirmative action, not inaction")), it was wrong on both counts.

For one thing, defendants' conduct is not properly regarded as *in*action at all. NPBL retained the $210 switch rate as its posted tariff every day, governing the conduct of business at NIT for so long as the tariff was posted. Defendants' continued maintenance of that tariff therefore is the functional equivalent of affirmatively posting a price.

And for another, whether conduct is characterized as action or inaction has no logical bearing on the operation of the statute of limitations. "[I]n circumstances such as here, … continuing and accumulating damage may result from intentional, concerted inaction"; "certain conspiracies, such as boycotts, operate through inaction." *Lower Lake Erie*, 998 F.2d at 1172. Indeed, in this case the whole point of the antitrust violation is to inflict harm every day by using the same exclusionary switch rate to keep CSXT out of NIT. So long as such an anticompetitive practice is continuing and causes new injury into the future, the way in which that practice is effectuated is immaterial. As

51

suggested earlier, there is no logical reason why collecting an excessive price restarts the limitations period but demanding that price for its exclusionary effect does not.

*Third*, notwithstanding CSXT's continued exclusion from NIT, the district court believed that CSXT could not demonstrate "new acts that 'inflict new and accumulating injury on the plaintiff.'" Dkt. 559, at 39 (quoting *Kaw Valley Elec. Co-op. Co. v. Kan. Elec. Power Co-op, Inc.*, 872 F.2d 931, 933 (10th Cir. 1989)); *see id.* at 49 (recognizing that CSXT was "economically excluded from providing on-dock rail at NIT[] before, during and after" 2015 but holding that it had not demonstrated new and accumulating harm in the limitations period). But properly understood, CSXT made just such a demonstration.

Whether continued implementation of the excessive rate is characterized as an affirmative act or as conscious inaction, for reasons already explained the required payment of that rate for access to NIT was a "new act" in the relevant sense. And defendants' conduct during the limitations period certainly inflicted "new and accumulating injury," as each day's enforcement of the excessive rate excluded CSXT from NIT and cost it additional business. Of course, that continued conduct did not

52

involve a new *sort* of injury or anticompetitive practice. But unless the reaffirmation of a prior bad act may not restart the statute of limitations—and that is not the proper rule, as the district court itself recognized[13]—the district court's conclusion has no basis.

### D. Antitrust and statute-of-limitations policies preclude termination of CSXT's right of action.

The district court reasoned that construing the continuing-violation doctrine narrowly was necessary to advance the goals animating the

---

[13] The district court noted that the circuits are divided on "whether a 'reaffirmation' of a prior bad act should restart the limitations period." Dkt. 559, at 30-31; *see id.* at 24 n.7. The Sixth and Tenth Circuits have held that a defendant's reaffirmation of an anticompetitive practice does not restart the statute of limitations, even when that conduct involves a new act that causes new harm; the Third, Fifth, and Ninth Circuits disagree. *Compare, e.g., DXS, Inc. v. Siemens Med. Sys., Inc.*, 100 F.3d 462, 468 (6th Cir. 1996), and *Kaw Valley*, 872 F.2d at 934-35, *with W. Penn*, 627 F.3d at 106-08, *Poster Exch.*, 517 F.2d at 127, and *Samsung*, 747 F.3d at 1202-03. The latter set of courts has the better of this argument. Finding that reaffirmations *may* restart the statute of limitations is consistent "with controlling precedent"; *Hanover Shoe* itself involved "reaffirmations of decisions originally made outside the limitations period." *W. Penn*, 627 F.3d at 106, 107. And that conclusion follows from logic and policy: Violators of the antitrust laws should not become immune simply because, rather than come up with innovative and creative forms of anticompetitive conduct, they commit the same offense over and over again. The district court here correctly did not rely on application of a reaffirmation limit, instead opining that "subsequent reaffirmations do not restart the limitations period" only when the challenged conduct "was 'final and irrevocable.'" Dkt. 559, at 24 n.7; *see id.* at 31-34. For reasons already explained, that is not the case here.

statute of limitations. Dkt. 559, at 11-12. But as courts of appeals have widely recognized, robust application of the doctrine is compelled both by specific antitrust and by broader statute-of-limitations policies.

*First*, the goals of the antitrust laws require an approach that permits plaintiffs to challenge anticompetitive practices that continue into the limitations period. As the Third Circuit has explained, invoking an observation of the Fifth Circuit:

> "[Adopting the district court's rule] would ... improperly transform the limitations statute from one of repose to one of continued immunity. For according to [the district court's holding], a plaintiff who suffers [damage from a continuing antitrust violation] is barred not only from proving violations and damages more than four years old, but is barred forever from complaining of [the continuation] of the unlawful conduct. The function of the limitations statute is simply to pull the blanket of peace over acts and events which have themselves already slept for the statutory period, thus barring the proof of wrongs embedded in time-passed events. *Employing the limitations statute additionally to immunize recent repetition or continuation of violations and damages occasioned thereby not only extends the statute beyond its purpose, but also conflicts with the policies of vigorous enforcement of private rights through private actions.*"

*W. Penn*, 627 F.3d at 107-08 (quoting *Poster Exch.*, 517 F.2d at 127-28) (emphasis added). Or, as the Second Circuit concluded, "it would undercut enforcement of the Sherman Act to hold that, if a monopolist merely retains its illicit market control for four years after its last

54

anticompetitive action, it may charge an exorbitant price until its power is eviscerated in an appropriate suit for equitable relief." *Berkey Photo*, 603 F.2d at 296; *see also Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 329 (1955) (rejecting legal theory that "would in effect confer on [defendants] a partial immunity from civil liability for future violations" of the antitrust laws).

