No. 23-1537

In the

# United States Court of Appeals
## for the Fourth Circuit

CSX TRANSPORTATION, INC.,

*Plaintiff-Appellant*,

v.

NORFOLK SOUTHERN RAILWAY CO. AND
NORFOLK & PORTSMOUTH BELT LINE RAILROAD CO.,

*Defendants-Appellees*.

On Appeal from the United States District Court for the
Eastern District of Virginia, No. 2:18-cv-00530-MSD-RJK
Hon. Mark S. Davis, *Chief United States District Judge*

## NORFOLK SOUTHERN RAILWAY CO. AND NORFOLK & PORTSMOUTH BELT LINE RAILROAD CO.'S JOINT RESPONSE BRIEF

<table>
<tr>
<td>

Alan Durrum Wingfield
Michael Edward Lacy
TROUTMAN PEPPER HAMILTON
  SANDERS LLP
P.O. Box 1122
Richmond, VA 23218

John Curtis Lynch
Megan Burns
Kathleen Michelle Knudsen
TROUTMAN PEPPER HAMILTON
  SANDERS LLP
222 Central Park Ave., Ste. 2000
Virginia Beach, VA 23462

</td>
<td>

Shay Dvoretzky
  *Counsel of Record*
Parker Rider-Longmaid
Steven Marcus
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
1440 New York Ave., NW
Washington, DC 20005
Telephone: 202-371-7000
shay.dvoretzky@skadden.com

</td>
</tr>
</table>

*Counsel for Defendant-Appellee Norfolk Southern Railway Co.*

*(counsel continue on inside cover)*

*(counsel continued from cover)*

James Long Chapman, IV
William Ryan Snow
Alexander Ryan McDaniel
CRENSHAW WARE & MARTIN, PLC
150 West Main St., Ste. 1500
Norfolk, VA 23510

*Counsel for Defendant-Appellee*
*Norfolk & Portsmouth Belt Line*
*Railroad Co.*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No.  23-1537          Caption:   CSX Transportation, Inc. v. Norfolk Southern Railway Co., et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Norfolk Southern Railway Co.
(name of party/amicus)

who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?    ☑ YES ☐ NO
      If yes, identify all parent corporations, including all generations of parent corporations:

      Norfolk Southern Railway Co. is wholly owned by Norfolk Southern Corporation.

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☑ YES ☐ NO
      If yes, identify all such owners:
      Norfolk Southern Corporation is publicly held and is traded on the New York Stock Exchange under the symbol NSC.

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Shay Dvoretzky                    Date:    November 22, 2023

Counsel for: Norfolk Southern Railway Co.

[Print to PDF for Filing]

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __23-1537__        Caption: __CSX Transportation, Inc. v. Norfolk Southern Railway Co., et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Norfolk and Portsmouth Belt Line Railroad Company__
(name of party/amicus)

_____

 who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?                    ☑YES ☐NO
      If yes, identify all parent corporations, including all generations of parent corporations:

        Norfolk Southern Railway Corporation (co-appellee)
        CSX Transportation, Inc. (appellant)

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                        ☑YES ☐NO
      If yes, identify all such owners:
        Norfolk Southern Railway Corporation (co-appellee): 57%
        CSX Transportation, Inc. (appellant): 43%

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?      ☐YES ☑NO
If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)      ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?      ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.      Is this a criminal case in which there was an organizational victim?      ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ W. Ryan Snow                    Date: November 22, 2023

Counsel for: Norfolk and Portsmouth Belt Line

**Print to PDF for Filing**

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENTS.....................................................................i

TABLE OF AUTHORITIES.................................................... ix

INTRODUCTION ................................................................1

ISSUE STATEMENT ...........................................................6

STATEMENT OF THE CASE.................................................6

I.    Factual background ......................................................6

    A.    Railroads compete to transport cargo from East Coast ports........................................................................6

    B.    Double stacking gives railroad companies significant competitive advantages, and CSX and Norfolk Southern invested in it at different times and in different places...............7

    C.    CSX and Norfolk Southern have different modes of access to the Port of Virginia. ..............................................8

    D.    Belt Line offers switching services at a rate based on its operating costs. .................................................8

    E.    CSX contemplates but does not follow through with proposals to lower the uniform rate just for CSX........................11

II.   Procedural background ..................................................12

    A.    CSX sues in 2018. ............................................12

    B.    The district court grants summary judgment against CSX's claims for damages under the Sherman Act and Virginia law. ..................................................13

        1.    The Sherman Act claims are time-barred............................13

# TABLE OF CONTENTS
(continued)

Page

        a.    The statute of limitations expired on the 2009 ratesetting, and CSX's damages model was fatally flawed. ..................................................14

        b.    The 2015 port congestion did not involve overt acts, and CSX offered no evidence of injury .............................................................15

        c.    The 2018 proposal did not involve overt acts, and CSX offered no evidence of injury ....................16

    2.    CSX's state-law damages claims are time-barred. ...........17

C.    The district court dismisses CSX's remaining claims. ................18

SUMMARY OF ARGUMENT ..............................................................19

STANDARD OF REVIEW ...................................................................25

ARGUMENT ........................................................................................26

A.    The Sherman Act statute of limitations requires a plaintiff to identify actionable conduct within four years of filing suit..............................................................................26

    1.    Statutes of limitations serve important purposes, especially in antitrust cases. ..................................................26

    2.    Statutes of limitations require a cause of action accruing within the limitations period. ..............................28

    3.    The Sherman Act's statute of limitations requires suit within four years of accrual. .........................................29

    4.    The continuing-violation doctrine is not an exception to the accrual rule..................................................31

# TABLE OF CONTENTS
(continued)

Page

5.  A Sherman Act plaintiff must identify an overt act within the limitations period, even if that act is part of continuing violations. .......................................................34

6.  At summary judgment, the plaintiff must provide a damages model that would allow a jury to disaggregate recoverable and unrecoverable damages. ...................................................................37

B.  CSX's action is barred because the effects of the 2009 ratesetting involve no overt act that can restart the statute of limitations, and CSX failed to produce damages evidence anyway. .............................................................39

1.  CSX's challenge to the $210 rate accrued in 2009 and the statute of limitations ran out in 2013, because the continuing maintenance and effects of the rate over time do not involve new overt acts restarting the limitations period. ...........................................................40

2.  Summary judgment was also required because CSX's damages model cannot disaggregate new and accumulating harm from other alleged harm...................44

C.  Neither the 2015 port congestion events nor the 2018 rate proposal involves overt acts that restart the statute of limitations. ...........................................................................46

1.  The 2015 events involved no overt acts, and CSX offered no damages evidence...............................................46

2.  Defendants' response to the 2018 rate proposal does not involve an overt act and CSX offers no damages evidence. ...............................................................................48

## TABLE OF CONTENTS
(continued)

**Page**

D.    CSX's counterarguments are wrong.................................51

    1.    CSX conflates *injury* with *acts*................................51

    2.    *Hanover Shoe* and the other decisions CSX cites do not support its argument but instead confirm the principles set out above.........................................55

    3.    CSX's argument nullifies the overt-act requirement. .......58

    4.    The 2015 and 2018 episodes did not involve overt acts. ..................................................60

    5.    CSX wrongly suggests in a footnote that the Court should remand on its state-law claims if it agrees with CSX's statute-of-limitations theory. ...........................61

CONCLUSION ....................................................................62

CERTIFICATE OF COMPLIANCE ....................................64

CERTIFICATE OF SERVICE .............................................65

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Adams v. Woods*,
  6 U.S. (2 Cranch) 336 (1805) .................................................. 26, 27

*Al George, Inc. v. Envirotech Corp.*,
  939 F.2d 1271 (5th Cir. 1991) ...........................................................41

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
  603 F.2d 263 (2d Cir. 1979) ................................................. 30, 31, 47

*Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*,
  152 F.3d 588 (7th Cir. 1998) ............................................... 38, 50, 51

*Board of Regents of the University of
  the State of New York v. Tomanio*,
  446 U.S. 478 (1980) ...........................................................................26

*Brown v. American Broadcasting Co.*,
  704 F.2d 1296 (4th Cir. 1983) ...........................................................28

*California v. American Stores Co.*,
  495 U.S. 271 (1990) ...........................................................................54

*Champagne Metals v. Ken-Mac Metals, Inc.*,
  458 F.3d 1073 (10th Cir. 2006) .........................................................43

*Charlotte Telecasters, Inc. v. Jefferson-Pilot Corp.*,
  546 F.2d 570 (4th Cir. 1976) ........................................... 3, 14, 21, 22,
  ................................................................................... 24, 25, 29, 30,
  ........................................................................ 36, 50, 53, 59, 61

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) ...................................................................... 38, 44

*Delaware State College v. Ricks*,
  449 U.S. 250 (1980) ..................................................................... 32, 33

*Delta Theaters, Inc. v. Paramount Pictures, Inc.*,
  158 F. Supp. 644 (E.D. La. 1958) .....................................................52

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*DXS, Inc. v. Siemens Medical Systems, Inc.,*
  100 F.3d 462 (6th Cir. 1996) .......................................................... 20, 21, 30, 35

*Evans v. Technologies Applications & Service Co.,*
  80 F.3d 954 (4th Cir. 1996) ................................................................. 25, 26, 33

*Francis v. Booz, Allen & Hamilton, Inc.,*
  452 F.3d 299 (4th Cir. 2006) ............................................................................25

*Gabelli v. SEC,*
  568 U.S. 442 (2013) ...................................................................................... 27, 28

*GO Computer, Inc. v. Microsoft Corp.,*
  508 F.3d 170 (4th Cir. 2007) ........................................................................ 27, 29

*Green v. Brennan,*
  578 U.S. 547 (2016) ...................................................................................... 28, 29, 32

*Gumwood HP Shopping Partners, L.P. v. Simon Property Group, Inc.,*
  221 F. Supp. 3d 1033 (N.D. Ind. 2016) ............................................................38

*Hanover Shoe, Inc. v. United Shoe Machinery Corp.,*
  377 F.2d 776 (3d Cir. 1967) ............................................................................56

*Hanover Shoe, Inc. v. United Shoe Machinery Corp.,*
  392 U.S. 481 (1968) ........................................................... 3, 4, 24, 55, 56, 57

*In re Lower Lake Erie Iron Ore Antitrust Litigation,*
  998 F.2d 1144 (3d Cir. 1993) ................................................... 24, 25, 59, 60, 61

*In re Mylan N.V. Securities Litigation,*
  No. 16-cv-7926, 2023 WL 2711552
  (S.D.N.Y. March 30, 2023) ...............................................................................39

*In re Pre-Filled Propane Tank Antitrust Litigation,*
  860 F.3d 1059 (8th Cir. 2017) (en banc)..........................................................30

*Kaw Valley Electric Cooperative Co. v. Kansas
  Electric Power Cooperative, Inc.,*
  872 F.2d 931 (10th Cir. 1989) ..................................................................... 41, 43

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Klehr v. A. O. Smith Corp.*,
    521 U.S. 179 (1997)............................................................................ 3, 20, 21, 22,
    ................................................................................................ 30, 32, 34, 35,
    ................................................................................... 39, 44, 50, 52, 53, 59

*Lancianese v. Bank of Mount Hope*,
    783 F.2d 467 (4th Cir. 1986) ........................................................ 2, 20, 29, 30,
    .......................................................................................... 35, 40, 41, 53, 55

*Ledbetter v. Goodyear Tire & Rubber Co.*,
    550 U.S. 618 (2007)....................................................................................... 21, 33

*Magnetar Technologies Corp. v. Intamin, Ltd.*,
    801 F.3d 1150 (9th Cir. 2015) ........................................................ 37, 38, 39, 44

