No. 23-1537

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

CSX TRANSPORTATION, INC., individually and on
behalf of Norfolk & Portsmouth Belt Line Railroad Company,

*Plaintiff-Appellant*,

v.

NORFOLK SOUTHERN RAILWAY COMPANY; NORFOLK &
PORTSMOUTH BELT LINE RAILROAD COMPANY,

*Defendants-Appellees*.

Appeal from Order of the United States District Court
for the Eastern District of Virginia
No. 2:18-cv-0530 (Davis, J.)

**JOINT APPENDIX VOLUME 1 – PUBLIC**

James Long Chapman, IV
William Ryan Snow
Alexander Ryan McDaniel
CRENSHAW WARE &
MARTIN, PLC
150 West Main St., Ste.
1500
Norfolk, VA 23510
Telephone: (757) 623-3000
jchapman@cwm-law.com

*Counsel for Defendant-
Appellee Norfolk &
Portsmouth Belt Line
Railroad Co.*

Shay Dvoretzky
Parker Rider-Longmaid
Steven Marcus
SKADDEN, ARPS,
SLATE,
MEAGHER & FLOM LLP
1440 New York Ave., NW
Washington, DC 20005
Telephone: (202) 371-7000
shay.dvoretzky@skad-
den.com

*Counsel for Defendant-
Appellee Norfolk Southern
Railway Co.*

Charles A. Rothfeld
Evan M. Tager
Carmen N. Longoria-
Green
MAYER BROWN LLP
1999 K Street, N.W.
Washington, DC 20006
Telephone: (202) 263-3000
crothfeld@may-
erbrown.com

*Counsel for Plaintiff-
Appellant CSX Transpor-
tation, Inc.*

*(Additional counsel listed on inside cover)*

Alan Durrum Wingfield
Michael Edward Lacy
TROUTMAN PEPPER
HAMILTON
SANDERS LLP
P.O. Box 1122
Richmond, VA 23218
Telephone: (804) 697-
1350

John Curtis Lynch
Megan Burns
Kathleen Michelle Knud-
sen
TROUTMAN PEPPER
HAMILTON
SANDERS LLP
222 Central Park Ave.,
Ste. 2000
Virginia Beach, VA 23462
Telephone: (757) 687-
7765

*Counsel for Defendant-
Appellee Norfolk South-
ern Railway Co.*

Michael A. Scodro
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
Telephone: (312) 782-
0600

Benjamin L. Hatch
Robert W. McFarland
MCGUIRE WOODS, LLP
101 W. Main Street, Ste.
9000
Norfolk, VA 23510
Telephone: (757) 640-
3700

*Counsel for Plaintiff-
Appellant CSX Transpor-
tation, Inc*

**VOLUME 1**

| Date | Description | Dkt. # | Page |
|------|-------------|--------|------|
| n/a | Docket Sheet | n/a | JA1 |
| Oct. 4, 2018 | Complaint | 1 | JA47 |
| Oct. 4, 2018 | Complaint Ex A, 1897 Agreement | 1-1 | JA88 |
| Oct. 4, 2018 | Complaint Ex C, Supplemental Agreement, March 1, 1989 | 1-3 | JA97 |
| Sept. 9, 2019 | Opinion and Order [on motions to dismiss] | 66 | JA102 |
| Apr. 12, 2021 | Norfolk and Portsmouth Belt Line Railroad Co.'s Mem. In Support of Mot. for Summ. J. (excerpt) | 297 | JA162 |
| Apr. 12, 2021 | Switching Charges, Dec. 10, 2014 (Exhibit 2 to Norfolk and Portsmouth Belt Line Railroad Co.'s Mem. In Support of Mot. for Summ. J.) | 297-2 | JA164 |
| Apr. 12, 2021 | Norfolk S. Railway Co.'s Mem. In Support of Mot. for Summ. J. (excerpt) | 310 | JA171 |
| May 3, 2021 | CSX Transportation, Inc.'s Opp. to Mot. for Summ. J. (excerpt) | 328 | JA193 |
| May 3, 2021 | Handwritten notes (Exhibit 80 to CSX Transportation, Inc.'s Opp. to Mot. for Summ. J.) | 328-13 | JA210 |
| May 3, 2021 | Email Cannon to DiDeo (Exhibit 84 to CSX Transportation, Inc.'s Opp. to Mot. for Summ. J.) | 328-15 | JA225 |
| May 13, 2021 | Norfolk and Portsmouth Belt Line Railroad Co.'s Reply In Support of Mot. for Summ. J. (excerpt) | 382 | JA228 |
| May 18, 2021 | Opinion and Order [on Motion to Dismiss] | 395 | JA233 |

| Date | Description | Dkt. # | Page |
|------|-------------|--------|------|
| Oct. 13, 2022 | Norfolk S. Railway Co.'s Mem. In Support of Mot. to Exclude Opinions of Howard Marvel (excerpt) | 466 | JA263 |
| Dec. 5, 2022 | Tr. Of Hearing on Motions for Summ. J. (Dec. 1, 2022) (excerpt) | 520 | JA269 |
| Jan. 3, 2023 | Opinion and Order [granting in part, and denying in part, motions for summary judgment] | 559 | JA275 |
| Jan. 27, 2023 | Opinion and Order [on motion to dismiss all remaining claims] | 613 | JA379 |
| Apr. 19, 2023 | Opinion and Order [on state law claims] | 643 | JA406 |
| Apr. 26, 2023 | Judgment | 644 | JA430 |
| May 18, 2023 | Notice of Appeal | 651 | JA431 |

## VOLUME 2 - SEALED

| Date | Description | Dkt. # | Page |
|------|-------------|--------|------|
| Apr. 12, 2023 | Howard Marvel Expert Report (Exhibit 7 to Norfolk S. Railway Co.'s Mem. In Support of Mot. for Summ. J.) | 308-03 | JA434 |
| Apr. 12, 2023 | Howard Marvel Expert Reply Report (Exhibit 71 to Norfolk S. Railway Co.'s Mem. In Support of Mot. for Summ. J.) | 308-59 | JA454 |
| May 3, 2021 | May 14, 2009 email (Exhibit 2 to Opp. to Defs.' Mots. for Summ. J.) | 324-02 | JA466 |
| May 3, 2021 | July 27, 2009 email (Exhibit 3 to Opp. to Defs.' Mots. for Summ. J.) | 324-03 | JA470 |
| May 3, 2021 | Coleman Dep Tr. (Exhibit 5 to Opp. to Defs.' Mots. for Summ. J.) | 324-05 | JA474 |

| Date | Description | Dkt. # | Page |
|------|-------------|--------|------|
| May 3, 2021 | Norfolk S. Railway Co.'s Response to Pls.' First Set of Interrogatories (Exhibit 6 to Opp. to Defs.' Mots. for Summ. J.) | 324-06 | JA480 |
| May 3, 2021 | Excerpt of transcript of deposition of Thomas Capozzi (Exhibit 13 to Opp. to Defs.' Mots. for Summ. J.) | 324-13 | JA485 |
| May 3, 2021 | July 31, 2009 email (Exhibit 19 to Opp. to Defs.' Mots. for Summ. J.) | 324-19 | JA489 |
| May 3, 2021 | April 18, 2016 email (Exhibit 78 to Opp. to Defs.' Mots. for Summ. J.) | 326-07 | JA496 |
| May 3, 2021 | Mar. 22, 2016 meeting invitation email (Exhibit 79 to Opp. to Defs.' Mots. for Summ. J.) | 326-08 | JA498 |
| May 3, 2021 | Excerpt of transcript of deposition of Catherine Vick (Exhibit 104 to Opp. to Defs.' Mots. for Summ. J.) | 326-24 | JA500 |
| May 3, 2021 | Dec. 16, 2015 email (Exhibit 105 to Opp. to Defs.' Mots. for Summ. J.) | 326-25 | JA504 |
| May 3, 2021 | Apr. 13, 2018 Letter from Port of Va. (Exhibit 118 to Opp. to Defs.' Mots. for Summ. J.) | 326-37 | JA508 |
| Oct. 13, 2022 | Supplemental Report of Howard Marvel (Exhibit 2 to Norfolk S. Railway Co.'s Mem. In Support of Mot. to Exclude Opinions of Howard Marvel) | 469-2 | JA511 |

APPEAL,CLOSED

## U.S. District Court
## Eastern District of Virginia − (Norfolk)
## CIVIL DOCKET FOR CASE #: 2:18−cv−00530−MSD−RJK

CSX Transportation, Inc. v. Norfolk Southern Railway Company et al
Assigned to: District Judge Mark S. Davis
Referred to: Magistrate Judge Robert J. Krask
Case in other court:  4CCA Case manager Naeemah R. Sims, 23−01537
Cause: 15:2 Antitrust Litigation

Date Filed: 10/04/2018
Date Terminated: 04/26/2023
Jury Demand: Plaintiff
Nature of Suit: 410 Anti−Trust
Jurisdiction: Federal Question

| Date Filed | # | Docket Text |
|---|---|---|
| 10/04/2018 | 1 | COMPLAINT against Jerry Hall, Thomas Hurlbut, Philip Merrilli, Cannon Moss, Norfolk & Portsmouth Belt Line Railway Company, Norfolk Southern Railway Company ( Filing fee $ 400, receipt number 0422−6303291.), filed by CSX Transportation, Inc. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Civil Cover Sheet, # 8 Letter)(epri, ) (Entered: 10/05/2018) |
| 10/05/2018 | 2 | Two (2) Summonses Issued as to Norfolk & Portsmouth Belt Line Railway Company, Norfolk Southern Railway Company. NOTICE TO ATTORNEY: Print out two electronically issued summons and one copy of the attachments for each defendant to be served with the complaint. (Attachments: # 1 Civil Motions Procedures)(epri, ) (Entered: 10/05/2018) |
| 10/05/2018 | 3 | Corporate Disclosure Statement by CSX Transportation, Inc.. (McFarland, Robert) (Entered: 10/05/2018) |
| 10/08/2018 | 4 | AFFIDAVIT re 1 Complaint, by CSX Transportation, Inc.. (McFarland, Robert) (Entered: 10/08/2018) |
| 10/23/2018 | 5 | AFFIDAVIT of Service for summons and complaint with attachments on 10/15/18 as to Norfolk & Portsmouth Belt Line Railway Company, filed by CSX Transportation, Inc. (tbro) (Entered: 10/24/2018) |
| 10/23/2018 | 6 | AFFIDAVIT of Service for summons and complaint with attachments on 10/15/18 as to Norfolk Southern Railway Company, filed by CSX Transportation, Inc. (tbro) (Entered: 10/24/2018) |
| 11/01/2018 | 7 | Proposed Summons re 1 Complaint, *Jerry Hall* by CSX Transportation, Inc.. (McFarland, Robert) (Entered: 11/01/2018) |
| 11/01/2018 | 8 | Proposed Summons re 1 Complaint, *Philip Merilli* by CSX Transportation, Inc.. (McFarland, Robert) (Entered: 11/01/2018) |
| 11/01/2018 | 9 | Proposed Summons re 1 Complaint, *Thomas Hurlbut* by CSX Transportation, Inc.. (McFarland, Robert) (Entered: 11/01/2018) |
| 11/01/2018 | 10 | Three (3) Summonses Issued as to Jerry Hall, Thomas Hurlbut, Philip Merrilli. NOTICE TO ATTORNEY: Print out two electronically issued summons and one copy of the attachments for each defendant to be served with the complaint. (Attachments: # 1 Civil Motions Procedures)(epri, ) (Entered: 11/01/2018) |
| 11/02/2018 | 11 | NOTICE of Appearance by Craig Thomas Merritt on behalf of Norfolk Southern Railway Company (Merritt, Craig) (Entered: 11/02/2018) |
| 11/02/2018 | 12 | NOTICE of Appearance by James L. Chapman, IV on behalf of Norfolk & Portsmouth Belt Line Railway Company (Chapman, James) (Entered: 11/02/2018) |
| 11/02/2018 | 13 | Financial Interest Disclosure Statement (Local Rule 7.1) by Norfolk & Portsmouth Belt Line Railway Company. (Chapman, James) (Entered: 11/02/2018) |

| 11/02/2018 | 14 | NOTICE of Appearance by Michael W. Smith on behalf of Norfolk Southern Railway Company (Smith, Michael) (Entered: 11/02/2018) |
|---|---|---|
| 11/02/2018 | 15 | NOTICE of Appearance by Belinda Duke Jones on behalf of Norfolk Southern Railway Company (Jones, Belinda) (Entered: 11/02/2018) |
| 11/02/2018 | 16 | NOTICE of Appearance by W. Ryan Snow on behalf of Norfolk & Portsmouth Belt Line Railway Company (Snow, W. Ryan) (Entered: 11/02/2018) |
| 11/02/2018 | 17 | NOTICE of Appearance by Darius Kobi Agyeman Davenport, Sr on behalf of Norfolk & Portsmouth Belt Line Railway Company (Davenport, Darius) (Entered: 11/02/2018) |
| 11/02/2018 | 18 | NOTICE of Appearance by David Caldwell Hartnett on behalf of Norfolk & Portsmouth Belt Line Railway Company (Hartnett, David) (Entered: 11/02/2018) |
| 11/02/2018 | 19 | Consent MOTION for Extension of Time to File Answer by Norfolk & Portsmouth Belt Line Railway Company. (Attachments: # 1 Proposed Order)(Chapman, James) (Entered: 11/02/2018) |
| 11/02/2018 |  | MOTIONS REFERRED to Magistrate Judge: Lawrence R. Leonard. 19 Consent MOTION for Extension of Time to File Answer (clou ) (Entered: 11/02/2018) |
| 11/02/2018 | 20 | ORDER granting Agreed Motion for Extension of Time to File Responsive Pleadings re 19 Consent MOTION for Extension of Time to File Answer. (See order for details). Copies distributed to all parties. Signed by Magistrate Judge Lawrence R. Leonard on 11/2/2018. (clou) (Entered: 11/02/2018) |
| 11/02/2018 | 21 | NOTICE of Appearance by Maurice Francis Mullins on behalf of Jerry Hall, Thomas Hurlbut, Philip Merrilli (Mullins, Maurice) (Entered: 11/02/2018) |
| 11/02/2018 | 22 | NOTICE of Appearance by Hugh McCoy Fain, III on behalf of Jerry Hall, Thomas Hurlbut, Philip Merrilli (Fain, Hugh) (Entered: 11/02/2018) |
| 11/05/2018 | 23 | NOTICE of Appearance by William Edgar Spivey on behalf of Cannon Moss (Spivey, William) (Entered: 11/05/2018) |
| 11/05/2018 | 24 | NOTICE of Appearance by Clark James Belote on behalf of Cannon Moss (Belote, Clark) (Entered: 11/05/2018) |
| 11/08/2018 |  | Case Reassigned to District Judge Mark S. Davis. District Judge Raymond A. Jackson no longer assigned to the case. (afar) (Entered: 11/08/2018) |
| 11/11/2018 | 25 | NOTICE of Appearance by John Michael Erbach on behalf of Jerry Hall, Thomas Hurlbut, Philip Merrilli (Erbach, John) (Entered: 11/11/2018) |
| 11/13/2018 | 26 | NOTICE of Appearance by Samuel Perry Coburn on behalf of Norfolk Southern Railway Company (Coburn, Samuel) (Entered: 11/13/2018) |
| 11/27/2018 | 27 | MOTION to Dismiss for Failure to State a Claim by Norfolk & Portsmouth Belt Line Railway Company. (Chapman, James) (Entered: 11/27/2018) |
| 11/27/2018 | 28 | Memorandum in Support re 27 MOTION to Dismiss for Failure to State a Claim filed by Norfolk & Portsmouth Belt Line Railway Company. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5)(Chapman, James) (Entered: 11/27/2018) |
| 11/27/2018 | 29 | MOTION to Dismiss by Cannon Moss. (Belote, Clark) (Entered: 11/27/2018) |
| 11/27/2018 | 30 | Memorandum in Support re 29 MOTION to Dismiss filed by Cannon Moss. (Attachments: # 1 Exhibit 1)(Belote, Clark) (Entered: 11/27/2018) |
| 11/27/2018 | 31 | MOTION to Dismiss by Jerry Hall, Thomas Hurlbut, Philip Merrilli. (Mullins, Maurice) (Entered: 11/27/2018) |
| 11/27/2018 | 32 | Memorandum in Support re 31 MOTION to Dismiss filed by Jerry Hall, Thomas Hurlbut, Philip Merrilli. (Mullins, Maurice) (Entered: 11/27/2018) |
| 11/27/2018 | 33 | NOTICE of Appearance by Michael Edward Lacy on behalf of Norfolk Southern Railway Company (Lacy, Michael) (Entered: 11/27/2018) |

JA2

| 11/27/2018 | 34 | MOTION to Dismiss for Failure to State a Claim by Norfolk Southern Railway Company. (Lacy, Michael) (Entered: 11/27/2018) |
|---|---|---|
| 11/27/2018 | 35 | Memorandum in Support re 34 MOTION to Dismiss for Failure to State a Claim filed by Norfolk Southern Railway Company. (Lacy, Michael) (Entered: 11/27/2018) |
| 11/27/2018 | 36 | Financial Interest Disclosure Statement (Local Rule 7.1) by Norfolk Southern Railway Company. (Lacy, Michael) (Entered: 11/27/2018) |
| 11/27/2018 | 37 | NOTICE of Appearance by Alan Durrum Wingfield on behalf of Norfolk Southern Railway Company (Wingfield, Alan) (Entered: 11/27/2018) |
| 11/27/2018 | 38 | NOTICE of Appearance by Elizabeth Spain Flowers on behalf of Norfolk Southern Railway Company (Flowers, Elizabeth) (Entered: 11/27/2018) |
| 12/21/2018 | 39 | Opposition to 27 MOTION to Dismiss for Failure to State a Claim filed by CSX Transportation, Inc.. (McFarland, Robert) (Entered: 12/21/2018) |
| 12/21/2018 | 40 | Opposition to 29 MOTION to Dismiss filed by CSX Transportation, Inc.. (McFarland, Robert) (Entered: 12/21/2018) |
| 12/21/2018 | 41 | Opposition to 31 MOTION to Dismiss filed by CSX Transportation, Inc.. (McFarland, Robert) (Entered: 12/21/2018) |
| 12/21/2018 | 42 | Opposition to 34 MOTION to Dismiss for Failure to State a Claim filed by CSX Transportation, Inc.. (McFarland, Robert) (Entered: 12/21/2018) |
| 12/27/2018 | 43 | Joint MOTION for Hearing re 32 Memorandum in Support, 27 MOTION to Dismiss for Failure to State a Claim , 30 Memorandum in Support, 29 MOTION to Dismiss , 28 Memorandum in Support, 31 MOTION to Dismiss , 35 Memorandum in Support, 34 MOTION to Dismiss for Failure to State a Claim by Norfolk & Portsmouth Belt Line Railway Company. (Chapman, James) (Entered: 12/27/2018) |
| 01/07/2019 | 44 | REPLY to Response to Motion re 31 MOTION to Dismiss filed by Jerry Hall, Thomas Hurlbut, Philip Merrilli. (Erbach, John) (Entered: 01/07/2019) |
| 01/07/2019 | 45 | REPLY to Response to Motion re 27 MOTION to Dismiss for Failure to State a Claim filed by Norfolk & Portsmouth Belt Line Railway Company. (Chapman, James) (Entered: 01/07/2019) |
| 01/07/2019 | 46 | REPLY to Response to Motion re 29 MOTION to Dismiss filed by Cannon Moss. (Belote, Clark) (Entered: 01/07/2019) |
| 01/07/2019 | 47 | REPLY to Response to Motion re 34 MOTION to Dismiss for Failure to State a Claim filed by Norfolk Southern Railway Company. (Lacy, Michael) (Entered: 01/07/2019) |
| 03/22/2019 | 48 | MOTION to Commence Discovery by CSX Transportation, Inc.. (McFarland, Robert) (Entered: 03/22/2019) |
| 03/22/2019 | 49 | Memorandum in Support re 48 MOTION to Commence Discovery filed by CSX Transportation, Inc.. (McFarland, Robert) (Entered: 03/22/2019) |
| 03/22/2019 | 50 | NOTICE of Appearance by Rowland Braxton Hill, IV on behalf of Norfolk Southern Railway Company (Hill, Rowland) (Entered: 03/22/2019) |
| 04/01/2019 | 51 | NOTICE by Norfolk & Portsmouth Belt Line Railway Company (Attachments: # 1 Exhibit 1)(Chapman, James) (Entered: 04/01/2019) |
| 04/05/2019 | 52 | Memorandum in Opposition re 48 MOTION to Commence Discovery filed by Jerry Hall, Thomas Hurlbut, Philip Merrilli. (Mullins, Maurice) (Entered: 04/05/2019) |
| 04/05/2019 | 53 | Response to 51 NOTICE filed by CSX Transportation, Inc.. (McFarland, Robert) (Entered: 04/05/2019) |
| 04/05/2019 | 54 | Opposition to 48 MOTION to Commence Discovery filed by Norfolk & Portsmouth Belt Line Railway Company. (Snow, W. Ryan) (Entered: 04/05/2019) |
| 04/05/2019 | 55 | Opposition to 48 MOTION to Commence Discovery filed by Cannon Moss. (Spivey, William) (Entered: 04/05/2019) |

JA3

| 04/05/2019 | 56 | Opposition to 48 MOTION to Commence Discovery filed by Norfolk Southern Railway Company. (Jones, Belinda) (Entered: 04/05/2019) |
|---|---|---|
| 04/11/2019 | 57 | RESPONSE in Support re 48 MOTION to Commence Discovery filed by CSX Transportation, Inc.. (McFarland, Robert) (Entered: 04/11/2019) |
| 04/12/2019 | | MOTIONS REFERRED to Magistrate Judge: 48 MOTION to Commence Discovery (tamarm) (Entered: 04/12/2019) |
| 04/16/2019 | 58 | ORDER denying 48 Motion to Commence Discovery. Signed by Magistrate Judge Lawrence R. Leonard on 4/16/2019. (Leonard, Lawrence) (Entered: 04/16/2019) |
| 04/19/2019 | 59 | NOTICE by Norfolk & Portsmouth Belt Line Railway Company (Attachments: # 1 Exhibit 1)(Chapman, James) (Entered: 04/19/2019) |
| 05/13/2019 | 60 | NOTICE by Norfolk & Portsmouth Belt Line Railway Company (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Chapman, James) (Entered: 05/13/2019) |
| 07/25/2019 | 61 | NOTICE by Norfolk & Portsmouth Belt Line Railway Company (Attachments: # 1 Exhibit 1)(Chapman, James) (Entered: 07/25/2019) |
| 08/15/2019 | 62 | Consent MOTION to Withdraw as Attorney by CSX Transportation, Inc.. (Attachments: # 1 Proposed Order)(Gantt, Emily) (Entered: 08/15/2019) |
| 08/15/2019 | 63 | NOTICE by Norfolk & Portsmouth Belt Line Railway Company (Attachments: # 1 Exhibit 1)(Chapman, James) (Entered: 08/15/2019) |
| 08/19/2019 | 64 | ORDER granting 62 Motion to Withdraw as Attorney. Attorney Emily Rebecca Gantt terminated. Signed by Chief District Judge Mark S. Davis on 08/19/2019. (tamarm) (Entered: 08/19/2019) |
| 09/04/2019 | 65 | NOTICE by Norfolk & Portsmouth Belt Line Railway Company (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Chapman, James) (Entered: 09/04/2019) |
| 09/09/2019 | 66 | OPINION AND ORDER granting in part and denying in part 27 Motion to Dismiss for Failure to State a Claim; denying 29 Motion to Dismiss; denying 31 Motion to Dismiss; denying 34 Motion to Dismiss for Failure to State a Claim; denying 43 Motion for Hearing. The Court PROVIDES Plaintiff with leave to amend the Complaint to cure defects with respect to Count VII−tortious interference within ten (10) days after the entry of this Order. Signed by Chief District Judge Mark S. Davis on 09/09/2019. (tamarm) (Main Document 66 replaced on 9/9/2019) (tamarm, ). (Entered: 09/09/2019) |
| 09/23/2019 | 67 | ANSWER to 1 Complaint, *Affirmative Defenses* by Jerry Hall, Thomas Hurlbut, Philip Merrilli.(Erbach, John) (Entered: 09/23/2019) |
| 09/23/2019 | 68 | ANSWER to 1 Complaint, by Cannon Moss.(Belote, Clark) (Entered: 09/23/2019) |
| 09/23/2019 | 69 | ANSWER to 1 Complaint, by Norfolk Southern Railway Company.(Jones, Belinda) (Entered: 09/23/2019) |
| 09/23/2019 | 70 | ANSWER to 1 Complaint, by Norfolk & Portsmouth Belt Line Railway Company.(Snow, W. Ryan) (Entered: 09/23/2019) |
| 09/24/2019 | | Refer for 16(b) (tamarm) (Entered: 09/24/2019) |
| 09/27/2019 | 71 | NOTICE of Appearance by Kathleen Michelle Knudsen on behalf of Norfolk Southern Railway Company (Knudsen, Kathleen) (Entered: 09/27/2019) |
| 09/27/2019 | 72 | RULE 26(f) PRETRIAL ORDER: Rule 16(b) Scheduling Conference set for 10/25/2019 at 10:00 AM in Norfolk Courtroom 5. Signed by Magistrate Judge Robert J. Krask on 9/26/2019, filed 9/27/19. (vwar) (Entered: 09/27/2019) |
| 10/23/2019 | 73 | NOTICE of Appearance by Jeanne Elizabeth Noonan on behalf of CSX Transportation, Inc. (Noonan, Jeanne) (Entered: 10/23/2019) |
| 10/23/2019 | 74 | MOTION to Withdraw as Attorney *[ Consent Motion to Withdraw Counsel and Incorporated Memorandum in Support ]* by Norfolk Southern Railway Company. (Attachments: # 1 Proposed Order)(Coburn, Samuel) (Entered: 10/23/2019) |

JA4

| 10/24/2019 | 75 | NOTICE of Appearance by Monica McCarroll on behalf of Norfolk Southern Railway Company (McCarroll, Monica) (Entered: 10/24/2019) |
|---|---|---|
| 10/24/2019 | 76 | NOTICE of Appearance by John C. Lynch on behalf of Norfolk Southern Railway Company (Lynch, John) (Entered: 10/24/2019) |
| 10/25/2019 | | Scheduling Conference − Rule 16b held on 10/25/2019. (vwar) (Entered: 10/25/2019) |
| 10/25/2019 | 77 | Joint MOTION for Protective Order *and Memorandum in Support* by CSX Transportation, Inc.. (Attachments: # 1 Exhibit 1)(McFarland, Robert) (Entered: 10/25/2019) |
| 10/25/2019 | 78 | Order Rule 16(b) Scheduling Order − Pursuant to the Rule 16(b) Conference it is ordered that the Final Pretrial Conference set for 5/22/2020 at 11:00 AM in Norfolk. Jury Trial set for 6/9/2020 at 10:00 AM in Norfolk Courtroom 5 before Chief District Judge Mark S. Davis. Signed by Chief District Judge Mark S. Davis and filed on 10/25/2019. (vwar) (Entered: 10/28/2019) |
| 10/28/2019 | | MOTIONS REFERRED to Magistrate Judge Leonard. 77 Joint MOTION for Protective Order *and Memorandum in Support* (tamarm) (Entered: 10/28/2019) |
| 10/29/2019 | 79 | STIPULATED PROTECTIVE ORDER GOVERNING THE HANDLING OF CONFIDENTIAL INFORMATION AND THE NON−WAIVER OF INFORMATION SUBJECT TO ATTORNEY−CLIENT PRIVILEGE AND/OR WORK PRODUCT PROTECTION PURSUANT TO FED. R. EVID. 502(D). Signed by Magistrate Judge Lawrence R. Leonard on 10/29/2019. (tamarm) (Entered: 10/29/2019) |
| 10/30/2019 | 80 | ORDER granting 74 Motion to Withdraw as Attorney. Attorney Belinda Duke Jones; Craig Thomas Merritt; Michael W. Smith; Samuel Perry Coburn and Rowland Braxton Hill, IV terminated. Signed by Chief District Judge Mark S. Davis on 10/30/2019. (tamarm) (Entered: 10/30/2019) |
| 11/01/2019 | | Set/Reset Hearings: Settlement Conference set for 3/24/2020 at 09:30 AM in Norfolk Judges Chamber before Magistrate Judge Lawrence R. Leonard. (jjon) (Entered: 11/01/2019) |
| 11/05/2019 | 81 | Settlement Conference Order: All parties and their lead counsel are required to appear at a settlement conference scheduled in the United States District Court, 600 Granby Street, Norfolk, Virginia 23510, at 9:30 a.m. on Tuesday, March 24, 2020. The parties must submit a brief memorandum of five pages or less directly to the chambers of the undersigned (do not file in the clerk's office) by NOON on WEDNESDAY, MARCH 18, 2020. Signed by Magistrate Judge Lawrence R. Leonard on 11/5/2019. (tamarm) (Entered: 11/05/2019) |
| 11/18/2019 | 82 | Joint MOTION Entry of Stipulated Order Regarding Discovery of Electronically Stored Information by Norfolk Southern Railway Company. (Attachments: # 1 Exhibit 1)(Lacy, Michael) (Entered: 11/18/2019) |
| 11/19/2019 | | MOTIONS REFERRED to Magistrate Judge Leonard: 82 Joint MOTION Entry of Stipulated Order Regarding Discovery of Electronically Stored Information (tamarm) (Entered: 11/19/2019) |
| 11/19/2019 | 83 | STIPULATED ORDER re: 82 Motion Regarding Discovery of Electronically Stored Information. Signed by Magistrate Judge Lawrence R. Leonard on 11/19/2019. (tamarm) (Entered: 11/19/2019) |
| 01/02/2020 | 84 | MOTION to Seal by Norfolk & Portsmouth Belt Line Railway Company. (Attachments: # 1 Proposed Order)(Chapman, James) Modified on 1/7/2020; motion withdrawn (tamarm). (Entered: 01/02/2020) |
| 01/02/2020 | 85 | Memorandum in Support re 84 MOTION to Seal filed by Norfolk & Portsmouth Belt Line Railway Company. (Chapman, James) (Entered: 01/02/2020) |
| 01/02/2020 | 86 | Notice of Under Seal Filing LCvR5 (B) by Norfolk & Portsmouth Belt Line Railway Company re 84 MOTION to Seal (Chapman, James) (Entered: 01/02/2020) |
| 01/02/2020 | 87 | MOTION for Partial Summary Judgment *ON DAMAGES* by Norfolk & Portsmouth Belt Line Railway Company. (Chapman, James) Modified on 1/8/2020; motion |

| | | |
|---|---|---|
| | | withdrawn (tamarm). (Entered: 01/02/2020) |
| 01/02/2020 | 88 | Memorandum in Support re 87 MOTION for Partial Summary Judgment *ON DAMAGES* filed by Norfolk & Portsmouth Belt Line Railway Company. (Attachments: # 1 Exhibit A, # 2 Appendix 1, # 3 Appendix 2)(Chapman, James) (Entered: 01/02/2020) |
| 01/02/2020 | 89 | Sealed Memorandum in Support re 87 MOTION to Seal . (Attachments: # 1 Exhibit A)(Chapman, James) (Entered: 01/02/2020) |
| 01/02/2020 | 90 | Financial Interest Disclosure Statement (Local Rule 7.1) by Virginia International Terminals, LLC. (Powers, Edward) (Entered: 01/02/2020) |
| 01/02/2020 | 91 | MOTION to Quash *CSX Transportation, Inc.'s Subpoena Duces Tecum* by Virginia International Terminals, LLC. (Powers, Edward) (Entered: 01/02/2020) |
| 01/02/2020 | 92 | Memorandum in Support re 91 MOTION to Quash *CSX Transportation, Inc.'s Subpoena Duces Tecum* filed by Virginia International Terminals, LLC. (Attachments: # 1 Exhibit A (Part 1 of 1), # 2 Exhibit A (Part 2 of 2), # 3 Exhibit B)(Powers, Edward) (Entered: 01/02/2020) |
| 01/06/2020 | 93 | Withdrawal of Motion by Norfolk & Portsmouth Belt Line Railway Company re 84 MOTION to Seal , 87 MOTION for Partial Summary Judgment *ON DAMAGES* (Hartnett, David) (Entered: 01/06/2020) |
| 01/06/2020 | 94 | MOTION for Partial Summary Judgment by Norfolk & Portsmouth Belt Line Railway Company. (Attachments: # 1 Proposed Order)(Chapman, James) Modified on 4/29/2021 (tamarm, ). (Entered: 01/06/2020) |
| 01/06/2020 | 95 | Memorandum in Support re 94 MOTION for Partial Summary Judgment filed by Norfolk & Portsmouth Belt Line Railway Company. (Attachments: # 1 Exhibit A, # 2 Appendix 1, # 3 Appendix 2)(Chapman, James) (Entered: 01/06/2020) |
| 01/07/2020 | 96 | Withdrawal of Motion by Norfolk & Portsmouth Belt Line Railway Company re 87 MOTION for Partial Summary Judgment *ON DAMAGES* (Hartnett, David) (Entered: 01/07/2020) |
| 01/13/2020 | 97 | Consent MOTION Motion to Excuse Defendants Hall, Hurlbut and Merilli's In−Person Attendance at Settlement Conference re 81 Settlement Conference Order,, by Jerry Hall, Thomas Hurlbut, Philip Merrilli. (Attachments: # 1 Proposed Order)(Erbach, John) (Entered: 01/13/2020) |
| 01/13/2020 | 98 | Memorandum in Support re 97 Consent MOTION Motion to Excuse Defendants Hall, Hurlbut and Merilli's In−Person Attendance at Settlement Conference re 81 Settlement Conference Order,, filed by Jerry Hall, Thomas Hurlbut, Philip Merrilli. (Attachments: # 1 Proposed Order)(Erbach, John) (Entered: 01/13/2020) |
| 01/14/2020 | | MOTIONS REFERRED to Magistrate Judge Leonard. 97 Consent MOTION Motion to Excuse Defendants Hall, Hurlbut and Merilli's In−Person Attendance at Settlement Conference re 81 Settlement Conference Order. (tamarm) (Entered: 01/14/2020) |
| 01/16/2020 | | Telephone Conference re 97 set for 1/21/2020 at 09:30 AM in Norfolk Judges Chamber before Magistrate Judge Lawrence R. Leonard. (lwoo) (Entered: 01/16/2020) |
| 01/16/2020 | 99 | NOTICE of Appearance by Ashley Partin Peterson on behalf of CSX Transportation, Inc. (Peterson, Ashley) (Entered: 01/16/2020) |
| 01/16/2020 | 100 | RESPONSE in Opposition re 91 MOTION to Quash *CSX Transportation, Inc.'s Subpoena Duces Tecum* filed by CSX Transportation, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(McFarland, Robert) (Entered: 01/16/2020) |
| 01/16/2020 | 101 | RESPONSE in Opposition re 94 MOTION for Partial Summary Judgment filed by CSX Transportation, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(McFarland, Robert) (Entered: 01/16/2020) |
| 01/21/2020 | 102 | Minute Entry for telephone conference on the Consent Motion to Excuse Defendants Hall, Hurlbut and Merrillis In−Person Attendance at Settlement Conference 97 held 1/21/2020 before Magistrate Judge Lawrence R. Leonard. Benjamin Hatch, Robert McFarland and Jeanne Noonan appeared on behalf of Plaintiff. Alan Wingfield |

|  |  |  |
|---|---|---|
|  |  | appeared on behalf of Defendant Norfolk Southern Railway. Ryan Snow appeared on behalf of Defendant Norfolk & Portsmouth Belt Line Railway Company. Hugh Fain and John Erbach appeared on behalf of Defendants Hall, Hurlbut and Merrilli. William Spivey appeared for Cannon Moss. Questions by the Court regarding damages. Mr. Hatch notes that the Prayer seeks only injunctive relief from Defendants and does not object to the motion. The Court will GRANT the motion and prepare an Order. Court in recess. (lwoo) (Entered: 01/21/2020) |
| 01/21/2020 | 103 | ORDER granting 97 Motion Excuse Defendants Hall, Hurlbut, and Merrili's In−Person Attendance at Settlement Conference. Individual Defendants Hall, Hurlbut and Merilli are excused from attending the March 24, 2020 settlement conference in person, provided that their counsel appears with full authority to settle on their behalf. Signed by Magistrate Judge Lawrence R. Leonard on 02/21/2020. (tamarm) (Entered: 01/21/2020) |
| 01/22/2020 | 104 | REPLY to Response to Motion re 91 MOTION to Quash *CSX Transportation, Inc.'s Subpoena Duces Tecum* filed by Virginia International Terminals, LLC. (Powers, Edward) (Entered: 01/22/2020) |
| 01/22/2020 | 105 | REPLY to Response to Motion re 94 MOTION for Partial Summary Judgment filed by Norfolk & Portsmouth Belt Line Railway Company. (Snow, W. Ryan) (Entered: 01/22/2020) |
| 01/23/2020 |  | MOTIONS REFERRED to Magistrate Judge Leonard. 91 MOTION to Quash *CSX Transportation, Inc.'s Subpoena Duces Tecum* (tamarm) (Entered: 01/23/2020) |
| 01/23/2020 | 106 | Emergency MOTION for Extension of Time to Complete Discovery *and Amend Scheduling Order* by CSX Transportation, Inc.. (McFarland, Robert) (Entered: 01/23/2020) |
| 01/23/2020 | 107 | Memorandum in Support re 106 Emergency MOTION for Extension of Time to Complete Discovery *and Amend Scheduling Order* filed by CSX Transportation, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15)(McFarland, Robert) (Entered: 01/23/2020) |
| 01/23/2020 | 108 | NOTICE by CSX Transportation, Inc. re 106 Emergency MOTION for Extension of Time to Complete Discovery *and Amend Scheduling Order OF REQUEST FOR EXPEDITED CONSIDERATION* (McFarland, Robert) (Entered: 01/23/2020) |
| 01/23/2020 | 109 | Consent MOTION for Extension *of Time to Serve Objections to Discovery* by Jerry Hall, Thomas Hurlbut, Philip Merrilli. (Attachments: # 1 Proposed Order)(Erbach, John) (Entered: 01/23/2020) |
| 01/24/2020 |  | MOTIONS REFERRED to Magistrate Judge Leonard. 109 Consent MOTION for Extension *of Time to Serve Objections to Discovery. Also emailed Magistrate and Chief District Judges' chambers regarding 106 Emergency Motion and 108 Request for Expedited Consideration. (tamarm) Modified text on 1/24/2020 (tamarm). (Entered: 01/24/2020)* |
| 01/24/2020 | 110 | ORDER granting 109 Consent Motion for Extension of Time to Serve Objections to Plaintiffs Discovery filed by Defendants Jerry Hall, Thomas Hurlbut and Philip Merilli. Defendants Jerry Hall, Thomas Hurlbut and Philip Merilli shall serve their objections to CSXT's First Set of Requests for Admission, Interrogatories, and Requests for Production on or before January 31, 2020. Signed by Magistrate Judge Lawrence R. Leonard on 01/24/2020. (tamarm) (Entered: 01/24/2020) |
| 01/27/2020 |  | Motion Hearing re 91 Motion to Quash set for 2/10/2020 at 10:00 AM in Norfolk Mag Courtroom 1 w/OCR before Magistrate Judge Lawrence R. Leonard. (lwoo) (Entered: 01/27/2020) |
| 01/27/2020 | 111 | Memorandum in Opposition re 106 Emergency MOTION for Extension of Time to Complete Discovery *and Amend Scheduling Order* filed by Norfolk Southern Railway Company. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G)(Lacy, Michael) (Entered: 01/27/2020) |

| | | |
|---|---|---|
| 01/29/2020 | 112 | Opposition to 106 Emergency MOTION for Extension of Time to Complete Discovery *and Amend Scheduling Order* filed by Norfolk & Portsmouth Belt Line Railway Company. (Snow, W. Ryan) (Entered: 01/29/2020) |
| 01/29/2020 | 113 | REPLY to Response to Motion re 106 Emergency MOTION for Extension of Time to Complete Discovery *and Amend Scheduling Order* filed by CSX Transportation, Inc.. (Attachments: # 1 Exhibit A)(McFarland, Robert) (Entered: 01/29/2020) |
| 01/31/2020 | 114 | Consent MOTION for Extension *of Discovery Deadlines between Plaintiff CSX Transportation, Inc. and Defendants Jerry Hall, Thomas Hurlbut, and Philip Merilli* by Jerry Hall, Thomas Hurlbut, Philip Merrilli. (Attachments: # 1 Proposed Order)(Erbach, John) (Entered: 01/31/2020) |
| 01/31/2020 | | MOTIONS REFERRED to Magistrate Judge: Leonard. 114 Consent MOTION for Extension *of Discovery Deadlines between Plaintiff CSX Transportation, Inc. and Defendants Jerry Hall, Thomas Hurlbut, and Philip Merilli* (tamarm, ) (Entered: 01/31/2020) |
| 01/31/2020 | 115 | MOTION to Dismiss , *For Judgment on the Pleadings, and for Referral of Issues to the U.S. Surface Transportation Board* by Norfolk Southern Railway Company. (Lacy, Michael) (Entered: 01/31/2020) |
| 01/31/2020 | 116 | Memorandum in Support re 115 MOTION to Dismiss , *For Judgment on the Pleadings, and for Referral of Issues to the U.S. Surface Transportation Board* filed by Norfolk Southern Railway Company. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F)(Lacy, Michael) (Entered: 01/31/2020) |
| 02/04/2020 | 117 | ORDER granting 114 Motion for of Discovery Deadlines between Plaintiff CSX Transportation, Inc. and Defendants Jerry Hall, Thomas Hurlbut, and Philip Merilli by Jerry Hall, Thomas Hurlbut, Philip Merrilli. Signed by Magistrate Judge Lawrence R. Leonard on 02/03/2020. (tamarm, ) (Entered: 02/04/2020) |
| 02/05/2020 | 118 | ORDER granting in part 106 Motion for Extension of Time to Complete Discovery. See Order for Details. Signed by Magistrate Judge Lawrence R. Leonard on 2/5/20. (bpet, ) (Entered: 02/05/2020) |
| 02/06/2020 | 119 | MOTION to Dismiss for Lack of Jurisdiction *Under Rule 12(b)(1) Based On Mootness* by Jerry Hall, Thomas Hurlbut, Philip Merrilli. (Erbach, John) (Entered: 02/06/2020) |
| 02/06/2020 | 120 | Memorandum in Support re 119 MOTION to Dismiss for Lack of Jurisdiction *Under Rule 12(b)(1) Based On Mootness* filed by Jerry Hall, Thomas Hurlbut, Philip Merrilli. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Erbach, John) (Entered: 02/06/2020) |
| 02/07/2020 | 121 | Request for Hearing by Norfolk & Portsmouth Belt Line Railway Company re 94 MOTION for Partial Summary Judgment (Chapman, James) (Entered: 02/07/2020) |
| 02/10/2020 | 122 | ORDER granting in part and deferring in part 91 Motion to Quash. (See Order for specifics.) Signed by Magistrate Judge Lawrence R. Leonard on 02/10/2020. (tamarm, ) (Entered: 02/10/2020) |
| 02/10/2020 | 123 | Minute Entry for proceedings held before Magistrate Judge Lawrence R. Leonard:Motion Hearing held on 2/10/2020 re 91 MOTION to Quash *CSX Transportation, Inc.'s Subpoena Duces Tecum* filed by Virginia International Terminals, LLC. Matter came on for hearing on pending motion to quash (#91). Present were Rob McFarland, on behalf of the plaintiffs, Kathleen Knudsen on behalf of Norfolk Southern, Ryan Snow on behalf of Norfolk & Portsmouth Belt Line Railway Company and Eddie Powers and Jennifer Eaton on behalf of Virginia International Terminals. Mr. Powers argued the motion and Mr. McFarland responded. The Court made rulings on the record. For the reasons stated on the record the Court GRANTS the proprietary portion of the motion and defers ruling on the ESI aspect. The Court will issue an order. Court adjourned. (Court Reporter Jody Stewart, OCR.)(cdod, ) (Entered: 02/10/2020) |
| 02/12/2020 | 124 | Motion to appear Pro Hac Vice by Tara L. Reinhart and Certification of Local Counsel Christopher Herlihy Filing fee $ 75, receipt number 0422−7071772. by Norfolk Southern Railway Company. (Herlihy, Christopher) (Entered: 02/12/2020) |

| | | |
|---|---|---|
| 02/12/2020 | 125 | Motion to appear Pro Hac Vice by John R. Thornburgh II and Certification of Local Counsel Christopher Herlihy Filing fee $ 75, receipt number 0422−7071773. by Norfolk Southern Railway Company. (Herlihy, Christopher) (Entered: 02/12/2020) |
| 02/12/2020 | 126 | Motion to appear Pro Hac Vice by Thomas R. Gentry and Certification of Local Counsel Christopher Herlihy Filing fee $ 75, receipt number 0422−7071778. by Norfolk Southern Railway Company. (Herlihy, Christopher) (Entered: 02/12/2020) |
| 02/13/2020 | 127 | NOTICE of Appearance by Massie Payne Cooper on behalf of Norfolk Southern Railway Company (Cooper, Massie) (Entered: 02/13/2020) |
| 02/14/2020 | 128 | ORDER granting 126 Motion for Pro hac vice for Thomas Robert Gentry as to Norfolk Southern Railway Company. Signed by Chief District Judge Mark S. Davis on 02/14/20. (tlev, ) (tlev, ). (Entered: 02/14/2020) |
| 02/14/2020 | 129 | ORDER granting 125 Motion for Pro hac vice for John Reed Thornburgh, II as to Norfolk Southern Railway Company. Signed by Chief District Judge Mark S. Davis on 02/14/20. (tlev, ) (Entered: 02/14/2020) |
| 02/14/2020 | 130 | ORDER granting 124 Motion for Pro hac vice for Tara Lee Reinhart as to Norfolk Southern Railway Company. Signed by Chief District Judge Mark S. Davis on 02/14/20. (tlev, ) (Entered: 02/14/2020) |
| 02/14/2020 | 131 | RESPONSE in Opposition re 115 MOTION to Dismiss , *For Judgment on the Pleadings, and for Referral of Issues to the U.S. Surface Transportation Board* filed by CSX Transportation, Inc.. (Hatch, Benjamin) (Entered: 02/14/2020) |
| 02/14/2020 | 132 | RESPONSE in Support re 115 MOTION to Dismiss , *For Judgment on the Pleadings, and for Referral of Issues to the U.S. Surface Transportation Board* filed by Norfolk & Portsmouth Belt Line Railway Company. (Attachments: # 1 Exhibit 1)(Chapman, James) (Entered: 02/14/2020) |
| 02/17/2020 | 133 | MOTION to Compel *Responsive Documents* by CSX Transportation, Inc.. (McFarland, Robert) (Entered: 02/17/2020) |
| 02/17/2020 | 134 | Memorandum in Support re 133 MOTION to Compel *Responsive Documents* filed by CSX Transportation, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F)(McFarland, Robert) (Entered: 02/17/2020) |
| 02/18/2020 | 135 | NOTICE of Appearance by Clay Sutton Hester on behalf of Jerry Hall, Thomas Hurlbut, Philip Merrilli (Hester, Clay) (Entered: 02/18/2020) |
| 02/20/2020 | 136 | NOTICE of Appearance by V. Kathleen Dougherty on behalf of CSX Transportation, Inc. (Dougherty, V.) (Entered: 02/20/2020) |
| 02/20/2020 | 137 | RESPONSE to Motion re 119 MOTION to Dismiss for Lack of Jurisdiction *Under Rule 12(b)(1) Based On Mootness* filed by Norfolk & Portsmouth Belt Line Railway Company. (Chapman, James) (Entered: 02/20/2020) |
| 02/20/2020 | 138 | REPLY to Response to Motion re 115 MOTION to Dismiss , *For Judgment on the Pleadings, and for Referral of Issues to the U.S. Surface Transportation Board* filed by Norfolk Southern Railway Company. (Lacy, Michael) (Entered: 02/20/2020) |
| 02/20/2020 | 139 | RESPONSE to Motion re 119 MOTION to Dismiss for Lack of Jurisdiction *Under Rule 12(b)(1) Based On Mootness* filed by CSX Transportation, Inc.. (McFarland, Robert) (Entered: 02/20/2020) |
| 02/24/2020 | 140 | NOTICE of Appearance by Johnny Brent Justus on behalf of CSX Transportation, Inc. (Justus, Johnny) (Entered: 02/24/2020) |
| 02/24/2020 | 141 | Joint MOTION to Dismiss *Defendants Hall, Hurlbut, and Merilli and for Stipulation* by CSX Transportation, Inc.. (Attachments: # 1 Exhibit Proposed Order)(McFarland, Robert) (Entered: 02/24/2020) |
| 02/25/2020 | 142 | REPLY to Response to Motion re 119 MOTION to Dismiss for Lack of Jurisdiction *Under Rule 12(b)(1) Based On Mootness* filed by Jerry Hall, Thomas Hurlbut, Philip Merrilli. (Mullins, Maurice) (Entered: 02/25/2020) |
| 02/27/2020 | 143 | ORDER granting 141 Motion to Dismiss. Upon stipulation and agreement of the parties, IT IS HEREBY ORDERED that Defendants Jerry Hall, Thomas Hurlbut, and |

| | | |
|---|---|---|
| | | Philip Merilli are DISMISSED from this action, without prejudice, and with each party bearing its own attorneys' fees and costs. IT IS FURTHER ORDERED that any final award of injunctive relief entered by this Court against Defendant NPBL will be followed and undertaken by NPBL, including through the present NPBL Board of Directors. Signed by Chief District Judge Mark S. Davis on 02/26/2020. (tamarm, ) (Entered: 02/27/2020) |
| 02/28/2020 | 144 | MOTION to Dismiss for Lack of Jurisdiction by Cannon Moss. (Belote, Clark) (Entered: 02/28/2020) |
| 02/28/2020 | 145 | Memorandum in Support re 144 MOTION to Dismiss for Lack of Jurisdiction filed by Cannon Moss. (Attachments: # 1 Exhibit 1)(Belote, Clark) (Entered: 02/28/2020) |
| 03/02/2020 | 146 | Withdrawal of Motion by CSX Transportation, Inc. re 133 MOTION to Compel *Responsive Documents* (Attachments: # 1 Exhibit A)(McFarland, Robert) (Entered: 03/02/2020) |
| 03/04/2020 | 147 | AFFIDAVIT of Service for Subpoena served on Sarah Jayne McCoy, Registered Agent on 03/02/2020, filed by Norfolk & Portsmouth Belt Line Railway Company. (Chapman, James) (Entered: 03/04/2020) |
| 03/04/2020 | 148 | AFFIDAVIT of Service for Subpoena served on Sarah Jayne McCoy, Registered Agent on 03/02/2020, filed by Norfolk & Portsmouth Belt Line Railway Company. (Chapman, James) (Entered: 03/04/2020) |
| 03/11/2020 | 149 | AFFIDAVIT of Service for Subpoena served on Tony Ingram on March 7, 2020, filed by Norfolk Southern Railway Company. (Lacy, Michael) (Entered: 03/11/2020) |
| 03/12/2020 | 150 | AFFIDAVIT of Service for Deposition Subpoena served on Jermaine Swafford on 3/11/2020, filed by Norfolk Southern Railway Company. (Lacy, Michael) (Entered: 03/12/2020) |
| 03/13/2020 | 151 | RESPONSE to Motion re 144 MOTION to Dismiss for Lack of Jurisdiction filed by Norfolk & Portsmouth Belt Line Railway Company. (Chapman, James) (Entered: 03/13/2020) |
| 03/13/2020 | 152 | MOTION to Compel *Depositions of Plaintiff CSX Transportation, Inc.'s Deponents* by Norfolk Southern Railway Company. (Lacy, Michael) (Entered: 03/13/2020) |
| 03/13/2020 | 153 | Memorandum in Support re 152 MOTION to Compel *Depositions of Plaintiff CSX Transportation, Inc.'s Deponents* filed by Norfolk Southern Railway Company. (Attachments: # 1 Exhibit A)(Lacy, Michael) (Entered: 03/13/2020) |
| 03/13/2020 | 154 | RESPONSE to Motion re 144 MOTION to Dismiss for Lack of Jurisdiction filed by CSX Transportation, Inc.. (McFarland, Robert) (Entered: 03/13/2020) |
| 03/16/2020 | 155 | MOTION to Quash *NPBL's Subpoena Duces Tecum* by Virginia International Terminals, LLC. (Powers, Edward) (Entered: 03/16/2020) |
| 03/16/2020 | 156 | Memorandum in Support re 155 MOTION to Quash *NPBL's Subpoena Duces Tecum* filed by Virginia International Terminals, LLC. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Powers, Edward) (Entered: 03/16/2020) |
| 03/17/2020 | 157 | Joint MOTION to Stay *Due to the Coronavirus* by Norfolk Southern Railway Company. (Attachments: # 1 Proposed Order)(Lynch, John) (Entered: 03/17/2020) |
| 03/18/2020 | | Reset: Settlement Conference reset for 4/20/2020 at 09:30 AM in Norfolk Mag Courtroom 1 before Magistrate Judge Lawrence R. Leonard. (lwoo) (Entered: 03/18/2020) |
| 03/18/2020 | 158 | Joint MOTION to Dismiss *Defendant Cannon Moss and Stipulation* by Cannon Moss. (Attachments: # 1 Proposed Order)(Spivey, William) (Entered: 03/18/2020) |
| 03/19/2020 | 159 | ORDER granting 158 Joint Motion to Dismiss. Defendant Cannon Moss is DISMISSED from this action, without prejudice, with each party bearing its own attorneys' fees and costs; It is further ORDERED that any final award of injunctive relief entered by this Court against Defendant NPBL will be followed and undertaken by NPBL, including through the present NPBL Board of Directors and Management. Signed by Chief District Judge Mark S. Davis on 03/19/2020. (tamarm, ) (Entered: |

| | | |
|---|---|---|
| | | 03/19/2020) |
| 03/19/2020 | 160 | ORDER granting 157 Motion to Stay. This case is stayed for thirty (30) days and all existing deadlines, including trial, are vacated pending rescheduling. On or before April 16, 2020, the Parties are directed to submit a status report to the Court with recommendations for proceeding and a request for a telephonic status conference with the Court to discuss scheduling. Signed by Chief District Judge Mark S. Davis on 03/19/2020. (tamarm, ) (Entered: 03/19/2020) |
| 03/20/2020 | 161 | ORDER finding as moot 144 Motion to Dismiss for Lack of Jurisdiction filed by Defendant Cannon Moss based on the Court's Order (ECF No. 159) entered on March 19, 2020 which dismissed Defendant Moss from the case. Signed by Chief District Judge Mark S. Davis on 03/20/2020. (Davis, Mark) (Entered: 03/20/2020) |
| 03/20/2020 | 162 | Memorandum in Support of 163 MOTION to Quash *30(b)(6) Subpoena issued to VPA* by Virginia International Terminals, LLC. (Attachments: # 1 Exhibit A)(Powers, Edward) Modified text on 3/23/2020 (tamarm, ). (Entered: 03/20/2020) |
| 03/20/2020 | 163 | MOTION to Quash by Virginia International Terminals, LLC. (Powers, Edward) (Entered: 03/20/2020) |
| 04/16/2020 | 164 | Joint MOTION to Stay by CSX Transportation, Inc.. (Attachments: # 1 Exhibit 1 − Proposed Order)(McFarland, Robert) (Entered: 04/16/2020) |
| 04/17/2020 | 165 | ORDER granting 164 Joint Motion to Stay for an additional thirty (30) days, until May 19, 2020, and all existing deadlines will be rescheduled. On or before May 18, 2020, the Parties are directed to submit a status report to the Court with recommendations for proceeding and a request for a telephonic status conference with the Court to discuss scheduling. Signed by Chief District Judge Mark S. Davis on 04/16/2020. (tamarm, ) (Entered: 04/17/2020) |
| 05/13/2020 | 166 | MOTION to Compel *the Production of Documents from Plaintiff CSX Transportation, Inc.* by Norfolk Southern Railway Company. (Attachments: # 1 Proposed Order)(Lacy, Michael) (Entered: 05/13/2020) |
| 05/13/2020 | 167 | Brief in Support to 166 MOTION to Compel *the Production of Documents from Plaintiff CSX Transportation, Inc.* filed by Norfolk Southern Railway Company. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10)(Lacy, Michael) (Entered: 05/13/2020) |
| 05/13/2020 | 168 | MOTION to Seal by Norfolk Southern Railway Company. (Attachments: # 1 Proposed Order)(Lacy, Michael) (Entered: 05/13/2020) |
| 05/13/2020 | 169 | Memorandum in Support re 168 MOTION to Seal filed by Norfolk Southern Railway Company. (Lacy, Michael) (Entered: 05/13/2020) |
| 05/13/2020 | 170 | Sealed Memorandum in Support re 167 Brief in Support,. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 7, # 4 Exhibit 8, # 5 Exhibit 9, # 6 Exhibit 10)(Lacy, Michael) (Entered: 05/13/2020) |
| 05/13/2020 | 171 | Notice of Filing Sealing Motion LCvR5(C) by Norfolk Southern Railway Company re 170 Sealed Memorandum in Support (Lacy, Michael) (Entered: 05/13/2020) |
| 05/18/2020 | 172 | Joint MOTION to Stay by CSX Transportation, Inc.. (Attachments: # 1 Exhibit 1, Proposed Order)(McFarland, Robert) (Entered: 05/18/2020) |
| 05/20/2020 | 173 | ORDER granting 172 Motion to Stay. This case is stayed for an additional thirty (30) days, until June 18, 2020. On or before June 17, 2020, the Parties are directed to submit a status report to the Court with recommendations for future proceedings and a request for a telephonic status conference with the Court to discuss scheduling. Signed by Chief District Judge Mark S. Davis on 05/20/2020. (tamarm, ) (Entered: 05/20/2020) |
| 05/20/2020 | 174 | RESPONSE to Motion re 168 MOTION to Seal filed by CSX Transportation, Inc.. (Attachments: # 1 Exhibit A, Proposed Order)(McFarland, Robert) (Entered: 05/20/2020) |

| | | |
|---|---|---|
| 05/21/2020 | | MOTION REFERRED to Magistrate Judge Lawrence R. Leonard: 168 MOTION to Seal . (bpet, ) (Entered: 05/21/2020) |
| 05/22/2020 | 175 | ORDER: It is hereby ORDERED that the Motion to Seal be GRANTED. The Court ORDERS that NS's unredacted Brief in Support of its Motion to Compel (ECF No. 170) and Exhibits 1,2, and 7−10 to the Brief in Support shall be permanently maintained under seal by the Clerk. Signed by Magistrate Judge Lawrence R. Leonard and filed on 5/22/2020. (epri, ) (Entered: 05/22/2020) |
| 05/27/2020 | 176 | RESPONSE in Opposition re 166 MOTION to Compel *the Production of Documents from Plaintiff CSX Transportation, Inc.* filed by CSX Transportation, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G)(McFarland, Robert) (Entered: 05/27/2020) |
| 05/28/2020 | 177 | Consent MOTION to Withdraw as Attorney *and Memorandum in Support* by CSX Transportation, Inc.. (Attachments: # 1 Proposed Order)(Noonan, Jeanne) (Entered: 05/28/2020) |
| 05/28/2020 | 178 | ORDER granting 177 Motion to Withdraw as Attorney. Attorney Jeanne Elizabeth Noonan terminated. Signed by Chief District Judge Mark S. Davis on 05/28/2020. (tamarm, ) (Entered: 05/28/2020) |
| 06/02/2020 | 179 | REPLY to Response to Motion re 166 MOTION to Compel *the Production of Documents from Plaintiff CSX Transportation, Inc.* filed by Norfolk Southern Railway Company. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13)(Lacy, Michael) (Entered: 06/02/2020) |
| 06/02/2020 | 180 | MOTION to Seal by Norfolk Southern Railway Company. (Attachments: # 1 Proposed Order)(Lacy, Michael) (Entered: 06/02/2020) |
| 06/02/2020 | 181 | Memorandum in Support re 180 MOTION to Seal filed by Norfolk Southern Railway Company. (Lacy, Michael) (Entered: 06/02/2020) |
| 06/02/2020 | 182 | Sealed Response/Reply/Opposition re 179 Reply to Response to Motion,. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13)(Lacy, Michael) (Entered: 06/02/2020) |
| 06/02/2020 | 183 | Notice of Filing Sealing Motion LCvR5(C) by Norfolk Southern Railway Company re 182 Sealed Response/Reply/Opposition, (Lacy, Michael) (Entered: 06/02/2020) |
| 06/03/2020 | | MOTIONS REFERRED to Magistrate Judge Leonard. 166 MOTION to Compel *the Production of Documents from Plaintiff CSX Transportation, Inc.* (tamarm, ) (Entered: 06/03/2020) |
| 06/08/2020 | 184 | ORDER TO SHOW CAUSE within seven days, why Motions, ECF Nos. 152, 155 and 163, were not responded to as contemplated by this Court's prior Orders. Signed by Magistrate Judge Lawrence R. Leonard on 6/8/2020. (tamarm, ) (Entered: 06/08/2020) |
| 06/09/2020 | 185 | RESPONSE to Motion re 180 MOTION to Seal filed by CSX Transportation, Inc.. (Attachments: # 1 Exhibit A − Proposed Order)(McFarland, Robert) (Entered: 06/09/2020) |
| 06/09/2020 | | MOTIONS REFERRED to Magistrate Judge Leonard. 180 MOTION to Seal (tamarm, ) (Entered: 06/09/2020) |
| 06/11/2020 | 186 | ORDER granting 180 Motion to Seal. The Court ORDERS that NS's unredacted Reply in Support of its Motion to Compel (ECF No. 179) and Exhibits 1, 2, and 4−13 to the Reply shall be permanently maintained under seal by the Clerk. Signed by Magistrate Judge Lawrence R. Leonard on 6/11/2020. (tamarm, ) (Entered: 06/11/2020) |
| 06/12/2020 | 187 | Response to 184 Order to Show Cause filed by Norfolk Southern Railway Company. (Lacy, Michael) (Entered: 06/12/2020) |
| 06/15/2020 | 188 | Response to 184 Order to Show Cause filed by CSX Transportation, Inc.. (McFarland, Robert) (Entered: 06/15/2020) |

| 06/15/2020 | 189 | Withdrawal of Motion by Virginia International Terminals, LLC (Powers, Edward) (Entered: 06/15/2020) |
|---|---|---|
| 06/17/2020 | 190 | Joint MOTION to Continue *Stay Due to COVID−19* by Norfolk Southern Railway Company. (Attachments: # 1 Proposed Order)(Lacy, Michael) (Entered: 06/17/2020) |
| 06/18/2020 | 191 | ORDER granting 190 Motion to Continue Stay. Stay continued until 7/20/20; the parties are directed to submit a status report prior to said date. Signed by Chief District Judge Mark S. Davis on 6/18/20. (bpet, ) (Entered: 06/18/2020) |
| 07/02/2020 | 192 | ORDER finding as moot 152 Motion to Compel, based on Norfolk Southern's representation in ECF No. 187 that it intended to withdraw its motion. Signed by Magistrate Judge Lawrence R. Leonard on 7/2/2020. (Leonard, Lawrence) (Entered: 07/02/2020) |
| 07/14/2020 | 193 | NOTICE by Norfolk Southern Railway Company (Lacy, Michael) (Entered: 07/14/2020) |
| 07/14/2020 | 194 | ORDER re 166 MOTION to Compel *the Production of Documents from Plaintiff CSX Transportation, Inc.* filed by Norfolk Southern Railway Company. Plaintiff is DIRECTED to deliver to chambers (do not file), under seal, by no later than the close of business on 7/22/2020, the 194 documents from Attachment 9 and Attachment 10. (See Order for further details.) Signed by Magistrate Judge Lawrence R. Leonard on 7/14/2020. (tamarm, ) (Entered: 07/14/2020) |
| 07/20/2020 | 195 | Joint MOTION to Continue *Stay Due to COVID−19* by Norfolk Southern Railway Company. (Attachments: # 1 Proposed Order)(Lacy, Michael) (Entered: 07/20/2020) |
| 07/20/2020 | 196 | ORDER granting 195 Motion to Continue Stay. This case is stayed for additional thirty (30) days, until August 19, 2020, and all existing deadlines will be rescheduled. On or before August 19, 2020, the Parties are directed to submit a status report to the Court with recommendations for future proceedings. Signed by Chief District Judge Mark S. Davis on 7/20/2020. (tamarm, ) (Entered: 07/20/2020) |
| 07/24/2020 | 197 | MOTION to Seal by Norfolk & Portsmouth Belt Line Railway Company. (Attachments: # 1 Proposed Order)(Snow, W. Ryan) (Entered: 07/24/2020) |
| 07/24/2020 | 198 | Memorandum in Support re 197 MOTION to Seal filed by Norfolk & Portsmouth Belt Line Railway Company. (Snow, W. Ryan) (Entered: 07/24/2020) |
| 07/24/2020 | 199 | Notice of Under Seal Filing LCvR5 (B) by Norfolk & Portsmouth Belt Line Railway Company re 197 MOTION to Seal (Snow, W. Ryan) (Entered: 07/24/2020) |
| 07/24/2020 | 200 | MOTION to Compel by Norfolk & Portsmouth Belt Line Railway Company. (Snow, W. Ryan) (Entered: 07/24/2020) |
| 07/24/2020 | 201 | Memorandum in Support re 200 MOTION to Compel filed by Norfolk & Portsmouth Belt Line Railway Company. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H)(Snow, W. Ryan) (Entered: 07/24/2020) |
| 07/24/2020 | 202 | Sealed Memorandum in Support re 197 MOTION to Seal . (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit D, # 4 Exhibit G, # 5 Exhibit H)(Snow, W. Ryan) (Entered: 07/24/2020) |
| 07/24/2020 | 203 | MOTION to Compel *Depositions* by CSX Transportation, Inc.. (Attachments: # 1 Exhibit Proposed Order)(McFarland, Robert) (Entered: 07/24/2020) |
| 07/24/2020 | 204 | Memorandum in Support re 203 MOTION to Compel *Depositions* filed by CSX Transportation, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N)(McFarland, Robert) (Entered: 07/24/2020) |
| 07/24/2020 | 205 | MOTION to Seal by CSX Transportation, Inc.. (Attachments: # 1 Proposed Order)(McFarland, Robert) (Entered: 07/24/2020) |
| 07/24/2020 | 206 | Notice of Under Seal Filing LCvR5 (B) by CSX Transportation, Inc. re 205 MOTION to Seal (McFarland, Robert) (Entered: 07/24/2020) |

| 07/24/2020 | 207 | Memorandum in Support re 205 MOTION to Seal filed by CSX Transportation, Inc.. (McFarland, Robert) (Entered: 07/24/2020) |
|---|---|---|
| 07/24/2020 | 208 | Sealed Memorandum in Support re 203 MOTION to Compel *Depositions*. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N)(McFarland, Robert) (Entered: 07/24/2020) |
| 07/31/2020 | 209 | RESPONSE to Motion re 197 MOTION to Seal filed by CSX Transportation, Inc.. (Attachments: # 1 Proposed Order)(McFarland, Robert) (Entered: 07/31/2020) |
| 07/31/2020 | | MOTIONS REFERRED to Magistrate Judge Leonard. 197 MOTION to Seal (tamarm, ) (Entered: 07/31/2020) |
| 08/04/2020 | | MOTIONS REFERRED to Magistrate Judge Leonard. 205 MOTION to Seal (tamarm, ) (Entered: 08/04/2020) |
| 08/07/2020 | 210 | RESPONSE in Opposition re 200 MOTION to Compel filed by CSX Transportation, Inc.. (Attachments: # 1 Exhibit 1)(McFarland, Robert) (Entered: 08/07/2020) |
| 08/07/2020 | 211 | MOTION to Seal by CSX Transportation, Inc.. (Attachments: # 1 Exhibit 1 − Proposed Order)(McFarland, Robert) (Entered: 08/07/2020) |
| 08/07/2020 | 212 | Notice of Under Seal Filing LCvR5 (B) by CSX Transportation, Inc. re 211 MOTION to Seal (McFarland, Robert) (Entered: 08/07/2020) |
| 08/07/2020 | 213 | Memorandum in Support re 211 MOTION to Seal filed by CSX Transportation, Inc.. (McFarland, Robert) (Entered: 08/07/2020) |
| 08/07/2020 | 214 | Sealed Response/Reply/Opposition re 200 MOTION to Compel . (Attachments: # 1 Exhibit 1)(McFarland, Robert) (Entered: 08/07/2020) |
| 08/07/2020 | 215 | RESPONSE in Opposition re 203 MOTION to Compel *Depositions* filed by Norfolk Southern Railway Company. (Attachments: # 1 Exhibit A, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit B, # 10 Exhibit C)(Lacy, Michael) (Entered: 08/07/2020) |
| 08/07/2020 | 216 | MOTION to Seal by Norfolk Southern Railway Company. (Attachments: # 1 Proposed Order)(Lacy, Michael) (Entered: 08/07/2020) |
| 08/07/2020 | 217 | Memorandum in Support re 216 MOTION to Seal filed by Norfolk Southern Railway Company. (Lacy, Michael) (Entered: 08/07/2020) |
| 08/07/2020 | 218 | Sealed Attachment/Exhibit(s) re 215 Response in Opposition to Motion,. (Attachments: # 1 Exhibit C)(Lacy, Michael) (Entered: 08/07/2020) |
| 08/07/2020 | 219 | Notice of Filing Sealing Motion LCvR5(C) by Norfolk Southern Railway Company re 216 MOTION to Seal (Lacy, Michael) (Entered: 08/07/2020) |
| 08/12/2020 | 220 | MOTION for Extension of Time to File Response/Reply as to 200 MOTION to Compel *(Agreed)* by Norfolk & Portsmouth Belt Line Railway Company. (Attachments: # 1 Proposed Order)(Snow, W. Ryan) (Entered: 08/12/2020) |
| 08/12/2020 | | MOTIONS REFERRED to Magistrate Judge Leonard. 220 MOTION for Extension of Time to File Response/Reply as to 200 MOTION to Compel *(Agreed)* (tamarm, ) (Entered: 08/12/2020) |
| 08/12/2020 | 221 | ORDER granting 220 Motion for Extension of Time to File Reply re 200 MOTION to Compel Reply due by 8/20/2020. Signed by Magistrate Judge Lawrence R. Leonard on 8/12/2020. (tamarm, ) (Entered: 08/12/2020) |
| 08/13/2020 | 222 | REPLY to Response to Motion re 203 MOTION to Compel *Depositions* filed by CSX Transportation, Inc.. (Attachments: # 1 Exhibit 1)(McFarland, Robert) (Entered: 08/13/2020) |
| 08/14/2020 | | MOTIONS REFERRED to Magistrate Judge Leonard. 203 MOTION to Compel *Depositions* (tamarm, ) (Entered: 08/14/2020) |

| 08/14/2020 | 223 | ORDER granting 197 Motion to Seal. The Court ORDERS that Exhibits A, B, D, G, and H to the memorandum in support of the Belt Line's motion to compel, and the references to the exhibits in the body of the memorandum in support, shall be and hereby are sealed and omitted from public filing. These materials shall be sealed at least until 90 days after a final order is entered in this case and then, unless the case is appealed, be returned at that time to counsel for the filing parties. Signed by Magistrate Judge Lawrence R. Leonard on 8/14/2020. (tamarm, ) (Entered: 08/14/2020) |
|---|---|---|
| 08/14/2020 | 224 | ORDER granting 205 Motion to Seal. CSXT's unredacted Memorandum in Support of its Motion to Reopen and Compel Depositions and the unredacted Exhibits shall be maintained under seal by the Clerk pending further order of the Court. Signed by Magistrate Judge Lawrence R. Leonard on 8/14/2020. (tamarm, ) (Entered: 08/14/2020) |
| 08/14/2020 | 225 | ORDER granting 211 Motion to Seal. CSXT's unredacted Opposition to NPBL's Motion to Compel and the unredacted Exhibit 1 shall be maintained under seal by the Clerk pending further order of the Court. Signed by Magistrate Judge Lawrence R. Leonard on 8/14/2020. (tamarm, ) (Entered: 08/14/2020) |
| 08/14/2020 | 226 | ORDER granting 216 NSR's Motion to Seal. The deposition transcript excerpts attached to NSR's Brief shall be maintained under seal by the Clerk pending further order of the Court. Signed by Magistrate Judge Lawrence R. Leonard on 8/14/2020. (tamarm, ) (Entered: 08/14/2020) |
| 08/19/2020 | 227 | Joint MOTION for Extension of Time to File Status Report by CSX Transportation, Inc.. (Attachments: # 1 Exhibit 1 (Proposed Order))(McFarland, Robert) (Entered: 08/19/2020) |
| 08/20/2020 | 228 | Reply to Motion re 200 MOTION to Compel filed by Norfolk & Portsmouth Belt Line Railway Company. (Snow, W. Ryan) (Entered: 08/20/2020) |
| 08/21/2020 | 229 | ORDER granting in part and denying in part 166 Motion to Compel. (See Order for specifics.) Signed by Magistrate Judge Lawrence R. Leonard on 8/21/2020. (tamarm, ) (Entered: 08/21/2020) |
| 08/24/2020 | 230 | Request for Hearing by CSX Transportation, Inc re 203 MOTION to Compel Depositions (McFarland, Robert) (Entered: 08/24/2020) |
| 08/24/2020 | 231 | Request for Hearing by Norfolk & Portsmouth Belt Line Railway Company re 200 MOTION to Compel (Snow, W. Ryan) (Entered: 08/24/2020) |
| 08/24/2020 | 232 | STATUS REPORT Joint Status Report of the Parties by CSX Transportation, Inc.. (Attachments: # 1 Exhibit CSXT Exhibit 1, # 2 Exhibit CSXT Exhibit 2, # 3 Exhibit CSXT Exhibit 3, # 4 Exhibit CSXT Exhibit 4, # 5 Exhibit CSXT Exhibit 5)(McFarland, Robert) (Entered: 08/24/2020) |
| 08/25/2020 | | MOTIONS REFERRED to Magistrate Judge Leonard. 200 MOTION to Compel (tamarm, ) (Entered: 08/25/2020) |
| 08/25/2020 | 233 | ORDER granting 227 Motion for Extension of Time to File. It is ORDERED that or before August 24, 2020, the Parties are directed to submit a status report to the Court with recommendations for proceeding and a request for a telephonic status conference with the Court to discuss scheduling. Signed by Chief District Judge Mark S. Davis on 8/25/2020. (tamarm, ) (Entered: 08/25/2020) |
| 08/27/2020 | | Set Deadlines as to 200 MOTION to Compel , 203 MOTION to Compel Depositions. Motion Hearing set for 9/4/2020 at 02:00 PM in Norfolk Remote before Magistrate Judge Lawrence R. Leonard. (cdod, ) (Entered: 08/27/2020) |
| 08/27/2020 | 234 | MOTION to Withdraw as Attorney Elizabeth S. Flowers by Norfolk Southern Railway Company. (Attachments: # 1 Proposed Order)(Flowers, Elizabeth) (Entered: 08/27/2020) |
| 08/28/2020 | 235 | ORDER granting 234 Motion to Withdraw as Attorney. Elizabeth S. Flowers is removed as counsel of record for Defendant Norfolk Southern Railway Company in this matter. Signed by Chief District Judge Mark S. Davis on 8/28/2020. (tamarm, ) (Entered: 08/28/2020) |

JA15

| | | |
|---|---|---|
| 09/04/2020 | 239 | Minute Entry for proceedings held before Magistrate Judge Lawrence R. Leonard:Motion Hearing held on 9/4/2020 re 200 MOTION to Compel filed by Norfolk & Portsmouth Belt Line Railway Company, 203 MOTION to Compel *Depositions* filed by CSX Transportation, Inc.. Matter came on for hearing on pending motions to compel (#200, 203). Present by zoom were Robert McFarland, Katie Dougherty and Ben Hatch on behalf of the plaintiff, Alan Wingfield, Michael Lacy, John Lynch, and Monica McCarroll on behalf of Norfolk Southern, Ryan Snow and David Hartnett on behalf of Norfolk & Portsmouth Belt Line Railway Company. Mr. Snow argued the motion to compel on behalf of the Belt Line and Mr. McFarland and Ms. Dougherty responded. Court made rulings on the record. The motion is Granted. Mr. McFarland argued the motion to compel on behalf of the plaintiff and Mr. Lynch responded. Court made rulings on the record. The motion is GRANTED. CSX is also directed to file any claim for reasonable expenses incurred in making their motion within 30 days of this order. Court to enter a short order. Court adjourned. (Court Reporter Paul McManus, OCR.)(cdod, ) (Entered: 09/09/2020) |
| 09/08/2020 | 236 | ORDER granting 200 Motion to Compel. CSXT is DIRECTED to provide appropriate responses to NPBL's interrogatories 3 and 4 within 14 days of the date of this order. Signed by Magistrate Judge Lawrence R. Leonard on 9/4/2020. (tamarm, ) (Entered: 09/08/2020) |
| 09/08/2020 | 237 | ORDER granting 203 Motion to Compel. The parties are DIRECTED to conduct the depositions in question within 60 days of the date of this order. Furthermore, pursuant to Fed. R. Civ. P. 37(a)(5)(A), CSXT is DIRECTED to file any claim for reasonable expenses incurred in making their motion within 30 days of the date of this Order. Signed by Magistrate Judge Lawrence R. Leonard on 9/4/2020. (tamarm, ) (Entered: 09/08/2020) |
| 09/09/2020 | 238 | TRANSCRIPT of Proceedings, Motions to Compel and Re−open discovery, held on 9/4/20, before Judge Lawrence R. Leonard, Court Reporter/Transcriber Paul McManus, Telephone number 757−222−7077. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 10/9/2020. Redacted Transcript Deadline set for 11/9/2020. Release of Transcript Restriction set for 12/8/2020.(mcmanus, paul) (Entered: 09/09/2020)** |
| 09/11/2020 | 240 | Objection to 237 Order on Motion to Compel, filed by Norfolk Southern Railway Company. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Wingfield, Alan) (Entered: 09/11/2020) |
| 09/25/2020 | 241 | Response to 240 Objection filed by CSX Transportation, Inc.. (Attachments: # 1 Exhibit 1)(McFarland, Robert) (Entered: 09/25/2020) |
| 10/01/2020 | 242 | ORDER − The parties are directed to appear via remote proceedings for a supplemental scheduling conference on October 20,2020 at 10:00 a.m., at which time this case will be set for trial in July 2021, and all necessary pre−trial and discovery deadlines set. In the meantime, the parties are ORDERED to meet and confer for the purpose of coming to agreement, as much as possible, on a proposed pre−trial schedule. Further, it is ORDERED thatdiscovery shall immediately resume, including the scheduling and taking of depositions, by remote means if necessary. As discussed at the September 4,2020, hearing, the Court expects the parties to engage in discovery regardless of whether proceedings can occur in person or remotely, and will look with disfavor on any requested extensions based on any one parties' unwillingness to participate in remote proceedings. Signed by Magistrate Judge Lawrence R. Leonard on 10/1/2020. (tamarm, ) (Entered: 10/01/2020) |
| 10/01/2020 | 243 | Reply to 240 Objection *to Magistrate Judge's Non−Dispositive Order* filed by Norfolk Southern Railway Company. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Wingfield, Alan) (Entered: 10/01/2020) |

| 10/01/2020 | 244 | MOTION to Stay re 237 Order on Motion to Compel, *Pending Ruling on Objection* by Norfolk Southern Railway Company. (Wingfield, Alan) (Entered: 10/01/2020) |
| 10/01/2020 | 245 | Memorandum in Support re 244 MOTION to Stay re 237 Order on Motion to Compel, *Pending Ruling on Objection* filed by Norfolk Southern Railway Company. (Wingfield, Alan) (Entered: 10/01/2020) |
| 10/05/2020 | 246 | MOTION for Attorney Fees by CSX Transportation, Inc.. (Attachments: # 1 Proposed Order)(McFarland, Robert) (Entered: 10/05/2020) |
| 10/05/2020 | 247 | Memorandum in Support re 246 MOTION for Attorney Fees filed by CSX Transportation, Inc.. (Attachments: # 1 Exhibit A − Declaration of Robert W. McFarland, # 2 Exhibit 1 to the Declaration of Robert W. McFarland, # 3 Exhibit B − Declaration of Alan D. Albert, # 4 Exhibit 1 to the Declaration of Alan D. Albert)(McFarland, Robert) (Entered: 10/05/2020) |
| 10/15/2020 | 248 | RESPONSE in Opposition re 244 MOTION to Stay re 237 Order on Motion to Compel, *Pending Ruling on Objection* filed by CSX Transportation, Inc.. (McFarland, Robert) (Entered: 10/15/2020) |
| 10/19/2020 | 249 | NOTICE by CSX Transportation, Inc. re 242 Order,,, *(JOINT)* (Attachments: # 1 Exhibit 1, Proposed Order)(McFarland, Robert) (Entered: 10/19/2020) |
| 10/19/2020 | 250 | Memorandum in Opposition re 246 MOTION for Attorney Fees filed by Norfolk Southern Railway Company. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Wingfield, Alan) (Entered: 10/19/2020) |
| 10/20/2020 | 251 | Reply to Motion re 244 MOTION to Stay re 237 Order on Motion to Compel, *Pending Ruling on Objection* filed by Norfolk Southern Railway Company. (Wingfield, Alan) (Entered: 10/20/2020) |
| 10/20/2020 | 252 | Waiver of *Hearing and Request for Expedited Ruling* by Norfolk Southern Railway Company (Wingfield, Alan) (Entered: 10/20/2020) |
| 10/22/2020 | 253 | MEMORANDUM ORDER − Defendants objection to Judge Leonards order is OVERRULED. ECF No. 240. Defendants motion to stay Judge Leonards ruling is DENIED as MOOT in light of this Courts resolution of Defendants objection prior to the scheduled date of any of the relevant depositions. ECF No. 244. Signed by Chief District Judge Mark S. Davis on 10/22/2020. (tamarm, ) (Entered: 10/22/2020) |
| 10/22/2020 | 254 | Order Rule 16(b) Scheduling Order − Pursuant to the Rule 16(b) Conference it is ordered that Final Pretrial Conference set for 6/25/2021 at 10:00 AM in Norfolk. Jury Trial set for 7/13/2021 at 10:00 AM in Norfolk Courtroom 1 before Chief District Judge Mark S. Davis. A settlement conference shall be held on 4/1/2021, at 9:30 a.m. in Norfolk. Signed by Magistrate Judge Lawrence R. Leonard on 10/20/2020, filed 10/22/2020. (vwar) (Entered: 10/22/2020) |
| 10/22/2020 |  | Settlement Conference set for 4/1/2021 at 09:30 AM in Norfolk before Magistrate Judge Lawrence R. Leonard. (vwar) (Entered: 10/22/2020) |
| 10/22/2020 | 255 | Request for Hearing by Norfolk Southern Railway Company re 115 MOTION to Dismiss *, For Judgment on the Pleadings, and for Referral of Issues to the U.S. Surface Transportation Board* (Wingfield, Alan) (Entered: 10/22/2020) |
| 10/26/2020 | 256 | REPLY to Response to Motion re 246 MOTION for Attorney Fees filed by CSX Transportation, Inc.. (Attachments: # 1 Exhibit 1)(McFarland, Robert) (Entered: 10/26/2020) |
| 10/28/2020 |  | MOTION REFERRED to Magistrate Judge Lawrence R. Leonard: 246 MOTION for Attorney Fees. (bpet, ) (Entered: 10/28/2020) |
| 10/28/2020 | 257 | MOTION for Leave to File *Surreply in Opposition to CSXT's Motion for Attorneys' Fees* by Norfolk Southern Railway Company. (Wingfield, Alan) (Entered: 10/28/2020) |
| 10/28/2020 | 258 | Brief in Support to 257 MOTION for Leave to File *Surreply in Opposition to CSXT's Motion for Attorneys' Fees* filed by Norfolk Southern Railway Company. (Attachments: # 1 Exhibit A)(Wingfield, Alan) (Entered: 10/28/2020) |

| 11/10/2020 | 259 | Joint MOTION for Discovery *for Entry of Deposition Protocol* by Norfolk Southern Railway Company. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Wingfield, Alan) (Entered: 11/10/2020) |
|---|---|---|
| 11/12/2020 | 260 | RESPONSE to Motion re 257 MOTION for Leave to File *Surreply in Opposition to CSXT's Motion for Attorneys' Fees* filed by CSX Transportation, Inc.. (McFarland, Robert) (Entered: 11/12/2020) |
| 11/13/2020 |  | MOTIONS REFERRED to Magistrate Judge Leonard. 259 Joint MOTION for Discovery *for Entry of Deposition Protocol* (tamarm, ) (Entered: 11/13/2020) |
| 11/17/2020 | 261 | ORDER re 259 Motion for Discovery. Signed by Magistrate Judge Lawrence R. Leonard on 11/17/2020. (tamarm, ) (Entered: 11/17/2020) |
| 11/18/2020 | 262 | REPLY to Response to Motion re 257 MOTION for Leave to File *Surreply in Opposition to CSXT's Motion for Attorneys' Fees* filed by Norfolk Southern Railway Company. (Wingfield, Alan) (Entered: 11/18/2020) |
| 11/19/2020 |  | MOTIONS REFERRED to Magistrate Judge Leonard. 257 MOTION for Leave to File *Surreply in Opposition to CSXT's Motion for Attorneys' Fees* (tamarm, ) (Entered: 11/19/2020) |
| 11/24/2020 | 263 | ORDER granting 257 Motion for Leave to File a Sur‑Reply in Opposition to CSXT's Motion for Attorneys' Fees. Signed by Magistrate Judge Lawrence R. Leonard on 11/24/2020. (tamarm, ) (Entered: 11/24/2020) |
| 11/24/2020 | 264 | Sur‑Reply to Motion re 246 MOTION for Attorney Fees filed by Norfolk Southern Railway Company. (tamarm, ) (Entered: 11/24/2020) |
| 12/02/2020 | 265 | Second Settlement Conference Order. All parties and their lead counsel are required to appear before the undersigned via Zoom.gov remote proceedings for a settlement conference at 9:30 a.m. on April 1, 2021. A brief memorandum is to be submitted by noon on 3/25/2021. (See Order for specifics.) Signed by Magistrate Judge Lawrence R. Leonard on 12/2/2020. (tamarm, ) (Entered: 12/02/2020) |
| 12/29/2020 | 266 | NOTICE of Appearance by Alexander Ryan McDaniel on behalf of Norfolk & Portsmouth Belt Line Railway Company (McDaniel, Alexander) (Entered: 12/29/2020) |
| 01/21/2021 | 267 | Joint MOTION to Compel *Depositions of CSXT Witnesses* by Norfolk Southern Railway Company. (Attachments: # 1 Proposed Order)(Wingfield, Alan) (Entered: 01/21/2021) |
| 01/21/2021 | 268 | Memorandum in Support re 267 Joint MOTION to Compel *Depositions of CSXT Witnesses* filed by Norfolk Southern Railway Company. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N)(Wingfield, Alan) (Entered: 01/21/2021) |
| 01/21/2021 | 269 | Joint MOTION to Seal *Documents* by Norfolk Southern Railway Company. (Attachments: # 1 Proposed Order)(Wingfield, Alan) (Entered: 01/21/2021) |
| 01/21/2021 | 270 | Memorandum in Support re 269 Joint MOTION to Seal *Documents* filed by Norfolk Southern Railway Company. (Wingfield, Alan) (Entered: 01/21/2021) |
| 01/21/2021 | 271 | Sealed Memorandum in Support re 267 Joint MOTION to Compel *Depositions of CSXT Witnesses*. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit F, # 5 Exhibit G, # 6 Exhibit H, # 7 Exhibit I, # 8 Exhibit J, # 9 Exhibit M)(Wingfield, Alan) (Entered: 01/21/2021) |
| 01/21/2021 | 272 | Notice of Filing Sealing Motion LCvR5(C) by Norfolk Southern Railway Company (Wingfield, Alan) (Entered: 01/21/2021) |
| 01/22/2021 | 273 | ORDER granting 269 Motion to Seal. Defendants' unredacted Memorandum in Support of Joint Motion to Compel Depositions of CSXT Witnesses and unredacted Exhibits A, B, C, F, G, H, I, J, and M to their Memorandum in Support of Joint Motion to Compel Depositions of CSXT Witnesses shall be maintained under seal by the Clerk pending further order of the Court. Signed by Magistrate Judge Lawrence R. Leonard on 1/22/2021. (tamarm, ) (Entered: 01/22/2021) |

| 01/25/2021 | 274 | Request for Hearing by Norfolk Southern Railway Company re 267 Joint MOTION to Compel *Depositions of CSXT Witnesses* (Wingfield, Alan) (Entered: 01/25/2021) |
|---|---|---|
| 02/04/2021 | 275 | RESPONSE in Opposition re 267 Joint MOTION to Compel *Depositions of CSX Witnesses* filed by CSX Transportation, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L)(McFarland, Robert) (Entered: 02/04/2021) |
| 02/04/2021 | 276 | MOTION to Seal by CSX Transportation, Inc.. (Attachments: # 1 Proposed Order)(McFarland, Robert) (Entered: 02/04/2021) |
| 02/04/2021 | 277 | Notice of Under Seal Filing LCvR5 (B) by CSX Transportation, Inc. re 275 Response in Opposition to Motion, (McFarland, Robert) (Entered: 02/04/2021) |
| 02/04/2021 | 278 | Sealed Response/Reply/Opposition re 275 Response in Opposition to Motion,. (Attachments: # 1 Exhibit E, # 2 Exhibit H, # 3 Exhibit J, # 4 Exhibit L)(McFarland, Robert) (Entered: 02/04/2021) |
| 02/04/2021 | 279 | Memorandum in Support re 276 MOTION to Seal filed by CSX Transportation, Inc.. (McFarland, Robert) (Entered: 02/04/2021) |
| 02/10/2021 | 280 | ORDER granting 276 Motion to Seal. CSXT's unredacted Opposition to Defendants' Joint Motion to Compel and the unredacted Exhibits E, H, J, and L shall be maintained under seal by the Clerk pending further order o f the Court. Signed by Magistrate Judge Lawrence R. Leonard on 2/10/21. (tamarm, ) (Entered: 02/10/2021) |
| 02/10/2021 | 281 | REPLY to Response to Motion re 267 Joint MOTION to Compel *Depositions of CSXT Witnesses* filed by Norfolk Southern Railway Company. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Wingfield, Alan) (Entered: 02/10/2021) |
| 02/10/2021 | 282 | Joint MOTION to Seal by Norfolk Southern Railway Company. (Attachments: # 1 Proposed Order)(Wingfield, Alan) (Entered: 02/10/2021) |
| 02/10/2021 | 283 | Memorandum in Support re 282 Joint MOTION to Seal filed by Norfolk Southern Railway Company. (Wingfield, Alan) (Entered: 02/10/2021) |
| 02/10/2021 | 284 | Sealed Response/Reply/Opposition re 281 Reply to Response to Motion. (Attachments: # 1 Exhibit A, # 2 Exhibit C)(Wingfield, Alan) (Entered: 02/10/2021) |
| 02/10/2021 | 285 | Notice of Filing Sealing Motion LCvR5(C) by Norfolk Southern Railway Company (Wingfield, Alan) (Entered: 02/10/2021) |
| 02/11/2021 | | MOTIONS REFERRED to Magistrate Judge Leonard. 267 Joint MOTION to Compel *Depositions of CSXT Witnesses* (tamarm, ) (Entered: 02/11/2021) |
| 02/16/2021 | 286 | ORDER granting 267 Motion to Compel. The Court ORDERS that CSXT promptly produce Michael Burns and Steven Armbrust within 14 days for depositions limited to questioning on the lately produced documents referenced in Defendants' Memorandum in Support of their Joint Motion to Compel. Depositions are limited to no more than one hour each. Signed by Magistrate Judge Lawrence R. Leonard on 2/16/2021. (tamarm, ) (Entered: 02/16/2021) |
| 02/22/2021 | | MOTIONS REFERRED to Magistrate Judge Leonard. 282 Joint MOTION to Seal (tamarm, ) (Entered: 02/22/2021) |
| 02/23/2021 | 287 | ORDER granting 282 Motion to Seal. Defendants' unredacted Reply in Support of Joint Motion to Compel Depositions of CSXT Witnesses and unredacted Exhibits A and C to their Reply in Support of Joint Motion to Compel Depositions of CSXT Witnesses shall be maintained under seal by the Clerk pending further order of the Court. Signed by Magistrate Judge Lawrence R. Leonard on 2/23/2021. (tamarm, ) (Entered: 02/24/2021) |
| 03/23/2021 | 288 | ORDER denying 246 Motion for Attorney Fees. Signed by Magistrate Judge Lawrence R. Leonard on 3/23/2021. (tamarm, ) (Entered: 03/23/2021) |
| 03/26/2021 | 289 | Joint MOTION for Leave to File Excess Pages *Contained in Local Civil Rule 7* by Norfolk & Portsmouth Belt Line Railway Company, Norfolk Southern Railway Company. (Wingfield, Alan) (Entered: 03/26/2021) |

JA19

| 03/26/2021 | 290 | Memorandum in Support re 289 Joint MOTION for Leave to File Excess Pages *Contained in Local Civil Rule 7* filed by Norfolk & Portsmouth Belt Line Railway Company, Norfolk Southern Railway Company. (Wingfield, Alan) (Entered: 03/26/2021) |
|---|---|---|
| 03/26/2021 | 291 | Waiver of re 289 Joint MOTION for Leave to File Excess Pages *Contained in Local Civil Rule 7 Hearing and Request for Expedited Ruling* by Norfolk & Portsmouth Belt Line Railway Company, Norfolk Southern Railway Company (Wingfield, Alan) (Entered: 03/26/2021) |
| 04/01/2021 | | Case reassigned to Magistrate Judge Robert J. Krask. Magistrate Judge Lawrence R. Leonard no longer assigned to the case. (tamarm, ) (Entered: 04/01/2021) |
| 04/01/2021 | 292 | RECUSAL ORDER − the Clerk is DIRECTED to reassign this case to an alternate United States Magistrate Judge. Signed by Magistrate Judge Lawrence R. Leonard on 4/1/2021. (tamarm, ) (Entered: 04/01/2021) |
| 04/01/2021 | | Minute Entry for proceedings held before Magistrate Judge Lawrence R. Leonard:Settlement Conference held on 4/1/2021. (cdod, ) (Entered: 04/02/2021) |
| 04/02/2021 | 293 | ORDER granting in part and denying in part 289 defendants' Motion to Exceed Page Limitations. To facilitate the timely preparation of defendants' opening briefs on any dispositive motions and for good cause shown, the Court authorizes defendants to file briefs not exceeding 40 pages, pursuant to Local Civil Rule 7(F)(3). Signed by Magistrate Judge Robert J. Krask on 04/02/2021. (Krask, Robert) (Entered: 04/02/2021) |
| 04/12/2021 | 294 | MOTION to Seal by Norfolk & Portsmouth Belt Line Railway Company. (Attachments: # 1 Proposed Order)(Snow, W. Ryan) (Entered: 04/12/2021) |
| 04/12/2021 | 295 | Memorandum in Support re 294 MOTION to Seal filed by Norfolk & Portsmouth Belt Line Railway Company. (Snow, W. Ryan) (Entered: 04/12/2021) |
| 04/12/2021 | 296 | MOTION for Summary Judgment by Norfolk & Portsmouth Belt Line Railway Company. (Snow, W. Ryan) (Entered: 04/12/2021) |
| 04/12/2021 | 297 | Memorandum in Support re 296 MOTION for Summary Judgment filed by Norfolk & Portsmouth Belt Line Railway Company. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10)(Snow, W. Ryan) (Entered: 04/12/2021) |
| 04/12/2021 | 298 | NOTICE by Norfolk & Portsmouth Belt Line Railway Company re 296 MOTION for Summary Judgment *Additional Exhibits* (Attachments: # 1 Exhibit 11, # 2 Exhibit 12, # 3 Exhibit 13)(Snow, W. Ryan) (Entered: 04/12/2021) |
| 04/12/2021 | 299 | NOTICE by Norfolk & Portsmouth Belt Line Railway Company re 296 MOTION for Summary Judgment *Additional Exhibits* (Attachments: # 1 Exhibit 14, # 2 Exhibit 15, # 3 Exhibit 16, # 4 Exhibit 17, # 5 Exhibit 18, # 6 Exhibit 19, # 7 Exhibit 20)(Snow, W. Ryan) (Entered: 04/12/2021) |
| 04/12/2021 | 300 | NOTICE by Norfolk & Portsmouth Belt Line Railway Company re 297 Memorandum in Support, 296 MOTION for Summary Judgment *Additional Exhibits* (Attachments: # 1 Exhibit 21, # 2 Exhibit 22, # 3 Exhibit 23, # 4 Exhibit 24, # 5 Exhibit 25, # 6 Exhibit 26, # 7 Exhibit 27, # 8 Exhibit 28, # 9 Exhibit 29, # 10 Exhibit 30, # 11 Exhibit 31, # 12 Exhibit 32, # 13 Exhibit 33, # 14 Exhibit 34, # 15 Exhibit 35)(Snow, W. Ryan) (Entered: 04/12/2021) |
| 04/12/2021 | 301 | NOTICE by Norfolk & Portsmouth Belt Line Railway Company re 297 Memorandum in Support, 296 MOTION for Summary Judgment *Additional Exhibits* (Attachments: # 1 Exhibit 36, # 2 Exhibit 37, # 3 Exhibit 38, # 4 Exhibit 39, # 5 Exhibit 40, # 6 Exhibit 41, # 7 Exhibit 42, # 8 Exhibit 43, # 9 Exhibit 44, # 10 Exhibit 45)(Snow, W. Ryan) (Entered: 04/12/2021) |
| 04/12/2021 | 302 | NOTICE by Norfolk & Portsmouth Belt Line Railway Company re 297 Memorandum in Support, 296 MOTION for Summary Judgment *Additional Exhibits* (Attachments: # 1 Exhibit 46, # 2 Exhibit 47, # 3 Exhibit 48, # 4 Exhibit 49, # 5 Exhibit 50, # 6 Exhibit 51, # 7 Exhibit 52)(Snow, W. Ryan) (Entered: 04/12/2021) |

| 04/12/2021 | 303 | Sealed Memorandum in Support re 299 NOTICE, 296 MOTION for Summary Judgment , 298 NOTICE, 302 NOTICE, 300 NOTICE, 297 Memorandum in Support, 301 NOTICE,. (Attachments: # 1 Exhibit 3, # 2 Exhibit 4, # 3 Exhibit 7, # 4 Exhibit 8, # 5 Exhibit 9, # 6 Exhibit 11, # 7 Exhibit 12, # 8 Exhibit 13, # 9 Exhibit 14, # 10 Exhibit 15, # 11 Exhibit 16, # 12 Exhibit 18, # 13 Exhibit 20, # 14 Exhibit 22, # 15 Exhibit 23, # 16 Exhibit 24, # 17 Exhibit 25, # 18 Exhibit 28, # 19 Exhibit 29, # 20 Exhibit 31, # 21 Exhibit 32, # 22 Exhibit 33, # 23 Exhibit 34, # 24 Exhibit 36, # 25 Exhibit 38, # 26 Exhibit 39, # 27 Exhibit 40, # 28 Exhibit 41, # 29 Exhibit 44, # 30 Exhibit 45, # 31 Exhibit 46, # 32 Exhibit 47, # 33 Exhibit 48, # 34 Exhibit 50, # 35 Exhibit 51, # 36 Exhibit 52)(Snow, W. Ryan) (Entered: 04/12/2021) |
| 04/12/2021 | 304 | Notice of Under Seal Filing LCvR5 (B) by Norfolk & Portsmouth Belt Line Railway Company re 294 MOTION to Seal , 296 MOTION for Summary Judgment (Snow, W. Ryan) (Entered: 04/12/2021) |
| 04/12/2021 | 305 | MOTION to Seal by Norfolk Southern Railway Company. (Attachments: # 1 Proposed Order)(Wingfield, Alan) (Entered: 04/12/2021) |
| 04/12/2021 | 306 | Memorandum in Support re 305 MOTION to Seal filed by Norfolk Southern Railway Company. (Wingfield, Alan) (Entered: 04/12/2021) |
| 04/12/2021 | 307 | MOTION for Summary Judgment by Norfolk Southern Railway Company. (Wingfield, Alan) (Entered: 04/12/2021) |
| 04/12/2021 | 308 | Sealed Memorandum in Support re 307 MOTION for Summary Judgment . (Attachments: # 1 Exhibit 2, # 2 Exhibit 5, # 3 Exhibit 7, # 4 Exhibit 8, # 5 Exhibit 9, # 6 Exhibit 10, # 7 Exhibit 10A, # 8 Exhibit 11, # 9 Exhibit 13, # 10 Exhibit 14, # 11 Exhibit 15, # 12 Exhibit 17, # 13 Exhibit 18, # 14 Exhibit 19, # 15 Exhibit 20, # 16 Exhibit 21, # 17 Exhibit 23, # 18 Exhibit 24, # 19 Exhibit 25, # 20 Exhibit 26, # 21 Exhibit 27, # 22 Exhibit 28, # 23 Exhibit 29, # 24 Exhibit 30, # 25 Exhibit 32, # 26 Exhibit 33, # 27 Exhibit 34, # 28 Exhibit 35, # 29 Exhibit 36, # 30 Exhibit 37, # 31 Exhibit 38, # 32 Exhibit 40, # 33 Exhibit 41, # 34 Exhibit 42, # 35 Exhibit 43, # 36 Exhibit 44, # 37 Exhibit 45, # 38 Exhibit 46, # 39 Exhibit 47, # 40 Exhibit 48, # 41 Exhibit 49, # 42 Exhibit 50, # 43 Exhibit 51, # 44 Exhibit 52, # 45 Exhibit 53, # 46 Exhibit 54, # 47 Exhibit 55, # 48 Exhibit 59, # 49 Exhibit 60, # 50 Exhibit 61, # 51 Exhibit 62, # 52 Exhibit 63, # 53 Exhibit 64, # 54 Exhibit 65, # 55 Exhibit 67, # 56 Exhibit 68, # 57 Exhibit 69, # 58 Exhibit 70, # 59 Exhibit 71, # 60 Exhibit 72, # 61 Exhibit 74, # 62 Exhibit 75, # 63 Exhibit 76)(Lacy, Michael) (Entered: 04/12/2021) |
| 04/12/2021 | 309 | NOTICE by Norfolk Southern Railway Company re 308 Sealed Memorandum in Support,,,,, 307 MOTION for Summary Judgment (Lacy, Michael) (Entered: 04/12/2021) |
| 04/12/2021 | 310 | Memorandum in Support re 307 MOTION for Summary Judgment filed by Norfolk Southern Railway Company. (Attachments: # 1 Exhibit 3, # 2 Exhibit 4, # 3 Exhibit 6, # 4 Exhibit 12, # 5 Exhibit 16, # 6 Exhibit 22, # 7 Exhibit 31, # 8 Exhibit 39, # 9 Exhibit 56, # 10 Exhibit 57, # 11 Exhibit 58, # 12 Exhibit 66, # 13 Exhibit 73, # 14 Exhibit 79, # 15 Exhibit 83, # 16 Exhibit 84, # 17 Exhibit 85, # 18 Exhibit 90, # 19 Exhibit 91, # 20 Exhibit 92, # 21 Exhibit 104, # 22 Exhibit 107, # 23 Exhibit 110, # 24 Exhibit 120, # 25 Exhibit 121)(Wingfield, Alan) (Entered: 04/12/2021) |
| 04/12/2021 | 311 | Notice of Hearing Date re 307 MOTION for Summary Judgment (Wingfield, Alan) (Entered: 04/12/2021) |
| 04/12/2021 | 312 | Sealed Document re 308 Sealed Memorandum in Support,,,,,, 309 NOTICE, 307 MOTION for Summary Judgment . (Attachments: # 1 Exhibit 78, # 2 Exhibit 80, # 3 Exhibit 81, # 4 Exhibit 82, # 5 Exhibit 86, # 6 Exhibit 87, # 7 Exhibit 88, # 8 Exhibit 89, # 9 Exhibit 93, # 10 Exhibit 94, # 11 Exhibit 95, # 12 Exhibit 96, # 13 Exhibit 97, # 14 Exhibit 98, # 15 Exhibit 99, # 16 Exhibit 100, # 17 Exhibit 102, # 18 Exhibit 103, # 19 Exhibit 105, # 20 Exhibit 106, # 21 Exhibit 108, # 22 Exhibit 109, # 23 Exhibit 111, # 24 Exhibit 112, # 25 Exhibit 113, # 26 Exhibit 114, # 27 Exhibit 115, # 28 Exhibit 116, # 29 Exhibit 117, # 30 Exhibit 118, # 31 Exhibit 119)(Lacy, Michael) (Entered: 04/12/2021) |
| 04/13/2021 | 313 | Notice of Filing Sealing Motion LCvR5(C) by Norfolk Southern Railway Company re 305 MOTION to Seal (Wingfield, Alan) (Entered: 04/13/2021) |

| 04/16/2021 | 314 | Joint MOTION for Leave to File Excess Pages by CSX Transportation, Inc.. (Attachments: # 1 Exhibit 1, Proposed Order)(McFarland, Robert) (Entered: 04/16/2021) |
| 04/19/2021 | | MOTIONS REFERRED to Magistrate Judge Krask. 314 Joint MOTION for Leave to File Excess Pages (tamarm, ) (Entered: 04/19/2021) |
| 04/19/2021 | 315 | ORDER granting 314 Motion for Leave to File Excess Pages. Signed by Magistrate Judge Robert J. Krask on 4/19/2021. (tamarm, ) (Entered: 04/19/2021) |
| 04/19/2021 | 316 | RESPONSE to Motion re 305 MOTION to Seal filed by CSX Transportation, Inc.. (Attachments: # 1 Exhibit 1 − Proposed Order)(McFarland, Robert) (Entered: 04/19/2021) |
| 04/19/2021 | 317 | RESPONSE to Motion re 294 MOTION to Seal filed by CSX Transportation, Inc.. (Attachments: # 1 Exhibit 1 − Proposed Order)(McFarland, Robert) (Entered: 04/19/2021) |
| 04/20/2021 | | MOTIONS REFERRED to Magistrate Judge Krask. 294 MOTION to Seal , 305 MOTION to Seal (tamarm, ) (Entered: 04/20/2021) |
| 04/21/2021 | 318 | ORDER granting 294 Motion to Seal. The Court ORDERS that NPBL's unredacted Memorandum in Support of Motion for Summary Judgment and Exhibits 3,4,7−9,11−16, 18, 20, 22−25, 28−29, 31−34, 36, 38−41,44−48, 50−52 to the Memorandum (see EOF No. 303) shall be permanently maintained under seal by the Clerk. Signed by Magistrate Judge Robert J. Krask on 4/21/2021. (tamarm, ) (Entered: 04/21/2021) |
| 04/21/2021 | 319 | ORDER granting 305 Motion to Seal. The Court ORDERS that NS's unredacted Memorandum in Support of Motion for Summary Judgment and Exhibits 2, 5, 7, 8, 9, 10, IDA, 11, 13, 14, 15, 17, 18, 19,20, 21,23, 24, 25,26, 27,28,29,30, 32, 33, 34,35,36, 37, 38,40,41,42,43,44,45,46,47,48,49,50, 51, 52, 53, 54,55, 59, 60, 61, 62,63,64, 65, 67, 68, 69, 70, 71,72, 74, 75, 76, 77,78, 80, 81, 82, 86, 87, 88,89,93,94,95,96,97,98,99,100,102,103,105,106,108,109, 111, 112,113,114,115,116, 117,118, and 119 to the Memorandum shall be permanently maintained under seal by the Clerk.Signed by Magistrate Judge Robert J. Krask on 4/21/2021. (tamarm, ) (Entered: 04/21/2021) |
| 04/28/2021 | | Set Hearings: Telephone Conference set for 4/29/2021 at 02:00 PM in Norfolk Telephonically before Magistrate Judge Robert J. Krask. (btit, ) (Entered: 04/29/2021) |
| 04/29/2021 | 320 | Withdrawal of Motion by Norfolk & Portsmouth Belt Line Railway Company re 94 MOTION for Partial Summary Judgment (Snow, W. Ryan) (Entered: 04/29/2021) |
| 04/29/2021 | | Minute Entry for Telephone Conference held on 4/29/2021 before Magistrate Judge Robert J. Krask. Benjamin Hatch and Robert McFarland represented plaintiff. Michael Lacy, Tara Reinhart, John Thornburgh, II, and Alan Wingfield represented Norfolk Southern. James Chapman and Ryan Snow represented Norfolk & Portsmouth Belt Line Railway Company. (btit, ) (Entered: 04/29/2021) |
| 04/29/2021 | 321 | ORDER − The Final Pretrial Conference has been rescheduled to 6/7/2021 at 10:00 a.m. This proceeding will be conducted remotely. The parties are DIRECTED to submit to chambers of the undersigned, no later than 6/1/2021 certain documents (see order for details). Signed by Magistrate Judge Lawrence R. Leonard on 4/29/2021. (tamarm, ) (Entered: 04/30/2021) |
| 05/03/2021 | 322 | MOTION to Seal by CSX Transportation, Inc.. (Attachments: # 1 Exhibit 1 − Proposed Order)(Hatch, Benjamin) (Entered: 05/03/2021) |
| 05/03/2021 | 323 | Notice of Filing Sealing Motion LCvR5(C) by CSX Transportation, Inc. re 322 MOTION to Seal (Hatch, Benjamin) (Entered: 05/03/2021) |
| 05/03/2021 | 324 | Sealed Document re 322 MOTION to Seal . (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26, # 27 Exhibit 27, # 28 Exhibit 28, # 29 Exhibit 29, # 30 Exhibit 30, # 31 Exhibit 31, # 32 Exhibit 32, # 33 Exhibit 33, # 34 |

| | | Exhibit 35)(Hatch, Benjamin) (Entered: 05/03/2021) |
|---|---|---|
| 05/03/2021 | 325 | Sealed Document re 322 MOTION to Seal . (Attachments: # 1 Exhibit 36, # 2 Exhibit 37, # 3 Exhibit 38, # 4 Exhibit 39, # 5 Exhibit 40, # 6 Exhibit 41, # 7 Exhibit 42, # 8 Exhibit 43, # 9 Exhibit 44, # 10 Exhibit 45, # 11 Exhibit 46, # 12 Exhibit 47, # 13 Exhibit 48, # 14 Exhibit 49, # 15 Exhibit 50, # 16 Exhibit 51, # 17 Exhibit 52, # 18 Exhibit 53, # 19 Exhibit 55, # 20 Exhibit 56, # 21 Exhibit 59, # 22 Exhibit 60, # 23 Exhibit 61, # 24 Exhibit 62, # 25 Exhibit 63, # 26 Exhibit 64, # 27 Exhibit 66, # 28 Exhibit 67, # 29 Exhibit 68, # 30 Exhibit 69, # 31 Exhibit 70)(Hatch, Benjamin) (Entered: 05/03/2021) |
| 05/03/2021 | 326 | Sealed Document re 322 MOTION to Seal . (Attachments: # 1 Exhibit 72, # 2 Exhibit 73, # 3 Exhibit 74, # 4 Exhibit 75, # 5 Exhibit 76, # 6 Exhibit 77, # 7 Exhibit 78, # 8 Exhibit 79, # 9 Exhibit 81, # 10 Exhibit 82, # 11 Exhibit 83, # 12 Exhibit 85, # 13 Exhibit 86, # 14 Exhibit 90, # 15 Exhibit 92, # 16 Exhibit 93, # 17 Exhibit 94, # 18 Exhibit 95, # 19 Exhibit 97, # 20 Exhibit 99, # 21 Exhibit 100, # 22 Exhibit 101, # 23 Exhibit 102, # 24 Exhibit 104, # 25 Exhibit 105, # 26 Exhibit 106, # 27 Exhibit 107, # 28 Exhibit 109, # 29 Exhibit 110, # 30 Exhibit 111, # 31 Exhibit 112, # 32 Exhibit 113, # 33 Exhibit 114, # 34 Exhibit 115, # 35 Exhibit 116, # 36 Exhibit 117, # 37 Exhibit 118)(Hatch, Benjamin) (Entered: 05/03/2021) |
| 05/03/2021 | 327 | Memorandum in Support re 322 MOTION to Seal filed by CSX Transportation, Inc.. (Hatch, Benjamin) (Entered: 05/03/2021) |
| 05/03/2021 | 328 | RESPONSE in Opposition re 307 MOTION for Summary Judgment , 296 MOTION for Summary Judgment filed by CSX Transportation, Inc.. (Attachments: # 1 Exhibit 1−33 (Filed Under Seal), # 2 Exhibit 34, # 3 Exhibit 35−53 (Filed Under Seal), # 4 Exhibit 54, # 5 Exhibit 55−56 (Filed Under Seal), # 6 Exhibit 57, # 7 Exhibit 58, # 8 Exhibit 59−64 (Filed Under Seal), # 9 Exhibit 65, # 10 Exhibit 66−70 (Filed Under Seal), # 11 Exhibit 71, # 12 Exhibit 72−79 (Filed Under Seal), # 13 Exhibit 80, # 14 Exhibit 81−83 (Filed Under Seal), # 15 Exhibit 84, # 16 Exhibit 85−86 (Filed Under Seal), # 17 Exhibit 87, # 18 Exhibit 88, # 19 Exhibit 89, # 20 Exhibit 90 (Filed Under Seal), # 21 Exhibit 91, # 22 Exhibit 92−95 (Filed Under Seal), # 23 Exhibit 96, # 24 Exhibit 97 (Filed Under Seal), # 25 Exhibit 98, # 26 Exhibit 99−102 (Filed Under Seal), # 27 Exhibit 103, # 28 Exhibit 104−107 (Filed Under Seal), # 29 Exhibit 108, # 30 Exhibit 109−118 (Filed Under Seal))(Hatch, Benjamin) (Entered: 05/03/2021) |
| 05/04/2021 | 329 | MOTION in Limine *to Exclude Evidence and Argument that NPBL's Switch Rate is Unreasonable* by Norfolk Southern Railway Company. (Wingfield, Alan) (Entered: 05/04/2021) |
| 05/04/2021 | 330 | Memorandum in Support re 329 MOTION in Limine *to Exclude Evidence and Argument that NPBL's Switch Rate is Unreasonable* filed by Norfolk Southern Railway Company. (Wingfield, Alan) (Entered: 05/04/2021) |
| 05/04/2021 | 331 | MOTION in Limine *to Exclude Evidence and Argument on CSX's Loss of Customer Contracts* by Norfolk Southern Railway Company. (Wingfield, Alan) (Entered: 05/04/2021) |
| 05/04/2021 | 332 | Memorandum in Support re 331 MOTION in Limine *to Exclude Evidence and Argument on CSX's Loss of Customer Contracts* filed by Norfolk Southern Railway Company. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Wingfield, Alan) (Entered: 05/04/2021) |
| 05/04/2021 | 333 | MOTION to Seal by Norfolk Southern Railway Company. (Attachments: # 1 Proposed Order)(Wingfield, Alan) (Entered: 05/04/2021) |
| 05/04/2021 | 334 | Memorandum in Support re 333 MOTION to Seal filed by Norfolk Southern Railway Company. (Wingfield, Alan) (Entered: 05/04/2021) |
| 05/04/2021 | 335 | Sealed Memorandum in Support re 331 MOTION in Limine *to Exclude Evidence and Argument on CSX's Loss of Customer Contracts*. (Attachments: # 1 Exhibit A, # 2 Exhibit C, # 3 Exhibit D, # 4 Exhibit E)(Wingfield, Alan) (Entered: 05/04/2021) |
| 05/04/2021 | 336 | Notice of Filing Sealing Motion LCvR5(C) by Norfolk Southern Railway Company re 333 MOTION to Seal (Wingfield, Alan) (Entered: 05/04/2021) |

| 05/05/2021 | <u>337</u> | MOTION in Limine *Regarding Use of Internal Emails* by Norfolk Southern Railway Company. (Wingfield, Alan) (Entered: 05/05/2021) |
|---|---|---|
| 05/05/2021 | <u>338</u> | Memorandum in Support re <u>337</u> MOTION in Limine *Regarding Use of Internal Emails* filed by Norfolk Southern Railway Company. (Attachments: # <u>1</u> Exhibit A, # <u>2</u> Exhibit B, # <u>3</u> Exhibit C, # <u>4</u> Exhibit D, # <u>5</u> Exhibit E, # <u>6</u> Exhibit F)(Wingfield, Alan) (Entered: 05/05/2021) |
| 05/05/2021 | <u>339</u> | MOTION to Seal by Norfolk Southern Railway Company. (Attachments: # <u>1</u> Proposed Order)(Wingfield, Alan) (Entered: 05/05/2021) |
| 05/05/2021 | <u>340</u> | Memorandum in Support re <u>339</u> MOTION to Seal filed by Norfolk Southern Railway Company. (Wingfield, Alan) (Entered: 05/05/2021) |
| 05/05/2021 | <u>341</u> | Sealed Attachment/Exhibit(s) re <u>338</u> Memorandum in Support,. (Attachments: # <u>1</u> Exhibit B, # <u>2</u> Exhibit C, # <u>3</u> Exhibit D, # <u>4</u> Exhibit E, # <u>5</u> Exhibit F)(Wingfield, Alan) (Entered: 05/05/2021) |
| 05/05/2021 | <u>342</u> | Notice of Filing Sealing Motion LCvR5(C) by Norfolk Southern Railway Company re <u>339</u> MOTION to Seal (Wingfield, Alan) (Entered: 05/05/2021) |
| 05/06/2021 | <u>343</u> | MOTION in Limine *Regarding Discontinuance of the Diamond Track* by Norfolk Southern Railway Company. (Wingfield, Alan) (Entered: 05/06/2021) |
| 05/06/2021 | <u>344</u> | Memorandum in Support re <u>343</u> MOTION in Limine *Regarding Discontinuance of the Diamond Track* filed by Norfolk Southern Railway Company. (Attachments: # <u>1</u> Exhibit A, # <u>2</u> Exhibit B, # <u>3</u> Exhibit C)(Wingfield, Alan) (Entered: 05/06/2021) |
| 05/06/2021 | <u>345</u> | MOTION to Seal by Norfolk Southern Railway Company. (Attachments: # <u>1</u> Proposed Order)(Wingfield, Alan) (Entered: 05/06/2021) |
| 05/06/2021 | <u>346</u> | Memorandum in Support re <u>345</u> MOTION to Seal filed by Norfolk Southern Railway Company. (Wingfield, Alan) (Entered: 05/06/2021) |
| 05/06/2021 | <u>347</u> | Sealed Memorandum in Support re <u>343</u> MOTION in Limine *Regarding Discontinuance of the Diamond Track*. (Attachments: # <u>1</u> Exhibit A, # <u>2</u> Exhibit B, # <u>3</u> Exhibit C)(Wingfield, Alan) (Entered: 05/06/2021) |
| 05/06/2021 | <u>348</u> | Notice of Filing Sealing Motion LCvR5(C) by Norfolk Southern Railway Company re <u>345</u> MOTION to Seal (Wingfield, Alan) (Entered: 05/06/2021) |
| 05/07/2021 | <u>349</u> | MOTION in Limine *to Exclude Evidence and Argument Regarding the Use of Internal NS Emails* by Norfolk & Portsmouth Belt Line Railway Company. (Snow, W. Ryan) (Entered: 05/07/2021) |
| 05/07/2021 | <u>350</u> | Memorandum in Support re <u>349</u> MOTION in Limine *to Exclude Evidence and Argument Regarding the Use of Internal NS Emails* filed by Norfolk & Portsmouth Belt Line Railway Company. (Snow, W. Ryan) (Entered: 05/07/2021) |
| 05/07/2021 | <u>351</u> | MOTION to Seal by Norfolk & Portsmouth Belt Line Railway Company. (Attachments: # <u>1</u> Proposed Order)(Snow, W. Ryan) (Entered: 05/07/2021) |
| 05/07/2021 | <u>352</u> | Memorandum in Support re <u>351</u> MOTION to Seal filed by Norfolk & Portsmouth Belt Line Railway Company. (Snow, W. Ryan) (Entered: 05/07/2021) |
| 05/07/2021 | <u>353</u> | MOTION in Limine *to Exclude Evidence and Argument About CSXT's Private Switching Rates* by Norfolk & Portsmouth Belt Line Railway Company. (Snow, W. Ryan) (Entered: 05/07/2021) |
| 05/07/2021 | <u>354</u> | Memorandum in Support re <u>351</u> MOTION to Seal , <u>353</u> MOTION in Limine *to Exclude Evidence and Argument About CSXT's Private Switching Rates* filed by Norfolk & Portsmouth Belt Line Railway Company. (Attachments: # <u>1</u> Exhibit A, # <u>2</u> Exhibit B, # <u>3</u> Exhibit C, # <u>4</u> Exhibit D, # <u>5</u> Exhibit E)(Snow, W. Ryan) (Entered: 05/07/2021) |
| 05/07/2021 | <u>355</u> | Sealed Memorandum in Support re <u>351</u> MOTION to Seal , <u>353</u> MOTION in Limine *to Exclude Evidence and Argument About CSXT's Private Switching Rates*. (Attachments: # <u>1</u> Exhibit A, # <u>2</u> Exhibit C, # <u>3</u> Exhibit D, # <u>4</u> Exhibit E)(Snow, W. Ryan) (Entered: 05/07/2021) |

| 05/07/2021 | 356 | Notice of Filing Sealing Motion LCvR5(C) by Norfolk & Portsmouth Belt Line Railway Company re 351 MOTION to Seal , 353 MOTION in Limine *to Exclude Evidence and Argument About CSXT's Private Switching Rates* (Snow, W. Ryan) (Entered: 05/07/2021) |
| --- | --- | --- |
| 05/07/2021 | 357 | MOTION to Seal by Norfolk & Portsmouth Belt Line Railway Company. (Attachments: # 1 Proposed Order)(Snow, W. Ryan) (Entered: 05/07/2021) |
| 05/07/2021 | 358 | Memorandum in Support re 357 MOTION to Seal filed by Norfolk & Portsmouth Belt Line Railway Company. (Snow, W. Ryan) (Entered: 05/07/2021) |
| 05/07/2021 | 359 | MOTION in Limine *To Limit Evidence and Argument from Non−Parties VPA and VIT* by Norfolk & Portsmouth Belt Line Railway Company. (Snow, W. Ryan) (Entered: 05/07/2021) |
| 05/07/2021 | 360 | Memorandum in Support re 357 MOTION to Seal , 359 MOTION in Limine *To Limit Evidence and Argument from Non−Parties VPA and VIT* filed by Norfolk & Portsmouth Belt Line Railway Company. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Snow, W. Ryan) (Entered: 05/07/2021) |
| 05/07/2021 | 361 | Sealed Memorandum in Support re 357 MOTION to Seal , 359 MOTION in Limine *To Limit Evidence and Argument from Non−Parties VPA and VIT*. (Attachments: # 1 Exhibit B, # 2 Exhibit D)(Snow, W. Ryan) (Entered: 05/07/2021) |
| 05/07/2021 | 362 | Notice of Under Seal Filing LCvR5 (B) by Norfolk & Portsmouth Belt Line Railway Company re 357 MOTION to Seal , 359 MOTION in Limine *To Limit Evidence and Argument from Non−Parties VPA and VIT* (Snow, W. Ryan) (Entered: 05/07/2021) |
| 05/07/2021 | 363 | MOTION to Seal by Norfolk & Portsmouth Belt Line Railway Company. (Attachments: # 1 Proposed Order)(Snow, W. Ryan) (Entered: 05/07/2021) |
| 05/07/2021 | 364 | Memorandum in Support re 363 MOTION to Seal filed by Norfolk & Portsmouth Belt Line Railway Company. (Snow, W. Ryan) (Entered: 05/07/2021) |
| 05/07/2021 | 365 | MOTION in Limine *to Exclude Evidence From CSXT Witnesses Who Lack Personal Knowledge* by Norfolk & Portsmouth Belt Line Railway Company. (Snow, W. Ryan) (Entered: 05/07/2021) |
| 05/07/2021 | 366 | Memorandum in Support re 365 MOTION in Limine *to Exclude Evidence From CSXT Witnesses Who Lack Personal Knowledge*, 363 MOTION to Seal filed by Norfolk & Portsmouth Belt Line Railway Company. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J)(Snow, W. Ryan) (Entered: 05/07/2021) |
| 05/07/2021 | 367 | Sealed Memorandum in Support re 365 MOTION in Limine *to Exclude Evidence From CSXT Witnesses Who Lack Personal Knowledge*, 363 MOTION to Seal . (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit D, # 4 Exhibit E, # 5 Exhibit F, # 6 Exhibit G, # 7 Exhibit H, # 8 Exhibit I)(Snow, W. Ryan) (Entered: 05/07/2021) |
| 05/07/2021 | 368 | Notice of Under Seal Filing LCvR5 (B) by Norfolk & Portsmouth Belt Line Railway Company re 365 MOTION in Limine *to Exclude Evidence From CSXT Witnesses Who Lack Personal Knowledge*, 363 MOTION to Seal (Snow, W. Ryan) (Entered: 05/07/2021) |
| 05/11/2021 | | MOTIONS REFERRED to Magistrate Judge Krask. 322 MOTION to Seal (tamarm, ) (Entered: 05/11/2021) |
| 05/11/2021 | 369 | RESPONSE to Motion re 333 MOTION to Seal filed by CSX Transportation, Inc.. (Attachments: # 1 Exhibit 1 − Proposed Order)(Hatch, Benjamin) (Entered: 05/11/2021) |
| 05/12/2021 | 370 | ORDER granting CSXT's 322 Motion to Seal and ORDERS that CSXT's unredacted Consolidated Opposition to Defendants' Motions for Summary Judgment and Exhibits, etc. Signed by Magistrate Judge Robert J. Krask on 5/12/2021. (afar) Modified Text on 5/13/2021 (afar). (Entered: 05/12/2021) |
| 05/12/2021 | 371 | RESPONSE to Motion re 339 MOTION to Seal filed by CSX Transportation, Inc.. (Attachments: # 1 Exhibit 1 − Proposed Order)(Hatch, Benjamin) (Entered: 05/12/2021) |

| 05/12/2021 | 372 | MOTION to Seal by CSX Transportation, Inc.. (Attachments: # 1 Exhibit 1 − Proposed Order)(Hatch, Benjamin) (Entered: 05/12/2021) |
|---|---|---|
| 05/12/2021 | 373 | Memorandum in Support re 372 MOTION to Seal filed by CSX Transportation, Inc.. (Hatch, Benjamin) (Entered: 05/12/2021) |
| 05/12/2021 | 374 | MOTION in Limine *to Exclude Thomas D. Crowley* by CSX Transportation, Inc.. (Attachments: # 1 Exhibit 1 − Proposed Order)(Hatch, Benjamin) (Entered: 05/12/2021) |
| 05/12/2021 | 375 | Memorandum in Support re 374 MOTION in Limine *to Exclude Thomas D. Crowley* filed by CSX Transportation, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G)(Hatch, Benjamin) (Entered: 05/12/2021) |
| 05/12/2021 | 376 | Sealed Memorandum in Support re 372 MOTION to Seal . (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit D, # 4 Exhibit E)(Hatch, Benjamin) (Entered: 05/12/2021) |
| 05/12/2021 | 377 | Notice of Filing Sealing Motion LCvR5(C) by CSX Transportation, Inc. re 372 MOTION to Seal (Hatch, Benjamin) (Entered: 05/12/2021) |
| 05/12/2021 | 378 | MOTION in Limine *to Preclude Mischaracterization of CSXT's Rate Proposals* by CSX Transportation, Inc.. (Attachments: # 1 Exhibit 1 − Proposed Order)(Hatch, Benjamin) (Entered: 05/12/2021) |
| 05/12/2021 | 379 | Memorandum in Support re 378 MOTION in Limine *to Preclude Mischaracterization of CSXT's Rate Proposals* filed by CSX Transportation, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Hatch, Benjamin) (Entered: 05/12/2021) |
| 05/13/2021 | 380 | MOTION to Seal by Norfolk & Portsmouth Belt Line Railway Company. (Attachments: # 1 Proposed Order)(Chapman, James) (Entered: 05/13/2021) |
| 05/13/2021 | 381 | Memorandum in Support re 380 MOTION to Seal filed by Norfolk & Portsmouth Belt Line Railway Company. (Chapman, James) (Entered: 05/13/2021) |
| 05/13/2021 | 382 | Reply to 380 MOTION to Seal , 296 MOTION for Summary Judgment filed by Norfolk & Portsmouth Belt Line Railway Company. (Chapman, James) (Entered: 05/13/2021) |
| 05/13/2021 | 383 | Sealed Response/Reply/Opposition re 380 MOTION to Seal , 296 MOTION for Summary Judgment . (Chapman, James) (Entered: 05/13/2021) |
| 05/13/2021 | 384 | Notice of Under Seal Filing LCvR5 (B) by Norfolk & Portsmouth Belt Line Railway Company re 380 MOTION to Seal , 382 Reply *In Support of Motion for Summary Judgment* (Chapman, James) (Entered: 05/13/2021) |
| 05/13/2021 | 385 | Reply to Motion re 307 MOTION for Summary Judgment filed by Norfolk Southern Railway Company. (Attachments: # 1 Exhibit 122, # 2 Exhibit 123, # 3 Exhibit 124, # 4 Exhibit 125)(Lacy, Michael) (Entered: 05/13/2021) |
| 05/13/2021 | 386 | MOTION to Seal by Norfolk Southern Railway Company. (Attachments: # 1 Proposed Order)(Lacy, Michael) (Entered: 05/13/2021) |
| 05/13/2021 | 387 | Memorandum in Support re 386 MOTION to Seal filed by Norfolk Southern Railway Company. (Lacy, Michael) (Entered: 05/13/2021) |
| 05/13/2021 | 388 | Sealed Response/Reply/Opposition re 385 Reply to Motion. (Attachments: # 1 Exhibit 123, # 2 Exhibit 124, # 3 Exhibit 125)(Lacy, Michael) (Entered: 05/13/2021) |
| 05/13/2021 | 389 | Notice of Filing Sealing Motion LCvR5(C) by Norfolk Southern Railway Company re 386 MOTION to Seal (Lacy, Michael) (Entered: 05/13/2021) |
| 05/14/2021 | | MOTIONS REFERRED to Magistrate Judge Krask. 333 MOTION to Seal , 339 MOTION to Seal , 345 MOTION to Seal (tamarm, ) (Entered: 05/14/2021) |
| 05/14/2021 | 390 | RESPONSE to Motion re 357 MOTION to Seal , 351 MOTION to Seal , 363 MOTION to Seal filed by CSX Transportation, Inc.. (Attachments: # 1 Exhibit 1 − Proposed Order)(Hatch, Benjamin) (Entered: 05/14/2021) |

JA26

| 05/17/2021 | | MOTIONS REFERRED to Magistrate Judge Krask. 357 MOTION to Seal , 351 MOTION to Seal , 363 MOTION to Seal (tamarm, ) (Entered: 05/17/2021) |
|---|---|---|
| 05/17/2021 | 391 | ORDER granting 333 Motion to Seal. The Court ORDERS that NS's unredacted Memorandum in Support of Motion in Limine to Exclude Evidence and Argument on CSXT's Loss of Customer Contracts and Exhibits A, C, D, and E to the Memorandum shall be permanently maintained under seal by the Clerk. Signed by Magistrate Judge Robert J. Krask on 5/17/2021. (tamarm, ) (Entered: 05/17/2021) |
| 05/17/2021 | 392 | ORDER granting 339 Motion to Seal. The Court ORDERS that Exhibits A, B, C, D, E, and F to NS's Memorandum in Support of Motion in Limine Regarding Use of Internal Emails shall be permanently maintained under seal by the Clerk. Signed by Magistrate Judge Robert J. Krask on 5/17/2021. (tamarm, ) (Entered: 05/17/2021) |
| 05/17/2021 | 393 | ORDER granting 345 Motion to Seal. NS's Memorandum in Support of Motion in Limine Regarding Discontinuance of the Diamond Track, and unredacted Exhibits A, B and C to its Motion and Memorandum in Support of Motion in Limine Regarding Discontinuance of the Diamond Track shall be maintained under seal by the Clerk pending further order of the Court. Signed by Magistrate Judge Robert J. Krask on 5/17/2021. (tamarm, ) (Entered: 05/17/2021) |
| 05/18/2021 | 394 | Request for Hearing by Norfolk & Portsmouth Belt Line Railway Company re 296 MOTION for Summary Judgment (Snow, W. Ryan) (Entered: 05/18/2021) |
| 05/18/2021 | 395 | OPINION AND ORDER granting in part and denying in part 115 Motion to Dismiss. NSRs motion to dismiss on jurisdictional grounds is DENIED; NSRs motion to dismiss the antitrust and state conspiracy claims with prejudice is DENIED; NSRs motion to refer to the STB a determination of a reasonable switching rate is DENIED at this time; and in light of the STBs primary jurisdiction, NSRs motion for a stay pending transfer of the immunity dispute to the STB is GRANTED. After the STB rules, this Court will expeditiously resolve all remaining summary judgment issues, to include the breach of contract claim that is outside the referral to the STB. In the interim, the instant case will be STAYED. The trial date is hereby released, and counsel are instructed to contact the undersigned judges calendar clerk to schedule a new trial date as soon as the STB issues its ruling. Signed by Chief District Judge Mark S. Davis on 5/18/2021. (Copies distributed as directed.) (tamarm, ) (Entered: 05/18/2021) |
| 05/19/2021 | 396 | ORDER granting 351 Motion to Seal. The unredacted memorandum in support of the Belt Line's memorandum in support of its motion in limine to exclude evidence or argument about CSXT's private switching rates, as well as unredacted Exhibits A, C, D and E thereto, shall be maintained under seal by the Clerk pending further order of the Court. Signed by Magistrate Judge Robert J. Krask on 5/19/2021. (tamarm, ) (Entered: 05/19/2021) |
| 05/19/2021 | 397 | ORDER granting 357 Motion to Seal. The unredacted memorandum in support of the Belt Line's memorandum in support of its motion in limine to limit evidence and argument from nonparties VPA and VIT, as well as unredacted Exhibits B and D thereto, shall be maintained under seal by the Clerk pending fiirther order of the Court. Signed by Magistrate Judge Robert J. Krask on 5/19/2021. (tamarm, ) (Entered: 05/19/2021) |
| 05/19/2021 | 398 | ORDER granting 363 Motion to Seal. The unredacted memorandum in support of the Belt Line's memorandum in support of its motion in limine to exclude evidence from CSXT witnesses who lack personal knowledge, as well as unredacted Exhibits A, B, D, E, F, G, H, I thereto, shall be maintained under seal by the Clerk pending further order of the Court. Signed by Magistrate Judge Robert J. Krask on 5/19/2021. (tamarm, ) (Entered: 05/19/2021) |
| 08/20/2021 | 399 | MOTION to Withdraw as Attorney by Norfolk Southern Railway Company. (Attachments: # 1 Proposed Order)(Wingfield, Alan) (Entered: 08/20/2021) |
| 08/23/2021 | 400 | ORDER granting 399 Motion to Withdraw as Attorney. Attorney John Reed Thornburgh, II terminated. Signed by Chief District Judge Mark S. Davis on 8/23/2021. (tamarm, ) (Entered: 08/23/2021) |
| 06/20/2022 | 401 | NOTICE by CSX Transportation, Inc. *of Issuance of Surface Transportation Board Decision* (Attachments: # 1 Exhibit 1 − STB Decision)(McFarland, Robert) (Entered: |

| | | |
|---|---|---|
| | | 06/20/2022) |
| 07/19/2022 | 402 | NOTICE by Norfolk Southern Railway Company *of Request for Court Status Conference* (Wingfield, Alan) (Entered: 07/19/2022) |
| 07/19/2022 | | MOTIONS REFERRED to Magistrate Judge Robert J. Krask. 372 , 380 , 386 Motions to Seal (bpet, ) (Entered: 07/19/2022) |
| 07/20/2022 | 403 | Response to 402 NOTICE filed by CSX Transportation, Inc.. (McFarland, Robert) (Entered: 07/20/2022) |
| 07/21/2022 | 404 | ORDER granting 372 CSXT's Motion to Seal and ORDERS that CSXT's unredacted Memorandum in Support of its Motion to Exclude, etc., shall be maintained under seal by the Clerk pending further order of the Court. Signed by Magistrate Judge Robert J. Krask on 7/20/22. (afar) (Entered: 07/21/2022) |
| 07/21/2022 | 405 | ORDER granting 380 Belt Line's Motion to Seal and ORDERS that the unredacted portions of its reply in support of its Motion for Summary Judgment against CSX Transportation, Inc. shall be maintained under seal by the Clerk pending further order of the Court. Signed by Magistrate Judge Robert J. Krask on 7/20/22. (afar) (Entered: 07/21/2022) |
| 07/21/2022 | 406 | ORDER granting 386 Defendant's Motion to Seal and ORDERS that Defendant's unredacted Reply Memorandum in Support of Motion for Summary Judgment and Exhibits shall be maintained under seal by the Clerk pending further order of the Court. Signed by Magistrate Judge Robert J. Krask on 7/20/22. (afar) (Entered: 07/21/2022) |
| 08/08/2022 | 407 | MOTION to Withdraw as Attorney by Norfolk & Portsmouth Belt Line Railway Company. (Attachments: # 1 Proposed Order)(Chapman, James) (Entered: 08/08/2022) |
| 08/08/2022 | 408 | ORDER granting 407 Motion to Withdraw as Attorney. Attorney David Caldwell Hartnett terminated. Signed by Chief District Judge Mark S. Davis on 8/8/2022. (dbra, ) (Entered: 08/08/2022) |
| 08/15/2022 | 409 | NOTICE by CSX Transportation, Inc. *(Joint)* (Attachments: # 1 Exhibit 1 − Proposed Amended Rule 16(b) Scheduling Order)(McFarland, Robert) (Entered: 08/15/2022) |
| 08/16/2022 | 410 | Amended Order Rule 16(b) Scheduling Order − Pursuant to the Rule 16(b) Conference it is ordered that Final Pretrial Conference set for 12/6/2022 at 10:00 AM in Norfolk Judges Chamber before Magistrate Judge Robert J. Krask. Jury Trial set for 1/18/2023 at 10:00 AM in Norfolk Courtroom 1 before Chief District Judge Mark S. Davis. Signed by Magistrate Judge Robert J. Krask on 8/15/22. (btit) (Entered: 08/16/2022) |
| 08/17/2022 | 411 | NOTICE of Appearance by Jeanne Elizabeth Noonan on behalf of CSX Transportation, Inc. (Noonan, Jeanne) (Entered: 08/17/2022) |
| 08/17/2022 | 412 | NOTICE by CSX Transportation, Inc. *of Appeal by Defendant Norfolk Southern Railway Company* (Attachments: # 1 Exhibit A, # 2 Exhibit B)(McFarland, Robert) (Entered: 08/17/2022) |
| 08/25/2022 | 413 | MOTION to Withdraw as Attorney by Norfolk Southern Railway Company. (Attachments: # 1 Proposed Order)(Herlihy, Christopher) (Entered: 08/25/2022) |
| 08/26/2022 | 414 | ORDER granting 413 Motion to Withdraw as Attorney. Attorney Christopher Scott Herlihy terminated. Signed by Chief District Judge Mark S. Davis on 8/26/2022. (dbra, ) (Entered: 08/26/2022) |
| 09/02/2022 | 415 | MOTION to Seal by CSX Transportation, Inc.. (Attachments: # 1 Proposed Order)(Hatch, Benjamin) (Entered: 09/02/2022) |
| 09/02/2022 | 416 | Notice of Filing Sealing Motion LCvR5(C) by CSX Transportation, Inc. re 415 MOTION to Seal (Hatch, Benjamin) (Entered: 09/02/2022) |
| 09/02/2022 | 417 | Sealed Document re 415 MOTION to Seal . (Attachments: # 1 Exhibit 2)(Hatch, Benjamin) (Entered: 09/02/2022) |

| | | |
|---|---|---|
| 09/02/2022 | 418 | Memorandum in Support re 415 MOTION to Seal filed by CSX Transportation, Inc.. (Hatch, Benjamin) (Entered: 09/02/2022) |
| 09/02/2022 | 419 | Opposition *Consolidated*, RESPONSE in Opposition re 337 MOTION in Limine *Regarding Use of Internal Emails*, 331 MOTION in Limine *to Exclude Evidence and Argument on CSX's Loss of Customer Contracts*, 343 MOTION in Limine *Regarding Discontinuance of the Diamond Track*, 329 MOTION in Limine *to Exclude Evidence and Argument that NPBL's Switch Rate is Unreasonable* filed by CSX Transportation, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2 (Filed Under Seal))(Hatch, Benjamin) (Entered: 09/02/2022) |
| 09/02/2022 | 420 | MOTION to Seal by CSX Transportation, Inc.. (Attachments: # 1 Proposed Order)(Hatch, Benjamin) (Entered: 09/02/2022) |
| 09/02/2022 | 421 | Notice of Filing Sealing Motion LCvR5(C) by CSX Transportation, Inc. re 420 MOTION to Seal (Hatch, Benjamin) (Entered: 09/02/2022) |
| 09/02/2022 | 422 | Sealed Document re 420 MOTION to Seal . (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Hatch, Benjamin) (Entered: 09/02/2022) |
| 09/02/2022 | 423 | Memorandum in Support re 420 MOTION to Seal filed by CSX Transportation, Inc.. (Hatch, Benjamin) (Entered: 09/02/2022) |
| 09/02/2022 | 424 | RESPONSE in Opposition re 349 MOTION in Limine *to Exclude Evidence and Argument Regarding the Use of Internal NS Emails*, 359 MOTION in Limine *To Limit Evidence and Argument from Non−Parties VPA and VIT*, 365 MOTION in Limine *to Exclude Evidence From CSXT Witnesses Who Lack Personal Knowledge*, 353 MOTION in Limine *to Exclude Evidence and Argument About CSXT's Private Switching Rates* filed by CSX Transportation, Inc.. (Attachments: # 1 Exhibit 1 (Filed Under Seal), # 2 Exhibit 2 (Filed Under Seal), # 3 Exhibit 3 (Filed Under Seal))(Hatch, Benjamin) (Entered: 09/02/2022) |
| 09/02/2022 | 425 | MOTION to Seal by Norfolk & Portsmouth Belt Line Railway Company. (Attachments: # 1 Proposed Order)(Snow, W. Ryan) (Entered: 09/02/2022) |
| 09/02/2022 | 426 | Memorandum in Support re 425 MOTION to Seal filed by Norfolk & Portsmouth Belt Line Railway Company. (Snow, W. Ryan) (Entered: 09/02/2022) |
| 09/02/2022 | 427 | Notice of Under Seal Filing LCvR5 (B) by Norfolk & Portsmouth Belt Line Railway Company re 425 MOTION to Seal (Snow, W. Ryan) (Entered: 09/02/2022) |
| 09/02/2022 | 428 | Sealed Response/Reply/Opposition re 374 MOTION in Limine *to Exclude Thomas D. Crowley*, 425 MOTION to Seal . (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Snow, W. Ryan) (Entered: 09/02/2022) |
| 09/02/2022 | 429 | Memorandum in Opposition re 374 MOTION in Limine *to Exclude Thomas D. Crowley* filed by Norfolk & Portsmouth Belt Line Railway Company. (Attachments: # 1 Exhibit 1 − Filed Under Seal, # 2 Exhibit 2 − Filed Under Seal, # 3 Exhibit 3 − Filed Under Seal)(Snow, W. Ryan) (Entered: 09/02/2022) |
| 09/02/2022 | 430 | Joint MOTION to Seal by Norfolk Southern Railway Company. (Attachments: # 1 Proposed Order)(Lacy, Michael) (Entered: 09/02/2022) |
| 09/02/2022 | 431 | Memorandum in Support re 430 Joint MOTION to Seal filed by Norfolk Southern Railway Company. (Lacy, Michael) (Entered: 09/02/2022) |
| 09/02/2022 | 432 | Notice of Filing Sealing Motion LCvR5(C) by Norfolk Southern Railway Company re 430 Joint MOTION to Seal (Lacy, Michael) (Entered: 09/02/2022) |
| 09/02/2022 | 433 | Sealed Response/Reply/Opposition re 378 MOTION in Limine *to Preclude Mischaracterization of CSXT's Rate Proposals*. (Attachments: # 1 Exhibit 3, # 2 Exhibit 5, # 3 Exhibit 6, # 4 Exhibit 7, # 5 Exhibit 10, # 6 Exhibit 12, # 7 Exhibit 13)(Lacy, Michael) (Entered: 09/02/2022) |
| 09/02/2022 | 434 | Memorandum in Opposition re 378 MOTION in Limine *to Preclude Mischaracterization of CSXT's Rate Proposals* filed by Norfolk Southern Railway Company. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 |

| | | |
|---|---|---|
| | | Exhibit 16)(Lacy, Michael) (Entered: 09/02/2022) |
| 09/02/2022 | 435 | Opposition to 374 MOTION in Limine *to Exclude Thomas D. Crowley*, 428 Sealed Response/Reply/Opposition filed by Norfolk Southern Railway Company. (Lacy, Michael) (Entered: 09/02/2022) |
| 09/12/2022 | | MOTIONS REFERRED to Magistrate Judge: Krask. 425 MOTION to Seal , 430 Joint MOTION to Seal (afar) (Entered: 09/12/2022) |
| 09/12/2022 | | MOTIONS REFERRED to Magistrate Judge: Krask. 415 MOTION to Seal , 420 MOTION to Seal (afar) (Entered: 09/12/2022) |
| 09/14/2022 | 436 | ORDER granting 415 Motion to Seal. Signed by Magistrate Judge Robert J. Krask on 9/13/22. (jhie, ) (Entered: 09/14/2022) |
| 09/14/2022 | 437 | ORDER granting 420 Motion to Seal. Signed by Magistrate Judge Robert J. Krask on 9/13/22. (jhie, ) (Main Document 437 replaced on 9/14/2022) (jhie, ). (Entered: 09/14/2022) |
| 09/14/2022 | 438 | ORDER granting 425 Motion to Seal. Signed by Magistrate Judge Robert J. Krask on 9/13/22. (jhie, ) (Entered: 09/14/2022) |
| 09/14/2022 | 439 | ORDER granting 430 Joint Motion to Seal. Signed by Magistrate Judge Robert J. Krask on 9/13/22. (jhie, ) (Entered: 09/14/2022) |
| 09/15/2022 | 440 | NOTICE by Norfolk Southern Railway Company *of Related Complaint* (Attachments: # 1 Exhibit A)(Wingfield, Alan) (Entered: 09/15/2022) |
| 09/23/2022 | 441 | Reply to Motion re 343 MOTION in Limine *Regarding Discontinuance of the Diamond Track* filed by Norfolk Southern Railway Company. (Wingfield, Alan) (Entered: 09/23/2022) |
| 09/23/2022 | 442 | Reply to Motion re 337 MOTION in Limine *Regarding Use of Internal Emails* filed by Norfolk Southern Railway Company. (Wingfield, Alan) (Entered: 09/23/2022) |
| 09/23/2022 | 443 | Reply to Motion re 331 MOTION in Limine *to Exclude Evidence and Argument on CSX's Loss of Customer Contracts* filed by Norfolk Southern Railway Company. (Wingfield, Alan) (Entered: 09/23/2022) |
| 09/23/2022 | 444 | Reply to Motion re 329 MOTION in Limine *to Exclude Evidence and Argument that NPBL's Switch Rate is Unreasonable* filed by Norfolk Southern Railway Company. (Wingfield, Alan) (Entered: 09/23/2022) |
| 09/23/2022 | 445 | MOTION to Seal by Norfolk & Portsmouth Belt Line Railway Company. (Attachments: # 1 Proposed Order)(Snow, W. Ryan) (Entered: 09/23/2022) |
| 09/23/2022 | 446 | Notice of Under Seal Filing LCvR5 (B) by Norfolk & Portsmouth Belt Line Railway Company re 445 MOTION to Seal (Snow, W. Ryan) (Entered: 09/23/2022) |
| 09/23/2022 | 447 | Memorandum in Support re 445 MOTION to Seal filed by Norfolk & Portsmouth Belt Line Railway Company. (Snow, W. Ryan) (Entered: 09/23/2022) |
| 09/23/2022 | 448 | Sealed Response/Reply/Opposition re 445 MOTION to Seal , 349 MOTION in Limine *to Exclude Evidence and Argument Regarding the Use of Internal NS Emails*, 359 MOTION in Limine *To Limit Evidence and Argument from Non−Parties VPA and VIT*, 365 MOTION in Limine *to Exclude Evidence From CSXT Witnesses Who Lack Personal Knowledge*, 353 MOTION in Limine *to Exclude Evidence and Argument About CSXT's Private Switching Rates*. (Attachments: # 1 Exhibit A)(Snow, W. Ryan) (Entered: 09/23/2022) |
| 09/23/2022 | 449 | Reply to Motion re 445 MOTION to Seal , 349 MOTION in Limine *to Exclude Evidence and Argument Regarding the Use of Internal NS Emails*, 359 MOTION in Limine *To Limit Evidence and Argument from Non−Parties VPA and VIT*, 365 MOTION in Limine *to Exclude Evidence From CSXT Witnesses Who Lack Personal Knowledge*, 353 MOTION in Limine *to Exclude Evidence and Argument About CSXT's Private Switching Rates* filed by Norfolk & Portsmouth Belt Line Railway Company. (Attachments: # 1 Exhibit A (filed under seal), # 2 Exhibit B)(Snow, W. Ryan) (Entered: 09/23/2022) |

| 09/23/2022 | 450 | MOTION to Seal by CSX Transportation, Inc.. (Attachments: # 1 Proposed Order)(Hatch, Benjamin) (Entered: 09/23/2022) |
|---|---|---|
| 09/23/2022 | 451 | Notice of Filing Sealing Motion LCvR5(C) by CSX Transportation, Inc. re 450 MOTION to Seal (Hatch, Benjamin) (Entered: 09/23/2022) |
| 09/23/2022 | 452 | Sealed Reply re 450 MOTION to Seal . (Attachments: # 1 Exhibit 2, # 2 Exhibit 3)(Hatch, Benjamin) (Entered: 09/23/2022) |
| 09/23/2022 | 453 | Memorandum in Support re 450 MOTION to Seal filed by CSX Transportation, Inc.. (Hatch, Benjamin) (Entered: 09/23/2022) |
| 09/23/2022 | 454 | REPLY to Response to Motion re 378 MOTION in Limine *to Preclude Mischaracterization of CSXT's Rate Proposals* filed by CSX Transportation, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2 − Filed Under Seal, # 3 Exhibit 3 − Filed Under Seal)(Hatch, Benjamin) (Entered: 09/23/2022) |
| 09/23/2022 | 455 | MOTION to Seal by CSX Transportation, Inc.. (Attachments: # 1 Proposed Order)(Hatch, Benjamin) (Entered: 09/23/2022) |
| 09/23/2022 | 456 | Notice of Filing Sealing Motion LCvR5(C) by CSX Transportation, Inc. re 455 MOTION to Seal (Hatch, Benjamin) (Entered: 09/23/2022) |
| 09/23/2022 | 457 | Sealed Reply re 455 MOTION to Seal . (Attachments: # 1 Exhibit A)(Hatch, Benjamin) (Entered: 09/23/2022) |
| 09/23/2022 | 458 | Memorandum in Support re 455 MOTION to Seal filed by CSX Transportation, Inc.. (Hatch, Benjamin) (Entered: 09/23/2022) |
| 09/23/2022 | 459 | REPLY to Response to Motion re 374 MOTION in Limine *to Exclude Thomas D. Crowley* filed by CSX Transportation, Inc.. (Attachments: # 1 Exhibit A)(Hatch, Benjamin) (Entered: 09/23/2022) |
| 09/26/2022 | | MOTIONS REFERRED to Magistrate Judge Krask: 337 MOTION in Limine *Regarding Use of Internal Emails*, 374 MOTION in Limine *to Exclude Thomas D. Crowley*, 331 MOTION in Limine *to Exclude Evidence and Argument on CSX's Loss of Customer Contracts*, 378 MOTION in Limine *to Preclude Mischaracterization of CSXT's Rate Proposals*, 349 MOTION in Limine *to Exclude Evidence and Argument Regarding the Use of Internal NS Emails*, 359 MOTION in Limine *To Limit Evidence and Argument from Non−Parties VPA and VIT*, 343 MOTION in Limine *Regarding Discontinuance of the Diamond Track*, 365 MOTION in Limine *to Exclude Evidence From CSXT Witnesses Who Lack Personal Knowledge*, 329 MOTION in Limine *to Exclude Evidence and Argument that NPBL's Switch Rate is Unreasonable*, 353 MOTION in Limine *to Exclude Evidence and Argument About CSXT's Private Switching Rates* (afar) (Entered: 09/26/2022) |
| 10/03/2022 | 460 | ORDER granting 450 Motion to Seal. The Court GRANTS CSX's Motion to Seal and ORDERS that CSZ's unredacted Reply in Support of its Motion in Limine to Preclude Mischaracterization of CSXT's Rate Proposals, together with Exhibits 2 and 3 thereto shall be maintained under seal by the Clerk pending further order of the Court. Signed by Magistrate Judge Robert J. Krask on 10/3/22. (mrees, ) (Entered: 10/03/2022) |
| 10/03/2022 | 461 | ORDER granting 455 Motion to Seal. The Court GRANTS CSX's Motion to Seal and ORDERS that CSX'S unredacted Reply in Support of its Motion to Exclude Thomas D. Crowley, together with Exhibit A shall be maintained under seal b the Clerk pending further order of the Court. Signed by Magistrate Judge Robert J. Krask on 10/3/22. (mrees, ) (Entered: 10/03/2022) |
| 10/03/2022 | 462 | ORDER: The Court GRANTS IN PART 445 Motion to Seal the discovery response and ORDERS NPBL to file a copy of the discovery response by 10/11/22, with only the confidential information redacted. Signed by Magistrate Judge Robert J. Krask on 10/3/22. (afar) (Entered: 10/03/2022) |
| 10/03/2022 | 463 | NOTICE by CSX Transportation, Inc. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Hatch, Benjamin) (Entered: 10/03/2022) |
| 10/11/2022 | 464 | NOTICE by Norfolk & Portsmouth Belt Line Railway Company re 462 Order on Motion to Seal, 449 Reply to Motion,, (Attachments: # 1 Exhibit A to D.E. 449)(Snow, W. Ryan) (Entered: 10/11/2022) |

| | | |
|---|---|---|
| 10/13/2022 | <u>465</u> | MOTION to Exclude *Opinions of Professor Howard P. Marvel* by Norfolk Southern Railway Company. (Attachments: # <u>1</u> Proposed Order)(Wingfield, Alan) (Entered: 10/13/2022) |
| 10/13/2022 | <u>466</u> | Memorandum in Support re 465 MOTION to Exclude *Opinions of Professor Howard P. Marvel* filed by Norfolk Southern Railway Company. (Attachments: # <u>1</u> Exhibit 1, # <u>2</u> Exhibit 2, # <u>3</u> Exhibit 3, # <u>4</u> Exhibit 4, # <u>5</u> Exhibit 5, # <u>6</u> Exhibit 6, # <u>7</u> Exhibit 7, # <u>8</u> Exhibit 8, # <u>9</u> Exhibit 9, # <u>10</u> Exhibit 10, # <u>11</u> Exhibit 11, # <u>12</u> Exhibit 12, # <u>13</u> Exhibit 13, # <u>14</u> Exhibit 14, # <u>15</u> Exhibit 15, # <u>16</u> Exhibit 16, # <u>17</u> Exhibit 17, # <u>18</u> Exhibit 18, # <u>19</u> Exhibit 19, # <u>20</u> Exhibit 20, # <u>21</u> Exhibit 21, # <u>22</u> Exhibit 22, # <u>23</u> Exhibit 23, # <u>24</u> Exhibit 24, # <u>25</u> Exhibit 25, # <u>26</u> Exhibit 26, # <u>27</u> Exhibit 27, # <u>28</u> Exhibit 28, # <u>29</u> Exhibit 29, # <u>30</u> Exhibit 30, # <u>31</u> Exhibit 31, # <u>32</u> Exhibit 32, # <u>33</u> Exhibit 33, # <u>34</u> Exhibit 34, # <u>35</u> Exhibit 35, # <u>36</u> Exhibit 36, # <u>37</u> Exhibit 37, # <u>38</u> Exhibit 38, # <u>39</u> Exhibit 39, # <u>40</u> Exhibit 40, # <u>41</u> Exhibit 41, # <u>42</u> Exhibit 42, # <u>43</u> Exhibit 43, # <u>44</u> Exhibit 44, # <u>45</u> Exhibit 45, # <u>46</u> Exhibit 46, # <u>47</u> Exhibit 47, # <u>48</u> Exhibit 48, # <u>49</u> Exhibit 49, # <u>50</u> Exhibit 50, # <u>51</u> Exhibit 51, # <u>52</u> Exhibit 52, # <u>53</u> Exhibit 53, # <u>54</u> Exhibit 54, # <u>55</u> Exhibit 55, # <u>56</u> Exhibit 56, # <u>57</u> Exhibit 57, # <u>58</u> Exhibit 58, # <u>59</u> Exhibit 59, # <u>60</u> Exhibit 60, # <u>61</u> Exhibit 61, # <u>62</u> Exhibit 62, # <u>63</u> Exhibit 63)(Wingfield, Alan) (Entered: 10/13/2022) |
| 10/13/2022 | <u>467</u> | MOTION to Seal by Norfolk Southern Railway Company. (Attachments: # <u>1</u> Proposed Order)(Wingfield, Alan) (Entered: 10/13/2022) |
| 10/13/2022 | <u>468</u> | Memorandum in Support re 467 MOTION to Seal filed by Norfolk Southern Railway Company. (Wingfield, Alan) (Entered: 10/13/2022) |
| 10/13/2022 | <u>469</u> | Sealed Memorandum in Support re <u>465</u> MOTION to Exclude *Opinions of Professor Howard P. Marvel*. (Attachments: # <u>1</u> Exhibit 1, # <u>2</u> Exhibit 2, # <u>3</u> Exhibit 3, # <u>4</u> Exhibit 4, # <u>5</u> Exhibit 5, # <u>6</u> Exhibit 6, # <u>7</u> Exhibit 7, # <u>8</u> Exhibit 8, # <u>9</u> Exhibit 10, # <u>10</u> Exhibit 11, # <u>11</u> Exhibit 12, # <u>12</u> Exhibit 13, # <u>13</u> Exhibit 14, # <u>14</u> Exhibit 15, # <u>15</u> Exhibit 16, # <u>16</u> Exhibit 17, # <u>17</u> Exhibit 18, # <u>18</u> Exhibit 20, # <u>19</u> Exhibit 21, # <u>20</u> Exhibit 22, # <u>21</u> Exhibit 23, # <u>22</u> Exhibit 24, # <u>23</u> Exhibit 25, # <u>24</u> Exhibit 26, # <u>25</u> Exhibit 27, # <u>26</u> Exhibit 29, # <u>27</u> Exhibit 30, # <u>28</u> Exhibit 31, # <u>29</u> Exhibit 33, # <u>30</u> Exhibit 36, # <u>31</u> Exhibit 37, # <u>32</u> Exhibit 38, # <u>33</u> Exhibit 39, # <u>34</u> Exhibit 40, # <u>35</u> Exhibit 41, # <u>36</u> Exhibit 42, # <u>37</u> Exhibit 43, # <u>38</u> Exhibit 44, # <u>39</u> Exhibit 45, # <u>40</u> Exhibit 46, # <u>41</u> Exhibit 47, # <u>42</u> Exhibit 48, # <u>43</u> Exhibit 49, # <u>44</u> Exhibit 50, # <u>45</u> Exhibit 51, # <u>46</u> Exhibit 52, # <u>47</u> Exhibit 53, # <u>48</u> Exhibit 54, # <u>49</u> Exhibit 55, # <u>50</u> Exhibit 56, # <u>51</u> Exhibit 57, # <u>52</u> Exhibit 58, # <u>53</u> Exhibit 59, # <u>54</u> Exhibit 60, # <u>55</u> Exhibit 61, # <u>56</u> Exhibit 62, # <u>57</u> Exhibit 63)(Wingfield, Alan) (Entered: 10/13/2022) |
| 10/13/2022 | <u>470</u> | Notice of Filing Sealing Motion LCvR5(C) by Norfolk Southern Railway Company re <u>467</u> MOTION to Seal (Wingfield, Alan) (Entered: 10/13/2022) |
| 10/14/2022 | <u>471</u> | MOTION to Seal by Norfolk & Portsmouth Belt Line Railway Company. (Attachments: # <u>1</u> Proposed Order)(Snow, W. Ryan) (Entered: 10/14/2022) |
| 10/14/2022 | <u>472</u> | Notice of Filing Sealing Motion LCvR5(C) by Norfolk & Portsmouth Belt Line Railway Company re <u>471</u> MOTION to Seal (Snow, W. Ryan) (Entered: 10/14/2022) |
| 10/14/2022 | <u>473</u> | MOTION in Limine *#5 to Exclude Testimony From Plaintiff's Expert Howard Marvel* by Norfolk & Portsmouth Belt Line Railway Company. (Snow, W. Ryan) (Entered: 10/14/2022) |
| 10/14/2022 | <u>474</u> | Sealed Memorandum in Support re <u>471</u> MOTION to Seal , <u>473</u> MOTION in Limine *#5 to Exclude Testimony From Plaintiff's Expert Howard Marvel*. (Attachments: # <u>1</u> Exhibit 1, # <u>2</u> Exhibit 2, # <u>3</u> Exhibit 3, # <u>4</u> Exhibit 4)(Snow, W. Ryan) (Entered: 10/14/2022) |
| 10/14/2022 | <u>475</u> | Memorandum in Support re <u>471</u> MOTION to Seal , <u>473</u> MOTION in Limine *#5 to Exclude Testimony From Plaintiff's Expert Howard Marvel* filed by Norfolk & Portsmouth Belt Line Railway Company. (Attachments: # <u>1</u> Exhibit 1 (Filed Under Seal), # <u>2</u> Exhibit 2 (Filed Under Seal), # <u>3</u> Exhibit 3 (Filed Under Seal), # <u>4</u> Exhibit 4 (Filed Under Seal), # <u>5</u> Exhibit 5)(Snow, W. Ryan) (Entered: 10/14/2022) |
| 10/14/2022 | <u>476</u> | Memorandum in Support re <u>471</u> MOTION to Seal filed by Norfolk & Portsmouth Belt Line Railway Company. (Snow, W. Ryan) (Entered: 10/14/2022) |

JA32

| 10/19/2022 | 477 | Request for Hearing by Norfolk & Portsmouth Belt Line Railway Company re 349 MOTION in Limine *to Exclude Evidence and Argument Regarding the Use of Internal NS Emails*, 359 MOTION in Limine *To Limit Evidence and Argument from Non–Parties VPA and VIT*, 365 MOTION in Limine *to Exclude Evidence From CSXT Witnesses Who Lack Personal Knowledge*, 353 MOTION in Limine *to Exclude Evidence and Argument About CSXT's Private Switching Rates*, 296 MOTION for Summary Judgment (Snow, W. Ryan) (Entered: 10/19/2022) |
|---|---|---|
| 10/19/2022 | 478 | Request for Hearing by Norfolk Southern Railway Company re 337 MOTION in Limine *Regarding Use of Internal Emails*, 331 MOTION in Limine *to Exclude Evidence and Argument on CSX's Loss of Customer Contracts*, 343 MOTION in Limine *Regarding Discontinuance of the Diamond Track*, 329 MOTION in Limine *to Exclude Evidence and Argument that NPBL's Switch Rate is Unreasonable*, 307 MOTION for Summary Judgment (Lacy, Michael) (Entered: 10/19/2022) |
| 10/19/2022 | 479 | Consent MOTION for Extension of Time to File Response/Reply as to 465 MOTION to Exclude *Opinions of Professor Howard P. Marvel*, 473 MOTION in Limine #5 *to Exclude Testimony From Plaintiff's Expert Howard Marvel*, MOTION for Leave to File Excess Pages by CSX Transportation, Inc.. (Attachments: # 1 Exhibit 1 − Proposed Order)(McFarland, Robert) (Entered: 10/19/2022) |
| 10/19/2022 | 480 | Request for Hearing by CSX Transportation, Inc. re 374 MOTION in Limine *to Exclude Thomas D. Crowley*, 378 MOTION in Limine *to Preclude Mischaracterization of CSXT's Rate Proposals* (McFarland, Robert) (Entered: 10/19/2022) |
| 10/20/2022 | 481 | AGREED ORDER: The Court GRANTS 479 Motion and IT IS HEREBY ORDERED that CSX is permitted to file a consolidated responsive brief relating to Defendants' Daubert Motions [475 and 473], not to exceed 50 pages. It is FURTHER ORDERED that CSX shall file its response on or before 11/4/2022. NS and NPBL shall file their replies on or before 11/14/2022.Signed by Magistrate Judge Robert J. Krask on 10/20/22. (afar) (Entered: 10/20/2022) |
| 10/26/2022 |  | MOTIONS REFERRED to Magistrate Judge: Krask. 471 MOTION to Seal (afar) (Entered: 10/26/2022) |
| 10/26/2022 |  | MOTIONS REFERRED to Magistrate Judge: Krask. 467 MOTION to Seal (afar) (Entered: 10/26/2022) |
| 10/31/2022 | 482 | NOTICE by CSX Transportation, Inc. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Hatch, Benjamin) (Entered: 10/31/2022) |
| 10/31/2022 | 483 | ORDER granting 467 Motion to Seal. Signed by Magistrate Judge Robert J. Krask on 10/31/22. (jhie, ) (Entered: 10/31/2022) |
| 10/31/2022 | 484 | ORDER granting 471 Motion to Seal. Signed by Magistrate Judge Robert J. Krask on 10/31/22. (jhie, ) (Entered: 10/31/2022) |
| 11/04/2022 | 485 | MOTION to Seal by CSX Transportation, Inc.. (Attachments: # 1 Proposed Order)(Hatch, Benjamin) (Entered: 11/04/2022) |
| 11/04/2022 | 486 | Notice of Filing Sealing Motion LCvR5(C) by CSX Transportation, Inc. re 485 MOTION to Seal (Hatch, Benjamin) (Entered: 11/04/2022) |
| 11/04/2022 | 487 | Sealed Consolidated Opposition re 485 MOTION to Seal . (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6)(Hatch, Benjamin) (Entered: 11/04/2022) |
| 11/04/2022 | 488 | Memorandum in Support re 485 MOTION to Seal filed by CSX Transportation, Inc.. (Hatch, Benjamin) (Entered: 11/04/2022) |
| 11/04/2022 | 489 | RESPONSE in Opposition re 465 MOTION to Exclude *Opinions of Professor Howard P. Marvel*, 473 MOTION in Limine #5 *to Exclude Testimony From Plaintiff's Expert Howard Marvel* filed by CSX Transportation, Inc.. (Attachments: # 1 Exhibit 1 − Filed Under Seal, # 2 Exhibit 2 − Filed Under Seal, # 3 Exhibit 3 − Filed Under Seal, # 4 Exhibit 4 − Filed Under Seal, # 5 Exhibit 5 − Filed Under Seal, # 6 Exhibit 6 − Filed Under Seal, # 7 Exhibit 7, # 8 Exhibit 8)(Hatch, Benjamin) (Entered: 11/04/2022) |

| | | |
|---|---|---|
| 11/07/2022 | | MOTIONS REFERRED to Magistrate Judge: Krask. 465 MOTION to Exclude *Opinions of Professor Howard P. Marvel*, 473 MOTION in Limine #5 *to Exclude Testimony From Plaintiff's Expert Howard Marvel* (afar) (Entered: 11/07/2022) |
| 11/14/2022 | | MOTIONS REFERRED to Magistrate Judge Krask: 485 MOTION to Seal (afar) (Entered: 11/14/2022) |
| 11/14/2022 | 490 | Reply to Motion re 465 MOTION to Exclude *Opinions of Professor Howard P. Marvel* filed by Norfolk Southern Railway Company. (Wingfield, Alan) (Entered: 11/14/2022) |
| 11/14/2022 | 491 | MOTION to Seal by Norfolk Southern Railway Company. (Attachments: # 1 Proposed Order)(Wingfield, Alan) (Entered: 11/14/2022) |
| 11/14/2022 | 492 | Memorandum in Support re 491 MOTION to Seal filed by Norfolk Southern Railway Company. (Wingfield, Alan) (Entered: 11/14/2022) |
| 11/14/2022 | 493 | Sealed Response/Reply/Opposition re 465 MOTION to Exclude *Opinions of Professor Howard P. Marvel*. (Wingfield, Alan) (Entered: 11/14/2022) |
| 11/14/2022 | 494 | Notice of Filing Sealing Motion LCvR5(C) by Norfolk Southern Railway Company re 491 MOTION to Seal (Wingfield, Alan) (Entered: 11/14/2022) |
| 11/14/2022 | 495 | MOTION to Seal by Norfolk & Portsmouth Belt Line Railway Company. (Attachments: # 1 Proposed Order)(Snow, W. Ryan) (Entered: 11/14/2022) |
| 11/14/2022 | 496 | Notice of Filing Sealing Motion LCvR5(C) by Norfolk & Portsmouth Belt Line Railway Company re 495 MOTION to Seal (Snow, W. Ryan) (Entered: 11/14/2022) |
| 11/14/2022 | 497 | Sealed Response/Reply/Opposition re 473 MOTION in Limine #5 *to Exclude Testimony From Plaintiff's Expert Howard Marvel*, 495 MOTION to Seal . (Attachments: # 1 Exhibit 1)(Snow, W. Ryan) (Entered: 11/14/2022) |
| 11/14/2022 | 498 | Reply to Motion re 473 MOTION in Limine #5 *to Exclude Testimony From Plaintiff's Expert Howard Marvel*, 495 MOTION to Seal filed by Norfolk & Portsmouth Belt Line Railway Company. (Attachments: # 1 Exhibit 1)(Snow, W. Ryan) (Entered: 11/14/2022) |
| 11/14/2022 | 499 | Memorandum in Support re 495 MOTION to Seal filed by Norfolk & Portsmouth Belt Line Railway Company. (Snow, W. Ryan) (Entered: 11/14/2022) |
| 11/15/2022 | 500 | ORDER: The Court GRANTS CSX's Motion to Seal and ORDERS that CSX's unredacted Consolidated Opposition to Defendants' Motions to Exclude CSX's expert witness. Dr. Howard P. Marvel, together with Exhibits 1,2,3,4,5, and 6 shall be maintained under seal by the Clerk pending further order of the Court. The Clerk is REQUESTED to send a copy of this Order to all counsel of record. Copies sent as DIRECTED on 11.15.22. Signed by Magistrate Judge Robert J. Krask and filed on 11/15/22. (epri, ) (Entered: 11/15/2022) |
| 11/16/2022 | | Set Hearings: Daubert Hearing set for 12/2/2022 at 11:00 AM in Norfolk Mag Courtroom 1 before Magistrate Judge Robert J. Krask, with OCR. (btit) (Entered: 11/16/2022) |
| 11/18/2022 | | Motion Hearing set as to 307 MOTION for Summary Judgment, 296 MOTION for Summary Judgment for 12/1/2022 at 10:00 AM in Norfolk Courtroom 1 before Chief District Judge Mark S. Davis. (vwar) (Entered: 11/18/2022) |
| 11/22/2022 | | MOTIONS REFERRED to Magistrate Judge Krask: 491 MOTION to Seal , 495 MOTION to Seal (Vpea, ) (Entered: 11/22/2022) |
| 11/23/2022 | 501 | ORDER granting 491 Motion to Seal. Signed by Magistrate Judge Robert J. Krask on 11/23/22. (jhie, ) (Entered: 11/23/2022) |
| 11/23/2022 | 502 | ORDER granting 495 Motion to Seal. Signed by Magistrate Judge Robert J. Krask on 11/23/22. (jhie, ) (Entered: 11/23/2022) |
| 11/29/2022 | 505 | ORDER. The parties are DIRECTED to submit to the chambers of the undersigned, no later than 4:00 p.m. on December 2, 2022, a proposed Final Pretrial Order, a copy of all exhibits to which the parties have unresolved objections, and copies of any *de bene esse* depositions to which the parties have made objections. Signed by Magistrate |

JA34

| | | |
|---|---|---|
| | | Judge Robert J. Krask on 11/29/22. (jhie, ) (Entered: 11/29/2022) |
| 12/01/2022 | 511 | MOTION HEARING held before Chief District Judge Mark S. Davis: Paul McManus, OCR. Benjamin Hatch, Robert McFarland, Ashley Peterson, Jeanne Noonan, present on behalf of CSX Transportation, Inc. Aaron OBrien, present as corporate representative for CSX Transportation, Inc. Michael Lacy, Tara Reinhart, John Lynch, Alan Wingfield, Kathleen Knudsen, Thomas Gentry, and Megan McConnell, present on behalf of Norfolk Southern. Michael McClellan and Joe Carpenter, present as corporate representatives for Norfolk Southern. Ryan Snow, John Chapman and Alexander McDaniel, present on behalf of Norfolk & Portsmouth Belt Line Railway Co. Matter came on for a hearing on 296 and 307 Motions for Summary Judgment. Introductory comments of the Court. Argument of counsel heard. Further comments of the Court. Court will issue an order. Court adjourned. (vwar) (Entered: 12/01/2022) |
| 12/01/2022 | 512 | NOTICE of Appearance by William Cole Geddy on behalf of CSX Transportation, Inc. (Geddy, William) (Entered: 12/01/2022) |
| 12/02/2022 | 513 | MOTION to Seal *Portions of Exhibit F to Proposed Final Pretrial Order* by CSX Transportation, Inc.. (Attachments: # 1 Proposed Order)(McFarland, Robert) (Entered: 12/02/2022) |
| 12/02/2022 | 514 | Notice of Filing Sealing Motion LCvR5(C) by CSX Transportation, Inc. re 513 MOTION to Seal *Portions of Exhibit F to Proposed Final Pretrial Order* (McFarland, Robert) (Entered: 12/02/2022) |
| 12/02/2022 | 515 | Sealed Document re 513 MOTION to Seal *Portions of Exhibit F to Proposed Final Pretrial Order*. (McFarland, Robert) (Entered: 12/02/2022) |
| 12/02/2022 | 516 | Memorandum in Support re 513 MOTION to Seal *Portions of Exhibit F to Proposed Final Pretrial Order* filed by CSX Transportation, Inc.. (McFarland, Robert) (Entered: 12/02/2022) |
| 12/02/2022 | 517 | NOTICE by CSX Transportation, Inc. *of Filing of Proposed Final Pretrial Order* (Attachments: # 1 Proposed Order Proposed Final Pretrial Order, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H)(McFarland, Robert) (Entered: 12/02/2022) |
| 12/02/2022 | 518 | Minute Entry for Daubert Hearing held on 12/2/2022 before Magistrate Judge Robert J. Krask: Matter came on for a hearing to address the pending Daubert motions (ECF Nos. 374, 465, and 473). Benjamin Hatch, Robert McFarland, Ashley Peterson, and Krystal Gollolgy appeared on behalf of CSX Transportation, Inc. Michael Lacy and Tara Reinhart appeared on behalf of Norfolk Southern Railway Company. Alexander McDaniel and Ryan Snow appeared on behalf of Norfolk & Portsmouth Belt Line Railway Company. The Court addressed the motion to exclude opinions of Professor Howard R. Marvel (ECF No. 465). Argument of counsel heard. The Court addressed the motion in limine to exclude testimony from Plaintiffs Expert Howard Marvel (ECF No. 473). Argument of counsel heard. The Court addressed the motion to exclude Thomas D. Crowley (ECF No. 374). Argument of counsel heard. Further comments of the Court. Court to issue an order. Court adjourned. (Court Reporter Carol Naughton, OCR.)(btit) (Entered: 12/02/2022) |
| 12/05/2022 | 520 | TRANSCRIPT of Proceedings held on 12/2/2022, before Chief Judge Mark S. Davis, Court Reporter/Transcriber Paul McManus, Telephone number 757−222−7077. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 1/4/2023. Redacted Transcript Deadline set for 2/6/2023. Release of Transcript Restriction set for 3/6/2023.**(mcmanus, paul) (Entered: 12/05/2022) |
| 12/05/2022 | 521 | ORDER. The 329 , 353 , 378 Motions in Limine are DENIED; the 331 , 343 Motions in Limine are DENIED WITHOUT PREJUDICE; the 359 , 365 Motions in Limine are GRANTED IN PART AND DENIED IN PART WITHOUT PREJUDICE; and the |

| | | |
|---|---|---|
| | | 374 Motion in Limine is GRANTED IN PART AND DENIED IN PART. See Order for details. The Court reserves ruling on the Motions in Limine filed at ECF Nos. 337 , 349 , 465 , and 473 . Signed by Magistrate Judge Robert J. Krask on 12/5/22. (jhie, ) (Entered: 12/05/2022) |
| 12/06/2022 | 522 | Motion to appear Pro Hac Vice by Meghan McConnell and Certification of Local Counsel Tara L. Reinhart Filing fee $ 75, receipt number AVAEDC−8695773. by Norfolk Southern Railway Company. (Attachments: # 1 Certificate of Good Standing)(Reinhart, Tara) (Entered: 12/06/2022) |
| 12/06/2022 | 523 | Motion to appear Pro Hac Vice by Julia Kupfer York and Certification of Local Counsel Tara L. Reinhart Filing fee $ 75, receipt number AVAEDC−8695811. by Norfolk Southern Railway Company. (Attachments: # 1 Certificate of Good Standing)(Reinhart, Tara) (Entered: 12/06/2022) |
| 12/06/2022 | 524 | EXCERPT TRANSCRIPT of proceedings (Daubert Hearing − Rulings) held on 12−02−2022, before Magistrate Judge Robert J. Krask, Court Reporter/Transcriber Carol Naughton, Telephone number,757−222−7073. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 1/5/2023. Redacted Transcript Deadline set for 2/6/2023. Release of Transcript Restriction set for 3/6/2023.(naughton, carol) (Entered: 12/06/2022)** |
| 12/06/2022 | | Set Hearings: Continuation of Final Pretrial Conference set for 12/20/2022 at 10:00 AM in Norfolk Courtroom 2 before Magistrate Judge Robert J. Krask. (btit) (Entered: 12/06/2022) |
| 12/06/2022 | 525 | ORDER: The final pretrial conference will resume on 12/20/2022, at 10:00 am. Counsel are ORDERED to submit revised exhibit lists to the chambers of the undersigned by 4:00 pm on 12/15/2022. Signed by Magistrate Judge Robert J. Krask on 12/6/2022. (afar) (Entered: 12/06/2022) |
| 12/06/2022 | 526 | ORDER: Plaintiff shall brief the matter as outlined no later than 12/9/2022. Defendants shall respond no later than 12/15/22. Plaintiff shall file any reply no later than 12/19/22. Signed by Magistrate Judge Robert J. Krask on 12/6/2022. (afar) (Entered: 12/06/2022) |
| 12/07/2022 | 527 | ORDER denying 522 Motion for Pro hac vice for Meghan McConnell. Signed by Chief District Judge Mark S. Davis on 12/7/2022. (tlev, ) (Entered: 12/07/2022) |
| 12/07/2022 | 528 | ORDER granting 523 Motion for Pro hac vice for Julia Kupfer York as to Norfolk Southern Railway Company. Signed by Chief District Judge Mark S. Davis on 12/7/2022. (tlev, ) (Entered: 12/07/2022) |
| 12/09/2022 | 529 | MOTION to Seal by CSX Transportation, Inc.. (Attachments: # 1 Proposed Order)(McFarland, Robert) (Entered: 12/09/2022) |
| 12/09/2022 | 530 | Notice of Filing Sealing Motion LCvR5(C) by CSX Transportation, Inc. re 529 MOTION to Seal (McFarland, Robert) (Entered: 12/09/2022) |
| 12/09/2022 | 531 | Sealed Memorandum in Support re 529 MOTION to Seal . (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 14, # 14 Exhibit 16)(McFarland, Robert) (Entered: 12/09/2022) |
| 12/09/2022 | 532 | Memorandum in Support re 529 MOTION to Seal filed by CSX Transportation, Inc.. (McFarland, Robert) (Entered: 12/09/2022) |
| 12/09/2022 | 533 | MOTION TO TAKE THE DE BENE ESSE DEPOSITION OF CHRIS LUEBBERS by CSX Transportation, Inc.. (Attachments: # 1 Exhibit 1 − Proposed Order)(McFarland, Robert) (Entered: 12/09/2022) |

| 12/09/2022 | 534 | Memorandum in Support re 533 MOTION TO TAKE THE DE BENE ESSE DEPOSITION OF CHRIS LUEBBERS filed by CSX Transportation, Inc.. (Attachments: # 1 Exhibit 1 − Filed Under Seal, # 2 Exhibit 2 − Filed Under Seal, # 3 Exhibit 3 − Filed Under Seal, # 4 Exhibit 4 − Filed Under Seal, # 5 Exhibit 5 − Filed Under Seal, # 6 Exhibit 6 − Filed Under Seal, # 7 Exhibit 7 − Filed Under Seal, # 8 Exhibit 8 − Filed Under Seal, # 9 Exhibit 9 − Filed Under Seal, # 10 Exhibit 10 − Filed Under Seal, # 11 Exhibit 11 − Filed Under Seal, # 12 Exhibit 12 − Filed Under Seal, # 13 Exhibit 13, # 14 Exhibit 14 − Filed Under Seal, # 15 Exhibit 15, # 16 Exhibit 16 − Filed Under Seal, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20)(McFarland, Robert) (Entered: 12/09/2022) |
| 12/12/2022 | | MOTIONS REFERRED to Magistrate Judge Krask: 513 MOTION to Seal *Portions of Exhibit F to Proposed Final Pretrial Order* (afar) (Entered: 12/12/2022) |
| 12/13/2022 | 535 | ORDER: The Court finds that further briefing is required as outlined in this Order. Counsel shall file simultaneous briefs, not exceeding 15 pages, on the issue of injunctive relief no later than noon on Friday, December 16, 2022. Signed by Chief District Judge Mark S. Davis on 12/13/2022. (afar) (Entered: 12/13/2022) |
| 12/14/2022 | 536 | ORDER granting 513 Motion to Seal CSX/s unredacted Exhibit F to the proposed final pretrial order. Signed by Magistrate Judge Robert J. Krask on 12/13/2022. (afar) (Entered: 12/14/2022) |
| 12/15/2022 | 537 | RESPONSE in Opposition re 533 MOTION TO TAKE THE DE BENE ESSE DEPOSITION OF CHRIS LUEBBERS filed by Norfolk Southern Railway Company. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Lacy, Michael) (Entered: 12/15/2022) |
| 12/15/2022 | 538 | NOTICE by CSX Transportation, Inc. re 525 Order, (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Noonan, Jeanne) (Entered: 12/15/2022) |
| 12/15/2022 | 539 | NOTICE by CSX Transportation, Inc. (Attachments: # 1 Exhibit 1)(Hatch, Benjamin) (Entered: 12/15/2022) |
| 12/15/2022 | 540 | Opposition to 533 MOTION TO TAKE THE DE BENE ESSE DEPOSITION OF CHRIS LUEBBERS *Norfolk and Portsmouth Belt Line Railroad Company's Opposition to CSXT's Motion to Take the De Bene Esse Deposition of Chris Luebbers* filed by Norfolk & Portsmouth Belt Line Railway Company. (Snow, W. Ryan) (Entered: 12/15/2022) |
| 12/16/2022 | 541 | Memorandum *in Response* to 535 Order, filed by CSX Transportation, Inc.. (Attachments: # 1 Exhibit A)(Hatch, Benjamin) (Entered: 12/16/2022) |
| 12/16/2022 | 542 | Memorandum *in Response* to 535 Order, filed by Norfolk & Portsmouth Belt Line Railway Company. (Attachments: # 1 Exhibit 1)(Snow, W. Ryan) (Entered: 12/16/2022) |
| 12/16/2022 | 543 | Memorandum *in Response* to 535 Order, filed by Norfolk Southern Railway Company. (Attachments: # 1 Exhibit A)(Lacy, Michael) (Entered: 12/16/2022) |
| 12/16/2022 | 544 | ORDER: The Final Pretrial Conference scheduled to resume on 12/20/22, is cancelled pending the Court's ruling on the motions for summary judgment, ECF Nos. 296, 307. Signed by Magistrate Judge Robert J. Krask on 12/16/22. (afar) (Entered: 12/16/2022) |
| 12/16/2022 | | FPTC set before Magistrate Judge Robert J. Krask is terminated.. (afar) (Entered: 12/16/2022) |
| 12/16/2022 | 545 | Objection to 521 Order on Motion in Limine,,,,,,,,,,,,,,, 329 MOTION in Limine *to Exclude Evidence and Argument that NPBL's Switch Rate is Unreasonable* filed by Norfolk Southern Railway Company. (Wingfield, Alan) (Entered: 12/16/2022) |
| 12/16/2022 | 546 | Objection to 521 Order on Motion in Limine,,,,,,,,,,,,,,, 343 MOTION in Limine *Regarding Discontinuance of the Diamond Track* filed by Norfolk Southern Railway Company. (Wingfield, Alan) (Entered: 12/16/2022) |
| 12/19/2022 | | MOTIONS REFERRED to Magistrate Judge Krask: 529 MOTION to Seal (Vpea) (Entered: 12/19/2022) |

| | | |
|---|---|---|
| 12/19/2022 | 547 | REPLY to Response to Motion re 533 MOTION TO TAKE THE DE BENE ESSE DEPOSITION OF CHRIS LUEBBERS filed by CSX Transportation, Inc.. (Attachments: # 1 Exhibit A)(McFarland, Robert) (Entered: 12/19/2022) |
| 12/20/2022 | | MOTIONS REFERRED to Magistrate Judge Krask: 533 MOTION TO TAKE THE DE BENE ESSE DEPOSITION OF CHRIS LUEBBERS (afar) (Entered: 12/20/2022) |
| 12/21/2022 | 548 | ORDER: The Court FINDS that it is appropriate to allow each party an opportunity to respond to the arguments made by the other parties in the supplemental briefs filed last week. Counsel shall file simultaneous briefs, not exceeding 15 pages, on the outlined issues no later than noon on Tuesday, December 27, 2022. Signed by Chief District Judge Mark S. Davis on 12/21/2022. (afar) (Entered: 12/21/2022) |
| 12/27/2022 | 549 | Memorandum *in Response* to 548 Order, filed by CSX Transportation, Inc.. (McFarland, Robert) (Entered: 12/27/2022) |
| 12/27/2022 | 550 | Memorandum *in Response* to 548 Order, filed by Norfolk Southern Railway Company. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Lacy, Michael) (Entered: 12/27/2022) |
| 12/27/2022 | 551 | MOTION to Seal by Norfolk Southern Railway Company. (Attachments: # 1 Proposed Order)(Lacy, Michael) (Entered: 12/27/2022) |
| 12/27/2022 | 552 | Memorandum in Support re 551 MOTION to Seal filed by Norfolk Southern Railway Company. (Lacy, Michael) (Entered: 12/27/2022) |
| 12/27/2022 | 553 | Sealed Response/Reply/Opposition re 550 Memorandum. (Attachments: # 1 Exhibit C)(Lacy, Michael) (Entered: 12/27/2022) |
| 12/27/2022 | 554 | Notice of Filing Sealing Motion LCvR5(C) by Norfolk Southern Railway Company re 551 MOTION to Seal (Lacy, Michael) (Entered: 12/27/2022) |
| 12/30/2022 | 555 | Opposition to 545 Objection *to Denial of the Motion in Limine Regarding NPBL's Switch Rate, ECF No. 329* filed by CSX Transportation, Inc.. (Attachments: # 1 Exhibit A)(McFarland, Robert) (Entered: 12/30/2022) |
| 12/30/2022 | 556 | Opposition to 546 Objection *to Denial of the Motion in Limine Regarding the Diamond Track, ECF No. 343* filed by CSX Transportation, Inc.. (Attachments: # 1 Exhibit A)(McFarland, Robert) (Entered: 12/30/2022) |
| 01/03/2023 | 557 | ORDER granting 529 Motion to Seal −Signed by Magistrate Judge Robert J. Krask on 01/03/2023. (Vpea) (Entered: 01/03/2023) |
| 01/03/2023 | 558 | ORDER granting 533 Motion to take the deposition of Chris Luebbers−Signed by Magistrate Judge Robert J. Krask on 01/03/2023. (Vpea) (Entered: 01/03/2023) |
| 01/03/2023 | 559 | OPINION AND ORDER re 296 and 307 Motions for Summary Judgment. Defendants' motions for summary judgment are GRANTED in part, and DENIED in part. Additionally, summary judgment is denied as to the court−raised issue of injunctive relief. The jury trial scheduled to commence on 1/18/23 will be converted to a bench trial on injunctive relief. Counsel should also immediately contact the Magistrate Judge assigned to this case to schedule the resumption of the final pretrial conference. Signed by Chief District Judge Mark S. Davis on 1/3/2023. (dbra, ) . (Entered: 01/03/2023) |
| 01/04/2023 | | MOTIONS REFERRED to Magistrate Judge Krask 551 MOTION to Seal (Vpea) (Entered: 01/04/2023) |
| 01/05/2023 | | Set Hearings: Telephone Conference set for 1/6/2023 at 10:30 AM in Norfolk Telephonically before Magistrate Judge Robert J. Krask, with OCR. (btit) (Entered: 01/05/2023) |
| 01/05/2023 | 560 | ORDER: The parties are INSTRUCTED to submit preliminary proposed findings of fact and conclusions of law on or before 1/12/2023. See Order for additional details. Signed by Chief District Judge Mark S. Davis on 1/5/2023. (afar) (Entered: 01/05/2023) |
| 01/05/2023 | 561 | Reply to 546 Objection *to Denial of Its Motion in Limine Regarding Discontinuance of the Diamond Track* filed by Norfolk Southern Railway Company. (Wingfield, Alan) (Entered: 01/05/2023) |

| | | |
|---|---|---|
| 01/05/2023 | 562 | Reply to 545 Objection *to Denial of Its Motion in Limine to Exclude Evidence and Argument that NPBL's Switch Rate is Unreasonable* filed by Norfolk Southern Railway Company. (Wingfield, Alan) (Entered: 01/05/2023) |
| 01/06/2023 | 563 | Minute Entry for Telephone Conference held on 1/6/2023 before Magistrate Judge Robert J. Krask: The matter came on for a hearing to address procedures moving forward. Benjamin Hatch, Robert McFarland, and Jeanne Noonan appeared on behalf of Plaintiff. Alan Wingfield, Michael Lacy, Kathleen Knudsen, Tara Reinhart, Thomas Gentry, Alexander McDaniel, and Ryan Snow appeared on behalf of Defendants. Comments and questions by the Court. Responses of counsel heard. Court to prepare an order. Court adjourned. (Court Reporter Jody Stewart, OCR.)(btit) (Entered: 01/06/2023) |
| 01/06/2023 | 564 | ORDER: Outlining deadlines as noted in the Order; see Order for details. The final pretrial conference will resume at 9:00 am on 1/11/23. Supplemental Briefing from the parties addressing the effect the summary judgment ruling has on the pending motions in limine would be instructive. Counsel shall file simultaneous briefs no later than 9:00 am on 1/9/2023. Signed by Magistrate Judge Robert J. Krask on 1/6/2023. (afar) (Entered: 01/06/2023) |
| 01/06/2023 | | Set Hearings: Continuation of Final Pretrial Conference set for 1/11/2023 at 09:00 AM in Norfolk Courtroom 2 before Magistrate Judge Robert J. Krask. (btit) (Entered: 01/06/2023) |
| 01/09/2023 | 565 | Memorandum *in Response* to 564 Order, filed by CSX Transportation, Inc.. (McFarland, Robert) (Entered: 01/09/2023) |
| 01/09/2023 | 566 | Memorandum *on the Issues of the Impact of the Court's Summary Judgment Order on Defendants' Pending Motions* to 564 Order, filed by Norfolk Southern Railway Company. (Lacy, Michael) (Entered: 01/09/2023) |
| 01/09/2023 | 567 | TRANSCRIPT of proceedings (Daubert Hearing) held on 12−02−2022, before Magistrate Judge Robert J. Krask, Court Reporter/Transcriber Carol Naughton, Telephone number,757−222−7073. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 2/8/2023. Redacted Transcript Deadline set for 3/13/2023. Release of Transcript Restriction set for 4/10/2023.(naughton, carol) (Entered: 01/09/2023)** |
| 01/09/2023 | 570 | ORDER granting 551 Motion to Seal and ORDERS that Defendants'Joint Brief on the Issue of Injunctive Relief and Laches, including Exhibit C, shall be under seal.Signed by Magistrate Judge Robert J. Krask on 01/09/2023. (Vpea ) (Entered: 01/09/2023) |
| 01/09/2023 | | Set Hearings: Telephone Conference set for 1/10/2023 at 03:30 PM in Norfolk Telephonically before Magistrate Judge Robert J. Krask, with OCR. (btit) (Entered: 01/09/2023) |
| 01/09/2023 | 572 | MOTION to Dismiss *All Remaining Claims for Relief* by Norfolk & Portsmouth Belt Line Railway Company. (Snow, W. Ryan) (Entered: 01/09/2023) |
| 01/09/2023 | 573 | Brief in Support of 572 MOTION to Dismiss *All Remaining Claims for Relief* filed by Norfolk & Portsmouth Belt Line Railway Company. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5)(Snow, W. Ryan) (Entered: 01/09/2023) |
| 01/09/2023 | 574 | JOINDER OF Norfolk and Portsmouth Belt Line Railroad Company's MOTION to Dismiss All Remaining Claims for Relief by Norfolk Southern Railway Company. (Wingfield, Alan) Modified the text on 1/10/2023 (Vpea). (Entered: 01/09/2023) |
| 01/10/2023 | 576 | NOTICE by CSX Transportation, Inc. re 564 Order, *of Filing Amended Trial Exhibit Lists and Deposition Designations* (Attachments: # 1 Exhibit B, # 2 Exhibit C, # 3 Exhibit D, # 4 Exhibit E, # 5 Proposed Order)(McFarland, Robert) (Entered: |

| | | |
|---|---|---|
| | | 01/10/2023) |
| 01/10/2023 | 577 | ORDER: CSX is therefore instructed to file a responsive brief no later than midnight on Thursday, January 12, 2023. Any reply shall be filed by 5pm on Friday, January 13, 2023. Signed by Chief District Judge Mark S. Davis on 1/10/23. (mrees, ) (Entered: 01/10/2023) |
| 01/10/2023 | 579 | Minute Entry for Telephone Conference held on 1/10/2023 re 337 MOTION in Limine *Regarding Use of Internal Emails* filed by Norfolk Southern Railway Company, 465 MOTION to Exclude *Opinions of Professor Howard P. Marvel* filed by Norfolk Southern Railway Company, 349 MOTION in Limine *to Exclude Evidence and Argument Regarding the Use of Internal NS Emails* filed by Norfolk & Portsmouth Belt Line Railway Company, 473 MOTION in Limine *#5 to Exclude Testimony From Plaintiff's Expert Howard Marvel* filed by Norfolk & Portsmouth Belt Line Railway Company before Magistrate Judge Robert J. Krask: Benjamin Lucas Hatch, Esq., Robert William McFarland, Esq., Jeanne Elizabeth Noonan, Esq., V. Kathleen Dougherty, Esq., and William Cole Geddy, Esq. appeared on behalf of the Plaintiff, CSX Transportation, Inc. Alan Durrum Wingfield, Esq., Michael Edward Lacy, Esq., Kathleen Michelle Knudsen, Esq., Massie Payne Cooper, Esq., and Tara L Reinhart, Esq. appeared on behalf of the Defendant, Norfolk Southern Railway Company. Alexander Ryan McDaniel, Esq. and W. Ryan Snow, Esq. appeared on behalf of the Defendant, Norfolk & Portsmouth Belt Line Railway Company. Comments and questions by the Court. Responses of counsel heard. The Court ruled as follows: ECF No. 465 − The Court declines to exclude Dr. Marvels opinions based on NSs arguments; ECF No. 473 − The Court DENIES IN PART AND GRANTS IN PART Belt Lines motion; ECF No. 337 − Norfolk Southerns motion in limine regarding the use of internal emails is DENIED WITHOUT PREJUDICE; ECF No. 349 − Belt Lines motion in limine to exclude evidence and argument regarding the use of internal emails is DENIED WITHOUT PREJUDICE. Court to prepare an order. Court adjourned. (Court Reporter Jody Stewart, OCR.)(btit) (Entered: 01/11/2023) |
| 01/10/2023 | 580 | ORDER: 337 Motion in Limine and 349 Motion in Limine are denied without prejudice. 465 Motion to Exclude is DENIED. Granting in part and denying in part 473 Motion in Limine. See order for details. Signed by Magistrate Judge Robert J. Krask on 01/10/2023. (Vpea) (Entered: 01/11/2023) |
| 01/11/2023 | 581 | TRANSCRIPT of proceedings held on 1−10−2023, before Judge Robert J. Krask, Court Reporter/Transcriber Jody Stewart, Telephone number 757−222−7071. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 2/10/2023. Redacted Transcript Deadline set for 3/13/2023. Release of Transcript Restriction set for 4/11/2023.(stewart, jody) (Entered: 01/11/2023)** |
| 01/11/2023 | | Minute Entry for proceedings held before Magistrate Judge Robert J. Krask: Continuation of Final Pretrial Conference held on 1/11/2023. (btit) (Entered: 01/13/2023) |
| 01/12/2023 | 582 | ORDER:The final pretrial conference will resume at 10:00 a.m. on January 12, 2023.Signed by Magistrate Judge Robert J. Krask on 01/11/2023. (Vpea ) (Entered: 01/12/2023) |
| 01/12/2023 | 583 | Motion to appear Pro Hac Vice by Meghan McConnell and Certification of Local Counsel Tara L. Reinhart Filing fee $ 75, receipt number AVAEDC−8750671. by Norfolk Southern Railway Company. (Attachments: # 1 Certificate of Good Standing)(Reinhart, Tara) (Entered: 01/12/2023) |
| 01/12/2023 | 585 | ORDER: The final pretrial conference will resume at 10:00 a.m. on January 13,2023.Signed by Magistrate Judge Robert J. Krask on 01/12/2023. (Vpea) (Entered: 01/12/2023) |

| 01/12/2023 | 586 | NOTICE by Norfolk Southern Railway Company *of Filing Supplemental Objections to Deposition* (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Wingfield, Alan) (Entered: 01/12/2023) |
| 01/12/2023 | 587 | Proposed Findings of Fact by Norfolk Southern Railway Company. (Lacy, Michael) (Entered: 01/12/2023) |
| 01/12/2023 | 588 | MOTION to Seal by Norfolk Southern Railway Company. (Attachments: # 1 Proposed Order)(Lacy, Michael) (Entered: 01/12/2023) |
| 01/12/2023 | 589 | Memorandum in Support re 588 MOTION to Seal filed by Norfolk Southern Railway Company. (Lacy, Michael) (Entered: 01/12/2023) |
| 01/12/2023 | 590 | Sealed Document re 587 Proposed Findings of Fact. (Lacy, Michael) (Entered: 01/12/2023) |
| 01/12/2023 | 591 | Notice of Filing Sealing Motion LCvR5(C) by Norfolk Southern Railway Company re 588 MOTION to Seal (Lacy, Michael) (Entered: 01/12/2023) |
| 01/12/2023 | 592 | MOTION FOR INJUNCTIVE RELIEF and Proposed Findings of Fact by CSX Transportation, Inc (Hatch, Benjamin) Modified text on 1/13/2023 (Vpea). (Entered: 01/12/2023) |
| 01/12/2023 | 593 | Opposition to 572 MOTION to Dismiss *All Remaining Claims for Relief,* 574 MOTION to Dismiss *All Remaining Claims for Relief* filed by CSX Transportation, Inc.. (Hatch, Benjamin) (Entered: 01/12/2023) |
| 01/12/2023 |  | Minute Entry for proceedings held before Magistrate Judge Robert J. Krask: Continuation of Final Pretrial Conference held on 1/12/2023. Robert W. McFarland, Esq., and Jeanne E. Noonan, Esq., represented CSX Transportation, Inc. Alan D. Wingfield, Esq., and Massie P. Cooper, Esq., represented Norfolk Southern Railway Company. W. Ryan Snow, Esq., represented Norfolk & Portsmouth Belt Line Railway Company. (btit) (Entered: 01/13/2023) |
| 01/12/2023 | 594 | ORDER: STIPULATED ORDER ON TRIAL SCHEDULE. Signed by Magistrate Judge Robert J. Krask on 01/12/2023(See order for details) (Vpea) (Entered: 01/13/2023) |
| 01/13/2023 |  | Notice of Correction re 592 Docket text has been corrected to match the pleading (Vpea) Modified text on 1/13/2023 (Vpea). (Entered: 01/13/2023) |
| 01/13/2023 | 595 | NOTICE by CSX Transportation, Inc. *Proposed Revised Final Pretrial Order* (McFarland, Robert) (Entered: 01/13/2023) |
| 01/13/2023 | 596 | ORDER: The parties are INFORMED that the bench trial, if any, will begin Thursday, January 19, 2023. The parties are REQUESTED to preserve their availability on January 18, 2023, should a matter arise that requires a status conference or other proceeding. Signed by Chief District Judge Mark S. Davis on 1/13/2023. (afar) (Entered: 01/13/2023) |
| 01/13/2023 | 597 | ORDER granting 583 Motion for Pro hac vice for Meghan McConnell as to Norfolk Southern Railway Company. Signed by Chief District Judge Mark S. Davis on 1/13/23. (tlev, ) (Entered: 01/13/2023) |
| 01/13/2023 | 598 | REVISED FINAL PRETRIAL ORDER. Signed by Magistrate Judge Robert J. Krask on 1/13/2023. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H)(afar) (Entered: 01/13/2023) |
| 01/13/2023 | 599 | Sealed Exhibit F re 598 Revised Final Pretrial Order. (afar) (Entered: 01/13/2023) |
| 01/13/2023 | 600 | Reply to 572 MOTION to Dismiss *All Remaining Claims for Relief* filed by Norfolk & Portsmouth Belt Line Railway Company. (Snow, W. Ryan) (Entered: 01/13/2023) |
| 01/13/2023 | 601 | Reply to 574 MOTION to Dismiss *All Remaining Claims for Relief* filed by Norfolk Southern Railway Company. (Wingfield, Alan) (Entered: 01/13/2023) |
| 01/13/2023 |  | Minute Entry for proceedings held before Magistrate Judge Robert J. Krask: Continuation of Final Pretrial Conference held on 1/13/2023. Robert W. McFarland, Esq., represented CSX Transportation, Inc. Kathleen Knudsen, Esq., represented |

| | | |
|---|---|---|
| | | Norfolk Southern Railway Company. Alexander McDaniel, Esq., represented Norfolk & Portsmouth Belt Line Railway Company. (btit) (Entered: 01/19/2023) |
| 01/16/2023 | 602 | ORDER: The Court finds that it is appropriate to hold oral argument at 11:00 am on Wednesday, January 18, 2023. The parties should be prepared to address the matters outlined in this Order. Signed by Chief District Judge Mark S. Davis on 1/16/2023. (afar) Modified Text on 1/17/2023 (afar). (Entered: 01/16/2023) |
| 01/16/2023 | | Hearing set for 1/18/2023 at 11:00 AM in Norfolk Courtroom 1 before Chief District Judge Mark S. Davis. (afar) (Entered: 01/16/2023) |
| 01/16/2023 | | Bench Trial set for 1/19/2023 at 10:00 AM in Norfolk Courtroom 1 before Chief District Judge Mark S. Davis. (afar) (Entered: 01/16/2023) |
| 01/16/2023 | | Update bench trial date on the record (afar) (Entered: 01/16/2023) |
| 01/17/2023 | | Motion Hearing set as to 572 and 574 MOTION to Dismiss *All Remaining Claims for Relief for 1/18/2023 at 11:00 AM in Norfolk Courtroom 1 before Chief District Judge Mark S. Davis. (vwar) (Entered: 01/17/2023)* |
| 01/18/2023 | 604 | MOTION HEARING held before Chief District Judge Mark S. Davis: Paul McManus, OCR. Benjamin Hatch, Robert McFarland, Ashley Peterson, present on behalf of CSX Transportation, Inc. Erin OBrien, present as corporate representative for CSX Transportation, Inc. Michael Lacy, John Lynch, Alan Wingfield, present on behalf of Norfolk Southern. Joe Carpenter, present as corporate representatives for Norfolk Southern. Ryan Snow, John Chapman and Alexander McDaniel, present on behalf of Norfolk & Portsmouth Belt Line Railway Co. Matter came on for a hearing on 572 and 574 Motion to Dismiss. Motion Hearing held on 1/18/2023 re 572 MOTION to Dismiss and 574 MOTION to Dismiss. Comments of the Court. Argument of counsel heard. Court made certain findings on the record. Court GRANTED defendants 572 and 574 Motion to Dismiss with respect to the federal claims seeking injunctive relief. Court will issue a written opinion. The trial of this matter has been continued. A Status Conference will be held on February 14, 2023, at 11:00 a.m. Status Conference set for 2/14/2023 at 11:00 AM in Norfolk Courtroom 1 before Chief District Judge Mark S. Davis. Court adjourned. (Lunch: 1:00 p.m. 2:00 p.m.) (vwar) (Entered: 01/19/2023) |
| 01/19/2023 | 605 | TRANSCRIPT of proceedings held on 1/18/2023, before Chief Judge Mark S. Davis, Court Reporter/Transcriber Paul McManus, Telephone number 757−222−7077. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 2/21/2023. Redacted Transcript Deadline set for 3/21/2023. Release of Transcript Restriction set for 4/19/2023.(mcmanus, paul) (Entered: 01/19/2023)** |
| 01/23/2023 | | MOTIONS REFERRED to Magistrate Judge Krask 588 MOTION to Seal (Vpea) (Entered: 01/23/2023) |
| 01/24/2023 | 606 | Objection to 580 Order on Motion in Limine,,,, Order on Motion to Exclude,,, 579 Motion Hearing,,,,,,, filed by Norfolk Southern Railway Company. (Lacy, Michael) (Entered: 01/24/2023) |
| 01/24/2023 | 607 | ORDER granting 588 Motion to Seal. Signed by Magistrate Judge Robert J. Krask on 1/24/2023. (afar) (Entered: 01/24/2023) |
| 01/24/2023 | 608 | MOTION to Seal by Norfolk & Portsmouth Belt Line Railway Company. (Attachments: # 1 Proposed Order)(Snow, W. Ryan) (Entered: 01/24/2023) |
| 01/24/2023 | 609 | Memorandum in Support re 608 MOTION to Seal filed by Norfolk & Portsmouth Belt Line Railway Company. (Snow, W. Ryan) (Entered: 01/24/2023) |
| 01/24/2023 | 610 | Sealed Document re 608 MOTION to Seal , 580 Order on Motion in Limine,,,, Order on Motion to Exclude,,,. (Snow, W. Ryan) (Entered: 01/24/2023) |

| 01/24/2023 | 611 | Notice of Filing Sealing Motion LCvR5(C) by Norfolk & Portsmouth Belt Line Railway Company re 608 MOTION to Seal (Snow, W. Ryan) (Entered: 01/24/2023) |
|---|---|---|
| 01/24/2023 | 612 | Objection to 580 Order on Motion in Limine,,,, Order on Motion to Exclude,,, filed by Norfolk & Portsmouth Belt Line Railway Company. (Snow, W. Ryan) (Entered: 01/24/2023) |
| 01/27/2023 | 613 | OPINION AND ORDER: Defendant's motion seeking dismissal of CSX's federal antitrust injunctive relief claims are GRANTED. ECF Nos 572 , 574 . The bench trial on any remaining state law claims seeking injunctive relief has been continued at the joint request of the parties. Signed by Chief District Judge Mark S. Davis on 1/27/2023. (afar) (Entered: 01/27/2023) |
| 02/07/2023 | 614 | MOTION to Dismiss *Any Remaining Claim and Requested Relief* by Norfolk Southern Railway Company. (Lacy, Michael) (Entered: 02/07/2023) |
| 02/07/2023 | 615 | Memorandum in Support re 614 MOTION to Dismiss *Any Remaining Claim and Requested Relief* filed by Norfolk Southern Railway Company. (Lacy, Michael) (Entered: 02/07/2023) |
| 02/07/2023 | 616 | Supplemental MOTION to Dismiss *All Claims for State Law Injunctive Relief* by Norfolk & Portsmouth Belt Line Railway Company. (Snow, W. Ryan) (Entered: 02/07/2023) |
| 02/07/2023 | 617 | Memorandum in Support re 616 Supplemental MOTION to Dismiss *All Claims for State Law Injunctive Relief* filed by Norfolk & Portsmouth Belt Line Railway Company. (Snow, W. Ryan) (Entered: 02/07/2023) |
| 02/07/2023 | 618 | MOTION to Seal by CSX Transportation, Inc.. (Attachments: # 1 Proposed Order)(McFarland, Robert) (Entered: 02/07/2023) |
| 02/07/2023 | 619 | Notice of Filing Sealing Motion LCvR5(C) by CSX Transportation, Inc. re 618 MOTION to Seal (McFarland, Robert) (Entered: 02/07/2023) |
| 02/07/2023 | 620 | Sealed Consolidate Opposition re 618 MOTION to Seal . (McFarland, Robert) (Entered: 02/07/2023) |
| 02/07/2023 | 621 | Memorandum in Support re 618 MOTION to Seal filed by CSX Transportation, Inc.. (McFarland, Robert) (Entered: 02/07/2023) |
| 02/07/2023 | 622 | Opposition to 606 Objection, 610 Sealed Document filed by CSX Transportation, Inc.. (McFarland, Robert) (Entered: 02/07/2023) |
| 02/08/2023 | 623 | MOTION for Entry of Judgment under Rule 54(b) *or Certification Under 28 U.S.C. § 1292(b) and for Entry of a Stay Pending Appeal* by CSX Transportation, Inc.. (McFarland, Robert) (Entered: 02/08/2023) |
| 02/08/2023 | 624 | Memorandum in Support re 623 MOTION for Entry of Judgment under Rule 54(b) *or Certification Under 28 U.S.C. § 1292(b) and for Entry of a Stay Pending Appeal* filed by CSX Transportation, Inc.. (McFarland, Robert) (Entered: 02/08/2023) |
| 02/13/2023 | 625 | Reply to 606 Objection, 612 Objection *to the Denial of Their Rule 702 Motion and MIL #5 to Exclude the Opinions of Prof. Howard P. Marvel* filed by Norfolk Southern Railway Company. (Lacy, Michael) (Entered: 02/13/2023) |
| 02/13/2023 | 626 | MOTION to Seal by Norfolk Southern Railway Company. (Attachments: # 1 Proposed Order)(Lacy, Michael) (Entered: 02/13/2023) |
| 02/13/2023 | 627 | Memorandum in Support re 626 MOTION to Seal filed by Norfolk Southern Railway Company. (Lacy, Michael) (Entered: 02/13/2023) |
| 02/13/2023 | 628 | Sealed Response/Reply/Opposition re 625 Reply. (Lacy, Michael) (Entered: 02/13/2023) |
| 02/13/2023 | 629 | Notice of Filing Sealing Motion LCvR5(C) by Norfolk Southern Railway Company re 626 MOTION to Seal (Lacy, Michael) (Entered: 02/13/2023) |
| 02/14/2023 | 630 | STATUS CONFERENCE held before Chief District Judge Mark S. Davis: Paul McManus, OCR. Robert McFarland, Benjamin Hatch and Jeanne Noonan, present on behalf of CSX Transportation, Inc. Michael Lacy and Alan Wingfield, present on |

JA43

| | | |
|---|---|---|
| | | behalf of Norfolk Southern. Ryan Snow, John Chapman and Alexander McDaniel, present on behalf of Norfolk & Portsmouth Belt Line Railway Company. Matter came on for a status hearing. Status Conference held on 2/14/2023. Comments of the Court. Comments of counsel heard re: status of the case. Further comments from the Court re: participating in a settlement conference. Counsel will report back to the Court by Friday, February 17, 2023, if they believe a settlement conference would be helpful. Court adjourned. (vwar) (Entered: 02/14/2023) |
| 02/21/2023 | 631 | ORDER: The parties are ORDERED to contact Judge Lawrence Leonard's Career Law Clerk to schedule a Settlement Conference. See order for additional details. Signed by Chief District Judge Mark S. Davis on 2/21/2023. (afar) (Entered: 02/21/2023) |
| 02/21/2023 | 632 | RESPONSE in Opposition re 616 Supplemental MOTION to Dismiss *All Claims for State Law Injunctive Relief*, 614 MOTION to Dismiss *Any Remaining Claim and Requested Relief* filed by CSX Transportation, Inc.. (Hatch, Benjamin) (Entered: 02/21/2023) |
| 02/22/2023 | 633 | Memorandum in Opposition re 623 MOTION for Entry of Judgment under Rule 54(b) *or Certification Under 28 U.S.C. § 1292(b) and for Entry of a Stay Pending Appeal* filed by Norfolk Southern Railway Company. (Wingfield, Alan) (Entered: 02/22/2023) |
| 02/24/2023 | | MOTIONS REFERRED to Magistrate Judge Krask: 618 MOTION to Seal and 626 MOTION to Seal (afar) (Entered: 02/24/2023) |
| 02/27/2023 | | MOTIONS REFERRED to Magistrate Judge Krask 608 MOTION to Seal (Vpea) (Entered: 02/27/2023) |
| 02/27/2023 | 634 | ORDER granting 608 Motion to Seal. Signed by Magistrate Judge Robert J. Krask on 02/27/2023. (Vpea) (Entered: 02/27/2023) |
| 02/27/2023 | 635 | ORDER granting 618 CSX Motion to Seal. Signed by Magistrate Judge Robert J. Krask on 02/27/2023. (Vpea) (Entered: 02/27/2023) |
| 02/27/2023 | 636 | ORDER granting 626 Norfolk Southern Motion to Seal. Signed by Magistrate Judge Robert J. Krask on 2/27/23. (Vpea) (Entered: 02/27/2023) |
| 02/27/2023 | 637 | Reply to Motion re 616 Supplemental MOTION to Dismiss *All Claims for State Law Injunctive Relief*, 614 MOTION to Dismiss *Any Remaining Claim and Requested Relief* filed by Norfolk Southern Railway Company. (Lacy, Michael) (Entered: 02/27/2023) |
| 02/28/2023 | 638 | REPLY to Response to Motion re 623 MOTION for Entry of Judgment under Rule 54(b) *or Certification Under 28 U.S.C. § 1292(b) and for Entry of a Stay Pending Appeal* filed by CSX Transportation, Inc.. (McFarland, Robert) (Entered: 02/28/2023) |
| 03/02/2023 | 639 | THIRD Settlement Conference Order: All parties and their lead counsel are required to appear at a settlement conference scheduled in the United States District Court, 600 Granby Street, Norfolk, Virginia 23510 at 1:30p.m. on Monday, April 10, 2023; Memorandum due by NOON on MONDAY, APRIL 3, 2023. (See order for details) Signed by Magistrate Judge Lawrence R. Leonard on 3/2/2023. (Vpea) (Entered: 03/02/2023) |
| 03/27/2023 | 640 | Consent MOTION to Withdraw as Attorney *and Memorandum in Support* by CSX Transportation, Inc.. (Attachments: # 1 Proposed Order)(Peterson, Ashley) (Entered: 03/27/2023) |
| 03/27/2023 | 641 | ORDER granting 640 Motion to Withdraw as Attorney as to Attorney Ashley Partin Peterson as counsel for CSXT.. Signed by Chief District Judge Mark S. Davis on 03/27/2023. (Vpea) (Entered: 03/27/2023) |
| 04/10/2023 | | Settlement Conference held on 4/10/2023 before Magistrate Judge Lawrence R. Leonard. (lwoo) (Entered: 04/11/2023) |
| 04/19/2023 | 642 | ORDER: This matter is before the Court on several objections to evidentiary rulings made by the Magistrate Judge assigned to this case. The objections are OVERRULED. The objection advanced by Norfolk Southern Railway Company ("NSR") in ECF No. 545 seeks a blanket exclusion precluding CSX from offering any evidence or argument at trial that would categorize the "switch rate" charged by Norfolk & Portsmouth Belt Line Railway company as unreasonable or excessive (or any similar adjective) is |

| | | |
|---|---|---|
| | | OVERRULED. The Objection advanced by NSR in <u>546</u> regarding evidence involving the "Diamond Track" is OVERRULED for the reasons argued by CSX in <u>556</u>. The Objections advanced by the NSR and NPBL in <u>606</u> and <u>610</u> challenging the denial of Defendant's motions seeking to exclude the entirety of CSX expert Professor Howard Marvel's opinion testimony are OVERRULED for the reasons argued in greater detail by CSX in [620}. Signed by Chief District Judge Mark S. Davis on 4/19/2023. (Vpea) (Entered: 04/19/2023) |
| 04/19/2023 | <u>643</u> | OPINION AND ORDER: Defendant's motions <u>614</u> <u>616</u> seeking the resolution of the remaining state law injunctive relief claims are GRANTED. In light of such ruling disposing of all remaining state law claims, CSX's Motion <u>623</u> seeking a ruling authorizing an immediate interlocutory appeal is DISMISSED as moot. Signed by Chief District Judge Mark S. Davis on 4/19/2023. (Vpea) (Entered: 04/19/2023) |
| 04/26/2023 | <u>644</u> | CLERK'S JUDGMENT Entered and Filed Nunc Pro Tunc on 4/19/2023. (Vpea) (Entered: 04/26/2023) |
| 05/03/2023 | <u>645</u> | BILL OF COSTS by Norfolk & Portsmouth Belt Line Railway Company. (Attachments: # <u>1</u> Declaration of W. Ryan Snow, # <u>2</u> Exhibit Exhibit A to Declaration, # <u>3</u> Exhibit Exhibit B to Declaration)(Snow, W. Ryan) (Entered: 05/03/2023) |
| 05/03/2023 | <u>646</u> | MOTION for Attorney Fees *Motion for Costs of Suit and Attorneys' Fees* by Norfolk & Portsmouth Belt Line Railway Company. (Snow, W. Ryan) (Entered: 05/03/2023) |
| 05/03/2023 | <u>647</u> | Brief in Support to <u>646</u> MOTION for Attorney Fees *Motion for Costs of Suit and Attorneys' Fees* filed by Norfolk & Portsmouth Belt Line Railway Company. (Snow, W. Ryan) (Entered: 05/03/2023) |
| 05/03/2023 | <u>648</u> | MOTION for Costs *of Suit and Attorneys' Fees* by Norfolk Southern Railway Company. (Wingfield, Alan) (Entered: 05/03/2023) |
| 05/03/2023 | <u>649</u> | Brief in Support to <u>648</u> MOTION for Costs *of Suit and Attorneys' Fees* filed by Norfolk Southern Railway Company. (Wingfield, Alan) (Entered: 05/03/2023) |
| 05/03/2023 | <u>650</u> | BILL OF COSTS by Norfolk Southern Railway Company. (Attachments: # <u>1</u> Declaration of Alan D. Wingfield, # <u>2</u> Exhibit A, # <u>3</u> Exhibit B, # <u>4</u> Exhibit C)(Wingfield, Alan) (Entered: 05/03/2023) |
| 05/16/2023 | <u>651</u> | NOTICE OF APPEAL as to <u>613</u> Order on Motion to Dismiss,,, <u>644</u> Clerk's Judgment, <u>559</u> Order on Motion for Summary Judgment,,,,,, <u>643</u> Order on Motion to Dismiss,,,, Order on Motion for Entry of Judgment under Rule 54(b), by CSX Transportation, Inc.. Filing fee $ 505, receipt number AVAEDC−8938349. (Hatch, Benjamin) (Entered: 05/16/2023) |
| 05/16/2023 | <u>652</u> | Transmission of Notice of Appeal to US Court of Appeals re <u>651</u> Notice of Appeal, (All case opening forms, plus the transcript guidelines, may be obtained from the Fourth Circuit's website at www.ca4.uscourts.gov) (Attachments: # <u>1</u> Notice of Appeal)(Vpea) (Entered: 05/17/2023) |
| 05/17/2023 | <u>653</u> | Opposition to <u>645</u> Bill of Costs, <u>650</u> Bill of Costs filed by CSX Transportation, Inc.. (McFarland, Robert) (Entered: 05/17/2023) |
| 05/17/2023 | <u>654</u> | RESPONSE in Opposition re <u>646</u> MOTION for Attorney Fees *Motion for Costs of Suit and Attorneys' Fees*, <u>648</u> MOTION for Costs *of Suit and Attorneys' Fees* filed by CSX Transportation, Inc.. (McFarland, Robert) (Entered: 05/17/2023) |
| 05/18/2023 | <u>657</u> | USCA Case Number 23−1537 4CCA Case manager Naeemah R. Sims for <u>651</u> Notice of Appeal, filed by CSX Transportation, Inc. (23−1537) (epri, ) (Entered: 05/24/2023) |
| 05/23/2023 | <u>655</u> | Reply to Motion re <u>646</u> MOTION for Attorney Fees *Motion for Costs of Suit and Attorneys' Fees*, <u>648</u> MOTION for Costs *of Suit and Attorneys' Fees (Consolidated Reply)* filed by Norfolk & Portsmouth Belt Line Railway Company. (Snow, W. Ryan) (Entered: 05/23/2023) |
| 05/23/2023 | <u>656</u> | Reply to <u>653</u> Opposition, <u>645</u> Bill of Costs, <u>650</u> Bill of Costs *(Consolidated Reply)* filed by Norfolk Southern Railway Company. (Attachments: # <u>1</u> Exhibit 1, # <u>2</u> Exhibit 2, # <u>3</u> Exhibit B (Amended))(Wingfield, Alan) (Entered: 05/23/2023) |

| 08/08/2023 | 658 | NOTICE OF TAXING OF COSTS (vwar) (Entered: 08/08/2023) |
|---|---|---|
| 08/31/2023 | 659 | Costs Taxed in amount of $ 47,934.59 against CSX Transportation, Inc. (vwar) (Entered: 08/31/2023) |
| 08/31/2023 | 660 | Costs Taxed in amount of $ 60,080.14 against CSX Transportation, Inc. (vwar) (Entered: 08/31/2023) |
| 08/31/2023 | 661 | Consent MOTION to Withdraw as Attorney by CSX Transportation, Inc.. (Attachments: # 1 Proposed Order)(Noonan, Jeanne) (Entered: 08/31/2023) |
| 09/01/2023 | 662 | ORDER granting 661 Motion to Withdraw as Attorney. Attorney Jeanne E. Noonan is granted leave to withdraw as counsel for CSXT. Signed by Chief District Judge Mark S. Davis on 9/1/2023. (dbra, ) (Entered: 09/01/2023) |
| 09/07/2023 | 663 | NOTICE by CSX Transportation, Inc. re 660 Costs Taxed, 659 Costs Taxed (Hatch, Benjamin) (Entered: 09/07/2023) |
| 09/08/2023 | 664 | ORDER of USCA Granting 39 Motion to withdraw as Counsel as to 651 Notice of Appeal, filed by CSX Transportation, Inc. (Vpea) (Entered: 09/13/2023) |
| 09/21/2023 | 665 | OPINION AND ORDER re 646 Motion for Attorney Fees and 648 Motion for non−taxable Costs. This Court DENIES Defendant's motions seeking attorneys' fees and non−taxable costs. See Order for details. (Copies distributed as directed). Signed by Chief District Judge Mark S. Davis on 9/21/2023. (Vpea) (Entered: 09/21/2023) |

JA46

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

CSX TRANSPORTATION, INC.,
individually and on behalf of NORFOLK
& PORTSMOUTH BELT LINE
RAILROAD COMPANY,

      Plaintiff,

v.                                                    Civil Action No. __2:18cv530__

NORFOLK SOUTHERN RAILWAY
COMPANY, NORFOLK & PORTSMOUTH
BELT LINE RAILROAD COMPANY,
JERRY HALL, THOMAS HURLBUT,
PHILIP MERILLI, and CANNON MOSS,

      Defendants.

_____/

## COMPLAINT

    Plaintiff CSX Transportation, Inc. ("CSXT"), individually and on behalf of

Norfolk & Portsmouth Belt Line Railroad Company ("NPBL"), by counsel, files this

Complaint against Defendants Norfolk Southern Railway Company ("NS"), NPBL,

Jerry Hall, Thomas Hurlbut, Philip Merilli, and Cannon Moss as follows:

### NATURE OF THE ACTION

    1.    The NPBL is a terminal switching railroad operating in the cities of

Norfolk, Portsmouth, and Chesapeake, Virginia.  It was formed in 1896 by a

collection of railroads, who entered into an agreement "for the mutual benefit of each

1

in the interchange of business" to build and operate a belt line railway connecting various tracks of the eight railroads in Hampton Roads that would enable the interchange of cars among the railroads and connection to the port, among other facilities. In building and operating the NPBL, the founders sought to ensure that all railroads would have ready access to industries and ports which would ensure competition for transportation services. Toward that end, rail service to the Norfolk International Terminals ("NIT") was opened in 1917.

2.    As a result of mergers and acquisitions among the original eight railroads, by the end of the twentieth century the number of NPBL members had decreased to three. In the late 1980's, the then-remaining three shareholders of NPBL—CSXT, Norfolk and Western Railway Company, and Southern Railway Company—agreed to reapportion the amount of amount of board seats associated with each shareholder. Critically, this reapportionment did not result in any single shareholder possessing majority control of the board, and indeed no single shareholder at that time owned a majority of the shares. After this reappointment, however, Norfolk and Western Railway Company and Southern Railway Company merged, with the result being that the new company, NS, owning 57% of the shares of NPBL, as compared to CSXT's 43%. For at least the past ten years, NS has inserted former NS employees in all management positions of the NPBL and current or former NS employees in four of the six NPBL Board of Directors voting positions

2

and one non-voting director. NS and these directors and the NPBL management they put in place have conspired to operate the NPBL in order to benefit NS at the expense of the profitability and viability of the NPBL, and to harm NS's competitor CSXT.

3.      NS and the NPBL's conspiracy to operate the NPBL to pursue illegitimate ends is nowhere more vividly demonstrated than at the NIT, the largest international shipping terminal in Virginia. Only two entities have the ability to access NIT by rail: NPBL and NS. Currently, NPBL must utilize NS tracks in order to reach NIT. NS and the NPBL have used the NPBL as a chess piece to establish and maintain NS's monopolistic control over intermodal transportation[1] in and out of NIT by making it practically impossible for any other rail carriers to provide intermodal rail service to NIT. This has kept out competitors, but it has come at the expense of NPBL's own interests. NS and NPBL have acted in concert to have NPBL demand a rate designed to exclude competition in the relevant market, dispose of NPBL's key rail assets, and take other actions contrary to NPBL's business interests. Though NIT has been rapidly expanding and increasing its revenues in recent years due to increased shipping, NPBL's revenues have tellingly remained flat or decreased.

---

[1] Intermodal is the use of two modes of freight, such as ship and rail, to transport goods from shipper to consignee.

3

4.      The Virginia Port Authority ("VPA") has indicated that the growing port would benefit from multiple rail carriers being able to access NIT because it would allow more volume to be moved at competitive prices.  And yet, at this point, competitors such as CSXT are practically precluded from using the NPBL to connect to NIT because the rate set by NPBL's board, in concert with NS, is prohibitively expensive and because NS refuses to allow NPBL to handle intermodal trains over its tracks on a regular basis.  The only modern example in which CSXT actually utilized NPBL to connect to NIT occurred in 2015 when, due to closures of other ports around the country, the NIT was inundated with excess containers and because of demands from its customers, CSXT was forced to pay the high rate charged by the NBPL.  This was the briefest of windows in which CSXT could feasibly pay these rates because the other port closures caused all costs associated with ocean shipping to temporarily skyrocket. Under normal business conditions, the NPBL's rate and its operating procedures effectively preclude competitor access to NIT.

5.      CSXT wants to compete on fair terms at NIT, but has been unable to do so.  This condition exists despite the fact that the NPBL was created for the very purpose of fostering cooperative access for railroad carriers.  CSXT's recent proposal to NPBL to set a competitive rate and improve its services—including by volunteering the use of CSXT's own engines and fuel to perform NPBL's services— was summarily quashed by NPBL's board and management despite the projections

4

that CSXT's proposal would have substantially increased NPBL's business and revenues.

6.    NS's actions have resulted in the loss of existing and prospective intermodal business for CSXT.  It has also harmed the market by foreclosing competition for intermodal transportation servicing NIT.  And it has reduced revenue and income to the NPBL, which earns revenue and income by charging fees for interchange of trains and the use of its track.

## PARTIES

7.    CSXT is a Class I railroad operating in the Eastern United States and Canada.  CSXT is headquartered in Jacksonville, Florida and is incorporated under Virginia law.  It brings this suit on its own behalf and also in a derivative capacity as a shareholder of NPBL.

8.    NS is also a Class I railroad operating in the Eastern United States and Canada.  NS is headquartered in Norfolk, Virginia and is incorporated under Virginia law.

9.    The NPBL is a Class III terminal switching railroad.  It is headquartered in Chesapeake, Virginia, and is incorporated under Virginia law.

10.    Individual Defendants Jerry Hall, Thomas Hurlbut, Philip Merilli, and Cannon Moss are voting members of the NPBL Board of Directors, who, *inter alia*, participated in the rejection of CSXT's most recent service proposal.  Hall, Hurlbut,

5

and Merilli are also employees of NS.  Moss is a former employee of NS and has been the President and General Manager of NPBL since 2011.  The Individual Defendants are named as party defendants in Count VI only, but the conduct of the Individual Defendants is relevant to the other counts of the Complaint.

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 because CSXT's claims against Defendants arise under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and therefore raise federal questions.

12.    The Court has supplemental jurisdiction over all state law claims under 28 U.S.C. § 1367(a).

13.    This Court has personal jurisdiction over the Defendants because they are residents of Virginia, regularly conduct business in Virginia, and/or caused injury by acts in Virginia.

14.    Pursuant to 28 U.S.C. § 1391(b), venue is proper in this Court because a substantial part of the events giving rise to this dispute occurred within this District.

## FACTUAL ALLEGATIONS

*The Purpose and Structure of the NPBL*

15.    In 1896, eight railroads, including CSXT and NS's predecessors in interest, joined together to form the NPBL in order to provide an efficient means of interchanging the traffic of its owners between their lines and various marine

terminals and industries located along the NPBL's tracks. In 1897, they signed the NPBL Operating Agreement, attached hereto as Exhibit A. The joint agreement between the railroads was designed to ensure that all railroads would have ready access to NIT, which would ensure competition for transportation services.

16.   The NPBL Operating Agreement, as amended, governs the ownership and operation of the NPBL, and it creates and establishes various duties and obligations between and among the shareholders.

17.   In order to advance the purpose for which the NPBL was formed, the original shareholder companies, the predecessors of the current shareholders and parties to the NPBL Operating Agreement, expressly agreed therein that the NPBL would be a "separate organization in which all [railroads] are to be equally interested and each to have an equal representation." Ex. A at 1. The shareholders agreed that it is in the best interest of all that each shareholder company have "equal representation" in the organization; and accordingly the Operating Agreement provides that each shareholder "shall have one representative on the Board" of the NPBL. *Id.* at 1–2.

18.   The Operating Agreement further provides that each shareholder must "co-operate cordially in encouraging the business of the [NPBL] for which it is constructed." *Id.* at 4. Under the Operating Agreement, the NPBL anticipates that its shareholders will deliver to the NPBL all cars to be delivered to customers that

they cannot serve directly.  *Id.*  CSX thus has an expectation that the NPBL will provide it with an efficient means of interchanging its traffic including, without limitation, to and from the NIT.  *Id.* at 6 (referencing "the intent" that the NPBL "shall perform the service for which it was built and said Company be directly responsible for the competent and efficient discharge of its every obligation to the parties hereto").

19.    Further, under the NPBL Operating Agreement, the members of the NPBL Board of Directors are obligated to vote for "such resolutions, by-laws or other proceedings as may be necessary to carry into effect the agreements made in" the NPBL Operating Agreement.  *Id.* at 6.

20.    The NPBL currently operates over 26 miles of track in and around the Hampton Roads area of Virginia.  A map of the NPBL and the tracks owned by other railroads in the area is attached hereto as Exhibit B.  Crucially, the NPBL provides a means of access to the largest port in Virginia and one of the largest ports on the Eastern Seaboard, NIT.  For any rail carrier other than NS, the only way to access NIT by rail is via NBPL.  Being accessible by deep-draft ships and operating some of the world's largest cranes, NIT is uniquely positioned to handle some of the largest ships in the world.  Yet NS, together with NPBL, through NPBL directors and managers, has essentially blocked access to this large and growing port facility for anyone but itself.

*The Supplemental Agreement*

21.    As a result of mergers and acquisitions among the original eight railroads, by the end of the twentieth century the number of NPBL members had decreased to three.  By 1989, the number of shareholder railroads owning the NPBL had declined to three—CSXT, Norfolk and Western Railway Company ("NW") and Southern Railway Company ("SR").

22.    In a Supplemental Agreement dated March 1, 1989, attached hereto as Exhibit C, the three railroads agreed that CSXT was afforded the right to appoint two representatives to the NPBL Board of Directors, and the other two companies, NW and SR, collectively between them were afforded the right to appoint three representatives to the NPBL Board. Ex. C ¶ 1.  The Supplemental Agreement further provided that other than the single sentence of the Operating Agreement specifically referenced, "[n]othing herein shall be deemed to amend, alter, or affect any other provision of the NPBL Agreement." *Id.* ¶ 2.

23.    The following year, NW and SR merged to form the single company now known as Norfolk Southern Railway Company.  The merger of those two companies left NS and CSXT as the only remaining shareholders of the NPBL. As a result, NS owns 57% of NPBL, and CSXT owns 43%.  Per the NPBL By-Laws, which have been effect in their current form since 1996, attached hereto as Exhibit

9

D, NS has appointed four voting members to the NPBL Board of Directors and CSXT has appointed two.

24.     NPBL, a distinct corporation under Virginia law, remains an independent entity from its two remaining shareholders, NS and CSXT.  It operates according to its own bylaws and with its own management and Board of Directors. The railroads and NPBL lack economic integration, and the interests of NPBL can diverge from its railroad shareholders where higher prices mean higher revenue for NS but more cost for NPBL.  The conspiracy described below between NPBL and NS thus joined together separate decision-makers pursuing separate economic interests, depriving the marketplace of independent centers of decision-making.

*NPBL's Deteriorating Financial Condition*

25.     Rather than abide by the original purposes of the Operating Agreement, including the requirement to cordially cooperate in encouraging the business of NPBL, NS and the management of the NPBL conspired to operate the NPBL to harm CSXT and the market, even at the expense of the NPBL's own business interests.

26.     The NPBL Board of Directors currently consists of six voting members and one non-voting member.  Three of those voting positions are filled with current NS employees designated by NS to serve as NPBL Directors: Defendants Hall, Hurlbut, and Merilli.

10

27.     Another voting position is held by the NPBL President, Cannon Moss, a former NS employee who in 2011 was nominated at NS's direction and elected by vote of NS's shares, and over CSXT's objection.  Defendant Moss's predecessor, David Stinson, was also a former NS employee and returned to work at NS after his tenure as NPBL President.  Donna Coleman, the current non-voting member of the Board of Directors and Vice President of NPBL, is also a former employee of NS. In addition, Bill O'Brien, the current Terminal Superintendent of NPBL, is also a former employee of NS.

28.     NS also has other connections with the management of the NPBL.  The management of NPBL all have NS email addresses, which they use to conduct the business of the NPBL.

29.     For at least 12 years, every President and VP of NPBL was a former NS employee.

30.     All of the individual Defendants have independent personal stakes in furthering NS's interests as Directors of NPBL, such as the expectation of future employment with NS and the expectation of future remuneration from NS.

31.     Collectively, Defendant Moss, in his capacity as a Director, along with Defendants Hall, Hurlbut, and Merilli constitute the four "Individual Defendants."

32.     NS in conspiracy with the NPBL, and through the Individual Defendants, have operated the NPBL as a vehicle for advancing NS's interests at the

11

expense of their contractual duties to CSXT. The Individual Defendants, in advancing NS's interests regardless of the impact on NPBL, have further violated their fiduciary duties to NPBL. Management of NPBL conspired with NS to harm CSXT and grow NS's market power.

33. The NPBL's operating revenue is derived principally from switch operations, and is largely dependent upon the switch services being provided to the shareholders' companies, who in turn pay for those services.

34. Defendants have caused the NPBL to establish and maintain unreasonably high rates for its switch services for intermodal freight. The current line haul switch rate is dramatically higher than rates for comparable services charged by other short line railroads. This rate was adopted by the Individual Defendants and/or their predecessors in 2009, over the objection of the other NPBL board members.

35. The rates charged by the NPBL and other anticompetitive restrictions on CSXT's use of the NPBL have effectively foreclosed CSXT from moving containers to or from NIT on the NPBL. Meanwhile, NS is able to access NIT directly via its own rail connections.

36. The Defendants' actions as to NPBL are adversely affecting commerce in Hampton Roads and Virginia. The VPA has expressly requested that NPBL "facilitate dual [rail] access [by CSXT and NS] for handling containers at NIT,"

12

because NPBL's current failure to provide "proper access to NIT by CSX puts Virginia at a competitive disadvantage."  Indeed, the Defendants' activity is raising prices charged to shippers and, ultimately consumers, because NS has shut out the only other company who could compete to provide intermodal services.

37.    In part as a result of its excessive line haul switch rate, the NPBL's overall financial performance has been declining over the past several years and continues to deteriorate.  NPBL's revenue has essentially been flat or down over the past several years, including in 2017.  And, the bottom line revenue of NPBL is deceptive, however, because much of NPBL's revenue in recent years has been generated from the sale of real estate.  Rail car volume has been essentially flat for years, and decreased in 2017.  Current car volume on the NPBL as a whole is heavily dependent on a single customer (not at NIT) engaged in a single line of business. No new sources of substantial and recurring business have been added in recent years, nor do any appear to be planned.  No excess cash flow is being generated that could be used for capital expenditures for maintenance, upgrades, or expansion.

*The Individual Defendants' Repeated Failures to Act in the Best Interest of the NPBL and to Abide by the NPBL Operating Agreement*

38.    In advance of the April 18, 2018 NPBL Board and stockholders meetings, CSXT presented a Service Proposal that would have significantly and rapidly increased the NPBL's revenue and operating income by nearly doubling the

volume of cars that the NPBL moves annually. A copy of the Service Proposal is attached hereto as Exhibit E.

39. The Service Proposal, which included a proposed substantially lowered switch rate per car, as well as a guarantee of a minimum annual volume of CSXT moving 18,000 cars to or from NIT, would have generated annually approximately $1,440,000 in incremental revenue and potentially $660,000 in incremental operating income for the NPBL. The Service Proposal would have provided the NPBL with a consistent, long-term and substantial stream of much-needed additional income, and should have generated new revenue opportunities for the NPBL.

40. Rather than engage in any discussions to advance that proposal and secure those financial benefits, the Individual Defendants and NPBL Management erected baseless and pretextual barriers to the NPBL without even considering or responding substantively to, much less adopting, the Service Proposal. The Individual Defendants refused to even form an independent committee to evaluate it or allow a formal vote, and thus effectively rejected it. Notably, at the April 18, 2018 Board and shareholder meetings, the Individual Defendants parroted the same pretextual reasons for denying the request as offered by NS in its responses to CSXT's Service Proposal.

41.    Additionally, in response to CSXT's proposal, Defendant Moss revealed that they were considering entering into a new agreement, ostensibly between the NPBL and NS, that effectively would impose a substantial increase in charges paid to NS for NPBL's usage of its rights of access to NS's track, which would, in turn, reduce the profitability of intermodal service for NPBL while ultimately raising the rates charged to NPBL customers.  Regardless of what the appropriate charge should be, the timing of this interest by NBPL in finalizing a new deal between NS and NPBL is highly suspicious and consistent with Defendants' other ploys using the NPBL to keep CSXT from servicing the NIT.

42.    By rejecting the Service Proposal, Defendants' actions have prevented NPBL from providing switch services necessary for CSXT to move intermodal containers by rail to and from NIT, thereby depriving CSXT of an efficient means of serving NIT, which in turn has impaired CSXT's business interests and prevented it from using the NPBL's services to and from NIT, causing the attendant loss in revenue and income to NPBL.

43.    NPBL's lost income from not providing the proposed service to CSXT in turn impairs NPBL's ability to finance and make capital investments in its infrastructure necessary to preserve and grow the railroad's business and serve its shareholders in the manner required by the Operating Agreement, and effectively

15

blocks the NPBL from providing a second ("dual") means of access by rail to NIT (in addition to service by NS itself), as expressly requested by the VPA.

44.    Defendants' imposition of unreasonable and anticompetitive rates harms everyone (including NPBL, CSXT, freight shippers, and other competitors) except NS.  Notably, NS itself has been able to avoid having to pay the unreasonable and anti-competitive NPBL rates set by the Individual Defendants for intermodal rail service because NS owns and operates over the sole rail line that connects to NIT, the same line that NPBL operates over to access NIT.

45.    This is not the first time that the Individual Defendants have, in conspiracy with NS and the NPBL, misused NPBL as a tool to serve NS's own interests.

46.    As one example, in response to a CSXT service proposal in 2010, NPBL refused to accept CSXT's offer to provide CSXT locomotives and free fuel to move cars for NPBL over the NPBL routes under any terms or circumstances (including without charge to NPBL for use of the locomotives or fuel), while permitting locomotives owned by NS to do so and causing NPBL to lease or contract with NS for use of NS's locomotives without competitive bidding.

47.    In 2008, NPBL took the necessary actions to commence the sale of productive NPBL property in Norfolk and an attempted sale in Portsmouth, and the termination of NPBL's access rights over NS tracks used for the proper delivery of

16

services that NPBL is obligated to provide to its shareholders (including the consent to NS's removal of a "diamond" key to NPBL providing adequate, reasonable, efficient and predictable access to NIT). The sale of property in Norfolk had the potential to further constrain NPBL's connection to NIT. The sale of property in Portsmouth, had it been successful, would have effectively limited CSXT's access to its own intermodal yard in Portsmouth. The removal of the "diamond" has resulted in having to move NPBL trains into NS's Portlock yard, where further movement of those NPBL trains is controlled and constrained by NS and NS's own trains, and then reversing the NPBL trains out of that yard to move to or from NIT.

48. Through those same acts and practices, and others, the Individual Defendants and/or their predecessors have violated their fiduciary obligations to act in the best interests of the NPBL and, by conspiring with them to do so, NS has violated its contractual obligations to CSXT, including but not limited to its obligation to "encourage[e] the business of the [NPBL]."

*Relevant Markets*

49. The relevant geographic market is the intermodal port facilities of Hampton Roads, Virginia. The Hampton Roads metropolitan area has three ports through which freight travels, Portsmouth Marine Terminal ("PMT"), Virginia International Gateway ("VIG"), and NIT. But, with very limited exceptions, PMT has not handled intermodal freight since 2011 and is not expected to going forward.

17

Ports outside of the Hampton Roads metropolitan area face significant barriers to competing with the Hampton Roads' ports.  In particular, the distance between the port complexes on the East Coast effectively prevent such port complex from acting as viable potential competitors.  For example, the closest port complex to the south of Hampton Roads is Charleston, South Carolina, more than 430 miles away.  And the closest port complex to the north of Hampton Roads is Baltimore, Maryland, more than 230 miles away.  Shippers choose which port complex to use based on geographic considerations—where the freight is coming from and headed.

50.    Freight transportation by rail in and out of the Hampton Roads' ports constitutes a distinct service market under the antitrust laws.  Rail transportation is the only method that can achieve the level of throughput required for major shippers of freight.  Indeed, major customers refuse to contract with carriers who cannot provide rail transportation in and out of the Hampton Roads' ports.  Moreover, the market for freight transportation by rail in and out of the Hampton Roads ports is characterized by high barriers to entry.  Development of rail connections requires significant capital investment and engineering.  As such, there is no significant cross-elasticity of demand or reasonably interchangeable alternatives for freight transportation by rail in and out of the Hampton Roads' ports.

*Defendants' Anti-Competitive Actions to Achieve Dominance of Freight Transportation by Rail In and Out of the Hampton Roads' Ports*

51.    NS and the NPBL have used the NPBL as a chess piece to establish and maintain monopolistic control over intermodal transportation in and out of the Hampton Roads' ports.

52.    NS has monopoly power or a dangerous probability of achieving monopoly power in the relevant market described above.  NS is one of the nation's largest railroads, operating in 22 states.  In the relevant market, NS's market share exceeds 70%.  For the NIT, NS's market share is approximately 90%.  NS has the ability to control prices for intermodal transportation and exclude competition.  It benefits from a significant barrier to entry into the market for intermodal transportation in and out of Hampton Roads ports, namely the lack of accessible rail routes for competitors that are not owned by NS to the NIT.

53.    NS did not secure or maintain its monopoly power in Hampton Roads by virtue of its ingenuity or other salutary competitive behavior.  Rather, it has continually and deliberately engaged in a pattern of anticompetitive conduct that has eliminated or prevented competition.

54.    Among other anticompetitive acts, NS, in conspiracy with the Individual Defendants and NPBL, has caused the NPBL to reject, without any reasonable, meaningful and lawful consideration or negotiation, CSXT's Service Proposal, thereby effectively denying CSXT access to NIT by rail in competition with NS.

55.    When CSXT was forced to pay the NPBL's rates in 2015, due to closures of other ports around the country, NS directly, and through the NPBL, prioritized NS's shipping needs over those of CSXT.  NS failed to allow, in a reasonable and timely manner, the movement of cars delivered to NPBL by CSXT, sacrificing NPBL's own profits from the business CSXT would otherwise deliver.

56.    NS conspiring with NPBL, by and through the Individual Defendants, have discriminated against CSXT by refusing to allow NPBL to use CSXT's fully fueled locomotives to access NIT, requiring only NS-owned or supplied locomotives to be used by or on NPBL.

57.     NS conspiring with NPBL, by and through the Individual Defendants, have set (and maintained) NPBL's switch rates at levels designed to exclude competition in the relevant market, thereby dramatically raising CSXT's costs to serve intermodal rail customers, and diminishing the amounts of freight moved, and related revenues earned by NPBL.

58.    NS conspiring with NPBL, by and through the Individual Defendants, and/or their predecessors, mandated NPBL consent to the termination of its access rights to the track between NS Juncture and Carolina Juncture, *i.e.*, the "diamond" and connecting track (with NS then removing that track), and mandated NPBL cease and desist from requesting the reinstatement of the diamond, connecting track and related operating rights, all of which has severely impaired, and continues to severely

impair, NPBL's ability to efficiently and predictably provide CSXT with rail access to NIT.

59.    In response to CSXT's Service Proposal, NS and NPBL, by and through the Individual Defendants, threatened to enter into an agreement that would increase dramatically the charges that NPBL would pay for access to NS's track.  This would have further raised the rate charged to NPBL's customers.  This threat to increase rates was an attempt to pressure CSXT into abandoning its Service Proposal.

60.    NS and NPBL, by and through the Individual Defendants, have taken these and other actions with the intent and effect of denying CSXT and other competitors the ability to compete with NS to provide freight rail transportation in and out of the shipping ports in the Norfolk area.

61.    These acts are contrary to the independent profit-maximizing self-interest of NS and the NPBL, as they increased costs and reduced revenue for NPBL, of which NS is a majority owner.

62.    Rather than try to compete on the merits, Defendants, through this willful exclusionary conduct, have acted to acquire and wield power over price and to exclude competition, and thus to monopolize (and attempt to monopolize) intermodal transportation in and out of Hampton Roads' ports.

63.    Defendants' actions were within the flow of, and substantially affected, interstate and international commerce.  Defendants also used instrumentalities of

21

interstate or foreign commerce (or both).  And their activities have had a direct, substantial, and reasonably foreseeable effect on interstate and international commerce.

*Harm to CSXT and Competition*

64.    The result of Defendants' actions has been a loss in existing and prospective business for CSXT and, in turn, for the NPBL.  Defendants, conspiring together, have pushed CSXT out of the market for intermodal transportation though NIT.

65.    In addition, Defendants' actions have harmed competition for intermodal transportation in and out of Hampton Roads' ports, with customers paying substantially higher prices for that transportation via rail service provided by NS, than they would absent Defendants' anticompetitive conduct.

66.    Defendants' actions have also resulted in reduced choice among shippers for intermodal options from Hampton Roads' ports.

*The Individual Defendants' Refusal to Remedy Defects in the NPBL's Current Corporate Governance Structure*

67.    CSXT also proposed, both before and at the April 2018 NPBL Board and shareholders' meetings, several remedial actions to address defects in NPBL's current corporate governance structure.  A copy of the proposal is attached hereto as Exhibit F.

68.     Those remedial actions would have 1) allowed for equal representation of NPBL shareholders on NPBL's Board; 2) added independent directors to a Board that currently has none; 3) mitigated NS's improper influence over the NPBL Board and management, which NS has used to its sole advantage and to cause NPBL and the Individual Defendants, together with NS, to violate fiduciary, contractual and statutory duties; and 4) ultimately allowed the NPBL to operate as a "separate organization," as required by the NPBL Operating Agreement.

69.     Among other things, CSXT proposed that each shareholder designate only one individual for election as a director; that the shareholders elect four independent directors to the NPBL Board; and that the Board and shareholders implement a plan for an orderly transition to independent management.

70.     At the April 2018 meetings, CSXT's shareholder representative asked the NPBL Board to adopt CSXT's proposals, and made a motion that the shareholders proceed to elect only one director designated by each shareholder and elect four independent directors.

71.     Prior to the meetings, CSXT also identified and proposed to NS eight candidates for election as independent directors to fill the remaining four positions on the NPBL Board.

72.     The Individual Defendants rejected CSXT's governance proposal in its entirety, voted against CSXT's motion, refused to nominate (much less elect) any

independent directors, and instead insisted upon, and NS voted to approve, a slate that included four (interested) directors designated by NS (three current NS employees, Defendant Cannon Moss, and Donna Coleman (as a non-voting director)) and only two directors designated by CSXT.

73.    The Individual Defendants have not offered any legitimate and valid reasons for their refusal to take any steps to remedy the NPBL's corporate governance failures, despite the fact that their position is contrary to the NPBL Operating Agreement and Virginia law barring interested director transactions, Va. Code § 13.1-691, and means that NPBL can no longer effectively operate as a corporation where NS and CSXT are at loggerheads and recent proposals to benefit NPBL are rejected out of hand.

74.    Instead, the Individual Defendants have merely parroted NS's self-serving and invalid argument that the changes CSXT proposed are "unnecessary."

75.    NS has conspired with NPBL, through the NPBL Board, management, and operation of the railroad, to exclude CSXT from the market.

76.    The Individual Defendants, in combination with NS, have acted in violation of the law and in breach of their fiduciary, contractual, and statutory duties to NPBL.

## COUNT I
### (Violation of Sherman Act § 1, 15 U.S.C. § 1: Conspiracy to Restrain Trade Against Defendants NS and NPBL)

24

77.    CSXT incorporates and realleges the allegations of paragraphs 1 through 76 of this Complaint as if fully set forth herein.

78.    Defendants NS and NPBL agreed to and did participate in anticompetitive conduct that unreasonably restrained trade and commerce. Thus, Defendants engaged in combination and conspiracy and violated Section 1 of the Sherman Act, 15 U.S.C. § 1.

79.    NS conspired with NPBL and the Individual Defendants to take actions and implement policies that effectively foreclosed CSXT from utilizing the NPBL to compete in the provision of multi-modal services at NIT.

80.    This conspiracy has served to enhance and further solidify NS's monopoly power in the relevant market, which has had the effect of severely restricting supply and increasing the prices charged to customers for intermodal transportation.

81.    Defendants' anticompetitive conduct is a *per se* violation of Section 1 of the Sherman Act.

82.    Alternatively, even if Defendants' anticompetitive conduct is judged under the antitrust Rule of Reason, there is no legitimate business justification for Defendants' actions and the conduct through which they adopted and implemented their combination and conspiracy. Moreover, the anticompetitive effects of Defendants' conduct far outweigh any conceivable procompetitive benefits or

25

justifications. Even if such a justification existed, any possible procompetitive benefits could have been obtained by less restrictive alternatives.

83.    As a direct and proximate result of Defendants' combination and conspiracy, Defendants have unreasonably restrained trade and commerce. They have excluded actual and potential competition from the relevant market, and profited from their anticompetitive conduct by establishing and maintaining artificially high prices for intermodal transportation services provided to customers, and by otherwise reaping financial benefits from their combination and conspiracy.

84.    As a direct and proximate result of Defendants' combination and conspiracy, CSXT and consumers have been injured. The injury consists of paying artificially inflated prices for intermodal transportation—prices higher than consumers and CSXT would have paid absent Defendants' combination and conspiracy. Their injuries are what the antitrust laws were designed to prevent and flow directly from Defendants' conduct.

## COUNT II
### (Violation of Sherman Act § 2, 15 U.S.C. § 2: Conspiracy to Monopolize Against Defendants NS and NPBL)

85.    CSXT incorporates and realleges the allegations of paragraphs 1 through 84 of this Complaint as if fully set forth herein.

86.    Defendants NS and NBPL acted with a specific intent to combine or conspire to monopolize and to destroy competition in the relevant market.

26

Defendants devised and implemented a plan in furtherance of the conspiracy to systematically eliminate competition in the relevant market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

87.    NS conspired with NPBL and the Individual Defendants to willfully engaged in a course of exclusionary conduct in furtherance of the conspiracy to obtain a monopoly in the relevant market, including:

(a)    causing the NPBL to reject, without any reasonable, meaningful and lawful consideration or negotiation, CSXT's Service Proposal, thereby denying CSXT access to NIT by rail in competition with NS;

(b)    failing to allow the movement of, in a reasonable and timely manner, cars delivered to the NPBL by CSXT, sacrificing NPBL's own profits from the business CSXT would otherwise deliver;

(c)    discriminating against CSXT by refusing to allow NPBL to use CSXT's fully fueled locomotives to access NIT, while requiring NS-owned or supplied locomotives exclusively to be used by or on the NPBL;

(d)    setting the NPBL's switch rates at levels designed to exclude competition in the relevant market for comparable switch rates, thereby dramatically raising CSXT's costs to serve intermodal rail customers, and diminishing the amounts of freight moved, and related revenues earned by, NPBL;

27

(e)    causing NPBL to terminate its access rights to the track between NS Juncture and Carolina Juncture, i.e. the "diamond" track (with NS then removing that track), which has severely impaired NPBL's ability to efficiently and predictably provide CSXT and other competitors with rail access to NIT; and

(f)    threatening to enter into agreements with NPBL to increase dramatically the charges that NPBL would pay to NS for exercise of the NPBL's rights to access NS trackage, if NPBL provided the service to NIT proposed by CSXT.

88.    Defendants do not have a legitimate business purpose for any of their anticompetitive conduct in furtherance of the conspiracy.    Any claimed procompetitive benefit is pretextual in light of the obvious competitive circumstances and associated marketplace conduct inconsistent with any such benefit.  Defendants' conduct does not result in greater competition in the relevant market.   The only "benefit" that flows from Defendants' conduct is a reduction in competition, and that benefit inures only to NS's advantage, not to that of customers or competition in the relevant market.

89.    Defendants' anticompetitive acts in furtherance of the conspiracy to monopolize have injured competition in the relevant market, suppressed CSXT's provision of intermodal transportation, and the provision of intermodal

transportation of other rail carriers, diminished CSXT's future provision of intermodal transportation and the opportunities for provision of intermodal transportation of other competitors, and increased CSXT's operating costs and the operating costs of other competitors.

90.    Defendants' overall course of conduct has and will continue to, among other things, maintain rates designed to exclude competition in the relevant market, and otherwise deprive customers of their ability to make an unfettered choice of rail carriers on the merits.

## COUNT III
## (Violation of Sherman Act § 2, 15 U.S.C. § 2: Monopolization Against Defendant NS)

91.    CSXT incorporates and realleges all of the allegations of paragraphs 1 through 90 this Complaint as if fully set forth herein.

92.    Defendant NS's conduct constitutes the intentional maintenance of monopoly power in the relevant market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

93.    For the purpose of maintaining its monopoly power, NS committed numerous anticompetitive acts, including:

(a)    causing NPBL to reject, without any reasonable, meaningful and lawful consideration or negotiation, CSXT's Service Proposal, thereby denying CSXT access to NIT by rail in competition with NS;

29

(b)    failing to allow the movement of in a reasonable and timely manner, cars delivered to the NPBL by CSXT, sacrificing NPBL's own profits from the business CSXT would otherwise deliver;

(c)    discriminating against CSXT by refusing to allow NPBL to use CSXT's fully fueled locomotives to access the NIT, while requiring NS-owned or supplied locomotives exclusively to be used by or on the NPBL;

(d)    setting the NPBL's switch rate[s] at levels designed to exclude competition in the relevant market, thereby dramatically raising CSXT's costs to serve intermodal rail customers, and diminishing the amounts of freight moved, and related revenues earned by, NPBL;

(e)    causing NPBL to terminate its access rights to the track between NS Juncture and Carolina Juncture, i.e. the "diamond" track (with NS then removing that track), which has severely impaired NPBL's ability to efficiently and predictably provide CSXT and other competitors with rail access to NIT; and

(f)    threatening to enter into agreements with NPBL to increase dramatically the charges that NPBL would pay to NS for exercise of the NPBL's rights to access NS trackage, if NPBL provided the service to NIT proposed by CSXT.

30

94.    NS has excluded CSXT from the relevant market and has deprived consumers of the benefits of competition among rail carriers.

95.    NS does not have a legitimate business purpose for any of its anticompetitive conduct.  Any claimed procompetitive benefit is pretextual in light of the obvious competitive circumstances and associated marketplace conduct inconsistent with any such benefit. NS's conduct does not result in greater competition in the relevant market.  The only "benefit" that flows from NS's conduct is a reduction in competition, and that benefit inures only to NS's advantage, not to that of customers or competition in the relevant market.

96.    NS's monopolization has injured competition in the relevant market, suppressed CSXT's provision of intermodal transportation, and the provision of intermodal transportation of other rail carriers, diminished CSXT's future provision of intermodal transportation and the opportunities for provision of intermodal transportation of other competitors, and increased CSXT's operating costs and the operating costs of other competitors.

97.    NS's overall course of conduct has and will continue to, among other things, maintain rates designed to exclude competition in the relevant market, and otherwise deprive customers of their ability to make an unfettered choice of rail carriers on the merits.

## COUNT IV
### (Violation of Sherman Act § 2, 15 U.S.C. § 2: Attempted Monopolization Against Defendant NS)

98.    CSXT incorporates and realleges the allegations of paragraphs 1 through 97 of this Complaint as if fully set forth herein.

99.    Defendant NS acted with a specific intent to monopolize and to destroy competition in the relevant market.   NS devised and implemented a plan to systematically eliminate competition in the relevant market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

100.    NS willfully engaged in a course of exclusionary conduct to obtain a monopoly in the relevant market, including:

(a)    causing the NPBL to reject, without any reasonable, meaningful and lawful consideration or negotiation, CSXT's Service Proposal, thereby denying CSXT access to NIT by rail in competition with NS;

(b)    failing to allow the movement of, in a reasonable and timely manner, cars delivered to the NPBL by CSXT, sacrificing NPBL's own profits from the business CSXT would otherwise deliver;

(c)    discriminating against CSXT by refusing to allow NPBL to use CSXT's fully fueled locomotives to access the NIT, while causing NS-owned or supplied locomotives exclusively to be used by or on the NPBL;

32

(d)      setting the NPBL's switch rates at levels designed to exclude competition in the relevant market for comparable switch rates, thereby dramatically raising CSXT's costs to serve intermodal rail customers, and diminishing the amounts of freight moved, and related revenues earned by, NPBL;

(e)      mandating NPBL to terminate its access rights to the track between NS Juncture and Carolina Juncture, i.e. the "diamond" track (with NS then removing that track), which has severely impaired NPBL's ability to efficiently and predictably provide CSXT and other competitors with rail access to NIT; and

(f)      threatening to enter into agreements with NPBL to increase dramatically the charges that NPBL would pay to NS for exercising NPBL's rights to access NS trackage, if NPBL provided the service to NIT proposed by CSXT.

101.  NS does not have a legitimate business purpose for any of its anticompetitive conduct.  Any claimed procompetitive benefit is pretextual in light of the obvious competitive circumstances and associated marketplace conduct inconsistent with any such benefit.  NS's conduct does not result in greater competition in the relevant market.  The only "benefit" that flows from NS's

33

conduct is a reduction in competition, and that benefit inures only to NS's advantage, not to that of customers or competition in the relevant market.

102.   Throughout the time NS engaged in this exclusionary conduct, it had a dangerous probability of succeeding in gaining a monopoly in and controlling the relevant market and excluding its competitors.

103.   NS's attempts to destroy competition in the relevant market have injured competition in the relevant market, suppressed CSXT's provision of intermodal transportation, and the provision of intermodal transportation of other rail carriers, diminished CSXT's future provision of intermodal transportation and the opportunities for provision of intermodal transportation of other competitors, and increased CSXT's operating costs and the operating costs of other competitors.

104.   NS's overall course of conduct has and will continue to, among other things, maintain rates designed to exclude competition in the relevant market, and otherwise deprive customers of their ability to make an unfettered choice of rail carriers on the merits.

## COUNT V
### (Breach of Contract, against Defendant NS)

105.   CSXT incorporates and realleges the allegations of paragraphs 1 through 104 of this Complaint as if fully set forth herein.

106.   CSXT and Defendant NS are co-parties to the NPBL Operating Agreement, which establishes legally enforceable obligations owed by NS to CSXT.

34

These include, but are not limited to: 1) that shareholders shall maintain and operate NPBL as a "separate organization in which all are to be equally interested," 2) NS will "co-operate cordially in encouraging the business of the [NPBL] for which it is constructed," 3) NS shall "deliver to [NPBL] all cars to be interchanged with other [parties to the agreement]," 4) NS shall ensure its Directors "vote for such resolutions, by-laws or other proceedings as may be necessary to carry into effect" the NPBL Operating Agreement, and 5) the implied covenant of good faith and fair dealing.

107.   Defendant NS has breached these contractual obligations by, *inter alia*, effectively blocking CSXT's access to NS's trackage over which NPBL has rights, by refusing to consider proposals that would improve the revenues of NPBL, by failing to encourage the business of NPBL, and by inducing its employees and/or the Individual Defendants to vote for measures that are harmful to NPBL.

108.   NS's breaches have harmed CSXT, *inter alia*, by reducing the revenues of NPBL, of which CSXT is a shareholder, by causing CSXT to pay high rates when it has utilized the NPBL, and by causing CSXT to lose potential business due to its inability to economically access NIT by rail.

### COUNT VI (Derivative Claim)
### (Breach of Fiduciary Duties, against Individual Defendants Hall, Hurlbut, Merilli, and Moss)

35

109.   CSXT incorporates and realleges the allegations of paragraphs 1 through 108 of this Complaint as if fully set forth herein.

110.   CSXT, in its capacity as a shareholder in NPBL, brings this derivative action on behalf of NPBL and its shareholders, pursuant to Va. Code § 13.1-672.1, against the Individual Defendants for their breaches of fiduciary duties.  CSXT was a shareholder of NPBL at all times during the conduct complained of in this action, and it fairly and adequately represents the interests of NPBL in enforcing NPBL's rights.

111.   CSXT made a written demand to NPBL to take suitable action on June 22, 2018.  NBPL responded to CSXT on September 11, 2018, denying any illegal conduct and disagreeing that any action is warranted in response to CSXT's demand letter.

112.   The Individual Defendants have breached their fiduciary duties to NPBL, including their duties of good faith and loyalty and to act in an honest, fair and reasonable manner in the best interests of NPBL.  Instead of acting in the best interests of NPBL, they have acted predominately in the interests of NS at the expense of NPBL, by, for instance, denying CSXT's Service Proposal and proposal for reforms of NPBL's corporate governance structure, and by failing to appropriately manage NPBL, leading to its deteriorating financial condition.

36

113.   These breaches have damaged NPBL.  CSXT, on behalf of NPBL, specifically seeks injunctive relief as specified in the prayer for relief as to the Individual Defendants.

## COUNT VII
### (Tortious Interference with Business Expectancy, Against Defendants NS and NPBL)

114.   CSXT incorporates and realleges the allegations of paragraphs 1 through 113 of this Complaint as if fully set forth herein.

115.   As a shareholder of the NPBL, CSXT has reasonable business expectancies, including that the corporation will be managed and directed in a manner that is in accord with the Operating Agreement, allowing CSXT access to NPBL trackage in Hampton Roads.  CSXT reasonably expects economic benefit as a result of being a shareholder of NPBL, such as revenues from NPBL and its ability to access NPBL trackage and NPBL-served industries.  As the majority shareholder of NPBL, NS, and the Individual Defendants, respectively, have knowledge of CSXT's business expectancies.

116.   Defendants NS and NPBL have wrongfully employed improper methods in order to intentionally interfere with these expectancies, such as unfair competition, breach of fiduciary duty by the Individual Defendants, and using the NPBL as a means of self-dealing.

37

117.  Defendants' interference is without justification and privilege, and has caused CSXT damages, such as lost opportunities for contracts with shipping partners.  Additionally, because Defendants' conduct was intentionally undertaken with malice to harm CSXT and benefit themselves, CSXT is further entitled to punitive damages.

## COUNT VIII
### (Statutory Business Conspiracy, Va. Code § 18.2-499, Against Defendants NS and NPBL)

118.  CSXT incorporates and realleges the allegations of paragraphs 1 through 117 of this Complaint as if fully set forth herein

119.  In violation of Va. Code § 18.2-499, Defendant NS has conspired, by express agreement and tacit understanding, with Defendant NPBL, and with the Individual Defendants, in their capacity as directors and/or managers of NPBL, to intentionally, purposefully, and without lawful justification willfully and maliciously interfere with CSXT's reasonable business expectations, violate the individual Defendants' fiduciary duties to NPBL, and to breach NS's contract with CSXT.  Defendants acted without lawful justification.

120.  This conspiracy has harmed CSXT, *inter alia*, by reducing the revenues of NPBL, of which CSXT is a shareholder, and by causing CSXT to lose potential business with shipping companies, due to its inability to access NIT.

121.   In addition to compensatory damages, CSXT is entitled to treble damages, lost profits, punitive damages, attorneys' fees, and other relief pursuant to Va. Code § 18.2-500.

## COUNT IX
## (Civil Conspiracy, Against Defendants NS and NPBL)

122.   CSXT incorporates and realleges the allegations of paragraphs 1 through 121 of this Complaint as if fully set forth herein.

123.   Defendant NS has conspired, by express agreement and tacit understanding, with Defendant NPBL, and with the Individual Defendants, in their capacity as directors and/or managers of NPBL, to intentionally, purposefully, and without lawful justification willfully and maliciously interfere with CSXT's reasonable business expectations, violate the Individual Defendants' fiduciary duties to NPBL, and to breach NS's contract with CSXT.  Defendants acted without lawful justification.

124.   This conspiracy has harmed CSXT, *inter alia*, by reducing the revenues of NPBL, of which CSXT is a shareholder, and by causing CSXT to lose potential business with shipping companies, due to its inability to access NIT.

125.   In addition to compensatory damages, CSXT is entitled to punitive damages because the Defendants acted with malice.

## PRAYER FOR RELIEF

WHEREFORE, CSXT respectfully prays for the following:

1) That this Court render judgment in favor of CSXT, individually and on behalf of NPBL, and against Defendants;

2) That this Court award CSXT, individually and on behalf of NPBL, actual, consequential, and compensatory damages, and treble damages;

3) That this Court award CSXT punitive damages in amounts to be determined by the jury;

4) That this Court enter an injunction against Defendants from continuing to commit the above referenced violations of federal and state law;

5) That this Court enter an injunction against NS, NPBL, and the Individual Defendants, as appropriate, that restores CSXT's right as a co-equal shareholder and/or establishes an independent board structure as previously proposed by CSXT and that directs that NPBL approve CSXT's Service Proposal;

6) That this Court award CSXT its costs, attorneys' fees and litigation expenses; and

7) That this Court enter such other and further relief as it deems just and proper under the circumstances.

**CSXT requests trial by jury on all counts so triable.**

40

Dated:  October 4, 2018          Respectfully submitted,


                                 **CSX TRANSPORTATION, INC.**

                                 *By Counsel*


                                 _____/s/_____
                                 Robert W. McFarland (VSB No. 24021)
                                 Benjamin L. Hatch (VSB No. 70116)
                                 E. Rebecca Gantt (VSB No. 83180)
                                 MCGUIREWOODS LLP
                                 World Trade Center
                                 101 West Main Street, Suite 9000
                                 Norfolk, Virginia  23510-1655
                                 Telephone: (757) 640-3716
                                 Facsimile:  (757) 640-3930
                                 E-mail: rmcfarland@mcguirewoods.com
                                         bhatch@mcguirewoods.com
                                         rgantt@mcguirewoods.com

# EXHIBIT A



# Agreement

### BETWEEN

## NEW YORK, PHILADELPHIA & NORFOLK R. R. CO.,

## SEABOARD AND ROANOKE R. R. CO.,

## NORFOLK AND SOUTHERN R. R. CO.,

## NORFOLK AND WESTERN RY. CO.,

## ATLANTIC AND DANVILLE RY. CO.,

## SOUTHERN RY. CO.,

## NORFOLK AND CAROLINA R. R. CO.,

### AND

## CHESAPEAKE AND OHIO RY. CO.

### DATED JULY 7, 1897.

### IN RE: NORFOLK AND PORTSMOUTH BELT LINE R. R. CO.

AN AGREEMENT made and entered into on this Seventh day of July, A. D. 1897, by and between THE NEW YORK, PHILADELPHIA & NORFOLK RAILROAD COMPANY, THE SEABOARD & ROANOKE RAILROAD COMPANY, THE NORFOLK & SOUTHERN RAILROAD COMPANY, THE NORFOLK & WESTERN RAILWAY COMPANY, THE ATLANTIC & DANVILLE RAILWAY COMPANY, THE SOUTHERN RAILWAY COMPANY, THE NORFOLK & CAROLINA RAILROAD COMPANY, and THE CHESAPEAKE & OHIO RAILWAY COMPANY.

WHEREAS each of the Companies above named desires to secure the construction of a Belt Line Railroad from Pinner's Point, Virginia, to a connection with the Norfolk and Western Railway in Berkley, Virginia, for the mutual benefit of each in the interchange of business, and it is conceded to be for the best interest of all that the same should be constructed, maintained and operated under a separate organization in which all are to be equally interested and each to have an equal representation, and it has been decided to construct, maintain and operate the same under the charter of The Southeastern and Atlantic Railroad Company.

*Now, Therefore, This Agreement Witnesseth* That the several companies hereinbefore named, each in consideration of the mutual agreements hereinafter made, do hereby mutually agree that the said The Southeastern and Atlantic Railroad Company shall be organized and its business and affairs conducted and maintained on the following terms and conditions, to wit:

*First.*—That the Capital Stock of the said Southeastern and Atlantic Railroad Company shall be fixed at Fifty Thousand Dollars.

2

*Second.*—That each of the Companies above named, parties hereto, doth hereby agree to subscribe to one-eighth of the Capital Stock of said Company, and to pay for the same at such time or times and in such amount or amounts as the same may be called by the Board of Directors of said Company.

*Third.*—That if the said Capital Stock should at any time hereafter be increased, the same will be subscribed for and taken in equal proportions by such of the companies above named as may then hold stock in the said Southeastern and Atlantic Railroad Company.

*Fourth.*—That the number of Directors of the said Southeastern and Atlantic Railroad Company shall always be fixed to correspond to the number of Companies holding stock therein, so that each of said Companies shall have one representative on the Board, and that such representative shall in all cases be elected upon the nomination of the President or Vice-President of the Company holding such stock. In case of a vacancy the Board of Directors shall fill the same at their first subsequent meeting upon the nomination of the President or Vice-President of the Company in whose representation the vacancy occurred.

*Fifth.*—That there shall be a President, a Vice-President, a Secretary and Treasurer, which two last named offices may be filled by one person, and such other officers and agents as may be from time to time elected by the Board of Directors of the Southeastern and Atlantic Railroad Company.

*Sixth.*—That the affairs of the Company shall be under the management of the President and Directors, and that the By-Laws of the Company to be adopted by them shall provide for carrying into effect the provisions of this Agreement.

3

*Seventh.*—That the Southeastern and Atlantic Railroad
Company is to forthwith commence and is to complete as
soon as practicable a Belt Line Railway from the point
of connection of the New York, Philadelphia and Norfolk
Railroad Company's terminal tracks with the tracks of
the Norfolk and Carolina Railroad Company at Pinner's
Point, Virginia, to a connection with the track of the
Norfolk & Western Railway Company in Berkley, cross-
ing and connecting with the tracks of the Seaboard and
Roanoke Railroad Company, the Atlantic & Danville
Railway Company and the Norfolk & Southern Railroad
Company, and crossing the Southern branch of the Eliz-
abeth River by a suitable bridge.

*Eighth.*—That to provide for the construction of the
said Belt Line Railway, and for the future purposes of the
Company, the Southeastern and Atlantic Railroad Com-
pany is to make a mortgage to secure an issue of forty-
year five per cent Gold Bonds, limited in the aggregate
to Four Hundred Thousand Dollars, in denominations of
One Thousand Dollars each, and that the said Company
shall have the right to issue so many of such bonds as
may be necessary for the construction and equipment of
its railroad including right-of-way, roadbed, superstruc-
tures and bridges, not to exceed Two Hundred and Fifty
Thousand Dollars, as the same may be required, but the
remaining One Hundred and Fifty Thousand Dollars shall
be issued under the direction of the Board of Directors
only when necessary to provide in part the funds required
for the acquisition of property and for additional construc-
tion and equipment purposes, and then to the extent only
of seventy-five per cent of such expenditures, the remain-
ing twenty-five per cent to be provided by the issue of
additional Capital Stock, or otherwise as may be provided
by the Board of Directors.

*Ninth.*—That a uniform rate shall be fixed for the move-
ment of freight cars over the said Southeastern and At-

4

lantic Railroad Company's railroad, regardless of distance, and that the rate per loaded freight car shall be so adjusted from time to time as to yield a net revenue sufficient to pay the interest upon the bonds outstanding and a dividend of six per cent on the stock. In case arrangements shall hereafter be perfected for the handling of passenger traffic by the Belt Line the net revenues derived therefrom shall be divided equally among the lines, owners of the stock, as an extra dividend, quarterly semi-annually or annually, as the Directors may determine, it being understood that if the net revenue from the passenger business shall be sufficient to pay extra annual dividends of more than six per cent, then the Directors may reduce the rate per loaded freight car sufficiently to absorb such excess.

*Tenth.*—That the Companies hereinbefore named, parties to this agreement, will co-operate cordially in encouraging the business of the Southeastern and Atlantic Railroad Company, for which it is constructed, and that each of them will deliver to the said Company all cars to be interchanged with other Companies hereinbefore named, parties hereto, except where there are physical connections already existing.

*Eleventh.*—That each and all of the aforesaid Companies, parties hereto, are to make the rates of freight in full car load lots between points on the said Southeastern and Atlantic Railroad to points on or that can be reached by their respective lines, in both directions, no higher than those between Norfolk or Portsmouth and such points.

*Twelfth.*—That no one of the aforesaid Companies, parties hereto, will sell its stock in the Southeastern and Atlantic Railroad Company to any other person, persons, corporation or corporations, until it shall first have given to the other owners of the stock in said Company the

5

right to purchase the same in an amount *pro rata* to the amount held by each of them, and at a price not to exceed what may be offered by others, and that to accomplish this notice shall be given by any such stockholder which may desire to sell its interest, to the President and Directors of the Southeastern and Atlantic Railroad Company of its desire to sell, and that the stockholders in said Southeastern and Atlantic Railroad Company shall have at least thirty days from the delivery of such notice within which to purchase the same under the terms above set forth, and that the certificates of stock to be issued by the Southeastern and Atlantic Railroad Company shall provide that the same are not transferable except upon the conditions stated above.

*Thirteenth.*—That any and all vacancies that may occur in the Board of Directors shall be promptly filled, at once if nomination can be made and the Board be in session, and if not then at the succeeding meeting of the Board, such vacancies to be filled by the election of the nominee of the President or Vice-President of the Company whose representation may be vacant, and that such election shall take place when such nomination has been or may be made before any other business shall be transacted at the said meeting.

*Fourteenth.*—That none of the Companies, parties hereto, shall be in any way liable for any of the debts, obligations or liabilities of the said Southeastern and Atlantic Railroad Company beyond the amount of their subscriptions to its Capital Stock.

*Fifteenth.*—It is understood and agreed that the locomotives owned by the parties hereto are not to enter upon or use the tracks of the Southeastern and Atlantic Railroad Company for any purpose whatever, excepting under such rules and regulations as may be established by the Board of Directors of the Southeastern and At-

6

lantic Railroad Company by a vote of a majority of all the members of said Board, the intent being that the Southeastern and Atlantic Railroad Company shall perform the service for which it was built and said Company be directly responsible for the competent and efficient discharge of its every obligation to the parties hereto.

*Sixteenth.*—No other Railroad Company shall be admitted as a stockholder of the Southeastern and Atlantic Railroad Company excepting with the consent of a majority of all of the members of the Board of Directors.

*Seventeenth.*—That each of the Companies parties hereto, agrees that the Director named by each to represent it in the Board of the Southeastern and Atlantic Railroad Company shall and will vote for such resolutions, by-laws or other proceedings as may be necessary to carry into effect the agreements herein made.

USCA4 Appeal: 23-1537     Doc: 48        Filed: 12/06/2023     Pg: 101 of 438

7

*In Witness Whereof* the several Companies above named have each caused this agreement to be signed by its President, Vice-President or General Manager.

THE CHESAPEAKE & OHIO RWY. CO.
By
DECATUR AXTELL,
*2nd Vice-President.*

THE ATLANTIC & DANVILLE RY. CO.
By
CHAS. O. HAINES,
*Gen. Manager.*

THE NORFOLK & SOUTHERN R. R. CO.
By
W. B. DICKERMAN,
*President.*

THE NORFOLK & CAROLINA R. R. CO.
By
W. G. ELLIOTT,
*President.*

THE NEW YORK, PHILA. & NORFOLK R. R. CO.
By
A. J. CASSATT,
*President.*

THE NORFOLK & WESTERN RWY. CO.
By
HENRY FINK,
*President.*

SOUTHERN RAILWAY COMPANY,
By
A. B. ANDREWS,
*1st Vice-President.*

SEABOARD AND ROANOKE R. R. CO.
By
R. C. HOFFMAN,
*President.*

# EXHIBIT C

Dated: March 1, 1989

NORFOLK AND PORTSMOUTH BELT LINE
RAILROAD COMPANY

NPBL not made a party to this
Agreement - Copy of Supplemental
Agreement between Proprietary Companies
of the Belt Line) AS INFORMATION

AMONG

CSX TRANSPORTATION

and

NORFOLK AND WESTERN

and

SOUTHERN RAILWAY

Copy of Supplemental Agreement
between Proprietary Companies, relating
to the NPBL Operating Agreement No.
dated July 7, 1897, and No. 267 dated
February 1, 1924.



**NORFOLK SOUTHERN**

Norfolk Southern Corporation
Law Department
Three Commercial Place
Norfolk, Virginia 23510-2191
—

**Writer's Direct Dial Number**

(804) 629-2818

Norfolk, VA – April 5, 1989

Mr. J. M. Donnelly
Vice President, Secretary and Comptroller
Norfolk and Portsmouth Belt Line Railroad Company
P. O. Box 3669
Norfolk, VA 23514

Dear Mr. Donnelly:

Enclosed for your information is a copy of the
Supplemental Agreement dated March 1, 1989, among CSXT, Norfolk
and Western, and Southern Railway, relating to the NPBL
operating agreement dated July 7, 1897.  The parties have
agreed that, notwithstanding Article Fourth of the 1897
agreement, CSXT will continue to have the right to appoint two
representatives to the NPBL Board of Directors, and NW and
Southern will have the right to appoint a total of three
representatives.

Very truly yours,

J. Gary Lane
General Attorney

Enclosure

CC L. W. FISHER

Operating Subsidiaries:  Norfolk and Western Railway Company / Southern Railway Company / North American Van Lines, Inc.

## SUPPLEMENTAL AGREEMENT

THIS SUPPLEMENTAL AGREEMENT, dated as of March 1, 1989, is between CSX TRANSPORTATION, INC., a Virginia corporation ("CSX"), NORFOLK AND WESTERN RAILWAY COMPANY, a Virginia corporation ("NW"), and SOUTHERN RAILWAY COMPANY, a Virginia corporation ("SR").

### WITNESSETH:

WHEREAS, CSX owns 216 shares of the common stock of Norfolk and Portsmouth Belt Line Railroad Company, a Virginia corporation ("NPBL");

WHEREAS, NW and SR each owns 144 shares of the common stock of NPBL;

WHEREAS, CSX, on the one hand, and NW and SR, on the other hand (NW and SR together being hereinafter referred to as "NW/SR"), are successors in interest to railroad companies that were parties to an Agreement dated July 7, 1897 (the "NPBL Agreement"), relating to the ownership and operation of NPBL;

WHEREAS, Article Fourth of the NPBL Agreement provides that the number of directors of NPBL shall always be fixed to correspond to the number of companies owning stock in NPBL;

WHEREAS, as of the date hereof, two of the directors of NPBL are representatives of CSX and three of the directors are representatives of NW/SR, and the parties hereto desire to retain such representation on the board of directors of NPBL ("NPBL Board") notwithstanding the provisions of Article Fourth of the NPBL Agreement;

NOW, THEREFORE, the parties hereto agree as follows:

1.   Notwithstanding the first sentence of Article Fourth of the NPBL Agreement, CSX shall have the right to appoint two representatives to the NPBL Board, and NW/SR shall have the right to appoint three representatives to the NPBL Board.

2.   Nothing herein shall be deemed to amend, alter, or affect any other provision of the NPBL Agreement.

-2-

IN WITNESS WHEREOF, the parties have caused this Supplemental Agreement to be executed by their duly authorized officers.

CSX TRANSPORTATION, INC.

By: _____
                         ~~Vice President~~ Treasurer

NORFOLK AND WESTERN RAILWAY COMPANY

By: _____
                   Vice President

SOUTHERN RAILWAY COMPANY

By: _____
                   Vice President

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division



FILED

SEP - 9 2019

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

CSX TRANSPORTATION, INC.
*individually and on behalf of*
*Norfolk & Portsmouth Belt Line*
*Railroad Company,*

    **Plaintiff,**

**v.**              Civil No. 2:18cv530

Norfolk Southern Railway Company,
Norfolk & Portsmouth Belt Line
Railway Company,
Jerry Hall,
Thomas Hurlbut,
Philip Merrilli,
Cannon Moss,

    **Defendants.**

---

**OPINION AND ORDER**

  This matter is before the Court on the following four

Motions to Dismiss:

- (1) motion filed by Defendant Norfolk & Portsmouth Belt Line Railway Company ("Belt Line"), pursuant to Federal Rule of Civil Procedure 12(b)(6) and 49 U.S.C. § 10501(b), ECF No. 27;
- (2) motion filed by Defendant Cannon Moss ("Moss"), pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), ECF No. 29;
- (3) motion filed by Defendants Jerry Hall ("Hall"), Thomas Hurlbut ("Hurlbut"), Philip Merrilli ("Merrilli"),[1] pursuant to Federal Rule of Civil Procedure 12(b)(6) and 28 U.S.C. § 1367(c), ECF No. 31;

---

[1] Defendants Moss, Hall, Hurlbut, and Merrilli will be collectively referred to as "Individual Defendants."

1

- and (4) motion filed by Defendant Norfolk Southern Railway Company ("NS" or "Norfolk Southern") pursuant to Federal Rule of Civil Procedure 12(b)(6), ECF No. 34.[2]

For the reasons stated below, Defendants' Motions to Dismiss are **DENIED**, except with respect to Belt Line's motion to dismiss Count VII (tortious interference with a business expectancy) on the basis that Plaintiff has failed to state a claim, which is **GRANTED**.

## I. FACTUAL and PROCEDURAL HISTORY[3]

Plaintiff CSX Transportation, Inc. ("Plaintiff" or "CSX") is a railroad that operates in the eastern United States and Canada. Compl., ECF No. 1 ¶ 7. Norfolk Southern is also a railroad operating in the eastern United States and Canada. Id. ¶ 8. In 1896, eight railroads, including CSX and Norfolk Southern's predecessors in interest, joined together to form Belt Line. Id. ¶ 15. Belt Line is a terminal switching railroad that operates in the Hampton Roads area of Virginia. Id. ¶¶ 9, 15, 20. Belt Line's purpose was to connect the eight owner-railroads' tracks (and traffic carried by the railroads)

---

[2] Defendants Belt Line, Moss, Hall, Hurlbut, Merrilli, and Norfolk Southern will be collectively referred to as "Defendants."

[3] A motion to dismiss under Rule 12(b)(6) is generally limited to a review of the allegations in the complaint itself. Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 165–66 (4th Cir. 2016). However, courts may consider documents that are attached to the complaint as exhibits. Fed. R. Civ. P. 10(c). Thus, the facts recited here are drawn from the Complaint and attached exhibits. They are assumed true only to decide the motion to dismiss. The facts stated here are not factual findings for any purpose other than consideration of the pending motions. See Erickson v. Pardus, 551 U.S. 89, 94 (2007) ("[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint.").

to various marine terminals located along Belt Line's tracks. Id. ¶ 1, 15. In 1917, Belt Line established a connection from several owner-railroads' tracks to the Norfolk International Terminals ("NIT"). Id. ¶ 1. NIT is one of the largest marine terminal facilities in Virginia and one of the largest terminals on the East Coast. Id. ¶ 20.

To govern this arrangement, the owner-railroads signed the Belt Line Operating Agreement in 1897, which sets forth the ownership and operation of Belt Line and various duties and obligations of the shareholders. Id. ¶ 16, see also Ex. A. The Belt Line Operating Agreement provides that Belt Line would be a "separate organization in which all [railroads] are to be equally interested and each to have an equal representation." Compl. ¶ 17; Ex. A at 1. Specifically, the Operating Agreement provides that each shareholder "shall have one representative on the Board" of Belt Line. Compl. ¶ 17; Ex. A at 1-2. The Operating Agreement further provides that each shareholder must "co-operate cordially in encouraging the business of the [Belt Line] for which it is constructed." Compl. ¶ 18; Ex. A at 4. The Operating Agreement also states that Belt Line anticipates that its shareholders will deliver to Belt Line all railroad cars that the shareholders cannot serve directly. Compl. ¶ 18; Ex. A at 6 ¶ 10. CSX alleges the Operating Agreement provided CSX with an expectation that Belt Line will provide it with an

efficient means of interchanging its traffic, including, without limitation, to and from the NIT. Compl. ¶ 18; Ex. A at 6 (providing that Belt Line "shall perform the service for which it was built and said Company be directly responsible for the competent and efficient discharge of its every obligation to the parties hereto"). Finally, the Operating Agreement provides that the members of the Belt Line Board of Directors are obligated to vote for "such resolutions, by-laws or other proceedings as may be necessary to carry into effect the agreements made in" the Belt Line Operating Agreement. Compl. ¶ 19; Ex. A at 6.

As a result of mergers and acquisitions among the original eight railroads, by the end of the 20th century, only three Belt Line member-owners remained: CSX, Norfolk and Western Railway Company, and the Southern Railway Company. Compl. ¶¶ 2, 21. In a Supplemental Agreement dated March 1, 1989, the three remaining shareholders agreed to reapportion the board seats: CSX was afforded the right to appoint two representatives to the Belt Line Board of Directors, and the other two companies were afforded the right to appoint three representatives to the Belt Line Board collectively. Id. ¶¶ 2, 22; Ex. C ¶ 1. The Supplemental Agreement further provided that, other than the reapportionment, "[n]othing herein shall be deemed to amend,

4

JA105

alter, or affect any other provision of the [Belt Line] Agreement." Id. ¶ 22; Ex. C ¶ 2.

Subsequently, Norfolk and Western Railway Company and the Southern Railway Company merged to form Norfolk Southern. Id. ¶ 23. The new company owns 57% of Belt Line, and CSX owns 43%. Per the revised 1996 Belt Line By-Laws, NS is able to appoint four voting members to the Belt Line Board of Directors and CSX appoints two. Id. ¶ 23. CSX alleges that for at least the past ten years, NS has inserted former NS employees in all management positions of Belt Line and appointed current or former NS employees in four of the six Belt Line Board of Directors voting positions and one non-voting director position. Id. ¶ 2, 26. Individual Defendants Hall, Hurlbut, and Merilli are all current NS employees and three of the current voting members of the Belt Line Board of Directors appointed by NS. Id. ¶ 10, 26. Defendant Moss is the fourth voting member of the Belt Line Board appointed by NS, the President and General Manager of Belt Line since 2011, and is a former employee of NS. Id. ¶¶ 10, 27. Moss's predecessor, David Stinson, was also a former NS employee and returned to work at NS after his tenure as Belt Line President. Id. ¶ 27. Donna Coleman, the current non-voting member of the Board of Directors and Vice President of Belt Line, is also a former employee of NS. Id. ¶ 27. In addition,

5

JA106

Bill O'Brien, the current Terminal Superintendent of Belt Line, is also a former employee of NS.  Id.

CSX alleges that Norfolk Southern has abused its position as majority shareholder, colluding with the Individual Defendants and Belt Line to deny competitors access to NIT.  Id. ¶¶ 3, 20, 25.  Norfolk Southern is able to access NIT directly via Norfolk Southern's tracks.  Other railroads can only access NIT through Belt Line's tracks because these tracks connect Norfolk Southern's railroad tracks leading to NIT with the tracks of other railroads.  See Map, ECF No. 1-2.  CSX alleges that Norfolk Southern, through its control of Belt Line, has blocked access to NIT by others.  Id.  Defendants have allegedly done so by causing Belt Line to establish and maintain unreasonably high rates for its switch services for intermodal freight,[4] which are dramatically higher than rates charged by comparable railroads.  Id. ¶ 34.  The rate was set in 2009, over the objection of the Belt Line board members not appointed by NS.  Id. ¶ 34.

Defendants' actions are alleged to have adversely affected commerce in Hampton Roads and Virginia.  The Virginia Port Authority has allegedly indicated that NIT would benefit from multiple rail carriers being able to access NIT because it would

---

[4] Intermodal refers to the use of two modes of freight, such as ship and rail, to transport goods from shipper to consignee.  Compl. at 3 n.1.

6

allow more volume to be moved at competitive prices, and has requested that Belt Line "facilitate dual [rail] access [by CSX and NS] for handling containers at NIT," because Belt Line's current failure to provide "proper access to NIT by CSX puts Virginia at a competitive disadvantage." Id. ¶¶ 4, 36.

The only recent example of CSX actually utilizing Belt Line to access NIT occurred in 2015 when, due to closures of other ports around the country, NIT was inundated with excess containers. Because of customer demand, CSX was forced to pay the high rate charged by Belt Line. This was the only period where CSX could pay the high rates, and that was only because the other port closures caused all costs associated with ocean shipping to temporarily skyrocket. Under normal business conditions, Belt Line's rate and its operating procedures preclude competitor access to NIT. Id. ¶ 4.

Defendants have allegedly further rejected any proposal to address Belt Line's financial state or Norfolk Southern's control of Belt Line. In advance of the April 18, 2018 Belt Line Board and stockholders meetings, CSX presented a Service Proposal that would have significantly and rapidly increased Belt Line's revenue and operating income by nearly doubling the volume of cars that Belt Line moves annually. Id. ¶ 38. The proposal included a lower switch rate per car with a guarantee of a minimum annual volume, with CSX moving 18,000 cars to or

7

JA108

from NIT, and it would have purportedly generated approximately $1,440,000 annually in incremental revenue and potentially $660,000 annually in incremental operating income for Belt Line. Id. ¶ 39. CSX alleges Individual Defendants and Belt Line Management refused to form an independent committee to evaluate the proposal or allow a formal vote, and thus effectively rejected it. Id. ¶ 40. Additionally, in response to CSX's proposal, Moss revealed that Defendants were considering entering into a new agreement that effectively would impose a substantial increase in charges paid to NS for Belt Line's usage of its rights of access to NS's track, and which would, in turn, reduce the profitability of intermodal service for Belt Line, thus increasing costs to Belt Line's customers. Id. ¶ 41.

CSX has also allegedly proposed, both before and at the April 2018 Belt Line Board and shareholders' meetings, several remedial actions to address defects in Belt Line's current corporate governance structure. Id. ¶ 67. These proposals would have permitted each shareholder to designate only one individual for election as a director; permitted the shareholders to elect four independent directors to the Belt Line Board; and permitted the Board and shareholders to implement a plan for an orderly transition to independent management. Id. ¶ 68-69. CSX also identified and proposed to NS eight candidates for election as independent directors to fill the remaining four positions on

8

the Belt Line Board. Id. ¶ 71. CSX's shareholder representative made a motion for the Belt Line Board to adopt CSX's proposals. Id. ¶ 70. CSX alleges the Individual Defendants rejected CSX's governance proposal in its entirety, voted against CSX's motion, refused to nominate (much less elect) any independent directors, and instead elected four directors designated by NS (three current NS employees and Defendant Cannon Moss) and only two directors designated by CSX. Id. ¶ 72. Donna Coleman who is also alleged to have an interest in NS, was also elected as a non-voting director. Id.

As further evidence of this alleged collusion, CSX asserts that the management of Belt Line all have NS email addresses, which they use to conduct the business of the Belt Line, id. ¶ 28, and for at least 12 years, every president and vice president of Belt Line was a former NS employee. Id. ¶ 29. All of the Individual Defendants allegedly have interests in furthering Norfolk Southern's interests in their role as directors of Belt Line, with the expectation of future employment and remuneration from Norfolk Southern. Id. ¶ 30. In 2010, Belt Line refused to accept CSX's offer to provide its locomotives and fuel free of charge to Belt Line, while accepting a lease or contract to use NS's locomotives without competitive bidding. Id. ¶ 46. In 2008, Belt Line commenced the sale of property in Norfolk and attempted to sell property

9

JA110

in Portsmouth.   The sale of Norfolk property would have
constrained Belt Line's access to NIT and the sale of Portsmouth
property would have constrained CSX to its own intermodal yard
in Portsmouth.   Belt Line also gave up its access rights to the
track between NS Juncture and Carolina Juncture (the "diamond"
track).  Doing so has required Belt Line trains to be moved into
a trainyard controlled by NS.

CSX alleges this collusion by Belt Line management
represents a breach of the contractual duty owed by Belt Line to
CSX.  CSX also alleges that Individual Defendants are in breach
of their fiduciary duties to Belt Line.  Id. ¶ 3, 32, 37.  This
hurts Belt Line because Belt Line's operating revenue is derived
principally from switch operations, which is dependent upon the
switch services being provided to the shareholders' companies,
who in turn pay for those services.  Id. ¶ 33.  Although NIT has
been rapidly expanding and increasing its revenues in recent
years due to increased shipping, Belt Line's revenues have
tellingly remained flat or decreased.  Id. ¶¶ 3, 37.  Belt
Line's rail car volume has been essentially flat for years, and
decreased in 2017.  Current car volume on the Belt Line as a
whole is heavily dependent on a single customer (not at NIT)
engaged in a single line of business.  No new sources of
substantial and recurring business for Belt Line have been added
in recent years, nor do any appear to be planned.  Moreover, no

10

JA111

excess cash flow is being generated that could be used for capital expenditures for maintenance, upgrades, or expansion. Id. ¶ 37.

CSX filed the Complaint beginning this suit on October 4, 2018. ECF No. 1. CSX makes the following claims:

- Count I, conspiracy to restrain trade, in violation of 15 U.S.C. § 1, against Defendants Norfolk Southern and Belt Line;

- Count II, conspiracy to monopolize, in violation of 15 U.S.C. § 2, against Defendants Norfolk Southern and Belt Line;

- Count III, monopolization, in violation of 15 U.S.C. § 2, against Norfolk Southern;

- Count IV, attempted monopolization, in violation of 15 U.S.C. § 2, against Defendant Norfolk Southern;

- Count V, breach of contract, against Norfolk Southern;

- Count VI, a derivative claim in CSX's capacity as a shareholder in Belt Line, pursuant to Va. Code § 13.1-672.1, for breach of fiduciary duties, against Individual Defendants Hall, Hurlbut, Merilli, and Moss;

- Count VII, tortious interference with a business expectancy, against Norfolk Southern and Belt Line;

11

JA112

- Count VIII, statutory business conspiracy, in violation of Va. Code § 18.2-499, against Norfolk Southern and Belt Line;

- and Count IX, civil conspiracy, against Norfolk Southern and Belt Line.

On November 27, 2018, Defendants filed their respective motions to dismiss. Belt Line seeks to dismiss all counts against it (Counts I, II, VII, VIII, and IX). In its motion and accompanying memorandum, Belt Line argues that all such counts must be dismissed because: 1) CSX cannot force Belt Line to accept its proposed rate, 2) all counts are preempted by the jurisdiction of the Surface Transportation Board under 49 U.S.C. § 10501(b), or alternatively, 3) the case should be held in abeyance to permit the ongoing STB proceedings to conclude, 4) the federal claims against it (Counts I and II) must be dismissed because a parent and majority-owned subsidiary cannot conspire with each other, 5) the state law claims—Counts VII, VIII, IX—are time barred, and 6) because CSX fails to state a claim.

In its own individual motion and accompanying memorandum, Norfolk Southern also argues that: 1) the state law claims are time barred, 2) the breach of contract claim (Count V) fails because CSX fails to identify a covenant in the Operating Agreement that NS has breached, 3) CSX fails to state a claim

12

JA113

for tortious interference because NS is a party to the Operating Agreement and the economic loss rule bars a tortious interference claim. NS's motion does not seek to dismiss Counts I-IV, the federal claims.

In their separate motion and accompanying memorandum, Defendants Hall, Hurlbut, and Merilli argue that CSX fails to state a claim for breach of fiduciary duty, and the Court should decline to exercise supplemental jurisdiction. In his seperate motion and accompanying memorandum, Defendant Moss argues that: 1) the Court lacks subject matter jurisdiction over Count VI, as the breach of fiduciary duty does not arise from the same case or controversy as CSX's federal claims, 2) even if the Court has jurisdiction, it should decline to exercise supplemental jurisdiction, and 3) CSX fails to state a claim for breach of fiduciary duty.

Plaintiff filed a response to each of the motions, ECF Nos. 39-42, and Defendants filed their respective replies, ECF Nos. 44-47. Having been fully briefed, the motions to dismiss are ripe for review. The Court has reviewed the parties' submissions and concludes that a hearing is not necessary. Local Civil Rule 7(J); Fed. R. Civ. P. 78.

13

JA114

## II. STANDARD OF REVIEW

### A. Rule 12(b)(1)

Belt Line and Defendant Moss challenge the jurisdiction of the Court over various counts. These arguments are properly considered under Fed. R. Civ. P. 12(b)(1).

A motion to dismiss for lack of subject matter jurisdiction, pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, may attack a complaint on its face, insofar as the complaint fails to allege facts upon which the court can base jurisdiction, or it may attack the truth of any underlying jurisdictional allegations contained in the complaint. Beck v. McDonald, 848 F.3d 262, 270 (4th Cir. 2017); Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982). In the former situation, known as a facial challenge, the court is required to accept all of the complaint's factual allegations as true, "and the plaintiff, in effect, is afforded the same procedural protection as he would receive under a 12(b)(6) consideration." Adams, 697 F.2d at 1219.

In the latter situation, involving a challenge to the truth of the jurisdictional allegations, also known as a factual challenge, "the district court may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings." Velasco v. Gov't of Indonesia, 370 F.3d 392, 398 (4th Cir. 2004) (citing Adams, 697 F.2d at 1219). In explaining

14

JA115

how district courts should evaluate evidence presented in a factual challenge, the United States Court of Appeals for the Fourth Circuit has indicated that it depends on whether the jurisdictional facts are intertwined with the merits facts. Kerns v. United States, 585 F.3d 187, 196 (4th Cir. 2009). When jurisdictional facts are not intertwined with the merits, the trial court may weigh evidence and resolve factual disputes to determine its jurisdiction. See Arbaugh v. Y&H Corp., 546 U.S. 500, 514 (2006); Adams, 697 F.2d at 1219. In such a case, the plaintiff bears the burden of proving jurisdiction by a preponderance of the evidence and may present "affidavit[s], depositions or live testimony" to meet its burden. Adams, 697 F.2d at 1219; accord United States ex rel. Vuyyuru v. Jadhav, 555 F.3d 337, 437-48 (4th Cir. 2009). When jurisdictional and merits facts are intertwined, "[i]t is the better view that . . . the entire factual dispute is appropriately resolved only by a proceeding on the merits." Adams, 697 F.2d at 1219; accord Kerns, 585 F.3d at 193, 196.

## B. Rule 12(b)(6)

Defendants all seek to dismiss the various counts pursuant to Fed. R. Civ. P. 12(b)(6). The well-established Rule 12(b)(6) standard of review permits dismissal when a complaint fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A complaint fails to state a claim if it does not

15

JA116

allege "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). Although a complaint need not be detailed, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." Id. at 555; see Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

A motion to dismiss tests the sufficiency of a complaint without resolving factual disputes, and a district court "'must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff.'" Kensington Volunteer Fire Dep't v. Montgomery Cty., 684 F.3d 462, 467 (4th Cir. 2012) (citation omitted). Although the truth of the facts alleged is presumed, district courts are not bound by the "legal conclusions drawn from the facts" and "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." E. Shore Mkts., Inc. v. Assocs. Ltd. P'ship, 213 F.3d 175, 180 (4th Cir. 2000); see Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 555). To survive a motion to dismiss under Rule 12(b)(6), "a complaint must include 'more than an unadorned, the-defendant-unlawfully-

harmed-me accusation.'" Johnson v. Am. Towers, LLC, 781 F.3d 693, 709 (4th Cir. 2015) (quoting Iqbal, 556 U.S. at 678).

A motion to dismiss pursuant to Rule 12(b)(6) must be read in conjunction with Federal Rule of Civil Procedure 8(a)(2). Rule 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), so as to ". . . give the defendant fair notice of what the . . . claim is and the grounds upon which it rests. . . ." Twombly, 550 U.S. at 555 (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). Fair notice is provided by setting forth enough facts for the complaint to be "plausible on its face" and "raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact). . . ." Id. at 555 (internal citations omitted).

And as discussed *supra* n.3, pursuant to Rule 12(d), if matters outside the pleadings are submitted in conjunction with or in opposition to a 12(b)(6) motion, the court generally must either exclude such materials from consideration or convert the motion into a motion for summary judgment. Fed. R. Civ. P. 12(d). However, a court may consider matters outside the pleadings expressly relied on in a complaint. See Lorenzo v. Rumsfeld, 456 F. Supp. 2d 731, 734 (E.D. Va. 2006) (citing Phillips v. LCI Int'l, Inc., 190 F.3d 609, 618 (4th Cir. 1999))

17

(finding that at the 12(b)(6) stage, "a court can consider documents outside of the pleadings, without converting the motion to one for summary judgment, so long as the documents are integral to and explicitly relied on in the complaint."); Davis v. George Mason Univ., 395 F. Supp. 2d 331, 335 (E.D. Va. 2005) (quoting Gasner v. County Dinwiddie, 162 F.R.D. 280, 282 (E.D. Va. 1995)) ("In the Eastern District of Virginia, 'when a plaintiff fails to introduce a pertinent document as part of his complaint, the defendant may attach the document to a motion to dismiss the complaint and the Court may consider the same without converting the motion to one for summary judgment.'").

Where a party has made both a Rule 12(b)(1) motion and a Rule 12(b)(6) motion, a court should address the 12(b)(1) issue first.  5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1350 (3d ed. 2004).  If the court concludes there is no subject matter jurisdiction, it is appropriate to avoid a decision on the Rule 12(b)(6) motion because finding the absence of subject matter jurisdiction results in dismissal of the complaint, thereby mooting the remaining defenses and other arguments about the validity of the claims alleged.  Id.

.

18

JA119

## III. DISCUSSION

Belt Line is the only party that seeks to dismiss the federal claims. The Court begins by addressing Belt Line's four arguments that the federal claims should be dismissed.

### A. All Claims – Belt Line

Belt Line makes two arguments that all claims against it should be dismissed: first, that the claims against it are preempted by proceedings before the Surface Transportation Board ("STB") and second, Belt Line appears to make an argument that CSX has failed to state any claim because Belt Line has not committed a wrongful act.

#### 1. Preemption

First, Belt Line argues that the Court does not have subject matter jurisdiction over any of the counts against it because they are expressly preempted by the Interstate Commerce Commission Termination Act of 1995 ("ICCTA"). The ICCTA created the STB.

> The STB is an economic regulatory agency that Congress charged with the fundamental missions of resolving railroad rate and service disputes and reviewing proposed railroad mergers. The STB is decisionally independent, although it is administratively affiliated with the Department of Transportation.

Overview of the STB, Surface Transportation Board, https://www.stb.gov/stb/about/overview.html. The ICCTA, in

19

JA120

particular 49 U.S.C. § 10501(b), grants exclusive jurisdiction

to the STB over:

> (1) transportation by rail carriers, and the remedies
> provided in this part with respect to rates,
> classifications, rules (including car service,
> interchange, and other operating rules), practices,
> routes, services, and facilities of such carriers; and
>
> (2) the construction, acquisition, operation,
> abandonment, or discontinuance of spur, industrial,
> team, switching, or side tracks, or facilities, even
> if the tracks are located, or intended to be located,
> entirely in one State,

49 U.S.C. § 10501(b). As alleged in the Complaint, Belt Line

and Norfolk Southern have negotiated an increase in the charges

Belt Line would pay to Norfolk Southern to access Norfolk

Southern's tracks that lead to the NIT. Compl. ¶ 41. The Court

notes that on July 25, 2019, Belt Line notified the Court that

the STB decided to hold its related proceeding in abeyance

pending resolution of this federal court proceeding including

any appeals. ECF No. 61. Norfolk Southern has petitioned the

STB for reconsideration. ECF No. 63.

    In any event, Belt Line's jurisdictional argument is

meritless. The U.S. Court of Appeals for the Fourth Circuit has

found that the express preemption clause under 49 U.S.C. §

10501(b) preempts <u>regulation</u> of the railroad industry with

respect to rates, locations, and the operation of railroad

tracks <u>by state and local governments</u>. <u>PCS Phosphate Co. v.</u>

<u>Norfolk S. Corp.</u>, 559 F.3d 212, 218-19 (4th Cir. 2009). The STB

also interprets this provision to preempt state and local actions that impact the regulation of railroads. See Green Mountain R.R. Corp. v. Vermont, 404 F.3d 638, 642 (2d Cir. 2005); Adrian & Blissfield Ry. Co. v. Vill. of Blissfield, 550 F.3d 533, 540 (6th Cir. 2008) (citing CSX Transp., Inc.—Petition for Declaratory Order, 2005 WL 1024490, at *2 (S.T.B. May 3, 2005) (the two "broad categories" of actions preempted by § 10501(b) are "state and local actions . . . denying a railroad the ability to conduct some part of its operations or to proceed with activities that the Board has authorized . . . [and any] state or local regulation of matters directly regulated by the Board—such as the construction, operation, and abandonment of rail lines; railroad mergers, line acquisitions, and other forms of consolidation; and railroad rates and service.")). Belt Line has not cited any case that supports the proposition that the ICCTA preempts other federal statutes like the antitrust claims before the Court.

Even assuming the ICCTA could preempt other federal statutes, with respect to both the federal and state law claims that are pled against Belt Line, courts have recognized that "Congress narrowly tailored the ICCTA preemption provision to displace only 'regulation,' i.e., those state laws that may reasonably be said to have the effect of 'managing' or 'governing' rail transportation, while permitting the continued

21

application of laws having a more remote or incidental effect on rail transportation." Fla. E. Coast Ry. Co. v. City of W. Palm Beach, 266 F.3d 1324, 1331 (11th Cir. 2001) (quoting Black's Law Dictionary 1286 (6th ed. 1990)) (emphasis added). The Fourth Circuit has found that "voluntary agreements" entered into by private railroad companies "are not presumptively regulatory acts," and are generally not preempted by the statute. PCS Phosphate, 559 F.3d at 218-19 ("If contracts were by definition 'regulation,' then enforcement of every contract with 'rail transportation' as its subject would be preempted as a state law remedy 'with respect to regulation of rail transportation.'"). Thus, when considering a preemption argument involving the STB, courts begin with a presumption that the acts are non-regulatory if they result from a private agreement like a contract, but courts must also look at whether the "allegations, if pursued, would directly interfere with the STB's exclusive jurisdiction" over the regulation of railroads. PCS Phosphate Co. v. Norfolk S. Corp., 520 F. Supp. 2d 705, 717 (E.D.N.C. 2007), aff'd, 559 F.3d 212 (4th Cir. 2009) (phosphate mining company brought claim against defendant railroad for misleading, unfair, and coercive threats to abandon a railroad line which plaintiff's business depended on; STB proceedings also adjudicated whether defendant railroad could abandon the railroad line, and thus, preempted the claim).

Here, the owner-shareholder companies, including Plaintiff and Norfolk Southern, formed Belt Line through contract. This is the type of "voluntary agreement" among parties that the Fourth Circuit has explained is not a "presumptively regulatory act." PCS Phosphate, 559 F.3d at 218-19. Moreover, Belt Line has not overcome the presumption, that a voluntary agreement is not regulatory, by demonstrating that the various federal and state law claims would affect the STB's exclusive jurisdiction over the regulation of railroads. The question before the STB is whether to approve the increased rate that Norfolk Southern will charge Belt Line for use of NS's tracks in the future. The question before this Court is whether Belt Line and Norfolk Southern engaged in illegal conduct up to this point in time that violated, for instance, federal antitrust laws or constituted a state law business conspiracy or breach of contract (in particular, by setting the Uniform Rate charged to access NIT too high in order to deter competition). If CSX were to prevail in this Court on the federal antitrust claims or state law business conspiracy claims in this suit, this Court may award damages for CSX's previous losses or injunctive relief to prevent Norfolk Southern and Belt Line from continuing to carry out such an antitrust or business conspiracy. In particular, the injunctive relief would prevent "Defendants from continuing to commit the above referenced violations of federal

23

JA124

and state law," restore CSX's shareholder rights, establish an independent board structure, and/or require approval of CSX's service proposal. Compl., Prayer for Relief. That is, any injunctive relief may prevent Defendants from continuing to engage in the conspiracy or make changes to Belt Line's governance. However, the STB's jurisdiction would not be affected; that is, the STB may still approve or disapprove the pending rate increase that Norfolk Southern would charge Belt Line in the future.

In contrast, in the earliest PCS Phosphate case, the district court found, *inter alia*, that the plaintiff's claim brought under North Carolina's unfair and deceptive trade practices law, which was based in tort, sought treble damages for defendants' threats to abandon a railroad line. PCS Phosphate, 520 F. Supp. 2d at 717. If the court addressed the question of whether defendants had to continue operation of a railroad track, the court would have to adjudicate an issue that was within the exclusive jurisdiction of the STB—namely, the abandonment of railroad lines (and resultant damages). Therefore, the tort claim "managed" or "governed" the regulation of railroads, and the Court held that the ICCTA preempted state tort law on this issue. Id. ("These allegations, if pursued, would directly interfere with the STB's exclusive jurisdiction over the abandonment of railroad tracks. Accordingly,

24

plaintiff's UDTPA claim is preempted."). The court in <u>PCS</u> <u>Phosphate</u> also found that the plaintiff's claims for breach of contract, breach of an easement, and unjust enrichment did not intrude on the STB's jurisdiction because they related to prior conduct and agreements formed by the parties. <u>PCS Phosphate</u>, 520 F. Supp. 2d at 716 ("[T]he court holds that section 10501(b) does not preempt plaintiff's breach of contract and breach of easement covenants claims. These claims concern the performance of obligations under contracts voluntarily negotiated by the parties' predecessors in interest and do not have the effect of preventing or unreasonably interfering with railroad operations."). Here, for those same reasons, the various federal and state law claims do not intrude on the issue before the STB, which is compensation paid by Belt Line to Norfolk Southern to use Norfolk Southern's tracks.

For the reasons stated above, the Court finds that the claims against STB are not preempted by the ICCTA, and there is no compelling reason to stay this action.

## 2. The Proposal

Second, Belt Line argues that all the counts against it must be dismissed because Belt Line has not committed any wrongful act. Specifically, Belt Line notes that it cannot accept CSX's proposal to allow CSX to access NIT at a lower rate than Belt Line's Uniform Rate without violating its own

25

Operating Agreement, and Belt Line charged CSX the Uniform Rate to access NIT.[5]

At the outset, the Court notes that, to the extent that Belt Line is making a merits argument, such an issue is inappropriate to resolve on a 12(b)(6) motion. Gellman v. State of Md., 538 F.2d 603, 606 (4th Cir. 1976). Moreover, it is not clear what claims Belt Line asks this Court to dismiss as a result of its purported inability to accept CSX's rate proposal. To the extent that Belt Line argues that CSX has failed to state a claim against Belt Line for antitrust conspiracy, tortious interference, and conspiracy under state law, these arguments will be addressed in depth below as Belt Line makes more specific 12(b)(6) arguments. However, the Court briefly notes at this juncture that Belt Line apparently misunderstands CSX's proposal regarding the rate as alleged in the Complaint. Belt Line's Operating Agreement does state that Belt Line must provide a uniform rate for all shareholders. ECF No. 1-1 at 3-4 ¶ 9. However, neither the Complaint nor the rate proposal attached to the Complaint, which CSX proposed in 2018, states that CSX is seeking a lower preferential rate, below the Uniform Rate, for only itself. The service proposal states that "[p]resently, the Belt Line's switch rate of $210 per car is an

---

[5] As further discussed below, the Individual Defendants make a similar unavailing argument in seeking to dismiss the shareholder derivative claims alleged against them.

economic barrier that prevents CSXT from being able to move any meaningful port freight by rail at NIT. . . . Accordingly, CSXT proposes the following, all to be memorialized in a formal agreement: One-way rate of $37.50 per container (empty or loaded) for a term of three years on movements handled by the Belt Line between Berkley Yard and NIT." ECF No. 1-5. The service proposal does not state that the rate would be lowered for only CSX. The lowered rate is not limited to CSX, at least as alleged in the Complaint and the rate proposal, but rather applies to any traffic by any company on Belt Line's tracks between "Berkley Yard and NIT." Compl. ¶ 39; ECF No. 1-5. Therefore, the proposal is within the power of Belt Line and its directors to accept, and does not appear to violate the Operating Agreement. It appears that CSX is not alleging it should have been given a preferential rate, but that it is alleging the Uniform Rate is set too high in order to benefit Norfolk Southern's interests at the expense of Belt Line's own interests and CSX's interests. Compl. ¶ 41. Although ultimately a merits question, courts have found that rejecting proposals which are in a company's own interest and within the company's power to accept may be evidence of, for instance, an antitrust conspiracy. See, e.g., SourceOne Dental, Inc. v. Patterson Companies, Inc., 310 F. Supp. 3d 346, 357 (E.D.N.Y. 2018) (in denying summary judgment, the court found that

27

"evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators" is evidence of "a common motive to conspire"). As CSX is not arguing that Belt Line unlawfully failed to give CSX a preferential rate, but that Belt Line's rejection of the proposed reduced uniform rate is evidence of wrongdoing, Belt Line's argument, that the claims should be dismissed because CSX is seeking a preferential rate, misses the mark and seeks to dismiss a claim that was never asserted.

For the general reasons stated above, the Court finds that CSX has adequately alleged some form of wrongdoing by Belt Line that can support a claim. The Court further addresses below Belt Line's 12(b)(6) arguments specific to each claim.

### B. Federal Antitrust Claims - Belt Line

Next, the Court addresses Belt Line's two remaining arguments specific to Counts I-IV, the federal antitrust claims.

### 1. Parent-Subsidiary

Belt Line argues that Plaintiff has failed to state an antitrust claim because Norfolk Southern is the parent company of Belt Line, and cannot conspire with a subsidiary. Thus, Belt Line argues the antitrust conspiracy counts fail.

The Supreme Court has held that a corporation and its wholly owned subsidiary, as well as a corporation and an unincorporated division, must be viewed as a single entity for

28

JA129

purposes of § 1 of the Sherman Act, and therefore cannot conspire with each other. <u>Copperweld Corp. v. Independence Tube Corp.</u>, 467 U.S. 752, 770-71 (1984). The Court reasoned that, unlike concerted conduct among otherwise independent entities, which presents substantial anticompetitive risk and is therefore closely scrutinized by the Sherman Act, the internally coordinated conduct of a parent and its subsidiary presents no such risk because that conduct is basically assumed by one actor pursuing the economic interests of a single firm. <u>Id.</u> ("[T]here can be little doubt that the operations of a corporate enterprise organized into divisions must be judged as the conduct of a single actor. . . . A division within a corporate structure pursues the common interests of the whole rather than interests separate from those of the corporation itself."). That is, "[a] § 1 agreement may be found when the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement. But in reality a parent and a wholly owned subsidiary always have a unity of purpose or a common design. They share a common purpose whether or not the parent keeps a tight rein over the subsidiary; the parent may assert full control at any moment if the subsidiary fails to act in the parent's best interests." <u>Id.</u> at 771 (internal citations and quotations omitted).

*Copperweld*'s bright-line rule is limited to antitrust conspiracies between a parent corporation and a wholly-owned subsidiary. However, even if the subsidiary is not wholly owned, courts have found that some related corporations, such as parents and majority-owned subsidiaries or "sister" subsidiaries of a common parent, have a sufficient unity of interest that they are incapable of conspiring for purposes of § 1 of the Sherman Act. *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1135 (3d Cir. 1995) (applying *Copperweld* and finding a "unity of interest" between corporation and its subcontractor hired to carry out "day-to-day" functions); *City of Mt. Pleasant v. Associated Elec. Coop., Inc.*, 838 F.2d 268, 276-77 (8th Cir. 1988); *Hood v. Tenneco Texas Life Ins. Co.*, 739 F.2d 1012, 1015 (5th Cir. 1984); *see also Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 706 (4th Cir. 1991) ("We recognize that a medical staff can be comprised of physicians with independent and at times competing economic interests. As a result, when these actors join together to take action among themselves, they are unlike a single entity and therefore they have the capacity to conspire as a matter of law.").

A sufficient unity of interest to prevent the formation of an antitrust conspiracy may be found when the parent owns a substantial majority of the subsidiary's stock. *See, e.g., Rohlfing v. Manor Care, Inc.*, 172 F.R.D. 330, 344 (N.D. Ill.

30

JA131

1997) (in finding unity of interest between sister subsidiaries
where a parent company owned 100% of one subsidiary and 82.3% of
another, court stated that "[s]uch a unity of interest is very
likely to be found when the parent owns a substantial majority
the subsidiary's stock."). In determining whether parent and
majority-owned subsidiaries can conspire for antitrust purposes,
courts also look at whether the parent and subsidiary are
inextricably intertwined in the same corporate mission, are
bound by the same interests which are affected by the same
occurrences, and exist to accomplish essentially the same
objectives. For example, a parent that does not wholly own a
subsidiary but nevertheless asserts total dominion over its
actions, by way of management control, contractual obligations,
economic incentives, or otherwise, is probably incapable of
conspiring with that subsidiary for purposes of § 1 of the
Sherman Act. Williams v. I.B. Fischer Nevada, 999 F.2d 445, 447
(9th Cir. 1993) (affirming summary judgment decision that held a
franchisor and franchisee were a "common enterprise" incapable
of conspiring to restrain trade); Siegel, 54 F.3d at 1135
(affirming summary judgment and finding unity of interest where
one corporation was an "inseparable part" of the other's
management).

Here, it is alleged that Norfolk Southern is the majority
shareholder of Belt Line. However, it is also alleged that

31

Norfolk Southern only owns 57% of Belt Line, which is below what other courts have found necessary to find "a substantial majority." Compl. ¶ 23; see, e.g., Siegel Transfer, Inc. v. Carrier Exp., Inc., 54 F.3d 1125, 1133 (3d Cir. 1995) ("Although Bethlehem Steel did not own .08% of the Railroad's stock, the difference between its 99.92% ownership and the 100% ownership in Copperweld is de minimus."). Moreover, while it is alleged that Norfolk Southern has managed to insert current or former NS employees in Belt Line management positions, id. ¶ 38, it cannot be said that Norfolk Southern exerts total dominion, as CSX still retains the right to appoint two of the directors. Id. ¶¶ 2, 23, 26; see, e.g., Freeman v. San Diego Ass'n of Realtors, 322 F.3d 1133, 1146 (9th Cir. 2003), as amended on denial of reh'g (Apr. 24, 2003) (finding that competitor associations that separately appointed directors to a corporation were not part of a common enterprise).

Another important reason that the Court cannot grant the motion to dismiss, on the grounds that a parent and majority-owned subsidiary cannot conspire for antitrust purposes, is that the Plaintiff alleges that Norfolk Southern and Belt Line's interests diverge. Compl. ¶¶ 3, 24, 25, 32, 48, 112. Because Norfolk Southern allegedly conspired with Belt Line to maintain an inflated switch service rate in order to exclude competitor railways, and because Norfolk Southern is able to access NIT

32

through its own tracks, Norfolk Southern benefits by retaining a monopoly allowing it to handle all of the freight from NIT. Even if other railroads paid the inflated switch service rate to Belt Line in order to access NIT, Norfolk Southern still benefits because Belt Line, in turn, pays Norfolk Southern an inflated price for access to Norfolk Southern's tracks to NIT. Id. ¶¶ 34, 41. However, this hurts Belt Line's interests because Belt Line is charged higher fees by Norfolk Southern, which are passed on to its customers, and other railroads are less likely to use Belt Line's tracks, reducing Belt Line's volume. If a competitor railway were to use Belt Line's services to access NIT, Norfolk Southern still profits from the inflated switch rate that Belt Line must pay to use NS's tracks. Therefore, Norfolk Southern's interest in maintaining a higher switch service rate, so that it can allegedly retain a virtual monopoly, diverges from Belt Line's interest in encouraging the business of Belt Line for which it was formed. Operating Agreement, ECF No. 1-1 ¶ 15 (Belt Line was formed to "ensure competition for transportation services" among the railroads.).

For the reasons stated above, Belt Line's argument that the Complaint alleges it is a common enterprise with Norfolk

Southern, and therefore cannot conspire for the purposes of antitrust law, fails.[6]

## 2. Antitrust Injury

Finally, the Court addresses Belt Line's argument that CSX has failed to allege an antitrust injury because CSX is not alleged to have been denied access to the <u>entire</u> relevant market (the Port of Hampton Roads), only NIT, one of several marine terminals that form the market.

In order to state a claim under either § 1 or § 2 of the Sherman Act, a plaintiff must allege an "antitrust injury," that is, a "business loss of the sort the antitrust laws were designed to prevent." <u>Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.</u>, 910 F.2d 139, 149 (4th Cir. 1990); <u>SD3, LLC v. Black & Decker (U.S.) Inc.</u>, 801 F.3d 412, 432 (4th Cir. 2015), <u>as amended on reh'g in part</u> (Oct. 29, 2015) (finding that an antitrust injury is loss resulting from anticompetitive effects of the defendant's behavior on the plaintiff and the market). This Court has found that an antitrust injury is not limited to those situations where a competitor is completely shut out of an entire market, but may include "reduction of output, increase in price, or deterioration in quality." <u>E.I.</u>

---

[6] The Court notes that most of these cases were decided on summary judgment as the determination of whether a parent corporation shares "a unity of interest" with a subsidiary is a factual determination. Therefore, the Court will not prematurely reach such issue at the motion to dismiss stage of the litigation.

DuPont de Nemours & Co. v. Kolon Indus., Inc., 688 F. Supp. 2d
443, 460 (E.D. Va. 2009) (denying motion to dismiss where the
plaintiff had alleged partial exclusion from market).

Here, CSX has alleged an antitrust injury. Although the
injury is limited to only NIT, one of several port terminals
that form the Port of Hampton Roads, CSX has alleged that,
because the rate charged by Belt Line to potential customers
like CSX to access Norfolk Southern's tracks to NIT is
artificially high, this has resulted in reduced output. CSX
also alleges that the Virginia Port Authority has stated that
the Port would benefit from multiple rail carriers being able to
access NIT because it would allow more volume to be moved, i.e.
output has been reduced by the alleged anticompetitive activity.
Further, the artificially and anticompetitive high prices are
alleged to be passed on to customers, and such alleged increase
in price is another form of antitrust injury. Id.

For the reasons stated above, the Court finds that CSX has
alleged an antitrust injury.

### C. State Tort and Contract Claims – Defendants

#### 1. Statute of Limitations

The Court now turns to Defendants' various arguments
regarding CSX's state tort and contract law claims (i.e. Count V
for breach of contract, Count VII for tortious interference with
business expectancy, Count VIII for statutory business

35

JA136

conspiracy, and Count IX for civil conspiracy).  As with the
federal claims, the Court must begin with challenges to its
jurisdiction; Norfolk Southern and Belt Line both argue that the
state law claims are time barred, thus depriving this Court of
jurisdiction.

Count V for breach of contract, Count VII for tortious
interference with business expectancy, Count VIII for statutory
business conspiracy, and Count IX for civil conspiracy, are all
subject to a five-year limitations period.  Va. Code § 8.01-
246(2) (setting forth statute of limitations for breach of a
written contract); Dunlap v. Cottman Transmission Sys., LLC, 287
Va. 207, 220-222 (Va. 2014) (holding that the five-year
limitations period under Va. Code § 8.01-243(B) applies to
claims for tortious interference with business expectancy);
Detrick v. Panalpina, Inc., 108 F.3d 529, 543 (4th Cir. 1997)
(applying five-year limitations period under Va. Code § 8.01-
243(B) to statutory business conspiracy claims); Hurst v. State
Farm Mut. Auto. Inc. Co., No. 7:05-cv-776, 2007 U.S. Dist. LEXIS
21172, *17 (W.D. Va. March 23, 2007) (holding that limitations
period for civil conspiracy is based on limitations period for
underlying wrongful act).  Defendants argue that the claims
accrued in 2009, when Belt Line set the alleged artificially
high Uniform Rate, and subsequent acts are continuations of the
first wrongful act.  Plaintiff argues that each subsequent event

36

constitutes a new wrongful act giving rise to each cause of action anew.

Under Virginia law, the applicable statute of limitations accrues separately for each wrongful act. L-3 Commc'ns Corp. v. Serco, Inc., No. 1:15-CV-701, 2018 WL 1352093, at *5 (E.D. Va. Mar. 15, 2018) (applying Virginia law and finding "any act to interfere with the expectancy in each Task Order constituted an independent tort" with a new statute of limitations). The Virginia Supreme Court has distinguished between wrongful acts and damages from a single and continuous wrongful act. Hampton Roads Sanitation Dist. v. McDonnell, 234 Va. 235, 239 (Va. 1987) ("If the wrongful act is of a permanent nature and one that produces all the damages which can ever result from it, [then] the entire damages must be recovered in one action and the statute of limitations begins to run from the date of the wrongful act. Conversely, when wrongful acts are not continuous but occur only at intervals, each occurrence inflicts a new injury and gives rise to a new and separate cause of action."); accord Union Labor Life Ins. Co. v. Sheet Metal Workers Nat'l Health Plan, No. 90-2728, 1991 WL 212232, at *5 (D.D.C. Sept. 30, 1991) (Virginia statute of limitations accrued anew where "wrongful acts or breaches of duty" occurred "in distinct intervals or installments, as opposed to being continuous.").

37

Defendants Belt Line and Norfolk Southern singularly focus on the establishment of the Uniform Rate in 2008, and argue that any damages flow from that singular alleged breach of contract, tortious interference, or conspiracy, and thus, actions grounded upon these violations are barred by the statute of limitations. However, that focus is misplaced. Here, Plaintiff has alleged multiple wrongful acts that may constitute a breach of contract, tortious interference with a business expectation, and/or common law or statutory conspiracy within the five-year statute of limitations. In particular, it is alleged that in 2018, CSX presented a proposal to Defendants at the Belt Line Board and Stockholders meeting, and the Defendants declined to evaluate or vote upon such proposal. The Complaint alleges that this constituted a new wrongful act, and the statute of limitations began accruing upon the wrongful act. New damages flow from this wrongful act — the Plaintiff's expectation damages, which is what Plaintiff's profits would have been if Defendants had accepted the proposal minus what Plaintiff's profits actually were. These damages are distinct from the Defendants' alleged 2008 wrongful act. The damages for the 2008 wrongful act of setting the Uniform Rate would be the difference in CSX's profit if the parties had set the Uniform Rate at a fair market rate in 2008 minus CSX's actual profit. The damages from establishing the 2008 Uniform Rate do not encompass the damages sought for

38

other alleged wrongful acts in this action.  Thus, this is not a
case where a singular wrongful act results in continuing
damages.  See Kancor Americas, Inc. v. ATC Ingredients, Inc.,
No. 15-CV00589-GBL-IDD, 2016 WL 740061, at *6 (E.D. Va. Feb. 25,
2016) (denying summary judgment because the various breach of
contract, unjust enrichment, and conversion claims were not time
barred as defendant's failure to pay back the money was a
separate act each time defendant failed to pay, giving rise to a
new cause of action, as opposed to a single act where the
damages are permanent and continue accruing even if the
defendant does not continue to act wrongfully).

While it is easy to see how these new actions constitute a
new act of breaching the contract or tortiously interfering, it
may be more difficult to see how it is a new act of conspiring
because the alleged conspirators are the same and the alleged
motivations are the same.  However, the Complaint alleges that
in 2018, Defendants entered into a new agreement to increase the
amount Belt Line pays to NS to access NS's tracks to NIT.  (In
fact, this is the subject of proceedings before the STB).
Defendants Norfolk Southern and Belt Line fail to address this
allegation, which reflects a new alleged conspiracy.  Any
increase in the price that Norfolk Southern charges Belt Line
would, in turn, be passed onto Belt Line's customers.  That is,
it would lead to an increase in the Uniform Rate.  The Court

39

JA140

concludes that Plaintiff has alleged a new conspiracy within the statute of limitations period; this second attempt to raise the Uniform Rate is not a continuation of the same conspiracy to set the Uniform Rate at the 2008 level because the price is again increased. See Forest Lakes Cmty. Ass'n, Inc. v. United Land Corp. of Am., 293 Va. 113, 124 (Va. 2017) (in finding that multiple trespasses occurred, each of which was subject to the statute of limitations independently, the Supreme Court of Virginia cautioned courts to distinguish between recurring and indefinite injuries and repeated actions because the latter gives rise to causes of action that "look "remarkably like an earlier one but is nonetheless a standalone claim in its own right" and the statute of limitations in the latter scenario accrues from the new date of injury).

For the reasons stated above, the Court finds that Plaintiff has alleged wrongful acts within the statute of limitations period. Therefore, as the claims are not untimely, the Court does not lack jurisdiction.

### 2. Breach of Contract

The Court now turns to Defendants' various arguments about the state law claims. The Court begins with the breach of contract claim. Count V, the breach of contract claim, is only alleged against Norfolk Southern. Norfolk Southern argues that

40

JA141

CSX fails to state a claim because it has not identified a covenant in the Operating Agreement that NS has breached.

The contract in question is the Operating Agreement of Belt Line, which states that Belt Line would operate "for the mutual benefit of each [shareholder] in the interchange of business." ECF No. 1-1 at 1. Norfolk Southern attempts to argue that this language is merely a preamble, and not a binding term. Plaintiff has alleged that this term is the very overarching purpose of the Belt Line agreement. The Court does not need to determine whether this language constitutes a binding term of the contract at the motion to dismiss stage. Plaintiff's allegation is sufficient to overcome the motion to dismiss, as the language is either unambiguous and therefore a discernible contract term justifying denial of the motion to dismiss, or it is ambiguous such that the motion to dismiss should be denied as discovery would be necessary to determine the intention of the parties regarding this clause. See, e.g., Grubb & Ellis Co. v. Corkhill, No. 1:09-CV-974, 2009 WL 10689439, at *1 (E.D. Va. Oct. 15, 2009) (denying motion to dismiss because "[i]n this case the Court finds that the language of the contract is not unambiguous as the parties clearly interpret various provisions of the contract differently. Further, the Court believes that parol evidence may be necessary to determine the intent behind the terms of the contract.").

41

Further, Plaintiff notes that other articles of the Agreement contain covenants Norfolk Southern is alleged to have breached, as they state that the parties to the agreement "will co-operate cordially in encouraging the business of the [Belt Line] for which it is constructed." ECF No. 1-1 at 4. Contrary to Norfolk Southern's assertions, this clause is not indefinite. Under Virginia law, cooperation clauses are generally enforceable. See, e.g., Felman Prod., Inc. v. Indus. Risk Insurers, No. CIV.A. 3:09-0481, 2011 WL 4543966, at *4 (S.D.W. Va. Sept. 29, 2011) (finding that cooperation clause in insurance contract was enforceable). Here, Norfolk Southern has stated no reason why this clause would be any different.

For the reasons stated above, the motion to dismiss the breach of contract claim, on the basis that CSX has failed to identify a covenant in the Operating Agreement that Norfolk Southern has breached, is denied.

### 3. Tortious Interference with a Business Expectancy

Norfolk Southern next argues that CSX fails to state a claim for tortious interference with a business expectancy (Count VII) because Norfolk Southern is a party to the Operating Agreement and a party may breach, but cannot interfere with, its own contract. Further, Norfolk Southern argues that the economic loss rule bars a tortious interference claim. For its part, Belt Line argues that CSX's alleged business expectancy is

42

JA143

a general interest shared by all stockholders and a claim of interference with such a business expectation can be brought only as a derivative claim. Next, Belt Line argues that CSX has failed to state a valid business expectancy.

In Virginia, a party may recover for tortious interference with a business expectancy if it shows: "'(1) the existence of a business relationship or expectancy, with a probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship or expectancy; (3) a reasonable certainty that absent defendant's intentional misconduct, plaintiff would have continued in the relationship or realized the expectancy; and (4) damages to the plaintiff.'" Am. Chiropractic Ass'n v. Trigon Healthcare, Inc., 367 F.3d 212, 228 (4th Cir. 2004) (quoting Commercial Bus. Sys., Inc. v. Halifax Corp., 253 Va. 292, 484 S.E.2d 892, 896 (Va. 1997)).

Both Belt Line's first argument, that there can be no tortious interference with a business expectancy because any business expectancy is a general expectation shared by all Belt Line stockholders, and Norfolk Southern's first argument, that it cannot interfere with a contract to which it is a party, suffer from similar defects. The business expectation in question is not the savings to its shareholders that would result from Norfolk Southern charging a fair rate to Belt Line to access the tracks to NIT, and Belt Line then setting a lower

43

Uniform Rate.  CSX also is not alleging tortious interference with the Operating Agreement.  Rather CSX argues that Norfolk Southern and Belt Line have interfered with CSX's business expectancy from third party customers who would have paid CSX to transport goods from NIT.  That is not a general expectation shared by all Belt Line stockholders but one that is specific to CSX, and Norfolk Southern is not a party to any such anticipated business.

Norfolk Southern's second argument is that the economic loss rule bars any recovery by CSX for tortious interference with a business expectancy.  Under Virginia law, the economic loss rule provides that where a person is a party to a contract with another and has suffered purely economic losses related to the contract, rather than, for instance, physical injuries, that person may not recover damages in tort.  See Blake Construction Co. V. Alley, 353 S.E.2d 724, 727 (Va. 1987).  This is because "a plaintiff who suffers purely economic loss must sue in contract and cannot sue in tort."  Fix v. Eakin/Youngentob Assocs., Inc., 57 Va. Cir. 149, at *1 (Alexandria City, Va. Cir. 2001).  That is, the parties' recourse is through the agreement that they have signed rather than tort claims.  Here, CSX and NS have entered into a contract: the Operating Agreement of Belt Line.  Having only suffered economic damages, the economic loss rule prevents CSX from bringing a claim for tortious

44

interference, or any other tort, where any damage results from a breach of the Operating Agreement. However, "[t]he economic loss rule does not bar recovery [for] plaintiffs' claim for tortious interference with a prospective business or economic advantage." Fix, 57 Va. Cir. at 149. These damages are not related to the contract; therefore, CSX may still bring a tort claim although it has only suffered economic loss. For these reasons, Norfolk Southern's motion to dismiss Count VII-tortious interference with a business expectancy-fails.

However, Belt Line's second argument, that CSX has failed to state a sufficient business expectancy to survive a motion to dismiss, has greater merit. Courts have held that the mere possibility of a future business relationship is not enough to satisfy the tort's first and third elements—1) probability of future economic benefit to the plaintiff, and 3) but for the defendant's misconduct, the plaintiff would have realized the expectancy. Instead, a plaintiff must demonstrate that a future economic benefit is objectively probable. Am. Chiropractic, 367 F.3d at 228 (citing Commercial Bus. Sys., 484 S.E.2d at 897). In Peterbilt of Bristol, Inc. v. Mac Trailers, Mfg., the Western District of Virginia found that a local truck dealer failed to state a valid claim for tortious interference with a business expectancy because the complaint alleged merely that an out-of-state dealer illegally sold a truck to one of plaintiff's

45

existing customers, but failed to allege that the economic benefit was objectively probable by demonstrating that but for the interference, the customer would have purchased the truck from the plaintiff truck dealer. No. 1:09CV00058, 2009 WL 4063663, at *1 (W.D. Va. Nov. 23, 2009). Here, the business expectancy is even more tenuous than the one in Peterbilt.

CSX has failed to name or identify an actual third party with whom CSX would engage in business. CSX alleges that it has lost "opportunities for contracts with shipping partners." Compl. ¶ 117. The Complaint then relies on the Virginia Port Authority's assessment that having an additional railroad with access to NIT "would allow more volume to be moved at competitive prices," and the fact that CSX is the only other railroad that can "provide intermodal services" at NIT. Id. ¶¶ 4, 36. These allegations are insufficient to meet the objective probability standard set forth in Peterbilt. In Peterbilt, the third party also had a preexisting business relationship. Similarly, CSX has alleged a business relationship with its shipping partners (although they are unidentified). 2009 WL 4063663, at *1. However, the plaintiff in Peterbilt did not sufficiently allege that the plaintiff would have realized the economic benefit. That is, the plaintiff did not allege that, but for the out-of-state competitor's wrongdoing, the customer would have purchased the truck from plaintiff. Id. Similarly,

46

JA147

CSX has not alleged that it would realize the economic benefit by demonstrating, for instance, that its shipping partners also use NIT and would engage CSX if CSX were able to access NIT. Therefore, the Court finds that Plaintiff has failed to allege a plausible claim that it has suffered tortious interference with a business expectancy.

Although CSX does not request leave to amend any defective claims, after a dismissal under Fed. R. Civ. P. 12(b)(6), a court "normally will give plaintiff leave to file an amended complaint" because "[t]he federal rule policy of deciding cases on the basis of the substantive rights involved rather than on technicalities requires that plaintiff be given every opportunity to cure a formal defect in his pleading." Ostrzenski v. Seigel, 177 F.3d 245, 252-53 (4th Cir. 1999) (emphasis omitted). A court may grant such leave *sua sponte*. Edwards v. Murphy-Brown, L.L.C., 802 F. Supp. 2d 670, 673 (E.D. Va. 2011). However, "a district court may deny leave to amend if the amendment 'would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would have been futile.'" U.S. ex rel. Nathan v. Takeda Pharm. N. Am., Inc., 707 F.3d 451, 461 (4th Cir. 2013) (quoting Laber v. Harvey, 438 F.3d 404, 426 (4th Cir. 2006)).

47

Here, there has been no showing of prejudice, bad faith, or futility that would result from allowing Plaintiff to amend. Thus, Plaintiff is granted leave to amend the Complaint.

### 4. Statutory and Common Law Conspiracy

Next, Belt Line argues that Counts VIII and IX, alleging statutory and common law conspiracy, should be dismissed because Belt Line cannot conspire with Norfolk Southern as there can be no conspiracy between a parent and its majority-owned subsidiary. Alternatively, Belt Line argues the conspiracy is not plausible.

Belt Line's first argument rehashes the same argument it made with respect to the federal antitrust conspiracy claims, except it attempts to apply the argument to the state law conspiracy claims. As explained below, the Court rejects the argument for the same reasons discussed above in the antitrust conspiracy section. Compare Havird Oil Co. v. Marathon Oil Co., 149 F.3d 283, 292 (4th Cir. 1998) (finding that a parent and a non-wholly owned subsidiary could not be considered the same entity and therefore, could be liable under South Carolina state conspiracy law) with Zimpel v. LVI Energy Recovery Corp., 23 Va. Cir. 423 (Fairfax Cnty., Va Cir. 1991) (finding that because subsidiary was wholly owned it could not conspire with its parent for the purposes of a Virginia state law conspiracy).

48

Like its Copperweld antitrust argument that a parent and subsidiary cannot conspire for antitrust purposes, Belt Line argues that the Virginia intracorporate immunity doctrine does not permit a single entity to conspire for the purposes of common law business or statutory conspiracy. The Virginia intracorporate immunity doctrine recognizes that conspiracy requires two or more persons, and therefore, a single entity, like a corporation, cannot conspire with itself. To determine whether two parties are "a single entity," Virginia courts have looked to the U.S. Supreme Court decision in Copperweld. Zimpel v. LVI Energy Recovery Corp., 23 Va. Cir. 423 (Fairfax Cnty., Va. Cir. 1991) ("The Virginia Civil Conspiracy statute has [like in Copperweld] been construed to disallow consideration of a parent and its wholly owned subsidiary as separate 'persons.'").

Here, Belt Line cannot satisfy the brightline rule established in Copperweld because it is not a wholly-owned subsidiary of Norfolk Southern, and CSX alleges that Belt Line and Norfolk Southern have divergent interests. Further, as with federal law, under Virginia law, whether two parties are a single entity is a question of fact, and it would be inappropriate to resolve that issue definitively at this stage. Peterson v. Fairfax Hosp., No. 11188., 1993 WL 946248, at *10 (Loudoun Cnty., Va. Cir. Sept. 23, 1993) ("The Court has already overruled the Demurrer of the Defendants predicated on the

49

JA150

theory of intracorporate immunity. Such a defense to the conspiracy Count is best raised at a trial on the merits or by way of a motion for summary judgment.").

Belt Line next argues, with respect to the merits of the statutory and common law conspiracy counts, that CSX has failed to adequately allege such claims because CSX has not alleged Belt Line engaged in any unlawful acts. As with the antitrust conspiracy claims, Belt Line argues that it committed no wrongful act, and therefore all claims against it must be dismissed. As discussed above, *supra* at 25-27, CSX has already alleged plausible wrongful acts, for instance, the failure by Belt Line to adopt or even consider CSX's rate proposal. This is enough to allege a breach by Belt Line of its fiduciary duty to shareholders. Compl. ¶¶ 109-113, 114-117; see specifically id. ¶ 116 ("Defendants NS and [Belt Line] have wrongfully employed improper methods in order to intentionally interfere with these expectancies, such as unfair competition, breach of fiduciary duty by the Individual Defendants, and using Belt Line as a means of self-dealing."). Under Virginia law, a breach of fiduciary duty is an unlawful act on which a conspiracy claim can rest. Feddeman & Co., C.P.A., P.C. v. Langan Assocs., P.C., 260 Va. 35, 46 (Va. 2000). Therefore, Plaintiff has alleged at least one wrongful act—breach of fiduciary duty upon which common law and statutory conspiracy claims may rest. Therefore,

Plaintiff has adequately alleged common law and statutory conspiracy claims.

For the reasons stated above, Belt Line's motion to dismiss the state law conspiracy counts fails.

### D. Derivative Claims

#### 1. Jurisdiction

Finally, the Court addresses the Individual Defendants' challenges to Count VI-the shareholder derivative claim. The Court begins with Moss's jurisdiction challenge. Moss argues that Count VI should be dismissed for lack of subject matter jurisdiction because it does not arise out of the same case or controversy as the various federal antitrust, state law breach of contract, tortious interference and conspiracy claims against NS and Belt Line, and therefore provides no independent or related basis for jurisdiction.

The applicable statute provides that federal "courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they *form part of the same case or controversy* under Article III of the United States Constitution." 28 U.S.C. § 1367. For the claims to form part of the same case or controversy, the claims must "arise from the same set of facts." Eriline Co. S.A. v. Johnson, 440 F.3d 648, 653 (4th Cir. 2006). Here, the shareholder derivative claims are based on the

51

allegations that the Belt Line directors breached their various fiduciary duties by engaging in the federal antitrust, state breach of contract, and tort conspiracies, with the corporate Defendants.  Moss argues that to prove a federal antitrust claim will require CSX to introduce expert testimony from economists, while the derivative claim will require expert testimony regarding the standard of care required from Virginia corporate board members and factual evidence regarding any violation of that standard.

"To determine whether state law claims and federal law claims arise from a common nucleus of operative fact, district courts consider whether the claims are based on 'the same facts, or involve similar occurrences, witnesses or evidence.'" Maria v. Projekt Prop. Restoration, Inc., No. 18-CV-61279, 2019 WL 1116187, at *2 (S.D. Fla. Jan. 23, 2019) (quoting Hudson v. Delta Airlines, Inc., 90 F.3d 451, 455 (11th Cir. 1996)). Although it is true that some elements of the various claims will require different evidence in this case, the factual evidence required to demonstrate that Belt Line and Norfolk Southern committed antitrust and state law business conspiracies, and that Moss breached his fiduciary duties, are essentially the same.  To prove these claims, CSX will have to demonstrate that Moss colluded with the other Defendants, committing wrongful acts that constitute breaches of antitrust

52

and conspiracy law by Norfolk Southern and Belt Line, and breaches of fiduciary law by Moss. That is, the wrongful act that CSX alleged Moss committed is substantially linked to Norfolk Southern and Belt Line's alleged wrongful act; these wrongful acts merely constitute violations of different laws for each of the Defendants. However, this demonstrates that the claims against Moss still arise out of a common nucleus of operative fact as the claims against the other Defendants, in particular, the federal antitrust claims alleged against Norfolk Southern and Belt Line. For these reasons, Moss's jurisdictional argument fails.

### 2. Failure to State a Claim

All Individual Defendants argue that CSX has failed to allege a breach by the directors of their fiduciary duties.

In Virginia, a director has a duty to act in "good faith" and to "discharge his duties" in accordance with "the best interests of the corporation." Va. Code § 13.1-690(A); see also DCG&T ex rel. Battaglia/Ira v. Knight, 68 F. Supp. 3d 579, 587 (E.D. Va. 2014) (in Virginia, corporate directors must exercise good faith in their dealings with the corporation and its shareholders). Directors also owe a duty of loyalty, which "forbids the director from placing himself in a position where his individual interest clashes with his duty to his corporation." Id. (internal quotations omitted).

The Complaint alleges three purported breaches of these fiduciary duties: 1) the failure to consider and rejection of the service proposal, as to all Individual Defendants, 2) the failure to consider and rejection of the governance proposal, as to all Individual Defendants, and 3) the failure to staunch the deteriorating financial condition of Belt Line, as to Defendant Moss.

### a. Service Proposal

Individual Defendants argue that the first purported breach cannot be a breach because, if they had accepted the service proposal, they would have violated Belt Line's Operating Agreement. The Operating Agreement states that Belt Line must provide a uniform rate for all shareholders (Norfolk Southern and CSX). Defendants argue that CSX's proposal sought a rate for itself that was lower than the Uniform Rate that was set. However, as already discussed, the Complaint and the attached service proposal do not allege that CSX sought a lower preferential rate for itself. The lowered rate is not limited to CSX, but appears to be a proposal for a lower Uniform Rate. The proposal states clearly that "Presently, the [Belt Line's] switch rate of $210 per car is an economic barrier that prevents CSXT from being able to move any meaningful port freight by rail at NIT. . . . Accordingly, CSXT proposes the following, all to be memorialized in a formal agreement: One-way rate of $37.50

54

per container (empty or loaded) for a term of three years on movements handled by the [Belt Line] between Berkley Yard and NIT." ECF No. 1-5.

Nowhere in the proposal or the Complaint does it state that the rate would be lowered only for CSX. Again, Belt Line and its directors had the authority to accept the proposal; however, CSX has alleged that Belt Line and its directors failed to accept or even consider the proposal because of a conspiracy to keep the Uniform Rate artificially high in order to help Norfolk Southern maintain monopoly power over traffic to NIT. Such allegations are sufficient to allege a plausible breach of a director's various fiduciary duties under Virginia law. See, e.g., Glass v. Glass, 228 Va. 39, 47, 321 S.E.2d 69, 74 (1984) (engagement in a civil conspiracy may violate a director's duty to act in good faith); In re LandAmerica Fin. Grp., Inc., 470 B.R. 759, 797 (Bankr. E.D. Va. 2012) (citing Upton v. S. Produce Co., 133 S.E. 576, 580 (Va. 1926) (stating that officers may not abuse their positions for self-gain and profit as they "owed the duty of frankness and fair dealing as fiduciaries to [shareholders].").

### b. Governance Proposal

Because CSX has only alleged one count of breach of fiduciary duty, and the Court has found that CSX has alleged a plausible breach of fiduciary duty claim with respect to the

55

rejection and failure to consider CSX's service proposal, it is not necessary to decide whether CSX has plausibly alleged a breach of fiduciary duty based on Individual Defendants' failure to consider and rejection of the Governance proposal. However, the Court briefly addresses each remaining argument.

With respect to Individual Defendants' argument that Plaintiff failed to plausibly allege breaches of fiduciary duties because Individual Defendants did not have the power to change the corporate governance structure of Belt Line, that argument ignores the allegations that the directors individually breached their duties by refusing to consider the corporate governance proposal at all, and also breached their fiduciary duties by refusing to adopt other aspects of the proposal aside from changing the process of appointing directors, which were in the directors' power to accept. See, e.g., Stickley v. Stickley, 43 Va. Cir. 123, at *21 (Rockingham Cnty., Va. Cir. 1997) (finding breach of fiduciary duty where officer acts solely for the interest of majority shareholder and inter alia, rejects various proposals and requests by minority shareholder). Therefore, it appears CSX has plausibly alleged a breach of fiduciary duty by Individual Defendants, and the motions to dismiss on these grounds are denied.

56

JA157

### c. Deteriorating Financial Condition

Next, Individual Defendant Moss argues that he had no duty to act in the financial best interest of Belt Line because Belt Line is not a profit maximizing corporation. Directors of for-profit corporations have a duty to maximize profits. See generally David B. Guenther, The Strange Case of the Missing Doctrine and the "Odd Exercise" of Ebay: Why Exactly Must Corporations Maximize Profits to Shareholders?, 12 Va. L. & Bus. Rev. 427, 429 (2018) (collecting cases).[7] The Complaint alleges, as discussed above, that Belt Line's Operating Agreement states the purpose of the corporation is "for the mutual benefit of each [owner-shareholder] in the interchange of business." ECF No. 1-1. This clause plausibly alleges that Belt Line did have to maximize profits because maximizing profits may be for the mutual benefit of its shareholders. In that case, Moss has a duty to act in the interest of Belt Line's shareholders by maximizing profits, and CSX has plausibly alleged that a failure by Moss to maximize profits is contrary to the interest of Belt Line's shareholders and violative of his fiduciary duties.

---

[7] The Court recognizes that there is a debate about the scope of this duty and how to maximize profits, as reflected in the most recent Principle of Corporate Governance as to the purposes of a corporation, issued by the Business Roundtable. Statement on the Purpose of a Corporation, Business Roundtable (Aug. 19, 2019), https://opportunity.businessroundtable.org/ourcommitment; see also Claudine Gartenberg & George Serafeim, 181 Top CEOs Have Realized Companies Need a Purpose Beyond Profit, Harv. Bus. Rev., Aug. 20, 2019, https://hbr.org/2019/08/181-top-ceos-have-realized-companies-need-a-purpose-beyond-profit.

It is true that directors of social, environmental, and other charitable organizations do not have a duty to maximize profits. Guenther, *supra* at 429. However, the Complaint does not allege that Belt Line is a social, environmental, or charitable organization. Therefore, based on the allegations, the Court cannot conclude that Belt Line is not a profit-maximizing corporation per se, and that Moss did not owe a fiduciary duty to maximize profits.

For the reasons stated above, the Individual Defendants' motions to dismiss the derivative claims fail.

### 3. Supplemental Jurisdiction

Individual Defendants further ask the Court to decline to exercise supplemental jurisdiction over the shareholder derivative claims for breach of fiduciary duty because the antitrust claims are already complex and the combination of the two in one trial may lead to jury confusion. Under 28 U.S.C. § 1367(c), a district court may decline to exercise supplemental jurisdiction if:

> (1) the claim raises a novel or complex issue of State law,
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

58

Individual Defendants have not demonstrated any of the factors above. No novel or complex issues of state law are raised; the state law claims do not substantially predominate; and the Court has not dismissed any federal claims. With respect to Individual Defendants' argument that the jury would be confused by trying all claims together, in these circumstances, such a jury confusion argument is not a compelling reason for declining jurisdiction as any confusion may be mitigated with careful jury instructions. Wright's Well Control Servs., LLC v. Oceaneering Int'l, Inc., No. CV 15-1720, 2016 WL 740357, at *2 (E.D. La. Feb. 25, 2016) ("In every lawsuit involving multiple claims, jurors are required to weigh the evidence for each claim individually, and that obligation will present no undue burden on the jury in this case."); Guedry v. Marino, 164 F.R.D. 181, 186 (E.D. La. 1995) (noting that the risk of jurors becoming confused by the "sheer number of claims presented . . . can be addressed by instructions"). Further, shareholder derivative claims and antitrust claims are each complex. In re Cendant Corp., Derivative Action Litig., 232 F. Supp. 2d 327, 337 (D.N.J. 2002) (describing shareholder derivative action as complex). Therefore, the Individual Defendants have failed to explain why jurors may be capable of understanding the antitrust and derivative claims if tried separately, but would be confused by the same claims if faced with them in the same proceeding.

59

JA160

### IV. CONCLUSION

For the reasons stated above, the Motions to Dismiss of Defendants Moss, Hall, Hurlbut, Merrilli, and Norfolk Southern are **DENIED**.    ECF Nos. 29, 31, 34.    Defendant Belt Line's Motion to Dismiss is **GRANTED IN PART AND DENIED IN PART**.    ECF No. 27. The Court **PROVIDES** Plaintiff with leave to amend the Complaint to cure defects with respect to Count VII-tortious interference-within ten (10) days after the entry of this Order.    The joint motion for a hearing, ECF No. 43, is **DENIED**.

The Clerk is **REQUESTED** to send a copy of this Opinion and Order to all counsel of record.

**IT IS SO ORDERED.**

                                    /s/ Mark S. Davis
                                    Mark S. Davis
                          CHIEF UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
September  9  , 2019

60

JA161

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

**CSX TRANSPORTATION, INC.,**

        **Plaintiff,**

  **v.**                                                    **Civil Action No. 2:18-cv-530-MSD-RJK**

**NORFOLK SOUTHERN RAILWAY
COMPANY,** *et al.***,**

        **Defendants.**

### NORFOLK AND PORTSMOUTH BELT LINE RAILROAD COMPANY'S
### MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendant Norfolk and Portsmouth Belt Line Railroad Company (the "Belt Line"), by counsel, for its memorandum in support of its Motion for Summary Judgment against CSX Transportation, Inc. ("CSXT"), states as follows:

### Introduction

This is a case about intermodal container traffic. CSXT claims that the Belt Line and Norfolk Southern Railway Company ("NS"), since at least 2007, have conspired to block CSXT from intermodal rail access at Norfolk International Terminal ("NIT"). CSXT asserts four counts against the Belt Line: two antitrust conspiracy claims and two state law conspiracy claims. All fail as a matter of law.

The Belt Line has not conspired with NS or harmed CSXT. CSXT's claims are all time-barred, and its current demand for a special rate for NIT traffic is no different from the demand it made, but did not pursue, in 2010. Its legal theory to establish a conspiracy contradicts settled law, its state law claims are missing the essential element of an unlawful act, and its antitrust claims ignore the Belt Line's undisputed costs, depending instead on invalid price comparisons.

JA162

*Discontinuance of the "Diamond" in 2007*

19.     In 2007, the Belt Line Board discontinued service over a portion of NS-owned track that CSXT calls the "diamond."  While CSXT now argues that the purpose was to make NIT access more difficult, CSXT was not using the Belt Line to access NIT at the time.  *See* Girardot Dep. 217:15-23 (**Ex.15**).  The December 2007 Board meeting minutes reflect that the reason was cost: "After discussion and consideration of an alternate route and associated costs of trackage rights the following resolution was, on motion duly made and seconded, adopted…"  Dec. 2009 Board Meeting Minutes, p. 5 (**Ex. 16**).

20.     The discontinuance was filed with the STB, with no objection by CSXT.  *See* STB Docket No. AB-290 (Sub-No. 299X), *NSR – Discontinuance of Service Exemption & NPBL – Discontinuation of Trackage Rights Exemption,* May 15, 2008 (**Ex. 17**).

*Establishment of the $210 Switching Rate in 2009*

21.     In 2009, the Belt Line's Board formed a rate committee to review its tariff.  The rate committee included representatives from the Belt Line's management and each of its owners. *See* Coleman Dep. 109:1-110:25 (**Ex. 18**).

22.     At the Belt Line's December 2009 Board meeting, following evaluation by the rate committee, the Belt Line's Board adopted a uniform $210 line haul switching rate, to take effect January 1, 2010.  *See* Dec. 2009 Board Meeting Minutes (**Ex. 19**).

23.     In sworn deposition testimony, John Booth, CSXT's Director of Joint Facilities who spent 28 years working with switching railroads throughout the CSXT system, including the Belt Line, described the $210 rate as "in the neighborhood of what we had been expecting" in 2009, "kind of in the middle of the road," and "not an unusual number for a terminal switch carrier or an intermediate switch carrier. . ."  Booth Dep. 20-22; 141-42 (**Ex. 20**).

9

<u>Action Item 4</u>

NPB 8100-J
Cancels
NPB 8100-I

**NORFOLK AND PORTSMOUTH BELT LINE**

**RAILROAD COMPANY**

**TARIFF NPB 8100-J**

**CANCELS**

**TARIFF NPB 8100-I**

**SWITCHING CHARGES**
**ALSO**
**CHARGES FOR MOVEMENT INVOLVING**
**WEIGHING AND RE-WEIGHING LIGHT OR LOADED CARS**
**AND**
**CHARGES FOR SPECIAL SERVICE OF ENGINE AND TRAIN CREW**
**AT**
**CHESAPEAKE, NORFOLK AND PORTSMOUTH, VA**
**AND VICINITY**

ISSUED **December 10, 2014**                    EFFECTIVE **February 1, 2015**

ISSUED BY

NORFOLK & PORTSMOUTH BELT LINE RAILROAD COMPANY
1340 Truxton St
Chesapeake, VA 23324

EXHIBIT
2

1

NPBL000220

**TARIFF NPB 8100-J**

### RULES AND OTHER GOVERNING PROVISIONS
### GENERAL RULES AND REGULATIONS

RULE 1 -- Following is list of Railroads connecting with Norfolk and Portsmouth Belt Line Railroad Company:

CSX Transportation, Inc.
Norfolk Southern Railway Company
Bay Coast Railroad

RULE 2 --  Switching charges named herein will include the placement of an empty car to be loaded, and return of the same car loaded, or the placement of a loaded car and the return of the same car empty.

RULE 3 -- Except as otherwise provided in this Tariff, the rates per loaded car published in this Tariff will also apply on empty cars, new or old, moving on revenue billing.

RULE 4 -- Settlement for detoured trains will be made in accordance with rules of Detour Agreement adopted by the Association of American Railroads for Detouring Trains.

RULE 5 --  If an empty car is ordered for loading and if the service of switching or placing it has been performed and the car is not loaded for movement over this railroad, the switching charge for a loaded car as shown in Item 60, will be collected from the person, firm or corporation ordering such car. Not applicable in connection with empty cars refused or rejected by shipper account defective or unfit for loading.

RULE 6 -- Charges published herein apply to or from sidings and industries served directly by the rails of the Norfolk and Portsmouth Belt Line Railroad Company, also to or from sidings and industries reached by the Norfolk and Portsmouth Belt Line Railroad Company under operating agreements with other railroads.

RULE 7 -- DEMURRAGE RATES AND REGULATIONS -- All cars handled under this Tariff will be subject to the established car demurrage rules and charges as published in Tariff NPB 6004 Series or successive issues thereof.

RULE 8 -- APPLICATION OF SHIPMENTS LOADED IN ARTICULATED CARS -- When shipments are loaded in so-called articulated cars (two or more car units permanently or temporarily joined together), the switching charges published in this Tariff will apply separately to each unit of the articulated equipment.

**ITEM 10**                          **REFERENCE TO TARIFFS, ITEMS, NOTES, RULES, ETC.**

(A) Where reference is made in this tariff to tariffs, items, notes, rules, etc., such references are continuous and include supplements to and successive issues of such tariffs and reissues of such items, notes, rules, etc.

**ITEM 20**                                    **CONSECUTIVE NUMBERS**

Where consecutive numbers are represented in this tariff by the first and last numbers connected by the word "to" or a hyphen they will be understood to include both of the numbers shown. If the first number only bears a reference mark, such reference mark also applies to the last number shown and to all numbers between the first and last numbers.

**ITEM 30**                                  **METHOD OF CANCELLING ITEMS**

As this tariff is supplemented, numbered items with letter suffixes will be used in alphabetical sequence starting with A. Example: Item 445-A cancels Item 445, and Item 365-B cancels Item 365-A in a prior supplement, which in turn cancelled Item 365.

NPBL000221

**TARIFF NPB 8100-J**

**RULES AND OTHER GOVERNING PROVISIONS**
**GENERAL RULES AND REGULATIONS**

**ITEM 40**       **PENALTY CHARGE FOR UNAUTHORIZED APPROPRIATION OF**
                **RAILROAD-OWNED CARS FOR NON-REVENUE MOVEMENTS**

When a railroad-owned car is appropriated for the non-revenue movement of freight without a specific prior authorization from NPB, a penalty charge of $430.00 per car per movement will be assessed against the party appropriating such car. Such charge will be in addition to all other charges applicable to such car (See Note 1).

The payment of demurrage, detention, car storage or switching charges does not permit the unauthorized use or additional loading of empty or loaded cars which have been placed by this railroad for loading or unloading (See Note 2).

NOTE 1. This penalty charge does not apply to intraplant movements by other than railroad-owned power which are necessary to facilitate the loading or unloading of railroad-owned cars in connection with immediately prior or subsequent revenue movements, either switching or line-haul.

NOTE 2. Unauthorized use of a railroad-owned car refers to the unauthorized movement of a car by other than railroad-owned power beyond the confines of the industry where car was originally placed by this railroad for loading or unloading.

**ITEM 50**       **CARS MOVED FROM LOADING TRACKS WITHOUT BILLING AND HELD**
                **ON CARRIER'S HOLD TRACKS AWAITING BILLING INSTRUCTIONS**

Except as otherwise provided for in this tariff, when on shipper's order, cars are moved by carrier from industry or team tracks without billing and held on carrier's tracks awaiting forwarding instructions as defined in Item 200, Part 11. Tariff NPB 6004-Series, a charge of $52.00 per car will be assessed against the party responsible for furnishing such forwarding directions and the cars will remain on continuous demurrage or detention (See Note) in the demurrage account of the party in whose name the car was ordered until such forwarding directions are received by carrier's agent. (See Exception).

On car or cars removed from industry or team tracks on shipper's order and held awaiting billing instructions on carrier tracks and such car or cars are ordered back to the original industry or team tracks, the hold for disposition charge of $52.00 per car will be assessed for switch movement to the hold point on NPBL and a switching charge of $220.00 per car will be assessed for movement from hold point on NPBL back to original industry or team tracks. Provided that such move is inter-terminal, the applicable inter-terminal switching charge will apply in each direction in addition to the holding charge of $52.00. In all cases of hold for disposition, cars will remain on continuous demurrage.

EXCEPTION -- The charge of $52.00 per car will not apply when carrier's agent receives forwarding directions by noon of the day following performance of the service excluding Saturdays, Sundays and Holidays as defined in Item 200, Part 11, Tariff NPB 6004-Series.

3

NPBL000222

**TARRIFF NPB 8100-J**

---

**SWITCHING CHARGES OF THE**
**NORFOLK AND PORTSMOUTH BELT LINE RAILROAD COMPANY**

---

**ITEM 60**                     **INTRA-TERMINAL SWITCHING**

CHARGE PER CAR

  A.  Except as provided in Paragraph B, between industries, sidings or tracks
     located on or served by Norfolk and Portsmouth Belt Line Railroad Company .....................    $331.00

  B.  Cars switched between private sidings and leased storage tracks
     served by Norfolk and Portsmouth Belt Line Railroad ........................................................    $295.00

---

**ITEM 70**                      **LINE HAUL SWITCHING**

CHARGE PER CAR

Between industries or sidings located on or served by Norfolk and Portsmouth
Belt Line Railroad Company and interchange tracks with connecting lines on
Shipments originating at or destined to points located beyond yard or switching
Limits of connecting lines:

  A.  <u>Applicable on all commodities</u> ...............................................................................    $210.00

---

**ITEM 80**                     **INTER-TERMINAL SWITCHING**

CHARGE PER CAR

Between industries or sidings located on or served by Norfolk and Portsmouth
Belt Line Railroad Company and interchange tracks with connecting lines within yard or
Switching limits of connecting lines: ....................................................................    $262.00

---

**ITEM 90**                    **INTERMEDIATE SWITCHING**

CHARGE PER CAR

Between interchange tracks with connecting lines:

  (a) <u>Applicable on all commodities</u>..........................................................................    $155.00

---

4

JA167

NPBL000223

**TARIFF NPB 8100-J**

### SWITCHING CHARGES OF THE
### NORFOLK AND PORTSMOUTH BELT LINE RAILROAD COMPANY

### SWITCHING CHARGES, ALSO
### CHARGES FOR WEIGHING AND RE-WEIGHING LIGHT AND LOADED CARS
### CHARGES FOR SPECIAL SERVICE OF ENGINE AND TRAIN CREW
### NORFOLK AND PORTSMOUTH BELT LINE RAILROAD COMPANY

**ITEM 100**                         **MOVEMENT INVOLVING WEIGHING**
                                        (See Note A below)

                                                                        CHARGE PER CAR

(A) Weighing cars on private scales located at the industry:

When weighed before or after placement, or outbound cars before removal fron
Industry track ............................................................................................      $50.00

(B) Weighing cars on other private scales (See Note B below):

For weighing inbound or outbound loaded cars, when so requested before
Actual placement or interchange ………………………………….……………      $100.00

NOTE A -- Charges shown in this item are for handling of car incidental to weighing
and are in addition to switching charges herein for the required handling.
Norfolk and Portsmouth Belt Line Railroad Company does not own or operate track scales.

NOTE B -- Those desiring the weighing on private scales must make their
own arrangements with the owners of the scales for their use.

**ITEM 110**              **SWITCHING CHARGE ON CARS RECEIVED IN ERROR**
                           **OR NO FORWARDING DIRECTIONS**

                                                                        CHARGE PER CAR

Cars received by Norfolk and Portsmouth Belt Line Railroad Company,
in error or without necessary forwarding directions, will be handled in
accordance with AAR Car Service Rule 7.

If cars are returned to the tendering carrier, forwarded to the
proper carrier, or require holding, Norfolk and Portsmouth Belt Line
Railroad Company may assess the tendering carrier ..........................................      $262.00

**ITEM 120**         **LOCOMOTIVES, STEAM SHOVELS, BONDING CARS, DERRICKS**
                      **ON CRANES, DEAD ON OWN WHEELS**
                      **LOCOMOTIVES, ON OWN WHEELS, UNDER STEAM IN CHARGE**
                      **OF PILOT. (See Note)**

                                                                        CHARGE PER CAR

When handled between interchange tracks and/or industries or sidings located on or
served by the Norfolk & Portsmouth Belt Line Company.............................................      $264.00

NOTE -- Cost of Pilot when furnished by Norfolk and Portsmouth Belt Line Railroad
Company will be in addition to the switching charge.

5

**TARIFF NPB 8100-J**

### SWITCHING CHARGES OF THE
### NORFOLK AND PORTSMOUTH BELT LINE RAILROAD COMPANY

### SWITCHING CHARGES, ALSO
### CHARGES FOR WEIGHING AND RE-WEIGHING LIGHT AND LOADED CARS
### CHARGES FOR SPECIAL SERVICE OF ENGINE AND TRAIN CREW
### NORFOLK AND PORTSMOUTH BELT LINE RAILROAD COMPANY

**ITEM 130**                         <u>**INTRA-PLANT SWITCHING**</u>

<u>CHARGE PER CAR</u>

(A).   Except as provided in Paragraph B, for switching car between
two points on same track or from one track to another track entirely
within the confines of the same (single) plant or industry ....................................................      $133.00

(B).   For switching car between two points on same track or from one track to
another track entirely within the confines of the same (single) plant or industry
when use of carrier rails is involved ........................................................................................      $223.00

**ITEM 140**                  <u>**SPECIAL SWITCHING SERVICE/SPECIAL TRAIN SERVICE**</u>

A.   For special switching service of engine and train crew, on request of industry, when
regularly assigned on duty switch crew is requested (*See Notes*..................................      $350.00 (per hr)
*Note 1.* Special Switching service is defined as switching other than required by ordinary
operating convenience.
*Note 2.* Special switching service will be provided subject to the availability of engine
and crews and will be provided at the sole discretion of the NPBL.
*Note 3.* The charge for special service is per hour with a minimum of 2 hours and will be
in addition to published tariff charges for cars switched.

B.   For Special Train Service of engine and train crew, outside regular assigned duty,
furnished an industry for its use. ...........................................................................................      $3,500.00
*Note 1.* Charge will apply for a minimum of 8 hours or fraction thereof.
*Note 2.* An additional charge of $440.00 per hour or fraction thereof will apply for assignment
of engine and crew beyond eight (8) hours, with a maximum of twelve (12) hours for
each assignment.
*Note 3.* Charge will be computed from the time the crew starts duty at its home terminal until
the crew ends duty at its home terminal.
*Note 4.* Special Train service will be provided subject to the availability of engine and crews and
will be provided at the sole discretion and option of the NPBL.
*Note 5.* This charge will be in addition to published tariff charges for cars switched.

6

NPBL000225

**TARIFF NPB 8100-J**

**SWITCHING CHARGES OF THE**
**NORFOLK AND PORTSMOUTH BELT LINE RAILROAD COMPANY**

ITEM 150          **SWITCHING - TURNING OF CARS TO PERMIT LOADING AT STOP-OFF**
                  **POINTS OR UNLOADING AT STOP-OFF POINTS OR DESTINATIONS:**

1.   In instances where it is desired that freight in carloads be placed on delivery tracks for loading at stop-off points or unloading at stop-off points or destinations from one particular side or end of car, cars must be properly placarded on both sides and notation made on bill of lading and waybill substantially as follows:

**NOTICE TO CARRIER**

Deliver Car for loading or unloading from door or end specified by placard.

2.   On freight in carloads, not properly placarded on both sides of car to load or unload from one particular side or end of car, which shipper or consignee, after initial placement of car directs carrier to turn and return to the same track for loading or unloading from opposite side or end of car, the following shall apply:

**CHARGES**

(A)   If the car is turned at a "Y" or a turntable within the confines of an industry apply the intra-plant switching charge published in Item 130.

(B)    If the car is turned at a "Y" or a turntable outside the confines of the industry, apply intra-terminal switching charge published in Item 60.

NOTE I -- If Bill of Lading carries notation that car has been placarded, and placard has disappeared before placement, the charge named herein will not apply.

-THE END-

7

                                                    NPBL000226

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division**

| | | |
|---|---|---|
| CSX TRANSPORTATION, INC., | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NORFOLK SOUTHERN RAILWAY | ) | |
| COMPANY, *et al.*, | ) | Case No. 2:18-cv-530 |
| | ) | |
| *Defendants*. | ) | |
| | ) | |
| | ) | |
| | ) | |

**DEFENDANT NORFOLK SOUTHERN RAILWAY COMPANY'S
<u>BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

Page

TABLE OF EXHIBITS ........................................................................................... iv

GLOSSARY OF WITNESSES ............................................................................... xii

INTRODUCTION .................................................................................................... 1

STATEMENT OF UNDISPUTED MATERIAL FACTS ........................................ 3

    A.    The Parties ................................................................................................ 3

    B.    NS and CSX compete for international intermodal container business ................ 3

    C.    The Port of Virginia ................................................................................. 4

        1.    The Port of Virginia has operated three terminals ..................................... 4

        2.    VIT directs ocean carriers where to dock ................................................. 6

        3.    The Port of Virginia competes against other ports ................................... 6

        4.    CSX has a competitive advantage at the Port of New York/New Jersey .......... 7

        5.    NS has a Competitive Advantage at the Port of Virginia ......................... 8

        6.    Trucks compete against railroads for traffic at the POV .......................... 9

    D.    NPBL charges a uniform switch rate per the Operating Agreement ................ 10

        1.    NPBL set the switch rate at $210/well to cover its operating expenses ........ 11

        2.    There was no vote on CSX's 2010 Rate Proposal ................................... 11

        3.    CSX's 2018 Rate and Governance Proposals .......................................... 12

    E.    CSX was not foreclosed at NIT and used NPBL to move other freight ............. 13

    F.    NS and NPBL are litigating against each other regarding NS's request to have the STB set the trackage fee ....................................................... 15

    G.    Efforts to sell Pinners Point and decommissioning of Diamond Track .............. 16

ARGUMENT ......................................................................................................... 16

I.    CSX'S CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS ................ 16

# TABLE OF CONTENTS
(continued)

Page

    A.    Conduct beyond the limitations period cannot underpin claims or damages ...... 16

    B.    CSX cannot identify any distinct damages from conduct occurring within the limitations period, so CSX is not entitled to any recovery ........................... 18

    C.    The "continuing violation" doctrine cannot save CSX's antitrust conspiracy claims ................................................................................................ 19

I.    SUMMARY JUDGMENT ON CSX'S ANTITRUST CLAIMS IS WARRANTED ................................................................................................... 20

    A.    CSX's failure to properly define a relevant market compels dismissal of all CSX's antitrust claims ...................................................................... 20

        1.    CSX cannot proffer evidence to prove that the relevant market pleaded in its Complaint is properly defined ........................................... 21

        2.    Regardless of which proposed definition is considered, CSX has improperly gerrymandered the relevant market........................................ 22

            i.    Relevant geographic market ....................................... 24

            ii.    Relevant service market ............................................... 26

    B.    CSX cannot establish a genuine issue of material fact on its Section 2 monopolization and attempted monopolization claims ...................................... 27

        1.    CSX's Section 2 monopolization and attempted monopolization claims reach only unilateral conduct by a single firm ........................... 28

        2.    CSX cannot prove exclusionary conduct under an "essential facilities" theory........................................................................................ 28

            i.    CSX was not denied access to NIT ............................................ 31

            ii.    Antitrust scrutiny is not warranted because the Surface Transportation Board regulates rates ........................................... 32

        3.    NS's conduct did not result in substantial foreclosure........................... 32

III.    NS IS ENTITLED TO SUMMARY JUDGMENT ON CSX'S FEDERAL AND STATE CONSPIRACY CLAIMS................................................................. 33

    A.    CSX cannot show evidence of an agreement between NS and NPBL ............... 33

    B.    CSX cannot prove that trade was restrained unreasonably................................. 35

**TABLE OF CONTENTS**
(continued)

Page

C.     CSX cannot show any overt act in furtherance of the conspiracy ...................... 36

IV.   NS IS ENTITLED TO SUMMARY JUDGMENT ON CSX'S BREACH OF
       CONTRACT CLAIM ................................................................................. 37

A.     NS never blocked CSX's access to NIT in 2015 ................................. 38

B.     NS did not have a contractual duty to support CSX's 2018 Rate Proposal ........ 38

C.     NS had no contractual obligation to change NPBL's governance ...................... 40

CONCLUSION ............................................................................................. 40

Defendant Norfolk Southern Railway Company ("NS"), by counsel and pursuant to Rule 56 of the Federal Rules of Civil Procedure, submits the following brief in support of its Motion for Summary Judgment on all claims of Plaintiff CSX Transportation, Inc. ("CSX").  For the following reasons,[1] NS's Motion should be granted.

## INTRODUCTION

CSX levels a serious, but false, charge.  CSX is a Class 1 railroad serving half of the country, with over $10 billion in annual revenue.  CSX claims that, for more than a decade, Defendants have blocked CSX from having rail access to the docks at a single ocean shipping port terminal in Virginia—Norfolk International Terminal ("NIT")—and that CSX's inability to move international intermodal shipping containers directly from that terminal by rail has resulted in harm reverberating through its entire business ███████████████████████████

███.  But, in reality, CSX *does* have rail access to NIT via the Norfolk and Portsmouth Beltline Railroad Company ("NPBL"), and NPBL has never refused to move CSX's freight.  CSX has *chosen* to move its intermodal containers to and from NIT by truck instead of by rail ██████

████████████████████    ████████████████████████

████████████████████████

These undisputed facts lay plain that this case is not about CSX being blocked from NIT.  Rather, this case is about CSX's desire to avoid paying the going rate to access NIT by rail, namely NPBL's uniform $210 switch rate for rail traffic—a rate that any user of NPBL must pay; a rate

---

[1] NS also adopts and incorporates the arguments made in NPBL's brief that are readily transferable to NS.  *U.S. ex rel. LaCorte v. SmithKline Beecham Clinical Lab'ys, Inc.*, 149 F.3d 227, 237–38 (3d Cir. 1998) (recognizing incorporation of "readily transferrable" arguments between parties).  This includes all arguments regarding the lack of any conspiracy between NPBL and NS, whether antitrust, business conspiracy, or civil conspiracy.  NPBL's arguments equally apply to NS as the alleged other party to the conspiracy and are, thus, properly subject to adoption and incorporation.

that CSX has in fact paid without complaint on other portions of NPBL not at issue here; and a rate that has since 2010 barely covered NPBL's operating costs.  Though the available tariff rate is eminently justified, CSX seeks to use this lawsuit and the threat of treble antitrust damages to extract a special deal from NPBL that is well below the rate that NPBL's Operating Agreement requires it to charge.

In view of the undisputed facts, Defendants are entitled to summary judgment on all of CSX's claims.   As a threshold matter, well-established statute of limitations precedent demonstrates that CSX's claims are time-barred, or at minimum must be substantially narrowed on that basis.  Additionally, CSX's ill-conceived antitrust claims fail for a number of independent reasons.  *First*, CSX has gerrymandered its proposed relevant market—a required element for all of the antitrust claims—around its own circumstances rather than by reference to actual competitive conditions, ignoring that (a) trucking containers from port to destination is an alternative to moving them by rail for ocean carriers; and (b) ocean carriers can move intermodal containers through other terminals and ports to their ultimate destination.  *Second*, CSX's monopolization and attempted monopolization claims fail because CSX cannot satisfy the elements of the essential facilities claim it presses here.  *Third*, CSX's conspiracy-based antitrust claims fail because there is no conspiratorial agreement, and under the "rule of reason," CSX cannot prove the requisite substantial anticompetitive effect.  CSX's state law claims fare no better, and likewise cannot survive summary judgment for a litany of reasons, including because (1) NS assisted NPBL with moving CSX's intermodal trains to NIT in 2015, and (2) NS had no obligation to accept or consider CSX's 2018 request for a special low switch rate or corporate governance proposal.  For these reasons, this Court should grant NS's Motion and dismiss CSX's claims.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

**A.    The Parties**

1.      NS and CSX are Class 1 railroads that operate in the eastern United States and Canada.  (ECF No. 66, at 2.)

2.      NPBL is a terminal switching railroad founded in 1896 by eight railroads that operates in the cities of Norfolk, Portsmouth, and Chesapeake, Virginia.  (Compl. ¶ 1).  NPBL's business and affairs are governed by an Operating Agreement, dated July 7, 1897 (the "Operating Agreement").  (**Ex. 1**, NSR_00104139).  NPBL's primary business is to interchange, or switch, freight cars for other railroads, primarily its owners.  *Id*.  NPBL takes cars tendered by other railroads and delivers them to locations on its rail line, or vice-versa.  (**Ex. 2**, Moss Dep. 30:12-18).

3.      Following mergers and acquisitions among the original nine railroads, the number of shareholder railroads eventually was reduced to only CSX, Norfolk and Western Railway Company ("NW"), and Southern Railway Company ("SR").  (Compl. ¶ 2).  By Supplemental Agreement dated March 1, 1989, CSX, NW, and SR amended the Operating Agreement to allow CSX to appoint two NPBL board members and NW and SR to collectively appoint three board members.  (*See* **Ex. 3**, CSXT0086318[2]).  NW and SR's merger left NS and CSX as the sole shareholders of NPBL, with 57% and 43% respective ownership interests.  (Compl. ¶ 23).

**B.    NS and CSX compete for international intermodal container business.**

4.      NPBL is not a competitor to either NS or CSX.  (**Ex. 4**, Joyner 30(b)(6) Dep. 25:1-3; **Ex. 5**, Girardot (first) Dep. 41:13-20; **Ex. 6**, CSX Corp. Rep. Dep. 34:4-6, 35:19-36:7; **Ex. 7**, Marvel Rep. ¶¶12, 16-17; **Ex. 8**, Strongosky (first) Dep. 72:22-73:3).

---

[2] In 1989, NW and SR had legally merged following ICC approval of the Merger in 1982 but were still working through the operational merger.   ECF No. 116, at 1.

5.      NS and CSX vigorously compete for the transportation of international intermodal containers delivered to or from ports on the East Coast.  (**Ex. 9**, Heller Dep. (first) 36:18-21).

6.      "International intermodal traffic" refers to the transportation of cargo containers that are either imported to or exported from the United States and use more than one mode of transportation on a single trip from origin to destination.  (**Ex. 10**, Wright Rep. ¶ 21).

7.      Railroads often utilize "double-stacked" trains to move intermodal containers.  A double-stacked train can hold up to three containers in a single well, as opposed to a single-stacked train that can hold only one container per well.  (**Ex. 5**, at 184:12-25).

8.      CSX executives acknowledge that double-stacked trains double a railroad's train capacity and create cost and operational efficiencies.  (**Ex. 11**, Kenney (first) Dep. 41:20-42:1, 117:5-15; **Ex. 8**, at 45:14-47:1, 148:17-149:19; **Ex. 12**, Piacente Dep. 73:24-74:23; **Ex. 13**, CSXT0000897 at Slide 6; **Ex. 14**, CSXT0001792 at -794; **Ex. 15**, CSXT0124777 at -778).

**C.      The Port of Virginia**

**1.      The Port of Virginia has operated three terminals.**

9.      Until May 2020, the Port of Virginia ("POV") had three terminals supporting international intermodal traffic, Virginia International Gateway ("VIG"), Portsmouth Marine Terminal ("PMT"), and Norfolk International Terminals ("NIT").[3]  (**Ex. 7**, at ¶ 23).

10.     At VIG, CSX and NS have on-dock access via the Commonwealth Railway ("CWRY"), a short-line railroad.  (**Ex. 5**, at 99:18-99:24; **Ex. 16**, Luebbers Dep. (first) 60:05-60:08).  In 2019, VIG completed an expansion project and can now offer roughly the same capacity as NIT at 1.2 million containers annually.  (**Ex. 17**, Capozzi Dep. 220:23-221:2; **Ex. 10**, at ¶ 119).

11.     At PMT, NPBL owns the tracks leading to the terminal, which is located next to

---

[3]  These three terminals—NIT, VIG, and PMT—are sometimes collectively referred to as the "Hampton Roads ports" or the "Hampton Roads terminals."  *Id.*

CSX's Portsmouth Intermodal Yard.  (**Ex. 10**, at ¶ 37).  When operational, PMT could handle approximately 200,000 containers per year.  (*Id.* at ¶ 116).

12.    CSX had on-dock access to PMT through trackage rights over NPBL's tracks while PMT was operational.  (**Ex. 17**, at 74:24-75:5).  NS had on-dock access at PMT by using NPBL and paying NPBL the uniform switch rate.  (**Ex. 2**, at 113:01-113:07).

13.    PMT was temporarily shuttered between 2010 and 2014.  PMT was shuttered again in 2020 and remains closed today.  (**Ex. 17**, at 172:23-173:19; **Ex. 10**, Tbls. 5 & 6).

14.    At NIT, NS has on-dock access via tracks that it owns.  (**Ex. 18**, Martinez Dep. 31:20-32:04).  NPBL has trackage rights over NS's tracks.  *Id.*

15.    CSX has rail access to the on-dock facilities at NIT via NPBL, provided that CSX pays the NPBL switch rate.  (**Ex. 19**, MacDonald Dep. 42:3-6, 134:16-135:9; **Ex. 8**, at 195:2-9; **Ex. 20**, CSXT0037049 at Slide 4; **Ex. 21**, Hall Dep. 33:20-22, **Ex. 22**, Eliasson Dep. 81:6-9; **Ex. 23**, CSXT0050615 at -615).

16.    A railroad seeking access to NIT must coordinate an available operating window with NS.  (**Ex. 24**, DiDeo Dep. 192:22-193:10; **Ex. 25**, CSXT0126579 at -579; **Ex. 26**, CSXT0001301; **Ex. 9**, at 257:7-258:8; **Ex. 27**, C. Booth Dep. 87:17-88:7).

17.    NS and NPBL trains enter and move through NIT in different directions, meaning that two trains cannot be on the tracks at the same time.  (**Ex. 19**, at 92:21-93:1, 121:4-9; **Ex. 28**, CSXT0117504 at -504).  NS enters NIT through the southern main gate and travels in a continuous clockwise fashion as it moves into NIT, loads containers, and then exits NIT's northern back gate. (**Ex. 19**, at 91:18-92:5).  NPBL has trackage rights that allow it to enter and exit NIT through the northern back gate.  (**Ex. 29**, NSR_00306428 at -429; **Ex. 30**, CSXT0001276 at -276).  This requires NPBL to leave NIT through the same gate in which it enters.  (**Ex. 31**, NPBL013648 at -

649; **Ex. 19**, at 97:7-17).

### 2. VIT directs ocean carriers where to dock.

18.    Virginia International Terminals, Inc. ("VIT") is the private terminal operating subsidiary of the Virginia Port Authority ("VPA") that operates the POV. (**Ex. 17**, at 105:1-6; **Ex. 32**, Vick Dep. 27:25-28:8).

19.    VIT actively manages port operations at the POV



20.

### 3. The Port of Virginia competes against other ports.

21.    Ports compete with one another for international intermodal "discretionary cargo," which is cargo that can move through more than one port to its ultimate destination. (**Ex. 17**, at 186:4-187:2; **Ex. 15**, CSXT0124777 at -777).

22.    Ports along the West Coast of the United States compete with ports along the East Coast of the United States for discretionary international intermodal traffic for some origins and destinations, particularly in the Midwest. (**Ex. 8**, at 62:21-63:23; **Ex. 11**, at 29:20-30:11; **Ex. 12**, at 89:23-90:11; **Ex. 39**, Houfek Dep. 19:13-20:4; **Ex. 40**, CSXT0063241 at -241; **Ex. 41**, CSXT0069501 at -501; **Ex. 42**, CSXT0034771 at -771-72; **Ex. 43**, CSXT0045124 at -124).

23.    The inland locations for which the POV has the greatest natural shipping advantage over other ports tend to be origins and destinations locations close to the port itself. (**Ex. 10**, at ¶ 70; **Ex. 39**, at 19:14-20:25).

6

24.     The POV competes with Canadian ports and with the ports of Baltimore, Philadelphia, Savannah, Jacksonville, Charleston, and New York/New Jersey ("Port of NY/NJ") for discretionary international intermodal traffic.  (**Ex. 17**, at 187:15-188:2; **Ex. 19**, at 112:6-10; **Ex. 20**, at Slide 7; **Ex. 44**, CSXT0003542; **Ex. 45**, CSXT0038547 at -747; **Ex. 15**, at -777).

25.     CSX and NS consider how pricing affects an ocean carrier's decision to call at various ports.  (**Ex. 46**, CSXT0032388 at -388; **Ex. 8**, at 127:3-128:12; **Ex. 47**, CSXT0046487 at -488; **Ex. 48**, NSR_00026305 at -305; **Ex. 9**, at 117:6-13). ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████

### 4.    CSX has a competitive advantage at the Port of New York/New Jersey.

26.     The POV's main competitor for discretionary international intermodal cargo is the Port of NY/NJ, which is the East Coast port with the largest intermodal container business.  (**Ex. 10**, at ¶ 73; **Ex. 17**, at 187:20-23; **Ex. 5**, at 77:25-78:3; **Ex. 8**, at 212:1-6; **Ex. 53**, CSXT0052080 at -802-083; **Ex. 54**, CSXT0072702 at -702; **Ex. 46**, CSXT0032388 at -388; **Ex. 15**, CSXT0124777 at -777).

27.     The Port of NY/NJ is the first port of call on the East Coast for many ocean carriers, providing it with a speed-to-market advantage over the POV when serving overlapping inland destinations such as the Midwest.  (**Ex. 10**, at ¶ 73; **Ex. 32**, at 75:23-76:4; **Ex. 40**, at -241; **Ex. 55**, CSXT0003625 at -625).

28.     CSX has long prioritized the Port of NY/NJ as its main port for international intermodal traffic services.  (**Ex. 10**, at ¶ 74; **Ex. 56**, Kendall Dep. 29:16-30:1; **Ex. 57**,

VPA000793; **Ex. 58**, Joseph Bonney, "CSX Raises the Roof," JOC.com, Oct. 18, 2010, available

at https://www.joc.com/maritime-news/csx-raises-roof_20101018.html ("You hear a lot about the

Heartland Corridor. My statement is, 'Bring them on.' We can handle them here in New Jersey

and beat them head-on, straight up every day." (quoting Clarence Gooden, CSX's executive vice

president and chief commercial officer)); **Ex. 59**, CSXT0024736 at -736).

██████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████

30.      CSX reaches the same major Midwest locations through the Port of NY/NJ that NS

serves through the POV, including Chicago, Cleveland, Cincinnati, Columbus, Detroit, Louisville,

Kansas City, and St. Louis.  (**Ex. 62**, NSR_00000912 at Slide 21; **Ex. 63**, CSXT0003592 at Slide

11; **Ex. 60**, at Slides 3-4; **Ex. 64**, CSXT0096239).

31.      ████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████

██   ████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████

**5.      NS has a Competitive Advantage at the Port of Virginia.**

33.      NS completed its "Heartland Corridor" project in 2010, which gave NS double-

stack service through the POV and the fastest and most direct routes to Midwest destinations from

the POV.  (**Ex. 76**, NS_00001839 at -840; **Ex. 73**, McClellan Dep. 22-23, 151).  ████████████

██████████████████████████████████████████████████

██████████████████████████████████

34. CSX did not achieve double-stack capabilities from the POV until December 2016 when the Virginia Avenue Tunnel construction was completed, part of the National Gateway project. (**Ex. 5**, at 217:5-12; **Ex. 12**, at 73:24-74:6; **Ex. 68**, CSXT0052366 at Slide 9; **Ex. 69**, CSXT0024736 at -736).

██████████████████████████████████████████████████████████

████████████████████████████████████████

35. ████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████

### 6. Trucks compete against railroads for traffic at the POV.

36. Between 2012 and 2019, trucks accounted for 60%-65% of all international intermodal traffic through the POV. (**Ex. 10**, at ¶ 59, Chart 1).

37. CSX and POV officials confirm that trucks and rail compete most closely for international intermodal traffic movements of up to 200 miles. (**Ex. 71**, Marvel Reply Rep. ¶ 40; **Ex. 12**, at 86:7-16; **Ex. 5**, at 60:16-22; **Ex. 35**, at 72:12-73:5; **Ex. 32**, at 48:17-49:6; **Ex. 72**, CSXT0032082 at -082).

38. CSX and NS executives confirm that trucks and rail also compete for international intermodal movements between 200 and 500 miles, and in certain circumstances, for movements longer than 500 miles. (**Ex. 8**, at 112:8-24; **Ex. 73**, at 119:4-120:18; **Ex. 5**, at 62:7-17; **Ex. 11**, at 47:12-21; **Ex. 70**, at 33:13-23; **Ex. 74**, CSXT0159556 at -565; **Ex. 4**, at 19:7-20:9; **Ex. 10**, at ¶ 61; **Ex. 75**, NSR_00041595 at -597; **Ex. 40**, at -241; **Ex. 45**, at -747).

39. ████████████████████████████████████████

████████████████████████████████████████████

40.     Both NS and CSX set at least some of their international intermodal rates in order to remain competitive with trucks.  (**Ex. 10**, at ¶¶ 66-67; **Ex. 40**, at -241; **Ex. 8**, 120:4-22; **Ex. 9**, at 248:3-249:9; **Ex. 72**, at -082; **Ex. 77**, CSXT0097850 at -850; **Ex. 5**, at 112:2-113:1).  ███████

████████████████████████████████████████████████████████

██████████████████████████████████

41.     Through CSX's Highway To Rail ("H2R") program, CSX actively seeks to convert trucking of international intermodal traffic to rail movement of those containers by CSX.  (**Ex. 11**, at 64:11-65:12; **Ex. 72**, at -083; **Ex. 8**, at 117:7-13).

**D.     NPBL charges a uniform switch rate per the Operating Agreement.**

42.     The Operating Agreement requires that NPBL fix a "uniform rate" for the NPBL's "movement of freight cars … regardless of distance."  (**Ex. 2**, at 114:7-16; **Ex. 1**, at art. 9; **Ex. 6**, at 28:13-16; **Ex. 22**, at 130:24-131:14).  The uniform rate is to be "adjusted from time to time" to pay a six percent dividend to shareholders.  (**Ex. 1**, at art. 9).  The uniform rate that NPBL charges to switch cars is referred to as its "switch rate."

43.     ███████████████████████████████████████████████████

█████████████████████████████████████████████████████████

██████████████████████████████████████████

44.     NPBL's switch rate is set through a published tariff.  (**Ex. 82**, Stinson Dep. 128:8-22; **Ex. 79**, NPBL000220).  Historically, NPBL has used rate committees to evaluate and propose adjustments to the switch rate to the NPBL Board for a vote.  (*Id.* at 158:21-25; **Ex. 83**, Coleman Dep. 47:10-15).

45.     Through its statutory authority, the Surface Transportation Board ("STB") has exclusive jurisdiction over the reasonableness of switch rates and the trackage rights agreement between NS and NPBL.  49 U.S.C. §§ 11102(a), (c)(1).

46.     NS provides administrative support to NPBL per contracts with NPBL.  (*See* **Ex. 2,** at 35:2-23 (leases three locomotives), 52:9-25 (billing and contract services), 58:2-6 (technology services), 60:4-61:25 (car management system), 62:1-13 (email addresses), 193:11-24 (benefits administration), 289:1-290:6 (locomotive maintenance)).

**1.      NPBL set the switch rate at $210/well to cover its operating expenses.**

47.     In 2009, the Board set NPBL's switch rate at $210 per well, effective January 1, 2010.  (**Ex. 88**, CSXT0125260).  The rate has remained the same since 2010.  (**Ex. 2**, at 202:14-18).

48.     The NPBL switch rate is based on NPBL's operating costs.  (**Ex. 89**, Crowley Rep. at 5, Tbl. 1; **Ex. 2**, at 234:12-20; **Ex. 83**, at 104:6-8).

49.     ███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████

50.     It is "very relevant" to consider NPBL's actual costs in setting the switch rate.  (*See* **Ex. 81**, at 75:16-17, 90:4-7; **Ex. 22**, at 87:5-9; **Ex. 90**, Ingram Dep. 169:2-6).

51.     Since 2010, NPBL's Board has approved the annual budget presented by NPBL's officers, which includes NPBL's anticipated expenses for the following year.  (**Ex. 89**, at 4 n.8).

52.     CSX's expert testified that he did *not* take into account the NPBL's operating expenses when he analyzed the NPBL switch rate.  (**Ex. 70**, at 92:4-15).

**2.      There was no vote on CSX's 2010 Rate Proposal.**

53.     On July 23, 2010, CSX sent a letter to NPBL (the "2010 Proposal") proposing that the parties enter into a contract relating to NPBL's movement of CSX's intermodal freight to and

from NIT.  (**Ex. 91**, NPBL007431 at -433).  Among other things, CSX proposed that it pay NPBL

a switch rate of $37.50 per container.  *Id.*  The terms proposed by CSX were subject to negotiation

between CSX and NPBL.  *Id.*  CSX sent NPBL a draft contract as part of the negotiation.  (**Ex. 92**,

J. Booth Dep. 248:10-249:8; **Ex. 93**, CSXT0109886 at -886-908).

54.    The proposed discounted rate did not consider all of NPBL's costs for moving the

trains.  (*See* **Ex. 92**, at 69:4-8, 72:7-11, 123:19-124:1; **Ex. 81**, at 131:9-12, 15-18, 135:6 (proposal

not based on expenses); **Ex. 80**, at 117:14-118:7 (plan profitability was speculative and

unsupported)).

55.    NPBL's officers presented their analysis to the NPBL Board.  However, no board

member ever moved for a vote on whether NPBL should agree to the 2010 Proposal.  (*See* **Ex. 94**,

NPBL017933 at -938).  Nor did CSX, as a shareholder, make a motion at the April 13, 2011

shareholders meeting to agree to the 2010 Proposal.  (**Ex. 95**, CSXT0000262 at -262).

### 3.    CSX's 2018 Rate and Governance Proposals

56.    ██████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████

57.    On March 23, 2018, CSX sent a letter to NPBL management proposing that the

parties enter into a contract relating to NPBL's movement of CSX's intermodal freight to and from

NIT.  (**Ex. 105**, CSXT0100329; **Ex. 106**, CSXT0119620; **Ex. 6**, at 143:22-144:2).  CSX said it

was "willing to work through [a rate committee] if necessary."  (**Ex. 105**).

58.    NPBL pursued the proposal.  Moss spoke with CSX about the proposal, met with

VIT as to port management, and consulted with NS regarding an operating plan for the movements

CSX proposed.  (**Ex. 107**, NPBL006228; **Ex. 2**, at 242:10-17).  ████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████

59.     NPBL management raised CSX's proposal at the April 18, 2018 NPBL Board meeting.  (**Ex. 108**, NPBL000745).  Board members raised concerns that giving CSX a special, contract rate would violate the Operating Agreement's uniform rate provision.  (**Ex. 109**, Merilli Dep. 55:2-8).  These concerns led NPBL's management to recommend that the Board form a rate committee to fully investigate the proposal.  (**Ex. 2**, at 242:21-22).

60.     CSX was not interested in a rate committee.  (**Ex. 2**, at 244:25-245:1).  The CSX-appointed directors never moved to form a rate committee and *never* moved for a vote on the 2018 Rate Proposal at the April 18, 2018 Board meeting.  (**Ex. 6**, at 138:17-19; **Ex. 110**, Armbrust Dep. 214:15-21).  NPBL never rejected the rate proposal made by CSX.  (**Ex. 2**, at 287:25-288:9).

61.     On April 6, 2018, CSX sent a letter to NS and NPBL demanding that the NPBL Board be restructured to overturn the Supplemental Agreement's 3-2 allocation of board seats between the two parent railroads and for NPBL to adopt an ethics compliance program.  (**Ex. 111**, CSXT0100552).  But NPBL already maintained a code of ethics and conflicts of interest standards.  (**Ex. 2**, at 49:22-50:3; **Ex. 83**, at 39:17-40:6, 214:2-8; **Ex. 109**, Merilli Dep. 55:13-56:3).

62.     CSX asked for a vote to restructure the Board at the shareholder meeting on April 18, 2018.  (**Ex. 112**, CSXT0149075).  NS voted its majority shares against the proposal.  (*Id.*; **Ex. 113**, NSR_000738434).  Shortly thereafter, CSX commenced this litigation.

**E.     CSX was not foreclosed at NIT and used NPBL to move other freight.**

63.     Prior to 2015, NPBL moved only one intermodal train to NIT at CSX's request.  (**Ex. 19**, at 73:20-25).  In that instance, CSX recognized that the switch rate was not "too onerous." (**Ex. 96**, CSXT0082577 at -577).  CSX did not ask NPBL to move any other intermodal freight to

13

or from NIT until March 27, 2015.  (**Ex. 19**, at 131:8-133:3).

64.     After receiving CSX's request to move a train of intermodal freight to and from NIT on March 27, 2015, NS worked with NPBL, CSX, and VIT to create an operating window. (**Ex. 19**, at 142:6-19).  An operating window was agreed to on March 31, 2015, and NPBL moved the train on April 1, 2015.  (**Ex. 19**, at 144:20-25; **Ex. 116**, CSXT0001301).  Over the next couple of months, CSX asked NPBL to move eight more trains to and from NIT.  (**Ex. 2**, at 291:21-24; **Ex. 19**, at 189:17-20).  NPBL moved every train that CSX asked it to move.  (**Ex. 2**, at 291:25-292:7).

65.     As part of these movements, NS provided an operating window for NPBL to move the trains on NS's track to NIT on Tuesday and Thursday mornings, which was consistent with the operating window that NS provided NPBL on March 1, 2011.  (**Ex. 97**, CSXT0001537; **Ex. 117**, CSXT0126579; **Ex. 19**, at 179:15-180:9).

66.     CSX has not asked NPBL to move intermodal freight to or from NIT since July 2015.  NPBL has never refused to move CSX's intermodal freight to or from NIT.  (**Ex. 2**, at 291:21-292:7; **Ex. 19**, at 189:17-20; **Ex. 11**, at 28:21-23).

67.     CSX has used NPBL to move other freight.  ████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
████████████████████████████████████

68.     ████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
██████████████████████

69.


70.

Both (i) the total volume of containers moving by rail in and out of the POV, and (ii) the total number of containers moved by CSX, have increased from 2009 to the present.  (**Ex. 10**, at Tbls. 5, 6).

71.

**F.     NS and NPBL are litigating against each other regarding NS's request to have the STB set the trackage fee.**

72.

73.     NPBL and NS could not agree on the amount of the trackage fee that NPBL would pay NS for use of NS's tracks.  (**Ex. 101**, NPBL005850; **Ex. 102**, CSX Resp. NPBL's Req. Admis. Nos. 5 & 8 (AEO) (admitting that NS has not increased the trackage fee and that NPBL opposed NS's request to increase the trackage fee)).

74.     As a result, on September 13, 2018, NS petitioned the STB to set the trackage rights compensation, a proceeding where NS and NPBL are adverse parties.  (*See* **Ex. 103**, CSX Resp. NPBL's Req. Admis.  No. 3 (admitting that Defendants did not enter into any trackage fee agreement)).

15

JA189

"proper consumer" and the products that those consumers may find reasonably interchangeable). Here, both of CSX's proposed markets are too narrow in that both (i) improperly omit other modes of transportation that plainly compete with rail transportation for ocean carriers' business; and (ii) improperly omit from their geographic scope ports beyond the POV that provide alternative options for ocean carriers to move their intermodal containers to their ultimate destination. CSX's failure to properly define either the service dimension or the geographic dimension is fatal to its claims.

### i. Relevant geographic market.

The Complaint alleges a geographic market of "the intermodal port facilities of Hampton Roads, Virginia," (Compl. ¶ 49), and Prof. Marvel narrows this market further to only NIT. (**Ex. 7**, at ¶ 40). But here, not only are all *three* intermodal terminals at the POV reasonable alternatives,[8] so are other ports outside of the POV, most significantly the Port of NY/NJ.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████ Ocean carriers can, and do, use other POV terminals instead of NIT. (*See* SOF ¶¶ 10, 12). Indeed, there is no international intermodal traffic or customer that must move through NIT. (SOF ¶ 69).

Moreover, the undisputed evidence demonstrates that ports compete with one another for the movement of international intermodal discretionary cargo—cargo that by definition can be

---

[8] CSX significantly increased its international intermodal container movements at both NIT and the POV as a whole during the relevant period. (SOF ¶ 71). PMT closed to international intermodal container traffic in April 2020. (SOF ¶ 13).

moved through more than one port to its final destination.[9]  (SOF ¶¶ 21-22, 24).  The primary competitor of the POV is the Port of NY/NJ, (SOF ¶ 26), which benefits from often being the first port of call on the East Coast, providing that port with a speed-to-market advantage over the POV when serving inland destinations such as the Midwest compared to the POV. (SOF ¶ 27).  CSX and NS serve the same major Midwest locations through the Port of NY/NJ that they serve through the POV, including Chicago, Cleveland, Cincinnati, Columbus, Detroit, Louisville, Kansas City, and St. Louis. (SOF ¶ 30).  Further, CSX has long prioritized the Port of NY/NJ for its own international intermodal service, (SOF ¶ 28), having had double-stack capabilities out of the Port of NY/NJ for at least 10 years, ████████████████████████████████████

███████████████████████████████████ ███████ █████████

███████████████████████████████ Competition between the POV and the Port of NY/NJ means that ocean carriers can choose to route traffic through either port, as demonstrated ██████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████

The POV also competes with other East Coast ports—Baltimore, Philadelphia, Savannah, Jacksonville, Charleston, and Canadian ports—for discretionary international intermodal traffic. (SOF ¶ 24).  These East Coast ports provide ocean carriers with additional options to reach some of the same origins and destinations served by NS and CSX at the POV.  (SOF ¶¶ 21, 24).

---

[9] The inland locations for which POV has the greatest natural shipping advantage tend to be close to the port, which in turn tend to be most efficiently served by trucks rather than rail.  (SOF ¶ 23).

[10] ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████

Similarly, West Coast ports compete with East Coast ports (including the POV) for discretionary cargo going to or from markets in the Midwest. (SOF ¶ 22). In fact, CSX evaluates how pricing at different ports affects ocean carriers' decisions about which ports to utilize to move intermodal freight.[11] (SOF ¶ 25). ██████████████████████████████

████████████████████████████████████████████████████████████

██ Both of CSX's proposed geographic markets are deficient as a matter of law because they fail to include reasonable geographic alternatives available to ocean carriers.

## ii.    Relevant service market.

Failure to properly define the service dimension of a relevant market is a separate and independent reason CSX's claims must be dismissed. Here, CSX failed to include end-to-end truck transportation as a competitive alternative to rail for ocean carriers. Trucks accounted for more than 60% of the international intermodal traffic at the POV during the 2012-2019 period. (SOF ¶ 36). While trucks dominate movements of cargo containers up to 200 miles, they also compete with rail for a portion of movements of 200 miles or more. (SOF ¶¶ 37-38). ██████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████ Despite

---

[11] ████████████████████████████████████████████

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

CSX TRANSPORTATION, INC.,
individually and on behalf of NORFOLK
& PORTSMOUTH BELT LINE
RAILROAD COMPANY,

       Plaintiff,

       v.                           Civil Action No. 2:18-cv-530-MSD

NORFOLK SOUTHERN RAILWAY
COMPANY, *et al.*,

       Defendants.

_____/

**PLAINTIFF CSX TRANSPORTATION, INC.'S CONSOLIDATED**
**<u>OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

<div align="right">Page</div>

TABLE OF EXHIBITS ............................................................................................ viii

INTRODUCTION ..................................................................................................... 1

STATEMENT OF DISPUTED MATERIAL FACTS ............................................. 6

I.    The Parties ..................................................................................................... 7

II.    "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮?": NS and NPBL Conspire to Block CSX at NIT ................ 9

    a.    Defendants Use NPBL's Switch Rate to Block CSX ......................... 10

    b.    The 2009 Rate Committee .................................................................. 11

    c.    CSX's 2010 Proposal .......................................................................... 15

    d.    Defendants Impose Logistical and Operational Obstacles to Access NIT .......... 20

    e.    Defendants' Ongoing Trackage Rights "Dispute" .............................. 25

    f.    CSX's 2018 Service & Governance Proposals ................................... 26

III.    NPBL's $210 Switch Rate is Preclusive and Exclusionary ............................ 29

IV.    The International Intermodal Transportation Market ..................................... 31

    a.    Drayage is Not an Adequate Substitute for On-Dock Rail at NIT ..................... 33

    b.    Other Terminals are Not Adequate Substitutes for On-Dock Rail at NIT .......... 36

    c.    Trucks Do Not Compete with Rail for International Intermodal Freight ........... 38

V.    Harm to Competition and Damage to CSX ................................................... 39

STANDARD OF REVIEW ...................................................................................... 41

ARGUMENT ............................................................................................................ 41

I.    CSX's Claims are Timely. ............................................................................. 41

    a.    CSX's Sherman Act Claims are Timely (Counts I-IV). ..................... 42

    b.    CSX's State-Law Claims are Timely (Counts V, VIII, IX) ................ 47

    c.    CSX's Damages Calculation Methodology Does Not Govern Accrual. ............. 49

<div align="center">i</div>

TABLE OF CONTENTS
(continued)

Page

II.   There is Ample Evidence Supporting CSX's Conspiracy Claims (Counts I, II, VII, IX). ................................................................................................ 51

    a.   The Record Contains Substantial Evidence of Agreement and Overt Acts. ........ 52

        1.   NS's directors are agents of NPBL when acting in that capacity. ........... 54

        2.   The record contains ample evidence of conspiracy between NS and NPBL, above and beyond the conduct of NS's NPBL directors. ............ 56

    b.   CSX's state-law conspiracy claims are supported by ample record contains evidence of "wrongful or tortious" conduct (Counts VIII-IX). .......................... 57

III.  CSX Has Properly Supported its Antitrust Claims (Counts I-IV). ................................ 58

    a.   NS is not absolved of Section 2 liability merely because NPBL was involved. ................................................................................................. 58

    b.   The record shows that NS has maintained an illegal monopoly at NIT, not that NIT is an "essential facility" to which NS has denied access. ..................... 60

    c.   NS and NPBL conspired to restrain trade in violation of Section 1. .................. 60

        1.   Defendants' conduct is a per se violation of the Sherman Act. .............. 61

        2.   Defendants' conduct is also a violation of the Sherman Act under the Rule of Reason. ......................................................................... 61

            (i)   CSX has defined a relevant market, and NS's criticisms of that market turn on disputed facts. ............................................... 62

            (ii)   NS's monopoly power is also shown through ample evidence of actual harm to competition. ...................................... 64

            (iii)   CSX's expert's market definition matches the Complaint, and NS has shown no prejudice from any purported differences. ................................................................................. 65

        3.   Defendants' argument that the NPBL rate is "justified" rests on disputed facts. .................................................................................. 67

IV.   CSX's Breach of Contract Claim (Count V) is Well-Supported ..................................... 69

CONCLUSION ........................................................................................................... 70

16.     NPBL periodically convenes "rate committees," purportedly to "evaluate and propose adjustments to the switch rate to the NPBL Board for a vote."  NS SOF ¶ 44; *see also* **CSX Ex. 22** (NPBL009639).  Historically, these committees have been comprised of NPBL management and NS and CSX personnel.  *See* **CSX Ex. 5** (Coleman Dep. 110:6-15).

17.     NS has long used NPBL rate committees to monitor CSX's activities in the region and preserve its control of NIT.  *See, e.g.*, **CSX Ex. 23** (NSR_00199532) (1999 message from NS's Bob Belvin to members of the 1999 NPBL rate committee and NS-appointed NPBL directors, stating that ████████████████████████████████████████████

████████████████████████████████████████████████"); **CSX Ex. 24** (NSR_00306424) (email from NS intermodal market manager Chris Luebbers, summarizing 2002 rate committee meeting, including NS's concern that ██████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████"); **CSX Ex. 25 (**NSR_00306426 at -427) (email from Luebbers, summarizing 2006 committee's recommended ████████████████

████████████████████████████████████████████████████████

████████████████████").

   **b.  The 2009 Rate Committee**

18.     In 2009, NPBL convened a rate committee "████████████████████████

████████████████████████████████████████████████████████

██████████████████████." **CSX Ex. 26** (NSR_00074104 at -107). ██████████████████

"██████████████████████████████████████████████. **CSX Ex. 19** (NSR_00027070 at -071).  As part of the discussion, CSX recommended NPBL reduce its rate to allow for CSX intermodal traffic to NIT, which would increase NPBL's revenues.  *See* **CSX**

11

JA196



Case 2:18-cv-00530-MSD-RJK Document 328 Filed 05/03/21 Page 26 of 86 PageID# 8296

**Ex. 27** (CSXT0080856) (June 2009 letter from CSX's Tony Ingram to NPBL's David Stinson); **CSX Ex. 19** (NSR_00027070 at -073).

19. The NS-appointed members of the NPBL rate committee had a different goal. As NS's Chris Luebbers explained in an April 2009 email to NS-appointed rate committee members Liesl McLemore and Gregg Cronk: "[redacted] **CSX Ex. 2** (NSR_00084753 at -754) (emphasis added). According to Luebbers, the rate committee was a high priority for NS's intermodal group because "[redacted]." *Id.* at -753.

20. NS rate committee members internally discussed how to combat CSX's position "[redacted]." **CSX Ex. 28** (NSR_00084730) (emphasis added); *see also* **CSX Ex. 29** (NSR_00027114) (April 2009 email string with Luebbers, NS's VP of Intermodal & Automotive Jeff Heller, and NS-appointed NPBL director Mark Manion, discussing trackage at NIT, which Heller describes as "[redacted]"); **CSX Ex. 30** (NSR_00011118) (April 2009 email from NS's Luebbers to NS rate committee members McLemore and Cronk, warning that a lower NPBL rate at NIT "[redacted]").

21. Two days before the rate committee's July 2009 meeting, NS intermodal executives drafted a letter to NS-appointed NPBL director Mark Manion and the other NS-appointed members of the NPBL Board, titled "[redacted]." **CSX Ex. 3** (NSR_00177916). The letter describes that "[redacted]

*Id.* at -917.

Though the rate committee had yet to meet, the letter included NS's assumption that ██████

████████████████████████████████████████████████████████████████████████████████

██████████████████. *Id.* It concludes: "████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

█████████████████"[5] *Id.* at -918 (emphasis added).

22.     At the July 29, 2009 rate committee meeting, NPBL management made several

proposals to the committee. *See* **CSX Ex. 26** (NSR_00074104 at -123). First, management

recommended replacing the existing $████████ rate and the $████████████ rate with

a single $210 line-haul switch rate, not out of concern for any perceived violation of the NPBL

Operating Agreement, but because the NS accounting systems used by the Belt Line could not

handle the two-tiered structure. *See* **CSX Ex. 19** (NSR_00027070 at -073); *see also* **CSX Ex. 5**

(Coleman Dep. 117:18-118:18) (NPBL wanted to eliminate dual rates because it could not

distinguish between domestic and import/export traffic).

23.     NPBL management also recommended adopting a $█ per car rate for "unit trains,"

i.e., trains moving more than forty cars to one destination under a single waybill. **CSX Ex. 19**

(NSR_00027070 at -073). Management developed this rate by reviewing rates charged by other

short lines for similar services and evaluating NPBL's costs in a "worst case" scenario. *See id.*

CSX expressed interest in using this rate to move trains of intermodal freight to and from NIT,

---

[5] This is not the first time that NS personnel sought to influence the votes of NS-appointed NPBL
directors to preserve NS's competitive position, without regard for NPBL's independent business
interests. *See, e.g.*, **CSX Ex. 15** (NSR_00199530); **CSX Ex. 16** (NSR_00199524) (█████████
███████████████████████████████████████████████████████ *and* **CSX Ex. 17**
(NSR_00199515) ███████
███████████████████████████████████████ ").

13

from NS's Mike Wheeler, who said that the NPBL Board ███████████████████████

███████████████████████████.  *See* NS Ex. 80 at 117:14-118:7; *see also* **CSX Ex. 4**

(Wheeler Dep. 119:16-120:6) (███████████████████████████████████████

██████████████").  The financial analysis requested by NS-appointed directors showed the

Belt Line would cover its costs *and* make money under either scenario.  *See* CSX SOF ¶ 36.

### d.   Defendants Impose Logistical and Operational Obstacles to Access NIT
*[Disputed: NS SOF ¶¶ 15, 63-67, 75-77; NPBL SOF ¶ 10, 15, 19, 28-33, 35]*

43.     In 2008, NS discontinued service on a segment of track located near NIT, often

called the "Diamond," where NPBL had maintained trackage rights.[7]  NS SOF ¶¶ 76-77; NPBL

SOF ¶¶ 19-20.  The Diamond had allowed NPBL to access NIT via "an efficient, progressive

move."  **CSX Ex. 53** (Girardot Decl. ¶ 7).  Without it, NPBL trains carrying CSX intermodal

freight must travel a longer distance and move into NS's Portlock Yard, where engines have to be

attached to the back of the train before proceeding along NS's track (where NPBL has trackage

rights) to NIT.  *Id.*; *see also* **CSX Ex. 7** (Moss Dep. 170:11-172:20); **CSX Ex. 10** (Hunt Dep.

159:3-160:7).  As the Port of Virginia has recognized, this increases CSX's operational costs to

access NIT.  *See* **CSX Ex. 54** at 23; *see also* **CSX Ex. 53** (Girardot Decl. ¶ 7) (removal of Diamond

results in long delays and unequal treatment relative to NS trains); **CSX Ex. 55** (Girardot Dep.

93:5-95:20) (describing burdensome operations required to access NIT via NPBL without the

Diamond); **CSX Ex. 56** (NSR_00011108) (2009 email from NS's Luebbers, explaining that the

Diamond "was conveniently removed when the Ford plant shut down").

44.     In 2009, NPBL rejected CSX's offer to purchase the Belt Line's Port Norfolk Yard

---

[7] Although NPBL suggests the NPBL Board agreed to discontinue its trackage rights due to
"costs," NPBL SOF ¶ 19, the meeting minutes cited imply the Board discussed costs associated
with an "alternative route" to the Diamond.  *See* NPBL Ex. 16 at -847.

20

professor with more than forty years' experience—has confirmed, the empirical data show that NS's and NPBL's conduct harms ocean carriers. Because CSX cannot effectively act as a competitive constraint on NS at NIT, NS charges higher prices to carriers who use NIT intensively. *See* NS Ex. 7 ¶¶ 69-81. ███████████████████████████████████████ ███████████████████████████████████████████. *See id.* ¶ 81. And because ocean carriers contract with NS for multiple lanes across a large geographic portfolio, the reverberations of this overcharge extend throughout the network. *See id.*

102.    Because ocean carrier RFPs cover multiple ports, CSX has lost substantial business across its entire network because of its lack of on-dock access at NIT. *See* CSX SOF ¶¶ 77-81, 86, 88. Dr. Marvel estimates that CSX's lost profits totaled more than $███ million between 2009 and 2020:



*See* NS Ex. 71 ¶¶ 120-126 & Exs. 14 & 15; *see also* NS Ex. 7 ¶¶ 85-100.

## STANDARD OF REVIEW

The Court can grant summary judgment to Defendants only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Because credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge,'" the Court may evaluate the evidence only as needed to determine whether there is "sufficient disagreement to require submission to a jury." *McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014). The Court should view all facts and permissible inferences from them in the light most favorable to CSX. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). If a reasonable jury could return a verdict for CSX, "then a genuine factual dispute exists and summary judgment is improper." *Wright v. Va. Peninsula Regional Jail Auth.*, No. 2:19cv189, 2021 WL 963496 at *2 (E.D. Va. March 15, 2021) (Davis, C.J.).

## ARGUMENT

### I.     CSX's Claims are Timely.

Though Defendants do not acknowledge it, they bear the burden of proof on the affirmative defenses of the statute of limitations. *See Graham v. Island Creek Coal Co.*, 184 F. Supp. 2d 511, 515 (W.D. Va. 2002) (noting that defendants "bear the burden of proof on the issue of whether the plaintiff's claims are barred by the statute of limitations," and denying summary judgment where the record contained disputed evidence as to the date on which plaintiff's injury occurred). The record does not support summary judgment on limitations grounds. As explained below, CSX alleges ongoing antitrust violations, which are timely so long as they continue into the limitations period, which CSX has shown. Accordingly these claims—including *all* evidence of Defendants' ongoing anticompetitive conduct—must be submitted to a jury. The same is true for CSX's state law claims, as detailed below.

41

### a. CSX's Sherman Act Claims are Timely (Counts I-IV).

Defendants' primary argument against CSX's antitrust claims is that they are barred by the applicable four-year statute of limitations. *See* NS Br. at 16-20; NPBL Br. at 15-21 (both citing 15 U.S.C. § 15b). Defendants contend that, because CSX did not sue within four years of their very first anticompetitive act, their ongoing monopoly and conspiracy are now unreachable, and they are free to block CSX's access to NIT, stifle competition, and overcharge ocean carriers in perpetuity with impunity.

Defendants' arguments misstate the law. Under the "continuing violation" doctrine— which NS only briefly acknowledges and NPBL ignores—"[t]he period of limitations for antitrust litigation runs from the most recent injury caused by the defendants' activities rather than from the violation's inception." *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 902 (7th Cir. 2004). And, contrary to NS's suggestion, this principle applies equally to CSX's antitrust conspiracy *and* monopolization claims. *See id.* (explaining, in applying continuing violation doctrine to monopolization claim, that "improperly prolonging a monopoly is as much an offense against the Sherman Act as is wrongfully acquiring market power in the first place"). As the Fourth Circuit reaffirmed *just one day* after Defendants filed their motions, "'in the context of a continuing conspiracy to violate the antitrust laws,' the statute of limitations begins to run from 'each time a plaintiff is injured by an act of the defendants.'" *Mayor of Baltimore v. Actelion Pharms. Ltd.*, __ F.3d __, 2021 WL 1376980, at *6 (4th Cir. Apr. 13, 2021) (citing *Zenith Radio Corp. v. Hazeltine Res., Inc.*, 401 U.S. 321, 338 (1971)); *see also United States v. Dentsply Int'l, Inc.*, No. Civ. A. 99-005, 2001 WL 624807, at *17 & n.18 (D. Del. Mar. 30, 2001), *aff'd sub nom. Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 424 F.3d 363 (3d Cir. 2005) (in Sherman Act monopoly case, denying motion for summary judgment based on the statute of

limitations after concluding that a jury could find certain conduct sufficient to restart the statute of limitations under the continuing violation doctrine).

This is true even if "the acts occurr[ing] within the limitations period were reaffirmations of decisions originally made outside the limitations period," *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 107 (3d Cir. 2010), and even if the conduct at issue is "intentional, concerted *inaction*" rather than affirmative acts, *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1172 (3d Cir. 1993) (emphasis added). For example, in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, the Supreme Court held that the plaintiff's claims were timely, even though the defendant's allegedly monopolistic leasing policy had been first adopted more than *forty years* before plaintiff sued. *See* 392 U.S. 481, 502 n.15 (1968). The Court explained: "We are not dealing with a violation which, if it occurs at all, must occur within some specific and limited time span. Rather, we are dealing with conduct which constituted a continuing violation of the Sherman Act and which inflicted continuing and accumulating harm." *Id.*

So too here. Although evidence produced in discovery shows that Defendants have engaged in anticompetitive and conspiratorial conduct for years, *see, e.g.*, CSX SOF ¶¶ 10, 17, the record contains ample evidence of overt acts and "intentional, concerted inaction" causing new injuries within the limitations period, *see, e.g., id.* ¶¶ 45-54 (operational challenges and CSX's payment of $210 rate in 2015), ¶¶ 56-61 (trackage rights); ¶¶ 62-71 (2018 proposal); *see also id.* ¶ 102 (injury to CSX).[22] Each of these acts is enough to "start[ ] the statutory period running again" on CSX's antitrust claims. *Actelion Pharms.*, 2021 WL 1376980, at *6.

---

[22] Defendants take a stinted view of the evidence, suggesting that CSX has pointed to only six examples of wrongful conduct since 2009. *See* NS Br. at 16; NPBL Br. at 15 (citing CSX's 2d Supp. Resp. to NPBL's Interrog. No. 4). To be clear, the interrogatory cited by Defendants asked CSX to identify "the specific overt act(s) *by NPBL* that you contend form the basis for the conspiracy alleged in Counts I, II, VIII, and IX of your Complaint." *See* NS Ex. 118 at 2 (emphasis

43

None of the authority Defendants cite is to the contrary.  First, *Klehr v. A.O. Smith Corp.*,

actually *refutes* their arguments.  There, the Supreme Court analyzed a RICO claim by analogizing

to the Sherman Act, explaining that "in the case of a continuing violation . . . , each overt act that

is part of the violation and that injures the plaintiff . . . starts the statutory period running again,

regardless of the plaintiff's knowledge of the alleged illegality at much earlier times."  521 U.S.

179, 189 (1997).[23]   In other words, when a continuing violation includes conduct within the

limitations period that causes injury, the plaintiff may bring claims based on that conduct,

regardless of when the conduct began.  *See W. Penn Allegheny Health*, 627 F.3d 85 at 107 (holding,

after *Klehr*, that "*Hanover Shoe* and *Lower Lake Erie* leave no room for [Defendants'] proposed

rule. . . . [P]laintiff's suit was timely even though the acts that occurred within the limitations period

were reaffirmations of decisions originally made outside the limitations period.").

The other cases cited by NS are inapposite.  Both *Kaw Valley Electric Cooperative Co. v.

Kansas Electric Power Cooperative, Inc.*, 872 F.2d 931, 933-35 (10th Cir. 1989), and *Lancianese

v. Bank of Mount Hope*, 783 F.2d 467, 470 (4th Cir. 1986), held that the continuing violation

doctrine did not apply because the plaintiff pointed to damages, but not *conduct*, within the

limitations period.  And in *Al George, Inc. v. Envirotech Corp.*, 939 F.2d 1271, 1275 (5th Cir.

---

added).  It did not ask CSX to identify all wrongful conduct within the limitations period; nor did
it ask for examples of action (or purposeful inaction) by NS.  *See id.* at 2-3 (CSX's response,
clarifying that it is "in no way intended as an exhaustive list of overt acts committed by NS in
furtherance of the conspiracy").  CSX's response is thus not a catalogue of all evidence supporting
its claims.

[23] In arguing that CSX's antitrust claims are time-barred, NPBL suggests CSX "was aware of its
alleged injuries" in 2009.  *See* NPBL Br. at 16-17.  The evidence cited by NPBL does not support
this conclusion, particularly in light of Defendants' repeated obfuscations during this period.  *See*
CSX SOF ¶¶ 18-41.  Regardless, CSX's knowledge is immaterial, since each act in furtherance of
Defendants' continuing violations restarts the limitations period on its claims, no matter what CSX
knew or when.  *See Klehr*, 521 U.S. at 189.

1991), the court determined that the last overt act occurred *outside* the limitations period.  Here, as discussed above, CSX has identified both conduct *and* damages within the limitations period.

NS contends that Defendants' post-2014 conduct does not constitute "new and independent act[s]" that are "distinct from the 'abatable but unabated inertial consequences' of NPBL's 2009 decision to set the switch rate at $210."  NS Br. at 20.  As the Fourth Circuit recently reiterated, however, in cases involving anticompetitive pricing, each sale constitutes a new injury restarting the limitations period.  *See Actelion Pharms.*, 2021 WL 1376980, at *6.  So even if the $210 switch rate were the only conduct at issue—which it is not, as the Court has already recognized, *see* ECF No. 66 at 38-39—CSX's payment of that anticompetitive rate in 2015 would suffice to restart the statute of limitations on its claims.  But those payments are just one piece of CSX's case—the record also contains plentiful evidence of Defendants' obstruction of CSX's efforts to access NIT via NPBL in 2015, NS's cancellation of NPBL's trackage rights and subsequent attempts to negotiate a prohibitively high rate between 2015 and 2018, and Defendants' rejection of CSX's 2018 service and governance proposals.  All of these events constitute "new and independent" acts, distinct from the setting of the switch rate, that caused harm and thus restarted the statute of limitations.[24]

NS claims "Defendants took *no overt action* on the 2018 Rate Proposal."  NS Br. at 19 (emphasis in original).  But "overt action" for antitrust or conspiracy purposes need not be a formal Board vote denying CSX's request.  Rather, impeding, delaying and effectively denying through inaction are all sufficient to restart the limitation period, whether those acts are characterized as

---

[24] For this reason, NS's citation to *XY, LLC v. Trans-Ova Genetics* is inapposite.  In that case, the Federal Circuit affirmed summary judgment on limitations grounds because the plaintiff failed to identify *any* "new and accumulating" injury within the limitations period resulting from the alleged conspiracy.  *See* 890 F.3d 1282, 1292 (Fed. Cir. 2018).

45

actions to impede or *purposeful inaction*. *See Lower Lake Erie*, 998 F.2d at 1172 (explaining that

"continuing and accumulating damage may result from intentional, concerted inaction. The

purposeful nature of the inaction . . . obviously constitutes an injurious act, although perhaps not

an overt one in the commonly-understood sense"). It is undisputed that, pursuant to its charter,

NPBL exists to connect its owner railroads to destinations on its network, including NIT. Barring

Defendants' anticompetitive conduct, NPBL would have acted to facilitate CSX's access to NIT,

as it has facilitated CSX's and NS's access to other points. By refusing to take action on CSX's

proposals—which would have furthered NPBL's stated purpose and benefitted NPBL

financially—Defendants actively blocked CSX's access to NIT, thus engaging in the very

anticompetitive activity reflected in the record.

Most critically, NS's arguments underscore the many material disputes of fact at issue.

*Compare* NS Br. at 19 (arguing CSX "successfully used NPBL to access NIT in 2015") *with* CSX

SOF ¶¶ 46-49, 51-53 (describing substantial, unreasonable barriers imposed on CSX's access in

2015); NS Br. at 19 (arguing "Defendants took *no overt* action" on 2018 Proposal) *with* CSX SOF

¶¶ 64-71 (describing actions by NS and NPBL directors and management to prevent fair

consideration of the 2018 Proposal); NS Br. at 19-20 (arguing that NS "had the contractual right"

to reject CSX's Governance Proposal) *with* CSX SOF ¶ 2 & *infra* at 69-70 (disputing NS's

interpretation of the relevant agreements). These factual disputes preclude summary judgment.[25]

---

[25] To the extent that Defendants suggest that *evidence* of pre-2014 conduct is not admissible to
support CSX's claims, that argument fails. The trier of fact may consider all evidence of
Defendants' continuing violations. *See, e.g.*, *Dial Corp. v. News Corp.*, 165 F. Supp. 3d 25, 37-
38 (S.D.N.Y. 2016) ("[A] monopoly which is 'maintained' during the damages period would need
to be created before the damages period, and anticompetitive conduct before the limitations period
may be material to a showing that Plaintiffs were injured during the damages period.").

Because all of this evidence falls within the applicable limitations period, CSX's state law claims are timely.  At a minimum, the Court cannot resolve these factual issues on summary judgment.  *Lozano*, 839 F.2d at 1023.

### c.   CSX's Damages Calculation Methodology Does Not Govern Accrual.

In trying to show that CSX's claims are time-barred, Defendants point to CSX's damages calculation methodology, which they criticize, based on a total of two federal decisions, as not "apportion[ing] damages between any separate unlawful acts."  NPBL Br. at 18-19; *see also* NS Br. at 18-19.  To be sure, CSX's expert, Dr. Howard Marvel, calculated profits CSX lost due to "the totality of NS's and NPBL's efforts to foreclose CSX" from on-dock rail at NIT.  *See* CSX SOF ¶ 102.  Most of these occurred in years *after* 2013—within the limitations periods.  *See id.*

Defendants' argument that CSX must tie its damages calculation to specific overt acts "obfuscates the difference between, on the one hand, an 'overt act' necessary to show the existence of a conspiracy, and, on the other hand, an 'injurious act' causing damages within the limitations period."  *Lower Lake Erie*, 998 F.2d at 1172.  Although a plaintiff must identify at least one timely overt act causing injury in order to satisfy the statute of limitations, *Zenith Radio Corp.*, 401 U.S. at 338, its damages calculations need not be tied to that act, because "overt acts aren't what cause damage.  *It is the effectiveness of the overall conspiracy that causes damages.*"  *Lower Lake Erie*, 998 F.2d at 1172 (emphasis added).

Particularly in monopoly cases like this one, "the relevant inquiry is the anticompetitive effect of [Defendants'] exclusionary practices considered together."  *LePage's v. 3M*, 324 F.3d 141, 162 (3d Cir. 2003); *see also City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992) ("[I]t would not be proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect.").  Thus, once the jury finds that

49

Defendants' unlawful conduct injured CSX, "damages may be determined without strict proof of what act caused the injury, as long as the damages are not based on speculation or guesswork." *3M*, 324 F.3d at 166; *see also Dial Corp*, 165 F. Supp. 3d at 38 (in monopoly case, rejecting summary judgment argument that plaintiff's damages model did not "sort out the effects of any particular form of anticompetitive conduct," explaining that "calculating damages in antitrust cases is not an exact science," and that "if a jury were to find [defendant's] actions taken as a whole to be a violation of Section Two of the Sherman Act, disaggregating the monopolist's lawful actions from its unlawful actions for the purpose of calculating damages may be unnecessary, if not impossible"); *Poster Exch'g, Inc. v. Nat'l Screen Serv. Corp.*, 517 F.2d 117, 125 (5th Cir. 1975) (approving "day by day calculation of accruing injury" in monopoly and conspiracy case "based on continuing antitrust behavior, not merely the continuing damage [plaintiff] feels from a single day's monopoly and refusal to deal").

The same is true of CSX's state law conspiracy claims. The Fourth Circuit has recognized that, under Virginia law, damages result from the totality of a conspiracy, not any particular overt act. *See Blackwelder v. Millman*, 522 F.2d 766, 776 (4th Cir. 1975) (reversing summary judgment where damages resulting from conspiracy continued into limitations period); *see also Com. Bus. Sys., Inc. v. Bellsouth Servs., Inc.*, 453 S.E.2d 261, 267 (Va. 1995) ("Whether a conspiracy caused the alleged damage ordinarily is a question for a jury."). None of the cases cited by NPBL suggest otherwise. *See* NPBL Br. at 19-20 (citing *Gallop v. Sharp*, 19 S.E.2d 84, 86 (Va. 1942) (providing only that "the damage produced must arise as the effective result of the conspiracy")).[27]

---

[27] The other Virginia cases cited by NPBL do not involve conspiracy claims. *See Street v. Consumers Mining Corp.*, 39 S.E.2d 271 (Va. 1946) (trespass); *Louisville & N.R. Co. v. Saltzer*, 144 S.E. 456 (Va. 1928) (negligence).

50

JA208

NPBL contends that this Court's decision denying Defendants' motions to dismiss provided a "roadmap" for CSX's calculation of damages. *See* NPBL Br. at 20-21 (citing ECF No. 66 at 38-39). But this Court explained that CSX's damages would arise from profits lost as a result of Defendants' ongoing anticompetitive and conspiratorial conduct. *See* ECF No. 66 at 38. It did not suggest, at the motion to dismiss phase of the case, that CSX must apportion those lost profits by contract or tie them to any singular overt act. *See id.* NPBL's argument to the contrary misunderstands the facts of the case. CSX's lost profits are not limited to the marginal difference between the switch rate proposed by CSX and the rate charged by NPBL; they are the profits lost as a result of ocean carriers choosing not to contract with CSX due to its inability to access on-dock rail at NIT, as a result of the totality of Defendants' anticompetitive and conspiratorial conduct. Indeed, that is the consequence of the Defendants' conspiracy: CSX cannot effectively access NIT via NPBL and has lost business and profits due to that constraint. The record contains evidence of this lost business, *see id.* ¶ 88, and CSX's expert, Dr. Marvel, has calculated CSX's lost profits by year, *see id.* at ¶ 102. Neither Defendant challenges Dr. Marvel's damages calculation methodology.

The record contains ample evidence of overt acts by Defendants during the limitations period. The quantum or method for calculating damages arising from the totality of Defendants' conduct does not affect the timeliness of CSX's claims.

## II.     There is Ample Evidence Supporting CSX's Conspiracy Claims (Counts I, II, VII, IX).

CSXT has asserted four conspiracy claims against Defendants. *See* ECF No. 1 ¶¶ 77-84 (conspiracy to restrain trade in violation of Sherman Act § 1); *id.* ¶¶ 85-90 (conspiracy to monopolize in violation of Sherman Act § 2); *id. id.* ¶¶ 101-121 (statutory business conspiracy under Va. Code § 18.2-499, -500); *id.* ¶¶ 122-125 (Virginia common law conspiracy). Although

51

# Exhibit 80



CSX Transportation, Inc.
500 Water Street, J-801
Jacksonville, Florida 32202
Tel. 904-359-7637
Email: Tony_DiDeo@csx.com

**Tony DiDeo**
**Director Intercarrier Management**
**Joint Facilities**

March 23, 2018

**VIA OVERNIGHT MAIL AND ELECTRONIC MAIL**

Mr. Cannon Moss
Director, President & General Manager
Norfolk and Portsmouth Belt Line Railroad Company
1340 Truxton Street
Chesapeake, VA 23324

Ms. Donna Coleman
Director, Vice President, Comptroller & Corporate Secretary
Norfolk and Portsmouth Belt Line Railroad Company
1340 Truxton Street
Chesapeake, VA 23324

*[handwritten note:]*
$ 7.23/car each way
$ 6,003 bridge operator/mo
$ 8,000/yr property tax
$ 1,600/mo Portlock

**Re: Rate Proposal for Long Term Rail Service to NIT**

Dear Sir and Madam:

By this letter, CSX Transportation (CSXT) requests that NPBL management adopt the following proposal for long term rail intermodal service to Norfolk International Terminals (NIT), as described in detail below, and as consistent with the NPBL's purpose and interests.

A few years ago, NPBL handled several intermodal trains during a period of near historical shipping container congestion at the ports in Virginia and along the east coast. From those movements alone, we confirmed that consistently operating trains to NIT for CSXT is possible. During that short-lived crunch, CSXT was able to justify the extremely high cost of moving those trains via NPBL at its general tariff rate only because the Virginia Port Authority (VPA) and our customers were desperate to clear the backlog caused by the

JA211

NPBL000193

unexpected container surge, and our drayage providers were completely overwhelmed. In other words, we had no other practical choice at the time.

The NPBL's general tariff rate, however, remains prohibitive for normal movements of shipping containers to and from NIT. NPBL has not handled a single intermodal train for CSXT since that period of extreme congestion (nor did it move any intermodal trains to NIT for CSXT prior to that time). This is principally because NPBL's unduly high rates, as well as operational constraints on its service to NIT that should not have existed, and in all events are avoidable or remediable, have made use of NPBL to move containers to or from NIT economically non-viable, or even effectively impossible.

We have been studying this issue closely, however, and remain confident that a rate package promptly can be negotiated and agreed-to that would provide the NPBL with a consistent, long term stream of additional income that could improve its financial position and sustain it into the future, while also being sufficiently reasonable that NPBL could attract sufficient additional traffic to support the rates profitably. In fact, we estimate the service for CSXT we are proposing will generate for NPBL approximately $1,440,000 in incremental revenue and potentially $660,000 in incremental operating income in the first year of service alone (estimates based on NPBL's 2016 Annual Report).

The following is a proposal of terms which can serve as the foundation for a definitive rail transportation agreement. We are open to discussion on all points, and welcome your input throughout the process, though we want to move this to conclusion swiftly and see no reason it cannot be.

## Background

On July 19, 2010, CSXT provided NPBL management with a formal rate proposal and operating plan (enclosed), which was the product of months of review with NPBL management and Virginia International Terminals (VIT). In particular, NPBL management provided financial and costing information that allowed CSXT to tailor its proposal in a manner that would have provided consistent additional operating income to the NPBL and would have been mutually beneficial for NPBL and CSXT. We expect much of the work and learning from that extensive review process is still relevant and useable, and can be replicated or updated to expedite development of a new mutually-beneficial arrangement. Similarly, we believe the commercial sensitivity and depth of historical information on hand would obviate the need for convening another rate committee, but we are willing to work again through this approach if necessary.

With respect to the operating plan, we are pleased to report that senior officers of CSXT have already met with VPA officers to discuss our objective. The VPA was very supportive of our plans and have committed to assisting us with this important endeavor. Thus, much like the rate committee, we expect any discussions with VIT regarding operations will be productive and can be arranged in short order.

2 | P a g e

NPBL000194

## Summary of Proposed Rates and Contractual Terms

The past two decades have demonstrated that the NPBL general tariff charge of $210 per car (or per unit, in the case of articulated cars) remains an economic barrier for the NPBL to handle intermodal freight. This charge, whether absorbed by CSXT or passed through to the customer, is simply not competitive for any lane on our network and beyond. Although the NPBL's tariff history demonstrates that the NPBL has often published different switch charges for different commodities, we are aware of NPBL managements' past statements that it was not willing to offer different rates based on commodities. Similarly, we understand the NPBL has faced challenges from its Board and/or the other shareholder with respect to private contracts. More specifically, some Board members in the past have argued that an amendment to the NPBL bylaws would be required to permit the NPBL to enter into private freight contracts (even though the NPBL enters into private contracts for other services, such as locomotive leases, contractor services, etc.), and to allow use of non-NPBL owned or leased locomotives for movements over NPBL trackage. After reviewing case law and Virginia code extensively, we are not convinced this is an accurate interpretation of NPBL's bylaws or the law, generally. Nevertheless, we believe that we will be able to reach agreement on a long term transportation agreement that will be sufficiently beneficial to NPBL such that no reasonable person could refuse to take whatever action is necessary to allow NPBL to enter into such a contract, even if it would involve using locomotive power provided by CSXT or another company. By doing so, we might also be able to lay the groundwork for similar rates and services to be provided by NPBL for NS to reach Portsmouth Marine Terminal (PMT) going forward.

Even at an income-neutral level, we think aspects of how the NPBL operates need to be updated for it to remain viable and competitive, and able to fulfill its charter. Port traffic in Norfolk and Portsmouth is continuing to increase, and NIT is undergoing a radical expansion thanks in large part to a capital infusion of hundreds of millions of taxpayer dollars. If ever there was a time to demonstrate the NPBL's commitment to serve its shareholders and the community that supports it financially, and provide intermodal service to NIT, it is now. Failure to seize this opportunity virtually begs VPA to configure NIT in a manner that would effectively preclude NPBL from continuing to provide even nominal rail service to NIT.

### Rate:

We propose $80 per car (i.e., each articulated section of an articulated car), for loaded or empty cars, moved to or from NIT for the purpose of handling international containers. We think this rate will be sufficiently competitive to attract incremental rail intermodal freight to NIT, while allowing NPBL to earn additional revenue of $1,440,000, annually, based on the initial level of volume we describe below.

3 | Page

NPBL000195

*Volume*:

CSXT proposes a minimum annual volume guarantee, with mutually agreed conditions, of moving 18,000 cars (i.e., each articulated section), loaded or empty, moving to or from NIT, on the NPBL per contract year.  We are open to a gradual ramp up of volumes in the first years, to allow for less volume in the initial years, progressing (or even exceeding) the proposed volumes in this proposal letter.  Finally, we are willing to negotiate mutually-suitable minimum and/or maximum train sizes (on a per car basis).

*Shortfall Fee:*

CSXT proposes a shortfall fee of $60 per car, based on a minimum volume commitment of 18,000 cars per year.  Standard defenses or exceptions (e.g., force majeure) would apply.

*Days of Service:*

We have modeled our proposal based on 5 days per week service, consistent with the days of operation at NIT, in order to take advantage of the efficiency and safety benefits provided by fixed crew assignments.  Over time, we would be interested in up to 7 days per week service (with a corresponding increase in guaranteed minimum volume), and are willing to consider a graduated "ramp up" to 7 days in the earlier stages of this service.  We understand we will both need to consider labor costs, among other things, and are willing to work with you to maximize productivity.

*Start Date and Term:*

CSXT is ready, willing and able to commence service today.  That said, we would be open to a commencement date within 30 days of the execution and delivery of the mutually agreed contract.  With respect to the term of any agreement, CSXT is willing to negotiate a reasonable fixed term, including conditions for renewal, all to be mutually agreed.

*Locomotives and Fuel:*

CSXT is willing to provide NPBL with the locomotives and fuel to handle movement of CSXT traffic at no charge to NPBL.  We understand there has been an objection to using CSXT power in the past, even though CSXT and NS locomotives operate on NPBL property every day.  As noted above, we think we can reach a mutually agreed arrangement that is sufficiently attractive to motivate appropriate corporate action (if any is necessary) to remove any obstacles.  Nevertheless, we are also willing to work with NPBL to adjust the

4 | P a g e

NPBL000196

rates and operating plan to account for use of NPBL power and fuel, at least to the extent and for so long as any corporate formality actually requires NPBL to do so.

Regardless of which locomotives are used for the move, we would defer to NPBL's stated preference or requirements with respect to the minimum locomotive power (i.e., Horsepower per Ton Ratio).

### *Interchange Location, Time of Handoff, and Maximum Train Length:*

Here again, we would defer to the NPBL with respect to the interchange location, and are open to designation of multiple interchange locations (e.g., Berkley Yard and Portsmouth Yard) to be determined by the parties prior to each interchange event. Rates would remain the same, regardless of interchange location. Similarly, we are willing to work with you to determine operating windows for the exchange of interchange cars. We understand that, at least initially, the windows may vary on a weekly (if not daily) basis.

### *Documentation:*

The foregoing terms would be subject to and become binding only upon memorialization in a mutually agreed written format (rail transportation contract or equivalent) duly signed for both NPBL and CSXT.

### Economic Impact on the NPBL

Based on CSXT's internal projections of the NPBL cost structure, and the use of CSXT's locomotives and fuel at no cost to NPBL, we estimate this proposal would provide the NPBL with a minimum of $660,000 of additional annual operating income (and an operating ratio for the service equal to 54%) starting in the first full year of operations. That would represent a substantial increase over 2016 total operating income for the NPBL, with almost zero risk to the NPBL.

It is worth emphasizing that there is nothing but upside to this proposal, especially with a baseline commitment from CSXT to move 18,000 cars per year. Given the estimated operating ratio NPBL would enjoy from this service, and CSXT's expectation that volumes will only grow once the parties can demonstrate consistent service, we believe this proposal could be a significant element of NPBL's long term strategy in Norfolk.

### Operating Plan

The requested services is for "drop and swap" intermodal single-stack or double-stack unit train service between Berkley Yard (or Portsmouth Yard) and NIT. We intend to

5 | P a g e

NPBL000197

work with you to minimize direct expenses to the NPBL, to work with VIT to integrate with existing and planned operations inside the gate at NIT. We also recognize the need to work with NS to integrate with their operating needs, and we believe it is imperative for all parties to work together in order for NPBL to honor its longstanding obligation to provide service to its owners, to enjoy the use of its trackage rights, and to fulfill the purpose of its retained trackage rights from the sale of its property outside of NIT to the VPA in 2010.

We also note that the NPBL management endorsed the operating plan detailed in the July 19, 2010 rate proposal, and we are willing to work from that operating plan with such adjustments as may be deemed necessary to address any bona fide concerns raised by NS or VIT.

## Summary

During the eight years since CSXT's last proposal for long term rail intermodal service, CSXT has had no choice but to dray over one hundred thousand containers that easily could have been handled by the NPBL. Under the current proposal, and based solely on a minimum volume, the NPBL could earn at least $11 million in revenue and over $5 million in incremental operating income over the same period. As NIT continues work on its massive expansion project, nearly doubling its present throughput, the projected earnings from this proposal could increase tremendously.

As stated above, we are fully committed to work with the NPBL to address any concerns regarding the requested service and any other terms of this proposal. Given the opportunity presented by this proposal, and the downside if we must continue to rely on drayage, there can be no doubt that time is of the essence for both parties. To that end, we respectfully request a written response to this proposal no later than **April 2nd**.

We look forward to working with you on this important project.

Sincerely,

Tony DiDeo

(Enclosure – July 19, 2010 Rate Proposal and Operating/Financial Plan)

NPBL000198

**July 19, 2010 Rate Proposal & Operating/Financial Plan**

[Please see attached]

.

7 | P a g e

NPBL000199



500 Water Street, J315
Jacksonville, FL 32202
(904) 359-3486
John_Booth@csx.com

J.N. Booth, III
Director Joint Facilities

July 19, 2010

**VIA ELECTRONIC MAIL**

Mr. David Stinson
Director, President & General Manager
Norfolk and Portsmouth Belt Line Railroad Company
P.O. Box 7545
Portsmouth, VA 23707

Ms. Donna Coleman
Director, Vice President, Comptroller & Corporate Secretary
Norfolk and Portsmouth Belt Line Railroad Company
P.O. Box 7545
Portsmouth, VA 23707

Re:    Rail Service Connection to NIT – Rate Proposal and Operating/Financial Plan

Dear Sir and Madam:

We refer to CSXT's October 15, 2009 rate proposal, which was rejected by the NPBL because it did not include a detailed operating plan and estimated financial impact on the NPBL. To address the NPBL's concerns, CSXT has consulted with the NPBL and Virginia International Terminals, Inc. (VIT) on the following operating plan, and has further examined relevant financial information, including information provided to the 2009 NPBL Rate Committee.

CSXT is now pleased to offer the following rate proposal, together with an operating plan and related financial information. As detailed below, and assuming NPBL elects to use CSXT locomotives at no charge, this rate proposal will provide the NPBL with at least $149,452 in risk-free incremental operating income in the first calendar year of operations alone.

NPBL000200

USCA4 Appeal: 23-1537 Doc: 48 Filed: 12/06/2023 Pg: 224 of 438

## Operating Plan

This operating plan is for intermodal single-stack unit train service between Berkley Yard and Norfolk International Terminals (NIT). In addition to minimizing direct expenses to the NPBL, this operating plan is designed to integrate with existing and planned operations inside the gate at NIT.

At the onset, CSXT requests a drop & swap service three days per week, whereby the NPBL would complete services at NIT between 00:00 and 05:00 on Sunday, Tuesday, and Thursday. For your convenience, Annex A to this letter proposal provides a visual overview of the rail movements in the operating plan described below:

- First, CSXT will deliver a locomotive, including sufficient fuel for the round-trip to NIT, and cars to Berkley Yard, by 18:00 on the preceding day.

- Between 18:00 and 21:00 on the days of CSXT's delivery to Berkley Yard, the NPBL will access NSRR tracks starting at NS Jct., as permitted by agreements between NPBL, NSRR and their respective predecessors dated: July 26, 1917, July 27, 1917, December 31, 1985 and January 1, 2008.

- At Port Lock Yard, the NPBL will pull into an available track, as designated by the NSRR Yard Master. At this time, the NPBL crew will cut away from the front of this consist, run around to the tail, and reconnect. NPBL will perform required brake testing prior to departing. At this point, the NPBL will be staged and waiting for the NSRR Yardmaster to grant permission for movement to NIT.

- After departure from Port Lock Yard, the NPBL will arrive at NIT during the scheduled window from 00:00 to 05:00. As the NPBL advances the 8 miles to QM Jct. (crossing the right leg of the switch), it will proceed past West Jct. onto the NPBL trackage, known as Sewells Point Yard. Here, the crew will set off the consist onto the passing track near Hampton Blvd. and North Gate Road.

- The NPBL crew will then contact VIT for instructions relative to any outbound CSXT containers to be pulled from NIT.

  - If there is an outbound consist to be picked up at NIT, the NPBL crew will advance to NIT and retrieve the consist from the pickup track designated by VIT.

    - The consist will already have been inspected and air tested by TTX, at no cost to the NPBL.

    - The NPBL crew will backtrack over the same route returning to Berkley Yard for CSXT pick up between 13:00 and 17:00 same day.

  - If there is no outbound consist to be picked up at NIT, the NPBL crew would return the locomotive to Berkley during that same window.

2

NPBL000201

Please note the following, which was incorporated into this operating plan:

- The NPBL management has expressed confidence that the proposed round-trip schedule can be completed efficiently with one scheduled crew start.

- This operating plan assumes the NPBL will use CSXT's locomotive between Berkley and NIT without cost or requirement to refuel.

    o This accommodation will not only simplify operations for these moves, it will enhance NPBL's profitability as noted in the first table below. If NPBL elects to us its own power, the calculations shown in Table 2 will apply.

**Rates and Contractual Terms**

In order for the NPBL to secure port-related traffic at NIT, its rates and operating requirements must be competitive. Presently, the NPBL's switch rate of $ 210 per car is an economic barrier that prevents CSXT from being able to move any meaningful port freight by rail at NIT.

Here's why: under Item 125 of its public tariff, the Commonwealth Railway charges $35.61 per container (empty or loaded) for a similar movement from APM Terminals. The difference between switch charges is considerable, and will only make the NPBL's rate less competitive now that VIT can shift traffic to APM Terminals in its discretion.

CSXT is not interested in placing the full burden on the NPBL to close this gap. Our proposed operating plan, which provides substantial risk-free incremental operating income, demonstrates our willingness to make accommodations to help the NPBL in this effort.

Accordingly, CSXT proposes the following, all to be memorialized in a formal agreement:

- One-way rate of $37.50 per container (empty or loaded) for a term of three years on movements handled by the NPBL between Berkley Yard and NIT. For operational convenience as necessary, the parties may mutually agree to interchange at Portsmouth Yard for the same rate.

- To minimize financial risk to the NPBL, CSXT commits to provide a minimum average volume (measured over each six month period during the term) of 50 containers per scheduled NPBL round-trip. Assuming three days per week service, the NPBL would have a consistent revenue stream of $146,250 for 3,900 containers for that six month period.

- In consideration of CSXT's commitment, CSXT may request that scheduled service days be adjusted upon CSXT's prior written request. Also upon prior written request, CSXT may request double-stack service at the same rate per container.

3

NPBL000202

These adjustments, with allowance for proper notice, would give both parties adequate time to respond to changing market conditions.

- The NPBL's standard settlement and credit terms would apply to the covered traffic, with any potential container shortfall payment to be remitted in a reasonable time after each six month period.

- Mutually acceptable measures and standards of service, including incentives related thereto, would be incorporated into a formal agreement.

## Economic Impact on the NPBL

As shown below in Table 1, based on CSXT's internal analysis of the NPBL cost structure, and the use of CSXT's locomotives and fuel at no cost, this proposal would provide the NPBL with a minimum of $149,452 of additional annual operating income starting in the first full year of operations. That would represent an increase of 25% over 2009 total operating income for the NPBL, with almost zero risk to the NPBL.

It is worth emphasizing that there is nothing but upside to this proposal, especially with a baseline commitment of 50 containers.  For example, if CSXT tenders 80 containers per round-trip (the "Project Volume"), the NPBL's incremental operating income would be $296,872 over the first full year of operations. This modest increase in volume is not an unreasonable projection, and yet it would represent almost a 50% increase to 2009 operating income.

### [TABLES FOLLOW ON NEXT PAGE]

4

NPBL000203

**Table 1**

|  | W/ CSXT Locomotives & Fuel | |
|---|---|---|
|  | Base Level | CSXT Projected |
| Avg. Containers Per Train (Scheduled Crew) | 50 | 80 |
| **Annual** | | |
| Container Volume | 7,800 | 12,480~ |
| NPBL Revenue | $292,500 | $468,000 |
| Compensation & Benefits | $96,248 | $96,248 |
| Locomotive Expense | $0 | $0 |
| Fuel | $0 | $0 |
| Incremental Maintenance | $46,800 | $74,880 |
| Direct Expense* | $143,048 | $171,128 |
| Operating Income Impact | $149,452 | $296,872 |

\* Extrapolated from 2009 Rate Committee Meeting Package

**Table 2**

|  | W/ NPBL Locomotives & Fuel | |
|---|---|---|
|  | Base Level | CSXT Projected |
| Avg. Containers Per Train (Scheduled Crew) | 50 | 80 |
| **Annual** | | |
| Container Volume | 7,800 | 12,480 |
| NPBL Revenue | $292,500 | $468,000 |
| Compensation & Benefits | $96,248 | $96,248 |
| Locomotive Expense | $10,714 | $10,714 |
| Fuel | $19,000 | $19,000 |
| Incremental Maintenance | $46,800 | $74,880 |
| Direct Expense* | $172,762 | $200,842 |
| Operating Income Impact | $119,738 | $267,158 |

\* Extrapolated from 2009 Rate Committee Meeting Package

**Note to Table 2:** As noted above, CSXT's operating and financial plan contemplates the NPBL's use of CSXT locomotives and fuel at no charge. However, should the NPBL wish to use its own locomotives and fuel, Table 2 provides an estimate of the economic impact to the NPBL, which remains quite favorable.

If the NPBL elects not to use CSXT's locomotives and fuel, the NPBL would still make $119,738 in incremental operating income at the base-line volume commitment level in the first year of operations. And, using the Projected Volume, the NPBL would generate $267,158 of incremental operating income, which would represent an increase of approximately 45% over 2009 total operating income for the NPBL.

5

## Summary

CSXT reaffirms its belief that time is of the essence for the NPBL to consider this proposal, which is designed to enable both parties to attract intermodal port traffic at NIT. The outlined operating plan and projected financial gains respond to the NPBL's earlier concerns and provide the justification necessary for the NPBL management to support this endeavor.

CSXT also believes this proposal enables the NPBL to deliver on the commitments it has made, directly and indirectly, to the citizens of the Commonwealth, to create competitive dual rail service at NIT. We hope you agree and respectfully request a favorable response from you within thirty (30) days of this letter.

Very Truly Yours,

John Booth

6

NPBL000205

## Operating Plan Support Maps

### CSXT → Berkley Yard → NSRR Port Lock Yard



### NSRR Port Lock Yard → NIT



## Norfolk International Terminals



6

NPBL000206

# Exhibit 84

**Moss, Cannon**

| | |
|---|---|
| **From:** | Moss, Cannon |
| **Sent:** | Thursday, April 5, 2018 3:00 PM |
| **To:** | 'DiDeo, Tony' |
| **Subject:** | RE: Rate Proposal for Long Term Rail Service to NIT |

Tony:

Thank you for taking the time to talk with me about the CSX rate proposal.  I had an opportunity to meet with VIT this morning and wanted to pass along the following thoughts regarding the proposal you sent.

- The operating plan outlined in the 2010 letter gives us a good starting point for the operation.  The major factor in play are the windows NS would provide for NPBL to make our run to NIT.  Once we have those windows we can build our plan around them.
- The 2010 plan would require two crews.  I wasn't part of NPBL when this was discussed but looking at the times discussed, you would need two crews.  If we formulated a similar plan, two crews would be required.
- Interchange location would be Berkley yard.  The starting maximum length of the train would be 4,000ft. based on space available at Berkley Yard.  NPBL does not have any location to hold a 4,000 ft. train so the inbound/outbound trains will need to yarded before departure.
- Because of the time sensitive nature of intermodal traffic we would require two locomotives for this move.  This is to prevent any delay due to engine failure.  Under our current bylaws NPBL power is required.
- In order to facilitate this move, NPBL will need to hire 9 additional employees to perform this service.   Once hired the training time is approximately 5 months which will need to be a factor when considering a start date.
- NPBL management has reviewed the proposed rate and would recommend to the board for a rate committee to do a complete review of the tariff.

Please let me know if you have any questions,

Regards,
Cannon Moss

**From:** DiDeo, Tony [mailto:Tony_DiDeo@csx.com]
**Sent:** Friday, March 23, 2018 11:45 AM
**To:** Moss, Cannon <Cannon.Moss@nscorp.com>; Coleman, Donna <Donna.Coleman@nscorp.com>
**Subject:** [EXTERNAL] Rate Proposal for Long Term Rail Service to NIT

Please see the attached rail service proposal from CSXT.

Thanks,

Tony DiDeo

---

**Anthony DiDeo | CSX Transportation**

Director Intercarrier Management || Office (904) 359-7637 ||E-mail Tony_DiDeo@csx.com

1

NPBL006228

This email transmission and any accompanying attachments may contain CSX privileged and confidential information intended only for the use of the intended addressee. Any dissemination, distribution, copying or action taken in reliance on the contents of this email by anyone other than the intended recipient is strictly prohibited. If you have received this email in error please immediately delete it and notify sender at the above CSX email address. Sender and CSX accept no liability for any damage caused directly or indirectly by receipt of this email.

2

NPBL006229

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

CSX TRANSPORTATION, INC.,

        Plaintiff,

  v.                                      Civil Action No. 2:18-cv-530-MSD-RJK

NORFOLK SOUTHERN RAILWAY
COMPANY, *et al.*,

        Defendants.

**NORFOLK AND PORTSMOUTH BELT LINE RAILROAD COMPANY'S**
**<u>REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT</u>**

again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times."

CSXT Br. at 42 (quoting *Klehr*).  CSXT again fails to include the most important part:

> But the commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period…. *The plaintiff cannot use an independent, new predicate as a bootstrap to recover for injuries caused by other earlier predicate acts that took place outside the limitations period*.

*Id.* at 189-90 (emphasis added).[4]

### B. CSXT's damages model cannot sustain a verdict because it forces the jury to speculate which of CSXT's damages are for acts within the limitations period.

Even if CSXT could show that an overt act in furtherance of a conspiracy was committed within the limitations period, CSXT is barred from recovering damages for earlier acts that occurred outside the limitations period.  CSXT filed suit on October 4, 2018, so the 4-year limitations period on its federal antitrust claims extends back to October 2014.  Yet CSXT's model only calculates aggregate damages caused by the entirety of the alleged conspiracy, including damages as far back as 2009 for acts allegedly committed in 2008.  *See* Marvel Reply Report (ECF No. 301-10) at ¶¶ 124, 126.  That leaves the jury to speculate as to CSXT's recoverable losses.  Even CSXT agrees a jury verdict awarding damages cannot be "based on speculation or guesswork."  CSXT Br. at 49-50 (quoting *LePage's v. 3M*, 324 F.3d 141, 162 (3d Cir. 2003).

---

[4]    The other cases CSXT cites affirm this principle.  *See Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 502 (1968) (allowing antitrust claim in 1955 for conduct that began in 1912, but only permitting recovery of damages that accrued within limitations period); *Xechem v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 902 (7th Cir. 2004) (for suit filed in 2003, plaintiff could recover damages for acts in 2000 and 2002 but not in 1997); *Mayor v. Actelion Pharms. Ltd.*, 2021 U.S. App. LEXIS 10531, at *21 (4th Cir. 2021) ("[E]ach time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act"); *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 107 (3d Cir. 2010) (plaintiff may only "recover damages for the acts that occurred within the limitations period").

CSXT relies exclusively on its expert to calculate its alleged damages. Its expert states unequivocally that he calculated an aggregate amount of damages that included damages allegedly suffered as far back as October 1, 2009. *See* Marvel Reply Report (ECF No. 301-10) at ¶¶ 124, 126 (stating that "in total" he calculated damage "from October 1, 2009 through December 31, 2020" and that "the source of the damages I estimate is the totality of NS's and NPBL's efforts to foreclose CSX, rather than NPBL's exorbitant switch rate alone").

CSXT concedes in its opposition that its expert includes damages attributable to acts accruing outside the limitations period, and that he fails to distinguish damages for acts within the limitations period: "To be sure, CSX's expert, Dr. Howard Marvel, calculated profits CSX lost due to 'the totality of NS's and NPBL's efforts to foreclose CSX' from on-dock rail at NIT. *Most of these occurred in years* after 2013—within the limitations periods." CSXT Br. at 49 (internal citations omitted) (emphasis added).

This is fatal to CSXT's federal antitrust conspiracy claims. When a plaintiff's evidence gives the jury no basis on which to consider or account for the effect of the statute of limitations on alleged damages, it would be error to submit it to the jury.[5] "[T]he jury would be left entirely

---

[5]      Failure to disaggregate damages is routinely fatal to a plaintiff's antitrust claims. *Cf. Ky v. Marathon Petroleum Co. Lp*, 464 F. Supp. 3d 880, 894-95, 897 (W.D. Ky. 2020) (granting summary judgment when plaintiff's expert report "did not specify what portion of the calculated damages figure stems from Defendants' legal conduct and what portion, if any, is caused by any of their allegedly illegal forms of conduct."); *In re Independent Serv. Orgs. Antitrust Litig.*, 114 F. Supp. 2d 1070, 1090-91 (D. Kan. 2000) (granting summary judgment because plaintiff failed to meet its burden to disaggregate the amount of losses caused by actionable conduct); *Vernon v. So. Cal. Edison Co.*, 955 F.2d 1361, 1372 (9th Cir. 1992) ("serious flaws in the only damage study which could be proffered to the jury placed [plaintiff] in the position of having no proper proof of damages at all"); *United States Football League v. NFL*, 842 F.2d 1335, 1378-79 (2d Cir. 1988); *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 808 (9th Cir. 1988); *Farley Transp. Co. v. Santa Fe Trail Transp. Co.*, 786 F.2d 1342, 1351 (9th Cir. 1985); *ILC Peripherals Leasing Corp. v. IBM Corp.*, 458 F. Supp. 423, 434 (N.D. Cal. 1978, *aff'd per curiam sub nom.*, *Memorex Corp. v. IBM Corp.*, 636 F.2d 1188 (9th Cir. 1980), *cert. denied*, 452 U.S. 972 (1981).

to speculation to determine [what damages were] triggered by acts that accrued before or after the limitations period began, or to assess what portion of [damages are] attributable to acts that caused harm within the limitations period." *Gumwood HP Shopping Partners L.P. v. Simon Prop. Grp., Inc.*, 221 F. Supp. 3d 1033, 1044-45 (N.D. Ind. Nov. 22, 2016) (excluding plaintiff's expert because he calculated aggregate damages partly attributable to acts outside the limitations period); *see also Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946) ("Once causation of damages has been established, the amount of damages may be determined by a just and reasonable estimate *as long as the jury verdict is not the product of speculation or guess work*") (emphasis added).

CSXT argues that its expert "calculated CSX's lost profits by year," as a potential way to salvage its model. CSXT Br. at 51 (citing Exhibits 15 and 16 of Marvel's Reply Report). That is meaningless because it is not just a matter of subtracting the damages he calculated for years prior to 2014. Like the excluded expert in *Gumwood*, Marvel improperly opines that the acts outside the limitations period (including the clearly-time barred acts dating back to 2008) caused part of the alleged yearly damages within the limitations period.

The cases on which CSXT relies are inapposite. For example, in *Poster Exchange, Inc. v. National Screen Service Corp.*, 517 F.2d 117 (5th Cir. 1975), where the court approved "day by day calculation of accruing injury," it was specifically only for injury accruing within the limitations period; the plaintiff expressly disclaimed any recovery of damages for acts outside the limitations period. *See id.* at 124. The court stressed that "a newly accruing claim for damages must be based on some injurious act actually occurring during the limitations period, not merely the abatable but unabated inertial consequences of some pre-limitations action." *Id.* at 128.

The issue, therefore, is not that CSXT failed to "tie its damages calculation to specific overt acts," as CSXT frames it, *see* CSXT Br. at 49, but that CSXT failed to tie its damages to acts that occurred within the limitations period.  And on this, the failure is indisputable.

The argument advanced by CSXT in its opposition contradicts settled case law and would render the statute of limitations meaningless.  CSXT suggests the only thing it must do is pay the Belt Line's allegedly "exorbitant" rate one time during the limitations period, and then all of its damages for the entirety of the alleged conspiracy are back on the table.  CSXT Br. at 45.  Under that theory, the *Hanover Shoe* plaintiff could sue in 1955 and recover damages back to 1910 when the first act in furtherance of the conspiracy was committed.  The Supreme Court rejected such an absurd result, limiting recovery only of damages within the limitations period.  *See* 392 U.S. at 502.  CSXT is unable to do that here based on its damages model.  *See, e.g., Comcast Corp. v. Behrend*, 569 U.S. 27, 38 (2013) (plaintiffs' damages model, which calculated total damages from four alleged violations, was impermissibly overinclusive, because it could not establish damages attributable to the one violation that was still actionable after the other three were dismissed).

Because of CSXT's inability to present any competent evidence of its damages attributable to acts occurring within the limitations period, CSXT is missing an essential element of the federal antitrust claims against the Belt Line, entitling it to summary judgment on Counts I and II.

### C. Even if CSXT's damages model was not overinclusive, there was no continuing violation or new overt act during the limitations period.

For CSXT to reach the jury on damages, it first must show (not just allege) that overt acts in furtherance of a conspiracy were committed within the limitations period.  CSXT has no evidence with which to make the requisite showing. Thus, all of CSXT's claims against the Belt Line are either time-barred or not actionable.

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

CSX TRANSPORTATION, INC.,
*individually and on behalf*
*of NORFOLK & PORTSMOUTH BELT*
*LINE RAILROAD COMPANY,*

          **Plaintiff,**

v.                                                    Civil No. 2:18cv530

NORFOLK SOUTHERN RAILWAY COMPANY,
and

NORFOLK & PORTSMOUTH BELT LINE
RAILWAY COMPANY,

          **Defendants.**


<u>**OPINION AND ORDER**</u>

This matter is before the Court on a motion to dismiss/motion for judgment on the pleadings/motion to refer filed by Defendant Norfolk Southern Railway Company ("NSR") prior to the close of discovery (and prior to the lengthy COVID-19 stay previously imposed in this case).  ECF No. 115.  As of the date of this Opinion and Order, discovery is now closed and summary judgment motions were recently filed by NSR and Norfolk & Portsmouth Belt Line Railway Company ("Belt Line").  A jury trial is currently scheduled to begin on July 13, 2021, although under this Court's COVID-19 operating procedures (which permitted the resumption of civil jury trials on May 3, 2021), regardless of the outcome of the instant motion, such trial date would be subject to further

continuance if there is not an available retrofitted courtroom to allow the Court to keep jurors socially distanced throughout all stages of the jury trial process.

The relevant background of the case is set forth in greater detail in this Court's September 9, 2019 Opinion and Order. ECF No. 66. In short, Plaintiff CSX Transportation, Inc. ("CSX") alleges that Defendants NSR and Belt Line committed federal antitrust violations, state law conspiracy offenses, and contractual breaches associated with the manner in which Belt Line, a company jointly owned by NSR and CSX, was operated. For the reasons set forth below, NSR's motion is **DENIED in part**, and **GRANTED in part,** as the Court refers one disputed issue to the U.S. Surface Transportation Board ("STB").

### I. Background

NSR's motion challenges the jurisdiction of this Court, seeks judgment on the pleadings based on a claim of immunity, or alternative to both requests, asks this Court to refer two issues to the STB. It should be noted at the outset that: (1) both Belt Line and NSR previously filed timely motions to dismiss in this case, ECF Nos. 27, 34; (2) Belt Line's prior motion advanced a related, though not identical, challenge to this Court's jurisdiction, with such earlier-in-time challenge deemed "meritless" by this Court, ECF No. 66, at 20; (3) NSR did not previously challenge this Court's jurisdiction or otherwise raise

2

an immunity defense—to the contrary, NSR previously acknowledged
its inability to reach "some averments in the Complaint as to the
federal antitrust claims," ECF No. 35, at 3, and <u>conceded</u>
jurisdiction over such claims, ECF No. 69 ¶ 11; and (4) NSR did
not previously request a transfer to the STB for the purposes of
addressing an immunity defense or determining a reasonable
"switching rate" for use of Belt Line's tracks.

NSR now asserts that it is immune from federal antitrust laws
and state conspiracy laws with respect to its relationship with
Belt Line <u>not</u> because of any recent developments in the case, or
new facts learned during discovery, but rather, on the ground that
NSR has been immune from such claims for decades based on a railway
consolidation/merger occurring in 1982.  While this Court again
finds that it has jurisdiction over this case, and has reservations
regarding the validity of such immunity defense, the Court will
refer the immunity issue to the STB in light of its expertise
regarding the process and scope of railroad company mergers.

## II. Jurisdictional Challenge

NSR first contends that this Court lacks jurisdiction over
this case and thus seeks dismissal under Rule 12(b)(1).  Because
a Rule 12(b)(1) motion can be filed at any time, NSR contends that
its motion, filed long after this Court denied the original round
of Rule 12(b) motions, is timely.

In support of its jurisdictional challenge, NSR argues, among other things, that the parties' dispute arises out of a railway consolidation/merger, and that the STB, formerly the Interstate Commerce Commission ("ICC"): (1) has <u>exclusive authority</u> to approve mergers between rail carriers; and (2) that carriers participating in an approved merger are "exempt" from antitrust laws and other laws "as necessary to . . . carry out the transaction." ECF No. 116, at 8 (emphasis omitted); <u>accord</u> 49 U.S.C. § 11321(a).[1] While the Court agrees with NSR's recitation of the law, the STB's exclusive authority over rail carrier mergers implicates the doctrine of "primary jurisdiction," which—despite its name—is not "jurisdictional." Importantly, "[d]espite what the term [primary jurisdiction] may imply, [it] does not speak to the jurisdictional power of the federal courts. It simply structures the proceedings as a matter of judicial discretion, so as to engender an orderly and sensible coordination of the work of agencies and courts." <u>Envt'l Tech. Council v. Sierra Club</u>, 98 F.3d 774, 789 n.24 (4th Cir. 1996) (second and third alterations in original); <u>see</u> <u>Stevens v. Bos. Sci. Corp.</u>, 152 F. Supp. 3d 527, 533 (S.D.W. Va. 2016) (explaining that the name of such doctrine "is a misnomer"). The doctrine is applicable when a claim cognizable in federal court "requires the resolution of issues

---

[1] 49 U.S.C. § 11321 was previously codified at 49 U.S.C. § 11341.

which, under a regulatory scheme, have been placed within the special competence of an administrative body," thus causing a district court to suspend the judicial process "pending referral of [specific] issues to the administrative body for its views." United States v. W. Pac. R.R. Co., 352 U.S. 59, 64 (1956); see Mulberry Hills Dev. Corp. v. United States, 772 F. Supp. 1553, 1561 (D. Md. 1991) (explaining that a district court should "refrain from exercising its judicial power so that an agency particularly equipped to address issues and charged with regulatory duties within its expertise may perform its functions").

Here, notwithstanding NSR's arguments to the contrary, this Court has jurisdiction over the federal antitrust claims in this case, and has supplemental jurisdiction over the related state law claims. NSR's Rule 12(b)(1) motion to dismiss for lack of jurisdiction is therefore **DENIED.**

### III. Rule 12(c) Dismissal or STB Referral - Immunity

NSR next argues that this Court should dismiss this matter on the pleadings pursuant to Rule 12(c) based on NSR's statutory immunity. Plaintiff challenges the timeliness of such argument, contending that NSR's argument seeking dismissal: (1) should have been advanced as a Rule 12(b)(6) motion and was filed many months after the 12(b)(6) deadline; (2) contradicts NSR's prior jurisdictional position; (3) duplicates Belt Line's prior failed

jurisdictional challenge, thereby conflicting with the "law of the case"; and (4) is unripe to the extent it separately asserts that certain potential remedies would invade the province of the STB's exclusive jurisdiction. ECF No. 131, at 2-4. NSR and Belt Line each counter that NSR's arguments in support of dismissal differ from Belt Line's prior arguments in that they rely on a different statutory provision (49 U.S.C. § 11321), ECF Nos. 132, 138, with NSR again noting that jurisdiction can be challenged at any time.

First, to the extent NSR argues that its Rule 12(c) motion to dismiss is timely and/or meritorious based on jurisdictional grounds, the Court rejects such claim without further analysis for the same reasons set forth above. Second, as outlined below, to the extent NSR is seeking a Rule 12(c) dismissal, or alternatively, referral to the STB based on § 11321(a) immunity, the Court finds that although such claim was "delayed," it is not fatally untimely, and while dismissal is not appropriate, the request for referral to the STB on the immunity issue has merit. Third, to the extent NSR seeks a referral to the STB for a rate setting determination, such request is denied at this time for the same reasons this Court previously concluded that it has authority to grant monetary and injunctive relief in this case.

## A. Timeliness of Motion

As to the timeliness of the immunity defense, CSX accurately highlights the fact that NSR's pending motion was filed during

discovery and several months after the original round of Rule 12(b)

motions was resolved by the Court.  NSR fails to demonstrate why

it did not raise such immunity defense earlier in the case,[2] or

why it appeared to previously concede that it had no valid basis

to challenge the federal antitrust claims at that stage of the

case.  The delayed timing of NSR's immunity claim is especially

notable because the defense is predicated on a merger that has <u>at</u>

<u>all times</u> been within NSR's knowledge.

Notwithstanding NSR's delay, NSR appears correct both that

CSX's complaint does not include the facts on which NSR bases its

immunity defense[3] and that the motion, filed sufficiently in

advance of the scheduled trial date, is timely under Rule 12(c).

See Fed. R. Civ. P. 12(c) ("After the pleadings are closed--but

early enough not to delay trial--a party may move for judgment on

the pleadings."); Fed. R. Civ. P. 12(h)(2) (indicating that failure

---

[2] While NSR's Answer advances three affirmative defenses mentioning "immunity," none of these three theories is predicated on § 11321(a).  ECF No. 69.  CSX does not squarely assert a pleading error in response to the pending Rule 12(c) motion, although CSX does contend that NSR's motion has little relation to its answer.  See ECF No. 131, at 3.

[3] The complaint broadly references "mergers and acquisitions" over many decades involving multiple railways, ECF No. 1 ¶¶ 2, 21; however, it does not appear to discuss the 1982 merger, the ICC/STB's approval of it, or the fact that as of 1989, two of the three railway companies with an ownership interest in Belt Line were affiliates under common ownership due to the 1982 merger.  NSR's answer filled in the necessary facts regarding the 1982 merger and 1989 common ownership.  ECF No. 69 ¶ 2.  In fact, long prior to the filing of the answer, NSR reported such facts to the Court in its brief in support of its original dismissal motion, to include citing the STB's consolidation ruling.  <u>Norfolk S. Corp.—Control—Norfolk & W. Ry. Co. & S. Ry. Co.</u>, 366 I.C.C. 171 (1982).  Accordingly, it appears that NSR could have asked the Court to take judicial notice of the consolidation and argued its immunity defense at the outset of this case.

7

JA239

to state a claim can be raised in a Rule 12(c) motion or even at trial); <u>see also</u> 5C Wright & Miller, <u>Federal Practice and Procedure</u> § 1368 (3d ed. Apr. 2021 update) ("[C]ourts typically will construe . . . a late Rule 12(b) motion, or a Rule 12(b) motion that implicates affirmative defenses, as if it were brought under Rule 12(c).").[4]  Similarly, NSR's request seeking a stay and referral to the STB, while delayed, is not "untimely" under any applicable rule or practice argued by CSX.[5]

In the absence of a procedural bar to NSR's motion to dismiss or refer, the Court addresses the merits of such motion, further noting that this Court clearly has the authority (and potentially the obligation) to refer appropriate matters to the STB.  Although the COVID-19 pandemic and associated stays requested by the parties—followed by the continued effects of the pandemic on Court

---

[4]  The most relevant non-public evidence in support of NSR's dismissal/referral motion appears to be the consolidation/merger application that NSR attached as an exhibit to such motion.  ECF No. 116-5.  CSX does not challenge this exhibit as a matter that is not integral to the pleadings, nor is its authenticity challenged.  Accordingly, there does not appear to be a procedural obstacle to considering such document in conjunction with NSR's motion.  <u>Goines v. Valley Cmty. Servs. Bd.</u>, 822 F.3d 159, 166 (4th Cir. 2016).  Moreover, even if there is such an obstacle in conjunction with NSR's Rule 12(c) request for dismissal, the Court is unaware of any similar obstacle to the extent that NSR <u>seeks referral to the STB</u>.

[5]  Under the doctrine of "primary jurisdiction," the Court has the authority to make its own discretionary determination to refer a matter to the STB in order to "promot[e] proper relationships between the courts and administrative agencies."  <u>W. Pac. R.R. Co.</u>, 352 U.S. at 63; <u>see</u> <u>Stevens</u>, 152 F. Supp. 3d at 534 (explaining that the Court can "invoke the doctrine [of primary jurisdiction] sua sponte").  Therefore, even though the doctrine of primary jurisdiction may be "waivable" in certain circumstances, <u>CSX Transp., Inc. v. Transp.-Commc'ns Int'l Union</u>, 413 F. Supp. 2d 553, 564 (D. Md. 2006), this Court also has discretion to consider a referral to the STB with or without a motion from the parties.

operations and litigation in this District—have delayed the
Court's resolution of NSR's motion, as explained below, the Court
nevertheless finds that the best course is to temporarily stay
this federal action pending referral of the immunity issue to the
STB as such issue is potentially dispositive of nearly all claims
for relief.

## B. Merits of Dismissal/Referral

### 1. Factual Background

Briefly reciting the most relevant facts associated with the
1982 consolidation/merger that forms the basis of NSR's immunity
defense, in December of 1980, NWS Enterprises, Inc. ("NWS") filed
an application with the ICC to control two existing railways,
Norfolk and Western Railway Company ("NW") and Southern Railway
Company ("SR"). ECF No. 116-5. Shortly thereafter, the ICC filed
a notice in the Federal Register describing the transaction as
involving "the acquisition of control, through stock ownership of
NW and its subsidiary companies and of SR and its consolidated
system companies, by NWS, a newly incorporated non-carrier holding
company." NWS Enters.; Application To Control Norfolk & W. Ry.
Co. and S. Ry. Co., 46 FR 173-02, at 174, 1981 WL 109712 (Jan. 2,
1981) (emphases added). "The rail carrier subsidiaries of NW and
the SR consolidated system carriers are set forth in the appendix"
of the notice, with the appendix listing nearly fifty subsidiaries.
Id. at 176. Notably absent from such list of subsidiaries is

defendant Belt Line.  The acquisition by the newly formed holding company was not technically considered a "merger," although "certain operating efficiencies among the carriers" were proposed, and the carriers that would be owned by NWS would "continue to operate . . . over the lines described [in the notice], subject to certain abandonments and <u>coordinated operations described in the application</u>."  <u>Id.</u> (emphasis added).  No coordination with respect to Belt Line was mentioned in the application.

Approximately a year later, the STB published a lengthy decision authorizing Norfolk Southern Corporation ("NSC")[6] to acquire "control . . . of Norfolk and Western Railway Company and its subsidiary companies and of Southern Railway Company and its consolidated companies . . . subject to conditions."  <u>Norfolk S. Corp.—Control—Norfolk & W. Ry. Co. & S. Ry. Co.</u>, 366 I.C.C. 173, 173, 1982 WL 28414 (1982).  Such decision again listed the numerous NW and SR subsidiary companies, which again did not include Belt Line, and further approved "[a]cquisition of a line of railroad and of certain trackage rights incorporated in the primary application."  <u>Id.</u> at 173, 255-57.  No mention was made of NSC acquiring control over Belt Line or the trackage rights controlled by Belt Line.  The decision did, however, note the statutory

---

[6] It appears that the holding company being created to "control" both NW and SR was initially going to be NWS, but was ultimately named NSC.  NSC is NSR's predecessor.

polices of "recent rail reform legislation," which included an emphasis on the retention of competition.  Id. at 190.

The Rule 12(c) record suggests that, after the 1982 consolidation, the Belt Line partnership continued to operate under its plan of shared governance, with Belt Line's Board of Directors continuing to be appointed by CSX, NW, and SR.  ECF No. 1-3.  In 1989, CSX, NW, and SR signed an agreement to modify the number of directors appointed by each company such that NW and SR (both owned by NSC) would collectively appoint three directors, with the parties also agreeing that no other provision of the 1897 Belt Line Agreement would be amended, altered, or affected.[7]

## 2. Discussion

"Congress has vested with the STB, 'the exclusive authority to examine, condition, and approve proposed mergers and consolidations.'"  CSX Transp., Inc. v. Transp.-Commc'ns Int'l Union, 413 F. Supp. 2d 553, 562 (D. Md. 2006) (quoting Norfolk & W. Ry. Co. v. Am. Train Dispatchers Ass'n, 499 U.S. 117, 119 (1991)).  Critical to the instant dispute, the Interstate Commerce

---

[7] According to the parties, NW and SR merged in 1990, and the number of Belt Line board members was amended again at some point after such merger.  While not critical to the Court's analysis, the Court notes for context that it appears from public records that the 1990 merger occurred pursuant to the "corporate family" exemption such that STB approval of such merger was not required, with the STB reporting in early 1991 that a notice of exemption had been filed, further indicating that such transaction would "not result in . . . a change in the competitive balance with carriers outside the corporate family."  56 Fed. Reg. 1541-03, 1991 WL 310251 (Jan. 15, 1991).  It was at that time that the newly merged company was renamed "Norfolk Southern Railway [C]ompany."  Id.

Act provides that "[a] rail carrier, corporation, or person participating in [an] approved . . . transaction is exempt from the antitrust laws and from all other law, including State and municipal law, <u>as necessary</u> to let that rail carrier, corporation, or person <u>carry out the transaction</u>, . . . and <u>exercise control or franchises acquired</u> through the transaction." 49 U.S.C. § 11321(a) (emphases added). "The purpose of this provision, and the exemption from antitrust and other laws that it provides, is to ensure that efforts to merge and consolidate <u>are not obstructed</u>, and that <u>merger efficiencies can be achieved</u>." <u>CSX Transp., Inc.</u>, 413 F. Supp. 2d at 562-63 (emphases added) (citing <u>Train Dispatchers Ass'n</u>, 499 U.S. at 133). The Supreme Court has held that the exemption from "all other law" extends to cover "any obstacle imposed by law," including certain contracts, as long as "an ICC-approved transaction requires abrogation" of such obligations. <u>Train Dispatchers Ass'n</u>, 499 U.S. at 132-33.

While the Supreme Court has not expressly defined the contours of "necessity" in this context, a district court in this circuit has squarely addressed the issue, explaining as follows:

> The preclusive powers of the [Interstate Commerce Act] are not unlimited. As the Supreme Court noted in <u>Train Dispatchers</u>, exemption from other laws is only allowed when it is "<u>necessary to carry out an ICC-approved transaction</u>." 499 U.S. at 132-33 (emphasis added). . . .
>
> Although the Supreme Court did not define the term "necessary" in <u>Train Dispatchers</u>, the ICC has stated

> that the ICA super[s]edes other law where there
> otherwise will be an impediment to the merger. <u>CSX
> Corp.—Control—Chessie Sys., Inc., and Seaboard Coast
> Line Indus., Inc.</u>, 8 I.C.C. 2d 715, 721–22, 1992 WL
> 206172 (1992) ("[T]he necessity predicate is satisfied
> by a finding that some 'law' (whether antitrust, RLA, or
> a collective bargaining agreement formed pursuant to the
> RLA) is an impediment to the approved transaction. In
> other words, the necessity predicate assures that the
> exemption is no broader than the barrier which would
> otherwise stand in the way of implementation.").

<u>CSX Transp., Inc.</u>, 413 F. Supp. 2d at 568-69. The district court went on to highlight the fact that the plaintiff in that case failed to demonstrate that a post-merger dispute over where certain railroad clerical work was to be performed was a "critical factor" that could "impede" a long since final merger, finding that "at some point, the STB's purview over a merger must end." <u>Id.</u> at 569. On appeal, the Fourth Circuit expressed its agreement, stating in a footnote that "[t]he amount of time that has passed since the approved transaction was successfully completed militates against our finding that the STB would have jurisdiction" over a labor dispute that can be traced back to the merger, noting that the STB's "predecessor, the ICC, as well as the Seventh Circuit, has indicated that the STB's jurisdiction over legal disputes related to a merger should not extend indefinitely." <u>CSX Transp., Inc. v. Transp. Commc'ns Int'l Union</u>, 480 F.3d 678, 685 n.5 (4th Cir. 2007) (citing <u>Del. & Hudson Ry. Co.-Lease & Trackage Rts. Exemption–Springfield Terminal Ry. Co.</u>, 8 I.C.C. 2d 839, 845,

1992 WL 46807 (1992); Harris v. Union Pac. R.R., 141 F.3d 740, 744
(7th Cir. 1998)).

The Seventh Circuit's opinion in Harris is instructive
regarding the breadth of authority appropriately ceded to the STB
when post-merger disputes arise in situations where the ICC
approved a merger but said nothing, and implied nothing, about it
being "necessary" for a certain law, contract, or other "obstacle"
to the merger to be set aside as a barrier to the merger. Harris,
141 F.3d at 743-44. The Seventh Circuit explained:

> If the Commission says that it is "necessary" for some
> law to give way, then we review its decision to determine
> whether it was arbitrary, capricious, or an abuse of
> discretion. If the Commission implies (but does not
> quite say) that some other law had to yield, then perhaps
> a court should refer the subject to the agency under the
> doctrine of primary jurisdiction. See Railway Labor
> Executives' Ass'n v. United States, 987 F.2d 806, 815
> (D.C. Cir. 1993). But if the agency says nothing, a
> post-merger dispute is resolved under generally
> applicable laws. We added in Burlington Northern that
> "necessary", like "all", should be taken seriously.
> Only laws that would block the transaction give
> way. . . .
>
> On the railroad's understanding of § 11341(a), the Board
> is forever in charge of all legal disputes related to a
> merger. Is the railroad liable to a brakeman injured by
> failure of a coupler on a car that came from the acquired
> corporation? Does an easement on any of the carrier's
> rights of way survive the merger? Are the employees
> entitled to a Christmas bonus under the labor agreement?
> Some of these issues are resolved by arbitration or
> bargaining, others under state property law or the
> Safety Appliance Act. See Norfolk & Western Ry. v.
> Hiles, 516 U.S. 400 (1996). But if the Union Pacific
> were right, everything would be up for grabs. Who can
> tell which of these laws the Commission might have
> thought incompatible with the merger?

14

JA246

Harris, 141 F.3d at 743–44 (emphasis added).  While Harris and the 2006/2007 CSX case are instructive, those cases consider the necessity requirement in the context of ensuring the absence of an obstacle to "carry[ing] out the transaction," as contrasted with the portion of § 11321(a) addressing the need to "exercise control or franchises acquired through the transaction."

Here, the record clearly reveals that the ICC/STB said nothing about setting aside any state or federal law as an impediment to the 1982 consolidation with respect to Belt Line,[8] and in fact, said nothing about Belt Line in any respect.  Notably, as CSX argues, Belt Line is not included on the lengthy list of subsidiary companies in the appendix to the public notice that would be controlled by NSW/NSC if the consolidation was approved.  The record further suggests that the 1982 consolidation "applicants" never asked the ICC/STB to authorize "control" over Belt Line,[9] with the proposed consolidation plan stating as follows:

---

[8] NSR does not argue in its motion that, post-consolidation, it should also be freed from its contractual obligations set forth in the 1897 Belt Line Agreement.  This may be because the contract was re-ratified after 1982, or it may be because NSR recognizes that setting aside the contract is not "necessary" to the success of the merger.  See City of Palestine v. United States, 559 F.2d 408, 415 (5th Cir. 1977) ("Congress allowed the ICC significant power to effectuate approved transactions, but it did not authorize gratuitous destruction of contractual relations even when it serves the general public interest when the destruction is irrelevant to the success of approved transactions.") (emphasis added).  Regardless of the reason, such issue is not before this Court.

[9] Belt Line was listed by the applicants in an appendix to the application as an entity that NW, SR, and an SR subsidiary each held an ownership interest in, with the collection of these interests totaling to 57.14

15

JA247

(1) The proposed transaction involves Interstate Commerce Commission (Commission) authorization under Section 11343 et seq. of the Interstate Commerce Act (49 U.S.C. § 11343 et seq.) for NWS Enterprises, Inc. (NWS), a newly-incorporated non-carrier holding company, to acquire control through stock ownership of Norfolk and Western Railway Company (NW) and its subsidiary carrier companies, and of Southern Railway Company (Southern) and its consolidated system companies (collectively SR).

(2) As a result of the proposed transaction, NWS will also acquire indirect control through stock ownership of all subsidiaries of NW and Southern, including Southern Region Motor Transport, Inc. (SRMT), a motor carrier subsidiary of a wholly owned rail carrier subsidiary of Southern.

(3) By this application NWS is seeking Commission authorization under § 11343 to acquire control of NW and SR.

(4) The proposed transaction involves the acquisition of control through stock ownership of Norfolk and Western Railway Company and its subsidiary companies, and of Southern Railway Company and its consolidated system companies, by NWS Enterprises, Inc., a newly-incorporated non-carrier holding company.

(5) Applicants respectfully submit that the transactions proposed herein are in full accordance . . . with the statutory criteria set forth in the Interstate Commerce Act (49 U.S.C. §§ 11343-11347) . . . [and] Applicants respectfully request that the Commission make the following findings with respect thereto:

In Finance Docket No. 29430 (Sub-No. 1), that the following transactions are within the scope of 49 U.S.C. § 11343; are consistent with the public interest; reflect terms and conditions which are just and

---

percent. ECF No. 116-5, at 77. The seventeen-page chart that included Belt Line among over 150 other companies was provided to the ICC in response to a regulatory requirement that the applicants list the "measure of control or ownership exercised by Applicants over other carriers," ECF No. 116-5, at 77. It was not, therefore, a chart listing entities that NSC requested control over as part of the transaction. While such chart was not a "request" for control, it appears to illustrate that majority stock ownership of Belt Line would result from consolidation.

16

JA248

> reasonable . . . <u>and will have no adverse impact upon,
> but rather will enhance competition among rail carriers
> in the affected region</u>:
>
> > [●] acquisition by NWS Enterprises, Inc., <u>of
> > control of</u> Norfolk and Western Railway Company
> > <u>and its carrier subsidiaries</u>, and of Southern
> > Railway Company <u>and its consolidated system
> > companies</u> . . . .

ECF No. 116-5, at 4-5, 15, 19, 35-36 (emphases added). The second
item listed above appears significant to the Court as it indicates
that NWS/NSC provided an express notice that it would acquire
"indirect control" over a motor carrier "as a result" of the
proposed transaction, and it discussed such "control" and the
further permissions that were required. NSR does not highlight
any similar reference in the application stating that NWS/NSC was
seeking approval of "indirect control" over Belt Line because the
combination of stock held by three different NSW/NSC subsidiaries
would, <u>post-consolidation</u>, amount to more than a 50 percent
ownership interest in Belt Line.[10]

The above facts, as interpreted by the Court, provide support
for CSX's position that it is appropriate to draw a distinction
between a transaction that led to NSR amassing a slight majority
ownership position in Belt Line (a cooperative partnership formed
to serve the interests of all owners), and a transaction involving

---

[10] The detailed STB authorization ruling broadly indicates that the STB
considered the anticompetitive effects of the consolidation, <u>Norfolk S.
Corp.—Control</u>, 366 I.C.C. at 190-91, 227-29; however, there is no
indication, one way or the other, that Belt Line was part of such analysis.

the STB "approving" NSR <u>to control</u> Belt Line such that NSR was immune from antitrust/conspiracy law, thus freeing NSR (at least under such laws) to leverage its ownership of NW and SR in a coordinated effort to harm CSX. The concern about coordination purportedly designed to harm CSX is especially acute in light of the fact that Belt Line is, by design, a separate corporate entity with a mission of operating for the collective good of all owner railways.[11]

The consolidation documents before the Court[12] therefore suggest that the STB did <u>not</u> "announce" that NSC would control Belt Line, and it certainly did not announce that NSC was exempt from federal antitrust laws or state conspiracy laws. However, as to the latter point, the STB and federal courts have repeatedly held that § 11321 is <u>not</u> predicated on the agency "announcing that a particular exemption is necessary"; rather, the immunity

---

[11] As discussed in the Court's prior Opinion and Order, ECF No. 66, at 3-4, the 1897 Belt Line Agreement was originally executed by eight different railroad companies, ECF No. 1-1. "[E]ach of the Companies . . . desire[d] to secure the construction of a Belt Line Railroad" in Virginia "for the <u>mutual benefit of each</u> in the interchange of business" with all companies agreeing that it was "for the best interest of all" that the Belt Line Railroad "be constructed, <u>maintained and operated under a separate organization</u> in which all are to be equally interested and each to have an equal representation." ECF No. 1-1, at 3 (emphases added). The written agreement further provided that the named companies "<u>will co-operate cordially in encouraging the business</u> of the [newly formed] Railroad Company, for which it is constructed." <u>Id.</u> at 6 (emphasis added). Thus, there may not be the same "necessity" to control Belt Line as compared to a "typical" subsidiary beholden to the majority owner.

[12] The Court has only been provided "Volume 2/2A" from the consolidation application.

exemption is "self-executing." <u>Consol. Coal Sales Co. v. Consol. Rail Corp.</u>, 2002 STB Lexis 317, at *9-10 (S.T.B. May 23, 2002) (quoting <u>ICC v. Locomotive Eng'rs</u>, 482 U.S. 270, 298 (1987) (Stevens, J., concurring)); <u>see</u> <u>Soo Line R.R. Co. v. Consol. Rail Corp.</u>, No. 2:17cv106, 2018 WL 1566816, at *7 (N.D. Ind. Mar. 29, 2018) ("The statute makes the exemption self-executing whenever necessary to carry out an STB-approved transaction."); <u>CSX Corp.—Control—Chessie Sys.</u>, 8 I.C.C. 2d at 723 n.12 (same).

While CSX acknowledges that the STB "approved" a transaction that <u>resulted in</u> NSC amassing a 57 percent ownership interest in Belt Line and obtaining the right to appoint the majority of Belt Line's Board of Directors, CSX argues that such occurrence is not the same as the STB approving "control."  In this Court's view, the strongest support for such argument is that NSW/NSC did not request "control" over Belt Line in its application, the STB did not announce that Belt Line would be controlled in the public "notice" of the application, nor did the STB announce that such control was authorized in its approval.  While the Court acknowledges that the STB need not "announce" that the self-executing immunity exemption applies to a specific merger transaction, this Court is unaware of any STB decision or other precedent suggesting that STB notices do not even need to identify the companies over which control is being requested and authorized. <u>Cf.</u> 49 U.S.C. § 11344(a) (1982) (indicating that an application

for control requires the Commission to "notify those carriers" involved in the proposed transaction).[13]

Notwithstanding CSX's facially strong position regarding the absence of evidence of STB authorization of "control," CSX's position appears weakest when it argues that 57 percent ownership coupled with the ability to dominate the board of directors does not constitute "control" under STB precedent. While the parties agree that the concept of "control" is fact-based and varies with the circumstances, NSR effectively highlights CSX's inability to point to any ICC/STB decision finding that majority stock ownership coupled with an ability to appoint more than half of a board of directors can be interpreted as anything other than "control" over a subsidiary railway. ECF No. 138, at 9-10. Although addressing a slightly different issue, this Court has located a previous STB ruling that is relevant to the instant dispute. In CSX's favor, the STB's analysis confirms that other facts relevant to "control" still must be analyzed on a case-by-case basis even when a railway owns more than half of the stock of another railway. In NSR's favor, the STB's analysis appears to put significant emphasis on the ability to control the board of another railway. See Brotherhood of Ry. & Airline Clerks v. Burlington N. Inc., 671

---

[13] The "Historical and Revision" notes to 49 U.S.C. § 11344 indicate that subsection (a) was revised prior to 1982 to eliminate the need to also notify the applicant "since the applicant is on notice by filing the application." Section 11344 has been replaced by 49 U.S.C. § 11324.

F.2d 1085, 1090 (8th Cir. 1982) (recounting the respondents'
arguments that "terminal and switching railroads are not subject
to control by any one carrier, but are more properly viewed as
'partnerships' in which no one partner has the ability to control
the destiny of the corporation" and that "the inherent nature of
the companies and of the service they provide makes control by any
one carrier impossible," but remanding such issue to the STB based
on an incomplete record); Burlington N., Inc.—Control & Merger—
St. Louis-San Francisco Ry. Co., 366 I.C.C. 862, 866 & Appx. C,
1983 WL 28006 (1983) (finding, on limited remand, that: (1)
Burlington Northern did not control various terminal and switching
companies in which it owned less than, or exactly, a 50 percent
interest and had an inability to dominate the board of directors;
but (2) a "switching railway" and a "bridge railway" in which
Burlington Northern held "an ownership interest in excess of 50
percent," and had an ability to dominate the board, among other
facts demonstrating integration, were "under the direct control
and management" of Burlington Northern); cf. 49 U.S.C. § 10102(3)
("'[C]ontrol', when referring to a relationship between persons,
includes actual control, legal control, and the power to exercise
control, through or by (A) common directors, officers,
stockholders, a voting trust, or a holding or investment company,
or (B) any other means."); Union Pac. Corp., Union Pac. R.R. Co.
& Mo. Pac. R.R. Co.—Control—Chicago & N. W. Holdings Corp. &

Chicago & N. W. Transp. Co., 9 I.C.C. 2d 939, 947 (I.C.C. Sept. 17, 1993) ("In determining whether one person controls another, the Commission has rejected any arbitrary formula based upon percentage of stock ownership, and instead, [has] looked to a number of additional factors, including distribution of the remaining stock, the ability to elect directors and otherwise control or influence decision-making machinery, and the existence of management, marketing, operating and financial ties.").

In light of all of the above, this Court finds that the STB is the proper authority to clarify the contours of the 1982 consolidation at issue in this case. The Court acknowledges the apparent uniqueness of remanding an issue to the STB four decades after a railway consolidation was finalized. However, the alternative is for this Court to re-evaluate the details of the very same forty-year-old railway merger and determine what was requested, noticed, and approved by the ICC/STB during the administrative consolidation process. While precedent makes clear that the STB should generally not retain jurisdiction many years after a merger is complete with respect to new contracts, new factual developments, or new legal disputes that are tangentially related to a long-finalized merger, CSX Transp., Inc., 480 F.3d at 685 n.5; Harris, 141 F.3d at 744,[14] the dispute in this case is

---

[14] But see CSX Corp.-Control-Chessie Sys., 8 I.C.C. 2d at 724 n.14 (noting that, in appropriate circumstances, "operational changes" made eight years

22

JA254

distinguishable from the labor dispute cases cited by CSX that are based on changing operations _after_ a merger is completed. Here, there is not a new legal dispute tangential to the merger, but a dispute germane to the consolidation itself, with the genesis of the dispute grounded in the ICC/STB merger procedure and an associated factual dispute regarding the scope of what was actually approved/authorized by the ICC/STB in 1982. See _Envt'l Tech._ _Council_, 98 F.3d at 789 (noting that the purpose of the primary jurisdiction doctrine is "taking advantage of agency expertise and referring issues of fact not within the conventional experience of judges or cases which require the exercise of administrative discretion"); _Ry. Lab. Execs.' Ass'n v. S. Pac. Transp. Co._, 7 F.3d 902, 906 (9th Cir. 1993) (indicating that the ICC "should have exclusive authority to clarify the scope of its own approval and the corresponding breadth of the section 11341(a) exemption"); _AT&T Commc'ns, Inc. v. Consol. Rail Corp._, 285 F. Supp. 2d 649, 662 (E.D. Pa. 2003) (denying a dismissal motion, but granting a motion to stay a portion of the case and refer an issue to the STB because: (1) "the issue of whether the § 11321(a) exemption applies to an STB-authorized transaction is within the agency's jurisdiction"; and (2) "the STB possesses the expertise necessary to resolve" the dispute because "the STB has studied the

---

after a "Commission-approved merger" were causally tied to the merger itself).

Transaction; entertained public comment, hearings, and arguments
on the Transaction; and memorialized its approval in a lengthy,
detailed document"); cf. CSX Corp.-Control-Chessie Sys., 8 I.C.C.
2d at 722-23 ("The appropriate tribunal to determine whether the
proposed change in the status quo is directly related to and grows
out of, or flows from, a specifically authorized principal
transaction is this Commission, or the arbitrator acting pursuant
to the Commission's authority."). Referring back to the analysis
in Harris, if, as NSR asserts, the STB did approve NSC's "control"
over Belt Line in 1982, such approval at least "implie[d] (but
d[id] not quite say) that [antitrust/conspiracy] law[s] had to
yield," thereby rendering it appropriate for this Court to "refer
the subject to the agency under the doctrine of primary
jurisdiction." Harris, 141 F.3d at 743.

In addition to the open question regarding authorization of
"control," the Court notes the lack of precedent/administrative
guidance with respect to the parties' competing positions as to
whether it was "necessary" for NSR to be freed from antitrust and
conspiracy laws based on the railway consolidation at issue in
this case. In CSX's favor, the large-scale consolidation approved
in 1982 appeared to have nothing to do with Belt Line such that
NSC's need to secure "control" over Belt Line uninhibited by
antitrust/conspiracy laws was not necessary to achieve the
efficiencies of consolidation. See CSX Transp., Inc., 413 F. Supp.

2d at 562-63 ("The purpose of [§ 11321(a)], and the exemption from antitrust and other laws that it provides, is to ensure that efforts to merge and consolidate <u>are not obstructed</u>, and that <u>merger efficiencies can be achieved</u>.") (emphases added); <u>CSX Corp.—Control—Chessie Sys.</u>, 8 I.C.C. 2d at 721 ("[T]he 'necessity' predicate is satisfied by a finding that some 'law' . . . is an impediment to the approved transaction."). Moreover, it appears from the current record that Belt Line may have successfully operated as a collective/partnership for years after the consolidation, further suggesting that it was not "necessary" to allow NSR to dominate Belt Line in the same way that a parent company often controls a "typical" subsidiary. However, on the other side of the equation, if, post-consolidation, the STB classifies Belt Line as a "franchise" acquired through the transaction, and if NSC "acquiring" Belt Line was in fact "approved" by the STB in 1982, then it is arguably "necessary" under the scheme implemented by Congress and the STB to permit NSC/NSR to exercise its majority control over its newly acquired subsidiary free from the confines of antitrust or state conspiracy law. <u>See</u> 49 U.S.C. § 11321(a).[15]   In light of such conflicting

---

[15] The scope of the statutory phrase "control or franchises" is a matter that would benefit greatly from a consistent application as would occur through consideration by the STB in the first instance, as contrasted with a district-by-district evaluation by judges less familiar with the controlling regulatory scheme. <u>See</u> <u>Advamtel, LLC v. Sprint Commc'ns Co., L.P.</u>, 125 F. Supp. 2d 800, 804 (E.D. Va. 2001) (indicating that, "[a]s an aid" to determine whether the doctrine of primary jurisdiction applies, the

defensible positions regarding a matter squarely within the STB's expertise, referral to the STB is not only appropriate but arguably necessary.

Summarizing the above, NSR's motion to dismiss the antitrust and state conspiracy claims with prejudice is **DENIED**, but in light of the STB's primary jurisdiction, NSR's motion for a stay pending transfer of a single question to the STB regarding the applicability of § 11321(a) immunity is **GRANTED**.[16]

### IV. Rule 12(c) Dismissal or STB Referral - Remedies

Belt Line's original Rule 12(b) motion sought dismissal, in part, based on this Court's purported lack of jurisdiction to award certain damages, ECF No. 28, at 11, and NSR's current motion seeks dismissal and/or referral to the STB of certain matters relevant to damages based largely on the same theory, ECF No. 116, at 15-22.  Considering the timing of such motion, and considering the

---

court should consider, among other things, whether the issue "involves technical or policy considerations within the agency's particular field of expertise" and whether "there exists a substantial danger of inconsistent rulings," so as to "promote[] a uniform development of law and policy in the areas where Congress has delegated to an administrative agency the authority to develop and establish national rules").

[16] A stay is appropriate notwithstanding the late stage of this case because the STB's decision impacts the validity of a majority of the claims for relief in this case.  Additionally, as argued by NSR, it appears that CSX could have pursued a legal challenge to the reasonableness of the Belt Line switching rate in a proceeding before the STB for almost ten years before it filed suit, as the currently-in-place switching rate was established in 2009 and disputed by CSX as early as 2010.  As discovery is complete and summary judgment briefing was just completed, the Court will be in a position to address dispositive issues and expeditiously schedule a trial after the STB resolves the lone issue referred to it by this Court.

fact that such a determination is relevant to, but not controlling of, certain damages and/or the injunctive relief sought in this case, NSR's request is **DENIED** at this time. First, the Court agrees with CSX that the motion seeking dismissal/referral could have been brought at the time NSR filed its initial Rule 12(b)(6) motion, but as explained above, such motion is not fatally untimely. Second, NSR's request for dismissal/referral appears somewhat duplicative of arguments in Belt Line's earlier dismissal motion that have already been rejected by this Court. See ECF No. 66, at 21-25. Third, contrary to NSR's assertions, CSX's claims for relief do not appear to "begin and end" with a determination of whether the "switching rate" charged by Belt Line is "reasonable." Finally, a separate rate-setting proceeding before the STB has already been initiated, and the STB proceeding is currently stayed pending this Court's resolution of the antitrust and conspiracy claims at issue in this case, with the STB fully aware of the current litigation. NSR's motion fails to demonstrate the need for this Court to force the determination of a "reasonable rate" back to the STB at this time. Notably, the STB setting a new reasonable switching rate to be in place going forward will not resolve the contract, conspiracy, and antitrust claims pending in this case, id. at 24, which center on whether anticompetitive and collusive conduct in the past led to an artificially inflated switching rate designed to block NSR's competitors from accessing

Norfolk International Terminal by rail.  Similarly, NSR fails at this time to demonstrate that an STB re-evaluation of the reasonableness of the current switching rate would dictate what remedies are appropriate in this case and/or resolve whether antitrust or conspiratorial actions designed to harm CSX proximately caused the establishment of such switching rate.[17]

This Court, of course, has every intention of ensuring that the monetary or injunctive remedies secured in this case (if any) are within this Court's authority to award, and nothing in this Court's ruling precludes the Court from seeking further input from the STB at a later time should it be deemed necessary to determine damages.  The Court's decision not to refer the determination of a "reasonable" switching rate to the STB at this time is not tantamount to a finding that this Court has the authority to decide such a rate or to award CSX trackage rights.  Such decision is also not an indication of how this Court will rule on NSR's recently-filed, and still unripe, motion in limine seeking to exclude evidence and argument suggesting that Belt Line's switching rate is "unreasonable" or "excessive."  ECF No. 329. Rather, CSX alleges in this lawsuit that NSR and/or Belt Line committed federal and state law violations, and well as contractual breaches, by conspiring to manipulate a privately determined

---

[17] The current switching rate was established in 2009 without input from the STB, and CSX asserts that the establishment of such rate, and the maintenance of such rate over time, was the product of unlawful collusion.

switching rate for the purpose of harming CSX, and the Court finds, consistent with its earlier ruling, that determining liability, as well as at least some remedies associated with the alleged liability, falls within this Court's authority.

### V. Conclusion

For the reasons outlined above: (1) NSR's motion to dismiss on jurisdictional grounds is **DENIED;** (2) NSR's motion to dismiss the antitrust and state conspiracy claims with prejudice is **DENIED**; (3) NSR's motion to refer to the STB a determination of a reasonable "switching rate" is **DENIED** at this time; and (4) in light of the STB's primary jurisdiction, NSR's motion for a stay pending transfer of the immunity dispute to the STB is **GRANTED**. The following discrete question is **REFERRED** to the STB:

> Did the 1982 consolidation, whereby NSC acquired an indirect 57 percent interest in Belt Line, involve the ICC/STB granting NSC "approval" to control Belt Line, and if so, did such authorized "control" render it necessary for antitrust and/or state conspiracy laws to yield, whether because Belt Line was then deemed a "franchise" of NSC, or for any other reason?

After the STB rules, this Court will expeditiously resolve all remaining summary judgment issues, to include the breach of contract claim that is outside the referral to the STB. In the interim, the instant case will be **STAYED**.[18]   The trial date is

---

[18] The stay does not preclude counsel from coordinating with each other, and the Magistrate Judge assigned to this case (to the extent the Magistrate Judge determines it to be appropriate) to seek a resolution of any pending sealing motions.

hereby released, and counsel are instructed to contact the undersigned judge's calendar clerk to schedule a new trial date as soon as the STB issues its ruling.

The Clerk is **DIRECTED** to forward a copy of this Opinion and Order to all counsel of record and to the U.S. Surface Transportation Board.

**IT IS SO ORDERED.**

_____/s/_____
Mark S. Davis
CHIEF UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
May __18__ , 2021

30

JA262

USCA4 Appeal: 23-1537      Doc: 48      Filed: 12/06/2023      Pg: 268 of 438

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | |
|---|---|
| CSX TRANSPORTATION, INC., ) | |
| ) | |
| *Plaintiff,* ) | |
| ) | |
| v. ) | Case No. 2:18-cv-530 |
| ) | |
| NORFOLK SOUTHERN RAILWAY ) | |
| COMPANY, et al., ) | |
| ) | |
| *Defendants.* ) | |

**DEFENDANT NORFOLK SOUTHERN RAILWAY COMPANY'S**
**MEMORANDUM IN SUPPORT OF ITS**
**MOTION TO EXCLUDE OPINIONS OF PROFESSOR HOWARD P. MARVEL**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................................... iii

TABLE OF EXHIBITS ............................................................................................................... v

INTRODUCTION .........................................................................................................................1

BACKGROUND ............................................................................................................................5

    A.    Ocean Carriers Utilize Multiple Ports Along the East Coast to Deliver
           Cargo to the Midwest. ...........................................................................................5

    B.    The Port of Virginia Determines at Which Terminal a Ship Will Dock. ...............6

    C.    NS Enjoys Several Competitive Advantages Over CSX at the Port of
           Virginia. .................................................................................................................7

    D.    NS and CSX Compete with Trucks for Ocean Carriers' Intermodal
           Business. ................................................................................................................8

    E.    Prof. Marvel's Regression Analysis and Models. .................................................9

ARGUMENT .................................................................................................................................10

I.      LEGAL STANDARD ........................................................................................................10

II.     PROF. MARVEL'S TESTIMONY IS UNRELIABLE BECAUSE IT IS
       PREMISED ON A FLAWED CAUSAL THEORY THAT IS CONTRADICTED
       BY THE FACTUAL RECORD. .......................................................................................11

    A.    Prof. Marvel's NIT Intensity Theory Is Unsupported By the Record. .................11

    B.    Prof. Marvel Ignores the Record Evidence that Contradicts His
           Assumption of an Inherent Demand for NIT. ......................................................13

III.    PROF. MARVEL'S MODELS ARE UNRELIABLE BECAUSE THEY
       CANNOT SHOW A CAUSAL CONNECTION BETWEEN THE ALLEGED
       CONDUCT AND THE RESULTS OF THE ANALYSES. ..............................................19

    A.    Economic Analyses of Anticompetitive Effects or Damages Must Account
           for Alternative, Procompetitive Explanations. .....................................................19

    B.    Prof. Marvel's Regression Models Are Unreliable Because None of the
           Models are Capable of Distinguishing Anticompetitive Effects from
           Procompetitive Effects. .........................................................................................21

    C.    Prof. Marvel's Models Improperly Rely on Allegedly Wrongful Conduct
           that Occurred Outside of the Limitations Period. .................................................27

USCA4 Appeal: 23-1537      Doc: 48      Filed: 12/06/2023      Pg: 269 of 438

IV.   PROF. MARVEL'S DAMAGES MODEL IS UNRELIABLE BECAUSE IT IS
      BOUND TO FIND DAMAGES WHERE OCEAN CARRIERS USE ANY PORT
      INTENSIVELY. ...........................................................................................................27

CONCLUSION ...................................................................................................................30

USCA4 Appeal: 23-1537      Doc: 48      Filed: 12/06/2023      Pg: 270 of 438

ii

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬[11]

**C.    NS Enjoys Several Competitive Advantages Over CSX at the Port of Virginia.**

NS completed its "Heartland Corridor" project in 2010, which gave NS double-stack service through the Port of Virginia and the fastest and most direct routes to Midwest destinations from the Port of Virginia.[12] ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬[13] In contrast, CSX did not achieve double-stack capabilities from the Port of Virginia until December 2016.

NS has on-dock access at NIT via the tracks that it owns. It enters NIT through the southern main gate where it travels in a continuous clockwise fashion as it moves into NIT, loads containers, and then exits NIT's northern back gate.[14] On the other hand, NPBL has trackage rights that allow it to enter and exit NIT through the northern back gate.[15] NS and NPBL trains enter and move through NIT in different directions, meaning that two trains cannot be on the tracks at the same time.[16] CSX has rail access to the on-dock facilities at NIT via NPBL, provided that CSX pays the NPBL switch rate.[17]

---

[11] Ex. 5, Wright Rep. ¶ 132; Ex. 19, Joyner (30(b)(6)) Dep. at 118:18-119:4; Ex. 7, Strongosky (first) Dep. at 83:5-13.

[12] Ex. 20, NSR_00001839 at 840; Ex. 21, McClellan (first) Dep. at 22-23, 151.

[13] Ex. 22, Strongosky (2d) Dep. 70:17-71:3; Ex. 23, CSXT0165126.

[14] Ex. 24, MacDonald Dep. at 90:18-92:5; Ex. 25, Martinez Dep. 31:20-32:04.

[15] Ex. 26, NSR_00306428 at 429; Ex. 27, CSXT0001276 at 276; Ex. 28, NPBL013648 at 649; Ex. 24, MacDonald Dep. at 97:7-17.

[16] Ex. 24, MacDonald Dep. at 92:21-93:1, 121:4-9; Ex. 29, CSXT0117504 at 504.

[17] Ex. 24, MacDonald Dep. 42:3-6, 134:16-135:9; Ex. 7, Strongosky (first) Dep. at 195:2-9; Ex. 30, CSXT0037049 at Slide 4; Ex. 31, Hall Dep. 33:20-22; Ex. 32, Eliasson Dep. 81:6-9; Ex. 33, CSXT0050615 at 615.

7

specific terminals based on their railroad alignment. Prof. Marvel acknowledges the accuracy of these figures, but none of his models take into account the Port's active role in steering ocean carriers that do business with CSX away from NIT.[34]

In addition, neither Prof. Marvel,[35] nor any other witness in this case,[36] has identified any freight that *must* move through NIT (as opposed to VIG or PMT, or another East Coast port) such that the NIT terminal would be an ocean carrier's only option. In fact, Prof. Marvel acknowledged that for every Midwest destination that is served by any of the three terminals at Hampton Roads, there is at least one other East Coast port that ocean carriers could choose to serve those destinations.[37] An ocean carrier's railroad alignment also impacts its port intensity. The record is clear that CSX's best route structure to the Midwest is through the Port of NY/NJ; as a result, for instance, carriers using CSX for transport to/from Chicago moved ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ through the Port of NY/NJ than through the Port of Virginia. In contrast, NS's best route to the same locations is through the Port of Virginia; ocean carriers that use NS for rail transport to/from Chicago ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ through the Port of

---

[34] Ex. 3, Marvel Dep. at 72:24-73:10 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

[35] Ex. 3, Marvel Dep. at 87:1-87:7 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮).

[36] Ex. 10, Houfek Dep. at 141:7-16; Ex. 7, Strongosky (first) Dep. at 219:9-18; Ex. 15, Capozzi Dep. at 193:24-194:6.

[37] Ex. 3, Marvel Dep. at 45:10-13 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮).

Virginia as through the Port of NY/NJ. Thus, overall, █████████████████████████████████████████████ Ex. 5, Wright Rep. ¶ 152, Tbls. 1, 2.

Further, the pricing practices of both CSX and NS are inconsistent with the notion that there is inherent demand for NIT. ████████████████████████████████████████ ███████████████████████████████████████ In other words, for a particular route—*i.e.*, an origin and destination pair—████████████████████ ██████████████████████████[39] Prof. Marvel was unaware of this fact, because, remarkably, he never reviewed contracts between CSX or NS and their ocean carrier customers.[40] Nor did Prof. Marvel speak to any ocean carriers to confirm his opinion that carriers have a given demand for NIT:



[…]

---

[38] Ex. 5, Wright Rep. ¶ 132; Ex. 19, Joyner (30(b)(6)) Dep. at 118:18-119:4; Ex. 7, Strongosky (first) Dep. at 83:5-13.

[39] Ex. 19, Joyner (30(b)(6)) Dep. at 118:18-119:4; Ex. 7, Strongosky (first) Dep. at 83:5-13.

[40] Ex. 3, Marvel Dep. at 41:20-42:2 (██████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████).

[41] Ex. 3, Marvel Dep. at 87:8-87:19.

16

JA268

1

```
 1                  IN THE UNITED STATES DISTRICT COURT
                       EASTERN DISTRICT OF VIRGINIA
 2                          NORFOLK DIVISION


 3


 4   CSX TRANSPORTATION, INC.,      )
                                    )
 5            Plaintiff,            )
                                    )
 6   v.                             )    Civil Action No.
                                    )       2:18cv530
 7   NORFOLK SOUTHERN, et al.,      )
                                    )
 8            Defendants.           )


 9


10                      TRANSCRIPT OF PROCEEDINGS

11            (Hearing on Motion for Summary Judgment)

12
                            Norfolk, Virginia
13                          December 1, 2022

14

15   BEFORE:   THE HONORABLE MARK S. DAVIS
               United States District Judge
16

17

18

19

20

21

22

23

24

25
```

2

```
 1   Appearances:

 2          McGUIRE WOODS, LLP
                 By: Benjamin Lucas Hatch
 3                    Robert William McFarland
                      Ashley Partin Peterson
 4                    Jeanne Elizabeth Noonan
                      Johnny Brent Justus
 5                    Counsel for CSX Transportation, Inc.

 6          TROUTMAN PEPPER HAMILTON SANDERS LLP
                 By: Michael Edward Lacy
 7                    Alan Durrum Wingfield
                      John C. Lynch
 8                    Kathleen Michelle Knudsen
                      Massie Payne Cooper
 9          -- and --
            REDGRAVE, LLP
10               By: Megan McConnell
            -- and --
11          SKADDEN ARPS SLATE MEAGHER & FLOM LLP
                 By: Tara L. Reinhart
12                    Thomas R. Gentry
                      Counsel for Norfolk Southern Railway Company
13
            CRENSHAW, WARE & MARTIN, P.L.C.
14               By: W. Ryan Snow
                      James L. Chapman, IV
15                    Alexander Ryan McDaniel
                      Counsel for Norfolk & Portsmouth Belt Line
16                    Railway Company

17

18

19

20

21

22

23

24

25
```

Paul L. McManus, RMR, FCRR Official Court Reporter

USCA4 Appeal: 23-1537    Doc: 48    Filed: 12/06/2023    Pg: 276 of 438
Case 2:18-cv-00530-MSD-RJK   Document 520   Filed 12/05/22   Page 39 of 155 PageID# 13178

39

 1  point that the whole purpose of this monopolistic exercise in

 2  the conspiracy is to keep CSX out of NIT.  That is maintaining

 3  the monopoly.  And it is also doing it through a conspiracy that

 4  hurts NPBL; would not be in its own independent interests.  And

 5  that's evidence of conspiracy.

 6          There were multiple overt acts within the statutory

 7  period, and those overt acts had the effect of precluding us

 8  from that market, which our expert has analyzed.  And the effect

 9  of precluding us from that market is the damages our expert has

10  calculated.  And I think that's the damage approach and model

11  that was approved in Zenith.  Zenith does say, you know, you're

12  entitled to damages from that overt act, but it is not limited

13  to specifically that overt act.  It approves the market share

14  damages that were claimed in that four-year statutory period.

15          And Lower Lake Erie walks through that and confirms

16  that when you're talking about a monopoly that is set up and

17  blocking you and continuing to do so and refusing to, you know,

18  to deal, essentially, that that is precluding from the market,

19  and therefore you're entitled to your market damages, not just

20  the specific damage from a specific overt act.

21          And Your Honor asked about the XY, LLC decision at one

22  point, and the --

23          THE COURT:  Yes, how is -- distinguish their

24  determination there was no new accumulating damages.

25          MR. HATCH:  To me, the distinction is that -- and the

USCA4 Appeal: 23-1537    Doc: 48    Filed: 12/06/2023    Pg: 277 of 438
Case 2.18-cv-00530-MSD-RJK    Document 520    Filed 12/05/22    Page 40 of 155 PageID# 13179

40

 1    cases talk about this -- it's one thing if the monopolist

 2    destroyed your business on day one, right?  That could be a form

 3    of monopoly.  There's two competitors and this monopolist sends

 4    you into bankruptcy.  Destroys your business.  Okay.  Fine.  You

 5    know then you're done, your damages would be looking forward

 6    from there because you're done as a business.

 7          It's different though if they don't destroy you as a

 8    business or do a one-time act.  Again, taking the pill that

 9    hurts you still in year seven just like it hurts you in year

10    one.  They continue to do new things.  They continue the conduct

11    that precludes you from that market year over year.  I mean,

12    that's what you have to do as a monopolist.  If you haven't

13    killed your competitor, you have to continue to block them year

14    after year.

15          And Hanover Shoe, Zenith, all these cases say, okay,

16    maybe you can't recover for the out-of-statute damages, but what

17    we're not saying is that a monopolist who succeeds in not being

18    sued in the first four years of that monopoly gets penchant to

19    continue the monopoly into the future and not face the damages

20    they're doing to the market.  All the damages that are within

21    the statutory period are recoverable.  And that's, between

22    Hanover Shoe and Zenith, I think exactly where we are.

23          THE COURT:  And so how is this case different from XY?

24    Are you saying XY is wrong?

25          MR. HATCH:  No, I'm not saying XY is wrong.  Ours is

USCA4 Appeal: 23-1537    Doc: 48      Filed: 12/06/2023    Pg: 278 of 438
Case 2.18-cv-00530-MSD-RJK   Document 520   Filed 12/05/22   Page 41 of 155 PageID# 13180

41

1   not a single act.  Your Honor, in your introductory statements,

2   said in 2009 arguably a rate was set and a rate was denied.

3   They set 210 and didn't do the 75 that we were asking for, and

4   has it just been that conduct that has carried through this

5   whole time and been what is attributable to our harm?  And the

6   answer is no, it's not.  Because they could have at any time

7   between then and now decided to lower that rate.  And in fact we

8   made in 2018 an effort, again, to get them to do that.  They did

9   not.  So by persisting in the rate, they're deciding to maintain

10  and establish and charge that rate each year, causing the market

11  damages.

12          And that is where I go back to Zenith, which says it

13  would have been speculative and unavailable to us to sue for a

14  decade's worth of damages in 2009, because they would have said

15  you haven't accumulated those, you don't know what will happen,

16  we could change the rate tomorrow, so it's speculative.  That is

17  certainly what they would have argued, and in Zenith the Supreme

18  Court said, yeah, you don't have to face front-end inflative

19  damages when they can change the conduct, which in that case was

20  precluding you from the market, just like it is here.

21          Your Honor asked about the burden of proof issue on

22  the affirmative defense, and I will confess, Your Honor

23  references cases from the Tenth, Ninth, Sixth and Fed Circuits.

24  I don't believe I have seen those, I'll confess that.  So I

25  probably can't speak to them well because I don't believe they

USCA4 Appeal: 23-1537    Doc: 48    Filed: 12/06/2023    Pg: 279 of 438
Case 2.18-cv-00530-MSD-RJK   Document 520   Filed 12/05/22   Page 155 of 155 PageID# 13294

155

1          MR. LACY:  Yes, those are the main ones.

2          THE COURT:  All right.  Okay.  Thank you for your

3    arguments, and you will be hearing from me.

4          (Whereupon, proceedings concluded at 3:43 p.m.)

5

6                      *CERTIFICATION*

7

8          *I certify that the foregoing is a true, complete and*

9    *correct transcript of the proceedings held in the above-entitled*

10   *matter.*

11   Paul L. McManus,     Digitally signed by Paul L. McManus, OCR
                          DN: cn=Paul L. McManus, OCR, c=VA,
12   OCR                  email=pmcmanusocr@gmail.com
                          Date: 2022.12.05 14:14:52 -05'00'

13              Paul L. McManus, RMR, FCRR

14              _____

15                   Date

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

CSX TRANSPORTATION, INC.,
*individually and on behalf
of NORFOLK & PORTSMOUTH BELT
LINE RAILROAD COMPANY,*

          Plaintiff,

v.                                          Civil No. 2:18cv530

NORFOLK SOUTHERN RAILWAY COMPANY,
and NORFOLK & PORTSMOUTH BELT LINE
RAILWAY COMPANY,

          Defendants.

## OPINION AND ORDER

This matter is before the Court on motions for summary
judgment filed by defendant Norfolk & Portsmouth Belt Line Railway
Company ("NPBL"), ECF No. 296, and defendant Norfolk Southern
Railway Company ("NSR," and together with NPBL, "Defendants"), ECF
No. 307. A jury trial is currently scheduled to commence on
January 18, 2023. On December 1, 2022, the Court conducted a
hearing on the pending motions, and it thereafter received two
sets of supplemental briefs from the parties on the issue of
injunctive relief. For the reasons stated below, the Court **GRANTS
in part**, and **DENIES in part**, summary judgment in favor of
Defendants. The jury trial currently scheduled for January 18,
2023, will be converted to a bench trial on injunctive relief.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff CSX Transportation, Inc. ("Plaintiff" or "CSX") and defendant NSR are Class I railroads that operate in the eastern United States and Canada.  Defendant NPBL is a terminal and switching railroad that operates in Hampton Roads, Virginia.  NPBL was founded in 1896 as a joint venture by eight railroads, including predecessors of CSX and NSR, and it operates to provide its owners with access to NPBL's own tracks and tracks on which NPBL has rights to operate.  Due to industry consolidation, NPBL is now jointly owned only by CSX (43%) and NSR (57%).  Based on its majority position, NSR has appointed the majority of the NPBL Board for approximately thirty years.   During this time, there has been a pattern of the NPBL Board selecting a former NSR employee to serve as the NPBL President and of NSR rehiring its former employee after he serves as NPBL President for a few years. ECF No. 324-2.   Additionally, NSR provides various forms of administrative support to NPBL, including locomotive leases, billing and contract services, technology services, a car management system, email addresses,[1] benefits administration, and locomotive maintenance.

CSX and NSR vigorously compete for the domestic rail transportation of international "intermodal" containers delivered

---

[1] As a result of the email support, NPBL executives, including the company president, send and receive emails at the NSR domain "nscorp.com."

to and from various East Coast ports, including the Port of Virginia in Hampton Roads (the "POV"). Norfolk International Terminals ("NIT") is one of two primary POV terminals where international container ships offload their cargo. Critically, NSR has rail access to NIT over tracks that it owns, whereas CSX can only access NIT by rail through NPBL's contractual right to use NSR's tracks to access the terminal. Utilizing NPBL's trackage rights requires CSX to pay the NPBL "switch rate," which is the cost per train car "well" that NPBL charges customers to use its tracks/switching services. In 2009, the NPBL Board increased the switch rate to $210 per well, and that switch rate has remained the same ever since.[2] CSX's alternative to paying the $210 switch rate is transporting intermodal containers by truck from NIT to a local CSX railyard to be loaded onto a CSX train, a practice referred to as "drayage."

Adding further complication to the shared use of the single track to and from NIT, NSR owns tracks on the southern side of NIT

---

[2] The parties vehemently dispute whether the 2009 rate is an unreasonable barrier to CSX's ability to participate in the market. CSX has presented sufficient evidence on which a factfinder could conclude that the rate was viewed by NSR as a "high" rate that acted as an obstacle to CSX's ability to provide on-dock rail at NIT. CSX has also provided facially damaging evidence indicating that NSR acted to leverage its majority stake in NPBL to prevent CSX from securing a lower rate to access NIT in 2009 and shortly thereafter. CSX therefore has presented evidence supporting its claim that, in or around 2009, NSR and/or NSR in conjunction with NPBL, knowingly acted to preclude CSX from accessing NIT by rail even though NPBL exists for the purpose of providing its owners (including CSX) access to NPBL tracks and trackage rights. However, as discussed herein, nearly all of the claimed anti-competitive acts for which there is evidentiary support occurred prior to 2013.

3

that allow NSR trains to move through the terminal in a contiguous circle with its trains entering through the north gate and exiting through the south gate. In contrast, NPBL's more limited trackage rights require CSX trains moved by NPBL to enter and exit NIT through the north gate.

The crux of the instant lawsuit is whether NSR and NPBL committed monopolistic antitrust violations, or unlawfully colluded with each other in restraint of trade, in a manner that prevented CSX from fairly competing to transport international shipping containers destined for the POV, or more specifically for NIT, by preventing CSX from obtaining on-dock rail access at NIT.

Relevant to the dispute over rail access at NIT, both CSX and NSR have on-dock rail access at Virginia International Gateway ("VIG"), the other primary POV container terminal. VIG, however, has fewer berths capable of accepting large international containerships than does NIT.[3] The terminal operating company (Virginia International Terminals, hereinafter, "VIT") that operates the POV ultimately determines which terminal a containership will be routed to for docking and unloading.[4] As

_____

[3] It is the Court's understanding that both terminals were recently expanded and upgraded, but it appears undisputed that VIG was significantly smaller than NIT during the years leading up to the filing of the instant lawsuit.

[4] During certain years withing the applicable limitations period there was a third smaller POV terminal that also received some international container cargo. However, the operation of such smaller terminal during certain relevant years does not appear to materially impact the matters pending on summary judgment.

4

such, CSX cannot guarantee to its international shipping customers that CSX will be able to provide on-dock rail access at both POV terminals because it cannot prevent VIT from routing those customers' vessels to NIT. Various forms of record evidence demonstrate that NSR highly valued its position as the "sole" provider of on-dock rail access at NIT and that international shippers and VIT employees viewed CSX's lack of on-dock rail access at NIT as negatively impacting CSX's ability to compete for international shipping business at NIT.

CSX's lawsuit contends that, due to the share of POV intermodal business that is routed through NIT and due to NSR's monopolistic control over on-dock rail access at NIT, CSX is unlawfully precluded from fairly competing with NSR for intermodal traffic at NIT because: (1) on-dock rail access is critically important to international intermodal customers and that delays and/or unpredictability associated with drayage means that it is not a suitable commercial alternative beyond certain levels; (2) based on its on-dock rail access at VIG and NIT, only NSR can guarantee on-dock rail access to its international shipping customers; and (3) international shipping customers are harmed by elevated rates that NSR is able to charge and does charge due to its actions excluding CSX from competing at NIT.

Though VIG and NIT are in some ways "substitutes" within the same geographic market, as they provide the same service, CSX

points to evidence establishing that NSR, CSX, and international shipping companies are prevented from choosing to patronize one terminal over the other due to VIT's assignment of incoming vessels to a terminal based on berth availability and additional considerations other than railroad affiliation. CSX and its expert therefore contend that NIT and VIG are not truly "substitutes" within the same "market." Instead, CSX argues that the only way a railway serving the POV terminals can fairly compete for international shipping contracts is to offer on-dock rail access at both major terminals. CSX and its expert separately contend that relying on "drayage" services at NIT is not a valid substitute for on-dock rail access, and NSR's 2009 efforts to stop CSX from advertising that it had on-dock rail access at NIT provides circumstantial evidence for CSX's factual contention that on-dock rail access is critical to its ability to compete for international customers and that NSR took multiple steps to limit that access in and around 2009. See ECF Nos. 326-32 to 326-34; ECF No. 326-31. NSR strongly disputes all these claims, contending that CSX has not defined a relevant market due to available substitutes, to include VIG, drayage, other East Coast ports, and end-to-end truck transportation (meaning that international containers are transported from the port to their final destination without being placed on a train).

6

JA280

CSX filed its complaint in this action in October of 2018, alleging four federal antitrust claims and various state law claims. Following motions practice and dismissals, the remaining claims, all of which are disputed on summary judgment, are as follows: Count One, a § 1 Sherman Act conspiracy to restrain trade claim against NSR and NPBL; Count Two, a § 2 Sherman Act conspiracy to monopolize claim against NSR and NPBL; Counts Three and Four, § 2 Sherman Act monopoly and attempted monopoly claims against NSR; Count Five, a Virginia state law breach of contract claim against NSR; and Counts Eight and Nine, Virginia state law conspiracy claims against NSR and NPBL.

In March of 2020, the parties filed a joint motion to stay the case due to the COVID-19 pandemic, and several additional joint motions to stay for the same reason were subsequently filed and granted. A scheduling order establishing new deadlines was entered in October of 2020. In May of 2021, the Court entered an order referring a potentially dispositive issue to the U.S. Surface Transportation Board ("STB"), the federal agency charged with the economic regulation of freight rail. The case was again stayed until June of 2022 when the STB issued its decision. In August of 2022, an updated scheduling order was entered and a jury trial was scheduled for January 18, 2023.

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that a district court shall grant summary judgment in favor of a movant if such party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The mere existence of some alleged factual dispute between the parties "will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby Inc., 477 U.S. 242, 247-48 (1986). "A genuine question of material fact exists where, after reviewing the record as a whole, a court finds that a reasonable jury could return a verdict for the nonmoving party." Dulaney v. Packaging Corp. of Am., 673 F.3d 323, 330 (4th Cir. 2012).

"Because '[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge,'" the Court must only evaluate the evidence to the extent necessary to determine whether there is "sufficient disagreement to require submission to a jury or whether [the evidence] is so one-sided that one party must prevail as a matter of law." McAirlaids, Inc. v. Kimberly-Clark Corp., 756 F.3d 307, 310 (4th Cir. 2014) (alteration in original) (quoting Anderson, 477 U.S. at 251-52, 255). In making its determination, "the district court must view the evidence in the

8

light most favorable to the nonmoving party." Jacobs v. N.C. Admin. Off. of the Cts., 780 F.3d 562, 568 (4th Cir. 2015) (internal quotation marks omitted). The requirement that the district court construe all reasonable inferences in favor of the non-movant and avoid "weighing" evidence is not to be taken lightly, and a district court is obligated to deny summary judgment if "a jury could reasonably find either that the plaintiff proved his case by the quality and quantity of evidence required by the governing law or that he did not." United States v. McClellan, 44 F.4th 200, 205 (4th Cir. 2022) (quoting Anderson, 477 U.S. at 254).

The United States Supreme Court has instructed district courts to cautiously apply summary procedures in federal antitrust cases, though such caution is particularly important at the motion to dismiss stage. Poller v. Columbia Broad. Sys., Inc., 368 U.S. 464, 473 (1962). "Summary judgment clearly remains, however, an appropriate procedure in antitrust litigation." Terry's Floor Fashions, Inc. v. Burlington Indus., Inc., 763 F.2d 604, 610 (4th Cir. 1985). As the Fourth Circuit noted long after Poller was decided, "because of the unusual entanglement of legal and factual issues frequently presented in antitrust cases, the task of sorting them out may be particularly well-suited for Rule 56 utilization." Thompson Everett, Inc. v. Nat'l Cable Advert., L.P., 57 F.3d 1317, 1322 (4th Cir. 1995). This is, of course, especially true when dispositive matters do not turn on issues of motive or inferences

9

JA283

to be drawn from circumstantial evidence.  See id. (explaining, in the context of an antitrust case, that "if the evidence is 'merely colorable' or 'not significantly probative,' it may not be adequate to oppose entry of summary judgment" (quoting Anderson, 477 U.S. at 249-50)).

### III. DISCUSSION – STATUTE OF LIMITATIONS BACKGROUND

Defendants NSR and NPBL assert on summary judgment that CSX's federal antitrust claims and related state law claims are all time-barred.  It is undisputed that the longest applicable limitations period for any claim in this case is five years (thus dating back no earlier than October of 2013), with the federal antitrust claims governed by a four-year limitations period.  See GO Computer, Inc. v. Microsoft Corp., 508 F.3d 170, 173 (4th Cir. 2007) ("The statute of limitations for federal antitrust claims bars any action 'unless commenced within four years after the cause of action accrued,' plus any tolling.") (quoting 15 U.S.C. § 15b).[5]  CSX's Virginia common law conspiracy claim appears to have a two-year limitations period to the extent it relies on an alleged breach of a fiduciary duty.  See NorthStar Aviation, LLC v. Alberto, 332 F. Supp. 3d

---

[5] CSX's federal claims are advanced pursuant to § 1 and § 2 of the Sherman Act, though the private right to enforce the Sherman Act and recover damages is provided by a statutory provision adopted as part of the Clayton Act. 15 U.S.C. § 15. The Clayton Act expressly provides that private enforcement actions seeking damages are subject to a four-year limitations period. 15 U.S.C. § 15b.  A separate provision of the Clayton Act provides for injunctive relief based on threatened loss or damage. 15 U.S.C. § 26.

10

1007, 1015 (E.D. Va. 2018) (citing Va. Code § 8.01-248; <u>Singer v.</u>
<u>Dungan</u>, 45 F.3d 823, 827 (4th Cir. 1995).

The "principal purpose of limiting statutes is the prevention
of stale claims," and as "the Supreme Court has explained, statutes
of limitations protect important rights and are primarily designed
to assure fairness to defendants." <u>SD3, LLC v. Black & Decker</u>
<u>(U.S.), Inc.</u>, 215 F. Supp. 3d 486, 493 (E.D. Va. 2016) (quoting
<u>Goad v. Celotex Corp.</u>, 831 F.2d 508, 511 (4th Cir. 1987); <u>Burnett</u>
<u>v. New York Cent. R. Co.</u>, 380 U.S. 424, 428 (1965)). As explained
in a leading antitrust treatise:

> Limitation serves the same functions in antitrust as
> elsewhere in the law: to put old liabilities to rest, to
> relieve courts and parties from "stale" claims where the
> best evidence may no longer be available, and to create
> incentives for those who believe themselves wronged to
> investigate and bring their claims promptly,
> particularly when they are known or can be determined.
> Repose is especially valuable in antitrust, where tests
> of legality are often rather vague, where many business
> practices can be simultaneously efficient and beneficial
> to consumers but also challengeable as antitrust
> violations . . . .

Phillip E. Areeda & Herbert Hovenkamp, <u>Antitrust Law</u> ¶ 320a (5th
ed. 2022). In fact, the Supreme Court has expressly acknowledged
the need for enforcement of the limitations period in both the
RICO and Clayton Act contexts, explaining that:

> Both statutes share a common congressional objective of
> encouraging civil litigation to supplement Government
> efforts to deter and penalize the respectively
> prohibited practices. The object of civil RICO is thus
> not merely to compensate victims but to turn them into
> prosecutors, "private attorneys general," dedicated to

11

JA285

> eliminating racketeering activity.  The provision for treble damages is accordingly justified by the expected benefit of suppressing racketeering activity, an object pursued the sooner the better.  It would, accordingly, be strange to provide an unusually long basic limitations period that could only have the effect of postponing whatever public benefit civil RICO might realize.  The Clayton Act avoids any such policy conflict by its accrual rule that "[g]enerally, a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business," <u>Zenith Radio Corp. v. Hazeltine Rsch., Inc.</u>, 401 U.S. 321, 338 (1971), and the Clayton Act analogy reflects the clear intent of Congress to reject a potentially longer basic rule under RICO.

<u>Rotella v. Wood</u>, 528 U.S. 549, 557-58 (2000) (footnote and citation omitted).

As further explained in the above-referenced treatise, the impetus to apply a policy that generally recognizes immediate accrual "is particularly strong in the case of 'public' acts challenged as antitrust violations," including "exclusionary practices that are known by those at whom they are directed." Areeda & Hovenkamp, <u>Antitrust Law</u> ¶ 320a. This is so because parties injured by so-called "public" acts "<u>are able to feel</u> and perhaps to assess their injuries almost immediately," and because assessing the full scope of antitrust consequences "is often difficult[,] . . . it is especially important that antitrust challenges be timely made, <u>thus minimizing the social costs of any antitrust violation</u> but giving the parties repose for conduct that is lawful." <u>Id.</u> (emphasis added).

## IV. DISCUSSION – FEDERAL STATUTE OF LIMITATIONS

### A. Standard Accrual Rule

Supreme Court precedent establishes that a Sherman Act "cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business." Mayor of Baltimore v. Actelion Pharms. Ltd., 995 F.3d 123, 129 (4th Cir. 2021) (quoting Zenith, 401 U.S. at 338). Because a private action seeking to enforce the Sherman Act "vindicates one who is injured by a violation of the antitrust laws, it accrues when the plaintiff first suffers injury." Id. (second emphasis added) (citing Zenith, 401 U.S. at 339). Therefore, if "a plaintiff feels the adverse impact of an antitrust conspiracy on a particular date, a cause of action immediately accrues to him." Id. (quoting Zenith, 401 U.S. at 339). When the injury at issue involves exclusion from an industry or market based on an antitrust violation, the excluded would-be competitor typically has knowledge of the "public" act of exclusion, and thus, the injury is felt immediately. See N. Carolina Elec. Membership Corp. v. Carolina Power & Light Co., 780 F. Supp. 322, 331 (M.D.N.C. 1991) ("Judge Posner, a former antitrust professor, has explained that to a potential competitor 'exclusion from a market is a conventional form of antitrust injury that gives rise to a claim for damages as soon as the exclusion occurs even though, in the nature of things, the victim's losses lie mostly in the

13

future.'" (cleaned up) (emphasis added) (quoting <u>Brunswick Corp.</u> <u>v. Riegel Textile Corp.</u>, 752 F.2d 261, 271 (7th Cir. 1984))).

## B. Continuing Violation Doctrine

A review of the summary judgment record reveals that CSX's litigation position is based on alleged injuries stemming from numerous acts committed by Defendants more than four years before this suit was filed. NSR's summary judgment motion therefore anticipates CSX's reliance on the "continuing violation" doctrine applicable to certain § 1 and § 2 Sherman Act claims. Specifically, NSR argues that CSX cannot establish either that antitrust "overt acts" were committed during the limitations period or that it suffered new injuries from Defendants' conduct occurring during the limitations period. ECF No. 308, at 19-20.[6] In opposition to Defendants' motions for summary judgment, CSX does in fact invoke the continuing violation doctrine. ECF No. 328, at 41-46. In their reply briefs, both Defendants seek to further refute the doctrine's applicability. ECF No. 383, at 5-15; ECF No. 388, at 5-8.

Defendants, of course, bear the burden of proving that CSX's claims are time-barred. <u>David v. Alphin</u>, 704 F.3d 327, 339 (4th Cir. 2013). However, with respect to the federal antitrust claims, once Defendants illustrate that the claims are untimely <u>but for</u>

---

[6] The Court's citations to the parties' briefs are to the paginated numbers of the briefs, not the differently numbered ECF documents.

14

the application of the continuing violation exception, CSX bears the burden of establishing that the exception applies.  See XY, LLC v. Trans Ova Genetics, 890 F.3d 1282, 1292 (Fed. Cir. 2018) (applying Tenth Circuit law); Kaw Valley Elec. Co-op. Co. v. Kansas Elec. Power Co-op., Inc., 872 F.2d 931, 933 (10th Cir. 1989); Varner v. Peterson Farms, 371 F.3d 1011, 1019-20 (8th Cir. 2004) (finding that the plaintiffs who wished to proceed under a "continuing violation" exception "failed to plead sufficient facts . . . to establish an exception to toll the statutes of limitations"); see also Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp., 828 F.2d 211, 219-20 (4th Cir. 1987) (noting that when a plaintiff seeks "to escape the statute" of limitations on the basis of fraudulent concealment, the plaintiff must plead the necessary facts to demonstrate fraudulent concealment); Akron Presform Mold Co. v. McNeil Corp., 496 F.2d 230, 233 (6th Cir. 1974) (noting that when invoked rules are "in avoidance of the statute of limitations, the party seeking the benefit of them has the burden of proof to establish them").  Although CSX disputed at oral argument whether Defendants timely asserted that CSX had the burden on this issue and/or whether the applicable law places the burden on CSX, the Court finds both that the matter is properly before the Court and that CSX must shoulder the burden to prove that this exception applies.  Regardless, these findings are not determinative because the outcome of the Court's limitations

15

JA289

analysis would be the same no matter which party bears the burden of proof.

The "continuing violation" or "continuing conspiracy" doctrine applicable to claims under § 1 and § 2 of the Sherman Act is easily understood at a basic level. However, its application is exceedingly complex, and it applies differently across various types of antitrust cases. At base, the rule provides that "in the case of a 'continuing violation,' say, a price-fixing conspiracy that brings about a series of unlawfully high-priced sales over a period of years, 'each overt act that is part of the violation and that injures the plaintiff,' e.g., each sale to the plaintiff, 'starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times.'" Klehr v. A.O. Smith Corp., 521 U.S. 179, 189 (1997) (quoting 2 P. Areeda & H. Hovenkamp, Antitrust Law ¶ 338b, p. 145 (rev. ed. 1995)). Although the limitations period restarts as to new injuries flowing from new acts committed within the limitations period, "the commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period." Id. (citing Zenith, 401 U.S. at 338). Thus, as recognized by the Supreme Court in the context of both civil RICO cases and federal "antitrust cases, the plaintiff cannot use an independent, new predicate act as a bootstrap to recover for injuries caused by other earlier predicate

16

acts that took place outside the limitations period." Id. at 190 (emphasis added). It is therefore "not sufficient that the plaintiff may have suffered the damages caused by the defendant's violation within the limitations period," Lancianese v. Bank of Mount Hope, 783 F.2d 467, 470 (4th Cir. 1986); rather, calculable damages that flow from time-barred acts are time-barred four years after the defendant committed the acts that caused calculable harm. In Zenith, the Court explained the renewed limitations period in the "continuing violation" antitrust context as follows:

> In the context of a continuing conspiracy to violate the antitrust laws, such as the conspiracy in the instant case, this has usually been understood to mean that each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act. . . . Thus, if a plaintiff feels the adverse impact of an antitrust conspiracy on a particular date, a cause of action immediately accrues to him to recover all damages incurred by that date and all provable damages that will flow in the future from the acts of the conspirators on that date. To recover those damages, he must sue within the requisite number of years from the accrual of the action.

Zenith, 401 U.S. at 338-39 (emphasis added).

Here, Defendants assert that — as established by the plain language of Zenith and further supported by the Supreme Court's subsequent anti-bootstrapping rule from Klehr — CSX must provide evidence "linking" its claimed damages to overt acts occurring during the limitations period. See GO Computer, Inc. v. Microsoft Corp., 508 F.3d 170, 174 (4th Cir. 2007) (citing Zenith for the

17

proposition that "each new injurious act in a continuing antitrust conspiracy starts a new limitations clock <u>as to that act</u>") (emphasis added); <u>In re Cotton Yarn Antitrust Litig.</u>, 505 F.3d 274, 290 (4th Cir. 2007) (citing <u>Zenith</u> and <u>Klehr</u>); <u>AGF, Inc. v. Columbia Gas Transmission Corp.</u>, No. CV 2:04-0870, 2009 WL 10688066, at *3 (S.D.W. Va. July 2, 2009) (granting summary judgment in the defendant's favor as the plaintiff failed to file suit within four years of being excluded from the market, and any acts by defendant after plaintiffs terminated their businesses "did not cause new injuries to them").

As another judge of this Court recently explained, based on the <u>Zenith</u> analysis governing continuing violations in antitrust cases, "each injury suffered gives rise to <u>a separate cause of action</u> that is <u>subject to its own limitations period</u>," and a plaintiff's damages "must be connected to the discrete injuries that caused them." <u>Steves & Sons, Inc. v. JELD-WEN, Inc.</u>, 292 F. Supp. 3d 656, 671 (E.D. Va. 2018). Therefore:

> [A]n action by defendants within the statutory period does not bring the entire alleged conspiracy, the vast majority of which occurred outside the statutory period, into that period. Rather, it will only give rise to a cause of action (a) if the action within the statutory period itself injures the plaintiffs and (b) as to damages stemming from that action.

<u>Litovich v. Bank of Am. Corp.</u>, 568 F. Supp. 3d 398, 434 (S.D.N.Y. 2021); <u>see United States v. Dentsply Int'l, Inc.</u>, Civ. No. 99-255-SLR, 2001 WL 624807, at *17 (D. Del. Mar. 30, 2001) (explaining

18

JA292

that the intra-limitations period "overt act alleged by a plaintiff must be causally related to the plaintiff's claimed injury").

## C. Special Accrual Rule – Speculative Damages ("Zenith Exception")

A special antitrust accrual rule, sometimes referred to as the "Zenith exception," applies in certain antitrust actions to delay the date of accrual. The Zenith exception only applies when, at the time of the exclusionary conduct (when a private antitrust action would normally accrue), the plaintiff's damages are so dependent on future events that they are "too speculative to recover." Actelion Pharms., 995 F.3d at 130 (citing Zenith, 401 U.S. at 339); see Charlotte Telecasters, Inc. v. Jefferson-Pilot Corp., 546 F.2d 570, 573 (4th Cir. 1976) ("[A] cause of action for future damages does not accrue until the damages become reasonably ascertainable and, therefore, capable of proof."). The concept of "speculative" damages, however, must not be extended too far, lest it swallow the otherwise applicable accrual rule. Moreover, as recognized by the Fourth Circuit, "Zenith did not prescribe new standards for determining whether damages are too speculative to permit recovery." Charlotte Telecasters, 546 F.2d at 573. Rather, the precedent in place at the time Zenith was decided, "teach[es] that when the defendant's wrong has been proven, 'the jury may make a just and reasonable estimate of the damage based on relevant data, and render its verdict

19

JA293

accordingly,'" and that juries may "'act upon probable and inferential, as well as direct and positive proof.'" Id. (quoting Bigelow v. RKO Pictures, Inc., 327 U.S. 251, 264 (1946)).

Accordingly, "[m]ere uncertainty as to the extent or amount of damage will not bar recovery under the antitrust laws." Aurora Enterprises, Inc. v. Nat'l Broad. Co., 688 F.2d 689, 694 (9th Cir. 1982) (citing Story Parchment Co. v. Paterson Paper Co., 282 U.S. 555, 562 (1931)). Stated another way, "the Zenith case does not require that the plaintiff have the best evidence possible of his damage, but rather only that the damages be provable," and while better evidence of damages may not be available until the future, "that does not mean at an earlier point in time, enough evidence of damage was not available to allow the issue to go to the jury." In re Multidistrict Vehicle Air Pollution, 591 F.2d 68, 74 (9th Cir. 1979) (quoting Monona Shores, Inc. v. United States Steel Corp., 374 F. Supp. 930, 936 (D. Minn. 1973)). In Charlotte Telecasters, the Fourth Circuit rejected the plaintiff's Zenith argument that its date of accrual should be delayed because its future damages were too speculative, noting that the plaintiff's prior submission of a five-year projection of future subscribers and gross receipts that would have occurred had the plaintiffs received a television franchise from the city council revealed that "the damages which [the plaintiffs] sought were not too speculative to prevent the cause of action from accruing at the

20

time of the last overt act." *Charlotte Telecasters*, 546 F.2d at 573; *see* *N. Carolina Elec. Membership Corp.*, 780 F. Supp. at 333 (discussing the difference between uncertain damage and uncertain extent of damage, and indicating that "since *Zenith* most circuit courts have declined to label future damage claims speculative").

### D. CSX's Legal Construction of the Continuing Violation Doctrine

CSX advances two primary arguments in support of the application of the continuing violation doctrine to the summary judgment record. First, as set forth in its written brief and as argued at the summary judgment hearing, CSX contends that proof of an ongoing conspiracy during the limitations period as illustrated by any overt act is enough to support recovery for *all damages* caused by the conspiracy. Second, as advanced for the first time at oral argument, CSX contends that the *Zenith* exception governing speculative damages applies in this case.

### 1. Proof of Ongoing Conspiracy

In its written brief, CSX relies on *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144 (3d Cir. 1993) for the proposition that, in the context of an unlawful monopoly or conspiracy in restraint of trade that extends into the limitations period, the plaintiff need not link specific overt acts to specific accumulating damages because "overt acts aren't what cause damage," rather, "[i]t is the effectiveness of the overall

21

JA295

conspiracy that causes damages." Id. at 1172.  In Lower Lake Erie,
the court expressly rejected the argument that "Zenith and its
progeny limit recovery to damages resulting 'from injury-
causing overt acts,'" explaining that such assertion "fails to
recognize, in circumstances such as here, that continuing and
accumulating damage may result from intentional, concerted
inaction," meaning that purposeful inaction can be a sufficiently
injurious act, even if "perhaps not an overt one in the commonly-
understood sense." Id.  The Lower Lake Erie decision labeled the
defendant's effort — to rely on Zenith's language linking the
restarted limitations period to the damage caused by a new overt
act — as an "overreading" of Zenith directing a "myopic gaze" at
a rule that was not even at issue in Zenith.  Id.

    After rejecting the need to link damages to current overt
acts and allowing for a damages claim based on recent inaction,
the Third Circuit went on to reject the defendant's reliance on
Poster Exchange, Inc. v. National Screen Service Corp., 517 F.2d
117 (5th Cir. 1975), which was similarly cited for the proposition
that damages needed to be linked to overt acts.  The Lower Lake
Erie opinion explained that "far from requiring that the plaintiff
tie its damages to specific acts, the [Poster Exchange] court
acknowledged that a continuing conspiracy may give rise to
'continually accruing rights of action,' and the court simply
required the plaintiff to support its allegation that the defendant

22

JA296

had 'continued during the period in suit to refuse to deal.'"  998

F.2d at 1173 (quoting Poster Exchange, 517 F.2d at 128).

While Lower Lake Erie offers CSX a favorable interpretation

of Zenith in support of CSX's limitations and damages theories, it

predated the Supreme Court's clarification of the anti-

bootstrapping rule in Klehr.  Further, subsequent case law from

multiple circuits, including the Third and Fifth Circuits, has

clarified that the plain language in Zenith means what it says.

That is, the limitations period restarts for new and accumulating

damages caused by new actions committed within the limitations

period, and a plaintiff is barred from seeking damages based on

long stale conduct that has inertial consequences felt inside the

limitations period.

Having carefully considered CSX's reliance on Lower Lake Erie

in the light of subsequent case law, the Court reaches two

conclusions.  First, as to Poster Exchange, the analysis in that

case appears to address a slightly different question than Lower

Lake Erie, as the primary issue addressed by the Fifth Circuit

appeared to be why the repetition during the limitations period of

acts that are the same or similar to acts committed outside the

limitations period can restart the limitations period.  The Fifth

Circuit noted (1) that Zenith relied on case law that does not

require "acts different in kind to set up a later accruing cause

of action," and (2) the concern that a contrary rule would

23

JA297

"improperly transform the limitations statute from one of repose to one of continued immunity." Poster Exchange, 517 F.2d at 127.[7] Importantly, a subsequent case from the Fifth Circuit that more directly focused on the damages that are recoverable based on recent acts committed during the limitations period clarified that "[i]n the course of the Poster Exchange opinion we were careful to sound two caveats," with the second caveat "emphasiz[ing] that where a defendant commits an act injurious to plaintiff outside the limitations period, and damages continue to result from that act within the limitation period, no new cause of action accrues for the damages occurring within the limitations period because no act committed by the defendant within that period caused them." Imperial Point Colonnades Condo., Inc. v. Mangurian, 549 F.2d 1029, 1035 (5th Cir. 1977) (emphasis added). Therefore, the Fifth Circuit interprets its own holding in Poster Exchange as reading

---

[7] Consistent with the holding in Poster Exchange, the Fifth and Third Circuits both allow new acts similar-in-kind to old time-barred acts to "restart" the limitations period, whereas several other circuits, including the Sixth, Ninth, and Tenth, take a contrary view. See Bell v. Dow Chem. Co., 847 F.2d 1179, 1187 (5th Cir. 1988) (discussing disagreement with the Ninth Circuit regarding whether "reaffirmations" of refusals to deal restart the limitations period); W. Penn Allegheny Health Sys., Inc. v. UPMC, 627 F.3d 85, 106 (3d Cir. 2010) (declining to follow the Sixth Circuit's rule that "reaffirmations" of time-barred acts do not restart the limitations period because it was "inconsistent with controlling [Third Circuit] precedent"); Kaw Valley Elec. Co-op. Co. v. Kansas Elec. Power Co-op., Inc., 872 F.2d 931, 933 (10th Cir. 1989) (adopting the Ninth Circuit's rule). As discussed below, in this Court's view, the best way to synthesize such case law is to focus on whether the time-barred conduct excluding a company from participating in an industry was "final and irrevocable" (subsequent reaffirmations do not restart the limitations period) or whether it was non-final and subject to reconsideration (subsequent reaffirmation does restart the limitations period).

24

Zenith as follows: "Under Zenith, where defendants are alleged to have committed acts injurious to a plaintiff pursuant to an unlawful conspiracy, and where defendants committed some such acts more than four years before plaintiff commenced suit, and other such acts less than four years before plaintiff commenced suit, the plaintiff is allowed to recover damages resulting only from those acts committed less than four years before commencement of his suit." Id. at 1034 (emphasis added).

Second, notwithstanding the Third Circuit's pre-Klehr statements in Lower Lake Erie interpreting Zenith, the Third Circuit has more recently cited Zenith for the proposition that "in the context of a continuing conspiracy to violate the antitrust laws, . . . each time a plaintiff is injured by an act of the defendants a cause of action accrues to [it] to recover the damages caused by that act and . . . as to those damages, the statute of limitations runs from the commission of the act." W. Penn Allegheny Health Sys., Inc. v. UPMC, 627 F.3d 85, 106 (3d Cir. 2010) (emphasis added). In that same case, the Third Circuit further explained: "On a straightforward reading of Zenith, it therefore appears that [the plaintiff] may, consistent with the statute of limitations, recover damages for the acts that occurred within the limitations period." Id. at 106 (emphasis added).

Accordingly, a careful reading of the cases cited by CSX causes this Court to reject CSX's contention that it only needs to

25

point to a single act illustrating the continuance of the
conspiracy or monopoly during the limitations period to broadly
restart the limitations period and recover antitrust damages for
any and all harm suffered during the limitations period, to include
harm that is the inertial consequence of conduct occurring many
years ago.   This contention by CSX conflicts with the case law
outlined above and is out of step with the law governing
limitations in antitrust actions generally, which seeks to
"encourage[] parties to bring suits earlier . . . to minimize the
public harm that might arise from harmful monopolies."   Z Techs.
Corp. v. Lubrizol Corp., 753 F.3d 594, 603 (6th Cir. 2014).
Instead, this Court finds that the limitations period restarts
only as to the new damages arising from new overt acts committed
during the limitations period.   Such finding is aptly articulated
as an anti-bootstrapping rule in Klehr, and it has been effectively
summarized by the Sixth Circuit:

> We have held that an "antitrust cause of action accrues
> each time a defendant commits an act that injures the
> plaintiff's business."   DXS, Inc. v. Siemens Med. Sys.,
> Inc., 100 F.3d 462, 467 (6th Cir. 1996) (citing Zenith
> Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321,
> 338 (1971)).   "The focus is on the timing of the causes
> of injury, i.e., the defendant's overt acts, as opposed
> to the effects of the overt acts."   Peck v. Gen. Motors
> Corp., 894 F.2d 844, 849 (6th Cir. 1990) (per curiam)
> (emphasis added).   "[T]he fact that injuries have a
> rippling effect into the future only establishes that
> plaintiffs might have been entitled to future
> damages."   Id.

In re Travel Agent Comm'n Antitrust Litig., 583 F.3d 896, 902 (6th Cir. 2009) (cleaned up). In other words, an overt act committed in 2009, that excludes a company from competing in a market and causes harm beginning in 2009 and continuing through 2020, may not be the basis for an antitrust suit filed in 2018. What matters is the timing of the overt acts, not the length of time that such overt acts cause anti-competitive consequences. Of course, there are several exceptions to this general rule, such as when damages are unduly speculative or the harm is fraudulently concealed. However, in the absence of such exceptions, a competitor that is excluded from a market and sleeps on its rights loses its ability to recover monetary damages stemming from conduct occurring before the limitations period.

## 2. Applicability of the Zenith Exception

At oral argument, CSX offered a second and distinct argument in support of its limitations position predicated on a quote from Zenith and/or the application of the Zenith exception. The quote from Zenith reads as follows: "[The defendant] contends, and the Court of Appeals held, that the statute permits the recovery only of those damages caused by overt acts committed during the four-year period. We do not agree." Zenith, 401 U.S. at 333.

CSX's attempted reliance on this portion of Zenith to support its damages case can be disposed of swiftly. Though the quote from Zenith appears powerful on its face, when it is read in the

27

JA301

context of the entire opinion, such statement is best understood as only supporting what has been referred to herein as the "Zenith exception." That is, the broadly phrased prefatory statement made by the Supreme Court does <u>not</u> trump the Court's later discussion of "general" antitrust accrual rules as provided in that same opinion. It is that general discussion that establishes the accrual rule that has been applied and extended by countless federal circuit cases following <u>Zenith</u>. In contrast, the special "<u>Zenith</u> exception" has been applied relatively narrowly following <u>Zenith</u> only in cases when future damages are impossible to determine without resorting to speculation.

The <u>Zenith</u> exception is a unique legal theory applicable in unique circumstances, but it is not applicable here. Further, CSX did not argue for the application of this exception in its brief in opposition to summary judgment. More importantly, however, CSX has not at any time pointed to evidence in the record suggesting that CSX's damages could not have been calculated in or around 2009 without resort to speculation, and this Court is not independently aware of any such evidence. To the contrary, it appears clear from the record that a major railroad like CSX, with decades of experience competing with NSR across the Eastern United States and Canada, including competing for international intermodal traffic in Hampton Roads, could, in or around 2009, have reasonably estimated the recent and future damages it suffered

28

because of its alleged exclusion from on-dock rail access at NIT. See _Charlotte Telecasters_, 546 F.2d at 573 (rejecting the plaintiff's claim that future damages based on exclusion from the industry were speculative); _N. Carolina Elec. Membership Corp._, 780 F. Supp. at 333 ("[T]he statute of limitations is not tolled [by operation of the _Zenith_ exception] simply in order to wait and see the condition of the particular market. Indeed, since _Zenith_ most circuit courts have declined to label future damage claims speculative." (citing cases) (internal citation omitted)); _Samsung Elecs. Co. v. Panasonic Corp._, 747 F.3d 1199, 1204 (9th Cir. 2014) ("[T]he key question in determining whether damages were overly speculative such that recovery would be unavailable at the time of the initial act is whether the existence of the harm is determinable, not the specific dollar value of that harm.").[8]  Furthermore, past and future damages would have been even easier to calculate in 2011 or 2012 after a record of exclusion was established, yet suit was not filed until 2018. In sum, CSX's attempt at oral argument to rely on the result reached in _Zenith_, or the favorable language therefrom, without pointing

---

[8] In _Samsung_, the Court found the harm speculative because, at the time an initial written license was adopted, the plaintiff was not even in the "SD card" market and none of the parties "could have known for certain whether [the plaintiff] would enter that market."  _Samsung_, 747 F.3d at 1204-05. In contrast, here, CSX was serving intermodal customers by rail at the POV in 2009, and was even serving customers at NIT by draying containers to a nearby rail yard where they were then loaded onto a train for transport.

to any evidence illustrating why CSX's damages could not be
reasonably estimated without resort to speculation, is rejected.

## E. Additional Antitrust Principles Impacting Limitations

This Court's analysis above seeks to illustrate the
complexities in this area of the law.  For example, the above
discussion about the manner in which Zenith has been applied is
consistent with observations from leading scholars, who note that
the application of limitations rules in antitrust case law is
guided by circuit court rulings that "are inconsistent and often
hypertechnical, which makes analysis of the general problem
difficult."   Areeda & Hovenkamp, Antitrust Law ¶ 320a.   These
leading commentators have further opined that there is a more
recent trend "toward increased strictness against plaintiffs who
knew or should have known of a violation but delayed bringing their
suit," moving away from an arguable "casual[ness] about plaintiffs
who sat on their rights" as illustrated by Supreme Court case law
decided before 1970.   Id.   Therefore, it is helpful to review
several relevant antitrust concepts and how they may differ across
various types of cases before addressing the overt acts identified
by CSX in opposition to summary judgment.

### 1. "Reaffirmations" and "Final" Acts

The circuit split over whether a "reaffirmation" of a prior
bad act should restart the limitations period reflects a
disagreement over whether acts within the limitations period must

30

be "independent" from prior bad acts.   Compare W. Penn Allegheny
Health, 627 F.3d at 106 (2010) (reaffirmations restart the
limitations period) with Kaw Valley Elec. Co-op. Co. v. Kansas
Elec. Power Co-op., Inc., 872 F.2d 931, 933 (10th Cir. 1989) (new
act that is "merely a reaffirmation of a previous act" will not
restart the limitations period) (citation omitted). The parties'
briefs do not focus extensively on this issue, nor does the summary
judgment record render such distinction notably relevant to most
of the conduct before this Court, as neither Defendants' alleged
2015 conduct (delayed train movements) nor NSR's alleged 2016
conduct (termination of contracts) is a "reaffirmation" of past
conduct. However, a portion of NSR's 2018 conduct (a rejection of
CSX's effort to modify the NPBL Board structure) is a
"reaffirmation," as NSR relied on the continued existence and
enforceability of a decades-old contract.

    In this Court's view, the better rule is that, at least in
the context of a final decision reflected in a voluntary contract
that arises out of historical mergers, later reaffirmation of long
memorialized final contract terms is not an actionable "overt act"
capable of restarting the limitations period. See, e.g., Z Techs.,
753 F.3d at 599 ("Observations from our sister circuits, as well
as limited guidance from the Supreme Court, support our conclusion
that price increases in the merger-acquisition context do not
extend the statute of limitations," because in an antitrust

31

JA305

conspiracy "each price increase requires further collusion between multiple parties to maintain the monopoly; in a merger-acquisition case, however, the cause of harm is the merger itself."); Areeda & Hovenkamp, <u>Antitrust Law</u> ¶ 320c1 (explaining, when addressing the disagreement among federal courts regarding whether recent "reaffirmations" of prior unlawful acts should restart the limitations period, that "the most reliable way to predict outcomes is to separate situations where an injured plaintiff had actual knowledge of a violating act and had suffered sufficient injury (statute not tolled) from those where the plaintiff had no knowledge or its knowledge was incomplete or imperfect (statute tolled)"); <u>Varner v. Peterson Farms</u>, 371 F.3d 1011, 1019 (8th Cir. 2004) (finding, consistent with the Sixth, Ninth, and Tenth Circuits, that reaffirmations are not actionable); 1 Health Care and Antitrust L. § 9:10 (2022) ("In general, to start a new statute-of-limitations period, an act must . . . be a new and independent act that is not merely a reaffirmation of a previous act."); see also <u>Martin v. Sw. Virginia Gas Co.</u>, 135 F.3d 307, 310 (4th Cir. 1998) (explaining, in the context of an unlawful discrimination disability claim, that "[a]n employer's refusal to undo a discriminatory decision is not a fresh act of discrimination") (citation omitted). As discussed below, the "reaffirmation" of the contract in this case, even if potentially actionable, would also fail to restart the limitations period to

32

the extent it did not result in any new sales at monopolistic prices, directly extend CSX's exclusion from the market, or otherwise proximately cause any other new and accumulating harm.

Relatedly, and to avoid any confusion, the Court does not question CSX's ability to demonstrate that Defendants' conduct is potentially covered by the continuing violation doctrine even though historical mergers appear to be what facilitated the harm at issue in this case.  In certain circumstances, federal courts have held that a sufficiently "final" act of exclusion committed prior to the limitations period renders the doctrine legally inapplicable.  See Z Techs. Corp., 753 F.3d at 598 (refusing to extend the continuing violation theory to antitrust cases involving "price increases following a merger or acquisition," because "the cause of harm is the merger itself"); Garelick v. Goerlich's Inc., 323 F.2d 854, 855 (6th Cir. 1963) (finding that a letter indicating that the defendant would "cease doing business" with a former distributor, followed by ceasing such business as announced, was the final actionable act in the antitrust conspiracy); Al George, Inc. v. Envirotech Corp., 939 F.2d 1271, 1274-75 (5th Cir. 1991)  (agreeing with the Ninth Circuit's analysis regarding the impact of "final, immutable act[s]" (quoting Pace Indus., Inc. v. Three Phoenix Co., 813 F.2d 234, 238-39 (9th Cir. 1987))); Steves & Sons, 292 F. Supp. 3d at 672 (citing cases calling into question whether the doctrine applies

33

JA307

outside of conspiracy and monopolization cases or when the harm is predicated on "a single act").

Here, CSX remains NSR's active competitor for international intermodal containers arriving at NIT, and more importantly, CSX had an established avenue to seek re-evaluation of the condition (the excessive NPBL switch rate) that most directly excluded CSX from the industry for many years.  See Charlotte Telecasters, 546 F.2d at 572 ("[E]xclusion from participation in an industry constitutes a continuing conspiracy, unless the exclusion is final in its impact.").  Stated another way, although CSX's evidence reveals that the economic exclusion of CSX from on-dock rail access at NIT became effective at some point in or around 2009/2010, such exclusion was not "final" or "immutable" because CSX remains an owner of NPBL, and NPBL has procedures in place that allow CSX to seek modification of the switch rate through convening a NPBL rate committee.  Thus, like the fact pattern in Charlotte Telecasters where the city council denied the plaintiff's application for a cable television license but "adopted a non-exclusive ordinance and left open the possibility of granting additional franchises," 546 F.2d at 573 (emphasis added), the fact that CSX could "re-apply" to NPBL to seek a modified rate that would allow competition at NIT establishes that the prior rate was a not a final, immutable decision.

Therefore, the continuing violation doctrine is, as a general matter, "available" to CSX. Nonetheless, in order for CSX to demonstrate that the statute of limitations period restarted, the record must demonstrate that an overt act occurred "within the four years preceding the filing of the complaint," id., and as discussed at length above, CSX may recover only for the damages arising from the new conduct committed within the limitations period.[9] See Lancianese v. Bank of Mount Hope, 783 F.2d 467, 470 (4th Cir. 1986) ("[E]ach time a plaintiff is injured by a defendant's act in a continuing conspiracy to violate the antitrust laws, a cause of action accrues to him to recover damages caused by that act") (emphasis added); Barnosky Oils, Inc. v. Union Oil Co. of California, 665 F.2d 74, 81 (6th Cir. 1981) ("[P]laintiffs may sue only for damages that result from acts committed by the defendants within the four years preceding commencement of suit." (quoting Imperial Point, 549 F.2d at 1044)).

### 2. Customer vs. Competitor Damages

A seemingly less controversial issue is the fact that the limitations period for antitrust damages is generally treated differently when the plaintiff is a customer forced to pay a

---

[9] Several of the other pre-limitations overt acts purportedly committed by Defendants in furtherance of the conspiracy/monopoly, such as NPBL's discontinuance of certain tracks or acts associated with a decision not to sell a certain property to CSX, are the types of "final" acts that are not subject to reconsideration, and thus must be sued upon, if at all, within four years.

supracompetitive price due to an antitrust conspiracy or monopoly, than when the plaintiff is a competitor suffering harm due to partial or total exclusion from an industry. As explained in what appears to be the leading case on this distinction, "[a]lthough the business of a monopolist's rival may be injured at the time the anticompetitive conduct occurs, a purchaser, by contrast, is not harmed until the monopolist actually exercises its illicit power to extract an excessive price." Berkey Photo, Inc. v. Eastman Kodak Co., 603 F.2d 263, 295 (2d Cir. 1979); see also Areeda & Hovenkamp, Antitrust Law ¶ 320c4 (explaining that when a monopolist's customer is injured through paying higher prices, the customer may "rely on pre-limitation conduct in order to establish the exclusionary practices portion of a monopolization claim" but can only collect damages for the excess price paid "for the four years prior to filing" suit).

The distinction between damages suffered by a customer and by a competitor was recently recognized by the Fourth Circuit in Actelion Pharms, 995 F.3d at 131-33. In that case, the defendants argued that a new limitations period should not begin for each drug sale made at "supracompetitive prices" because such sales were "merely a holdover 'effect'" of settlement agreements reached with generic drug manufacturers outside the limitations period. Id. at 131. In rejecting that argument, the Fourth Circuit explained that although defendants labeled the case as a refusal-

to-deal case, "[t]he plaintiffs did not allege that [defendant's] refusals to deal excluded them 'from participation in an industry,' as they would have to allege to state a refusal-to-deal claim; they alleged that they are customers of [defendants] not competitors." Id. at 132. Accordingly, consistent with "[v]irtually every court faced with similar [customer-based] allegations," the Fourth Circuit held that the plaintiffs had alleged sufficient facts "to demonstrate that their claims were timely filed." Id. at 132-33.

The differing treatment between these two types of claims is grounded in the concept that, unlike an excluded rival who is injured as soon as the exclusion begins, a customer is not injured until a sale occurs, and it suffers a new and accumulating injury each time a subsequent supracompetitive price is paid. Therefore, in customer cases, new causes of action continue to accrue and new limitations periods begin running with each sale. Of course, even in these customer cases, the anti-bootstrapping rule allows only for the recovery of damages stemming from sales within four years of when suit is filed.

This key distinction further underscores the significance of the "type" of antitrust case brought by CSX, as well as its damages theory, to this summary judgment analysis. Antitrust cases generate an exceedingly complex decision tree. Even within one "type" of case, federal courts often differ as to the correct

37

approach when deciding limitations issues and the applicability of the "continuing violation" theory. Here, though much of the challenged conduct in this case was facilitated by railroad mergers occurring decades before the limitations period, CSX points to allegations that NSR more recently acted improperly to exclude CSX from the relevant market through conspiratorial or monopolistic manipulation of NPBL. Care must be taken in reviewing the record, however, because NSR has a lawful right to "compete" with CSX, and it is important to ensure that NSR's lawful competitive conduct, even if aggressive, is not mistaken as an antitrust act merely because NSR has evidenced an extreme opposition to facilitating the business of its direct competitor. This Court thus reviews the summary judgment record in the context of the specific antitrust theory advanced by CSX and agrees with Defendants that the lone theory of recovery of antitrust damages is that CSX was harmed as a competitor to NSR. That is, CSX's lone antitrust damages theory is that it was excluded as a competitor from on-dock rail access at NIT, purportedly causing CSX to suffer hundreds of millions of dollars of damages beginning in 2009 when its exclusion from the market became effective.

### 3. New and Accumulating Injury

Turning next to an issue that appears to be dispositive with respect to the antitrust damages claimed by CSX in this case, it is well-established in the continuing violation context that acts

38

committed during the limitations period will constitute "overt
acts" that restart the limitations period only if they are new
acts that "inflict new and accumulating injury on the plaintiff."
Kaw Valley, 872 F.2d at 933 (quoting Pace Indus., 813 F.2d at 238);
see Varner v. Peterson Farms, 371 F.3d 1011, 1019 (8th Cir. 2004)
(requiring "new and accumulating injury on the plaintiff"); DXS,
Inc. v. Siemens Med. Sys., Inc., 100 F.3d 462, 467 (6th Cir. 1996)
(same); see also Lehman v. Lucom, 727 F.3d 1326, 1331 (11th Cir.
2013).

Illustrating the "new injury" requirement, in XY, LLC v. Trans
Ova Genetics, LC, No. 13-CV-0876-WJM-NYW, 2015 WL 5579551, at *2
(D. Colo. Sept. 23, 2015), the district court reconsidered a
dispute over whether new instances of exclusionary conduct
committed during the limitations period were actionable under the
continuing violation theory, comparing Kaw Valley and Champagne
Metals v. Ken-Mac Metals, Inc., 458 F.3d 1073, 1088 (10th Cir.
2006), to illustrate the difference between final and non-final
acts of exclusion. XY, LLC, 2015 WL 5579551, at *2. Importantly,
however, in clarifying its earlier ruling, the district court
explained that it had not previously relied on the finality of the
primary act of exclusion at issue in that case (a termination
letter), but rather, had "assumed" that the letter terminating the
parties' business relationship "was not a final act that
permanently excluded [the plaintiff] from the market." Id.

39

JA313

(emphasis added). The Court nevertheless concluded that the plaintiff's claims were time-barred based on the plaintiff's failure to "meet the threshold requirement to show that any subsequent acts [committed during the limitations period] caused new injuries." Id. The Federal Circuit, applying Tenth Circuit law, affirmed the district court's ruling, noting that the plaintiff "failed to identify any 'new and accumulating injury' resulting from any of [the defendant's] post-termination acts." XY, LLC v. Trans Ova Genetics, 890 F.3d 1282, 1291 (Fed. Cir. 2018). The Federal Circuit further indicated in a footnote that the plaintiff's summary judgment brief "alleged only a single injury that resulted from [the defendant's] conduct: exclusion from the relevant market covered by [the defendant's] patents." Id. at 1292 n.3; see Garelick, 323 F.2d at 856 (explaining that while the disputed conduct from within the limitations period "might be overt acts," the plaintiffs "were not in any way injured or damaged thereby," and the district judge therefore correctly held that the four-year antitrust limitations period "barred the right to sue").

Courts have elucidated this same concept — that a new overt act is only actionable to the extent it causes new and accumulating harm beyond the damages flowing from the inertial consequences of time-barred conduct — in a number of ways in the antitrust context. See Xechem, Inc. v. Bristol-Myers Squibb Co., 372 F.3d 899, 902

40

JA314

(7th Cir. 2004) ("Each discrete act with <u>fresh adverse consequences</u> starts its own period of limitations." (emphasis added)); <u>Rite Aid Corp. v. Am. Exp. Travel Related Servs. Co.</u>, 708 F. Supp. 2d 257, 271 (E.D.N.Y. 2010) (finding that "unilateral increases to . . . merchant discount fees . . . satisfy both parts of the overt act test," as they were "new and independent acts" and they "inflicted new and accumulating harm" as the fee increase "inflicted <u>a greater quantum of damages</u>" (emphasis added)); <u>cf.</u> <u>Klehr</u>, 521 U.S. at 190 (describing the plaintiff's failure to demonstrate, in a civil RICO action, "how any [recent] new act could have caused them harm <u>over and above</u> the harm that the earlier acts caused" even though the new acts arguably illustrated new nefarious conduct (emphasis added)). This concept is consistent with case law and commentary discussed throughout this opinion indicating that each overt act causing new antitrust injury is assigned its own limitations period. <u>See, e.g.</u>, 1 Health Care and Antitrust L. § 9:10 (2022) ("Where a 'continuing violation' exists . . . [e]ach overt act that is part of a conspiracy and that injures the plaintiff generates a new and separate cause of action and starts a new limitations period," meaning that "several limitations periods may run at the same time."); <u>Vincent v. Reynolds Mem'l Hosp., Inc.</u>, 881 F.2d 1070, 1989 WL 87633, *4 (4th Cir. 1989) (unpublished table opinion) ("<u>[E]ach act</u> of a defendant <u>which injures</u> a plaintiff during the course of a conspiracy to violate the antitrust laws

constitutes a separate cause of action for which the plaintiff may recover damages.") (emphasis added). Phrased a slightly different way, and contrary to CSX's position in this lawsuit, "[i]njury and damage in a civil conspiracy action flow from the overt acts, not from the mere continuance of a conspiracy." Kadar Corp. v. Milbury, 549 F.2d 230, 234 (1st Cir. 1977) (quotation marks and citation omitted).[10]

### 4. Tracing Harm to Overt Acts

Before the Court addresses the specific acts relied on by CSX as "overt acts" and the damages purportedly stemming therefrom, the Court notes, as it did at oral argument, that it does not reject wholesale CSX's legal contention that a plaintiff providing evidence of an active conspiracy involving multiple intertwined overt acts causing various types and/or multiple instances of new and accumulating injury need not tie specific overt acts to specific forms of harm. Importantly, as long as the plaintiff can demonstrate that the harm supporting a damages claim collectively flows from unlawful acts committed during the limitations period, all of the damages are recoverable.[11]  See City of Vernon v. S.

---

[10] Kadar Corp. is not itself an antitrust case, but it did cite to and rely on Zenith in discussing the accrual date and limitations period in civil conspiracy cases.  Kadar Corp., 549 F.2d at 234.

[11] Similarly, if a defendant engages in a new act that supersedes all time-barred conduct in that it creates an identifiable new harm that occupies the field of all harm going forward, a plaintiff could easily demonstrate that the ongoing harm is attributable to conduct occurring within the limitations period.  See Xechem, 372 F.3d at 902 (discussing recent acts

California Edison Co., 955 F.2d 1361, 1371 (9th Cir. 1992) (indicating in a case where the statute of limitations was <u>not</u> at issue that when "damages arise from a series of unlawful acts intertwined with one another," and "<u>causation</u> of damages has been established," the law does not require "strict disaggregation of damages among the various unlawful acts" (quoting <u>MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.</u>, 708 F.2d 1081, 1161 (7th Cir. 1983))). However, when a decades-old conspiracy causes current harm that flows from time-barred acts and one or more recent overt acts, well-established antitrust law (including <u>Klehr</u>'s anti-bootstrapping rule) precludes a plaintiff from recovering the damages felt during the past four years that are consequences of conspiratorial or monopolistic acts committed years or decades earlier.[12] <u>Cf.</u> <u>MCI</u>, 708 F.2d at 1161-63 (explaining that when one portion of damages are recoverable because they result from

_____

that allegedly extended the unlawful period of patent exclusivity for an additional thirty months).

[12] As described in <u>Midwestern Machinery Co. v. Nw. Airlines, Inc.</u>, 392 F.3d 265, 269 (8th Cir. 2004), "[t]he typical antitrust continuing violation occurs in a price-fixing conspiracy, actionable under § 1 of the Sherman Act, <u>see</u> 15 U.S.C. § 1, when conspirators continue to meet to fine-tune their cartel agreement." Here, there is no horizontal price fixing "cartel," but even if there were, there is no evidence of "fine-tuning" or continued actions necessary to keep CSX out of the relevant market beyond 2011. Rather, even assuming that NSR and NPBL conspired to prevent CSX from accessing NIT by rail by discontinuing tracks, blocking CSX from acquiring property, and setting a switch rate that economically foreclosed CSX from providing on-dock rail service at NIT, this scheme was a resounding success by 2009, or alternatively, by 2011. Notably, CSX admits that when it decided to move a small number trains in 2015 due to a necessity created by a unique situation, it did so at a <u>financial loss</u> due to the <u>pre-existing barriers of entry</u> to the NIT market.

unlawful conduct, and another portion of damages are not
recoverable because they result from lawful competition, the
plaintiff must prove that the damages it seeks were caused by the
"unlawful acts of the defendant") (emphasis in original).

### F. Case-Specific Overt Acts and Flawed Damages Model

CSX's brief in opposition to summary judgment highlights
three groups of conduct that CSX relies on as "overt acts"
occurring during the four years preceding suit.   The summary
judgment record reveals that the 2015 conduct could be interpreted
as an overt act causing two types of harm to CSX, but CSX has not
sought recovery for this harm in this case.   As to the 2016 and
2018 conduct, CSX has not demonstrated that any of the acts it
points to is a new overt act that inflicted new and accumulating
harm.   Although CSX's current efforts to state a timely cause of
action for damages point to recent activity, and counsel for CSX
has presented well-articulated arguments in this complex area of
the law, controlling legal principles reveal that CSX is attempting
to breathe life into time-barred claims in the absence of any new
harm linked to any recent overt acts.   Finally, even if the Court
found that the 2015 conduct was potentially actionable, CSX relies
exclusively on a damages model that is fatally flawed, and
Defendants therefore demonstrate that they should prevail on the
damages claim as a matter of law.   As explained in greater detail
below, even when CSX's evidence is viewed in the light most

favorable to CSX, the evidence is insufficient for a reasonable juror to conclude that the entirety of CSX's lost customer contracts, or a majority of its lost contracts, or a notable minority percentage of its lost contracts, <u>or even a non-speculative de minimis percentage</u> of its lost contracts, is predicated on actionable overt acts occurring after 2012.

### 1. 2015 Conduct

Breaking down the 2015 conduct, CSX argues in opposition to summary judgment that NSR and NPBL conspired to obstruct CSX's efforts to move a limited number of trains to NIT during 2015. CSX asserts that unique circumstances existed for a brief period during 2015 that caused CSX to rely on NPBL to access NIT, despite the commercially unreasonable switch rate established in 2009.[13] Defendants counter that every train CSX requested was moved by NPBL, noting the absence of a genuine dispute of fact on that point. Nonetheless, CSX has identified a factual dispute with respect to whether NSR, or NSR as assisted by NPBL, took affirmative steps to complicate or delay CSX's operational use of the track to NIT for one or more trains.[14]

---

[13] Defendants dispute any characterization of the switch rate as unreasonable, and the Court's references above should not be viewed as a finding of fact, but rather, an acceptance of CSX's version of the facts for the purposes of summary judgment.

[14] As argued by NPBL at oral argument, the speed at which NPBL acted to secure an "operating window" to move the first train requested by CSX following CSX's years of non-use of the track to NIT arguably favors Defendants, even in the face of NSR's visceral reaction in opposition to

It is undisputed that 2015 was a period of "extreme port congestion across the East Coast," ECF No. 324, at 22, and that shipping containers were stacking up at NIT to a degree that CSX's process of serving its current NIT intermodal customers through drayage was failing. Therefore, according to CSX's own version of events, "CSX paid NPBL's $210 rate to move backlogged freight at NIT, recognizing that doing so under these circumstances would result in short-term economic losses for the greater good." Id. (emphasis added). Stated another way, CSX's version of the facts indicates that in 2015 it remained economically barred from competing for contracts with international shippers that wanted on-dock rail access at NIT because of the market barriers that Defendants had erected prior to the limitations period, but that CSX decided to move a small number of trains out of necessity even though it would lose money doing so.

How many of these small number of train moves actually occurred and how efficient they were is a matter of disputed fact. Accepting CSX's version of the facts supported by reasonable inferences that a factfinder could make in CSX's favor, the following could be found: (1) CSX paid a supracompetitive price to NPBL in 2015, and the law applicable to antitrust harm suffered by

---

CSX's initial request. Furthermore, CSX has not pointed to evidence demonstrating how many trains were delayed, intentionally or otherwise, though its evidence is sufficient to demonstrate that at least one CSX train was materially delayed.

customers would generally allow CSX, as a customer of NPBL, to recover for the excessive price it paid during 2015; and (2) NSR, and possibly NPBL, acted to obstruct, or aided in the obstruction of, CSX's train movements during 2015, with this obstruction resulting in CSX's temporary loss of business from one of its existing customers for a period of several weeks. However, even viewing the disputed facts and inferences in CSX's favor, there is simply no record evidence, direct or circumstantial, suggesting that any delay of a commercially unviable train in 2015 impacted CSX's ability to compete for international intermodal customer contracts at NIT.

First, addressing the elevated switch rate CSX paid to NPBL in 2015, the Court finds that CSX has waived the ability to recover such damages because it did not identify the overcharge as an overt act during discovery when squarely asked by NPBL to identify all of NPBL's overt acts. See ECF No. 303-31. Notably, CSX was compelled by the Court to answer this interrogatory, ECF No. 236, and it is too late for CSX to identify a new undisclosed overt act in an effort to avoid summary judgment on limitations grounds. Furthermore, assuming for the sake of argument that this claim was not waived, CSX has not advanced a theory of antitrust harm in this case predicated on the payment of a supracompetitive price in 2015 as a NPBL customer; CSX advances only a competitor claim based on its exclusion from the market. Finally, CSX offers no damages

47

JA321

model whatsoever to calculate the harm it suffered by paying an excess fee for an unknown number of train cars. The record is therefore insufficient as a matter of law to extend the limitations period based on "customer" harm flowing from the payment of a supracompetitive price.

Second, assuming in CSX's favor that NPBL conspired with NSR to obstruct CSX,[15] and assuming in the alternative that NSR acted unilaterally as a monopolist to unlawfully obstruct or delay CSX's access to NIT in 2015, CSX at best demonstrates that it suffered the minimal harm of _temporarily_ losing the business of a single customer for a few weeks in 2015. ECF No. 325-30. However, CSX has failed to seek any antitrust damages for this harm. Rather, as discussed herein, CSX's theory of antitrust harm only seeks damages for its total exclusion from the market, not any ancillary harm it purportedly suffered when participating in the market at a financial loss for a brief period in 2015. Furthermore, CSX has failed to advance a damages model predicated on such temporary loss, instead relying exclusively on a model seeking to recover

---

[15] NPBL President Cannon Moss timely responded to CSX's requests to access NIT in 2015 by contacting NSR and taking steps to arrange for "windows" to move CSX trains. NSR initially pushed back at NPBL's request, but windows were obtained and trains were moved. Material factual disputes exist regarding whether either Defendant conspired or acted to cause intentional delays, or whether delays resulted from the extreme port congestion and/or the operational issues associated with the conflicting "flow" of NPBL's train traffic at NIT due to its legal right to access only NIT's north gate. Because the conflicting characterization of these facts creates a genuine dispute, the Court accepts CSX's version of events for summary judgment purposes.

hundreds of millions of dollars of lost customer contracts. Because CSX has not sought damages based on what could be a single delayed train for a single customer, or offered a damages model on which a reasonable juror could calculate a non-speculative award for the short-term loss of business from this customer, there is not a triable issue based on the facts alleged by CSX.

Third, and critically important to CSX's efforts to restart the limitations period in 2015, CSX has not offered any evidence, direct or circumstantial, suggesting that Defendants' alleged actions to obstruct or delay CSX from utilizing NPBL to move one or more of its trains to NIT in 2015 resulted in any "new and accumulating injury." CSX itself argues that it was economically excluded from providing on-dock rail at NIT — before, during and after the 2015 events — due to acts occurring in and around 2009 and that, because of this exclusion, CSX's use of NPBL to access NIT by rail in 2015 came at a financial loss to CSX.[16] See ECF No. 324, at 22 (reflecting CSX's factual assertion that moving the trains in 2015 would result in "economic losses"); ECF No. 303-26 (revealing CSX's Chief Operating Officer's view that, in 2009, before the switch rate was increased to $210, the then-current

---

[16] CSX's opposition to summary judgment characterizes certain pre-2009 events (discontinuation of a segment of NSR track, NPBL refusal to sell a rail yard to CSX) as "operational" obstacles not "economic" obstacles. ECF No. 324, at 20-21. But the fact remains that, based on CSX's own theory of the case, by 2009, these final operational events coupled with the elevated switch rate precluded CSX from providing economically viable on-dock rail access to its customers, thereby excluding it from the relevant market.

rate of $148.50 served as "a direct barrier to fair and competitive access at NIT") (emphasis added).

Thus, CSX's own factual assertions make clear that, although CSX continued to suffer inertial and unabated harm from Defendants' exclusionary acts committed in and around 2009 (some of which were final events), CSX cannot demonstrate that in 2015, it suffered new and accumulating harm to its ability to compete for contracts with international intermodal customers that purportedly demand on-dock rail access at NIT. Notably, in response to Defendants' summary judgment motions, CSX does not point to any evidence suggesting that the events of 2015 contributed in any way to CSX's inability to secure contracts with international shippers.[17]

For all of these reasons, the Court finds that CSX has failed to identify an overt act committed by either Defendant in 2015 causing new and accumulating harm sufficient to restart the otherwise expired limitations period.[18] Rather, in support of its antitrust damages claim, CSX has alleged only a single injury,

---

[17] CSX does not point to any direct evidence (such as an affidavit or deposition testimony from any international shippers), or indirect evidence, suggesting that CSX had a harder time negotiating contracts in 2016, 2017, or thereafter, as a result of any NIT trains that were delayed in 2015.

[18] The Court separately notes that, with respect to the allegations against NPBL, CSX's evidence is insufficient for a reasonable factfinder to conclude that there was an "agreement" in restraint of trade or an agreement to assist NSR in establishing a monopoly but for CSX's reliance on the pre-limitations conduct, as made relevant by the continuing violation theory.

50

"exclusion from the relevant market," XY, LLC, 890 F.3d at 1292
n.3, and the record evidence, interpreted in CSX's favor,
demonstrates that such exclusion took effect in or around 2009.
CSX is therefore legally precluded from using the alleged short-
term delays of one or more trains in 2015 to bootstrap hundreds of
millions of dollars of damages wholly untethered to such acts and
that instead flow from the previously established market
exclusion. In the context of the damages case presented by CSX,
the 2015 acts do not restart the limitations period.

The Court separately concludes that even if the record is
interpreted as revealing some modicum of "new and accumulating
harm" to CSX's ability to compete in the market, the record still
supports entry of summary judgment on damages. As explained
herein, CSX's damages model is fundamentally flawed in that it
does not even attempt to separate harm stemming from the limited
conduct within the limitations period (physical delays of
economically unviable trains) from the established inertial
effects of the acts committed prior to, or during the 2009-2011
period. This is not a case where the plaintiff has admissible
evidence supporting its damages claim separate and apart from its
damages expert. Here, CSX has limited itself to a singular theory
of recovery, and that theory is unsupported by the law. See
Imperial Point, 549 F.2d at 1044 (adhering "to the rule that
plaintiffs may sue only for damages that result from acts committed

51

JA325

by the defendants within the four years preceding commencement of
suit") (emphasis added).

CSX's election to proceed on a unitary theory seeking recovery
for all anti-competitive acts, regardless of when they occurred,
dooms its ability to present to the jury a non-speculative damages
case arising from the 2015 conduct.  Though offered in the context
of a motion in limine rather than a motion for summary judgment,
Gumwood HP Shopping Partners, L.P. v. Simon Prop. Grp., Inc., 221
F. Supp. 3d 1033, 1045 (N.D. Ind. 2016), provides a helpful
articulation of the flaws in a plaintiff's damages model that
applies with similar force here:

> [The plaintiff's expert] gives the jury no basis on which
> to evaluate the effect of the statute of limitations on
> his damages opinion . . .  As discussed above, he did
> not tie his damages opinion to any particular injury.
> Nor did he indicate which . . . events would have
> triggered the snowball effect [where the loss of one
> customer leads to the loss of additional customers], or
> otherwise offer any basis to determine when the snowball
> would have begun accumulating.  Thus, even granting [the
> plaintiff's expert's] opinion that the snowball effect
> occurred and led to his damages figure, the jury would
> be left entirely to speculation to determine whether any
> snowball effect was triggered by acts that accrued
> before or after the limitations period began, or to
> assess what portion of the snowball was attributable to
> acts that caused harm within the limitations period. No
> award of damages based on that sort of speculation could
> be sustained.

Id. at 1044-45.  In most scenarios where damages are uncertain,
the lack of clarity does not rise to the level of a defect that
should preclude consideration by a jury; but here, CSX has pointed

52

JA326

to no record evidence on which a jury could reasonably estimate
the damages stemming from the short-term delay of trains in 2015
(as contrasted with the time-barred economic exclusion from NIT).
See Comcast Corp. v. Behrend, 569 U.S. 27, 36-38 (2013) (reversing
the appellate court's certification of a large class in a case
involving alleged violations of federal antitrust laws, holding
that "[t]here is no question that the [plaintiff's damages] model
failed to measure damages resulting from the particular antitrust
injury on which petitioners' liability in this action is premised,"
noting in its conclusion that "[t]he first step in a damages study
is the translation of the legal theory of the harmful event into
an analysis of the economic impact of that event" (quoting Federal
Judicial Center, Reference Manual on Scientific Evidence 432 (3d
ed. 2011))); City of Vernon, 955 F.2d at 1373 (affirming the
district court's grant of summary judgment based on the "serious
flaws in the only damage study [that] could be proffered to the
jury" which placed the plaintiff "in the position of having no
proper proof of damages at all"); Blue Cross & Blue Shield United
of Wisconsin v. Marshfield Clinic, 152 F.3d 588, 594-95 (7th Cir.
1998) (affirming the district court's ruling on summary judgment
"throw[ing] out the damages claim," but reversing its decision
rejecting the injunction claim, explaining that "no reasonable
jury could estimate the plaintiff's damages from the reports of
plaintiff's experts," nor could the "nonexpert evidence" support

a reasonable damages award, noting that although the plaintiff may have lost money as a result of the antitrust violation, there is a critical difference "between an actual and a quantifiable harm and also between a quantifiable and a quantified harm") (emphasis added); cf. Allegheny Pepsi-Cola Bottling Co. v. Mid-Atl. Coca-Cola Bottling Co., 690 F.2d 411, 415 (4th Cir. 1982) (explaining, post-trial, that the first damages theory was flawed because the damages calculation "did not consider" the impact of predatory pricing as required to prove which portion of the price reduction was "caused by the defendants' unlawful conduct"; and the second damages theory was "not sufficient to establish antitrust injury" for the same reason the district court excluded the proposed expert testimony, the plaintiff was asking the Court to "infer" injury to its competitive position in the market). Therefore, the faulty model is sufficient to undermine CSX's damages claim as a matter of law.

## 2. 2016 Conduct

CSX's opposition to summary judgment next points to unilateral actions by NSR beginning in 2015 and continuing into 2016. In July of 2015, NSR provided NPBL one year's notice that NSR was electing to cancel certain trackage rights agreements, including the 1917 trackage rights agreement by which NPBL has access to NIT, with that agreement's 99-year term set to expire in 2016. In 2016, NSR informed NPBL that it intended to negotiate a

54

single contract to govern all trackage rights going forward (which would establish the rate NPBL is required to pay NSR for access to the tracks leading to NIT). CSX alleges that although NSR externally stated its intent to provide NPBL with "materially the same access" to its tracks, emails reveal that NSR employees internally discussed a desire to "curtain NPBL's use of NSR's tracks (define actual times of use if possible and limit that as well) in the new agreement(s)" and "inflate the rate as much as NSR can," through a rate structured "as high as reasonable based on what [NSR] charge[s] other railroads in similar circumstances." ECF No. 326-7. To be clear, the rate at issue is the rate that NPBL pays NSR to use tracks owned by NSR. NSR, of course, has every right to seek to profit from the use of its tracks, and NSR's interests run counter to NPBL's interests. Additionally, a federal agency, the STB, has jurisdiction over any dispute between NSR and NPBL on this issue, and will act as a "check" to ensure that NSR charges NPBL a reasonable rate for what in essence will be a form of "forced sharing" of NSR's own tracks. Indeed, an expedited proceeding to establish this rate was brought before the STB in 2018, with NSR and NPBL as adversaries, but the proceeding was stayed at CSX's request to allow the instant litigation to be resolved before the new rate is determined.[19] Because of this

---

[19] Any future "switch rate" that NPBL charges to CSX to access NIT will necessarily include the NSR-NPBL rate as a cost factor because NPBL will have to pay NSR that rate for each car moved to NIT. Thus, this "expense"

55

JA329

stay, the NSR-NPBL rate that will apply <u>in the future</u> has yet to be established.

First, the Court concludes CSX has failed to demonstrate that a reasonable juror could find that NPBL committed an overt act (conspiratorial or monopolistic) or any other unlawful act associated with NSR's decision to cancel its contracts with NPBL at the conclusion of the contractual terms. CSX points to no evidence, direct or circumstantial, suggesting that NSR's actions on this issue were within the scope of a prior or then-existing conspiracy, or in furtherance of an <u>unlawful</u> monopoly. NSR has a legitimate competitive business interest in being paid a reasonable fee for the use of its tracks, and NSR's actions to update and maintain a reasonable fee paid by NPBL are separate from its alleged manipulation of NPBL.

Second, CSX fails to allege that it has suffered any harm from the cancellation of such contracts because NSR and NPBL continue to operate under the terms of the canceled contracts in light of the rate dispute pending at the STB.[20] Thus, it appears that the prior contract rate that NPBL pays to NSR remains in full force, and any "anticipated" future harm that CSX could suffer

---

will essentially be transferred to NPBL's customers, as are NPBL's other operating costs.

[20] CSX has admitted that: (1) the NPBL switch rate has not increased since the contracts expired on July 31, 2016; and (2) "any increase in the amount NS[R] charges to NPBL for use of NS[R]'s tracks to NIT would have to be approved by the Surface Transportation Board." ECF No. 312-17.

56

from an increase in the rate that NSR charges NPBL has not yet accrued and may never accrue, revealing the absence of any new and accumulating harm.[21]

CSX has suggested, without citation to evidence, that the rate dispute between NPBL and NSR is fabricated as a means to further delay CSX's access to NIT; however, it is CSX that intervened in the rate dispute before the STB and requested a stay of that proceeding pending the result of this litigation.[22] Finally, even assuming that CSX could establish that the contract cancellations were an overt act by NSR, and that CSX was harmed by the purportedly "delayed" resolution of the rate dispute, CSX has not presented a damages model in response to the detailed discovery request in this case that would allow a factfinder even to roughly estimate harm without resort to guesswork and speculation.

For all of these reasons, the Court finds that CSX has failed to point to record evidence demonstrating that NSR's unilateral actions in 2015/2016 are overt acts in support of the alleged

---

[21] CSX's efforts to illustrate at oral argument that NPBL has somehow capitulated to a significant increase in the rate it pays NSR as part of a conspiratorial arrangement was facially uncompelling. CSX's citation to a truncated excerpt from NPBL President Cannon Moss's deposition testimony excluded the portion explaining that NPBL's "opening" position before the STB regarding the new rate to be paid to NSR is lower than the average per car rate that NPBL currently pays. See ECF No. 297-6. CSX points to no contrary evidence.

[22] To the extent that CSX seeks to rely on an inference that the 2016 conduct was intended to extend CSX's exclusion from the relevant market, there is no evidence that CSX took any steps to re-enter the market in 2016 or 2017, nor that CSX asked NPBL to modify its rate during 2016 or 2017.

57

JA331

conspiracy or unlawful monopoly associated with this case. Notably, the potentially actionable conduct alleged in this case is NSR's manipulation of NPBL or NPBL's legal rights in a manner that restrains trade and/or creates or preserves an unlawful monopoly. NSR, who owns the tracks accessing NIT, must in essence "share" those tracks with NPBL pursuant to NPBL's contractual rights and STB requirements in this uniquely regulated industry. However, in doing so, NSR need not act in a manner designed to encourage the business of its rival. Importantly, as CSX acknowledges, this case was not brought under an "essential facilities" theory, which appears to be a now-disfavored "asset-based [doctrine] holding that mere ownership of a bottleneck asset may obligate a firm to share the asset with others." Herbert Hovenkamp, Federal Antitrust Policy: the Law of Competition and its Practice § 7.7, at 401 (6th ed. 2020). The doctrine is problematic because firms "may acquire monopoly power by establishing an infrastructure that renders them uniquely suited to serve their customers," and "compelling such firms to share the source of their advantage is in some tension with the underlying purpose of antitrust law, since it may lessen the incentive for the monopolist, the rival, or both to invest in those economically beneficial facilities." Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP, 540 U.S. 398, 407–08 (2004). Moreover, federal courts are "ill suited" to dictate the terms of "[e]nforced

sharing" as it requires them to "act as central planners, identifying the proper price, quantity, and other terms of dealing." Id. at 408. To the extent this doctrine remains applicable in limited circumstances, it does not apply where, as here, "a state or federal agency has effective power to compel sharing and to regulate its scope and terms." Id. at 411 (quoting Areeda, Antitrust Law, p. 150 ¶ 773e (2003 Supp.)). Here, that agency is the STB, and NSR can aggressively defend the terms of its dominating use of its own tracks before the STB; what NSR may not do under federal antitrust law (assuming that other prerequisites are established) is deny CSX the legal right it does have to use those tracks, whether such right is available by contract or by STB decree.

Therefore, NSR has the unilateral right to renegotiate the terms of expiring historical contracts, and the right to seek a rate "as high as reasonable" under the circumstances, particularly when: (1) the reasonableness of such rate will be scrutinized by a government agency; and (2) the rate is for shared access to tracks owned by NSR. See Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp., 910 F.2d 139, 147 n.14 (4th Cir. 1990) ("A firm, even one with monopoly power, is not guilty of predatory exclusionary conduct when it is simply exploiting the competitive advantages legitimately available to it."); Loren Data Corp. v. GXS, Inc., 501 F. App'x 275, 282 (4th Cir. 2012) (explaining that

59

JA333

the Sherman Act "directs itself not against conduct which is
competitive, even severely so, but against conduct which unfairly
tends to destroy competition itself" (emphasis added) (quoting
Spectrum Sports Inc. v. McQuillan, 506 U.S. 447, 458 (1993))); cf.
Trinko, 540 U.S. at 407 ("The mere possession of monopoly power,
and the concomitant charging of monopoly prices, is not only not
unlawful; it is an important element of the free-market system.").
NSR also has the right, particularly in a case where the NPBL's
lack of legal access to NIT's southern gate interferes with NSR's
efficient use of its own tracks, to seek clarity regarding when it
is required give NPBL access to NSR's tracks.   NSR may not, of
course, unlawfully interfere with NPBL's operations in a manner
designed to restrain trade or to further an unlawful monopoly;
however, none of CSX's evidence suggests that the 2016 conduct can
reasonably be interpreted as NSR acting in furtherance of a
conspiracy or illegal monopoly, even if it acted in a manner that
does ultimately prove detrimental to its rival, CSX.

     Based on the record as presented on summary judgment, the
Court easily concludes that no reasonable factfinder could find
that the 2015/2016 unilateral conduct by NSR was an overt act that
caused new and accumulating harm so as to restart the limitations
period for an antitrust cause of action that otherwise accrued in
or around 2009.   This is so for all the reasons discussed above,
as well as the fact that CSX's purported "harm" relies on

60

speculation as to future events, as it is possible that the STB, with or without considering NSR's historical objectionable conduct, will fashion a new rate beneficial to NPBL and/or CSX.

### 3. 2018 Conduct

The purported overt acts in 2018 arise out of a new CSX "service proposal" for a reduced rate that CSX would pay NPBL to access NIT, thus allowing CSX to re-enter the relevant market. At base, it is clear to the Court that if this proposal was denied, and if there were any evidence, direct or circumstantial, that the denial arose from an unlawful monopoly or conspiracy, there would be triable issues both as to whether there was an overt act causing new and accumulating harm and whether such harm occupied the field of market exclusion going forward. However, for the reasons explained below, CSX fails to demonstrate that its service proposal was denied, either expressly or implicitly, further failing to point to evidence capable of demonstrating that any presumed denial or implicit denial by NPBL was based on anything other than lawful business concerns or historic NPBL operating procedures.

### a. Factual Background

Though the evidence of what actually occurred in 2018 is disputed, the version of events that most favors CSX is that CSX presented a new service and governance proposal to NPBL shortly before the April 2018 meetings of the NPBL shareholders and Board of Directors. CSX's proposal sought to establish a new switch

61

JA335

rate of "$80 per car" for "Long Term Rail Service to NIT" and commit CSX to move a minimum annual volume of train cars, thus purportedly generating new profitable business for NPBL.   ECF No. 1-5.   CSX's own evidence indicates that NPBL President Cannon Moss was outwardly receptive to this proposal, with NPBL management's preliminary calculations suggesting that it might be financially viable for NPBL, such that it merited being sent to the NPBL Board to evaluate through a "rate committee."   ECF No. 324, at 26-27; ECF No. 328-15.   CSX's written proposal reflects a desire to avoid proceeding through a rate committee due to prior rate analysis performed in response to CSX's 2010 rate request, but states that CSX is willing to go through a rate committee if necessary.   ECF No. 1-5, at 2.

Thereafter, CSX's evidence demonstrates: (1) NSR <u>internally discussed</u> the proposal as demonstrated by NSR emails;[23] and

---

[23] CSX also points to an internal NSR email indicating that on April 3, 2018, NPBL/Cannon Moss had discussions with NSR personnel about "some time that [NPBL] could get into NIT, so that they could give quotes to . . . CSX for moving traffic into and out of NIT."   ECF No. 326-11.   The email also indicates that Mr. Moss had purportedly told CSX that the proposal would be discussed "at the NPBL Board meeting which is on April 18."   <u>Id.</u>   The email then concludes: "Of course we told them we could not accommodate a time for them to go to or pull freight from NIT."   <u>Id.</u>   Though this email provides facial evidence of NSR's continued desire to keep CSX from accessing NIT by rail, it does not illustrate (nor does CSX otherwise assert) that NSR actually obstructed NPBL or CSX from accessing NIT <u>to develop a rate proposal</u>.   It also does not demonstrate any other form of new and accumulating harm.   Moreover, an April 5, 2018 email from Mr. Moss to CSX indicates that he spoke with VIT (the company that operates NIT) on April 5, 2018 in response to CSX's proposal.   ECF No. 328-15.   The existence of the April 3 email, therefore, is insufficient to demonstrate a new overt act <u>causing new and accumulating injury</u>, though it is unquestionably helpful to CSX's injunctive relief claim.

62

JA336

(2) NPBL President Cannon Moss reviewed the proposal and sent an email response to CSX on April 5, 2018, identifying his "thoughts" about the proposal, including that NPBL management "would recommend to the board for a rate committee to do a complete review of the tariff." ECF No. 328-15. Nothing in Mr. Moss's email can reasonably be interpreted as suggesting that NPBL management was opposed to the proposal. On the contrary, it evinces NPBL management's view that the proposal warranted further evaluation. Id. CSX separately highlights Cannon Moss's deposition testimony which reveals that he had two key business concerns with CSX's proposal: (1) he felt in 2018 that he could not perform an in-depth financial analysis of CSX's proposal because he did not know what rate NPBL would have to pay NSR to use the track to NIT under the yet-to-be established new trackage rights contract; and (2) he was concerned that if NPBL negotiated a special reduced rate specific to CSX, NPBL's other major customer would want the same reduced rate. ECF No. 324, at 26-27; ECF No. 324-7. CSX suggests that it is reasonable to infer from Mr. Moss's first statement that NPBL intentionally sought to delay adoption of CSX's proposal, but that inference is unsupported by the evidence. The acknowledgment of such an obvious business concern in response to a long-term service proposal from CSX does not support a reasonable inference of an intent to delay.

The day after Cannon Moss sent his email to CSX indicating NPBL management's intent to recommend that the NPBL Board form a rate committee to review CSX's proposal, CSX's Assistant General Counsel sent a letter to the members of the NPBL Board "demand[ing]" that NSR, as well as NPBL through its Board of Directors, "take remedial actions at the April 2018 meetings" of the NPBL shareholders and the NPBL Board to "address serious deficiencies in the policies, procedures, controls and governance structure of the NPBL." ECF No. 1-6. Specifically, CSX demanded that all necessary actions be taken by NSR and NPBL to: (1) "afford CSX equal representation on the NPBL Board"; (2) replace NPBL management with "qualified individuals who are independent of both NS[R] and CSX[]," and (3) adopt a new corporate compliance program independent of NSR. Id.

On April 18, 2018, NPBL held both a shareholders meeting and a board meeting. The board meeting started first, was temporarily suspended for the shareholders meeting, and then reconvened thereafter. CSX's statement of facts asserts that during the shareholders meeting, CSX proposed the governance changes outlined in its letter, but NSR voted its shares against the proposal. ECF No. 324, at 28. As highlighted by NSR, NSR's action to reject the proposal to change the established board structure was merely a retention of its contractual right to appoint three directors pursuant to NSR's 1989 contract with CSX. The minutes from the

64

JA338

April 2018 shareholders meeting, which are uncontested, list the motions/action items handled during the meeting. Among the listed action items is CSX's proposal for changing the procedure for designating directors to require independent directors and an independent NPBL President, and for providing interim officers until the transition was completed; the proposal was voted on and was "not approved." ECF No. 312-24, at 2.

CSX further asserts in its statement of facts that at the April 18, 2018 NPBL Board meeting, the "CSX appointed directors requested that the Board appoint an independent [rate] committee to review and evaluate the 2018 Proposal, but the NS-appointed directors refused, based on purported conflicts with NPBL's governing documents." ECF No. 324, at 28. As evidence in support of this factual claim, CSX points to a May 18, 2018 letter written by CSX's assistant general counsel, which indicates: (1) that CSX had objected to "NPBL's 'management's' suggestion and the NS[R]'s representative's insistence that the NPBL Board establish a 'rate committee' comprised of interested director members to evaluate the Service Proposal"; (2) that "CSX[] demanded that an independent special committee be established to evaluate and respond to that proposal"; and (3) that the "NS[R]-controlled Board at the April 2018 meetings, nonetheless rejected CSX[]'s request to form an independent committee to review the Service Proposal." ECF No. 326-14 (emphasis added).

65

JA339

The Defendants challenge CSX's facts as unsupported by the record evidence.[24]  While the Court must view the facts in the light most favorable to CSX as the non-movant on summary judgment, CSX must present evidence sufficient to demonstrate a genuine issue of material fact; mere factual assertions, unsupported by the record evidence, are insufficient to withstand summary judgment. Here, a careful review of the competing allegations reveals that both CSX's proffered version of the facts in its brief and CSX's cited evidence in support of those facts fail to undercut NPBL's factual contention that the NPBL Board never voted in April 2018 on whether a rate committee (independent or otherwise) should be formed, and never voted on CSX's new service proposal for an $80 per car switch rate.  The second contention (no vote on the service proposal) is admitted by CSX, so the Court focuses on the first contention.

Importantly, Defendants' summary judgment motions expressly rely on the 2018 NPBL Board minutes in support of their factual claims, and CSX did not, in opposition, challenge the accuracy of what is reflected in the minutes.  The minutes indicate that Cannon Moss discussed CSX's proposal regarding intermodal traffic to NIT

---

[24] NPBL also challenges the manner in which CSX advances it facts, arguing that CSX has not directly responded to NPBL's facts as required by this Court's Local Rules, and by doing so, has admitted NPBL's version of the facts.  Although the Court does not find that CSX has "admitted" NPBL's facts based on the method of its response, NPBL is correct that CSX cannot merely "object" to NPBL's evidence, but must instead present responsive counter evidence sufficient to demonstrate a material dispute of fact.

and management's ongoing review of it, but the minutes do <u>not</u> <u>indicate</u> that any motion, action item, vote, or other <u>board action</u> was taken by NPBL with respect to a rate committee.  ECF No. 303-19.  This, of course, stands in contrast to the other action items listed in the <u>Board</u> minutes (multiple "motions" were approved) as well as the duly recorded vote regarding "independence" listed in the <u>shareholders meeting</u> minutes.  Therefore, CSX's evidence <u>at</u> <u>best</u> demonstrates that there was <u>a discussion</u> at the NPBL Board meeting regarding a rate committee, and that the NSR-appointed directors revealed that they did not want to form a "special" rate committee as purportedly "demanded" by the CSX-appointed directors.[25]

The absence of a genuine factual dispute as to whether the NPBL Board voted on the issue of an independent rate committee appears to be separately illustrated by testimony from a CSX-affiliated NPBL director.  <u>See</u> ECF No. 328-19 (Q: "Do you know if that was discussed at the April 18th, 2018 board meeting, conducting a tariff review or having a committee do it? A: I do

---

[25] CSX's statement of facts asserts that NPBL "rejected" the request for an independent rate committee due to a purported "conflict" with NPBL corporate governance documents.  However, as highlighted in NSR's reply brief, CSX appears to conflate this issue with a different "conflict" purportedly voiced by certain NPBL directors when discussing the terms of CSX's <u>new</u> <u>service proposal</u>.  A review of the May 18, 2018 letter offered by CSX as support for the purported rate committee "conflict" reveals <u>no mention of</u> <u>a "conflict"</u> associated with <u>the independence of the rate committee</u>, and thus, there is no evidence supporting any inference that a false "conflict" was manufactured by the NSR-affiliated board members to reject an independent rate committee.

not recall anything being presented to the board for their -- as an action item.  I am not sure if anyone mentioned a rate committee at that meeting."); cf. ECF No. 310-3 (indicating that after Cannon Moss stated in his early April email that NPBL management would recommend that the board form a rate committee that, as far as the CSX 30(b)(6) witness knew, CSX never "at any point sa[id] yes, thank you, we would like the rate committee").  It is likewise supported by the deposition testimony of Cannon Moss.  See ECF No. 324-7 (indicating that, after Mr. Moss relayed NPBL management's recommendation to the board that a rate committee examine CSX's proposal, "[t]here was no interest from either side to have a rate committee"); cf. ECF No. 310-23 (reflecting the testimony of the CSX in-house counsel who authored the May 2018 letter indicating that "as I recall from the -- there was not a desire to proceed with a rate proposal without approval of an independent board as well").

The Court, of course, does not "weigh" or balance the evidence on summary judgment.  The Court must, however, carefully review the record evidence to determine whether a genuine factual dispute exists.  In doing so, it is appropriate for the Court to carefully consider the words chosen by CSX's in-house counsel in the April 2018 letter, and CSX's litigation counsel in its statement of facts, both of which do not assert that the NPBL Board "voted" down a proposal for an independent rate committee at the 2018 Board

meeting, or that the Board otherwise took an active affirmative step as a Board in response to a "motion" or other "action item." Therefore, the Court finds that that there is no genuine factual dispute as to whether the NPBL Board acted on behalf of NPBL to reject a special rate committee. Similarly, CSX admits that the NPBL Board never voted on the CSX 2018 long-term rate proposal.

Alternatively, as discussed below, even if the Court assumes an informal rejection of CSX's request for a rate committee comprised of individuals with no ties to NPBL, such fact is insufficient to demonstrate a new injury-causing overt act. There would be "new harm" to CSX that excludes it from the market if there was a new vote by the NPBL Board denying CSX the ability to reenter the market at a lower rate. However, preliminary disagreements over how to determine the new rate do not amount to "new harm." Tellingly, any "new rate" established by the Board after referral to a rate committee could be higher or lower than the current rate based on legitimate factors wholly unrelated to unlawful motivations. CSX improperly seeks to build one inference upon the other, assuming both that NPBL would reject its request for a reduced rate and that such rejection would not be based on legitimate market factors, including NPBL's actual operating costs. See Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) ("The nonmoving party . . . cannot create a genuine issue of material

fact through mere speculation or the building of one inference upon another.").

### b. The Shareholder Proposal is Not an Overt Act Causing New and Accumulating Harm

As outlined above, the proposal considered by the NPBL shareholders, as evidenced by the meeting minutes and related evidence, was a "corporate governance" request from CSX that essentially sought to eliminate NSR's contractual right to appoint three NPBL directors of its choosing. As established during this case, NSR and CSX's relative ownership percentages were the result of historical railroad mergers, and the 3-2 director nomination power imbalance was the result of a written 1989 contract between NSR's two predecessors and CSX. ECF No. 310-1.

As Defendants argue, CSX has failed to demonstrate that NSR's vote denying a request that it surrender its explicit contractual rights in 2018 was an actionable overt act capable of restarting the limitations period.[26] Rather, NSR's action in 2018 to retain this long-established contractual right is at most a "reaffirmation" of its decades-old written agreement with CSX, and is therefore insufficient to restart the limitations period. See Varner, 371 F.3d at 1019; Kaw Valley Elec., 872 F.2d at 933; Pace

---

[26] Both NSR and CSX have, for many years, appointed their respective employees to the NPBL Board of Directors, such that the Board is routinely composed of three NSR-affiliated directors, and two CSX-affiliated directors. Additionally, the NPBL President, typically a former NSR employee, constitutes the sixth voting member of the Board.

Indus, 813 F.2d at 238; DXS, Inc., 100 F.3d at 467.  This finding
is further supported conceptually by case law finding that the
continuing violation doctrine is typically inapplicable to
inertial consequences that arise from a merger because the harm to
competition occurs when the merger is effectuated.  See Z Tech,
753 F.3d at 599; see Areeda & Hovenkamp, Antitrust Law ¶ 320c
(distinguishing between the "'inertial consequences' of a merger"
(which do not restart the limitations period), and ongoing meetings
by a cartel to adjust its prices (which do), noting that federal
courts show more reluctance to extend the limitations period in
cases involving "vertical arrangements involving refusal to deal,
tying, or exclusive dealing").  To the extent CSX suffered harm
solely as a result of the contractual power imbalance, CSX's claim
would have accrued in 1989 or shortly thereafter when NSR's
predecessors merged.  Alternatively, if active abuse of the power
imbalance was required, CSX's claim accrued when the unequal
balance of power was leveraged by NSR in or around 2009 to secure
NPBL action that excluded CSX from the relevant market.  Applicable
antitrust law precludes CSX from establishing an overt act in 2018
based on NSR's recent vote against modifying a contract that had
been final for three decades and had been actively utilized to
exclude CSX from the market nearly a decade earlier.  See Aurora
Enterprises, Inc. v. Nat'l Broad. Co., 688 F.2d 689, 694 (9th Cir.
1982) (explaining that "not every act by an antitrust defendant is

71

JA345

sufficient to restart the statute of limitations" and the "mere fact that defendants receive a benefit today as a result of a contract executed" more than fifteen years earlier "is not enough to restart the statute of limitations"); US Airways, Inc. v. Sabre Holdings Corp., 938 F.3d 43, 69 (2d Cir. 2019) ("A contract is a vehicle for determining at the time of contracting what should happen at some time thereafter.").

Alternatively, even assuming NSR's shareholder vote as prompted by CSX's governance proposal could be interpreted under applicable antitrust law as an overt act, rather than a mere reaffirmation, the record evidence fails as a matter of law to demonstrate that NSR's conduct caused any new and accumulating harm to CSX such that the limitations period restarts.[27]  Any potential new antitrust harm that CSX conceivably could have felt in and after 2018 would have resulted from the actions of the NPBL Board excluding CSX from the on-dock rail market at NIT, not from NSR's preliminary step of maintaining its long-established contractual right to appoint three NPBL Board members.  Stated another way, the preliminary step of appointing a board member to

---

[27] CSX, for its part, speculates that the NPBL Board members appointed in 2018, would breach their fiduciary duties and restrain trade at the first opportunity.  Cf. Hearing Tr. 35 ("I mean, we know what a rate committee does.  That's from 2009 and 2010.").  Such assertion is not grounded in any record evidence and runs contrary to this Court's responsibility to draw reasonable inferences in favor of CSX on summary judgment.  New actionable injury must be based on new acts impacting competition, not supposition and conjecture about how a party would act if it acted.

make decisions for a company does not itself cause new damages. It is instead the board's _actions_ on behalf of the company _after_ the director's appointment that a factfinder would have to scrutinize to determine: (1) whether they were legitimate actions or actionable antitrust violations; and (2) whether they caused new and accumulating injury. _See Conwood Co., L.P. v. U.S. Tobacco Co._, 290 F.3d 768, 788–89 (6th Cir. 2002) ("An antitrust plaintiff bears the burden of showing that the alleged violation was a material cause of its injury, a substantial factor in the occurrence of damage or that the violation was the proximate cause of the damage"); _see also Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp._, 828 F.2d 211, 219 (4th Cir. 1987) (discussing, within the context of an antitrust standing analysis, the "principled limits" on the otherwise "unbounded reach" of the antitrust damage remedy, to include "the causal connection between the alleged violation and the harm suffered," and finding that the indirect harm the plaintiff suffered from certain contract terminations was insufficient to support either antitrust damages or injunctive claims because the "chain of causation" was "too attenuated to be considered proximate").

A preliminary step, even if presumed to be taken with a monopolistic or conspiratorial mindset, does not constitute an injury-causing overt act sufficient to restart the limitations period in the absence of a subsequent act causing harm to the

market or a competitor. <u>See</u> <u>Warrior Sports, Inc. v. Nat'l</u>
<u>Collegiate Athletic Ass'n</u>, 623 F.3d 281, 285 (6th Cir. 2010)
(noting that because the defendant dropped proposed rule changes
"before they ever went into effect" such rules "cannot be
challenged because they necessarily did not cause (nor do they
threaten to cause) any injury to [plaintiff] or anyone else"); <u>see</u>
<u>Hoffman v. Halden</u>, 268 F.2d 280, 296-97 (9th Cir. 1959), <u>overruled</u>
<u>in part on other grounds by</u> <u>Cohen v. Norris</u>, 300 F.2d 24 (9th Cir.
1962) (explaining, in the context of a civil rights conspiracy
case, that "injury and damage must flow from the overt acts" and
when "the gravamen of the injury complained of is commitment to an
institution by court order," in most cases it is the "order of the
court," and not the "[v]arious preliminary steps . . . which lead
to the order" that cause injury from imprisonment or restraint).
A contrary rule would allow for the recovery of damages based on
the mere presumed intent to cause antitrust injury <u>even in the</u>
<u>absence of any actual injury</u>.  CSX thus fails to demonstrate that
NSR's actions at the April 2018 shareholders meeting are sufficient
to restart the long-expired limitations period.

### c. Board Never Voted on a Rate Committee or the Service Proposal, and "Inaction" is Insufficient

As outlined above, CSX fails to demonstrate that the NPBL
Board took a formal vote, or otherwise acted as a corporate body
on behalf of NPBL at the April 2018 Board meeting, to reject any

74

JA348

request that may have been made seeking an independent rate committee.[28]   CSX therefore fails to demonstrate a new overt act causing new and accumulating harm.   Moreover, even if the Court presumes against the record evidence that CSX's request for an independent committee was rejected by the NPBL Board, CSX fails to demonstrate that such action can restart the limitations period in the absence of evidence capable of establishing that the Board directly _or indirectly_ rejected CSX's service proposal or indicated that NPBL would not analyze the economic viability of the proposal.   It is the rejection of the service proposal that had the potential to cause new and accumulating harm, but only if such rejection was itself an antitrust violation and not based on a legitimate economic analysis.

As CSX cannot demonstrate new harm flowing from any 2018 acts, CSX contends that new actionable harm can flow from _inaction_.   Even

---

[28] Consistent with Defendants' argument that a corporation is not bound by the statements of individual directors, the Supreme Court of Virginia has explained that the "manner in which a corporation should conduct its affairs is prescribed by statute, as implemented by the by-laws of the corporation," and that "[o]rdinarily, an[] action designed to affect the property and business of a corporation should be taken only by formal resolution of the board of directors, at a duly constituted meeting."   Brewer v. First Nat'l Bank of Danville, 202 Va. 807, 812 (1961); see also Monacan Hills, Inc. v. Page, 203 Va. 110, 116 (1961) ("[The] directors of a corporation have authority to bind it only when they act collectively as a board." (alteration in original) (citation omitted)).   An exception to this general rule can be made for a corporation whose directors, officers, or shareholders routinely "ignore the requirements of the statutes and corporate by-laws, and conduct its business in an informal manner."   Brewer, 202 Va. at 812-13.   However, this exception is inapplicable here, where no party has sought such an exception and record evidence indicates that the NPBL Board conducted its business in a formal manner in keeping with Virginia statutory requirements.   The general rule requiring a corporation to act through formal board resolutions consequently applies to NPBL.

if this legal theory were available, on this record, CSX relies on the stacked assumptions that the NSR-appointed board members would — in the future — both reject CSX's proposal and do so in disregard of their fiduciary duty to fairly evaluate the service proposal based on NPBL costs and other legitimate business considerations. However, even after extensive discovery, CSX points to no evidence, direct or circumstantial, suggesting that the 2018 NPBL Board or its members had engaged in conspiratorial conduct in connection with the 2018 events. As such, CSX's claim that it suffered new actionable harm in 2018 based on inaction is grounded in speculation.[29]

CSX's efforts to restart the limitations period based on a theory of "purposeful inaction" is also legally flawed. As argued by Defendants, this Court finds that proper interpretation of the relevant case law requires that an overt act capable of restarting the limitations period must be based on affirmative action, not inaction. Such proposition appears to be generally accepted within federal antitrust precedent, including precedent from the Fourth Circuit. Charlotte Telecasters, 546 F.2d at 572-73.

In Charlotte Telecasters, the Charlotte City Council had elected not to award a television franchise to the plaintiff in

---

[29] Based on the record presented on summary judgment, CSX's suggestion that the NPBL had an independent obligation to reduce its switch rate to $80 per car in mid-2018 before the underlying NS-NPBL rate dispute was resolved is similarly unavailing.

March of 1967.  Upon request, the City Council reconsidered its decision in August of that same year, noting both that it "would leave [the original decision] as it is," and that the Council "will give some thought to" what the plaintiff's spokesman had said at the August meeting.  Id. at 573.  The plaintiff argued that the City Council's final comments and silence following the meeting "was an overt act of refusal" as it was equivalent to rejecting the request for a franchise after a period of further thought. Id. The Fourth Circuit rejected this argument, noting that the city council had not promised further consideration and that silence following the meeting did "not constitute an overt act." Id.   The Fourth Circuit then cited to Poster Exchange, which provides that a plaintiff "is obliged to demonstrate some act of the defendants during the limitations period foreclosing or interfering" with its participation in the market, as contrasted with the "abatable but unabated inertial consequences of some pre-limitations action."  Poster Exchange, 517 F.2d at 128 (emphasis added).

Here, the undisputed facts demonstrate (1) that NPBL management was receptive to CSX's 2018 proposal and recommended that it be sent to a "rate committee" for further evaluation, but (2) purported disagreements between NPBL Board members as to who should sit on a rate committee ultimately led to the Board's failure to vote either way regarding the makeup of the rate

committee or regarding the service proposal itself, with the instant lawsuit being filed six months after the 2018 Board meeting. Moreover, during this same period of time, the rate that NPBL would pay NSR for track access going forward (a critical input for analyzing CSX's service proposal) was being negotiated and was presented to the STB for expedited review, placing NSR and NPBL in opposition on this issue. There is, however, no evidence in the summary judgment record suggesting NSR and NPBL were colluding to abuse the STB process, and it is CSX that acted to halt (i.e., delay) that process. These facts are insufficient, as a matter of law, to demonstrate an overt act through action or inaction.[30]

Therefore, notwithstanding CSX's citation to <u>Lower Lake Erie</u> for the proposition that purposeful inaction can constitute an overt act in certain circumstances, there is no direct or circumstantial evidence of purposeful inaction here because CSX only sought a review of its proposal for a new service rate/conditions if such review were conducted <u>on CSX's own terms</u>. The Court rejects any suggestion from CSX that a "new" act or "new"

---

[30] This Court does not adopt the "purposeful inaction" standard argued for by CSX, but even if it did, CSX fails to demonstrate an overt act or damages flowing therefrom, as it merely speculates that fiduciary duties would be violated if the CSX proposal were considered. Defendants, for their part, argue that CSX's privilege log for this litigation predates the April 2018 events, contending that the 2018 proposal was made by CSX in an effort to manufacture an overt act. This Court does not address such allegation, but instead focuses on whether the evidence in the summary judgment record would allow a reasonable juror to conclude that NSR and or NPBL engaged in an overt act in 2018 that caused new and accumulating harm, finding that it does not.

injury manifested, as soon as CSX made its new proposal, based on speculative allegations of intentional delay or an unsupported assumption that a "standard" NPBL rate committee would have rejected the proposal. Notably, even if the proposal was rejected by the NPBL Board following referral to a rate committee, CSX would need to demonstrate that the denial was the <u>result of an antitrust violation</u> and not the proposal's lack of merit. The absence of a decision regarding both who would evaluate the proposal and whether it was economically viable for NPBL when all of NPBL's operational costs were considered precludes a finding that Defendants committed a new overt act causing new and accumulating harm.

The Court's analysis on this point should not be read to suggest that the makeup of the NPBL Board did not create an apparent risk of an adverse decision, but to recover damages, CSX must prove that it was <u>actually damaged</u> during the limitations period, not that the evidence suggests a likelihood of damage had additional events transpired. CSX has therefore failed to point to evidence, or reasonable inferences therefrom, that could support a finding that NPBL (or NSR) committed an injury-causing overt act in 2018. See <u>SD3, LLC v. Black & Decker (U.S.), Inc.</u>, 215 F. Supp. 3d 486, 499 (E.D. Va. 2016) ("Without any evidence of new refusals to deal, there can be no continuing violation and no tolling of the statute of limitations.").

79

In sum, CSX's efforts to demonstrate an overt act — through speculation about how a vote on a rate committee or on the 2018 service proposal would have caused harm had such votes occurred — are insufficient as a matter of law.[31]  Allowing a plaintiff to rely on inaction coupled with inferences about future conduct and resulting future harm based on long-stale misdeeds of a similar character would turn the legal test for damages on its head by allowing a plaintiff that has slept on its rights for years to resurrect a time-barred claim on the basis of supposition rather than evidence.

In summary, CSX fails to demonstrate that an overt act causing new and accumulating harm was committed by either Defendant during the limitations period.  Defendants, therefore, carry their ultimate burden to demonstrate that CSX's federal antitrust damages claim is time-barred as a matter of law.  Summary judgement is therefore **GRANTED** in Defendants' favor as to damages.

## V. DISCUSSION - FEDERAL INJUNCTIVE RELIEF

### A. Court-Raised Issues

In light of the legal hurdle that CSX appeared to be facing due to the timing of the acts on which it has relied to establish

---

[31] CSX appears to have taken steps similar to a television franchise applicant walking into a city council meeting and suggesting that several council members recuse themselves before a new franchise application is considered.  After the council members discussed such matter and several voiced their view that recusal was unnecessary (but never voted on a formal recusal request) the applicant then walked out of the meeting without seeking a ruling on recusal or on the application itself.

antitrust damages, the Court asked the parties during the summary judgment hearing what effect, if any, a defense-favorable limitations ruling would have on any injunctive relief claims remaining in this case.  Defendants took the position that such injunctive relief claims would be barred, while CSX argued that an injunctive relief trial would be necessary, even if its damages case failed.

The Court thereafter provided the parties with two opportunities to file simultaneous briefs on the issue of injunctive relief.  ECF Nos. 535, 548.  The second briefing order specifically requested analysis on the interplay of limitations and laches principles (Defendants did not raise laches in their first brief on injunctive relief, addressing it only after the Court did so) and offered the parties the opportunity to respond to the arguments made in the first round of briefing.  All parties provided detailed and well-argued papers despite the expedited briefing schedule.

As argued by CSX in its second supplemental brief, ECF No. 549, the timing of the additional briefing periods was both short and overlapping with December holidays, and neither injunctive relief generally, nor laches, were previously raised by either Defendant in support of summary judgment.  Consistent with CSX's position on this issue, the Court finds that court-initiated summary judgment should not be granted in favor of either Defendant

on the issue of injunctive relief, which has different elements and is governed by a different federal statute than CSX's antitrust damages claim. See 15 U.S.C. § 26. Though CSX does not challenge the Court's ability to raise a summary judgment issue <u>sua</u> <u>sponte</u> <u>if</u> the parties are provided sufficient time to present all relevant materials, Fed. R. Civ. P. 56(f), it effectively argues that the complexity of the factual and legal issues pertinent to this court-raised issue do not support entry of summary judgment based on the expedited schedule that occurred after the summary judgment hearing. Importantly, while there is an extensive evidentiary record before the Court, CSX's detailed <u>responsive</u> evidence in opposition to summary judgment was — appropriately — <u>not</u> tailored to be "responsive" to assertions about the availability of injunctive relief, <u>because Defendants had advanced no such claim</u>.[32] Moreover, the supplemental briefs and the Court's further research sufficiently reveal that, in the context of this case, CSX's injunctive relief claims do not simply "rise and fall" with the outcome of its damages claim. Summary judgment is therefore **DENIED** with respect to CSX's claim for injunctive relief.

---

[32] Defendants advanced certain challenges to CSX's case that would have been dispositive of all forms of relief, including injunctive relief (e.g., the absence of a conspiracy, or the failure to define a relevant market), but the Court denies summary judgment on these grounds due to genuine and material factual disputes.

## B. Bench Trial Independently Warranted

Alternatively, even if a sufficiently fulsome period to develop the record on injunctive relief issues is assumed, CSX has demonstrated, at least for summary judgment purposes, that it has standing to seek injunctive relief and that the existing record does not support entry of summary judgment in favor of Defendants.[33] As discussed in detail above, NSR has for many years filled the majority of the NPBL Board seats with current NSR employees, who have then voted to elect a former NSR employee as the NPBL President. Though this may have been an "equitable" arrangement initially notwithstanding NSR's <u>opportunity</u> to place its thumb on the scale of NPBL matters, CSX provides facially strong evidence that NSR manipulated its opportunity to dominate the NPBL Board in the years leading up to 2009 and extending into 2010 or 2011. CSX has likewise pointed to other more recent evidence, though much of it circumstantial and subject to competing inferences, suggesting that NSR may not have abandoned its willingness to use its "control" over NPBL for the purpose of benefiting NSR above all else. CSX therefore anticipates asking this Court to, in essence, equitably modify the balance of power at NPBL, by ordering NSR and

---

[33] Though the Court does not squarely analyze Defendants' reasserted arguments that this Court lacks authority to grant certain injunctive relief in this case due to the STB's regulatory authority, consistent with the prior rulings of both this Court and the STB, Defendants' supplemental briefs do not convince the Court that it lacks authority to enjoin unlawful collusion or similar activities that violate federal antitrust laws.

CSX to have equal votes on corporate governance issues[34] or by issuing an injunction that requires Defendants to establish a sufficiently "independent" NPBL Board or management structure.[35]

A necessary element for injunctive relief is a threatened or prospective injury, as opposed to a past injury that can be compensated with damages.  ECF No. 543, at 2.  "Because 'past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief <u>if unaccompanied by any continuing, present adverse effects</u>,' a plaintiff seeking 'declaratory or injunctive relief must establish <u>an ongoing or future injury in fact</u>.'"  <u>Davison v. Randall</u>, 912 F.3d 666, 677 (4th Cir. 2019) (cleaned up) (emphasis added)  (quoting <u>Kenny v. Wilson</u>, 885 F.3d 280, 287-88 (4th Cir. 2018)).  Allegations of future injuries "may suffice if the threatened injury is certainly

---

[34] Such relief may not require the Court to change the dividends received by CSX or NSR based on the percentage of ownership of NPBL, but instead tailor the relief to eliminate the power imbalance when it comes to corporate governance issues, board makeup, or the affiliations of corporate officers. Because federal courts have the authority to unwind completed mergers and divest ownership interests in response to federal antitrust violations, <u>Steves & Sons, Inc. v. JELD-WEN, Inc.</u>, 988 F.3d 690, 703 (4th Cir. 2021), NSR fails to demonstrate at this time that the <u>less intrusive</u> injunctive remedies proposed by CSX are unavailable as a matter of law.

[35] To the extent that NPBL challenges whether CSX can obtain injunctive relief against NPBL (rather than NSR), such arguments were not previously raised on summary judgment and are insufficient at this time.  Furthermore, it is unclear from the summary judgment record that injunctive relief would necessarily be directed only at NSR, as the Court could presumably require NPBL's directors to take specific steps to avoid future collusion with NSR, such as by ensuring that the Board elects an independent NPBL President.

impending, or there is a substantial risk that the harm will occur." Id.

Here, one of the relevant considerations for injunctive relief is whether there is a substantial risk that NSR will, in the future, engage in anti-competitive efforts to manipulate NPBL or otherwise unlawfully prevent CSX from utilizing the NPBL's tracks to NIT — this must not, of course, be confused with NSR's lawful competitive efforts to profit from other entities' use of its tracks. As discussed throughout this opinion, CSX's strongest evidence of past wrongs is based on acts committed in and around 2009; however, emails and other evidence highlighted by CSX from 2015 and 2018, as well as the CSX-favorable inferences that can be drawn therefrom, when considered in the context of the past conduct, present a triable issue as to whether NSR will use its ability to control the NPBL Board to harm CSX in the future in the same way it allegedly did so in the past.[36] Furthermore, NSR's purported representations to the STB after this case was filed regarding its legal right to control NPBL, pursuant to past mergers, may be relevant to the likelihood of future harm. Finally, the impending need for NPBL to act on issues critical to CSX's future access to NIT is clear, as NPBL is currently adverse to NSR in an STB proceeding over the rate NSR will charge NPBL in

---

[36] CSX, of course, contends that it continues to suffer from past violations committed before the limitations period and that Court-ordered injunctive relief is necessary to end the ongoing harm.

the future to access NIT.  As such, NPBL will need to reassess the switch rate charged to CSX and other customers <u>after</u> the STB resolves the stayed NSR-NPBL dispute.

In summary, because (1) disputed facts require this Court to assume for summary judgment purposes that there was a violation of antitrust laws in and around 2009, and (2) there is nothing to indicate that "the threat to [CSX] inherent in the [past] conduct would cease in the foreseeable future," <u>Zenith Radio Corp. v. Hazeltine Rsch., Inc.</u>, 395 U.S. 100, 131 (1969), it would be improper to grant summary judgment on injunctive relief at this time.  <u>See</u> <u>Machovec v. Council for Nat. Reg. of Health Serv. Providers in Psychology, Inc.</u>, 616 F. Supp. 258, 266-67 (E.D. Va. 1985) ("[T]o be entitled to injunctive relief, plaintiffs 'need only demonstrate a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur' that proximately resulted from defendants' putative antitrust violations." (quoting <u>Zenith</u>, 395 U.S. at 130 (1969)).

Turning to the issue of laches, this defense was not raised by Defendants on summary judgment, in the proposed final pretrial order, or in their first supplemental briefs on injunctive relief. Additionally, a valid basis for granting summary judgment on laches is not evident to the Court at this time, even assuming that — as Defendants suggest — CSX should bear the burden to prove the

86

JA360

absence of prejudice based on the fact that it waited more than four years after it was allegedly harmed to file suit.

As an equitable defense, laches requires considering the harm suffered by Defendants due to any delay, but the narrowly tailored version of injunctive relief that CSX espouses suggests the absence of any such prejudice.[37] Here, contrary to cases asking a district court to unwind a complex merger after corporate integration, the fact that the NPBL Board is reconstituted every year suggests that CSX's delay would not prejudice either Defendant's business operations. Furthermore, this case has similarities to the laches analysis in Steves & Sons, Inc. v. JELD-WEN, Inc., 988 F.3d 690, 707, 716-18 (4th Cir. 2021), where the Fourth Circuit reviewed the findings of another judge of this Court who had noted the temporal gap between the date of a merger and the date the merged entity took steps to manipulate the market. Any delay here should not date back to the 1989 contract, but rather, the activities occurring in and around 2009-2011, and potentially thereafter. Though the Court acknowledges Defendants' argument in their joint

---

[37] The Court does not take up the parties' newly raised dispute over whether CSX "waived" its right to seek injunctive relief in the form of a court-compelled "service agreement" based on CSX's failure to include that request in the final pretrial order. The Court does, however, refer the parties to the above discussion of the essential facilities doctrine and expressly notes its wholesale adoption of the Supreme Court's observations that both antitrust law and this Court are "ill suited" to dictate the terms of forced sharing to include "the proper price, quantity, and other terms of dealing." Trinko, 540 U.S. at 408. This is especially so in such a uniquely regulated industry where the STB itself can resolve disputes over rates and likely dictate other terms associated with the forced sharing of tracks.

second supplemental brief that CSX's delay has caused witnesses to become unavailable or memories to fade, (1) CSX has not had an opportunity to rebut such arguments due to Defendants' failure to raise them earlier, (2) the degree of prejudice asserted by Defendants is not enough to bar the injunctive claim entirely and can instead be addressed at trial, and (3) CSX points to more recent evidence, including emails from 2015 and 2018, that could support its claim for injunctive relief.  Finally, the Court recognizes the needed flexibility of the requested injunctive remedy and the need to ensure that the interplay between limitations and laches does not immunize longstanding federal antitrust violations (or the potential reaffirmations of those violations) to the detriment to the public and the relevant industry:

> The best solution to the problem of long-term contracts that are unlawful, if at all, from the beginning but also known to the plaintiff, is to use the statute of limitation to bar the tardy damage action but to give flexibility in equity to permit the injunction against continued enforcement.  To illustrate, suppose that the defendant imposes a 20-year requirements contract on the plaintiff that was challengeable as exclusive dealing from its inception. The purchaser who suffers injury but delays its damage action for six years has lost its opportunity to collect damages; but the public as well as the purchaser still profit from the termination of an anticompetitive arrangement.  The court should permit an action declaring the contract unlawful and unenforceable.  This approach may be precluded if the court woodenly adopts the principle that the period for determining whether laches bars an injunction is the same as that for the statute of limitation.

88

JA362

Areeda & Hovenkamp, <u>Antitrust Law</u> ¶ 320c3. For all of these reasons, summary judgment on the issue of injunctive relief is alternatively **DENIED** based on the state of the record currently before this Court.

## VI. ADDITIONAL CHALLENGES TO FEDERAL CLAIMS

Defendants advance several additional challenges to CSX's ability to prevail at trial on its federal antitrust claims, which if successful, would preclude a trial on injunctive relief. Those include challenges to: (1) CSX's definition of the relevant market; (2) whether an "agreement" to restrain trade or to establish or maintain an unlawful monopoly was ever entered into by Defendants; and (3) whether two firms can collectively form a monopoly. The Court is largely in agreement with CSX's summary judgment position on these issues, and finds that genuine and material factual disputes preclude summary judgment on most of these arguments and subarguments, and that all such claims fail to demonstrate that summary judgment should be entered in favor of Defendants.

### A. Relevant Market

NSR accurately argues that CSX's complaint defines the "relevant market" for antitrust purposes as encompassing rail transportation in and out of Hampton Roads ports (of which NIT and VIG are the two primary port terminals), while CSX's antitrust case is now tailored more narrowly to identify the relevant market as on-dock rail access <u>at NIT</u>. However, as argued by CSX, ECF No.

89

JA363

324, at 65-67, the <u>narrowing</u> of the market by CSX's expert, which is consistent with other portions of the complaint that identify the market exclusion as predicated on CSX's exclusion underline{from NIT}, has been long-known to Defendants. CSX's expert defined the narrowed market in February of 2020, and Defendants' expert response, provided a year later in February of 2021, directly responded to this definition of the relevant market. Fact discovery also continued after CSX's initial expert report. Defendants fail to identify any prejudice from this narrowing of the market definition in light of the timing of its disclosure in this case. Consequently, the court finds that this narrowing does not support a defense-favorable ruling on summary judgment.[38]

NSR separately argues that CSX's definition of the relevant market as "on-dock rail access at NIT" is improperly narrow and therefore fails as a matter of law. Though NSR raises some valid questions regarding the viability of the market as defined by CSX, its argument fails at the summary judgment stage due to the factual complexities outlined in the briefs regarding how ocean carriers choose a geographic port (Hampton Roads vs. New York vs.

---

[38] Though this Court does not find that an amendment to the complaint is necessary due to the timing of CSX's disclosure of its narrowed definition and the fact that the complaint expressly reveals that the exclusion at the POV was factually predicated on CSX's exclusion underline{from NIT}, underline{see} ECF No. 1, at 3 ("NS[R] and the NPBL have used the NPBL as a chess piece to maintain NS[R]'s monopolistic control over intermodal transportation in and out of NIT"), the Court would allow CSX to amend its complaint if the Court believed such amendment was necessary.

90

JA364

Baltimore), how they choose an individual terminal if they are able to choose such terminal, and the impact that a rail carrier has on an international shipper's decision to select a specific port or terminal. Additionally, the summary judgment record reveals that, while international shippers might take steps to align themselves with a specific POV terminal, they cannot truly control which terminal they patronize due to VIT's role in routing containership traffic. Therefore, one reasonable interpretation of the summary judgment record is that VIG is not a true "alternative" to NIT. In light of these and other relevant disputed factors (including the proper scope of the geographic market when the "product" at issue involves transportation), the Court finds that disputed facts preclude summary judgment on this basis. See Cont'l Airlines, Inc. v. United Air Lines, Inc., 120 F. Supp. 2d 556, 568 (E.D. Va. 2000) ("The definition of a relevant antitrust market is a highly fact-intensive inquiry."); E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 442 (4th Cir. 2011) (describing the inquiry into the relevant "geographic market" as "a fact-intensive exercise centered on the commercial realities of the market and competition").

For the same reason, the Court rejects NSR's related contention that the market identified by CSX is improper as a matter of law because it fails to consider either "drayage" as an alternative to on-dock rail at NIT, or the impact that end-to-end

91

JA365

truck transportation purportedly has on the relevant calculus. Disputed facts and conflicting expert opinions interpreting those facts reveal genuine disputes regarding the propriety of CSX's market definition, as illustrated by the factual dispute concerning the degree to which drayage is a <u>suitable</u> alternative to on-dock rail based on capacity limitations and/or international shippers' desire to avoid relying on drayage.

### B. Monopoly

A similar analysis is applicable to NSR's contention that CSX has not presented adequate evidence of monopoly power within the relevant market. Accepting for purposes of summary judgment CSX's narrowed definition of the market, NSR fails to demonstrate that either CSX's efforts to compete at NIT through drayage, or the evidence demonstrating an increase in CSX's NIT business over time, fatally undercuts the contrary evidence of NSR's apparent market dominance at NIT. In short, factual disputes require a trial.

NSR separately argues that CSX's theory of the case violates the federal antitrust requirement that a Sherman Act monopolization claim be predicated on the unilateral conduct of a single firm. This claim, however, likewise fails. CSX's theory of the case is that <u>NSR is the sole entity</u> that operates as a "monopolist," and the summary judgment record does not suggest otherwise. The evidence before the Court does not reveal that NPBL competes in the relevant market or that it conducts any

business with international shippers.[39]   Rather, CSX claims that
NPBL conspired with and assisted NSR in creating and/or defending
NSR's unlawful monopoly.

### C. Conspiratorial Agreement

Both NPBL and NSR argue that CSX's evidence is insufficient
as matter of law to demonstrate that NPBL entered into an agreement
with NSR in support of a monopoly or an unlawful restraint on
trade.   The Court, however, finds that the record evidence is
sufficient to raise a factual dispute regarding the existence of
such an agreement.   CSX has identified sufficient direct and
circumstantial evidence of an agreement between NSR and NPBL in
and around 2009 that was aimed (and may have unlawfully succeeded)
at erecting barriers to CSX's ability to provide on-dock rail
service at NIT.   See Robertson v. Sea Pines Real Est. Companies,
Inc., 679 F.3d 278, 289-90 (4th Cir. 2012) ("Conspiracies are often
tacit or unwritten in an effort to escape detection, thus
necessitating resort to circumstantial evidence to suggest that an
agreement took place.").   As a result, this argument and
Defendants' other arguments addressed immediately above fail to
carry Defendants' burden to demonstrate that summary judgment

---

[39] CSX asserts that NSR has handled between 84% and 98% of the international
intermodal business at NIT between 2009 and 2020.   There is no record
evidence suggesting that NPBL has any contracts with any international
shippers.

should be entered in their favor, and summary judgment is therefore **DENIED**.[40]

## VII. DISCUSSION – VIRGINIA STATE LAW CLAIMS

In keeping with their federal law arguments, Defendants assert that CSX's Virginia state law claims[41] are time-barred or otherwise fail as a matter of law. These arguments, and CSX's responses, are substantially underdeveloped compared to the parties' extensive federal antitrust arguments. Nonetheless, this Court has endeavored to fully analyze the state law claims. Cf. Steves & Sons, 988 F.3d at 727 (explaining that it "is not the obligation of [the Court of Appeals] to research and construct legal arguments open to parties, especially when they are represented by counsel") (citation omitted). Because the parties' state law arguments rely heavily on their respective federal law arguments, the Court's analysis follows suit where appropriate. For the reasons set forth below, the Court finds that there is no genuine dispute as to any material fact regarding CSX's state law claims and that Defendants are entitled to judgment as a matter of law with respect to those claims.

---

[40] To the extent the parties' briefs address the propriety of an "essential facilities" claim, CSX does not advance a claim under this special antitrust theory, and it is therefore unnecessary to analyze it here.

[41] Following motions practice and dismissals, CSX's remaining Virginia state law claims are as follows: Count Five, a breach of contract claim against NSR; and Counts Eight and Nine, statutory and common law conspiracy claims against NSR and NPBL.

94

JA368

## A. Background – Accrual and Limitations under State Law

Defendants argue, as they do in the federal antitrust context, that CSX's state law claims are time-barred. The parties agree that a five-year limitations period applies to both the breach of contract and statutory business conspiracy claims. ECF No. 303, at 17; ECF No. 308, at 17; ECF No. 324, at 47. However, as NSR argues, CSX's Virginia common law conspiracy claim appears subject to a two-year limitations period to the extent it relies on an alleged breach of a fiduciary duty. See NorthStar Aviation, LLC v. Alberto, 332 F. Supp. 3d 1007, 1015 (E.D. Va. 2018) (citing Va. Code § 8.01-248; Singer v. Dungan, 45 F.3d 823, 827 (4th Cir. 1995)). The Court need not determine which limitations period in fact applies to CSX's common law conspiracy claim because it fails even under the more generous five-year limitations period.

Just as under federal law, the limitations period for a Virginia cause of action begins to run when that cause of action accrues. Forest Lakes Comty. Ass'n, Inc. v. United Land Corp., 795 S.E.2d 875, 881 (Va. 2017). Each of the state law causes of action alleged by CSX accrues when the plaintiff first suffers the alleged harm. Westminster Investing Corp. v. Lamps Unlimited, Inc., 379 S.E.2d 316, 317 (Va. 1989) (breach of contract); Detrick v. Panalpina, Inc., 108 F.3d 529, 543 (4th Cir. 1997) (conspiracy). Though the parties agree on this basic premise, they disagree regarding when CSX's claims accrued.

95

JA369

Defendants, falling back on their federal antitrust arguments, argue that all of CSX's claims are time-barred because the damages CSX seeks stem from time-barred conduct. CSX, in turn, presents its state law causes of action as a series of distinct claims, presumably to cut its post-2013 allegations loose from the plainly time-barred pre-2013 acts. As CSX highlights, the Virginia Supreme Court has explained that "[i]t is possible for a new cause of action to accrue that looks remarkably like an earlier one but is nonetheless a stand-alone claim in its own right." Forest Lakes, 795 S.E.2d at 881. Where this doctrine applies, each such stand-alone claim is subject to its own limitations period, dating from when that individual claim accrues. Id.

## B. Conspiracy

CSX argues that the summary judgment record contains facts "from which a jury could conclude that Defendants entered into a new conspiracy within the limitations period."[42] ECF No. 324, at 47-48. The Court disagrees. As NPBL argues without opposition, Virginia civil conspiracy claims are subject to a heightened

---

[42] This theory of liability stands in obvious contrast to CSX's federal antitrust theory of liability, which relies on the continuing violation doctrine to seek to recover for the totality of antitrust damages suffered during the pre-suit limitations period, regardless of when the offending conduct occurred. Anticipating criticism on this point, CSX argues that it is "entitled to proceed on alternate theories of liability at trial when both are supported by the record. . . . Whether there was one or more conspiracies is a factual matter for the jury to find." ECF No. 324, at 48. This Court need not address Defendants' challenge to the propriety of CSX proceeding on conflicting factual theories because CSX's state law conspiracy claims fail as a matter of law even if properly presented.

evidentiary standard, requiring "clear and convincing evidence" of concerted action for an unlawful purpose. Dunlap v. Cottman Transm. Sys., 754 S.E.2d 313, 317 (Va. 2014) (statutory conspiracy); Pierce Oil Corp. v. Voran, 118 S.E. 247, 251 (Va. 1923) (common law conspiracy). First, CSX marshals no record evidence capable of satisfying its burden, instead relying only on this Court's prior ruling finding that CSX's complaint had sufficiently alleged a new conspiracy in 2018. ECF No. 324, at 48 (quoting ECF No. 66, at 39-40). This argument, of course, fails to illustrate how Defendants' conduct in 2015 and 2016 could be found to constitute one or more separate conspiracies. Further, the Court's prior finding regarding the sufficiency of the complaint is irrelevant at the summary judgment stage, where CSX must establish that record evidence is capable of supporting its claim. Failing to cite to the evidentiary record at all, CSX has not met this burden.

Second, the Court's own review of the summary judgment record, as necessitated to evaluate the federal claims, plainly reveals that no reasonable juror could conclude that there is clear and convincing evidence that Defendants entered into a new agreement to harm CSX between 2015 and 2018. In sum, to the extent that CSX's statutory and common law conspiracy claims are based on allegations of new conspiracies between 2015 and 2018 that are separate from the alleged conspiracy beginning in 2009, both causes

97

JA371

of action fail based on the record evidence, even when viewed in the light most favorable to CSX (and regardless of the heightened evidentiary standard).  To the extent that CSX's statutory and common law conspiracy claims are based on allegations of a conspiracy that began in 2009 and continued through 2018, both causes of action are time-barred.  Therefore, Defendants' summary judgment motions are **GRANTED** with respect to the Virginia statutory and common law conspiracy claims.

### C. Breach of Contract

Presumably due to the complexity of the antitrust issues, NSR's and CSX's summary judgment briefs devote limited attention to CSX's breach of contract claim.  NSR — despite asserting that all of CSX's state law claims are time-barred — fails to articulate how CSX's allegations of post-2013 contractual breaches could be time-barred claims (instead arguing that CSX's damages model is based on time-barred conduct).  CSX — despite focusing its limitations analysis on its conspiracy claims — appears to apply its Forest Lakes argument to the breach of contract claim as well, presumably taking the position that each alleged wrongful act by NSR constitutes a separate cause of action in contract with a separate limitations period.  NSR offers a more fulsome argument in its reply brief, but again fails to address clearly the scope of its limitations defense and instead pivots to the merits.

In keeping with the Court's analysis above, CSX cannot
maintain a breach of contract claim based on pre-October 2013
conduct. To the extent CSX alleges that NSR's actions in 2015,
2016, or 2018 breached NPBL's Operating Agreement,[43] the breach of
contract claim is not procedurally barred by the statute of
limitations. See Forest Lakes, 795 S.E.2d at 881 (noting that new
causes of action can "look[] remarkably like an earlier one").
However, CSX cannot sustain its breach of contract claim based on
these recent acts because none of the alleged breaches can satisfy
all required elements of a Virginia breach of contract claim:
"(1) a legally enforceable obligation of a defendant to a
plaintiff; (2) the defendant's violation or breach of that
obligation; and (3) injury or damage to the plaintiff caused by
the breach of obligation." Filak v. George, 594 S.E.2d 610, 614
(Va. 2004).

The Court turns first to the alleged 2018 conduct, which the
Court analyzed in detail in Part IV.F.3 above. These allegations
cannot sustain a breach of contract claim because a reasonable

---

[43] CSX's complaint describes the alleged breaches as follows: "effectively
blocking CSX[]'s access to NS[R]'s trackage over which NPBL has rights, by
refusing to consider proposals that would improve the revenues of NPBL, by
failing to encourage the business of NPBL, and by inducing its employees
and/or the [now-dismissed] Individual Defendants to vote for measures that
are harmful to NPBL." ECF No. 1 ¶ 107. Although the complaint does not
identify specific timeframes for the alleged breaches, these allegations
reasonably (or at least arguably) encompass CSX's allegations regarding
NSR's conduct in 2015 (delaying CSX's rail access to NIT), 2016 (canceling
contracts with NPBL, prompting an STB rate dispute and delaying the
establishment of a new NPBL switch rate); and 2018 (shutting down CSX's
alternate governance and rate proposals).

factfinder, viewing the evidentiary record in the light most favorable to CSX, could not conclude that NSR violated any legally enforceable obligation owed to CSX.  On the contrary, NSR and CSX's 1989 contract revising the Operating Agreement gave NSR the explicit contractual right to appoint three of NPBL's directors.  NSR's decision to exercise this specific contractual right cannot form the basis of a breach of contract claim.

CSX seeks to sidestep NSR's explicit contractual right by arguing that NSR breached the Operating Agreement by exercising its "contractual discretion in bad faith."  ECF No. 324, at 70 (quoting Morrison v. Wells Fargo Bank, N.A., 30 F. Supp. 3d 449, 456 (E.D. Va. 2014)).  But, as the Court's discussion in Morrison makes clear, the implied covenant of good faith and fair dealing does not apply to "activity governed by express contractual terms." 30 F. Supp. 3d at 456 (quoting Bennett v. Bank of Am., N.A., No. 3:12CV34-HEH, 2012 WL 1354546, at *10 (E.D. Va. Apr. 18, 2012)); see also Charles E. Brauer Co. v. NationsBank of Virginia, N.A., 466 S.E.2d 382, 386 (Va. 1996) ("When, as here, parties to a contract create valid and binding rights, one party does not breach the U.C.C.'s obligation of good faith by exercising such rights."); Virginia Vermiculite, Ltd. v. W.R. Grace & Co.- Connecticut, 156 F.3d 535, 542 (4th Cir. 1998).[44]

---

[44] Further, NSR exercised this contractual right in 2018 in the exact same way it had done for decades.  Even accepting that this exercise could be a breach of the Operating Agreement (which it is not), such a claim would have

Turning next to the 2016 conduct, those allegations cannot support CSX's contract claim because CSX fails to allege a breach or resulting damages.  First, there is no allegation that NSR lacked the right to cancel the relevant contracts with adequate notice, and CSX does not allege a breach associated with the manner of cancellation.[45]  Second, CSX fails to demonstrate that it suffered any injury or damage from NSR's cancellation of its contracts with NPBL.  As discussed in Part IV.F.2 above, NSR and NPBL have continued to operate under the canceled contracts, and it is CSX, not NSR, that has delayed resolution of the pending STB dispute.  Without any harm flowing from the act of cancellation, CSX fails to point to evidence capable of demonstrating a required element of this claim.

Turning last to the 2015 conduct, the record evidence (as discussed at length in Part IV.F.1 above) could reasonably support finding that NSR acted to obstruct CSX's train movements in 2015, with this obstruction resulting in CSX's temporary loss of business from one of its existing customers for a period of several weeks.

_____

accrued in or around 1989, or in or around 2009.  See Westminster Investing Corp., 379 S.E.2d at 319 (holding that shopping center tenant's breach of contract cause of action against landlord for repeatedly failing to enforce uniform business hours for all tenants as required by contract was time-barred because the cause of action had accrued the first time the landlord breached the contract).

[45] Absent speculation, there is likewise no evidence that NSR exercised its right in bad faith when NSR sought to renegotiate the fee it receives when other companies use NSR's own assets (the track to NIT).

CSX's limited argument on this issue highlights only one contract provision that the record could support as potentially applicable to this conduct: the provision requiring NSR and CSX to "co-operate cordially in encouraging the business of the [NPBL], for which it is constructed." ECF No. 324, at 69 (quoting ECF No. 1-1, at 6).

Assuming, without deciding, that a reasonable factfinder (viewing the summary judgment record in the light most favorable to CSX) could conclude that NSR breached an enforceable obligation to "co-operate cordially" by obstructing CSX's rail access to NIT in 2015, this breach of contract claim nonetheless fails as a matter of law because CSX's discovery responses did not advance a damages theory based on this harm, which is ancillary to CSX's sole damages theory. While CSX has suggested that it lost long-term customer contracts due, at least in part, to the obstruction of its trains in 2015, the summary judgment record is devoid of even a scintilla of evidence supporting that assertion. Moreover, CSX has failed to advance a damages model or supporting evidence predicated on any short-term financial loss from one customer in 2015. Thus, for the same reasons that these 2015 allegations do not present a triable issue of fact regarding CSX's antitrust causes of action, the record cannot sustain CSX's breach of contract claim.

In sum, and in keeping with the conspiracy analysis above, the Court finds that Defendants are entitled to summary judgment

as a matter of law with respect to the breach of contract claim because the underlying allegations are time-barred and/or are unsupported by the record evidence as a matter of law.[46] Defendants' motions are therefore **GRANTED** as to this claim.

## VIII. CONCLUSION

For the reasons set forth above, Defendants' motions for summary judgment are **GRANTED** in part, and **DENIED** in part. ECF Nos. 296, 307. Additionally, summary judgment is denied as to the court-raised issue of injunctive relief. The jury trial scheduled to commence on January 18, 2023, will be converted into a bench trial on injunctive relief. Counsel are instructed to confer to determine whether agreement can be reached on a schedule to submit proposed findings of fact and conclusions of law. Counsel should also immediately contact the Magistrate Judge assigned to this case to schedule the resumption of the final pretrial conference.

---

[46] Though the Court does not directly reach the issue at this time due to Defendants not having raised injunctive relief on summary judgment, it does not appear that a state law injunctive remedy claim could remain viable in this case, in contrast to CSX's federal antitrust claims. In the federal antitrust context, the injunctive remedy provided by the Clayton Act is clearly not subject to the same statute of limitations as the damages remedy. No party has even suggested, let alone argued, that there is any state law parallel that would allow a time-barred conspiracy or contract claim to proceed in equity. Similarly, the record appears to support Defendants' contention that even if a contractual breach occurred in 2015 due to one or more delayed trains, damages at law would be the only available remedy. Carbaugh v. Solem, 302 S.E.2d 33, 35 (Va. 1983). Regardless, as CSX notes, the availability or unavailability of any state law injunctive relief has no impact (i.e., does not limit) the breadth of the injunctive remedy available under federal law.

The Clerk is **DIRECTED** to send a copy of this Opinion and Order

to all counsel of record.

**IT IS SO ORDERED.**

/s/

Mark S. Davis
CHIEF UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
January **3**, 2023

104

JA378

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

CSX TRANSPORTATION, INC.,
*individually and on behalf
of Norfolk & Portsmouth Belt
Line Railroad Company,*

                **Plaintiff,**

v.                                  **Civil No. 2:18cv530**

NORFOLK SOUTHERN RAILWAY COMPANY,
NORFOLK & PORTSMOUTH BELT LINE RAILWAY
COMPANY,

                **Defendants.**

## OPINION AND ORDER

This matter is before the Court on a "Motion to Dismiss All Remaining Claims for Relief," filed by Defendant Norfolk & Portsmouth Belt Line Railway Company ("NPBL") on January 9, 2023. ECF No. 572. Defendant Norfolk Southern Railway Company ("NSR," and together with NPBL, "Defendants"), joined in the motion. ECF No. 574. In response to an expedited briefing order issued by the Court due to the impending trial date, Plaintiff CSX Transportation, Inc. ("CSX") filed its opposition brief on Thursday, January 12, 2023, and Defendants filed their replies on Friday, January 13, 2023.[1] On Monday January 16, 2023, a day that

---

[1] Though the briefing period was expedited, CSX's opposition brief offers the well-reasoned observation, fully joined in by the Court, that it would be a waste of resources to proceed to a lengthy antitrust trial on injunctive relief only for the Court to hold at the conclusion of trial that CSX lacks a federal cause of action. ECF No. 593, at 3.

the Court was closed in observance of a federal holiday, the Court issued a short order scheduling oral argument on the pending motion. ECF No. 602. After holding oral argument on January 18, 2023, and ruling from the bench, the Court now issues the instant Opinion and Order memorializing its rulings **GRANTING** Defendants' motion to the extent it seeks dismissal of CSX's federal injunctive relief claims.

## I. PROCEDURAL HISTORY

On January 3, 2023, the Court issued a lengthy Opinion and Order granting summary judgment in favor of Defendants on CSX's federal antitrust and state-law damages claims, but denying summary judgment on injunctive relief.[2] ECF No. 559. Familiarity with the case background and the key factual and legal allegations is therefore assumed.

In the January 3, 2023 Opinion and Order, the Court's threshold summary judgment ruling on injunctive relief did not turn on the merits, but rather, the Court concluded:

> The timing of the additional briefing periods was both short and overlapping with December holidays, and neither injunctive relief generally, nor laches, were previously raised by either Defendant in support of summary judgment. Consistent with CSX's position on

---

[2] Defendants' summary judgment motions and briefs did <u>not</u> address CSX's claims for injunctive relief, which prompted the Court to ask questions about injunctive relief at oral argument in early December. Injunctive relief was raised by the Court based on the Court's lack of clarity regarding the degree to which the stale timing of the antitrust activity alleged by CSX impacted the injunctive relief claims. In response, Defendants orally argued that CSX's injunctive relief claims failed for lack of standing. CSX opposed this contention. Thereafter, the Court provided the parties with two opportunities to file simultaneous briefs on injunctive relief.

2

this issue, the Court finds that court-initiated summary judgment should <u>not</u> be granted in favor of either Defendant on the issue of injunctive relief, which has different elements and is governed by a different federal statute than CSX's antitrust damages claim. <u>See</u> 15 U.S.C. § 26.

ECF No. 559, at 81-82. As explained earlier in the Court's January 3, 2023 summary judgment Opinion and Order, Section 16 of the Clayton Act, which is codified at 15 U.S.C. § 26, is what authorizes a private cause of action seeking injunctive relief for violations of §§ 1 and 2 of the Sherman Act. <u>Id.</u> at 10 n.5.

As an alternative ruling, the Court noted that the summary judgment record suggested that CSX had standing to pursue injunctive relief, discussed the Court's broad power under federal law to provide injunctive relief within the context of CSX's requested injunctive remedies, and found that there was not an adequate basis to grant summary judgment on this <u>Court-raised issue</u>. The Court similarly concluded that, based on the state of the record at that time, the doctrine of laches (also an issue that had not been previously briefed) did not bar injunctive relief as a matter of law.

Approximately one week after the Court ruled on summary judgment, Defendants filed the now-pending motion arguing that, pursuant to a clause in 15 U.S.C. § 26, the Court lacks jurisdiction to grant injunctive relief against "common carriers" subject to the jurisdiction of the U.S. Surface Transportation

3

Board (the "STB").[3]  ECF Nos. 572, 574.  Defendants alternatively
argue that, even if the limiting clause in § 26 is not
jurisdictional, judgment on the pleadings is appropriate because
CSX has no viable cause of action under § 26.  Id.; see Fed. R.
Civ. P. 12(c) & 12(h)(2).  The Court will first address the legal
standard applicable to each alternative argument, as well as the
legal standard for reconsidering prior rulings, and then analyze
whether Defendants' motion is proper under the various procedural
avenues briefed by the parties.

## II. THRESHOLD PROCEDURAL ISSUES

### A. Subject Matter Jurisdiction

It is well-established that litigants generally retain the
ability to "raise a court's lack of subject-matter jurisdiction at
any time in the same civil action, even initially at the highest
appellate instance."  Kontrick v. Ryan, 540 U.S. 443, 455 (2004).
As courts of limited jurisdiction, federal district courts have

---

[3] Defendants, who have advanced various jurisdictional challenges throughout
this case, raised a less developed version of this argument in their briefs
responding to the Court-raised issue of injunctive relief.  However,
Defendants' briefs did not previously distinguish the seminal Supreme Court
case on this issue.  See Georgia v. Penn. R.R. Co., 324 U.S. 439, 454 (1945);
cf. ECF No. 549, at 11 (reflecting CSX's reliance on Georgia in response to
the jurisdictional argument at summary judgment).  In a footnote in the
Court's summary judgment opinion, the Court indicated that it was "not
squarely analyz[ing] Defendants' reasserted arguments that this Court lacks
authority" to grant injunctive relief due to the STB's regulatory authority.
ECF No. 559, at 83 n.33; see also ECF No. 395 (reflecting this Court's prior
statement that it has "every intention of ensuring that the monetary or
injunctive remedies secured in this case (if any) are within this Court's
authority to award").  Defendants' current motion, having advanced a more
developed argument on this issue, argues that the time to squarely address
the claim is now.  CSX offers procedural objections to Defendants' motions,
but acknowledges that pre-trial resolution of this issue is sensible.

4

the ability, and even the obligation, to raise subject matter jurisdiction <u>sua</u> <u>sponte</u>.    <u>See</u> <u>Brickwood Contractors, Inc. v.</u> <u>Datanet Eng'g, Inc.</u>, 369 F.3d 385, 390 (4th Cir. 2004).    However, "[b]ecause the consequences that attach to the jurisdictional label may be so drastic," the United States Supreme Court has endeavored in recent years "to bring some discipline to the use of this term."    <u>Henderson ex rel. Henderson v. Shinseki</u>, 562 U.S. 428, 435 (2011).    Federal courts are directed to "look to see if there is any 'clear' indication that Congress wanted the rule" at issue to be "jurisdictional."    <u>Id.</u> at 436.

Whether a private cause of action exists under a federal statute is typically not a jurisdictional question, except in those cases where the plaintiff's position is "so insubstantial, implausible, foreclosed by prior decisions of [the Supreme Court], or otherwise completely devoid of merit as not to involve a federal controversy."    <u>Steel Co. v. Citizens for a Better Env't</u>, 523 U.S. 83, 89 (1998).    It is therefore "firmly established [in Supreme Court precedent] that the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, <u>i.e.</u>, the courts' statutory or constitutional <u>power</u> to adjudicate the case."    <u>Id.</u>    Accordingly, a district court has jurisdiction over a case if "the right of the petitioners to recover under their complaint will be sustained if the Constitution and laws of the United States are given one construction and will

5

JA383

be defeated if they are given another." Id. (quoting Bell v.
Hood, 327 U.S. 678, 685 (1946)); see Lexmark Int'l, Inc. v. Static
Control Components, Inc., 572 U.S. 118, 128 n.4 (2014) (noting
that while imperfect, the term "statutory standing" has been used
to denote whether a plaintiff has a cause of action under a federal
statute, but clarifying that applying statutory interpretation
principles to determine "the meaning of the congressionally
enacted provision creating a cause of action" is typically not a
jurisdictional inquiry).

### B. Rule 12(b)(6), Rule 12(h)(2), & Rule 12(c)

In situations where an issue is not jurisdictional, but a
plaintiff cannot state a valid legal claim on which relief can be
granted, a motion to dismiss may be filed under Rule 12(b)(6).
Although a Rule 12(b)(6) motion is typically filed early in a case
in response to the complaint, Rule 12(h)(2) provides that
"[f]ailure to state a claim on which relief can be granted," is
not waived even if it is not raised until trial. Fed. R. Civ. P.
12(h)(2); see 5C Fed. Prac. & Proc. Civ. § 1392 (3d ed., Apr. 2022)
(explaining that the defense of failure to state a claim is
preserved "against waiver during the pleading, motion, discovery,
and trial stages of the action"). Similar to a motion filed under
Rule 12(b)(6), Rule 12(c) provides: "After the pleadings are closed
— but early enough not to delay trial — a party may move for
judgment on the pleadings." Fed. R. Civ. P. 12(c).

## C. Reconsideration of Prior Orders

As noted above, this Court's prior summary judgment ruling declined to squarely address Defendants' challenge to this Court's authority to enjoin Defendants' activities that allegedly violate federal antitrust laws. "Where a district court issues an interlocutory order such as one for partial summary judgment 'that adjudicates fewer than all of the claims,'" the court retains discretion to revise such order 'at any time before the entry of a judgment adjudicating all the claims.'" Carlson v. Bos. Sci. Corp., 856 F.3d 320, 325 (4th Cir. 2017) (quoting Fed. R. Civ. P. 54(b)). Compared to revising a final judgment under Federal Rule of Civil Procedure 59(e), revising an interlocutory order under Rule 54(b) "involves broader flexibility . . . as the litigation develops and new facts or arguments come to light." Carlson, 856 F.3d at 325. Although district courts applying Rule 54(b) draw guidance from Rule 59(e)'s standard to ensure that the "law of the case" retains a sufficient degree of finality,[4] the "law of the case is just that," and it "cannot limit the power of a court to reconsider an earlier ruling." Am. Canoe Ass'n v. Murphy Farms, Inc., 326 F.3d 505, 515 (4th Cir. 2003). This is true because the

---

[4] A district court generally will not depart from a prior ruling constituting the law of the case unless there is (1) new evidence that was previously unavailable, (2) new controlling authority, or (3) a clear error in the prior ruling that would result in "manifest injustice." Hicks v. Brennan, No. 2:16CV89, 2017 WL 4476835, at *3 (E.D. Va. Apr. 27, 2017). However, while a district court's discretion to revisit a prior ruling "is guided by the law of the case doctrine," the absence of the above three factors does not prohibit the court from revisiting a ruling. Id. at *9.

7

"ultimate responsibility of the federal courts, at all levels, is to reach the correct judgment under law," and while such obligation "may be tempered at times by concerns of finality and judicial economy," the law of the case remains "a malleable doctrine meant to balance the interests of correctness and finality." Id.

Reaching the correct judgment is of particular importance when a district court addresses significant threshold matters, such as questions of "Article III standing" and "jurisdictional issues generally." Id. Furthermore, the weight given to the law of the case may be tempered "by the nature of the first ruling"; if "the ruling is avowedly tentative . . . it may be said that law-of-the-case principles do not apply." Id. at 516 (quoting 18B Fed. Prac. & Proc. Juris. § 4478.5).

### D. Procedural Analysis

Consistent with evolving Supreme Court precedent cabining the breadth of issues deemed "jurisdictional," the Court finds that it has jurisdiction over this question. Within the scope of that jurisdiction, the parties' dispute requires the Court to apply traditional principles of statutory interpretation to determine the scope of a statutory exception to the private cause of action created by 15 U.S.C. § 26. Though, historically, the instant dispute may have been labeled "jurisdictional," CSX's position regarding the existence of a federal cause of action is not so implausible that it divests this Court of federal question

8

JA386

jurisdiction.  Furthermore, the language of the statute does not reveal a clear intent by Congress to render the matter jurisdictional, as the relevant provision uses negative phrasing to explain to whom the statute does not provide an injunctive remedy.  See 15 U.S.C. § 26 ("[N]othing herein contained shall be construed to entitle" the listed class of parties the right to pursue relief).[5]

Adopting CSX's contention that the issue before this Court is not jurisdictional, the Court finds that determining whether CSX has a valid cause of action to seek relief under 15 U.S.C. § 26 is cognizable under Rule 12.  See Fed. R. Civ. P. 12(c), 12(h), 12(b)(6).  First, as argued by NSR, this Court has discretion to consider a Rule 12(c) motion even if it is filed shortly before trial.  See Reynolds Assocs. v. Kemp, 974 F.2d 1331, 1992 WL 207747, at *2 n.4  (4th Cir. 1992) (unpublished table opinion) ("The determination whether the 12(c) motion constitutes a delay of trial is within the sound discretion of the judge.  However, if it seems clear that the motion may effectively dispose of the case, the court should permit it regardless of any possible delay its consideration may cause."  (quoting 5A Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1367 at 514 (1990))). Second, as conceded by CSX, Rule 12(h)(2) permits this Court to

---

[5] Alternatively, to the extent this issue should be deemed "jurisdictional" based on historical cases indicating that 15 U.S.C. § 26 provides the sole authority for a private party to seek an injunction, Defendants' motions are plainly timely and dismissal for lack of jurisdiction would be warranted.

consider a Rule 12(b)(6) defense "at trial," and it would be irrational to proceed to a multi-week federal antitrust trial only to determine at the conclusion that CSX does not have a cause of action under 15 U.S.C. § 26.  Third, notwithstanding CSX's arguments to the contrary, the Court finds that the motions advanced by Defendants are subject to Rule 12(b)(6) treatment because they turn on a legal interpretation of the statute at issue, not on the facts developed during discovery.[6]

Even if resolving the instant dispute under Rule 12 is improper at this time, the Court finds that Defendants' motion is alternatively cognizable as an appropriate request for the Court to revisit its ruling on summary judgment.  While the existence of a private cause of action under § 26 is not "jurisdictional," it is a critical threshold matter with similar import.  The Supreme Court's opinion in <u>Nat'l R. R. Passenger Corp. v. Nat'l Ass'n of R. R. Passengers</u>, 414 U.S. 453 (1974) illustrates this point.

_____

[6] The only issue that could be considered "factual" is whether Defendants are "common carriers subject to the jurisdiction of the Surface Transportation Board."  15 U.S.C. § 26.  While CSX's complaint does not expressly identify Defendants in this way, they are identified as Class I and Class III railroads that move intermodal freight, and there has not, at any stage in this case, been any suggestion from CSX that Defendants are not common carriers under the STB's jurisdiction.  In fact, it is undisputed that both Defendants are currently parties to a rate proceeding before the STB (a proceeding that began before the instant lawsuit was filed).  ECF No. 312-17.  Furthermore, this case was stayed in 2021 to permit a potentially dispositive issue to be resolved <u>by the STB</u>.  ECF No. 395.  To the extent the current motion relies on a fact outside of the pleadings (Defendants' status as common carriers), CSX's failure to contest such fact, including at oral argument, is sufficient to support the pre-trial resolution of the threshold <u>legal dispute</u>, particularly when CSX concurs that pre-trial resolution is preferable.

There, the dispute centered on whether a private party can file suit under "the Amtrak Act" to challenge the discontinuance of specific passenger trains.  Id. at 454-55.  In framing the issue, the Supreme Court noted that "the parties have approached the question from several perspectives," with the issue "variously stated to be whether the Amtrak Act can be read to create a private right of action . . .; whether a federal district court has jurisdiction under the terms of the Act to entertain such a suit; and whether the respondent has standing to bring such a suit." Id. at 455-56.  The Court further noted that those questions "overlap in the context of this case even more than they ordinarily would" and that "however phrased, the threshold question clearly is whether the Amtrak Act or any other provision of law creates a cause of action whereby a private party such as the respondent can enforce duties and obligations imposed by the Act; for it is only if such a right of action exists that we need consider whether the respondent had standing to bring the action and whether the District Court had jurisdiction to entertain it."  Id. at 456. Ultimately, the Court concluded that there was not a private right of action, noting in a footnote that "[s]ince we hold that no right of action exists, questions of standing and jurisdiction became immaterial."  Id. at 465 n.13.

Consistent with the discussion in American Canoe, the law of the case doctrine is less potent when a dispute goes to the very

11

JA389

heart of whether a cause of action is valid.  Furthermore, as noted above, this Court did not squarely take up this matter when resolving the original summary judgment motion, as the parties did not seek a ruling on injunctive relief at that time.  As a result, notwithstanding CSX's suggestion that law of the case principles preclude reconsideration, there is either no "law of the case" on this issue for the Court to reconsider, or the Court's prior ruling is properly deemed "tentative," rendering law of the case principles largely inapplicable.

In summary, regardless of whether the Court interprets Defendants' pending motion as a Rule 12(c) pre-trial motion, a Rule 12(b)(6) motion filed at the outset of trial, or a motion to reconsider the Court's recent summary judgment ruling, the Court has authority to reach the merits.

### III. DISCUSSION – 15 U.S.C. § 26

#### A. Statutory Interpretation Principles

Having determined that Defendants' motion is procedurally proper, the Court turns to its merits.  Defendants argue that dismissal of CSX's <u>federal</u> antitrust injunctive relief claims is required because Section 16 of the Clayton Act — the very provision that creates a private cause of action for federal antitrust injunctive relief — deprives a district court of its authority to grant such relief if the defendant is a "common carrier subject to the jurisdiction of the Surface Transportation Board under

12

JA390

subtitle IV of title 49, United States Code."   15 U.S.C. § 26.
Defendants highlight the notable difference between the language
of the current version of § 26 and the version in force before
Congress passed the Interstate Commerce Commission Termination Act
(the "ICCTA").   Prior to the passage of the ICCTA in 1995, the
Interstate Commerce Commission (the "ICC") served as the regulator
for rail carriers, among other industries, as part of one of the
"most pervasive and comprehensive of federal regulatory schemes."
Chi. & N.W. Transp. Co. v. Kalo Brick & Tile Co., 450 U.S. 311,
318 (1981).   The ICCTA abolished the ICC, established the STB to
take its place, and made numerous updates to the regulatory scheme
governing rail carriers.  See ICC Termination Act of 1995, Pub. L.
No. 104-88, 109 Stat. 803, §§ 101-205 (Title I, abolishing the ICC
and amending subtitle IV of Title 49 of the U.S. Code; and Title
II, creating the STB).   Title III of the ICCTA, titled "Conforming
Amendments," sets forth a litany of changes to be made to other
federal statutes to conform those statutes to the ICCTA.   Many of
these changes simply swapped out the term "Interstate Commerce
Commission" in favor of the term "Surface Transportation Board."
See generally id. §§ 301-408.  Other changes, such as the change
made to 15 U.S.C. § 26 (also known as Section 16 of the Clayton
Act), included additional modifications.   Id. § 318(3).

    Defendants argue that under the pre-ICCTA version of 15 U.S.C.
§ 26, a district court was required to conduct "two inquiries to

13

JA391

determine whether injunctive relief is prohibited": (1) a "kind of defendant" inquiry; and (2) a "kind of relief" inquiry.  ECF No. 573, at 8.  Following the amendment of § 26 in 1995, Defendants contend that the only remaining inquiry is the "kind of defendant" inquiry.  Id.  This singular inquiry, Defendants suggest, requires the Court to ask: "Is the defendant a common carrier subject to the jurisdiction of the STB?"  Id.  In opposition, CSX argues that the current statutory language should be read no differently than the pre-ICCTA version of the statute because there is no indication in the legislative history that Congress intended to substantively change the statute in order to expand the "antitrust immunity available to common carriers."  ECF No. 593, at 15.  Instead, CSX asserts that the amended version of § 26 is "merely a condensed, and conforming, version of the pre-1995 language."  Id. at 20.

To determine whether CSX "has a cause of action under" 15 U.S.C. § 26, this Court must examine the statute by "apply[ing] traditional principles of statutory interpretation." Lexmark Int'l, 572 U.S. at 128.  "The starting point in discerning congressional intent is the existing statutory text . . . ." Lamie v. U.S. Trustee, 540 U.S. 526, 534 (2004) (Kennedy, J.) (internal citation omitted); see Niz-Chavez v. Garland, 141 S. Ct. 1474, 1480 (2021) (Gorsuch, J.) ("When called on to resolve a dispute over a statute's meaning, this Court normally seeks to afford the law's terms their ordinary meaning at the time Congress adopted

them."); Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S, 566 U.S. 399, 412 (2012) (Kagan, J., unanimous) ("We begin where all such inquiries must begin: with the language of the statute itself." (internal citations omitted)); Desert Palace, Inc. v. Costa, 539 U.S. 90, 98 (2003) (Thomas, J., unanimous) ("Our precedents make clear that the starting point for our analysis is the statutory text."); Am. Tobacco Co. v. Patterson, 456 U.S. 63, 68 (1982) (White, J.) ("As in all cases involving statutory construction, our starting point must be the language employed by Congress" (internal citations omitted)). As this Court has previously stated, "when determining Congress's purpose in enacting — or amending — a particular statute, the statutory text is the best evidence of what Congress set out to change, but also what it resolved to leave alone." World Fuel Servs. Trading, DMCC v. M/V HEBEI SHIJIAZHUANG, 12 F. Supp. 3d 792, 806 (E.D. Va. 2014) (citing W. Va. Univ. Hosps., Inc. v. Casey, 499 U.S. 83, 98 (1991)) (cleaned up). It is therefore ordinarily appropriate to assume, "absent a clearly expressed legislative intention to the contrary, that the legislative purpose is expressed by the ordinary meaning of the words used." Jam v. Int'l Fin. Corp., 139 S. Ct. 759, 769 (2019) (Roberts, C.J.) (quoting Am. Tobacco Co. v. Patterson, 456 U.S. 63, 68 (1982)) (cleaned up).

Reliance on legislative history as an interpretive tool is only appropriate where the statutory language, along with "all the

textual and structural clues," Niz-Chavez, 141 S. Ct. at 1480,
render the statute ambiguous as written, Toibb v. Radloff, 501
U.S. 157, 162 (1991) (Blackmun, J.) ("Where, as here, the
resolution of a question of federal law turns on a statute and the
intention of Congress, we look first to the statutory language and
then to the legislative history if the statutory language is
unclear." (quoting Blum v. Stenson, 465 U.S. 886, 896 (1984))).
The rule that "reference to legislative history is inappropriate
when the text of the statute is unambiguous," Dep't of Housing &
Urban Dev. v. Rucker, 535 U.S. 125, 132 (2002) (Rehnquist, C.J.,
unanimous), persists even in the face of legislative history that
is contrary to the statute's clear meaning, see Ratzlaf v. United
States, 510 U.S. 135, 147-48 (1994) (Ginsburg, J.) (noting that
even when the Court acknowledges some "contrary indications in [a]
statute's legislative history," the Court "do[es] not resort to
legislative history to cloud a statutory text that is clear").

### B. Textual Analysis

Here, the Court's statutory analysis begins with the current
text of 15 U.S.C. § 26, Lamie, 540 U.S. at 534, which states in
relevant part:

> Any person, firm, corporation, or association shall be
> entitled to sue for and have injunctive relief, in any
> court of the United States having jurisdiction over the
> parties . . . [p]rovided[] [t]hat nothing herein
> contained shall be construed to entitle any person,
> firm, corporation, or association, except the United
> States, to bring suit for injunctive relief against any
> common carrier subject to the jurisdiction of the

16

JA394

Surface Transportation Board under subtitle IV of Title 49.

15 U.S.C. § 26 (emphasis added). A plain reading of this text leaves scant room for interpretation. The statute provides a private cause of action to seek injunctive relief for a federal antitrust violation except when the defendant is a common carrier subject to the STB's jurisdiction. Here, there is no question that CSX is a private party that does not represent the United States. Neither can there be any question that NSR and NPBL are common carriers subject to the STB's jurisdiction. Accordingly, under the plain language of the statute, this Court cannot award CSX the federal antitrust injunctive remedy that it seeks.

Hoping to preserve the effect of the now-superseded version of the statute, CSX urges the Court to focus on the statutory language at the end of the common carrier exception. CSX contends that the word "under" in the phrase "subject to the jurisdiction of the Surface Transportation Board under subtitle IV of Title 49" should be read to provide that private party injunctive relief is unavailable only with respect to matters "within [the STB's] areas of regulatory authority." ECF No. 593, at 16. However, that is not the plainest reading of that statutory phrase. Instead, the language at the end of the exception reads more naturally as instructing where to look to determine if the putative defendant is the type of "common carrier" that is exempt from private party suits. In other words, the phrase says, if subtitle IV of Title

17

JA395

49 reveals that the defendant is a common carrier subject to STB
authority, then <u>only the United States</u> can bring a claim for
injunctive relief against that entity.  The phrase does not, as
CSX suggests, delimit the type of <u>matters</u> that can be the subject
of a cause of action filed by a private party; rather, it delimits
the type of <u>parties</u> that face exposure to a private action seeking
injunctive relief.

It is for this reason that CSX's continued reliance on <u>Georgia
v. Penn. R.R. Co.</u>, 324 U.S. 439 (1945), is misplaced.  In <u>Georgia</u>,
the Supreme Court interpreted the pre-ICCTA version of 15 U.S.C.
§ 26, which stated, in relevant part:

> [N]othing herein contained shall be construed to entitle
> any person, firm, or association, except the United
> States, to bring suit in equity for injunctive relief
> against <u>any common carrier subject to the provisions of
> the Act to regulate commerce</u>, approved February fourth,
> eighteen hundred and eighty-seven, <u>in respect of any
> matter</u> subject to the regulation, supervision, or other
> jurisdiction of the Interstate Commerce Commission.

15 U.S.C. § 26 (amended 1995) (emphasis added).  Relying on the
pre-1995 statutory language that <u>no longer exists</u>, the Supreme
Court held that injunctive relief against the rail carrier
defendants was <u>not</u> barred because the relief sought by the
plaintiff was "not <u>a matter</u> subject to the jurisdiction of the
[ICC]."  <u>Id.</u> at 455 (emphasis added).  This analysis, however,
does not speak to the current statutory text, which no longer
limits the bar on private actions to <u>matters</u> that are subject to
the jurisdiction of the STB.  Although CSX argues that the current

18

JA396

language is subject to the same interpretive scope as the version of the statute analyzed in Georgia, the plain language of the statute cannot support that conclusion. To conclude that the Georgia Court's analysis applies with equal force today requires concluding that, despite altering 15 U.S.C. § 26 to remove that language, Congress intended to preserve the functionality of the omitted clause. While it remains possible that Congress had such subjective intent, it is for Congress, not this Court, to rewrite § 26 to ensure that the objective statutory language achieves that end.

CSX's interpretation of the current statutory language effectively would require this Court to read additional language into § 26, such that it would say: "for injunctive relief against any common carrier with respect to matters subject to the jurisdiction of the Surface Transportation Board"; or alternatively, "for injunctive relief against any common carrier to the extent it is subject to the jurisdiction of the STB." But as the Supreme Court has explained, federal courts do not "usually read into statutes words that aren't there." Romag Fasteners, Inc. v. Fossil, Inc., 140 S. Ct. 1492, 1495 (2020). The federal judiciary, as a separate branch of government, must be "doubly careful" to avoid the temptation of reading words into a statute that change its meaning "when Congress has [] included the term in question elsewhere in the very same statutory provision." Id.

The Romag Fasteners logic supporting the need for elevated caution also applies in this case. Here, not only does CSX's position require reading additional words into 15 U.S.C. § 26, but it also requires the Court to ignore the manner in which Congress modified the law when it abolished the ICC and established the STB. Notably, elsewhere in the ICCTA's conforming amendments, Congress simply swapped in the phrase "Surface Transportation Board" where the statutes previously read "Interstate Commerce Commission." See ICC Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 803, §§ 301-340 (Title III — Conforming Amendments). In fact, Congress did just that in amending a different section of the Clayton Act. Id. § 318(1)(A) (replacing ICC with STB in § 7 of the Clayton Act). In obvious contrast to such straight swaps, Congress modified 15 U.S.C. § 26 by rephrasing and restructuring its articulation of the class of cases for which no private cause of action exists. Though, as CSX asserts, it remains possible that Congress merely intended to streamline the statutory phrasing without changing the provision's meaning, this Court is loath to make that speculative assumption in light of the clarity of Congress's chosen words, particularly when the change is viewed against the backdrop of the other 1-for-1 substitutions in Title III of the ICCTA. See Lamie, 540 U.S. at 534 ("The starting point in discerning congressional intent is the existing statutory text and not the predecessor statutes. It is well established that

'when the statute's language is plain, the sole function of the courts — at least where the disposition required by the text is not absurd — is to enforce it according to its terms.'" (emphasis added) (quoting Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A., 530 U.S. 1, 6 (2000)) (other internal citation omitted)).

### C. Legislative History

CSX seeks to further support its interpretation of § 26 by emphasizing the legislative history behind the 1995 ICCTA. However, as described in detail above, legislative history is only useful when it helps to clarify ambiguous statutory text. Toibb, 501 U.S. at 162. Congress, the branch of our government responsible for codifying federal causes of action, elected to strike some of the preexisting language in § 26 and the updated provision uses clear and plain words to codify a broad ban on private injunctive actions. As explained below, the limited legislative history behind the ICCTA creates, rather than resolves, ambiguity. See Azar v. Allina Health Servs., 139 S. Ct. 1804, 1814 (2019) ("Unable to muster support for its position in the statutory text or structure, the government encourages us to . . . follow it into the legislative history lurking behind the Medicare Act. But legislative history is not the law. And even those of us who believe that clear legislative history can

21

JA399

illuminate ambiguous text won't allow ambiguous legislative history to muddy clear statutory language.") (cleaned up).

As CSX underscores, there is a dearth of record evidence regarding Congress's intent in altering the words of 15 U.S.C. § 26, leading CSX to argue that Congress must not have intended to substantively alter the statute's scope. While this is a plausible theory, it could just as easily suggest that Congress thought that an explanation was unnecessary in light of both the language's clarity and the overall purpose of the ICCTA (railroad deregulation). The Court will not infer Congressional intent from the absence of Congressional comment in the face of clear statutory text.[7] Moreover, the Court's review of the limited legislative history that does exist shows that the legislative history might hurt, rather than help, CSX.[8]

Similarly, considering the policy behind the 1995 amendments also offers no obvious support for CSX's position. As CSX underscores, a professed purpose of the ICCTA was to facilitate

---

[7] Similarly, the Court must "not ask whether in [its] judgment Congress should have authorized [a particular cause of action], but whether Congress in fact did so." Lexmark Int'l, 572 U.S. at 128. This inquiry leaves no room for the Court to "apply its independent policy judgment to recognize a cause of action that Congress has denied." Id.

[8] See S. Rept. 104-176 - INTERSTATE COMMERCE COMMISSION SUNSET ACT OF 1995, S. Rept. 104-176, 104th Cong., at 51 (1995), https://www.congress.gov/congressional-report/104th-congress/senate-report/176/1. ("Sec. 506. Clayton Act — This section would amend 3 provisions of the Clayton Act to substitute the Board for the ICC. The affected sections are 15 U.S.C. 18 (which exempts ICC-approved mergers and acquisitions from the antitrust laws), 21 (which authorizes the ICC to enforce provisions of the Clayton Act), and 26 (which precludes private enforcement of the antitrust laws against regulated carriers).") (emphasis added).

railroad deregulation.  See ECF No. 593, at 3-4, 18.  To further that goal, the ICCTA sought generally to consolidate railroad regulatory power into the hands of the STB, limiting the reach of local, state, and even other federal laws.  See Iowa, Chicago & E. R.R. Corp. v. Washington Cnty., Iowa, 384 F.3d 557, 559 (8th Cir. 2004) (The "ICCTA repealed much of the economic regulation previously conducted by the ICC and by state railroad regulators working in conjunction with the ICC. In so doing, Congress recognized that continuing state regulation — of intrastate rail rates, for example — would 'risk the balkanization and subversion of the Federal scheme of minimal regulation for this intrinsically interstate form of transportation.'" (quoting H.R. REP. NO. 104-311, at 96, reprinted in 1995 U.S.C.C.A.N. 793, 808)); Island Park, LLC v. CSX Transp., 559 F.3d 96, 102 (2d Cir. 2009) (same).

The goal of consolidating regulatory authority in the STB arguably undercuts CSX's assertion that eliminating private injunctive actions against carriers subject to the STB's jurisdiction would represent a counter-intuitive "dramatic expansion of antitrust immunity" that was "buried" in the ICCTA. ECF No. 593, at 18.  As an initial matter, 15 U.S.C. § 26 does not confer antitrust "immunity" from injunctions because the antitrust laws continue to apply to rail carriers, with the United States serving as the ultimate backstop.  If an STB-regulated common carrier commits ongoing antitrust violations of sufficient public

23

JA401

concern, the Department of Justice retains its ability under § 26 to secure an injunction ending the antitrust violation. Second, narrowing the field of people who can bring injunctive relief claims against the railroad industry — claims that, by their nature require courts to order rail carriers to take certain actions — seems consistent with the ICCTA's deregulatory purpose because it limits rail carriers' exposure to regulation by court-ordered injunction.[9]  Third, it is important to remember that § 26 only governs injunctive relief. Private enforcement actions seeking damages for antitrust violations remain available under a different section of the Clayton Act that contains no common carrier exception. See 15 U.S.C. § 15. Accordingly, at best, the record demonstrates that there are two reasonable sides to the policy dispute. See Niz-Chavez, 141 S. Ct. at 1486 ("As usual, there are (at least) two sides to the policy questions before [the Court]; a rational Congress could reach the policy judgment the statutory text suggests it did; and no amount of policy-talk can overcome a plain statutory command.").

---

[9] CSX argues that it cannot be the case that "a private litigant may never obtain injunctive relief in a federal antitrust case against a common carrier subject to the jurisdiction of the STB, regardless of whether that injunctive relief has anything to do with the STB's sphere of regulation." ECF No. 593, at 15 (emphasis in original). That, however, is just what the statute says; the text is not facially ambiguous. Moreover, that concern does not apply here as the subject matter of this case is clearly related to the STB's sphere of regulations.

Finally, more recent legislative activity provides further support for the Court's reading of the statute's plain language. As Defendants highlight, congressional bills in 2008, 2011, and 2013 sought to eliminate what the bills' proponents saw as a rail carrier "carve-out" under federal antitrust law. See ECF No. 573, at 9-10;[10] ECF No. 601, at 4 (quoting the 2008 draft amendment package, as included in a report from the House Judiciary Committee, as stating that "[u]nder current law, section 16 [of the Clayton Act] exempts common carriers subject to the jurisdiction of the STB from suit for injunctive relief by anyone except the United States").[11]   Though this Court does not infer anything about Congress's intent in 1995 from legislative proposals or legislative comments made in subsequent years, see Oscar Mayer & Co. v. Evans, 441 U.S. 750, 758 (1979) (cautioning against undue reliance on statements made by Congress years after

---

[10] While these three bills all failed, legislating is a complicated process, and there is therefore no valid inference to be drawn from the fact that the bills were not passed.

[11] Cf. Markup of H.R. 4279, the Prioritizing Resources and Organization for Intellectual Property Act of 2008 . . . H.R. 1650, the Railroad Antitrust Enforcement Act of 2007 . . . . 110th Cong., at 48 (2008) (statement of Rep. Henry "Hank" Johnson, Member, H. Comm. On the Judiciary) ("After listening to Ranking Member Smith's remarks, I am concerned about section 2 of this act which would change section 16 of the Clayton Act, which provides that only the Federal Government may file suit for injunctive relief against any common carrier subject to the STB's jurisdiction, and it would give private individuals or private plaintiffs filing civil antitrust suits the right to obtain injunctive relief."); Id. (statement of Rep. Tammy Baldwin, Member, H. Comm. On the Judiciary) ("Currently, freight rail has enjoyed an exemption from a wide array of antitrust laws.  Antitrust laws generally have public enforcement and private enforcement.  This would give actors aggrieved by anticompetitive practices a private right to assert that grievance and have enforcement with injunctions.").

25

JA403

a law was passed), the fact that Members of Congress have repeatedly expressed an understanding of the current version of 15 U.S.C. § 26 that comports with this Court's view provides further support for the Court's finding that § 26 means what it says.[12]

Of course, none of this legislative analysis or policy analysis is necessary here. The Court highlights it only to explain why CSX's legislative history arguments, which seek to derive the statute's meaning from what the enacting Congress did not say, are unavailing even if considered substantively. This issue can be, should be, and indeed is settled based on the statutory text alone. That text hardly could be clearer: private parties (like CSX) cannot obtain injunctive relief for federal antitrust claims (like those alleged here) against STB-regulated common carriers (like NSR and NPBL). Therefore, the Court finds that CSX cannot maintain its remaining federal antitrust claims for injunctive relief against NSR and NPBL. This ruling does not render Defendants "immune" from federal antitrust law, or even federal antitrust injunctive remedies. Rather, Defendants remain

---

[12]   In addition to Congress's post-ICCTA comments, another federal district judge has held that the current version of 15 U.S.C. § 26 precludes a private cause of action seeking injunctive relief against a common carrier subject to the STB's jurisdiction. Truck-Rail Handling Inc. v. BNSF Ry. Co., No. C 02-02825 JSW, 2005 WL 8178364, at *4 n.5 (N.D. Cal. Mar. 8, 2005). There, neither party had raised the issue, and the court succinctly addressed § 26 in a single footnote; but the fact that the district judge apparently viewed the statutory language as sufficiently clear on its face to support a sua sponte ruling further supports this Court's interpretation of the statutory language. Stated differently, if the statutory history and familiarity with the Georgia case are what arguably create an interpretive dilemma, but the face of the current statute is clear and reveals no dilemma, the proper course is to apply the statute as written.

subject to the threat of private actions seeking treble damages for federal antitrust violations and to the threat of an injunction in a case filed by the United States.[13]

## IV. CONCLUSION

For the reasons set forth above, Defendants' motion seeking dismissal of CSX's federal antitrust injunctive relief claims are **GRANTED**. ECF Nos. 572, 574. As the legal viability of any remaining state law claim seeking injunctive relief is an open question, the Court anticipates setting a briefing schedule for this issue at the February status conference or earlier upon joint request from the parties. The bench trial on any remaining state law claims seeking injunctive relief has been continued at the joint request of the parties.

The Clerk is **DIRECTED** to send a copy of this Opinion and Order to all counsel of record.

**IT IS SO ORDERED.**

/s/ _____

Mark S. Davis
CHIEF UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
January 27, 2023

---

[13] To the extent that the thrust of the instant lawsuit is NSR's purported improper "control" over NPBL, Defendants may also be subject to federal oversight and certain injunctive remedies as imposed by the STB.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

CSX TRANSPORTATION, INC.,
*individually and on behalf
of Norfolk & Portsmouth Belt
Line Railroad Company,*

                    Plaintiff,

v.                                            Civil No. 2:18cv530

NORFOLK SOUTHERN RAILWAY COMPANY,
NORFOLK & PORTSMOUTH BELT LINE RAILWAY
COMPANY,

                    Defendants.


                    OPINION AND ORDER

     This matter is before the Court on supplemental motions filed

by Norfolk & Portsmouth Belt Line Railway Company ("NPBL") and

Norfolk Southern Railway Company ("NSR," and together with NPBL,

"Defendants"), addressing whether any of CSX Transportation,

Inc.'s ("CSX") state law claims seeking injunctive relief remain

in this case and/or whether any such claims that may remain are

viable. ECF Nos. 614, 616. Also before the Court is CSX's motion

asking the Court to withhold ruling on the Defendants' motions and

allow CSX to immediately appeal this Court's prior rulings on CSX's

federal antitrust claims and a portion of CSX's state law claims.

ECF No. 623. For the reasons explained below, the Court: (1)

**GRANTS** Defendants' motions to the extent they argue that CSX's

state law conspiracy claims, and the vast majority of CSX's state

law contract claim, require no further ruling by the Court because

injunctive relief under Virginia law is foreclosed by this Court's findings in its January 3, 2023 summary judgment Opinion and Order; and (2) **GRANTS** NSR's motion to the extent it argues that injunctive relief is unavailable under state law for any potential contractual breach involving NSR's obstruction of CSX trains in 2015.  These rulings dispose of <u>all remaining state law claims</u>, and CSX's motion seeking a ruling authorizing an immediate appeal is therefore **DISMISSED as moot**.

## I. PROCEDURAL BACKGROUND

Based on the focus of the parties' summary judgment briefing, this Court's January 3, 2023 Opinion and Order was almost exclusively dedicated to ruling on CSX's federal antitrust damages claims.  ECF No. 559.  Although the Court also found that nearly all of CSX's state law damages claims were time-barred, the Court did not squarely address the impact of its limitations ruling on CSX's ability to pursue injunctive relief under Virginia law, noting that the summary judgment briefs were underdeveloped on the ancillary state law claims and did not flesh out how the nature of the relief sought impacted the limitations bar.  See ECF No. 559, at 94 ("In keeping with their federal law arguments, Defendants assert that CSX's Virginia state law claims are time-barred or otherwise fail as a matter of law.  These arguments, and CSX's responses, are substantially underdeveloped compared to the parties' extensive federal antitrust arguments."); id. at 98

("Presumably due to the complexity of the antitrust issues, NSR's and CSX's summary judgment briefs devote limited attention to CSX's breach of contract claim."); id. at 103 n.46 (noting that although the Court "does not directly reach" the unbriefed issue of state law injunctive relief, "it does not appear" that any state claims for injunctive relief remain viable for various reasons, to include the Court's finding that the underlying conspiracy and contract claims were time-barred under Virginia law).

A week after the Court issued its summary judgment opinion, Defendants filed a motion to dismiss that was purportedly directed at all remaining claims, but the briefing focused on the availability of federal injunctive relief, and CSX argued at a later hearing that "there is no pending motion to which [CSX] had the opportunity to respond that challenged the state law claims," and that "there's more to be said" on these issues. ECF No. 605, at 38. At that hearing, the Court granted the Defendants' motion to dismiss CSX's federal antitrust injunctive relief claim based on a legal finding applicable solely to the federal claim. The Court also asked the parties again for their views on the status of the case — that is, whether Defendants had effectively already moved to have the remaining state law injunctive relief claims dismissed, or whether a bench trial should begin on those claims. The Court expressly referenced the Virginia legal principle that "equity follows the law," asking whether there was "really anything

3

JA408

left to proceed on as to the time-barred state law injunctive
relief claims" following the Court's ruling on summary judgment.
ECF No. 605, at 32.   The Court separately asked whether CSX's
timely allegation of a contractual breach by NSR in 2015 required
a different analysis, to include whether the Court could order
specific performance of any relevant contract provision.   Id. at
33-34.

After a recess to allow counsel an opportunity to speak with
each other and with their clients, CSX informed the Court that it
"does not . . . make sense" to proceed to a bench trial "if the
Court would conclude that [CSX's] claims are completely barred on
purely legal ground[s]."   Id. at 37-38.   CSX, however, indicated
that Defendants' recent motions did not formally move to dismiss
the state law injunctive relief claims, meaning that CSX had not
provided responsive argument on the relevant issues.   Id. at 38.
Although all counsel were given an opportunity to advocate for
their view of how the case should proceed and whether the state
law claims were barred on purely legal grounds, the Court noted
that CSX had argued "several times" that it had never had the
opportunity to brief the viability of the state law injunctive
relief claims.   Id. at 72-73.   After another recess requested by
CSX, counsel for all parties reported that the bench trial should
be continued, with the Court acknowledging that it could just
proceed to trial and "sort it all out on the back end," but that

doing so would "be very hard" for counsel and their clients. Id. at 73, 79. The Court therefore accepted the parties' joint proposal to continue the bench trial scheduled for the next day in favor of further briefing. Id. at 79, 82.

The motions currently before the Court were then filed, and CSX has now been afforded the opportunity to fully address the legal viability of any outstanding state law claims. CSX, of course, continues to oppose dismissal of the state law claims on the merits, but also argues that Defendants' pending motions, styled as Rule 12(c) motions, are not procedurally proper. CSX takes the position that the Court should neither have a trial nor rule on Defendants' motions, but should instead permit an immediate appeal to the Fourth Circuit, leaving the viability of the state law injunctive relief claims unresolved.

## II. DISCUSSION – CLAIMS DEEMED TIME-BARRED

For the reasons explained below, and for those articulated in Defendants' briefs, the Court finds that its prior limitations ruling effectively resolved the entirety of CSX's untimely state law causes of action regardless of the remedy requested. Although Defendants did not expressly argue on summary judgment that a favorable limitations ruling would extinguish the portion of CSX's state law claims seeking injunctive relief, they also did not argue that a favorable limitations ruling would only apply to the portion of the state law claim seeking money damages. See ECF No. 605, at

53 (reflecting NPBL's concession that the summary judgment briefs did not mention injunctive relief, but arguing that both Defendants' summary judgment motions were directed at the time-barred claims in their entirety). Though this Court found it advisable to seek further briefing to ensure that its summary judgment ruling did not improperly foreclose an available state law equitable remedy that operated outside the statute of limitations, having now provided CSX a full opportunity to argue its position, the Court agrees with Defendants that the Court's prior limitations ruling granting summary judgment in Defendants' favor effectively disposed of the entirety of the time-barred causes of action. Because the Court's prior ruling fully resolved CSX's untimely claims, the Court rejects CSX's procedural challenge to Defendants' pending motions.

## A. Equity Follows the Law

In Virginia, it is well established that "equity follows the law" and that with "respect to the statute of limitations[,] . . . a demand that would be barred if asserted in a legal forum will be equally barred in equity." Redford v. Clarke, 100 Va. 115, 121 (1902); Kappa Sigma Fraternity, Inc. v. Kappa Sigma Fraternity, 266 Va. 455, 467 (2003) (same). Injunctive relief under Virginia law is a remedy and not a standalone cause of action.[1] Although injunctive relief is equitable in nature, when such remedy is

---

[1] This legal proposition is not disputed. See ECF No. 632, at 11 n.3.

sought in conjunction with money damages <u>as a remedy</u> for a legal cause of action, the fact that the requested relief is grounded in equity does not allow a plaintiff to circumvent the otherwise applicable limitations period and proceed with timeliness governed only by the equitable doctrine of laches.  See <u>City of Portsmouth</u> <u>v. City of Chesapeake</u>, 232 Va. 158, 164 (1986) ("Laches, a species of estoppel, is an equitable defense," and a "proceeding to enforce a legal right is not subject to the equitable defense of laches."); <u>Pendleton v. Nat'l Wildlife Fed'n</u>, No. 5:10cv9, 2010 WL 1212566, at *6 (W.D. Va. Mar. 26, 2010) ("[B]oth the United States Court of Appeals for the Fourth Circuit and the Virginia Supreme Court have held that laches is a doctrine that applies only in equity to bar equitable actions, not at law to bar legal actions.") (quotation marks and citations omitted).  As recently explained by the Fourth Circuit:

> Under Virginia law, it is well established that the form of litigation does not affect the analysis of the statute of limitations.  <u>Kappa Sigma Fraternity, Inc.</u>, 266 Va. at 465.  Instead, "[t]he applicability of the statute of limitations is governed by the object of the litigation and the substance of the complaint, not the form in which the litigation is filed."  <u>Id.</u>  "If the law were otherwise, the statute of limitations could be rendered meaningless merely by the filing of a declaratory judgment action."  <u>Board of Supervisors v. Thompson Assocs.</u>, 240 Va. 133, 139 (1990).  Consequently, in order to determine whether the statute of limitations applies to [a] claim for declaratory and injunctive relief, it is necessary to look to "the object of the litigation and the substance of the complaint. . . ."  <u>Kappa Sigma Fraternity, Inc.</u>, 266 Va. at 465.

7

_Manotas v. Ocwen Loan Servicing, LLC_, 794 F. App'x 259, 263-64 (4th Cir. 2019) (second alteration added); _see also_ _Birchwood-Manassas Assocs., L.L.C. v. Birchwood at Oak Knoll Farm, L.L.C._, 290 Va. 5, 7 (2015) ("[S]tatutes of limitations are strictly enforced and must be applied unless the General Assembly has clearly created an exception to their application," and "any doubt[s] must be resolved in favor of the enforcement of the statute.") (citation omitted); _Lyons P'ship, L.P. v. Morris Costumes, Inc._, 243 F.3d 789, 798 (4th Cir. 2001) (conducting a separation of powers analysis and finding that, with respect to federal causes of action, "when Congress creates a cause of action and provides both legal and equitable remedies, its statute of limitations for that cause of action should govern, regardless of the remedy sought").

Applying the above, a Virginia breach of contract claim (or conspiracy claim grounded in a breach of a fiduciary duty) seeking both money damages and prospective injunctive relief does not have one standard governing the timeliness of the damages remedy and a second standard governing the timeliness of the requested injunctive relief. _See_ _Blankenship v. Consolidation Coal Co._, 850 F.3d 630, 640 (4th Cir. 2017) ("Apart from their challenge to the district court's limitations rulings, the plaintiffs challenge the court's denial of their request for injunctive relief. Because, however, the causes of action that provide the basis for any

8

JA413

claimed relief are [time-]barred, the plaintiffs' request for injunctive relief is also [time-]barred.").[2]

### B. Prospective Injunctions and Nature of Relief

CSX nevertheless argues that because the injunctive relief it seeks is "prospective," the Virginia statutory limitations periods governing contractual breaches and conspiracy claims do not control. ECF No. 632, at 8-14. CSX relies almost exclusively on citations to trespass and nuisance case law where the plaintiffs sought injunctions due to still-present conditions on real property that purportedly deprived the owners of certain rights. See Downey v. Verizon Virginia, L.L.C., 86 Va. Cir. 526, 527 (Greene Cnty., 2013) (sustaining a plea in bar as to an untimely damages claim due to the fact that the telephone cable at issue was installed on the plaintiffs' land many years ago, but allowing the case to proceed as to whether the defendant must remove the cable); Willems v. Batcheller, 109 Va. Cir. 319, 320 (Fairfax Cnty., 2022) (finding that the statutory limitation periods did not apply to the plaintiffs' nuisance and trespass claims seeking equitable relief and that "the defense of laches instead delimits the period within which the actions had to be brought").[3]

---

[2] Blankenship involved "state law claims of trespass, unjust enrichment, negligence, nuisance, and waste," and like the instant case, the plaintiffs "demanded hundreds of millions of dollars in damages, punitive damages, and injunctive relief." Blankenship, 850 F.3d at 633-34.

[3] CSX also cites to the Virginia Supreme Court's opinion in Armstrong v. Bryant, 189 Va. 760, 769 (1949) for the proposition that equitable remedies are not subject to statutes of limitations even if a claim is grounded in

9

While _Downey_ appears favorable to CSX, it is readily distinguishable because, unlike the instant case, _Downey_ involved a still-present physical trespass on land for which a purely equitable claim otherwise appeared to exist. _See_ _Boerner v. McCallister_, 197 Va. 169, 170-71 (1955) (finding that the "bill in chancery" was not a legal dispute over title to land, but "appeared to be a pure bill for an injunction to prevent a trespass" on land, which was properly asserted in equity). Second, even if _Downey_ were not distinguishable, it is unpersuasive when read in the context of the weight of Virginia authority, including other trespass cases, holding that laches "operates as the time limitation on certain equitable claims _where no statute of limitations is denoted_." _Rustgi v. Webb_, 105 Va. Cir. 199, 208 (Fairfax Cnty., 2020) (emphasis added) (internal quotation marks omitted). In contrast, if a statute of limitations is denoted for a claim, as it is for trespass and nuisance claims, then the statute applies and laches cannot "operate to defeat the intent of the General Assembly." _Id._; _cf._ _City of Portsmouth_, 232 Va. at 164 (indicating that laches did not apply to a boundary line dispute because the procedure invoked by the plaintiff "is purely statutory, conferring only legal, not equitable rights"); Sinclair

---

contract. This argument is unavailing because the cited discussion involved the court's explanation of why the plaintiff did not have an adequate remedy in law, and the facts as presented did _not_ suggest that the plaintiff's claim seeking specific performance of the sale of a residence was untimely under the applicable limitations period).

10

on Virginia Remedies § 43-2[E] (Oct. 2022) ("Claims cognizable at law presented in equitable actions remain subject to applicable statutory periods of limitations; this is true even where the claim is based on equitable considerations, such as unjust enrichment.").

The rule articulated in Rustgi was thereafter clarified by the same judge in Willems, with the later opinion noting that Rustgi "left unanswered" whether the determination of the timeliness of a trespass or nuisance claim "depends upon the nature of the remedy sought by the complainant." Willems, 109 Va. Cir. at 329-30. The court answered that question in the affirmative to the extent the relief sought by a plaintiff is solely equitable, relying on Virginia Code § 8.01-230, which includes an exception for solely equitable claims.[4]   Id. at 333.   Applying § 8.01-230, the court explained: "[W]hile the statute of limitations of actions under Virginia Code § 8.01-243 generally applies to claims of

---

[4] Virginia Code § 8.01-230 provides:
> In every action for which a limitation period is prescribed, the right of action shall be deemed to accrue and the prescribed limitation period shall begin to run from the date the injury is sustained in the case of injury to the person or damage to property, when the breach of contract occurs in actions ex contractu and not when the resulting damage is discovered, except where the relief sought is solely equitable . . . .

Va. Code § 8.01-230 (emphasis added). Though the Willems opinion appears to read this statute as removing "solely equitable" claims from the reach of an otherwise applicable statutory limitations period, section 8.01-230 can also be read as governing when the applicable limitations period begins to run, with claims grounded "solely" in equity potentially benefitting from the "discovery rule." See Wallace v. Jarvis, No. 7:09cv426, 2010 WL 8750309, at *3 (W.D. Va. July 30, 2010) (interpreting Va. Code § 8.01-230 as providing that "when the relief sought is solely equitable, Virginia applies a discovery rule").

11

JA416

trespass and nuisance, . . . because the relief sought by
Plaintiffs is solely equitable . . . the statutory limitation
periods do not apply to Plaintiffs' claims," which are instead
governed by "the defense of laches." Id. at 333 (emphasis added).

### C. Nature of the Cause of Action

Contrary to the Virginia case law cited by CSX, Virginia cases
that do not involve a continuing trespass have held that the
determination of whether a statutory limitations period bars
equitable relief turns on the nature of the cause of action, not
of the remedy sought.  See Orantes v. Ranchero, 70 Va. Cir. 277
(Fairfax Cnty., 2006).  The Orantes court explained:

> Orantes' argument that the limitations period of Va.
> Code § 8.01-243 does not apply to his claim in Count I
> because it seeks equitable remedies is unavailing.  The
> fact that the Bill of Complaint seeks largely equitable
> remedies does not change the fact that the claim in Count
> I is for fraud. . . .  Fraud is a tort, actionable at
> law, and would be barred if brought for money damages at
> law.  Accordingly, even though Orantes' claim was
> brought on the chancery side of the Court, it still is
> barred by Va. Code § 8.01-243. . . .  Here, while the
> remedy sought is equitable, the cause of action is
> fraud, and the fact that money damages are not sought in
> Count I does not save it from being time-barred.

Id. at 279-80 (emphasis in original).  The court went on to reach
the same conclusion as to the plaintiff's second count, a Virginia
civil conspiracy claim, rejecting the plaintiff's argument that
laches applied and noting that the plaintiff "cannot even claim
that he seeks purely equitable remedies in Count II." Id. at 280;
see Kappa Sigma Fraternity, Inc., 266 Va. at 467 (finding that to

the extent the plaintiff's claims are viewed as alleging a breach
of fiduciary duty, they "are time-barred" by that statutory "catch-
all" limitations provision); see Marriott v. Harris, 235 Va. 199,
214 (1988) (finding that an "ordinary bill of complaint instituting
a suit in equity upon written contracts" that sought "alternative
relief in the form of rescission" was governed by Virginia's
statute of limitations governing actions founded upon a contract).

In the context of the case before this Court, which involves
remedies for stale contractual breaches and conspiracies to harm
CSX's business, the Court finds unpersuasive both CSX's reliance
on continuing trespass cases and CSX's framing of its causes of
action as timely seeking prospective relief.  See Manotas, 794 F.
App'x at 263-64 (finding that even when a plaintiff seeks to enjoin
a future foreclosure sale based on the failure of a condition
precedent to such sale, the cause of action is "rooted in contract
and [is] subject to Virginia's statute of limitations for breach
of contract").  The better interpretation of Virginia law is that
laches applies instead of a statutory limitations period only when
the cause of action is exclusively cognizable in equity.  Parker
v. Griffin, 55 Va. Cir. 191 (Shenandoah Cnty., 2001); Culwell v.
Huff, 50 Va. Cir. 180, 181 (Bedford Cnty., 1999).

In Parker, the court explained that even though the suit to
"rescind a transaction or contract" was properly filed in equity,
the court still needed to determine whether there was a "statute

13

JA418

of limitations applicable to the circumstances presented." Id. at
192-93.  The Parker opinion further explained that: (1) while
"[g]eneral statutes of limitations do not apply to chancery courts
when dealing with matters exclusively cognizable in equity,"
claims of "undue influence are cognizable at law as well as in
equity"; (2) "[r]estitution may be recovered at law or in equity";
(3) undue influence "is a species of fraud" that is "actionable at
law"; and (4) "[w]here the chancery court enforces a right
cognizable at law, equity follows the law and will apply such
statute of limitations as may exist." Id. at 193 (emphasis added).
Based on these findings, as well as the finding that the claim at
issue sought recission of a contract, the court applied the five-
year limitations period governing contracts.  Id.; see Good v.
Weaver, 98 Va. Cir. 493, 493-94 (Rockingham Cnty., 2016) ("Despite
a finding that an action is equitable, that does not typically end
the analysis of the potential influence of a statute of
limitations[,]" and "if the equitable action at issue has a
corresponding action in law, then any equitable analysis governing
delay of filing will follow the statute of limitations that governs
the law action."); 12A Michie's Jurisprudence - Limitation of
Actions § 7 (2022) ("If a particular cause of action sounds in
both equity and law, then a trial court should apply a statute of
limitation to that particular cause of action."); Chen v. VPT,
Inc., No. 7:08cv419, 2008 WL 4693556, at *3 (W.D. Va. Oct. 24,

14

JA419

2008) (rejecting the plaintiff's efforts to use the equitable nature of the relief sought to avoid the statute of limitations for contract, fraud, and duress claims, agreeing with the defendant that "even if the complaint purports to only seek declaratory and equitable relief, 'equity follows the law; and if a legal demand be asserted in equity which at law is barred by statute, it is equally barred in equity'" (quoting Kappa Sigma Fraternity, Inc., 266 Va. at 467)); Westwood Ltd. P'ship v. Grayson, 96 Va. Cir. 312 (Fairfax Cnty., 2017) (applying laches to a fraudulent conveyance claim because it did not have a statutory limitations period, but applying the statute of limitations to a "voluntary conveyance" claim and claims for common law and statutory conspiracy), rev'd and vacated on other grounds sub nom. Grayson v. Westwood Buildings L.P., 300 Va. 25 (2021).

This Court has already ruled on summary judgment that both of CSX's conspiracy claims, and a portion of its contract claim, are time-barred under the applicable Virginia statutes of limitations, and even accepting that such claims sound in both law and equity, CSX remains bound by the statutory limitations period. Stated another way, because equity follows the law, Defendants have demonstrated that the legal effect of this Court's already issued summary judgment ruling extinguished these state law causes of

action in their entirety.[5]   Defendants' pending motions are therefore **GRANTED** to the extent that they contend that the Court's prior limitations ruling operates as a complete denial of the above-analyzed state law claims.

Alternatively, to the extent that there is a procedural infirmity with the Court simply revisiting the legal "impact" of its prior ruling, the Court finds it appropriate to: (1) reopen its earlier interlocutory ruling under Rule 54(b) of the Federal Rules of Civil Procedure to clarify its scope; or (2) to consider the state law injunctive relief issue anew through a Court-raised Rule 56(f) summary judgment procedure.[6]   Under either of these

---

[5] Even if the Court accepts, for the sake of argument, that the applicable Virginia statute of limitations does not apply to certain contract claims or conspiracy claims when the relief requested is "solely equitable," the Court is not faced with such scenario here as CSX's breach of contract claim and conspiracy claims sought hundreds of millions of dollars in monetary damages along with related injunctive relief.

[6] Rule 54(b), as argued by Defendants, provides that this Court's summary judgement ruling, which did not resolve all the claims in the case, "may be revised at any time" before the entry of final judgment. Fed. R. Civ. P. 54(b).  Rule 56(f), as previously referenced by this Court in its summary judgment ruling, allows the Court to grant summary judgment on a court-raised issue as long as the parties are provided notice and "a reasonable time to respond." Fed. R. Civ. P. 56(f).  As to Rule 54(b), when a prior ruling of the Court is avowedly tentative (as this Court's ruling was when indicating that it was not squarely addressing the full impact of its limitations finding while noting its reservations regarding whether any state law injunctive relief claims remained viable), law of the case considerations do not apply or at a minimum are far less potent.  See ECF No. 613, at 7-8.  As to Rule 56(f), the issue of whether CSX's injunctive relief claims could survive a limitations ruling adverse to CSX was first raised by this Court at oral argument on December 3, 2022, was argued extensively at the January hearing, and was thereafter fully briefed by the parties.  No factual disputes are relevant to this legal issue, and CSX has expressly indicated that it did not want to proceed to trial if there is a dispositive legal issue that would undercut CSX's ability to prevail. Accordingly, a reasonable time to respond to this issue unquestionably has been provided.

alternative approaches, summary judgment is **GRANTED** in favor of Defendants on the above analyzed claims because the issues are purely legal, both parties have had ample opportunity to brief and argue these purely legal issues, and neither party seeks to proceed to a trial that would merely waste resources.

### III. DISCUSSION – TIMELY CONTRACT CLAIM AGAINST NSR

#### A. Remaining Contract Claim and Procedure

To the extent CSX's breach of contract claim against NSR relies on alleged conduct occurring more than five years before the instant lawsuit was filed, such claim is resolved immediately above as time-barred conduct. To the extent CSX relies on purported breaches occurring in 2016 and 2018, this Court previously held that there was insufficient evidence in the summary judgment record to support a jury verdict finding that NSR breached an enforceable contract provision. ECF No. 559, at 99-101. Accordingly, CSX's contract claim has already been rejected as to the 2016 and 2018 conduct regardless of the remedy requested.

With respect to NSR's purported contractual breaches in 2015, which occurred during the limitations period and were not previously rejected on any ground asserting that there was insufficient evidence to demonstrate a breach, this issue requires a ruling beyond this Court's prior summary judgment Opinion and Order. Considering the proper procedure, if any, to take up this claim, the Court agrees with CSX that Rule 12(c), governing

17

JA422

judgement on the pleadings, does not appear to be the proper procedural vehicle. However, CSX plainly has been given ample opportunity to be heard on the validity of its state law injunctive relief claim grounded in contract, and CSX does not seek a trial on this claim at this time. Accordingly, in light of the procedural history set forth in Part I above, and for the reasons discussed in conjunction with the limitations ruling in Part III above, the Court finds that it is appropriate to reopen summary judgment under Rule 54(b), or to take up summary judgment anew under Rule 56(f) as to this lone outstanding matter.[7]

### B. Availability of Injunctive Relief under State Contract Law for alleged 2015 Breaches

First, CSX fails to demonstrate irreparable harm resulting from the potentially actionable contractual breaches occurring in 2015. As described in greater detail in this Court's summary judgment opinion, NSR purportedly obstructed the movement of a small number of CSX trains seeking to access a Norfolk, Virginia, containership terminal in 2015. It is undisputed that special market conditions in 2015 had created massive port congestion and unique challenges to managing intermodal rail traffic. For that

---

[7] In addition to the prior discussion on Rule 54(b), the Court notes its agreement with Defendants that controlling law addressing the scope of federal preemption has been clarified since this Court denied Defendants' original motion to dismiss. See ECF No. 617, at 7-8; ECF No. 637 at 8 (citing Edwards v. CSX Transportation, Inc., 983 F.3d 112, 122 (4th Cir. 2020)). Furthermore, the Court notes that it has fully considered CSX's motion seeking a path to file an interlocutory appeal, ECF No. 623, but finds that it promotes efficiency to resolve the merits of this very small slice of the contract claim — the sole issue remaining in this case.

18

reason, CSX sought to move a small number of trains across NSR's tracks using CSX's rights as a NPBL customer and shareholder even though those train movements would not be profitable for CSX. Although CSX purportedly lost business from one intermodal customer for a period of weeks as a result of NSR's obstructive conduct, CSX failed to advance a damages theory seeking to recover the limited monetary damages it suffered due to this temporary loss of business. ECF No. 559, at 102. Moreover, similar to the Court's prior conclusion that "the summary judgment record is devoid of even a scintilla of evidence" suggesting that CSX lost any long term contracts due to the 2015 conduct, id., nothing in the record would allow a reasonable juror to conclude that CSX is suffering any form of ongoing harm, let alone "irreparable harm" from these alleged contractual breaches, see Carbaugh v. Solem, 225 Va. 310, 314 (1983) (explaining that "lack of proof of irreparable harm is generally fatal," to a request for an injunction, which is an "extraordinary remedy" that will not issue "if the petitioner has an adequate remedy at law for the redress of his injury"). Therefore, CSX fails to demonstrate any ongoing harm or a risk of irreparable harm if an injunction grounded in contract is not issued.

Second, NSR effectively argues that although the contract provision at issue — that NSR "co-operate cordially" to encourage

the business of NPBL[8] — may be sufficiently definite to support a damages award, it is too broad to support <u>injunctive relief</u>. Notably, because "cordial" cooperation cannot be ordered to be specifically performed, any injunctive relief tethered to the 2015 breaches would require the Court to rewrite the contract to order that NSR engage in specific acts that are not otherwise required by the broad terms of the contract.  ECF No. 615, at 15-16 (citing cases).  This, of course, is improper under Virginia contract law. See <u>Eascalco, Inc. v. Caulfield</u>, 220 Va. 475, 477 (1979) ("A court cannot alter the terms of a contract and then enforce it; when specific performance is granted, the contract must conform substantially to the contract made by the parties.").

     Third, considering CSX's contention that it does "not seek specific performance of the 'cordial cooperation' clause," but instead seeks to remedy prior breaches through an injunction modifying NPBL's Board structure or management so that NSR could no longer "control" NPBL, ECF No. 632, at 18, 26, such relief is not an available remedy for the 2015 breaches.  An injunction ordering NSR to behave differently with respect to how it nominates NPBL Board members not only would improperly require this Court to write new terms into the parties' contract, but in doing so would conflict with NSR's existing express contractual right to appoint

---

[8] To the extent that CSX's trains were prevented from using NSR's tracks to access the containership terminal, NPBL lost business as NPBL would have generated income from these train movements.

the majority of NPBL's Board, a right that has been in place since
1989.  See Condo. Servs., Inc. v. First Owners' Ass'n of Forty Six
Hundred Condo., Inc., 281 Va. 561, 573 (2011) (indicating that
contract language should be harmonized to effectuate the intention
of the parties and that "a specific provision of a contract governs
over one that is more general in nature").  The Court agrees with
NSR that Virginia contract law does not provide an injunctive
remedy that would allow this Court to overrule or otherwise subvert
NSR's express contractual right to appoint the majority of the
NPBL Board, or otherwise apply the very broad cordial cooperation
clause to enjoin NSR from engaging in specified future activity
not otherwise dictated by the terms of the contract.

Similarly, to the extent CSX seeks an injunction that would
prevent NSR from engaging in an unlawful conspiracy to injure CSX,
or to modify how NSR nominates NPBL Board members, both forms of
relief are not tethered to the 2015 breaches.  NSR's alleged 2015
contractual breaches were a series of acts allegedly committed by
NSR that did not involve the NPBL Board as NSR did not need to
manipulate or conspire with the Board to obstruct access to NSR's
own tracks.  CSX's requested injunctive relief is in actuality
tethered to its two state law conspiracy claims — which have both
been rejected as time-barred — and not to the remaining contractual
breach claim.  Such relief is therefore an improper remedy for the
alleged contractual breaches.

Fourth and finally, injunctive relief that is designed to redress (i.e., relief that is tethered to) the 2015 obstruction would require the Court to direct NSR to modify its rail schedules or train movements. The Court agrees with NSR's contention, which is essentially conceded by CSX, that any injunctive relief directed at train movements would invade the <u>exclusive jurisdiction</u> of the Surface Transportation Board ("STB"). ECF No. 632, at 18 n.4. Notwithstanding CSX's efforts to avoid this issue by seeking an injunction that does not directly impact train movements but instead modifies the control structure of the NPBL Board, because CSX relies on a <u>state law</u> contract claim to seek an injunction ordering an STB-regulated railroad to modify its control structure, the Court finds that such remedy, even if otherwise available, is preempted by federal law.[9]

---

[9] Sections 11321 and 11323 of the Interstate Commerce Commission Termination Act (the "ICCTA") provide the STB with exclusive authority over "control" of rail carriers. 49 U.S.C. §§ 11321, 11323. Where the STB has approved and authorized such control, a rail carrier's actions in maintaining or exercising that control are "exempt from the antitrust laws and from all other law, including State and municipal law." <u>Id.</u> § 11321. Notably, the STB did <u>not</u> authorize NSR's control of NPBL. <u>Norfolk Southern Railway Co.</u>, Docket No. FD 36522, 2022 WL 2191932, at *15 (STB June 17, 2022). Without the protection of STB authorization, NSR's control is not automatically exempt from otherwise applicable laws, most notably federal antitrust laws. Although this Court previously determined that CSX's federal antitrust claims for damages and injunctive relief failed as a matter of law, the Court's ruling was <u>not</u> due to ICCTA preemption. Indeed, the ICCTA should be harmonized with other federal statutes, including the Sherman and Clayton Acts, wherever possible. <u>See, e.g.</u>, <u>Swinomish Indian Tribal Cmty. v. BNSF Ry. Co.</u>, 951 F.3d 1142, 1156 (9th Cir. 2020). Applying federal antitrust laws in the absence of STB "control" authorization is just that sort of necessary harmonization. CSX's remaining state law claims for injunctive relief, however, cannot be harmonized in the same way. CSX asks this Court, standing in the stead of a Virginia trial court, to eliminate NSR's (unapproved) control over NPBL by restructuring the NPBL board and/or rewriting the parties' 1989 contract. As previously explained by this

22

For all of these reasons, pursuant to Rule 54(b) and 56(f),
the Court **GRANTS** NSR's motion to the extent it argues that CSX's
claim for injunctive relief, grounded in contractual breaches
occurring in 2015, fails as a matter of law.  The Court notes that
CSX has had a full and fair opportunity to address this issue, no
further discovery has been requested, neither party seeks to
proceed to trial, and this subpart of the ancillary pendent state
law contract claim represents an exceedingly small piece of the
instant litigation that is best resolved at this time.  Given the
procedural posture and the lack of any request for a trial,[10] the

---

Court, "the ICCTA sought generally to consolidate railroad regulatory power
into the hands of the STB, limiting the reach of local, state, and even
other federal laws." ECF No. 613, at 23 (citations omitted).  This purpose
is evident in both § 11321's grant of "exclusive" jurisdiction to the STB
and in § 10501's preemption of laws or actions impacting rail transportation
and rates.  Edwards, 983 F.3d at 121.  And while space remains to harmonize
the federal antitrust laws with the STB's exclusive authority to regulate
control of rail carriers, granting CSX's requested injunctive relief based
on a state law breach of contract would encroach too far into the railroad
regulatory regime that Congress sought to streamline and federalize through
the ICCTA.  Cf. Norfolk Southern Railway Co., 2022 WL 2191932, at *14 n.24-
25 (suggesting that that STB expects the control issue to be brought before
the STB after the instant case is completed).  Therefore, unlike a situation
where a railroad has expressly agreed by contract to engage in specific
conduct otherwise within the STB's jurisdiction, PCS Phosphate Co. v.
Norfolk S. Corp., 559 F.3d 212, 221 (4th Cir. 2009), using state contract
law to meddle in issues of railroad control is inconsistent with and
therefore preempted by the ICCTA.

[10] CSX has acknowledged that proceeding to trial would be a waste of resources
if there was a legal bar to its injunctive relief claims, see ECF No. 605,
at 37-38; ECF No. 593, at 3, with CSX further clarifying that it would be
"inefficient" and "contrary to sound judicial administration" to proceed to
trial on the remaining state law claims, ECF No. 624, at 2.  This is not to
say that CSX conceded that a ruling on the contract claim is procedurally
appropriate; to the contrary, CSX highlights why Rule 12(c), as invoked by
Defendants, is an improper procedural vehicle for a merits-based ruling.
However, because all of the federal claims and the state law conspiracy
claims have now been fully resolved, as has CSX's contract claim to the
extent it relies on conduct occurring before or after 2015, and because the
viability of the state law injunctive relief contract claim is intertwined

23

interests of justice and efficiency will both be best served by avoiding piecemeal appeals.

## IV. CONCLUSION

For the reasons set forth above, Defendants' motions seeking the resolution of the remaining state law injunctive relief claims are **GRANTED**. ECF Nos. 614, 616. In light of such ruling disposing of all remaining state law claims, CSX's motion seeking a ruling authorizing an immediate interlocutory appeal is **DISMISSED as moot**. ECF No. 623.

The Clerk is **DIRECTED** to send a copy of this Opinion and Order to all counsel of record.

**IT IS SO ORDERED.**

/s/ 

Mark S. Davis
CHIEF UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
April 19 , 2023

---

with this Court's summary judgment ruling, the Court finds it appropriate to resolve this fully briefed issue in advance of the impending appeal rather than take steps to authorize an interlocutory appeal and leave one exceedingly small fraction of the case undecided.

24

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

**CSX TRANSPORTATION, INC.,**
*Individually and on behalf of*
*Norfolk & Portsmouth Belt*
*Line Railroad Company,*
      **Plaintiff,**

**v.**                                                    **Civil Action No.: 2:18cv530**

**NORFOLK SOUTHERN RAILWAY COMPANY**
**NORFOLK & PORTSMOUTH BELT LINE RAILWAY**
**COMPANY,**

      **Defendants.**

### JUDGMENT IN A CIVIL CASE

      **Decision by the Court.**   This action came for decision before the Court. The issues have been considered and a decision has been rendered.

**IT IS ORDERED AND ADJUDGED** that Defendants' motions seeking the resolution of the remaining state law injunctive relief claims are GRANTED.  ECF Nos. 614, 616.   In light of such ruling disposing of all remaining state law claims, CSX's motion seeking a ruling authorizing an immediate interlocutory appeal is DISMISSED as moot.  ECF 623.

                           FERNANDO GALINDO, Clerk

                           By: ____/s/_____
                                V. Pearson, Deputy Clerk

Entered *nunc pro tunc 4/19/2023*

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division**

CSX TRANSPORTATION, INC.,
individually and on behalf of NORFOLK
& PORTSMOUTH BELT LINE
RAILROAD COMPANY,

          Plaintiff,

v.                                 Civil Action No. 2:18-cv-530-MSD-RJK

NORFOLK SOUTHERN RAILWAY
COMPANY, *et al.*,

          Defendants.

_____/

**NOTICE OF APPEAL**

Pursuant to Rule 4 of the Federal Rules of Appellate Procedure, Plaintiff CSX

Transportation, Inc. ("CSX") notes its appeal to the United States Court of Appeals for the Fourth

Circuit from the final judgment in this case, which embraces, but is not limited to, the Judgment

in a Civil Case filed on April 26, 2023, ECF No. 644; the Court's Opinion and Order of January

3, 2023, granting Defendants' motions for summary judgment in part, ECF No. 559; the Court's

Opinion and Order of January 27, 2023, granting the Defendants' motions seeking dismissal of

CSX's federal antitrust injunctive relief claims, ECF No. 613; and the Court's Opinion and Order

of April 19, 2023, granting the Defendants' motions seeking dismissal of the remaining state law

claims for injunctive relief, ECF No. 643.

1

Dated:  May 16, 2023           Respectfully submitted,

**CSX TRANSPORTATION, INC.**
*By Counsel*

*/s/ Benjamin L. Hatch*
Robert W. McFarland (VSB No. 24021)
Benjamin L. Hatch (VSB No. 70116)
V. Kathleen Dougherty (VSB No. 77294)
Jeanne E. Noonan (VSB No. 87863)
MCGUIREWOODS LLP
World Trade Center
101 West Main Street, Suite 9000
Norfolk, Virginia  23510-1655
Tel.:  (757) 640-3716
Fax:  (757) 640-3966
rmcfarland@mcguirewoods.com
bhatch@mcguirewoods.com
vkdougherty@mcguirewoods.com
jnoonan@mcguirewoods.com

J. Brent Justus (VSB No. 45525)
W. Cole Geddy (VSB No. 93511)
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, Virginia  23219-3916
Tel.:  (804) 775-1000
Fax:  (804) 698-2026
bjustus@mcguirewoods.com
cgeddy@mcguirewoods.com

2

JA432

## CERTIFICATE OF SERVICE

I certify that on this 16th day of May, 2023, a true and correct copy of the foregoing was served on all counsel of record via Notice of Electronic Filing by filing with the Court's CM/ECF system.

**CSX TRANSPORTATION, INC.**
*By Counsel*

*/s/ Benjamin L. Hatch*
Robert W. McFarland (VSB No. 24021)
Benjamin L. Hatch (VSB No. 70116)
V. Kathleen Dougherty (VSB No. 77294)
Jeanne E. Noonan (VSB No. 87863)
MCGUIREWOODS LLP
World Trade Center
101 West Main Street, Suite 9000
Norfolk, Virginia  23510-1655
Tel.:  (757) 640-3716
Fax:  (757) 640-3966
rmcfarland@mcguirewoods.com
bhatch@mcguirewoods.com
vkdougherty@mcguirewoods.com
jnoonan@mcguirewoods.com

J. Brent Justus (VSB No. 45525)
W. Cole Geddy (VSB No. 93511)
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, Virginia  23219-3916
Tel.:  (804) 775-1000
Fax:  (804) 698-2026
bjustus@mcguirewoods.com
cgeddy@mcguirewoods.com