No. 23-1537

## IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

CSX TRANSPORTATION, INC., individually and on
behalf of Norfolk & Portsmouth Belt Line Railroad Company,

*Plaintiff-Appellant,*

v.

NORFOLK SOUTHERN RAILWAY COMPANY; NORFOLK &
PORTSMOUTH BELT LINE RAILROAD COMPANY,

*Defendants-Appellees.*

Appeal from Order of the United States District Court
for the Eastern District of Virginia
No. 2:18-cv-0530 (Davis, J.)

## REPLY BRIEF OF PLAINTIFF-APPELLANT
## CSX TRANSPORTATION, INC.

Benjamin L. Hatch
Robert W. McFarland
MCGUIRE WOODS, LLP
101 W. Main Street, Ste. 9000
Norfolk, VA 23510
Telephone: (757) 640-3700

Michael A. Scodro
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
Telephone: (312) 701-8886

Charles A. Rothfeld
Evan M. Tager
Carmen N. Longoria-Green
MAYER BROWN LLP
1999 K Street, N.W.
Washington, DC 20006
Telephone: (202) 263-3000
crothfeld@mayerbrown.com

*Attorneys for Plaintiff-Appellant*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................ii

INTRODUCTION ............................................................................ 1

I.   CONTINUED IMPLEMENTATION OF THE EXCLUSION-ARY SWITCH RATE WAS A CONTINUING ANTITRUST VIOLATION .......................................................................... 2

    A.   Continuation of an anticompetitive policy into the limitations period retriggers the statute of limitations.............. 2

    B.   Defendants misstate the continuing-violation doctrine ........ 8

        1.   Continuation of existing anticompetitive practices retriggers the statute of limitations ............................ 9

        2.   Reaffirmation of anticompetitive conduct is a continuing violation .......................................................... 15

        3.   The same continuing-violation rule applies to customers and competitors............................................... 21

    C.   Statue-of-limitations policy supports recognition of CSXT's right of action ........................................................ 25

II.  Defendants' discrete acts in 2015 and 2018 retriggered the statute of limitations................................................................ 27

III. CSXT OFFERS A VALID DAMAGES THEORY ........................ 30

CONCLUSION ................................................................................ 32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Al George, Inc. v. Envirotech Corp.*,
  939 F.2d 1271 (5th Cir. 1991) ....................................................... 18, 20

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
  603 F.2d 263 (2d Cir. 1979) ................................................................ 27

*Charlotte Telecasters, Inc. v. Jefferson-Pilot Corp.*,
  546 F.2d 570 (4th Cir. 1976) ............................................. 14, 15, 19, 30

*Delaware State Coll. v. Ricks*,
  449 U.S. 250 (1980) ............................................................................. 7

*Delta Theaters, Inc. v. Paramount Pictures, Inc.*,
  158 F. Supp. 644 (E.D. La.1958) ......................................... 3, 11, 12, 13

*DXS Inc. v. Siemens Medical Systems, Inc.*,
  100 F.3d 462 (6th Cir. 1996) .............................................................. 18

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*,
  392 U.S. 481 (1968) ............................................... 2, 3, 4, 6, 16, 18, 27

*Imperial Point Colonnades Condo., Inc. v. Mangurian*,
  549 F.2d 1029 (5th Cir. 1977) ....................................................... 12, 27

*Kaw Valley Elec. Co-op. Co. v. Kan. Elec. Power Co-op, Inc.*,
  872 F.2d 931 (10th Cir. 1989) ............................................................ 19

*Klehr v. A.O. Smith Corp.*,
  521 U.S. 179 (1997) ...........................................3, 4, 12, 17, 18, 26, 29

*Lancianese v. Bank of Mount Hope*,
  783 F.2d 467 (4th Cir. 1986) ................................................................ 8

*Ledbetter v. Goodyear Tire & Rubber Co.*,
  550 U.S. 618 (2007) .......................................................................... 6, 7

## TABLE OF AUTHORITIES
### (continued)

**Page**

*In re Lower Lake Erie Iron Ore Antitrust Litig.*,
  998 F.2d 1144 (3d Cir. 1993) ............................................ 10, 11, 14, 29

*Mayor of Balt. v. Actelion Pharms. Ltd.*,
  995 F.3d 123 (4th Cir. 2021) ......................................................... 24, 29

*In re Multidistrict Vehicle Air Pollution*,
  591 F.2d 68 (9th Cir.1979) ................................................................. 19

*Nat'l Souvenir Ctr., Inc. v. Historic Figures, Inc.*,
  728 F.2d 503 (D.C Cir. 1984) ............................................................. 12

*National Advert. Co. v. City of Raleigh*,
  947 F.2d 1158 (4th Cir. 1991) .............................................................. 4

*Pennsylvania Dental Ass'n v. Medical Serv. Ass'n*,
  815 F.2d 270 (3d Cir. 1987) ................................................................ 12

*Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*,
  517 F.2d 117 (5th Cir. 1975) ................................5, 6, 13, 14, 17, 19, 29

*Samsung Elecs. Co. v. Panasonic Corp.*,
  747 F.3d 1199 (9th Cir. 2014) .............................................................. 5

*Twin City Sportservice, Inc. v. Charles O. Finley & Co.*,
  512 F.2d 1264 (9th Cir. 1975) ....................................................... 14, 15

*United Air Lines, Inc. v. Evans*,
  431 U.S. 553 (1977) ............................................................................. 7

