**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 23-1537

CSX TRANSPORTATION, INC., individually and on behalf of Norfolk &
Portsmouth Belt Line Railroad Company,

Plaintiff − Appellant,

v.

NORFOLK SOUTHERN RAILWAY COMPANY; NORFOLK & PORTSMOUTH
BELT LINE RAILROAD COMPANY,

Defendants – Appellees,

Appeal from the United States District Court for the Eastern District of Virginia, at
Norfolk.  Mark S. Davis, Chief District Judge.  (2:18−cv−00530−MSD−RJK)

Argued:  March 21, 2024                     Decided:  August 29, 2024

Before DIAZ, Chief Judge, QUATTLEBAUM and RUSHING, Circuit Judges.

Affirmed by published opinion.  Chief Judge Diaz wrote the opinion, in which Judge
Quattlebaum and Judge Rushing joined.

**ARGUED:**  Charles Alan Rothfeld, MAYER BROWN, LLP, Washington, D.C., for
Appellant.  Shay Dvoretzky, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP,
Washington, D.C.; William Ryan Snow, CRENSHAW WARE & MARTIN, PLC, Norfolk,
Virginia, for Appellees.  **ON BRIEF:**  Benjamin L. Hatch, Robert W. McFarland,
MCGUIREWOODS, LLP, Norfolk, Virginia; Michael A. Scodro, Chicago, Illinois, Evan
M. Tager, Carmen N. Longoria-Green, MAYER BROWN LLP, Washington, D.C., for
Appellant.  Alan Durrum Wingfield, Michael Edward Lacy, Richmond, Virginia, John

Curtis Lynch, Megan Burns, Kathleen Michelle Knudsen, TROUTMAN PEPPER HAMILTON SANDERS LLP, Virginia Beach, Virginia; Parker Rider-Longmaid, Steven Marcus, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Washington, D.C., for Appellee Norfolk Southern Railway Co.  James Long Chapman, IV, Alexander Ryan McDaniel, CRENSHAW WARE & MARTIN, PLC, Norfolk, Virginia, for Appellee Norfolk & Portsmouth Belt Line Railroad Co.

———————————

DIAZ, Chief Judge:

The issue in this case is whether an exception to the Sherman Act's four-year statute of limitations, 15 U.S.C. § 15b, applies to otherwise untimely Sherman Act claims for damages.

CSX Transportation, Inc., sued the Norfolk Southern Railway Company and the Norfolk & Portsmouth Belt Line Railroad Company in 2018. CSX contends that Norfolk Southern and Belt Line conspired—in violation of the Sherman Act—to exclude it from competing in the international shipping market at the Norfolk International Terminal of the Port of Virginia. They did this, alleges CSX, by imposing an effectively exclusionary "switch rate," beginning in 2010 (and continuing to the present day), for the on-dock rail access CSX needs to conduct its operations at the Norfolk Terminal. According to CSX, it suffered injury to its business each day the rate remained in effect.

"Generally, a [federal antitrust] cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business." *Zenith Radio Corp. v. Hazeltine Rsch., Inc*., 401 U.S. 321, 338 (1971). It's undisputed that CSX's Sherman Act claims first accrued in 2009 and 2010, when the Defendants implemented the allegedly exclusionary switch rate. Also undisputed is that CSX filed this lawsuit in 2018, almost nine years after its claims first accrued.

The question presented is whether CSX's claims can survive dismissal based on an exception to the general accrual rule for antitrust causes of action—specifically, the "continuing-violation" or "continuing-conspiracy" doctrine the Supreme Court recognized in *Zenith*. That exception provides that "[i]n the context of a continuing conspiracy to

violate the antitrust laws . . . each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act." *Id.* According to CSX, the statute of limitations restarted—and a new cause of action accrued—each day that Norfolk Southern and Belt Line imposed the exclusionary rate.

The district court disagreed and granted judgment to the Defendants. Like the district court, we find that CSX hasn't shown that the continuing-violation doctrine applies. The decision to keep the allegedly exclusionary switch rate in place didn't trigger the doctrine because that conduct didn't inflict *new* harm causing *new* injury to CSX within the limitations period. And even if we accept that the Defendants committed some other act within the limitations period in furtherance of a conspiracy, CSX has failed to prove the second continuing-violation requirement: "the damages caused by that act"—which are the only damages it can "recover" under this exception. *Id.*

Therefore, we affirm the district court court's judgment.