And on that last point, as the Second Circuit recognized, the possibility of injunctive relief is not a sufficient curative. As a general matter, "[t]he treble-damages provision wielded by the private litigant is a chief tool in the antitrust enforcement scheme" (*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 635 (1985)), with Congress recognizing a strong "public interest in vigilant enforcement of the antitrust laws through the instrumentality of the private treble-damage action." *Lawlor*, 349 U.S. at 329. And in any event, the district court's reading of 15 U.S.C. § 26 makes injunctive relief at the request of a private party unavailable in this case. A possible equitable action by the government would not fill that gap; it was "the congressional purpose that private actions serve 'as a bulwark of antitrust enforcement.'" *Zenith,* 401 U.S. at 340; *see Minn. Mining & Mfg. Co. v. N.J. Wood Finishing Co.,* 381

U.S. 311, 318 (1965) ("Congress has expressed its belief that private antitrust litigation is one of the surest weapons for effective enforcement of the antitrust laws").

*Second*, the usual considerations that favor curtailing rights of action on limitations grounds have no application in a case like this one. "So long as a monopolist continues to use the power it has gained illicitly to overcharge its customers, it has no claim on the repose that a statute of limitations is intended to provide." *Berkey Photo*, 603 F.2d at 296. And "there can be no unfairness in preventing a monopolist that has established its dominant position by unlawful conduct from exercising that power in later years to extract an excessive price. … The taint of an impure origin does not dissipate after four years if a monopolist continues to extract excessive prices because of it." *Id*. Thus, defendants "hardly are in a position to argue for the protection of the statute of limitations on the traditional ground that evidence has been lost, memories have faded, and witnesses have disappeared … when it is the defendants' own recent conduct that results in a finding of a newly accruing cause of action." *Imperial Point Colonnades Condo.,* 549 F.2d at 1041 (cleaned up).

Nor, for that matter, would the rule adopted by the district court draw rational lines. Under the district court's approach, defendants are not assured repose for practices formulated more than four years ago because *customers* may bring damages actions arising out of such practices (again, the district court recognized that CSXT itself could challenge the $210 switch rate had it paid that rate and proceeded here as a customer) and, in cases not subject to Section 26, private plaintiffs and the government each also may pursue injunctive relief to challenge those practices. It is only when the plaintiff seeks damages for the monopolistic policy as a competitor that the repose kicks in—an outcome that has no basis in statute-of-limitations policy and serves simply to deny relief to one disfavored set of injured plaintiffs. At the same time, because *Klehr* allows actions only for damage occurring during the limitations period, permitting suit for harm caused by business exclusion during that period "does not discourage timely filed suits" or encourage potential plaintiffs to sleep on their rights. *Propane*, 860 F.3d at 1068.

## II.   Defendants Committed Overt Acts That Caused A Right Of Action To Accrue When They Took Steps In 2015-2018 To Keep CSXT From Conducting Business At NIT.

In addition, even if being denied business during the limitations period by continued application of an exclusionary rate is insufficient standing alone to restart the limitations period, CSXT established that NSR and NPBL committed new injurious acts between 2015 and 2018—and thus restarted the statute of limitations—when they took further discrete steps to perpetuate their antitrust violation.

1. The district court recognized record evidence supporting the proposition that, in 2015, NPBL demanded (and collected) an excessive switch rate from CSXT and, even as to CSXT trains that did enter NIT that year, NSR and NPBL unreasonably delayed and complicated CSXT's use of the NIT tracks. *See* pages 9-10, *supra*. The court nevertheless held that these acts did not restart the limitations period because CSXT's basic antitrust claim rests on exclusion from the NIT market, "such exclusion took effect in or around 2009," and the events of 2015 are "wholly untethered to such [2009] acts." Dkt. 559, at 51; *see id*. at 60-61 (similar as to NSR-NPBL trackage dispute of 2015-2016). But that is not so. The 2015-2016 acts plainly were in aid of, were "tethered to," and were

58

designed to facilitate the market exclusion that commenced in 2009. Consequently, this conduct constituted "a specific act or word … during the limitations period" that effectuated CSXT's continued exclusion from the market. *Poster Exch.*, 517 F.2d at 129.

2. The district court used a different rationale in dismissing the relevance of CSXT's unsuccessful 2018 proposal that NPBL and NSR lower the switch rate. *See* pages 10-11, 17-18, *supra.* There, the court reasoned that, because the rate proposal was never *formally* denied by NPBL, defendants' failure to react to the proposal could not serve as an overt act that restarted the limitations period. Dkt. 559, at 66-69, 76. This action–inaction distinction was key to the district court's decision on the point: The court recognized that the limitations period would have restarted "if there was a new vote by the NPBL Board denying CSX the ability to reenter the market at a lower [switch] rate." *Id.* at 69.