*Mayor & City Council of Baltimore v.*
    *Actelion Pharmaceuticals, Ltd.*,
    995 F.3d 123 (4th Cir. 2021) ........................................................ 30, 47, 53, 54

*MCI Communications Corp. v.*
    *American Telephone & Telegraph Co.*,
    708 F.2d 1081 (7th Cir. 1983) ........................................................ 38, 39, 45, 46

*Midwestern Machinery Co. v. Northwest Airlines, Inc.*,
    392 F.3d 265 (8th Cir. 2004) ................................................................ 35, 56, 57

*National Advertising Co. v. City of Raleigh*,
    947 F.2d 1158 (4th Cir. 1991) ...................................................... 2, 20, 33, 52, 57

*Norfolk Southern Railway Co. v. Surface Transportation Board*,
    72 F.4th 297 (D.C. Cir. 2023) ................................................................................9

*Order of Railroad Telegraphers v. Railway Express Agency, Inc.*
    321 U.S. 342 (1944)................................................................................................27

*Parkway 1046, LLC v. U. S. Home Corp.*,
    961 F.3d 301 (4th Cir. 2020) ..............................................................................29

*Poster Exchange, Inc. v. National Screen Service Corp.*,
    517 F.2d 117 (5th Cir. 1975) ................................................................ 57, 58, 59

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Rotella v. Wood*,
  528 U.S. 549 (2000).........................................................................28

*Samsung Electronics Co. v. Panasonic Corp.*,
  747 F.3d 1199 (9th Cir. 2014) ........................................................58

*SD3 II LLC v. Black & Decker (U.S.) Inc.*,
  888 F.3d 98 (4th Cir. 2018) ............................................................54

*United Air Lines, Inc. v. Evans*,
  431 U.S. 553 (1977).........................................................................32

*United States Football League v. National Football League*,
  842 F.2d 1335 (2d Cir. 1988) ............................................... 3, 22, 38

*US Airways, Inc. v. Sabre Holdings Corp.*,
  938 F.3d 43 (2d Cir. 2019) ........................................... 20, 21, 31, 35,
  .......................................................................... 41, 42, 43, 56, 57

*Varner v. Peterson Farms*,
  371 F.3d 1011 (8th Cir. 2004) ........................................................35

*Wallace v. Kato*,
  549 U.S. 384 (2007)............................................................ 19, 20, 28

*Wilson v. Garcia*,
  471 U.S. 261 (1985)................................................................. 26, 27

*Wood v. Carpenter*,
  101 U.S. 135 (1879)................................................................. 19, 27

*Woodard v. Lehman*,
  717 F.2d 909 (4th Cir. 1983) ..........................................................33

*Xechem, Inc. v. Bristol-Myers Squibb Co.*,
  372 F.3d 899 (7th Cir. 2004) ..........................................................35

*Z Technologies Corp. v. Lubrizol Corp.*,
  753 F.3d 594 (6th Cir. 2014) .................................................... 42, 43

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Zenith Radio Corp. v. Hazeltine Research, Inc.,*
    401 U.S. 321 (1971) ........................................................................ 2, 3, 20, 21, 26,
    ........................................................................................ 29, 30, 34, 35, 40,
    ........................................................................ 44, 51, 52, 53, 55, 57, 59

**STATUTES**

Sherman Act, 15 U.S.C. § 1 *et seq.*........................................................ 1, 2, 6, 12,
    ........................................................................................ 13, 19, 21, 23,
    ........................................................................ 24, 26, 29, 34, 51, 55

15 U.S.C. § 1 ........................................................................................ 12, 13

15 U.S.C. § 2 ........................................................................................ 12, 13

15 U.S.C. § 15b ........................................................................ 1, 2, 19, 29, 40, 54

15 U.S.C. § 26 ........................................................................ 18, 24, 54

42 U.S.C. § 2000e-5(e)(3)(A) ........................................................................21

**RULE**

Fed. R. Civ. P. 56(c) ................................................................ 25, 26, 28

**OTHER AUTHORITY**

Phillip Areeda & Herbert Hovenkamp,
    *Antitrust Law: An Analysis of Antitrust*
    *Principles and Their Application*
    (2023 Supplement) ........................................................................ 2, 27, 28, 31,
    ........................................................................................ 34, 35, 36, 37, 38,
    ........................................................................ 39, 43, 45, 53, 54, 57

## INTRODUCTION

In 2009, the Board of the Norfolk & Portsmouth Belt Line Railroad Company (Belt Line) voted to set the rate it charged for switching services to and from Norfolk International Terminal (NIT) to $210 per railcar to cover costs. CSX Transportation, Inc., which has a minority stake in Belt Line and seats on its Board, doesn't have its own tracks at NIT, but it can use trucks or Belt Line's switching services to access NIT. Not wishing to pay $210, however, CSX threatened litigation. But CSX waited nine years to sue, well beyond the Sherman Act's four-year statute of limitations. 15 U.S.C. § 15b. Until 2015, CSX never tried paying the rate for intermodal shipments out of NIT (and then suing for overpayment as a customer). And when it finally sought treble damages in 2018, its expert model—its only evidence of damages—failed to disaggregate damages resulting from pre-limitations-period conduct from damages resulting from within-limitations period conduct, making awarding damages impossible. So the district court granted summary judgment for Norfolk Southern and Belt Line.

The district court got it right. A competitor cannot sit on its hands for twice the limitations period and then sue just because it claims it is still suffering injury from expired acts. Statutes of limitations are designed to stop

just that kind of gamesmanship to prevent stale evidence, provide repose, and promote prompt suits for the public's benefit. CSX did not identify an overt act in the limitations period. Nor did it offer any evidence of alleged damages resulting from conduct within the limitations period, which is independently fatal. The Court should affirm.

1.      The Sherman Act's four-year statute of limitations begins to run when a cause of action "accrues," 15 U.S.C. § 15b—when the defendant's act causes the plaintiff injury and the plaintiff can sue. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971). That act must be "within the limitations period." *Lancianese v. Bank of Mount Hope*, 783 F.2d 467, 470 (4th Cir. 1986). These rules prevent plaintiffs from upsetting settled expectations by claiming some contemporary injury dating back to decades-old conduct. Injuries from out-of-limitations-period conduct do not restart the statute of limitations. The so-called "continuing-violation" doctrine "is occasioned by continual unlawful acts, not continual ill effects from an original violation." *National Advertising Co. v. City of Raleigh*, 947 F.2d 1158, 1166 (4th Cir. 1991); *see* Phillip Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 320c4 (2023 Supplement). A plaintiff

must sue within four years of the initial act causing injury or an overt act that causes a new injury.

A plaintiff also must show an injury from the overt act. At summary judgment, the plaintiff must produce evidence allowing the jury to disaggregate damages caused by the challenged acts from damages caused by other factors, like lawful acts or pre-limitations-period conduct. *See, e.g., United States Football League v. National Football League*, 842 F.2d 1335, 1378-79 (2d Cir. 1988). If that showing fails, so does the claim.

**2.** Applying those rules here is straightforward. CSX claims the 2009 ratesetting inflicts injury "every day" on its ability to compete with Norfolk Southern. But those alleged effects do not keep the statute of limitations open. CSX must identify an overt act—an affirmative act taken by Norfolk Southern or Belt Line—within the limitations period. It cannot. Inaction after the claim accrues—like the mere continuation of a rate set years earlier—is not enough to restart the statute of limitations. *See Charlotte Telecasters, Inc. v. Jefferson-Pilot Corp.*, 546 F.2d 570, 573 (4th Cir. 1976); *Zenith*, 401 U.S. at 338; *Klehr v. A. O. Smith Corp.*, 521 U.S. 179, 189 (1997).

The "continuing violation doctrine" doesn't say otherwise. Nor does CSX's main authority, a footnote in *Hanover Shoe, Inc. v. United Shoe*

- 3 -

*Machinery Corp.*, 392 U.S. 481, 502 n.15 (1968). *Hanover Shoe* involved a claim by a *customer*, not a *competitor*, who entered into leases within the limitations period. The caselaw makes clear that the nature of the injury (as a customer or a competitor) determines when a claim accrues and the limitations period begins. Because CSX sued as a *competitor*, not a *customer*, its injury—the profits it allegedly lost because of its inability to compete with Norfolk Southern at NIT—occurred, and its claims accrued, in 2009. That was when the ratesetting allegedly inflicted anticompetitive injury, *i.e.*, precluding CSX from on-dock rail access at NIT. Paying an allegedly too-high price later, in 2015, might harm a customer. But that's not CSX's theory, because a competitor paying the rate suffers no injury *as a competitor* precisely because paying the rate grants it access to NIT.

What's more, CSX failed to show damages. Its only evidence, an expert report from Dr. Howard Marvel, calculated harm from *all* of Norfolk Southern's alleged unlawful conduct, including conduct CSX no longer challenges (like a dispute about termination of an unrelated track) and conduct outside the limitations period (like the 2009 ratesetting). By failing to disaggregate damages caused by the $210 rate, CSX dead-ended its claims.

3.     These principles also doom CSX's attempts to identify overt acts in 2015 and 2018. CSX briefly paid Belt Line the $210 rate in 2015, but that's a *customer's* harm, not a *competitor's*, and CSX brought only a competitor suit—forfeiting, as the district court found, any customer contentions. In any event, CSX didn't attempt to quantify damages related to 2015 events, again forfeiting the claim.

Norfolk Southern's and Belt Line's responses to CSX's informal 2018 proposal to reduce the rate to $80 per railcar didn't involve an overt act either. Despite having two members on Belt Line's Board, CSX never sought a vote on its proposal, or on forming a committee to consider that proposal, even though Belt Line management endorsed commissioning a committee. Instead, CSX *obtained a stay* of Surface Transportation Board (STB) proceedings to determine Belt Line's cost for Norfolk Southern trackage rights—a key cost input for any Belt Line switch rate—delaying any change to the switch rate.

4.     CSX's complaints about indefinite antitrust immunity are unconvincing. *First*, CSX knew about the ratesetting—it objected to the ratesetting as a shareholder through its seats on the Board—and threatened litigation, in 2009. Yet CSX waited more than twice the limitations period to sue.

*Second*, customers asserting Sherman Act injuries for paying supracompetitive rates within the limitations period can sue, but CSX didn't sue as a customer. *Third*, the United States can seek injunctive relief. None of that has happened here, likely because Belt Line charges a rate to cover its costs.

## ISSUE STATEMENT

Whether the district court properly granted summary judgment on CSX's Sherman Act claims because CSX failed to identify any overt acts committed during the four-year limitations period causing new injury and produced no evidence a jury could use to calculate damages.

## STATEMENT OF THE CASE

### I.    Factual background

### A.    Railroads compete to transport cargo from East Coast ports.

Companies shipping containers overseas to and from the United States have a choice of competing ports and modes of transportation. For instance, a company might compare pricing and timing at all major East Coast ports. Dkt.310.6-7.

Once an ocean carrier docks, containers can be transported inland by truck, rail, or both—"intermodal transportation," or transportation by multiple modes. For instance, "drayage" takes containers from the dock by truck

to a local railyard, where they continue on by rail. Dkt.559.3. Railroads with-out on-dock access may also need to use tracks belonging to other railroads, including though switching services provided by switching railroads, like Belt Line, that assemble trains and transfer them between different railroads for a fee. Dkt.310.3.

### B. Double stacking gives railroad companies significant competitive advantages, and CSX and Norfolk Southern invested in it at different times and in different places.