*US Airways, Inc. v. Sabre Holdings Corp.*,
  938 F.3d 43 (2d Cir. 2019) ................................................. 3, 17, 18, 20

*Varner v. Peterson Farms*,
  371 F.3d 1011 .................................................................................... 18

## TABLE OF AUTHORITIES
### (continued)

**Page**

*W. Penn Allegheny Health Sys., Inc. v. UPMC,*
  627 F.3d 85 (3d Cir. 2010) ........................................................ 16, 17

*Z Technologies Corp. v. Lubrizol Corp.*,
  753 F.3d 594 (6th Cir. 2014) ..................................................... 19, 20

*Zenith Radio Corp. v. Hazeltine Res., Inc.*,
  401 U.S. 321 (1971) ................................... 3, 4, 11, 13, 24, 26

**Statutes**

15 U.S.C. § 26 ................................................................................ 26

**Other Authorities**

Phillip Areeda & Herbert Hovenkamp, *Antitrust Law: An
  Analysis of Antitrust Principles and Their Application*
  (2023 Supplement) ....................................................................... 5

iv

# INTRODUCTION

Defendants' brief confirms the nature of the conduct at issue here. For purposes of this appeal, it must be assumed that the switch rate first adopted by defendants in 2009-2010 is unlawfully anticompetitive. Defendants do not deny that they retained this as their posted rate, and continued (and still continue) to demand it, into the limitations period. Defendants also do not deny that imposition of this rate caused CSXT *new* injury year after year, harming its ability to compete during the limitations period for contracts with shippers that value on-dock rail access at NIT. Defendants specifically recognize that they demanded this rate from CSXT in 2015 and, in 2018, disregarded CSXT's request for a lower, competitive rate.

CSXT's challenge to this anticompetitive behavior is not barred by the statute of limitations. A defendant's purposeful decision to continue an anticompetitive practice into the limitations period, causing new and accumulating harm during that period, is the very definition of a continuing violation. Lest there be any doubt on that, defendants here in 2015 and 2018 committed additional acts that confirmed and reinforced their exclusionary—and harmful—practices. The Court should reject

1

defendants' request for perpetual immunity from liability for engaging in continued wrongful conduct.

## I. CONTINUED IMPLEMENTATION OF THE EXCLUSIONARY SWITCH RATE WAS A CONTINUING ANTITRUST VIOLATION.

Precedent, antitrust principle, and logic dictate that use of an anticompetitive practice in the statute-of-limitations period, causing new and accumulating injury during that period, may be challenged. Defendants' contrary arguments are confused, unsupported—and wrong.

### A. Continuation of an anticompetitive policy into the limitations period retriggers the statute of limitations.

1. Our opening brief showed that the continuing implementation of an unlawful policy that causes continuing harm is a continuing violation of the Sherman Act that retriggers the statute of limitations each time it causes injury. Opening Br. 22-28. As characterized by the Supreme Court, that type of conduct is not "a violation which, if it occurs at all, must occur within some specific and limited time span." *Hanover*, 392 U.S. at 502 n.15. Instead, it is "conduct" that "inflict[s] continuing and accumulating harm on" the plaintiff. *Id*. In the face of that sort of wrongful activity, a plaintiff may bring an action when it first feels harm "for the injury then

being inflicted," but is "equally entitled to sue" years later as the wrongful policy causes harm again and again. *Id.*[1]

As we also explained, that describes this case. Defendants devised their illegal policy in 2009, but have continued to implement it by demanding their anticompetitive rate in each succeeding year, continuing to effectively exclude CSXT from on-dock rail access at NIT. Defendants thus continued their injurious practice into the statute-of-limitations period, causing CSXT additional injury every year. Although CSXT may recover only for damages suffered in the limitations period, as explained in *Zenith* and *Klehr*, it *may* recover for those damages: When the plaintiff experiences "successive damages suffered day by day from a continuing conspiracy, the statute begins to run on each day's damage as it occurs." *Delta Theaters*, 158 F. Supp. at 649; *see* Opening Br. 28-30.

---

[1]    Defendants dismiss *Hanover* because the plaintiff there was a customer of the defendant; Hanover wanted to purchase machinery but instead was required to lease it. *See* Def. Br. 55-57. Defendants now insist that customer cases are judged by a different standard from, and have no relevance to, competitor claims like those here. We explain below (at 21-25) that defendants' customer/competitor distinction is wrong. But it also is not a valid basis for distinguishing *Hanover*. As the Second Circuit has explained, in *Hanover*, "[e]ach *refusal to sell* was a new actionable act." *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 68 (2d Cir. 2019) (emphasis added). Here, defendants' posting of an exclusionary rate is closely analogous to the refusals to sell in *Hanover*.

2. Defendants' principal response is to assume their conclusion; they simply restate the broad outlines of the continuing-violation doctrine as articulated in *Hanover*, *Zenith*, and *Klehr*. Defendants thus maintain, repeatedly, "that a 'continuing violation is occasioned by continuing unlawful acts, not continual ill effects from an original violation." Def. Br. 33 (quoting *National Advert. Co. v. City of Raleigh*, 947 F.2d 1158, 1166 (4th Cir. 1991)). But that proposition does nothing to advance defendants' argument. We agree that a continuing violation does not follow from an illegal act that occurs within "some specific and limited time span" (*Hanover*, 392 U.S. at 502 n.15), even if the harm caused by that act continues into the future; we have never contended, as defendants would have it, "that the statute of limitations runs [from] whenever the plaintiff continues to suffer injury from an old act." Def. Br. 52.