I.

"Because this appeal follows the district court's grant of the [Defendants'] motion for summary judgment, we recount the facts . . . in the light most favorable to [CSX], the non-moving party." *SD3 II LLC v. Black & Decker (U.S.) Inc.*, 888 F.3d 98, 103 (4th. Cir. 2018).

A.

1.

The Port of Virginia is a major East Coast hub of the international shipping market. Norfolk International Terminal "is one of two primary [Port of Virginia] terminals where international container ships offload their cargo." *CSX Transp., Inc. v. Norfolk S. Ry. Co.*, 648 F. Supp. 3d 679, 688 (E.D. Va. 2023). Generally, companies transporting shipping containers to and from overseas destinations via ocean carriers contract with domestic railroad companies like CSX and Norfolk Southern to move their cargo at the Norfolk Terminal for transport to and from inland destinations. *See id.* at 687–88.

"Intermodal" transportation—"the use of two modes of freight . . . to transport goods from shipper to consignee"—can, as is the case here, involve the use of both ship and rail. J.A. 49 ¶ 3 n.1. CSX and Norfolk Southern "vigorously compete for the domestic rail transportation of international 'intermodal' containers delivered to and from various East Coast ports [by container ships], including [those delivered at] the Port of Virginia." *CSX Transp.*, 648 F. Supp. 3d at 687–88.

Belt Line is a "terminal and switching railroad" company that operates at the Port of Virginia. *Id.* at 687. It facilitates "interchange of [railroad] cars among the railroads" operating in Hampton Roads, Virginia, "and connection to the port," J.A. 48 ¶ 1, via "[its] own tracks and tracks on which [it] has rights to operate," J.A. 276.

Belt Line "was established in 1896 as a joint venture of eight railroads to provide switching services in Norfolk, Portsmouth[,] and Chesapeake, Virginia." *Norfolk S. Ry. Co. v. Surface Transp. Bd.*, 72 F.4th 297, 301 (D.C. Cir. 2023), *cert. denied*, 144 S. Ct.

1343 (2024).  Its ownership structure has since changed.  Today, CSX and Norfolk Southern are Belt Line's sole remaining shareholders, with CSX owning a minority stake. *See id.* at 302.

2.

The dispute here centers on rail access to the docks at the Norfolk Terminal.

Norfolk Southern accesses the docks directly over tracks that it owns.  Belt Line also uses Norfolk Southern's tracks to access the docks.  In contrast, CSX doesn't own on-dock tracks at the Terminal; it can only access it via Belt Line's access.  To do so, CSX pays "[a] 'switch rate,' which is the cost per train car 'well' that Belt Line charges customers to use its tracks/switching services."[1]  *CSX Transp.*, 648 F. Supp. 3d at 688.

Alternatively, CSX can load containers delivered to the terminal dock onto trucks, which then transport them to a local railyard to be loaded onto a CSX train—"a practice referred to as 'drayage.'"  *Id.*  But CSX vigorously disputes whether drayage is a "suitable" alternative to on-dock rail access.  *See id.* at 726 (emphasis omitted).

3.

Effective in early 2010, Belt Line's Board increased the switch rate to $210 per well.  CSX alleges that the new rate made it economically impractical for it to access the Norfolk Terminal.  Appellant's Br. at 7.  According to CSX, "[t]he [new] switch rate has had the

---

[1] CSX defines a "well" as "a railcar designed to carry vertically stacked containers." Appellant's Br. at 7 n.3.

practical effect of almost entirely precluding [it] from offering on-dock rail service at [the Terminal]," which is essential to its business. *Id.* at 8.