For several reasons, this reasoning is mistaken.

*First*, it assumes away the problem. The switch rate implemented in 2009-2010 and still in force in 2018 has been shown to be illegal, at least for purposes of defeating summary judgment. Continuing to charge that rate when a new one was proposed therefore also must have been

59

illegal, constituting conduct that continued the monopoly—and restarted the statute of limitations.

*Second*, that defendants retained the existing rate through "purposeful inaction" rather than an affirmative act of reimposing the rate does not change the conclusion. We show above (at 51-52) that many forms of unlawful conduct are accomplished through failure to act, as in *Lower Lake Erie* (998 F.2d at 1172), in which the defendants' decades-long retention of supracompetitive prices constituted injurious conduct. So too here, NPBL's refusal even to put CSXT's proposal to a vote effectively *was* a decision to reject the lower switch rate, whether that was accomplished by acting affirmatively or by strategically choosing to do nothing.

In ruling to the contrary, the district court relied on *Charlotte Telecasters*. *See* Dkt. 559, at 76-77. But that reliance was misplaced. There, this Court indicated that "the last overt act of the alleged conspiracy" occurred when, in response to the plaintiff's request that the defendant city council reconsider its franchise application, the council "took no further action." 546 F.2d at 572-73. In just the same way here, defendants

"took no further action" in response to CSXT's request for a revised switch rate—and in doing so also committed an overt act.

That this sort of inaction *is* a limitations-restarting act is confirmed by the refusal-to-deal and analogous cases, in which the plaintiffs' unsuccessful request for an end to exclusionary conduct constitutes an overt act. *See* pages 45-47; *cf. Nat'l Souvenir Ctr.*, 728 F.2d at 510 (in tying case, "the 'overt act' requirement may be satisfied merely by the parties continuing to maintain contractual relationships that directly affect competition in the tied product market"). Here, too, defendants "continu[ed] to maintain [an exclusionary rate] that directly affect[s] competition in the [relevant] market." *Id*. That was an overt act.

In fact, if the district court were correct and inaction on a proposal may not restart the limitations period, antitrust defendants could avoid liability for their monopolistic acts or refusal-to-deal conspiracies simply by ignoring, rather than expressly denying, attempts by plaintiffs seeking to enter the closed market. There would be no logic to such a rule, which would reward gamesmanship. *See Poster Exch.*, 517 F.2d at 127 (rejecting approach that would transform "the limitations statute … to one of continued immunity").

*Third*, the district court dismissed the probative value of defendants' failure to act on CSXT's proposals for an independent rate committee and a revised NPBL governance structure; the court found the first failure to involve both inaction and speculation about what such a committee would have concluded, and the second to involve action that was final before the start of the limitations period. Dkt. 559, at 61, 69-80. But even accepting for argument's sake that those conclusions are correct on their own terms (and accepting further that the independent-rate-committee and new-governance proposals therefore did not constitute overt acts), they in no way detract from the reality that defendants' disregard of CSXT's *separate* rate proposal *was* an overt act. If anything, the rate-committee and governance proposals accentuate CSXT's strong effort to displace the monopolistic rate. Accordingly, they give greater force to CSXT's demonstration of a restarted statute of limitations.

**CONCLUSION**

The Court should reverse the judgment below.

Dated: August 31, 2023                Respectfully submitted,

                                                MAYER BROWN LLP

                                                /s/ Charles A. Rothfeld

Benjamin L. Hatch                         Charles A. Rothfeld
Robert W. McFarland                     Evan M. Tager
McGuire Woods, LLP                      Carmen N. Longoria-Green
101 W. Main Street, Ste. 9000        MAYER BROWN LLP
Norfolk, VA 23510                          1999 K Street, N.W.
Telephone: (757) 640-3700            Washington, DC 20006
                                                Telephone: (202) 263-3000
                                                etager@mayerbrown.com
Michael A. Scodro
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
Telephone: (312) 701-8886

*Attorneys for Plaintiff-Appellant*

63

## REQUEST FOR ORAL ARGUMENT

Because the issue presented is a significant and recurring one that the district court believed to have prompted inconsistent treatment in the courts, oral argument could assist this Court in the resolution of this case.

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), undersigned counsel certifies that this brief:

(i)    complies with the type-volume limitation of Rule 32(a)(7)(B)(i) and Local Rule 32(b) because it contains 12,991 words, including footnotes and excluding the parts of the brief exempted by Rule 32(f); and

(ii)    complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Office Word 2016 and is set in Century Schoolbook font in a size equivalent to 14 points or larger.

Dated: August 31, 2023          */s/ Charles A. Rothfeld*
                                 Charles A. Rothfeld

65

## CERTIFICATE OF SERVICE

I certify that on this 31st day of August, 2023, the foregoing document was served on all parties or their counsel of record through the CM/ECF system.

/s/ *Charles A. Rothfeld*
Charles A. Rothfeld