"Double stacking" allows railroads to transport multiple containers in the well of a single railcar. Recognizing the efficiencies double stacking would bring customers—increased capacity from shorter trains requires fewer locomotives, *see* Dkt.310.4—Norfolk Southern invested hundreds of millions of dollars to offer double-stack service across its rail network. Dkt.310.8. By 2010, Norfolk Southern had achieved double-stack service be-tween the Port of Virginia and the Midwest, giving it the most efficient routes to Chicago. Dkt.466.7.

CSX, in contrast, worked to develop double-stack capability into and out of the Port of New York-New Jersey in the late 1990s. Dkt.310.25. CSX's best route to the Midwest goes through that Port, not the Port of Virginia. Dkt.466.15. CSX achieved double-stack capability through the Port of

Virginia in late 2016. Dkt.310.9. After that, CSX's share of business at the Port of Virginia increased. Dkt.310.15.

### C. CSX and Norfolk Southern have different modes of access to the Port of Virginia.

Until May 2020, the Port of Virginia had three terminals supporting international intermodal traffic: Virginia International Gateway (VIG), Portsmouth Marine Terminal (PMT), and NIT. Dkt.310.4. The Virginia International Terminal, which operates the Port of Virginia, directs ocean carriers to a particular terminal for unloading. Dkt.310.6.

At VIG, CSX and Norfolk Southern both have on-dock rail access via another railroad. Dkt.310.4. CSX had on-dock access at PMT until PMT shuttered in 2020, and Norfolk Southern could access PMT by using Belt Line and paying the uniform Belt Line switch rate (discussed below). Dkt.310.5. At NIT, Norfolk Southern has on-dock rail access over its own tracks, while CSX can use drayage (subsidized by NIT) or use Belt Line by paying Belt Line's switch rate. *Id.*; Dkt.599.3, Dkt.599.49.

### D. Belt Line offers switching services at a rate based on its operating costs.

Belt Line was founded in 1896 by eight railroads to provide switching services in the Hampton Roads area of Virginia. Dkt.66.2. By 1989, railroad

consolidations left Belt Line in the hands of three railroads: CSX, Norfolk and Western Railway, and Southern Railway. Dkt.66.4. In 1989, Belt Line's Board adopted a Supplemental Agreement granting Norfolk and Western Railway and Southern Railway together (under common Norfolk Southern ownership) the right to appoint three voting members of the Board and CSX two; the Board appoints Belt Line's president, the sixth voting member. Dkt.1-3.5. Norfolk and Western Railway and Southern Railway subsequently merged, forming Norfolk Southern, which then held 57% of Belt Line's shares, with CSX holding the remaining 43%. *See* Dkt.66.5.*

Belt Line's bylaws require it to break even, generating only enough profit to pay shareholders a 6% dividend. Dkt.310.10. Belt Line must establish "a uniform rate … for the movement of freight cars." Dkt.1-1.3-4. The rate may be "adjusted from time to time," but must be "sufficient" to cover Belt Line's costs and pay the dividend. *Id.* Belt Line thus sets the switch rate based on its operating expenses. Dkt.310.11.

---

* In 2022, the STB decided (incorrectly, in Norfolk Southern's view, but not part of this appeal) that Norfolk Southern's consolidation of 57% ownership of Belt Line, and subsequent corporate reorganizations, didn't give Norfolk Southern antitrust immunity for its operations with Belt Line. *See Norfolk Southern Railway Co. v. STB*, 72 F.4th 297, 306-08 (D.C. Cir. 2023), *cert. petition forthcoming*, No. 23A226 (U.S.).

Before 2009, Belt Line charged $148.50 per railcar well for switching services for international cargo. Dkt.559.49-50. In 2009, Belt Line commissioned a committee of Belt Line managers and representatives from CSX and Norfolk Southern to review its rates. Dkt.328.11; *see* Dkt.297.9. The committee recommended a uniform rate for all cargo of $210 per railcar well, and the Belt Line Board approved the recommendation. *See* Dkt.559.49. If CSX could double-stack, it could have shipped two containers for $105 each under Belt Line's rate, but it couldn't, so CSX would have to pay $210 to ship a single container. Belt Line set that rate to cover its operating costs plus a 6% dividend. Dkt.310.10-11. CSX's Director of Joint Facilities described the rate as "in the neighborhood of what [CSX] had been expecting," and "not an unusual number for a terminal switch carrier." Dkt.297.9. Even so, in 2009, CSX threatened to sue Belt Line regarding the $210 rate. Dkt.310.12. CSX didn't follow through.

Belt Line's $210 rate has not changed since 2009. Between 2009 and 2018, CSX sought to use Belt Line's switching services to access NIT only a few times, in 2015, during a period of "extreme port congestion across the East Coast," when CSX's drayage program couldn't keep up. Dkt.559.45-46.

### E.   CSX contemplates but does not follow through with proposals to lower the uniform rate just for CSX.

In 2010, CSX proposed that Belt Line agree to a rate of $37.50 for intermodal freight. Dkt.310.12. Belt Line concluded that $37.50 wouldn't cover costs, and neither CSX nor any Board member moved for a vote on the proposal. *Id.*

One of those costs is the rate Belt Line pays Norfolk Southern to traverse part of Norfolk Southern's tracks based on a 99-year agreement. Dkt.559.54. That rate is a "critical input," Dkt.559.78, because Belt Line's switch fee *must* cover its costs, *see* Dkt.310.10. In 2016, that 99-year agreement expired, and Belt Line and Norfolk Southern began negotiating a new trackage rights fee. *See* Dkt.559.54-55. In 2018, unable to agree, the parties commenced an expedited proceeding before the STB to resolve the dispute and establish a new fee. Dkt.559.55.

While those negotiations were ongoing, in 2018, after CSX achieved double-stacking capability at the Port of Virginia, CSX proposed by email and letter that Belt Line give CSX alone a special $80-per-railcar-well rate rather than charge CSX the $210 uniform rate. *See* Dkt.559.61-62. CSX stated that it was "willing to work through [a rate committee] if necessary."

Dkt.310.12. Writing back, Belt Line's president was "outwardly receptive," opining that the proposal "merited being sent to the [Belt Line] Board to evaluate through a 'rate committee.'" Dkt.559.62.

At the Board meeting a few weeks later, the president discussed CSX's letter and said that Belt Line's management was reviewing the matter. Dkt.559.66-67. No Board member, including CSX's representatives, moved for a rate committee, or to vote directly on the $80 proposal. Dkt.559.67. One of CSX's representatives on the Board could "not recall anything being presented to the" Board about the issue "as an action item." Dkt.559.67-68.

CSX also sought to delay the STB's determination of the appropriate trackage fee to be paid by Belt Line to Norfolk Southern, a critical cost component of Belt Line's uniform switch rate. Rather than push to resolve that dispute, CSX requested, and the STB agreed, to stay the proceeding. Dkt.559.57. As the district court observed, CSX "acted to halt" and "delay" the STB process, thus impeding any change to the $210 rate. Dkt.559.78.

## II.    Procedural background

### A.    CSX sues in 2018.

CSX sued Norfolk Southern and Belt Line on October 4, 2018, bringing four claims under the Sherman Act, 15 U.S.C. §§ 1 and 2 (conspiracy to

restrain trade, conspiracy to monopolize, monopolization, and attempted monopolization), as well as Virginia state-law claims. CSX argued that the $210 rate, set in 2009, was "prohibitively expensive" and barred CSX from "compet[ing] on fair terms at NIT." Dkt.1 ¶¶ 4-5. CSX contended that the $210 switch rate excluded CSX from "compet[ing] in the relevant market," causing CSX injury in the form of lost profits, Dkt.1.22 ¶ 64.

### B. The district court grants summary judgment against CSX's claims for damages under the Sherman Act and Virginia law.

#### 1. The Sherman Act claims are time-barred.

The district court granted summary judgment against CSX's Sherman Act damages claims, concluding that they were barred by the statute of limitations. Where the injury "involves exclusion from an industry," the court reasoned, the statute of limitations begins to run when the "excluded would-be competitor … has knowledge of the public act of exclusion." Dkt.559.13. CSX claims it was excluded from competition by the 2009 ratesetting, injuring its ability to compete at NIT. Dkt.559.14. Allowing CSX to recover damages would reward "a plaintiff that has slept on its rights for years." Dkt.559.80.

The court rejected CSX's reliance on the continuing-violation doctrine, which required CSX to show that "an overt act occurred 'within the four years preceding the filing of the complaint.'" Dkt.559.35 (quoting *Charlotte Telecasters*, 546 F.2d at 573). And an overt act must "inflict new and accumulating injury on the plaintiff." Dkt.559.39. Thus, a "later reaffirmation of long memorialized final contract terms is not an actionable 'overt act' capable of restarting the limitations period." Dkt.559.31. What's more, the plaintiff must offer a damages model that "demonstrate[s] that the harm supporting a damages claim … flows from unlawful acts *committed during the limitations period*." Dkt.559.42.

Applying those principles, the district court found CSX's antitrust damages claims time-barred and rejected CSX's reliance on the 2015 and 2018 events as overt acts.

### a. The statute of limitations expired on the 2009 ratesetting, and CSX's damages model was fatally flawed.

"[A]n overt act committed in 2009" that "causes harm *beginning* in 2009 and continuing through 2020," the district court explained, "may *not* be the basis for an antitrust suit filed in 2018." Dkt.559.27. "What matters is the timing of *the overt acts*": CSX can only recover for "new damages arising from

- 14 -

new overt acts committed during the limitations period." Dkt.559.26-27. Belt Line's maintenance of the $210 rate after 2009 is not the kind of "'fine-tuning' or continued actions" that count as an overt act. Dkt.559.43 n.12.

The court also found CSX's case failed because CSX's damages model didn't disaggregate damages from conduct for which CSX could recover and conduct for which it couldn't, like lawful conduct or outside-limitations-period conduct. *See* Dkt.559.52. Marvel's model, the *only* damages evidence CSX supplied, "limited itself to a *singular* theory of recovery"—meaning that a jury would have no way to calculate damages for the challenged within-limitations-period conduct. Dkt.559.51.

### b. The 2015 port congestion did not involve overt acts, and CSX offered no evidence of injury.

The district court next rejected CSX's argument that its payment of the $210 rate and delayed train movements in 2015 involved overt acts. The court found the argument waived "because [CSX] did not identify the overcharge as an overt act during discovery" even after it "was compelled by the Court to answer [Belt Line's] interrogatory" about overt acts. Dkt.559.47.

The argument also failed on the merits. CSX's theory of injury was "based on its exclusion from the market," *not* its status "as a [Belt Line]

customer." *Id.* CSX couldn't claim harm as a customer paying allegedly supracompetitive prices (and CSX never presented any evidence about resulting injury to *shippers*, a required element in antitrust) when its theory was that the $210 rate excluded it from shipping contracts that instead went to Norfolk Southern, *see* Dkt. 328.49. That harm as a competitor accrued in 2009, not 2015. *See* Dkt.559.50.

CSX's claims failed for other reasons, too. CSX provided no "damages model whatsoever to calculate the harm it suffered"—which would have been "minimal"—by paying the $210 rate in 2015. Dkt.559.47-48. CSX also didn't quantify any harm from the 2015 congestion. *See* Dkt.559.48. Nor did CSX show that it suffered "new and accumulating injury" in 2015. Dkt.559.49.