Instead, the existence of a continuing violation turns on whether repeated misconduct—or continued implementation of an illegal policy— *in* the limitations period causes *new* harm in that period. The key distinction is that stated in *Klehr*, between (a) acts that cause harm once, even though that harm persists or compounds over time, which is not a

4

continuing violation; and (b) injury caused by implementation of the anticompetitive behavior *in* the limitations period, which is.

A continuing violation thus occurs when the plaintiff's "complaint is based on continuing antitrust behavior, not merely the continuing damage [that the plaintiff] feels *from a single day's monopoly and refusal to deal in [the year of the monopoly's creation].*" *Poster Exch.*, 517 F.2d at 125 (emphasis added). The continuing-violation standard "is meant to differentiate those cases where a continuing violation is *ongoing*—and an antitrust suit can therefore be maintained—from those where *all of the harm occurred at the time of the initial violation.*" *Samsung Elecs.*, 747 F.3d at 1202 (emphasis added). *See* Phillip Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶320c1 (2023 Supplement) (continuing violation "where the creation of [a] monopoly and the cause of its durability is not identified with a single act in time, but rather with an ongoing policy"); *id*. at 320c4 (limitations period starts running when monopoly "is created by a single identifiable act and is not perpetuated by an ongoing policy").

Here, defendants' misconduct falls squarely on the "continuing" side of the line. CSXT is not suing to recover for damage following "from

a single day's monopoly" in 2009 or to challenge acts "where all of the harm occurred at the time of the initial violation." Instead, the implementation of defendants' challenged rate continued in each successive year—and that *continuing* implementation was responsible for *new* harm, barring CSXT from offering on-dock service at NIT during the limitations period and impairing CSXT's ability to compete for contracts during that period. *See* Opening Br. 8-9. It is immaterial that defendants formulated and first implemented their unlawful practice in 2009-2010. The rate was not then set in perpetuity or even for a years-long fixed term; it could be revisited and changed at any time.

In just that way, the unlawful policies held to be continuing violations in *Hanover*, *Poster Exchange*, and myriad other cases also were devised and first implemented outside the limitations period, and then continued unchanged into it. *See* Opening Br. 23-24, 26-27, 45-46. What matters is the continued implementation of the unlawful policy in subsequent years.

The decisions on which defendants centrally rely are wholly consistent with this understanding. *See* Def. Br. 32-33 (citing cases). In *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618 (2007), which

involved a claim of employment discrimination, the Supreme Court simply held that "current effects alone cannot breathe life into prior, uncharged discrimination." *Id*. at 628; *see id*. at 624-28. But here, CSXT does not complain of the current effects of harm inflicted in prior years; it complains about continued, current implementation within the limitations period of an unlawful policy that continues to impose new injury.

The same is true of the other employment-discrimination decisions invoked by defendants, in which the discriminatory conduct occurred outside the limitations period and all that remained was the continuing and compounding harm caused by the discrimination on that earlier date. *See Delaware State Coll. v. Ricks*, 449 U.S. 250, 258 (1980) ("the only alleged discrimination occurred—and the filing limitations periods therefore commenced—at the time the tenure decision was made," "even though one of the *effects* of the denial of tenure—the eventual loss of a teaching position—did not occur until later"); *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 560 (1977) ("a challenge to a neutral system may not be

predicated on the mere fact that a past event which has no present legal significance has affected the calculation of seniority credit").[2]

This case involves the sort of conduct described as actionable in those decisions. A present violation *does* exist, in the form of a *currently charged anticompetitive rate*. CSXT does not complain of the current effect of old illegality; it challenges a rate charged anticompetitively during the limitations period.

### B.    Defendants misstate the continuing-violation doctrine.

In arguing that they nevertheless may continue to charge an anticompetitive price, defendants offer three specific contentions: (1) inaction (or, as they sometimes and more accurately put it, continuation of prior unlawful practices) is never an injurious act that reopens the statute of limitations; (2) "reaffirmation" of prior bad acts, as opposed to new forms of misconduct, likewise does not restart the limitations period; and (3) for continuing-violation purposes, suits by customers of the defendants

---

[2]    This Court's decision in *Lancianese v. Bank of Mount Hope*, 783 F.2d 467 (4th Cir. 1986), which defendants cite throughout their brief, stands for the same principle. There, because the wrongful conduct did not continue into the limitations period, the Court held that the time to sue was not extended simply because damages caused by time-barred acts were felt within that period. 783 F.2d at 470. That holding says nothing about this case.

should be judged under different standards than analogous suits by competitors. But defendants offer no substantial rationale for any of these propositions—and all are wrong.

### 1. Continuation of existing anticompetitive practices retriggers the statute of limitations.

Defendants argue throughout their brief that inaction (or continuation of existing practices) does not retrigger the statute of limitations. But that assertion is insupportable, as a matter of both antitrust policy and precedent.

**a.** Defendants ignore our demonstration that their continued implementation of the excessive switch rate is not properly characterized as inaction at all. Opening Br. 51. It is undisputed that NPBL used the $210 rate as its posted tariff every day from 2010 to the present, governing the conduct of business at NIT—and effectively excluding CSXT from on-dock rail access—in each intervening year. That was a conscious, purposeful decision, executed with the goal of maintaining NSR's monopoly. Continued posting of that rate is identical in substance to reposting it, which defendants surely would recognize as an overt act that reopens the statute of limitations. Defendants offer no reason why conduct that is the

same in substance should be treated differently for statute-of-limitations purposes.