CSX doesn't claim that it paid the rate or took any other action from 2010 through 2015. In 2015, however, heavy shipping traffic across the East Coast made it more difficult for CSX to move shipping containers via drayage. As a result, CSX alleges, it was forced to pay Belt Line's $210 rate.[2]

CSX asserts that Norfolk Southern and Belt Line took other action to impede its operations at the Norfolk Terminal. For instance, CSX claims—and the district court found—"that at least one CSX train was materially delayed" in 2015 by the actions of Norfolk Southern, Belt Line, or both. *CSX Transp.*, 648 F. Supp. 3d at 706 n.14. CSX also alleges that "[Norfolk Southern], and possibly [Belt Line], acted to obstruct, or aided in the obstruction of, CSX's train movements during 2015, [which] result[ed] in CSX's temporary loss of business from one of its existing customers for a period of several weeks." *Id.* at 706 (emphasis omitted).

4.

In 2018, CSX offered to pay Belt Line a switch rate of $80 in exchange for a promise to move a minimum annual volume of train cars. But the Belt Line Board never voted on the proposal, nor did CSX seek a vote. *See id.* at 715.

---

[2] We don't know how many times CSX paid the switch rate.

CSX also asked that Belt Line's Board be restructured "to . . . afford CSX equal representation." *Id.* at 714. And it raised the possibility of establishing an independent "rate committee" to review its $80 switch rate proposal. *See id.* at 714–16.

Using its majority stake, Norfolk Southern voted its shares against CSX's Board-modification proposal.[3] And while both Norfolk Southern and Belt Line discussed the rate-committee proposal, nothing ever came of it.

### B.

### 1.

CSX sued Norfolk Southern and Belt Line in federal court, raising claims for, as relevant here: (1) conspiracy to restrain trade, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, against Norfolk Southern and Belt Line (Count One); (2) conspiracy to monopolize the relevant market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, against Norfolk Southern and Belt Line (Count Two); (3) monopolization, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, against Norfolk Southern (Count Three); and (4) attempted monopolization, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, against Norfolk Southern (Count Four). CSX sought both damages and injunctive relief for these violations.

---

[3] The district court concluded that this shareholder vote wasn't an overt act sufficient to invoke the continuing violation doctrine. *CSX Transp.*, 648 F. Supp. 3d at 716–17. CSX doesn't address the merits of this ruling in its briefs, so we won't discuss it further.

Norfolk Southern and Belt Line moved to dismiss several of the counts against them.  The district court granted Belt Line's motion only as to CSX's tortious interference claim (Count Seven).

Separately, Norfolk Southern challenged the district court's jurisdiction and asserted an immunity defense.  As an alternative to granting relief on either theory, Norfolk Southern asked the district court to refer the issues to the United States Surface Transportation Board.[4]  J.A. 234.

The district court denied relief in part but referred the immunity issue to the Surface Transportation Board.  The Board then rejected Norfolk Southern's immunity claim, and the D.C. Circuit later affirmed.  *See Norfolk S. Ry. Co. v. Surface Transp. Bd.*, 72 F.4th 297 (D.C. Cir. 2023), *cert. denied*, 144 S. Ct. 1343 (2024).

### 2.

At the close of discovery, Norfolk Southern and Belt Line moved for summary judgment on the ground that CSX's claims were time-barred.  By this point, only the Sherman Act Section 1 and 2 claims, Virginia state-law conspiracy claims, and Virginia state-law breach of contract claims remained.

---

[4] The Interstate Commerce Act, 49 U.S.C. §§ 10101 *et seq.*, 11301 *et seq.*, grants the Surface Transportation Board "exclusive authority to examine, condition, and approve proposed mergers and consolidations of transportation carriers within its jurisdiction." *Norfolk & W. Ry. Co. v. Am. Train Dispatchers Ass'n*, 499 U.S. 117, 119–20 (1991).  And under the Act, "[a] rail carrier . . . participating in [a] [Board-]approved or [-]exempted [merger or acquisition] is exempt from the antitrust laws and from all other law, including State and municipal law, as necessary to let that rail carrier, corporation, or person carry out the transaction, hold, maintain, and operate property, and exercise control or franchises acquired through the transaction."  49 U.S.C. § 11321(a).

In an exhaustive opinion, the district court agreed with Norfolk Southern and Belt Line that, as to the federal antitrust claims for damages, CSX's action was untimely, and it entered judgment accordingly.[5]

From that order, CSX appeals.