### c. The 2018 proposal did not involve overt acts, and CSX offered no evidence of injury.

The court then rejected CSX's argument that its 2018 rate proposal involved overt acts. (The court also rejected CSX's argument that Belt Line's treatment of CSX's governance proposal was an overt act, but CSX doesn't challenge that ruling on appeal.) Viewing the record "in the light most favorable to CSX," the court explained that Belt Line "was outwardly receptive

- 16 -

to [CSX's] proposal," and that Belt Line's management thought "it merited being sent to the [Belt Line] Board to evaluate through a 'rate committee.'" Dkt.559.62, 66. Belt Line's president told CSX that he would "recommend to the Board for a rate committee to do a complete review of the [$80 rate]." Dkt.559.63 (quoting Dkt.328-15, at 1). Relying on Board minutes (the accuracy of which CSX did not challenge), plus testimony from a CSX-appointed Board member, the court concluded that CSX had offered no evidence that any "motion, action item, vote, or other *board action* was taken by [Belt Line] with respect to a rate committee." Dkt.559.66-67.

### 2. CSX's state-law damages claims are time-barred.

The district court also granted summary judgment against CSX's state-law damages claims. Dkt.559.94-103.

Virginia law imposes a five-year limitations period for breach-of-contract and conspiracy claims, and a two-year period for breach-of-fiduciary-duty claims. Dkt.559.95. Those periods "begin[] to run when th[e] cause of action accrues"—when "the plaintiff first suffers the alleged harm." *Id.* Unlike CSX's antitrust claims, which relied on the continuing-violation doctrine, CSX presented its state-law claims as "a series of distinct claims." Dkt.559.96.

- 17 -

The court granted summary judgment against the conspiracy claim because CSX failed to satisfy the heightened evidentiary standard *and* because CSX didn't identify "a *new agreement* to harm CSX" during the limitations period. Dkt.559.97. The court granted summary judgment against the breach-of-contract claim because the 1989 agreement gave Norfolk Southern "the *explicit contractual right* to appoint three of [Belt Line's] directors," and "exercis[ing] this specific contractual right cannot form the basis of a breach of contract claim." Dkt.559.100. And to the extent that CSX claimed that Norfolk Southern's actions in 2015 were a breach of contract, CSX failed to establish any damages to its business as a result of any breach. Dkt.559.102.

## C.    The district court dismisses CSX's remaining claims.

In a subsequent opinion, the district court dismissed CSX's remaining claims. The court first held that it could not grant injunctive relief, because the injunctive-relief statute says that "nothing herein contained shall be construed to entitle any[one] … except the United States, to bring suit for injunctive relief against any common carrier subject to the jurisdiction of the [STB]." Dkt.613.16-17; 15 U.S.C. § 26.

In another opinion, the district court dismissed any remaining state-law claims for injunctive relief as likewise untimely, finding that "equity

follows the law" in Virginia, so "a demand that would be barred if asserted in a legal forum will be equally barred in equity." Dkt.643.1-2, 6. The court also held that injunctive relief is unavailable under Virginia law for a potential breach of contract claim involving the 2015 events. Dkt.643.18-22.

CSX doesn't challenge any of the court's rulings on injunctive relief.

## SUMMARY OF ARGUMENT

**I.**    CSX's claims are barred by the Sherman Act's four-year statute of limitations, which begins running when a defendant acts and causes injury to the plaintiff. 15 U.S.C. § 15b. CSX sued in 2018, pointing to conduct *in 2009* and then *inaction* for the next nine years—even though CSX was fully aware of the conduct and even threatened litigation in 2009. CSX itself took no action within nine years. The Court should affirm.

**A.    1.**    Statutes of limitations run when a claim accrues. And a claim accrues when a plaintiff can file suit and obtain relief. Those basic rules are not mere technicalities: They provide "security and stability to human affairs," *Wood v. Carpenter*, 101 U.S. 135, 139 (1879), encouraging plaintiffs to sue before evidence becomes stale and memories fade.

**2.**    The Sherman Act imposes a four-year statute of limitations that begins running "after the cause of action accrue[s]." 15 U.S.C. § 15b. A claim

accrues when the plaintiff has a "complete and present cause of action," *Wallace v. Kato*, 549 U.S. 384, 388 (2007), and an antitrust plaintiff suing a competitor has a complete and present cause of action "when a defendant commits an act that injures a plaintiff's business," *Zenith*, 401 U.S. at 338. Thus, to satisfy the statute of limitations, the plaintiff must identify an anticompetitive act "within the limitations period." *Lancianese*, 783 F.2d at 470. And because a cause of action includes act and injury, the *type* of injury can change the analysis. An antitrust plaintiff may allege injury as a *competitor* to the defendant (injured by exclusion from competition) or injury as a *customer* of the defendant (injured by paying a supracompetitive price for a service).

**3.** These rules also apply to a "continuing conspiracy." *Zenith*, 401 U.S. at 338. A plaintiff cannot simply identify an act *outside* the limitations period (say, an unlawful merger or the enactment of a policy) that causes injury *within* the limitations period. A plaintiff's failure to timely challenge the initial unlawful act forecloses a later suit, even if that act causes later harm. That's because a "continuing violation is occasioned by continual unlawful acts, not continual ill effects from an original violation." *National Advertising*, 947 F.2d at 1166; *Klehr*, 521 U.S. at 189. To restart the statute of limitations, the plaintiff must identify a new, independent, and actionable

- 20 -

act—not a mere reaffirmation of the out-of-limitations-period act—that "inflict[s] new and accumulating injury on the plaintiff," *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 68 (2d Cir. 2019) (quoting *DXS, Inc. v. Siemens Medical Systems, Inc.*, 100 F.3d 462, 467 (6th Cir. 1996)), because the "statute of limitations period runs from the commission of the *act*." *Zenith*, 401 U.S. at 338 (emphasis added). Thus, when a plaintiff claims that a defendant violated the Sherman Act by enacting a policy outside the limitations period, the plaintiff must point to independent acts showing that a cause of action accrued inside the limitations period. *Id*. Silence or inaction is not enough. *Charlotte Telecasters*, 546 F.2d at 572-73.

**4.** The "continuing-violation" doctrine is an application of, not an exception to, these settled rules. Courts apply that doctrine when a defendant commits an unlawful act outside, but continuing into, the limitations period. In those cases, the plaintiff still must identify an "overt act" within the limitations period. *Klehr*, 521 U.S. at 189. That fundamental rule applies in cases across areas of law. *See, e.g.*, *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618, 628 (2007), *superseded by statute*, 42 U.S.C. § 2000e-5(e)(3)(A).

**5.** The rule is the same in antitrust cases. *See Zenith*, 401 U.S. at 338. The plaintiff must identify a new and independent act within the limitations

period—not a mere reaffirmation of outside-limitations-period conduct—and it must cause the plaintiff new and accumulating injury. *See Klehr*, 521 U.S. at 190. When a defendant enacts a policy before the limitations period, the continuation of the policy, without more, is not an overt act that restarts the limitations period. *See Charlotte Telecasters*, 546 F.2d at 572.

**6.**    The plaintiff must also show an injury from the overt act in the limitations period. At summary judgment, the plaintiff must produce evidence that would allow the factfinder to disaggregate the damages caused by the challenged acts from damages caused by "other factors," like lawful conduct or acts outside the limitations period. *See United States Football League*, 842 F.2d at 1378-79. Without such evidence, the plaintiff's claim fails, because, even assuming liability, the factfinder cannot assess damages.

**B.**    These principles foreclose CSX's arguments.

**1.**    CSX's primary argument is that it has suffered recurring injury to its ability to compete with Norfolk Southern because of the 2009 ratesetting. But the statute ran out in 2013. The continuation and ongoing effects of the 2009 ratesetting are not overt acts, much less acts inflicting new harm.

**2.**    CSX hasn't shown injury, either. Marvel's damages model (CSX's only damages evidence) calculated aggregate harm from *all* of

Norfolk Southern's alleged conduct, including conduct outside the limitations period and other theories of liability that CSX has abandoned. CSX's failure to provide evidence of alleged harm from the $210 rate is independently fatal, as precedent makes clear.

**C.**     The 2015 events and the defendants' response to CSX's 2018 letter also do not involve overt acts restarting the limitations period.

**1.**     CSX claimed injury as a *competitor*, not a *customer*, of Belt Line, so its argument that it paid supracompetitive rates in 2015 doesn't restart the statute of limitations for its alleged exclusion from the market based on the 2009 ratesetting. CSX also offered no evidence of damages resulting from its handful of $210 payments and purportedly delayed trains in 2015.

**2.**     CSX's 2018 proposal fails, too. Belt Line was receptive to CSX's proposal and offered to consider it further, but CSX balked. That's *CSX's* inaction, not Belt Line's or Norfolk Southern's. And again, CSX didn't estimate new and accumulating damages for the 2018 episode. CSX thus failed to identify any acts from within the limitations period that caused it injury.

**D.**     CSX's counterarguments lack merit.

**1.**     CSX's novel theory that Norfolk Southern committed an overt act every day the $210 rate was in effect writes the "act" requirement out of

the caselaw and the statute of limitations out of the Sherman Act. A plaintiff cannot sue decades after the enactment of an unlawful policy just by finding some injury traceable to that decades-old act. Moreover, CSX had full knowledge of the alleged conduct when it occurred, participating in the 2009 ratesetting and objecting to the rate through its seats on the Board.

**2.** CSX relies on a footnote in *Hanover Shoe*, 392 U.S. at 502 n.15. But that was a *customer* case, not a *competitor* case. Hanover Shoe sought the difference between what it paid United to lease machines versus what it would have paid if United had been willing to sell those machines. *Id.* at 483-85. In that context, the Supreme Court found that United's active conduct of entering new leases and collecting rents was a continuing violation. But the actionable overt acts a *competitor* must show in the limitations period are actions that impose new harm in excluding the plaintiff from the market—and CSX has shown nothing but the out-of-bounds 2009 ratesetting. And CSX's parade of horribles makes no sense. While CSX is time-barred as a competitor, a *customer* paying supracompetitive prices can sue after its purchase, and the United States can always bring a suit for injunctive relief. 15 U.S.C. § 26.

**3.** Forced to accept the overt act requirement, CSX makes it so broad that it becomes meaningless. CSX relies on *In re Lower Lake Erie Iron*

- 24 -

*Ore Antitrust Litigation*, 998 F.2d 1144 (3d Cir. 1993), but this Court's *Charlotte Telecasters* decision makes clear that inaction cannot be an overt act. Even if it could, *Lower Lake Erie* makes clear that the inaction here wasn't enough.

    **4.**    CSX's 2015 and 2018 arguments fail. The only injuries CSX complains of in 2015 were as a *customer* of Belt Line, and CSX presented *no evidence* of damages. And the defendants' response to the 2018 proposal didn't involve an overt act, because CSX itself didn't request a vote on a new rate—it instead obtained a stay of the STB proceeding that would have produced a key input to *determine* the Belt Line rate. Belt Line couldn't vote down a request that wasn't made.

    **5.**    CSX suggests in a footnote that the Court should revive its state-law damages claims if it prevails on its statute-of-limitations argument. That footnote is insufficient to preserve any argument, and, in any event, the district court correctly dismissed CSX's state-law claims for independent reasons that CSX doesn't challenge on appeal.

## STANDARD OF REVIEW

    This Court reviews the district court's summary judgment ruling de novo. *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 302 (4th Cir. 2006). "Summary judgment is appropriate only when 'there is no genuine issue as

to any material fact and the moving party is entitled to a judgment as a mat-

ter of law.'" *Evans v. Technologies Applications & Service Co.*, 80 F.3d 954, 958

(4th Cir. 1996) (quoting Fed. R. Civ. P. 56(c)).

## ARGUMENT

### A.     The Sherman Act statute of limitations requires a plaintiff to identify actionable conduct within four years of filing suit.