**b.** Even if continuation of the excessive switch rate is characterized as inaction, that conduct still is an injurious or overt act under the continuing-violation doctrine. As we discussed in our opening brief (at 32-34, 51), the Third Circuit—the only court to address the issue in this context—flatly rejected the "inaction" contention made by defendants here. As the court there explained: "This argument fails to recognize that certain conspiracies, such as boycotts, operate through inaction." *Lower Lake Erie*, 998 F.2d at 1172. Thus, "[t]he purposeful nature of the inaction—[in *Lower Lake Erie*,] an ongoing refusal to sell or lease—obviously constitutes an injurious act, although perhaps not an overt one in the commonly-understood sense." *Id*. Defendants offer no response to the Third Circuit's analysis, which is compelling. After all, there is no logical reason why active collection of excessive charges pursuant to a policy first formulated in 2009 restarts the statute of limitations (which defendants

concede to be the case), but purposefully continuing to demand that rate for its inevitable exclusionary effect does not.[3]

Moreover, as we also noted in our opening brief (at 24-25 & nn. 8, 9), lower court decisions cited with approval by the Supreme Court in *Zenith* and *Klehr* make clear that inaction (in the sense, as here, of continuing a policy that adversely affects the plaintiff) may restart the statute of limitations. In *Delta Theaters*, 158 F. Supp. at 648-49, cited in *Zenith*, continuation of a conspiracy that denied the plaintiff-theater access to first-run films could be challenged so long as the exclusionary practice

---

[3]      Defendants attempt to distinguish *Lower Lake Erie* on the ground that "only '*purposeful*,' 'intentional, concerted' inaction is sufficient for the continuing-violation doctrine." Def. Br. 59 (quoting *Lower Lake Erie*, 998 F.2d at 1172 (emphasis added by defendants)). But that is no distinction; defendants here undoubtedly also engaged in purposeful, intentional, and concerted inaction (if they are thought to have been inactive at all). Defendants also note the Third Circuit's observation that the *Lower Lake Erie* defendants rebuffed certain of the plaintiffs' overtures. *Id.* at 59-60. But even leaving aside that defendants here similarly rebuffed overtures from CSXT in 2018 (*see* 29-30, *infra*), defendants ignore the Third Circuit's view that the statute of limitations was retriggered because, in part, "dock handling rates … remained artificially inflated" during the limitations period—just as here, the NIT switch rate remained artificially inflated into the limitations period. 998 F.2d at 1172. Defendants get no more from the Third Circuit's observation that the *Lower Lake Erie* jury found commission of an overt act in the limitations period (Def. Br. 60 (citing 998 F.2d at 1173)); the court of appeals' point was that the conspiracy continued into the limitations period, which is not in dispute here.

11

continued and the plaintiff was harmed. In *National Souvenir Center*, cited in *Klehr*, a right of action continued to accrue during the running of a lease that had "continuing allegedly 'anticompetitive' effect[s]" (728 F.2d at 514), which is conduct no more active than that here; as Judge Wald wrote for the D.C. Circuit, "the 'overt act' requirement may be satisfied merely by the parties continuing to maintain contractual relationships that directly affect competition in the tied product market." *Id*. at 510. Courts reached similar conclusions in other decisions cited in *Klehr*: *Pennsylvania Dental*, 815 F.2d at 278 (plaintiff "continues to encounter resistance to its [business practices] traceable to the [defendants'] earlier actions"); *Imperial Point Colonnades Condo.*, 549 F.2d at 1036 (cause of action "continues to accrue for as long as the defendant takes advantage of the contract in question").

Defendants make no attempt to distinguish these holdings. In fact, they implicitly concede that Judge J. Skelly Wright's decision in *Delta Theaters* is inconsistent with their position. Def. Br. 52.[4] They disregard the other decisions altogether.

---

[4]    Although defendants concede that the Supreme Court cited *Delta Theaters* "to illustrate [the Court's] overt act rule"—and although we are here discussing proper application of that rule, which makes *Delta*

Similarly, refusal-to-deal decisions like *Poster Exchange* demonstrate that continuation of an unlawful policy, without new affirmative injurious conduct, qualifies as an overt act that restarts the limitations period, even though that continuation involves inaction (in the sense of the word used by defendants). Opening Br. 46-47. What mattered in those cases was the "continuing antitrust behavior." *Poster Exch.*, 517 F.2d at 125. To be sure, as defendants note (Def. Br. 57-58), the Fifth Circuit in *Poster Exchange* looked for "some specific act or word precluding Poster from obtaining supplies from" the defendant within the limitations period. 517 F.2d at 128. But as we explained in our opening brief (at 46-47), and as defendants do not deny, that "act or word" would not itself involve affirmative anticompetitive conduct; the showing was necessary simply to confirm that the original refusal to deal was continuing unchanged. *See* 517 F.2d at 128-29.[5] And here, continuation of defendants' unlawful

---

*Theaters* directly relevant—defendants discount *Delta Theaters* because the Supreme Court pointed to "a different page of [the] district court decision" than that quoted in our opening brief. Def. Br. 52. In fact, the page of *Delta Theaters* cited in our brief immediately followed and was the conclusion of the discussion cited approvingly by the Supreme Court in *Zenith*.

[5]    "Far from requiring that the plaintiff tie its damages to specific acts, the [Fifth Circuit in *Poster Exchange*] … simply required the plaintiff to support its allegation that the defendant had 'continued during the

policy into the limitations period is manifest (indeed, it is uncontested) from NPBL's continued posting of the excessive switch rate.