## II.

We review a grant of summary judgment de novo, "drawing all reasonable factual inferences in favor of the nonmoving party." *Hixson v. Moran*, 1 F.4th 297, 302 (4th Cir. 2021). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

---

[5] The district court also dismissed the remaining state law claims for various reasons. The only argument CSX makes on appeal as to these claims is that "if this [c]ourt reverses the district court's federal statute-of-limitations ruling, it also should vacate the district court's state-law ruling and remand for reconsideration in light of the Court's decision." Appellant's Br. at 18 n.7. But as we affirm the district court, we decline to address these claims further.

The court did order that a "court-raised issue of injunctive relief" would proceed to trial. *CSX Transp.*, 648 F. Supp. 3d at 731. But it later dismissed all claims for injunctive relief. *See* J.A. 379–405 (order dismissing federal antitrust injunctive relief claims); J.A. 406–29 (order dismissing state-law injunctive relief claims). CSX doesn't challenge the district court's dismissal of these claims.

III.

A.

CSX maintains that its otherwise untimely Sherman Act claims—brought almost nine years after the new switch rate (on which its claims are based) was implemented—can be saved by an exception to the Act's limitations statute known as the "continuing-violation doctrine."

The Clayton Antitrust Act imposes a four-year statute of limitations for "[a]ny action to enforce [the antitrust laws]" that starts to run "after the cause of action accrue[s]." 15 U.S.C. § 15b.  Thus, whether a federal antitrust claim for damages is time-barred under the Act's statute of limitations turns on whether that cause of action accrued within the limitations period.

CSX concedes that if its claims for damages accrued in 2010, when the switch rate was first implemented, then its 2018 suit is untimely.  To avoid the four-year time bar, CSX asserts that the continuing-violation doctrine brings its antitrust claims within the governing limitations period—i.e., the four years just before this action—because each day the Defendants charged the exclusionary switch rate, from 2010 to the present, caused CSX new injury.

As we explain, we disagree.

B.

"Generally, a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business." *Zenith,* 401 U.S. at 338.  "In the context

11

of a *continuing conspiracy* to violate the antitrust laws," a cause of action accrues "*each time* a plaintiff is injured by an act of the defendants."[6]  *Id.* (emphasis added).

The Supreme Court expounded on this concept in the context of a civil RICO claim.[7] *Klehr v. A.O. Smith Corp.*, 521 U.S. 179 (1997).  The question in *Klehr* was when a claim accrues "where the Respondent continues to commit predicate acts in the 4-year period immediately preceding suit."  *Id.* at 193 (cleaned up).  The court answered:

> [I]n the case of a continuing violation, say, a price–fixing conspiracy that brings about a series of unlawfully high[-]priced sales over a period of years, each overt act that is part of the violation and that injures the plaintiff, *e.g.,* each sale to the plaintiff, starts the statutory period running again . . . .  But the commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period.

*Id.* at 189 (internal citations and quotation marks omitted).

---

[6] *Zenith* also carves out an exception to the statute of limitations when future damages aren't immediately ascertainable.  *See, e.g., Railing v. United Mine Workers of Am.*, 445 F.2d 353, 354 (4th Cir. 1971) ("*Zenith* recognizes that there may be situations where damages that will eventually result are insufficiently ascertainable to permit recovery at the time the unlawful conduct occurs.  That such damages could not then be proved up because they are purely speculative does not mean that they may not be subsequently recoverable . . . .  In such a situation the cause of action accrues and the period of limitations begins to run at different points in time, but in both instances at the time that the damages are ascertainable.").  CSX doesn't argue that *Zenith*'s speculative damages exception applies, so we don't discuss it further.

[7] The RICO statute "does not provide an express statute of limitations for actions brought under its civil enforcement provision."  *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 146 (1987).  So the Supreme Court in *Malley-Duff* established "a uniform statute of limitations" for such actions.  *Id.* at 149.  After determining that the text of the Clayton Act "offer[ed] the closest analogy to" the RICO statute's civil enforcement provision, *id.* at 150, the Court held that "the 4–year statute of limitations for Clayton Act actions . . . [was] the most appropriate limitations period for RICO actions."  *Id.* at 156.