The Sherman Act's statute of limitations, which serves important pur-

poses, begins to run when a claim accrues, and a claim accrues when the

defendant committed an act and the plaintiff suffers injury from that act. A

suit within four years of accrual can recover "the damages caused by that

act." *Zenith*, 401 U.S. at 338. But four years after accrual, the statute of limi-

tation bars suit. *Id.*

### 1.     Statutes of limitations serve important purposes, especially in antitrust cases.

**a.**     "Statutes of limitations are not simply technicalities. On the con-

trary, they have been long respected as fundamental to a well ordered

judicial system," *Board of Regents of the University of the State of New York v.*

*Tomanio*, 446 U.S. 478, 487 (1980), because "[a] federal cause of action

'brought at any distance of time' would be 'utterly repugnant to the genius

of our laws,'" *Wilson v. Garcia*, 471 U.S. 261, 271 (1985) (quoting *Adams v. Woods*, 6 U.S. (2 Cranch) 336, 342 (1805)).

Statutes of limitations "promote justice by preventing surprises," *Order of Railroad Telegraphers v. Railway Express Agency, Inc.*, 321 U.S. 342, 348-49 (1944), and provide "security and stability to human affairs," *Wood*, 101 U.S. at 139. As this Court explained in affirming the dismissal of an antitrust claim as untimely, "[t]here is a place for finality in the law. Defendants are prejudiced when 'memories fade, documents are lost, and witnesses become unavailable.'" *GO Computer, Inc. v. Microsoft Corp.*, 508 F.3d 170, 180 (4th Cir. 2007) (brackets omitted). "And defendants are entitled to 'the security of knowing when legal action against them has been foreclosed.'" *Id.* (brackets omitted). "[E]ven wrongdoers are entitled to assume that their sins may be forgotten." *Gabelli v. SEC*, 568 U.S. 442, 449 (2013).

**b.** Strict enforcement of statutes of limitations is critical in antitrust cases, "where tests of legality are often rather vague, where many business practices can be simultaneously efficient and beneficial to customers but also challengeable as antitrust violations, where liability doctrines change and expand, where damages are punitively trebled, and where duplicate treble damages for the same offense may be threatened." Areeda & Hovenkamp

¶ 320a. So "it is especially important that antitrust challenges be timely made, thus minimizing the social costs of any antitrust violation but giving the parties repose for conduct that is lawful." *Id.* What's more, the antitrust laws rely on a "private attorneys general" model, and it would be "strange to provide an unusually long basic limitations period that could only have the effect of postponing whatever public benefit [private enforcement] might realize." *Rotella v. Wood*, 528 U.S. 549, 557-58 (2000).

### 2. Statutes of limitations require a cause of action accruing within the limitations period.

The standard rule "dictates that a limitations period should commence only after a claim accrues," unless "there is an exception to that rule when the text creating the limitations period clearly indicates otherwise." *Green v. Brennan*, 578 U.S. 547, 556 (2016). A claim accrues when "the plaintiff has 'a complete and present cause of action'" and "can file suit and obtain relief." *Wallace*, 549 U.S. at 388; *see Gabelli*, 568 U.S. at 448. Thus, the statute of limitations begins to run when "all the elements of the cause of action exist." *Brown v. American Broadcasting Co.,* 704 F.2d 1296, 1300 (4th Cir. 1983). If a plaintiff fails to sue within the limitations period, the claim is barred. *Id.*

Generally, "a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business." *Zenith*, 401 U.S. at 338. The analysis turns on the claim. For instance, because a wrongful-discharge claim requires discrimination plus discharge, the claim accrues "after the discharge," *Green*, 578 U.S. at 556, while a breach-of-contract claim accrues when the plaintiff can show "contractual obligation, breach, and damages," *Parkway 1046, LLC v. U. S. Home Corp.*, 961 F.3d 301, 307 (4th Cir. 2020).

### 3.     The Sherman Act's statute of limitations requires suit within four years of accrual.

**a.**     "Any action to enforce any cause of action under [the Sherman Act] shall be forever barred unless commenced within four years after the cause of action accrued." 15 U.S.C. § 15b. The statute thus follows the ordinary rule, beginning to run once the plaintiff has a claim. *Supra* pp. 28-29.

Barring exceptions not relevant here (like fraudulent concealment), a Sherman Act claim accrues "when a defendant commits an act that causes economic harm to a plaintiff." *GO Computer*, 508 F.3d at 177. The statute of limitations thus begins to run after (1) the defendant does an act and (2) the plaintiff suffers injury from that act. *See Lancianese*, 783 F.2d at 470 (citing

*Charlotte Telecasters*, 546 F.2d 570). An act or an injury alone is generally insufficient. *See id.* As the Supreme Court has explained,

> if a plaintiff feels the adverse impact of an antitrust conspiracy on a particular date, a cause of action immediately accrues to him to recover all damages incurred by that date and all provable damages that will flow in the future from the acts of the conspirators on that date. To recover those damages, he must sue within the requisite number of years from the accrual of the action.

*Zenith*, 401 U.S. at 339. Thus, "[i]t is not sufficient that the plaintiff may have suffered the damages caused by the defendant's violation within the limitations period." *Lancianese*, 783 F.2d at 470. Put differently, "the focus is on the timing of the causes of injury, i.e., the defendant's overt acts, as opposed to the effects of the overt acts." *DXS*, 100 F.3d at 467; *see Klehr*, 521 U.S. at 189.

     **b.**    Because accrual requires act *and* injury, the nature and timing of the plaintiff's antitrust injury determine when the limitations period begins to run. *See In re Pre-Filled Propane Tank Antitrust Litigation*, 860 F.3d 1059, 1067 (8th Cir. 2017) (en banc). As relevant here, the harm and its timing differ depending on whether the plaintiff is a *purchaser* of goods paying the defendant's supracompetitive prices or a *competitor* pushed out of business by the defendant's conduct. *See Mayor & City Council of Baltimore v. Actelion Pharmaceuticals, Ltd.*, 995 F.3d 123, 131-32 (4th Cir. 2021). A purchaser suffers

injury when it pays the defendant's supracompetitive price, *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 295 (2d Cir. 1979), or when it earlier signs a contract agreeing to that price, *US Airways*, 938 F.3d at 68-69. But a competitor is injured "at the time the [defendant's] anticompetitive conduct" (like an anticompetitive merger or the formation of a monopoly) "occurs." *Berkey Photo*, 603 F.2d at 295. Thus, as leading scholars put it, "[c]ustomers of the monopolist are not injured until after the monopolist causes them injury through higher prices, which may occur later than the exclusionary practices creating the monopoly … [but] competitors are injured immediately." Areeda & Hovenkamp ¶ 320c4.

### 4. The continuing-violation doctrine is not an exception to the accrual rule.

Courts have coined the term "continuing-violation doctrine" to refer to situations where a defendant engages in unlawful actions beginning outside but continuing into the limitations period. The term simply describes how the well-established accrual rule discussed above applies in such situations. It doesn't supplant the rule that a claim accrues, and the statute of limitations begins to run, when the plaintiff can make out all of the elements of a claim. Thus, in continuing-violation cases, the plaintiff must still identify

new unlawful acts causing new injury that took place *inside* the limitations period — not just injury flowing from stale conduct. "'[E]ach overt act that is part of the violation and that injures the plaintiff' … 'starts the statutory period running again,'" but "does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period." *Klehr*, 521 U.S. at 189. The "standard rule" across the law remains that the "limitations period begins to run after a claim accrues, not after an inevitable consequence of that claim." *Green*, 578 U.S. at 561.

For instance, in *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 557-58 (1977), the continuing-violation doctrine did not make timely a suit premised on the ongoing effects of a discriminatory policy that applied to the plaintiff more than four years earlier. The Court explained that "emphasis should not be placed on mere continuity; the critical question is whether any present *violation* exists." *Id.* at 558. Because the discriminatory policy was enacted outside the statute-of-limitations period, it was "merely an unfortunate event in history which has no present legal consequences." *Id.*

Likewise, in *Delaware State College v. Ricks*, 449 U.S. 250, 254-56 (1980), the continuing-violation doctrine did not make timely a suit where the plaintiff challenged a tenure denial outside the statute of limitations. The plaintiff

claimed that his suit was timely because his employment contract expired within the limitations period. The Court disagreed, holding that the "proper focus is upon the time of the *discriminatory acts*, not upon the time at which the *consequences* of the acts became most painful." *Id.* at 258. The "termination of employment … is a delayed, but inevitable, consequence of the denial of tenure." *Id.* at 257-58.

Similarly, the Court applied *Evans* and *Ricks* in *Ledbetter* to hold that a plaintiff challenging a discriminatory pay policy enacted outside the limitations period could not sue based on receiving paychecks during the limitations period. 550 U.S. at 628. The statute of limitations bars suit over a "discriminatory act that occurred outside the charging period," even if the act causes "some effect" within the limitations period. *Id.* at 632.

This Court, too, has "observed many times" that a "continuing violation is occasioned by continual unlawful acts, not continual ill effects from an original violation." *National Advertising*, 947 F.2d at 1166. Indeed, it is "*only* where an actual violation has occurred within that requisite time period that under any possible circumstances the theory of continuing violation is sustainable." *Woodard v. Lehman*, 717 F.2d 909, 915 (4th Cir. 1983).

### 5. A Sherman Act plaintiff must identify an overt act within the limitations period, even if that act is part of continuing violations.

**a.** The rules described above apply the same way to Sherman Act claims. The "continuing violation doctrine" refers to cases where the defendant's "actions consist not only of some definitive act in violation of the antitrust laws, but also of a series of subsequent acts that cause further injury to the plaintiff." Areeda & Hovenkamp ¶ 320c.1. Thus, "each time a plaintiff is injured by an act of the defendants, a cause of action accrues to him to recover the damages caused by that act, and that, as to those damages, the statute of limitations period runs from the commission of the act." *Zenith*, 401 U.S. at 338. By the same token, a plaintiff may only recover damages caused by acts within the limitations period; a plaintiff cannot recover damages "caused by old overt acts outside the limitations period." *Klehr*, 521 U.S. at 189-90. That means a plaintiff cannot "use an independent, new predicate act as a bootstrap to recover for injuries caused by other earlier predicate acts that took place outside the limitations period." *Id.* at 190.

Thus, even in "the context of a continuing conspiracy," the plaintiff must identify (1) "an act of the defendants" within the limitations period that (2) causes the plaintiff harm and therefore triggers a claim. *Zenith*, 401

- 34 -

U.S. at 338. The within-limitations act must be (1) "a new and independent act that is not merely a reaffirmation of a previous act"; and (2) "it must inflict new and accumulating injury on the plaintiff." *US Airways*, 938 F.3d at 68; *see also Varner v. Peterson Farms*, 371 F.3d 1011, 1019 (8th Cir. 2004); *DXS*, 100 F.3d at 467. In other words, plaintiffs must show that an "independent, new predicate" act "caused them harm over and above the harm that the earlier acts caused"; mere reaffirmations of the original, out-of-limitations unlawful conduct don't suffice. *Klehr*, 521 U.S. at 190; *see* Areeda & Hovenkamp ¶ 320c1 (citing cases). And even then, the plaintiff can "recover damages caused by that [new] act" only, *Lancianese*, 783 F.2d at 470, because the statute of limitations restarts only for the "fresh adverse consequences" of "[e]ach discrete act," *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 902 (7th Cir. 2004). Thus, for example, the "typical antitrust continuing violation occurs in a price-fixing conspiracy … when conspirators continue to meet to finetune their cartel agreement." *Midwestern Machinery Co. v. Northwest Airlines, Inc.*, 392 F.3d 265, 269 (8th Cir. 2004).

   **b.**   This Court has applied these rules to find time-barred allegations that a defendant maintained an anticompetitive policy initiated outside the limitations period. In such cases, the claim accrues and the statute begins to

run when the policy is enacted, not every day it is maintained, because the continuation of a policy is not an overt act.