**c.** Ultimately, defendants rely principally on this Court's decision in *Charlotte Telecasters*, which they invoke for the proposition that, when an anticompetitive policy is "initiated outside the limitations period," "the claim accrues and the statute begins to run when the policy is enacted, not every day it is maintained." Def. Br. 35-36. But that is not what *Charlotte Telecasters* says.

As we explained in our opening brief (at 46-47), the Court there relied on *Poster Exchange* to hold that "exclusion from participation in an industry constitutes a continuing conspiracy, unless the exclusion is final in its impact." 546 F.2d at 572. That describes this case, in which defendants substantially excluded CSXT from doing on-dock business at NIT, an exclusion that (all agree) was not final in its impact in 2010 (and still isn't final). That understanding is confirmed by the other authority relied upon in *Charlotte Telecasters*, *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 512 F.2d 1264, 1270 (9th Cir. 1975), which held that the

---

period in suit to refuse to deal.'" *Lower Lake Erie*, 998 F.2d at 1173 (quoting *Poster Exch.*, 517 F.2d at 128).

"necessarily continuing nature of the alleged harm" caused by an anti-competitive contract could be challenged many more than four years after entry into the contract. Here, too, defendants' ongoing demand for the excessive switch rate gives the harm a "necessarily continuing nature."

Defendants point to this Court's observations in *Charlotte Telecasters* that the Charlotte City Council's rejection of the plaintiff's renewed franchise request was "the last overt act of the alleged conspiracy," and that the Council's subsequent "silence" was not an overt act. Def. Br. 36 (quoting 546 F.2d at 573). But read in context, the Court's evident meaning was that the Council's rejection of the plaintiff's request was *conclusive* (which is the apparent significance of the Court's further observation that the Mayor "did not promise action in the future" (546 F.2d at 573)). That conclusion has no bearing in this case, in which posting of the excessive switch rate was *not* final and definitive.

### 2. Reaffirmation of anticompetitive conduct is a continuing violation.

**a.** Perhaps because their theory of "inaction" is unpersuasive, defendants rely heavily on the further contention that "reaffirmation" of wrongful conduct may not serve as an overt or injurious act that restarts the statute of limitations. But this argument, too, is wrong.

We explained in our opening brief (at 52 & n.13) that, although the circuits are divided on the question, the proposition that reaffirmation (and consequent continued implementation) of illegal acts does not restart the limitations period fails to withstand scrutiny. Defendants do not even attempt to provide a rationale for their reaffirmation rule.[6] But there are many reasons why that proposed rule is insupportable, as a matter of precedent, antitrust policy, and logic.

The Third Circuit has addressed the point most closely. As that court noted, disregarding "'reaffirmations' of acts done or decisions made outside the limitations period" cannot be squared with Supreme Court decisions. *W. Penn Allegheny*, 627 F.3d at 106. Most obviously, in *Hanover* itself the Supreme Court held that the challenged conduct constituted a continuing violation "even though the injurious acts that took place within the limitations period … were simply manifestations of the lease-only policy, which had been established in 1912, well before the start of the limitations period." *Id.* at 107. Similarly, *Klehr* recognized that sales

---

[6]    Defendants say that "there isn't" a circuit split on the reaffirmation question. Def. Br. 58. They are wrong; the conflict was acknowledged by the Third Circuit (*see W. Penn Allegheny*, 627 F.3d at 106) and noted by the district court in this case. *See* JA304-305.

made pursuant to a price-fixing conspiracy restart the limitations period even though such sales, almost by definition, rest on reaffirmation of the original wrongful conduct. *Id.* (citing *Klehr*, 521 U.S. at 189-90).

As for antitrust policy, "'[e]mploying the limitations statute … to immunize recent repetition or continuation of violations and damages occasioned thereby not only extends the statute beyond its purpose, but also conflicts with the policies of vigorous enforcement of private rights through private actions.'" *W. Penn Allegheny*, 627 F.3d at 108 (quoting *Poster Exch.*, 517 F.2d at 127-28). In our opening brief, we noted that there is no logical reason why antitrust violators should get a pass simply because they implement the same wrongful policy repeatedly ("reaffirming" it), while more innovative wrongdoers are subject to liability. Defendants offer no answer.

Nor do they find substantial support in the decisions they cite for their reaffirmation rule. Def. Br. 35. The Second Circuit's mention of "reaffirmation" in *US Airways*, 938 F.3d at 68, is an unexplicated quotation from a Sixth Circuit decision that the Second Circuit had no occasion to apply. The Second Circuit's actual holding does defendants no good: The court ruled that a price charged pursuant to a contract that was "binding

[on] the parties" "was not an overt act of its own, but a manifestation of the prior overt act of entering into the … contract." *Id.* at 68, 69. That was so, the court continued, because "[a] contract is a vehicle for determining at the time of contracting what should happen at some time thereafter." *Id.* at 69. But none of that is true here. This case does not involve a contract; the parties here are not mutually bound by the 2009 switch rate; and imposition of the challenged rate did not, at the time of its creation, resolve what rate would be applied at specific future points—to the contrary, all agree that the elevated switch rate could be changed at any time.

As for *Varner v. Peterson Farms*, 371 F.3d 1011, 1019 ((8th Cir. 2004), and *DXS Inc. v. Siemens Medical Systems, Inc.*, 100 F.3d 462, 467 (6th Cir. 1996), those decisions simply recited the "reaffirmation" language, without explanation or any attempt to reconcile their statements with *Hanover* or *Klehr* (which predated *Varner*).