CSX asserts that the Defendants' decision to keep the new switch rate in place from 2010 to the present is an act sufficient to constitute a continuing violation of the antitrust laws. On this theory, CSX contends that the switch rate caused injury—in the form of exclusion from "the market of railroad companies serving [the Norfolk Terminal] via on-dock rail," Appellant's Br. at 32—each day within the limitations period that it remained effective.

CSX alternatively contends that Norfolk Southern and Belt Line committed other acts within the limitations period in furtherance of a continuing violation or conspiracy. CSX points to actions in 2015—the year CSX paid Belt Line's exclusionary switch rate—that CSX maintains Norfolk Southern and Belt Line took to hinder or interfere with CSX's ability to run its operations at the Norfolk Terminal (the "2015 conduct"). These include (1) CSX's payment of the $210 switch rate to move an unknown amount of freight at the Norfolk Terminal, and (2) efforts by the Defendants to "materially delay[]" the movement of "at least one CSX" train, "resulting in CSX's temporary loss of business from one of its existing customers for a period of several weeks." *CSX Transp.*, 648 F. Supp. 3d at 706 & n.14 (emphasis omitted).

CSX also claims that the Defendants' failure to act on CSX's 2018 proposals to (1) reduce the switch rate to $80 and (2) establish an independent rate committee (the "2018 conduct") is evidence of additional overt acts.

We address each argument in turn.

13

C.

According to CSX, the continuing-violation doctrine holds that "[e]very time the defendant bars the plaintiff from the relevant market or the supracompetitive price is charged, the plaintiff is injured—and the limitations period starts to run again."[8] Appellant's Br. at 27. CSX says that Defendants' 2010 decision to impose a new inflated switch rate—and their decision to keep the rate in place from then until well beyond the limitations period—"harmed CSX[] [every subsequent day] by denying it that day's worth of business at [the Norfolk Terminal], precluding CSX[] from obtaining long-running contracts that require on-dock access to [the terminal]." *Id.* at 29. Thus, argues CSX, because it has incurred "successive damages suffered day by day from a continuing conspiracy, the statute begins to run on each day's damage as it occurs." *Id.* (quoting *Delta Theaters, Inc. v. Paramount Pictures, Inc.*, 158 F. Supp. 644, 649 (E.D. La. 1958)).

In CSX's view, "the acts of maintaining supracompetitive prices day after day to keep a competitor out of the market are injurious overt acts that restart the limitations period each day that the high price remains in place—because each day the [D]efendants

---

[8] Generally, in a "long-run" predatory pricing scheme, a "predator" firm acts in two phases to achieve its goal of destroying competition. *See Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995). "In the first stage, or 'price war' period, the defendant[-predator] sets prices below its marginal cost hoping to eliminate rivals and increase its share of the market." *Id.* "If the predator reaches this long-run goal, it enters the second stage, the 'recoupment' period," where it "can collect the fruits of the predatory scheme by charging supracompetitive prices—prices above competitive levels." *Id.* at 1434. "The predator's hope is that the excess profits [earned as a result of the supracompetitive prices] will allow it to recoup the losses suffered during the price war." *Id.*

14

could have lowered that price and chose not to." *Id.* at 37 (discussing *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144 (3d Cir. 1993)).

But that argument runs headlong into our precedent holding otherwise. We've held that a defendant's "silence" or failure to act after committing the initial antitrust violation, with no "promise [to] act[] in the future," doesn't qualify as an act sufficient to extend the statute of limitations. *Charlotte Telecasters, Inc. v. Jefferson-Pilot Corp.,* 546 F.2d 570, 573 (4th Cir. 1976).

In *Charlotte Telecasters*, a refusal-to-deal case, Telecasters "charged that [the defendant, Jefferson,] conspired with members of the city council of Charlotte, North Carolina, to obtain a [non-exclusive] television franchise, and to prevent the award of a franchise to the applicant in which [the plaintiffs] had an interest." *Id.* at 572. The city council awarded franchises to Jefferson and another unnamed applicant in March 1967. *Id.* It didn't, however, award Telecasters a franchise. *Id.* But Telecasters "was told, at the March [city council] meeting, that additional franchises might be considered in the future." *Id.*

Telecasters followed up on this statement on August 7, 1967, when it "asked the council to reconsider its application." *Id.* Aside from the mayor responding to Telecasters' request that the council would "leave it as it is," *id.* at 573 (cleaned up), "[t]he council . . . took no further action," *id.* at 572.