In *Charlotte Telecasters*, Charlotte Telecasters challenged an ordinance that authorized franchises for cable television. 546 F.2d at 572. After the city council awarded ordinances to Telecasters' rivals, Telecasters asked the city council to reconsider. *Id.* at 572. The mayor declined, saying that the council would "give some thought to what [plaintiff] has said today," but the council took no action. *Id.* at 573. More than four years later, Telecasters sued. The Court agreed that Telecasters had "properly alleged a continuing conspiracy." *Id.* at 573. But the action was time-barred, the Court held, because "the last overt act of the alleged conspiracy" was the council's rejection of Telecasters' reconsideration request more than four years before the complaint. *Id.* Neither the mayor's comment nor "[t]he council's silence after the meeting" was "an overt act of refusal." *Id.* at 572-73.

*Charlotte Telecasters* makes clear that a claim challenging an anticompetitive policy accrues at the enactment of the policy, *or* when the defendants take actions to further the monopoly that cause new harm. Thus, when a plaintiff alleges a monopoly created by a "discrete act injuring rivals, the statute runs against the injured rivals from the time the act is committed,"

and when a plaintiff alleges a monopoly maintained by ongoing acts, the statute of limitations starts again "provided that the subsequent acts fall within the definition of 'independent' predicate acts.'" Areeda & Hovenkamp ¶ 320c4.

In deciding whether a plaintiff has identified an overt act causing it new injury, courts pay "increas[ing] attention to what the plaintiff knew or should have known when the initial act constituting the violation occurred." *Id.* ¶ 320c1. Thus, "the most reliable way to predict outcomes [in continuing violation cases] is to separate situations where an injured plaintiff had actual knowledge of a violating act and had suffered sufficient injury (statute not tolled) from those where the plaintiff had no knowledge or its knowledge was incomplete or imperfect (statute tolled)." *Id.* That's because statutes of limitations discourage plaintiffs from sitting on their hands, especially in the antitrust context. *Supra* pp. 26-28.

> **6.    At summary judgment, the plaintiff must provide a damages model that would allow a jury to disaggregate recoverable and unrecoverable damages.**

A plaintiff must proffer evidence to "allow the jury to estimate the amount of damages without undue speculation in those cases where damages are sought." Areeda & Hovenkamp ¶ 338a. At summary judgment, the

plaintiff must "provide evidence such that the jury is not left to 'speculation or guesswork' in determining the amount of damages to award." *Magnetar Technologies Corp. v. Intamin, Ltd.*, 801 F.3d 1150, 1159 (9th Cir. 2015). If "no reasonable jury could estimate the plaintiff's damages from the reports of the plaintiff's experts," plaintiffs have not met their burden at summary judgment. *Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*, 152 F.3d 588, 594 (7th Cir. 1998) (Posner, J.).

When a plaintiff seeks damages for conduct, only some of which is actionable (because only some conduct is unlawful, or because only some conduct falls within the limitations period), the plaintiff must "provide the jury with a reasonable basis upon which to estimate the amount of [plaintiff's] losses" for which the plaintiff can recover, and the amount of losses caused by "other factors" for which the plaintiff cannot recover. *United States Football League*, 842 F.2d at 1378-79; *see also Gumwood HP Shopping Partners, L.P. v. Simon Property Group, Inc.*, 221 F. Supp. 3d 1033, 1045 (N.D. Ind. 2016). A damages model fails if it "identifies damages that [were] not the result of the wrong," and provides no means to disaggregate those damages from the overall calculation. *Comcast Corp. v. Behrend*, 569 U.S. 27, 37 (2013). Thus, the plaintiff's damages model must "reflect only the losses directly attributable

to *unlawful*" conduct so that a jury has a proper evidentiary basis to award damages. *MCI Communications Corp. v. American Telephone & Telegraph Co.*, 708 F.2d 1081, 1161 (7th Cir. 1983); *accord* Areeda & Hovenkamp ¶ 657b.

A plaintiff's damages model must allow a jury to separate damages resulting from within-limitations-period acts from damages resulting from outside-limitations-period acts. *See Klehr*, 521 U.S. at 190; Dkt.559.43. And disaggregation "is a threshold evidentiary showing that a plaintiff must meet to withstand summary judgment." *In re Mylan N.V. Securities Litigation*, No. 16-cv-7926, 2023 WL 2711552, at *35 (S.D.N.Y. March 30, 2023), *appeal docketed*, No. 23-720 (2d Cir. April 28, 2023). So summary judgment is appropriate if the damages expert "made no effort to separate the damages attributable to the [challenged] action from other possible causes of losses." *Magnetar Technologies*, 801 F.3d at 1160.

**B.    CSX's action is barred because the effects of the 2009 ratesetting involve no overt act that can restart the statute of limitations, and CSX failed to produce damages evidence anyway.**

CSX's primary theory is that Belt Line's 2009 ratesetting hurt CSX's ability to compete for on-dock rail service at NIT. *See* Dkt.559.47-48. That theory fails for two reasons: (1) CSX's claim accrued in 2009, and there was

no overt act after that, and (2) CSX failed to introduce a damages model dis-aggregating alleged harm from the ratesetting from other alleged harm, leaving a jury with no evidence to calculate damages. Each problem is inde-pendently fatal.

> 1. **CSX's challenge to the $210 rate accrued in 2009 and the statute of limitations ran out in 2013, because the continuing maintenance and effects of the rate over time do not involve new overt acts restarting the limitations period.**

a. The statute of limitations ran in 2013. CSX claims injury as a com-petitor, not a customer, of Norfolk Southern, arguing that the 2009 ratesetting cost it business by excluding it from competing with Norfolk Southern for contracts to ship goods to NIT, where Norfolk Southern could offer on-dock rail access at NIT. Dkt.559.47-48. CSX's claims thus accrued in 2009, when (under CSX's theory), the defendants "commit[ed] an act that injure[d] [CSX's] business." *Zenith*, 401 U.S. at 338. The claims became un-timely in 2013. *See* 15 U.S.C. § 15b.

b. CSX nonetheless claims that its 2018 suit is timely under the con-tinuing-violation doctrine. But even in a "continuing conspiracy," the plaintiff must point to "an act of the defendants," and the "statute of limita-tions runs from the commission of the act." *Zenith*, 401 U.S. at 338. Simply

put, there must be "an overt act in furtherance of an antitrust conspiracy." *Lancianese*, 783 F.2d at 470. CSX failed to show either an act or a new injury after 2009, so the limitations period never restarted.

Other than incorrectly purporting to identify overt acts in 2015 and 2018, *see infra* pp. 60-61, CSX argues that the continuation of the $210 rate since 2009 restarted the limitations period every day. But the mere continuation of the rate isn't an overt act, so it doesn't trigger a daily cause of action giving a plaintiff unlimited time to sue. *Supra* pp. 34-37. The continuing rate is simply the "*abatable but unabated inertial consequence[] of [a] pre-limitations action.*" *Al George, Inc. v. Envirotech Corp.*, 939 F.2d 1271, 1274 (5th Cir. 1991).

The caselaw makes this point clear. Take *Kaw Valley Electric Cooperative Co. v. Kansas Electric Power Cooperative, Inc.*, 872 F.2d 931, 932 (10th Cir. 1989), where the plaintiff alleged that cooperative members unlawfully decided, outside the limitations period, not to supply power to nonmembers. The members' subsequent rejections of the plaintiff's request for power did not restart the statute of limitations, because they were the "abatable but unabated inertial consequences" of the initial agreement. *Id.* at 933. Similarly, in *US Airways*, the plaintiff alleged that the defendant raised prices following a contract the parties entered into outside the limitations period. 938 F.3d at

49. The continuing-violation doctrine didn't apply, because the price increases were not overt acts but rather "manifestation[s] of the prior overt act of entering into the 2006 contract." *Id.* at 69.

Indeed, courts have refused to recognize the accrual of a cause of action even where prices *increased* during the limitations period, because the allegedly unlawful monopolization began outside the limitations period. In *Z Technologies Corp. v. Lubrizol Corp.*, 753 F.3d 594, 600 (6th Cir. 2014), the Sixth Circuit affirmed the dismissal of a supposed "continuing violation" case where, following an allegedly monopolistic acquisition outside the limitations period, the defendant steadily raised prices. The court explained that "precedent, leading antitrust commentators, and case law from [its] sister circuits all indicate that price increases in the merger-monopolization context are not 'overt acts' extending the statute of limitations." *Id.* Underscoring the distinction between "'independent' overt acts" (which restart the statute of limitations) and "benefits and profits derived from wrongful conduct" (which are at most "reaffirmations of a previous act" that do not restart the statute), the court explained that "[n]o new or subsequent action was undertaken to obtain a monopoly because one had already been accomplished." *Id.* at 601.

Contrast those decisions with *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073 (10th Cir. 2006). There, the plaintiff alleged that the defendants agreed outside the limitations period to pressure third parties to refuse to supply the plaintiff. *Id.* at 1089. The plaintiffs alleged that the defendants enacted that policy during the limitations period by pressuring third parties. *Id.* Thus, the defendants, unlike those in the cases above, "did not simply sit back and watch as the 'unabated inertial consequences' of their (alleged) anticompetitive agreement harmed [plaintiff] … ; rather, their actions within the limitations period 'manifest[ed] a commitment to renewing' and enforcing that agreement." *Id.* (quoting Areeda & Hovenkamp ¶ 210). Each act of pressure was an overt act for which the plaintiff could "seek to recover damages." *Id.* at 1090.

Maintaining the $210 rate is no different from the inaction in *Kaw Valley*, *US Airways*, and *Z Technologies*. Once the rate was set, no further action was required—just like the agreement in *Kaw Valley*, the contract in *US Airways*, and the acquisition in *Z Technologies.* And Belt Line and Norfolk Southern took no further action. *Supra* pp. 8-12. There is "no evidence" in the record of "'fine-tuning' or continued actions necessary to keep CSX out of the relevant market beyond 2011." Dkt.559.43 n.12. As the district court put

- 43 -

it, CSX "is attempting to breathe life into time-barred claims in the absence of any new harm linked to any recent overt acts." Dkt.559.44.

### 2. Summary judgment was also required because CSX's damages model cannot disaggregate new and accumulating harm from other alleged harm.

Even if CSX could show an *act*, it failed to provide the sort of evidence of *injury Zenith* requires. *See* 401 U.S. at 338; *supra* pp. 37-39. Thus, the Court should affirm even assuming that maintaining the $210 rate was an overt act.

To invoke the continuing-violation doctrine, the plaintiff must identify an overt act that caused harm "over and above the harm that the earlier acts caused." *Klehr*, 521 U.S. at 190; *supra* pp. 34-35. A plaintiff's damages model thus must give the jury a non-speculative basis to award damages caused by the unlawful overt act. *See Magnetar Technologies*, 801 F.3d at 1159. A damages model that lumps together "the combined effects of multiple forms of alleged antitrust harm," *Comcast*, 569 U.S. at 37-38, fails that test.

CSX's damages model purported to calculate harm from *all* of Norfolk Southern's conduct, no matter whether that conduct was actionable given the statute of limitations. Marvel's report—CSX's *only* evidence of damages—considered the aggregate effect on CSX's profits of the 2009 ratesetting *plus* other pre-limitations actions and within-limitations actions that caused

- 44 -

CSX's "lack of on-dock access at NIT." Dkt.328.20, 40. Marvel expressly admitted that "the source of the damages" he was estimating was "the *totality* of [Norfolk Southern and Belt Line's] efforts to foreclose CSX," rather than Belt Line's switch rate. Dkt.328.49 (emphasis added).