**b.** Defendants are equally mistaken in contending that "[t]he continuing rate is simply the '*abatable but unabated inertial consequence[] of [a] pre-limitations action.*'" Def. Br. 41 (quoting *Al George, Inc. v. Envirotech Corp.*, 939 F.2d 1271, 1274 (5th Cir. 1991)). This

phrase appears to have in mind "unabated inertial consequences of some pre-limitations action" that is "*irrevocable, immutable, permanent[,] and final.*" *Multidistrict Vehicle Air Pollution,* 591 F.2d at 72 (emphasis added). It thus describes situations in which injury follows from an anticompetitive practice that was "final in its impact" prior to the start of the limitations period. *Charlotte Telecasters*, 546 F.2d at 572. As we explained in our opening brief (at 49-50), that includes cases in which "the plaintiff's business is immediately and permanently destroyed" by the wrongful conduct or "the actionable wrong is by its nature permanent at initiation without further acts." *Poster Exch.*, 517 F.2d at 126-27. When misconduct is permanent and irreversible, the resulting injury may fairly be characterized as the inevitable and inertial consequence of that misconduct, involving no element of discretion on the defendants' part.

That describes the decisions relied upon by defendants for their "inertial consequence" contention. Def. Br. 41-43 (citing cases). In *Kaw Valley Electric Co-op.*, 872 F.2d at 934, the court deemed the determining factor to be whether the anticompetitive conduct was "final," which "is a question of fact." In *Z Technologies Corp. v. Lubrizol Corp.*, 753 F.3d 594, 600 (6th Cir. 2014) (emphasis added), the court held that "price increases

*following a merger or acquisition* are not overt acts." That is so because a merger or acquisition is an act that is "complete at the time of the merger"; "'[u]nlike a conspiracy or the maintaining of a monopoly, a merger is a discrete act.'" *Id.* at 601, 602. And, as just noted, in *US Airways* price increases were mandated by a final and binding contract between the parties.[7]

Defendants are thus quite wrong to assert that "[m]aintaining the $210 rate [in this case] is no different from the inaction in *Kaw Valley*, *US Airways*, and *Z Technlogies*." Def. Br. 43. As the court below recognized, here the "prior rate was … not a final, immutable decision" (JA308)—meaning that this case lacks the characteristic that was crucial to the outcomes in the decisions on which defendants rely. Indeed, defendants give away the game when, describing *US Airways*, they say that "a supracompetitive price *locked in* by an earlier contract would *not* be

---

[7]    The same is true of *Al George*, the decision from which defendants draw their "inertial consequence" language. The anticompetitive conduct there was initiation of a patent-infringement lawsuit; the court held that the statute of limitations had run because "'[t]he initiation of a lawsuit is the final, immutable act of enforcement of an allegedly illegal contract. … All subsequent acts are controlled by the exigencies of litigation.'" 939 F.3d at 1274 (citation omitted). Here, there was nothing final or immutable about defendants' posting of the excessive switch rate in 2009.

actionable at each sale" (Def. Br. 56 (first emphasis added)). The excessive switch rate here was *not* locked in, was (and still is) not permanent, and could have been changed by defendants at any time. The setting of the rate in 2009-2010 therefore did not make it inevitable that the rate still would be charged years later and that CSXT "inertially" would suffer the same harm repetitively.

### 3. The same continuing-violation rule applies to customers and competitors.

Defendants acknowledge that customers of antitrust defendants may sue for damage suffered during the limitations period from implementation of an anticompetitive practice put in place outside the period. But they insist that a different rule applies to competitors of those defendants, who (defendants here assert) must challenge an anticompetitive practice within four years of that practice's initial formulation, even if continued implementation of that practice causes continuing harm after those four years have passed. Defendants' only rationale for this rule is the statement that "[a] purchaser suffers injury when the defendant pays the defendant's supracompetitive price, … or when it earlier signs a contract agreeing to that price," "[b]ut a competitor is injured 'at the time the [defendant's] anticompetitive conduct' (like an anticompetitive

merger or the formation of a monopoly) 'occurs.'" Def. Br. 30-31 (citation omitted).

As we explained in our opening brief (at 40-44), however, this rationale for distinguishing between customers and competitors has no logical basis. Doubtless, customers are injured whenever they pay anticompetitive prices. But as we noted, that injury typically begins immediately after prices are fixed or a monopoly is created—and, in any event, customers may continue to sue for as long as they suffer injury, even if that is more than four years after they first paid an inflated price. Here, in its role as competitor, CSXT is in precisely the same position as a customer. It may (or may not) have first suffered competitive injury shortly after implementation of the anticompetitive switch rate (just as the customer of a price-fixer may first suffer injury shortly after prices are fixed), but CSXT suffers *new* injury from continued implementation of the excessive rate every time it is denied on-dock rail access at NIT, just as the price-fixer's customer suffers new injury when it pays fixed prices into the

future.[8] The particular injury following from continued implementation of the illegal practice is different in its details, but the principle is identical.

As we also explained (Opening Br. 42-43), the peculiarity of defendants' distinction is especially acute in this case, where CSXT was both a customer and a competitor of the defendants. Defendants offer no reason of antitrust or statute-of-limitations policy why CSXT would be permitted to sue for excessive payments had it paid the exorbitant switch rate on particular dates years after the rate was first formulated, but may not sue for lost profits because that rate was *so* high that it altogether precluded CSXT from competing for contracts at NIT on particular dates in those same years. It is no answer to say, as defendants do, that CSXT sued only as a competitor (Def. Br. 54); the point is that distinguishing competitors from customers in this context is irrational.