Just over four years later, Telecasters sued Jefferson under Section 1 of the Sherman Act, alleging that Jefferson "w[as] engaged in a continuing conspiracy to prevent it from obtaining a franchise." *Id.* at 572. And Telecasters argued that its action wasn't untimely

because "the cause of action did not accrue until the council had had a reasonable time[—]at least thirty days[—]to consider its request of August 7, 1967, and that the council's silence was an overt act of refusal." *Id.* In response, Jefferson urged that the violation alleged by Telecasters "consisted of a single act which injured [it]," and that pursuant to this theory, "[Telecasters'] cause of action accrued [to it] when the council confirmed the awards to [Jefferson and the other applicant, who were] Telecasters' competitors[,] on April 3, 1967." *Id.*

We held that Telecasters had successfully alleged that it was excluded from participation in the cable television market not by a single violation of the Act, but by a continuing conspiracy. *Id.* at 573. We found that "[s]ince the council adopted a non-exclusive ordinance and left open the possibility of granting additional franchises, Telecasters ha[d] properly alleged a continuing conspiracy." *Id.*

But Telecasters' claim failed nonetheless because "the last overt act of the alleged conspiracy was the council's consideration of Telecasters' request on August 7, 1967"—a date falling just outside the four-year limitations period—when "the mayor responded [to Telecasters' request for reconsideration] that the council would 'leave it as it is.'" *Id.* We concluded that the council "did not promise action in the future" in its response to Telecasters. *Id.* So the council's subsequent silence in the days and years following Telecasters' reconsideration request "d[id] not constitute an overt act." *Id.*

At bottom then, mere silence or inaction from a defendant—even though the allegedly unlawful conspiracy to exclude a plaintiff remains in effect—isn't enough to restart the limitations period. *See id.* Instead, an *affirmative* act—like a promise to act in

16

the future—is required. *See, e.g.*, *Lancianese v. Bank of Mount Hope*, 783 F.2d 467, 470 (4th Cir. 1986) (interpreting *Charlotte Telecasters* to mean that the continuing-violation doctrine applies "only where there is an overt act in furtherance of an antitrust conspiracy or a separate substantive violation which is committed within the limitations period.").

Our holding in *Charlotte Telecasters* tracks with the understanding of other circuits. *See, e.g.*, *Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594, 600 (6th Cir. 2014) (recognizing that because "an overt act . . . must be a new and independent act that is not merely a reaffirmation of a previous act," "the Sixth Circuit has repeatedly rejected invocations of the continuing-violations defense that are mere reaffirmations of a previous act") (cleaned up); *Kaw Valley Elec. Co-op. Co. v. Kan. Elec. Power Co-op., Inc.*, 872 F.2d 931, 934–35 (10th Cir. 1989) (explaining the "rule" in refusal-to-deal cases that mere "reaffirmation[s] of a previous [pre-limitations] refusal" within the limitations period are not enough to accrue a new cause of action where the initial refusal is "final").

Take the Fifth Circuit's decision in *Poster Exchange v. National Screen Service Corp.*, 517 F.2d 117 (5th Cir. 1975), a case CSX relies on heavily in this appeal, as an example.

In *Poster Exchange,* the court considered:

> whether the alleged continuing conspiracy and monopoly interfering with [plaintiff]'s ability to supply itself with advertising accessories is to be treated for statute of limitations purposes as a single act and invasion of [plaintiff]'s rights, occurring with the original refusal to deal, . . . or whether it may be viewed as a continuing series of acts upon which successive causes of actions may accrue.

*Id.* at 125.