At summary judgment, CSX defended this aggregate approach by contending that "[m]ost of [the actions the expert considered] occurred in years *after* 2013." Dkt.328.49. "Most" doesn't cut it. CSX claims three overt acts: the $210 rate, the 2015 rate payments, and the treatment of its 2018 letter (as discussed further below (at 60-61)). But CSX's damages model estimates aggregate damages only, by merging those three alleged acts with *other* conduct (such as the discontinuation of an interchange and scheduling issues) that CSX no longer challenges. *See* Dkt.382.7. CSX's "*singular* theory of recovery," Dkt.559.51, that *all* of Norfolk Southern's and Belt Line's actions caused CSX's injury, offers no way for a jury to disaggregate damages due to the $210 rate from damages due to other conduct that CSX no longer challenges. An "aggregated damage estimate" that leaves the jury "no way … to associate a portion of the overall damages estimate" to each overt act, Areeda & Hovenkamp ¶ 392g, like the model here, is fatally flawed and requires summary judgment. *See supra* pp. 37-39. It would be "unjust and contrary to

- 45 -

the policies of the treble damage remedy" to award CSX treble damages based on conduct outside the scope of liability. *MCI*, 708 F.2d at 1164.

### C. Neither the 2015 port congestion events nor the 2018 rate proposal involves overt acts that restart the statute of limitations.

As fallbacks, CSX tries to identify overt acts restarting the limitations period: actions related to a 2015 port congestion and defendants' response to CSX's 2018 proposal for an $80 rate. But neither episode involves an overt act that restarts the limitations period, because neither involved an "independent predicate act" (and not merely a reaffirmation of the original violation) inflicting "new and accumulating injury." *Supra* pp. 34-37. Those requirements ensure that plaintiffs—especially those with full knowledge of the possible antitrust violation, like CSX—do not delay indefinitely in challenging allegedly anticompetitive conduct. *Supra* pp. 26-28. And, again, CSX failed to offer damages evidence—an independently fatal problem.

#### 1. The 2015 events involved no overt acts, and CSX offered no damages evidence.

There are two problems with CSX's reliance on its 2015 payments of the $210 rate.

*First*, CSX claims it was injured as a *competitor* to Norfolk Southern, not as a Belt Line *customer*. *Supra* pp. 12-13. That distinction is critical. *See Actelion*, 995 F.3d at 129. The government amicus brief CSX selectively quotes (at 43-44) recognizes this very distinction: "factual differences can lead to different outcomes," because "[c]ompetitors are often 'injured' as soon as 'the dominant firm commences' an anticompetitive policy, but sometimes consumers are not injured right away." Corrected Br. for United States as Amicus Curiae 31, *Giordano v. Saks & Co.*, No. 23-600 (2d Cir. Aug. 7, 2023) (quoting *Berkey Photo*, 603 F.2d at 295). Assuming the 2009 ratesetting was anticompetitive, then CSX's claims accrued in 2009, when the rate allegedly began excluding CSX from business at NIT. CSX's argument that it was injured whenever it paid the allegedly supracompetitive rate set in 2009 is a customer theory that doesn't work for CSX's competitor claim.

As the district court found, CSX forfeited any customer claim. Dkt.559.47-48. CSX's complaint focuses on how the $210 rate excluded CSX from the market, not on the cost of paying a supracompetitive rate. *Supra* pp. 12-13. CSX didn't identify the 2015 events in a compelled interrogatory. Dkt.559.47; *supra* p. 15. And at summary judgment, CSX's harm argument was that "CSX has lost substantial business … because of its lack of on-dock

access at NIT." Dkt.328.40. Thus, the district court correctly concluded that "CSX has *not* advanced a theory of antitrust harm in this case predicated on the payment of a supracompetitive price in 2015 *as a* [*Belt Line*] *customer*; CSX advances only a *competitor* claim based on its exclusion from the market." Dkt.559.47. CSX cannot rewrite its theory on appeal.

*Second*, at summary judgment, "CSX offer[ed] no damages model whatsoever to calculate the harm it suffered by paying an excess fee" (or from any supposed delay of CSX trains) in 2015. Dkt.559.47-48. Marvel's report offered no way for a jury to estimate damages. *See* Dkt.559.48-49. With no evidence of injury, CSX cannot rely on anything from 2015 to restart the statute of limitations. *Supra* pp. 37-39.

### 2. Defendants' response to the 2018 rate proposal does not involve an overt act and CSX offers no damages evidence.

CSX fares no better by pointing to defendants' response to its 2018 letter requesting an $80 rate. *First*, CSX never moved the Belt Line Board for an $80 rate, so Belt Line never rejected CSX's proposal. *Second*, even if Belt Line's response involved an overt act, CSX's damages model fails to establish any damages from the 2018 events and does not disaggregate any injury from the 2018 event from injury caused by the 2009 ratesetting.

The district court's factual analysis was correct, and CSX doesn't contend otherwise. As the undisputed evidence shows, CSX never moved the Belt Line Board for an $80 rate, so the Board never voted on CSX's proposal. *See* Dkt.559.66-67; *supra* pp. 11-12. And a Board vote is necessary to change the rates. *See* Dkt.1-1.4. At most, CSX shared a preliminary proposal with Belt Line's management, who encouraged the proposal and recommended a rate committee—something CSX was open to. *Supra* pp. 11-12. But CSX didn't move to change the rate or to establish a rate committee, so Belt Line had no action to take. *Id.* The meeting minutes show that the Board discussed CSX's proposal, nothing more. Dkt.559.66-67. CSX does not dispute that there is no evidence that Belt Line "intentionally sought to delay adoption of CSX's proposal." Dkt.559.63.

In fact, instead of pushing for Belt Line and Norfolk Southern to resolve the trackage rights issue before the STB, CSX delayed the process by intervening and moving for a stay. Dkt.559.55. Because the trackage-rights fee is a critical input for Belt Line's switch rate, which must cover Belt Line's costs, impeding the STB proceedings also meant stalling any determination of a new switch rate. Dkt.559.55 & n.19.

An overt act must be an "independent, new act" for a claim to accrue and restart the statute of limitations as to harms from that act. *Klehr*, 521 U.S. at 190. Merely discussing CSX's proposal doesn't qualify. Those discussions didn't *do* anything, and, what's more, CSX didn't show that Norfolk Southern or Belt Line had any anticompetitive intent in discussing CSX's proposal. The evidence points to the opposite conclusion: Belt Line *encouraged* discussion of CSX's proposal. *See* Dkt.559.63.

*Charlotte Telecasters* makes clear that the events here do not include an overt act. Belt Line's consideration of CSX's proposal is like the mayor's comment that he would "give some thought to what (Telecaster's spokesman) has said today." *Charlotte Telecasters*, 546 F.2d at 573. And Belt Line's subsequent silence is like the council's maintenance of its franchise policy. Those events, *Charlotte Telecasters* held, did not "constitute an overt act." *Id.* And while *Charlotte Telecasters* found that the earlier rejection of plaintiff's proposal was an overt act, *id.*, here, CSX did not proffer evidence that Belt Line rejected CSX's proposals, *supra* pp. 11-12.

*Second*, as with the supposed 2015 overt act, CSX failed to provide any evidence of the damages it allegedly suffered from Belt Line's failure to lower the switch rate in 2018. CSX thus failed to meet its summary-judgment

burden to produce evidence from which a "reasonable jury could estimate the plaintiff's damages." *Blue Cross*, 152 F.3d at 594. Marvel conducted no analysis a jury could use to disaggregate damages from the 2018 episode from the aggregate damages he calculated.

### D.    CSX's counterarguments are wrong.

CSX's primary argument is that because the 2009 ratesetting inflicts harm on CSX "every day," the continuing-violation doctrine allows CSX to sue at any time, years—or even decades—into the future. CSX thus spends most of its brief (at 22-58) arguing that the 2009 ratesetting alone allows it to sue nine years later, over double Congress' chosen limitations period. That's not how statutes of limitations work, and endorsing CSX's position would nullify the Sherman Act's express provision. Precedent requires antitrust plaintiffs to show harm resulting from overt *acts*. *See Zenith*, 401 U.S. at 338. And CSX's arguments that the 2015 and 2018 episodes involve overt acts lack merit.

### 1.    CSX conflates *injury* with *acts*.

CSX contends that this case involves "a continuing violation," because the 2009 ratesetting set up a practice that "continue[s] into the statute-of-limitations period … causing *new* harm every day." Br. 22.

**a.** CSX's continuing-effects theory fundamentally misunderstands the way statutes of limitations work. A claim accrues only when an act causes an injury. *Supra* pp. 29-31. As this Court has "observed many times," injury alone is not enough: "a continuing violation is occasioned by continual unlawful acts, not continual ill effects from an original violation." *National Advertising Co.*, 947 F.2d at 1166. Thus, "[i]n the context of a continuing conspiracy to violate the antitrust laws … each time a plaintiff is injured by an *act* of the defendants a cause of action accrues to him to recover the damages caused by that *act* and that, as to those damages, the statute of limitations runs from the commission of the *act*." *Zenith*, 401 U.S. at 338 (emphases added). Continuing injury from an old act doesn't cut it.

Resisting this clear rule, CSX insists (Br. 24-25) that *Zenith* held that the statute of limitations runs whenever the plaintiff continues to suffer injury, even from an old act. To support that misreading, CSX cherry-picks (Br. 24-25, 29) language that the Supreme Court did not endorse from a different page of a district court decision (*Delta Theaters, Inc. v. Paramount Pictures, Inc.*, 158 F. Supp. 644, 648 (E.D. La. 1958)) the Court cited to illustrate its overt act rule. But the Supreme Court was clear:

> [I]f a plaintiff feels the adverse impact of an antitrust conspiracy on a particular date, a cause of action immediately accrues to him to recover all damages incurred by that date and all provable damages that will flow in the future from the acts of the conspirators on that date. To recover those damages, he must sue within the requisite number of years from the accrual of the action.

*Zenith*, 401 U.S. at 339; *accord Klehr*, 521 U.S. at 189.

This Court, too, has rejected CSX's novel theory. In *Lancianese*, the Court relied on *Zenith* and *Charlotte Telecasters* to reject an effects-based test, explaining that *Zenith* requires an "overt act in furtherance of an antitrust conspiracy or a separate substantive violation … committed within the limitations period." *Lancianese*, 783 F.2d at 470. "It is not sufficient that the plaintiff may have suffered damages caused by the defendant's violation within the limitations period." *Id.*

**b.**     CSX insists that the Court must reverse to prevent "perpetual immunity, permitting anticompetitive conduct to continue indefinitely." Br. 22. That's wrong.

*First*, customers can often bring suits even if competitors cannot, because a customer's claim accrues with each purchase at a supracompetitive price. *See Actelion*, 995 F.3d at 131. CSX rails against (Br. 40) that distinction, but it's well-established. *See Actelion*, 995 F.3d at 131; Areeda & Hovenkamp

- 53 -

¶ 320c4. And even if a plaintiff can sometimes be both a customer and a competitor, CSX's "complaint as written," *Actelion*, 995 F.3d at 132, is that of a competitor. CSX was well aware of the rate, having voted against it in 2009. If CSX thought the $210 rate was anticompetitive, it could have paid the rate, avoided alleged exclusion from the market, and sued to enjoin the rate and recover overpayments.

*Second*, the United States can sue railroads for injunctive relief, no matter the limitations period. *See California v. American Stores Co.*, 495 U.S. 271, 295-96 (1990). And, of course, customers can seek injunctive relief in cases that don't involve common carrier railroads. *See* 15 U.S.C. § 26.