---

[8]    It is not correct that a competitor necessarily suffers injury at the moment that the anticompetitive practice is formulated. Just as a customer is injured when it pays excessive prices, CSXT is injured when the excessive rate keeps it from competing for customer contracts at NIT. Depending on when competition for specific contracts occurred, that might not have happened until some time after defendants first devised and posted the excessive rate.

23

Defendants nevertheless insist that their distinction between customers and competitors is "well-established." Def. Br. 53. But they point to no decision that barred a competitor's suit in circumstances like those here. The decision of this Court that they invoke, *Actelion Pharmaceuticals*, stands for no such proposition. The Court there rejected the *Actelion* defendant's argument that the sales in that case really were manifestations of a refusal to deal that were not antitrust violations at all; the Court found that the plaintiffs sued as customers and not as competitors, as they would have to have done for the defendant's theory to be correct. 995 F.3d at 131-32. The Court had no occasion to, and did not, address how the continuing-violation doctrine applies to competitors who actually are injured by a continuing antitrust violation.

And defendants' distinction cannot be "well-established," as the United States recently took the position that separate accrual rules do *not* apply to competitors and consumers, explaining that "[t]he same accrual rule (*Zenith Radio*'s) applies to both types of claims." U.S. *Giordano* Br. 31. Defendants assert that we "selectively quote[]" the government's brief (Def. Br. 47), but the government did indeed state unequivocally that there is no categorical distinction between customers

24

and competitors. The dispositive question in every case simply is when wrongful conduct caused injury: "If plaintiffs suffer antitrust injury during the limitations period due to overt acts committed pursuant to a continuing violation, the plaintiffs may bring suit, whether they are 'consumers,' 'competitors,' or neither." U.S. *Giordano* Br. 31. This Court should apply that rule here.

## C. Statue-of-limitations policy supports recognition of CSXT's right of action.

Finally, defendants offer half-hearted, and unpersuasive, arguments from statute-of-limitations policy. Def. Br. 26-28, 54. Of course, we agree that statutes of limitations facilitate repose and encourage timely actions. But as we explained in our opening brief (at 53-57), those purposes are not served by defendants' rule, for several reasons.

*First*, the illogical distinctions drawn by defendants mean that their rule would *not* secure repose or prevent inquiry into acts occurring more than four years ago. As defendants acknowledge, they would allow customers to sue for "each purchase at a supracompetitive price," even if those purchases occurred many years after the anticompetitive conduct giving rise to that price and challenged in the suit. Def. Br. 53.

Defendants also recognize that the United States may bring an injunctive action to challenge anticompetitive prices more than four years after those prices were formulated, as may private parties in all cases not governed by 15 U.S.C. § 26. Def. Br. 5-6, 53-54. The legal peace demanded by defendants therefore is curiously gerrymandered to limit only a very narrow category of disfavored plaintiffs who, for purposes of statute-of-limitations policies, are identically situated to those who concededly *may* bring an action.

*Second*, our approach does not discourage timely suits. All agree that, under the rule of *Zenith* and *Klehr*, damages may be recovered only for injury suffered within the limitations period. Plaintiffs suffering immediate loss from an anticompetitive policy therefore have a powerful incentive to act quickly to avoid the accumulation of unrecoverable damages. CSXT may have chosen to hold off on a legal challenge here because it was reluctant to sue companies with which it necessarily has daily business interactions—bringing suit in 2018 only after defendants rebuffed its final effort to resolve the dispute without litigation—but the damages limitation undoubtedly encourages potential plaintiffs to sue expeditiously.

*Third*, defendants here cannot appeal to the equities. As we noted in our opening brief (at 56), "there can be no unfairness in preventing a monopolist that has established its dominant position by unlawful conduct from exercising that power in later years." *Berkey Photo*, 603 F.2d at 296. Defendants here, who must be assumed to have broken the law, "hardly are in a position to argue for the protection of the statute of limitations … when it is the defendants' own recent conduct that results in a finding of a newly accruing cause of action." *Imperial Point Colonnades Condo.,* 549 F.2d at 1041 (cleaned up).

*Finally*, CSXT's approach certainly would not "nullify" the antitrust statute of limitations. Def. Br. 51. Wrongful conduct must be challenged within four years of when it occurs; and plaintiffs must seek recovery for damage within four years of suffering it. But as *Hanover* and myriad other cases show, these limits do not mean that wrongdoers are entitled to receive perpetual immunity for *continued* implementation of illegal practices—which is what defendants demand here.

## II.  DEFENDANTS' DISCRETE ACTS IN 2015 AND 2018 RETRIGGERED THE STATUTE OF LIMITATIONS.

Some of these same errors infect defendants' treatment of the separate overt acts they committed in 2015 and 2018. Even if

27

continuation of an anticompetitive practice into the limitations period is not enough standing alone to retrigger the statute of limitations, those discrete acts—committed to perpetuate exclusion of CSXT from NIT—justify this suit.

1. We showed in our opening brief (at 58-59) that, in 2015, NPBL demanded and collected an excessive switch rate from CSXT; defendants also took steps to delay those few CSXT trains that accessed NIT, further impairing CSXT's business. Defendants now argue that these showings are irrelevant because CSXT is suing for competitive losses, not for overpayments made as a customer or losses attributable to train delays. Def. Br. 46-48. This argument misunderstands the significance of the 2015 evidence.