The court couldn't determine whether the continuing-violation doctrine applied to the plaintiff's claims because it was unclear whether, during the limitations period, there was "a mere absence of dealing, or whether there was some specific act or word precluding [the plaintiff] from obtaining supplies from [the defendant]." *Id.* at 128. But it held, in line with this distinction, that a continuing-violation claim must be supported by evidence of "some injurious act actually occurring during the limitations period, *not merely the abatable but unabated inertial consequences of some pre-limitations action.*" *Id.* (emphasis added). That is, for the plaintiff to establish that the doctrine applied, it was "obliged to demonstrate some act of the defendants during the limitations period foreclosing or interfering with its access to supplies." *Id.* at 128.

The district court there had left unresolved whether the plaintiff had created a genuine issue for trial "as to the occurrence of any specific act or word denying to it of access to [the defendant's] posters for distribution during the statutory period." *Id.* at 129. And the plaintiff had failed to offer evidence that "it ha[d] been refused access to standard accessories by [the defendant] during th[e] [limitations] period." *Id.* at 128. So the case was remanded "for a clarification on this narrow question." *Id.* at 129.

Rather than supporting CSX's view of the law, we read *Poster Exchange* to require exactly what the district court and this court have required to establish a continuing violation: an affirmative act committed within the limitations period in furtherance of the conspiracy to exclude the plaintiff from the relevant market. *See, e.g.*, *Barnosky Oils, Inc. v. Union Oil Co. of Cal.*, 665 F.2d 74, 81 (6th Cir. 1981) (explaining that the Fifth Circuit

in *Poster Exchange* "drew a critical distinction between the mere absence of dealing and an actual reiteration of the defendants' refusal to deal.").

Nor are we moved by CSX's reliance on *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979). In *Berkey Photo*, an antitrust price-fixing case, the Second Circuit concluded that although the defendant-monopolist had formed a monopoly enabling it to overcharge its customers "several decades" before the customer-plaintiff filed its action, a claim accrued to the plaintiff each time it paid the inflated price within the limitation period. *See id.* at 293–96.

CSX urges that "extracting an inflated payment" is equivalent to "den[ying] CSX[] income by keeping it from operating in the affected market." Appellant's Br. at 39–40 (emphasis omitted). Not so, according to *Berkey Photo*:

> Although the business of a monopolist's rival may be injured *at the time the anticompetitive conduct occurs*, a purchaser, by contrast, is not harmed until the monopolist actually exercises its illicit power to extract an excessive price. The case of predatory pricing illustrates the point clearly. *As soon as the dominant firm commences such a policy, other producers, who may be driven out of the market, are injured*. But, clearly, purchasers are not, for they receive the temporary boon of artificially low prices. It is only when the monopolist, having devoured its smaller rivals, enjoys the spoils of its conquest by boosting its price to excessive levels that a purchaser "feels the adverse impact" of the violation.

603 F.2d at 295 (quoting *Zenith Radio*, 401 U.S. at 339) (emphases added).

As the district court here noted, "[t]he differing treatment between these two types of claims is grounded in the concept that, unlike an excluded *rival* who is injured as soon as the exclusion begins, a *customer* is not injured until a sale occurs, and it suffers a new

and accumulating injury each time a subsequent supracompetitive price is paid." *CSX Transp.*, 648 F. Supp. 3d at 702 (emphases added and omitted).

So even accepting that maintaining an exclusionary price is the "functional equivalent of affirmatively posting a price," Appellant's Br. at 51, CSX's claim fails because it hasn't shown that such conduct inflicted *new* harm causing *new* injury to it within the limitations period. Instead, CSX's exclusion from the intermodal shipping market at the Norfolk Terminal following the Defendants' imposition of the exclusionary rate was "final in its impact." *Charlotte Telecasters*, 546 F.2d at 572.

We decline to find a continuing conspiracy based on this conduct.

D.

We're left then with CSX's alternative argument that other overt acts committed in 2015 and 2018 entitle it to recover damages for the injuries sustained within the limitations period. While we agree with CSX that at least some of this conduct would qualify as acts committed in furtherance of a continuing violation or conspiracy, the continuing-violation doctrine still can't save its claims because it hasn't offered sufficient evidence of antitrust injury resulting from these actions. *Cf., e.g.*, *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 710 (4th Cir. 2021) (discussing "antitrust injury" requirement of antitrust standing).