Ultimately, CSX's complaint is with the balance that Congress struck in § 15b. CSX knew about the ratesetting in 2009 and competed with Norfolk Southern for decades. Perhaps CSX didn't sue within four years because it couldn't double-stack at NIT at that time and so even the $80 rate it now wants wouldn't have helped it. Whatever the reason, CSX's lack of "reasonable diligence" means CSX has reached the end of the line. *SD3 II LLC v. Black & Decker (U.S.) Inc.*, 888 F.3d 98, 108 (4th Cir. 2018).

> **2.** ***Hanover Shoe* and the other decisions CSX cites do not support its argument but instead confirm the principles set out above.**

CSX insists that *Hanover Shoe* and a handful of out-of-circuit decisions hold that the continuing-violation doctrine applies when a defendant enacts an anticompetitive policy outside the limitations period that "causes *new* harm to the plaintiff every day." Br. 26. That's wrong. *Hanover Shoe* was a *customer* case, not a *competitor* case. And consistent with *Zenith*, *Lancianese*, and the continuing-violation doctrine in every other context, *Hanover Shoe* and the other decisions CSX cites require a plaintiff to identify an overt act within the limitations period. Just because those decisions reached a different *outcome* than the district court here based on the type of harm and conduct involved doesn't mean this Court should apply a different *rule*.

**a.** In *Hanover Shoe*, the plaintiff alleged that United's policy of leasing but refusing to sell its machines violated the Sherman Act. 392 U.S. at 483-84. Hanover Shoe was "a manufacturer of shoes and *a customer* of United Shoe Machinery Corporation," "a manufacturer and distributor of shoe machinery." *Id.* at 483 (emphasis added). Hanover claimed that United's lease-only policy helped it monopolize the market for shoe-manufacturing machines, *id.* at 483, 485-86 & n.3, and it sought to "recover from United the

difference between what it paid United in shoe machine rentals and what it would have paid had United been willing during the relevant period to sell those machines," *id.* at 483-84. The Supreme Court affirmed the rejection of United's statute-of-limitations argument, holding that United's conduct (which included "collect[ing] rentals on leases and enter[ing] into new leases," 377 F.2d 776, 794 (3d Cir. 1967) (supplemental opinion below of Freedman, J.)), "inflicted continuing and accumulating harm on Hanover." *Hanover Shoe*, 392 U.S. at 502 n.15.

As a customer case, *Hanover Shoe* doesn't inform the correct approach in this competitor case. *See supra* p. 47. Hanover Shoe's theory was that it was harmed every time it leased machines and paid more than it would have paid to buy the same machines. Hanover Shoe made shoes, not shoe-manufacturing equipment; it wasn't competing with United. In the customer context, United's new leases and rental collections were actionable conduct—"actively using the lease-only policy to maintain its monopoly." *Midwestern Machinery*, 392 F.3d at 270. Thus, "[e]ach refusal to sell" in *Hanover Shoe* "was a new actionable act," whereas a supracompetitive price locked in by an earlier contract would *not* be actionable at each sale, because "the performance of a contract [is] a manifestation of the 'overt act,' the

decision to enter the contract, rather than an independent overt act of its own." *US Airways*, 938 F.3d at 68-69 (refusing to apply *Hanover Shoe*).

In the competitor context, in contrast, "[e]xisting competitors must act when a rival initiates anti-competitive policies that do not require additional anti-competitive action to implement." *Midwestern Machinery*, 392 F.3d at 270 (citing Areeda & Hovenkamp ¶ 320c4). As subsequent decisions like *Zenith* make clear, a claim cannot accrue and restart the statute of limitations without an overt act. *See* 401 U.S. at 338-40; *supra* pp. 34-35. The harm in a competitor case like this one is exclusion from the market, and CSX (allegedly) began to feel that harm in 2009. *Supra* pp. 12-13. Accepting CSX's argument would let plaintiffs sit on their hands for decades, long aware of the conduct they believe is excluding them from competition, before bringing claims based solely on continuing effects. That is contrary to the well-established law that a "continuing violation is occasioned by continual unlawful acts, not continual ill effects from an original violation." *National Advertising Co.*, 947 F.2d at 1166.

**b.** CSX's reliance (Br. 26-27) on *Poster Exchange, Inc. v. National Screen Service Corp.*, 517 F.2d 117 (5th Cir. 1975), also fails. *Poster Exchange* made clear that "a newly accruing claim for damages must be based on some

injurious act actually occurring during the limitations period, not merely the abatable but unabated consequences of some pre-limitations action." *Id.* at 128. *Poster Exchange* required the plaintiff "to demonstrate some act of the defendants during the limitations period" furthering the conspiracy, and remanded for the plaintiff to "present a triable issue of fact as to the occurrence of any specific act or word … during the statutory period." *Id.* at 128-29.

CSX has identified no "specific act or word" during the limitations period, so *Poster Exchange* doesn't help it. Nor does *Samsung Electronics Co. v. Panasonic Corp.*, 747 F.3d 1199, 1202 (9th Cir. 2014), which likewise held that even in cases "where a continuing violation is ongoing," the plaintiff must "allege that a defendant completed an overt act during the limitations period." And claiming there's a circuit split (Br. 53 n.13) by citing cases that came out differently on different facts (there isn't, as just explained) gets it nowhere. *See also infra* pp. 59-60.

### 3. CSX's argument nullifies the overt-act requirement.

**a.** CSX ultimately recognizes that a claim accrues, and the statute of limitations restarts, only upon an overt act. So CSX tries to make overt acts encompass inaction, arguing that Norfolk Southern and Belt Line committed

an overt act "every day since [Belt Line] first set the switch rate in 2009" just by failing to change the 2009 $210 rate. Br. 31-32.

CSX's theory makes the overt-act requirement illusory. A plaintiff could challenge a decades-old conspiracy without identifying any independently unlawful action during the limitations period. *Zenith* and *Klehr* would be wrong, and *Poster Exchange* would not have needed to remand for the plaintiff to identify an "occurrence of any specific act or word" furthering the alleged conspiracy during the limitations period, 517 F.2d at 129.

**b.** CSX claims (Br. 33) that *Lower Lake Erie* proves that inaction can restart the limitations period. That's wrong, too.

*First*, this Court held in *Charlotte Telecasters* that inaction (there, "silence"), did "not constitute an overt act." 546 F.2d at 573; *see supra* pp. 35-37. That's consistent with *Zenith* and *Klehr*'s requirement that plaintiffs identify an *act* during the limitations period. *Supra* pp. 34-35.

*Second*, *Lower Lake Erie* (decided before *Klehr*) held that only "*purposeful*," "intentional, concerted" inaction is sufficient for the continuing-violation doctrine. 998 F.2d at 1172 (emphasis added). The court explained that the plaintiff (who prevailed at trial) had met that burden by showing, during the limitations period, that the defendant "rebuffed efforts to lease

dock property," "refus[ed] to grant commodity line haul rates," and engaged in "[c]oercion to prevent independent action." *Id.* The court also relied on the explicit jury finding that the defendant "took some overt action in furtherance of the conspiracy" within the limitations period to conclude that the plaintiff had proven an "active, injurious conspiracy" during the limitations period. *Lower Lake Erie*, 998 F.2d at 1173.

None of those features is present here. CSX provided no evidence that Norfolk Southern or Belt Line refused CSX in any way during the limitations period, or engaged in any coercion. *Lower Lake Erie* doesn't help CSX.

### 4. The 2015 and 2018 episodes did not involve overt acts.

CSX's arguments (Br. 58-62) that 2015 and 2018 episodes involved overt acts lack merit. *Supra* pp. 46-51.

CSX musters no response to the district court's conclusion that the only injuries CSX could have incurred in 2015 were from paying the $210 rate as a *customer* of Belt Line. But CSX didn't allege damages as a customer, but as a competitor that was well-aware of the ratesetting in 2009 that allegedly excluded it from the market. *Supra* pp. 11-12. CSX also ignores the district court's conclusion that it offered no evidence that a jury could use to assess

damages from the 2015 payments. *Supra* p. 16. The *only* damages evidence was Marvel's fatally flawed report. Dkt.559.51; *supra* pp. 44-46.

CSX also tries to shunt Belt Line's handling of its 2018 rate proposal into *Lower Lake Erie*'s "purposeful inaction" framework, but it gets stuck on the law and the facts. CSX loses under both *Charlotte Telecasters* (this Court's precedent) and *Lower Lake Erie* (the Third Circuit's). *Supra* pp. 59-60. And although CSX insists that Belt Line "refus[ed] even to put CSX[]'s proposal to a vote," Br. 60, the district court correctly found no record support for that claim. What's more, *CSX* could have, but didn't, ask the Board to vote on its rate proposal. If anything, Belt Line *supported* pursuing CSX's proposal. *Supra* pp. 11-12.

### 5. CSX wrongly suggests in a footnote that the Court should remand on its state-law claims if it agrees with CSX's statute-of-limitations theory.

CSX asks the Court in a footnote (Br. 18 n.7) for another chance at its state-law claims if it wins on its statute-of-limitations argument. That request fails. CSX ignores the independent reasons the district court dispatched CSX's state-law claims—rulings CSX doesn't challenge on appeal and that reversal would not disturb. CSX's conspiracy claim failed because CSX had not met the heightened evidentiary standard to show concerted action for an

unlawful purpose. *Supra* p. 18; Dkt.559.96-7. And CSX's breach-of-contract claim failed because Norfolk Southern had a contractual right to appoint Belt Line directors, and CSX offered no evidence of damages. *Supra* p. 18. CSX has forfeited any challenge to those independent grounds, which it doesn't even mention.

## CONCLUSION

The Court should affirm.

Dated: November 22, 2023        Respectfully submitted,

                                */s/ Shay Dvoretzky*

Alan Durrum Wingfield         Shay Dvoretzky
Michael Edward Lacy           *Counsel of Record*
TROUTMAN PEPPER HAMILTON     Parker Rider-Longmaid
   SANDERS LLP                Steven Marcus
P.O. Box 1122                 SKADDEN, ARPS, SLATE,
Richmond, VA 23218           MEAGHER & FLOM LLP
                              1440 New York Ave., NW
John Curtis Lynch             Washington, DC 20005
Megan Burns                  Telephone: 202-371-7000
Kathleen Michelle Knudsen      shay.dvoretzky@skadden.com
TROUTMAN PEPPER HAMILTON
   SANDERS LLP
222 Central Park Ave., Ste. 2000
Virginia Beach, VA 23462

*Counsel for Defendant-Appellee Norfolk Southern Railway Co.*

James Long Chapman, IV
William Ryan Snow
Alexander Ryan McDaniel
CRENSHAW WARE & MARTIN, PLC
150 West Main St., Ste. 1500
Norfolk, VA 23510

*Counsel for Defendant-Appellee*
*Norfolk & Portsmouth Belt Line*
*Railway Co.*

## CERTIFICATE OF COMPLIANCE

I hereby certify that (1) this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Local Rule 32(a)(7)(B) because, as calculated by Microsoft Word, it contains 13,000 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), and (2) this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2019 in a 14-point Book Antiqua font.

Dated: November 22, 2023

*/s/ Shay Dvoretzky*
Shay Dvoretzky
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
1440 New York Ave., NW
Washington, DC 20005
202-371-7000
shay.dvoretzky@skadden.com

*Counsel for Defendant-Appellee*
 *Norfolk Southern Railway Co.*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 22, 2023, I electronically filed this brief with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: November 22, 2023          */s/ Shay Dvoretzky*
Shay Dvoretzky
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
1440 New York Ave., NW
Washington, DC 20005
202-371-7000
shay.dvoretzky@skadden.com

*Counsel for Defendant-Appellee*
 *Norfolk Southern Railroad Co.*