The 2015 conduct shows that the conspiracy to exclude CSXT from NIT continued into the limitations period; it also demonstrates that continued demand for the anticompetitive rate during that period *did* largely exclude CSXT from NIT. On this latter point, the 2015 evidence established that CSXT accessed NIT only during an extraordinary dislocation of the market and that, during normal market conditions, it was impossible for CSXT to compete there. *See* Opening Br. 9-10. CSXT's

claim thus is for loss of business caused by the continued effectuation of defendants' anticompetitive practices, which the 2015 conduct demonstrates.

Accordingly, if some new affirmative "act or word" is thought necessary to show that defendants continued to deny CSXT access to NIT in the limitations period (*Poster Exch.*, 517 F.2d at 128), that demonstration is provided by the 2015 evidence. That conduct therefore is an overt act that "starts the statutory period running again." *Actelion*, 995 F.3d at 131 (cleaned up). *See Klehr*, 521 U.S. at 189 ("each overt act that is part of the violation and that injures the plaintiff … starts the statutory period running again") (cleaned up). On this, there is no "require[ement] that the plaintiff tie its damages to specific acts," so long as "the defendant had 'continued during the period in suit to refuse to deal'" (*Lower Lake Erie*, 998 F.2d at 1173 (citation omitted))—as, effectively, defendants did here.

2. In addition, we showed in our opening brief (at 59-62) that CSXT in 2018 proposed that NPBL lower the anticompetitive rate. The district court acknowledged that rejection of this proposal *would* have been an overt act that restarted the limitations period (*see id*. at 59), but held that

defendants' failure to *formally* deny the request was inaction that cannot qualify as an overt act. Defendants now parrot that reasoning. Def. Br. 49-50. But that rationale can't be correct. If defendants are right, conspirators and monopolists could continue anticompetitive conduct forever simply by ignoring, rather that forthrightly denying, requests to do business. Although we made this commonsense point in our opening brief (at 61), defendants make no response.

Nor do defendants find support in *Charlotte Telecasters*. *See* Def. Br. 50. There, the City Council's denial of the plaintiff's request for a franchise was held to be an overt act; there is no indication that the plaintiff afterwards made another request that the council disregarded. *See* 546 F.2d at 573. The Court therefore had no reason to, and did not, make the illogical suggestion that a defendant's purposeful disregard of such a proposal would fail to qualify as a limitations-extending overt act.

## III. CSXT OFFERS A VALID DAMAGES THEORY.

Defendants' remaining argument—that CSXT's damages model would not allow the jury to separate out damages suffered inside from those suffered outside the limitations period (Def. Br. 37-39, 44-46)—is insubstantial. Defendants' contention that "CSX[T]'s damages model

30

estimates aggregate damages only" (*id*. at 45) is simply incorrect. In fact, CSXT's expert determined CSXT's lost business year-by-year, with data that would allow for a breakdown even within individual years if necessary. *See* JA452 ("Exhibit 11 shows the damages estimated by the model *by year* and in total."); JA465. CSXT's evidence thus *does* provide "means to disaggregate [unrecoverable] damages from the overall [damages] calculation," as defendants demand. Def. Br. 38.

Defendants' brief is misleading when it asserts that the district court "found CSX[T]'s case failed because CSX[T]'s damages model didn't disaggregate damages from conduct for which CSX[T] could recover and conduct for which it couldn't." Def. Br. 15. The district-court language invoked by defendants was directed specifically, and only, at the adequacy of the 2015 overt-act evidence, which the court treated (erroneously, for the reasons explained above) as having been offered to establish overcharge damages suffered by CSXT in its capacity as customer. *See* JA326-325. The court nowhere suggested that, if a continuing violation has been established for years within the limitations period, CSXT's market-exclusion damages evidence is inadequate. To the contrary, excepting the claim relating to 2015, the court observed that "[i]n most scenarios where

damages are uncertain, the lack of clarity does not rise to the level of a defect that should preclude consideration by a jury." JA326. And here, the market-exclusion damages are clear and certain. Defendants' damages argument, like their broader continuing-violation theory, is wrong.

## CONCLUSION

The Court should reverse the judgment below.

Dated: December 18, 2023            Respectfully submitted,

                                    MAYER BROWN LLP

                                    */s/ Charles A. Rothfeld*
Benjamin L. Hatch                   Charles A. Rothfeld
Robert W. McFarland                 Evan M. Tager
McGuire Woods, LLP                  Carmen N. Longoria-Green
101 W. Main Street, Ste. 9000       MAYER BROWN LLP
Norfolk, VA 23510                   1999 K Street, N.W.
Telephone: (757) 640-3700           Washington, DC 20006
                                    Telephone: (202) 263-3000
Michael A. Scodro                   crothfeld@mayerbrown.com
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
Telephone: (312) 701-8886

*Attorneys for Plaintiff-Appellant*

32

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), undersigned counsel certifies that this brief:

(i)      complies with the type-volume limitation of Rule 32(a)(7)(B)(i) and Local Rule 32(b) because it contains 6489 words, including footnotes and excluding the parts of the brief exempted by Rule 32(f); and

(ii)     complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Office Word 2016 and is set in Century Schoolbook font in a size equivalent to 14 points or larger.

Dated: December 18, 2023            /s/ *Charles A. Rothfeld*
                                    Charles A. Rothfeld

## CERTIFICATE OF SERVICE

I certify that on this 18th day of December, 2023, the foregoing document was served on all parties or their counsel of record through the CM/ECF system.

/s/ *Charles A. Rothfeld*
Charles A. Rothfeld