Take the "2015 conduct" relating to CSX's payment of the $210 switch rate during the period of "extreme port congestion."[9]  *CSX Transp.*, 648 F. Supp. 3d at 706.  CSX says that its payment of the rate alone restarted the statute.  But CSX filed suit not as a purchaser of Belt Line's services but as a competitor of Norfolk Southern.  *Id.* at 702–03.  This distinction matters because although a *purchaser* is injured each time it must pay an anticompetitive price, *see, e.g.*, *Mayor of Baltimore v. Actelion Pharms. Ltd.*, 995 F.3d 123, 131–32 (4th Cir. 2021), and thus a cause of action accrues to it, the same can't be said of a *competitor*—whose antitrust injury is its exclusion from the relevant market, *see id.* at 132 (citing *Charlotte Telecasters*, 546 F.2d at 572 and *Berkey Photo*, 603 F.2d at 295).

CSX claims that the Defendants took other steps in furtherance of the conspiracy to exclude it from the Norfolk Terminal, like unreasonably delaying and interfering with CSX's ability to access the on-dock tracks once it had paid the switch rate.  *See* Appellant's Br. at 58.  The district court found this evidence underwhelming, stating that CSX has failed to show "how many trains were delayed, intentionally or otherwise, though its evidence is sufficient to demonstrate that at least one CSX train was materially delayed." *CSX Transp.*, 648 F. Supp. 3d at 706 n.14.

---

[9] We agree with the district court that the "2018 conduct" evidence—the proposals to lower the switch rate to $80 and establish a rate committee—is insufficient to establish an overt act, because there's no evidence that CSX did anything to move them forward. *See CSX Transp.*, 648 F. Supp. 3d at 712–13.  Under our decision in *Charlotte Telecasters*, inaction or silence isn't enough.  *See* 546 F.2d at 573.  So we focus our analysis in this section on the 2015 conduct.

We agree with the district court's assessment of this evidence, but will assume that it shows the necessary "overt act" or "act" needed to sustain a continuing-violation or -conspiracy theory. Even so, the claim fails because CSX hasn't shown what antitrust injury this act, or any other act committed within the limitations period, caused it.

"CSX's lone antitrust damages theory is that it was excluded as a competitor from on-dock rail access at [the Norfolk Terminal], purportedly causing CSX to suffer hundreds of millions of dollars of damages beginning in 2009," *id.* at 703, and continuing until 2020, *see* J.A. 200 ¶ 102. Consistent with that theory, its damages evidence "calculated aggregate harm from *all* [the Defendants'] alleged conduct, including conduct [occurring] outside the limitations period and other theories of liability that CSX has abandoned." Appellees' Br. at 22. But this isn't enough to establish injury because it doesn't show a causal connection between the Defendants' alleged antitrust violation and CSX's resulting injury within the limitations period. *Cf., e.g.*, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 584 n.7 (1986) ("However one decides to describe the contours of the asserted conspiracy—whether there is one conspiracy or several—respondents must show that the conspiracy caused them an injury for which the antitrust laws provide relief.").

Recall that *Klehr* held that "the commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period." *Klehr*, 521 U.S. at 189. In other words, a plaintiff's recovery is limited to "the damages caused by th[e] [injurious] act," *Zenith*, 401 U.S. at 338, meaning that, "in . . . antitrust cases, [a] plaintiff cannot use an independent, new predicate act as a

bootstrap to recover for injuries caused by other earlier predicate acts that took place outside the limitations period," *Klehr*, 521 U.S. at 190.

These cases effectively derail CSX's damages evidence. Rather than specifying the damages the Defendants caused CSX within the limitations period, the evidence "bootstraps" *all* the injury CSX suffered since Defendants' initial, pre-limitations violation, i.e., for its "total exclusion from the market." *CSX Transp.*, 648 F. Supp. 3d at 707.

As the district court aptly put it, "CSX's election to proceed on a unitary theory seeking recovery for all anti-competitive acts, regardless of when they occurred, dooms its ability to present to the jury a non-speculative damages case arising from the 2015 conduct," *id.* at 708—the only damages for which a timely cause of action had accrued to CSX.

The district court correctly rejected CSX's claim.

IV.

For these reasons, the district court's judgment is

*AFFIRMED.*